Positive
As of: June 23, 2025 9:56 PM Z

## *Alhaj v. New York City Health & Hosps. Corp.*

Supreme Court of New York, Kings County

October 10, 2022, Decided

Index No. 501052/2016

**Reporter**

77 Misc. 3d 1063 *; 177 N.Y.S.3d 433 **; 2022 N.Y. Misc. LEXIS 5994 ***; 2022 NY Slip Op 22318 ****

 **[****1]** Eyad Alhaj, Plaintiff, v New York City Health and Hospitals Corporation et al., Defendants.

**Notice:** THE PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION.
 THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE OFFICIAL REPORTS.

## Core Terms

termination, summary judgment, discriminatory, no evidence, resources, comments, email, smile, hostile work environment, prima facie case, discrimination case, employment decision, hired, stray, discriminatory intent, code word, give rise, circumstances, proffered, assigned, medicine, patients, strange, courts, probationary, cardiology, remarks, attend, summary judgment motion, decision to terminate

## Case Summary

### Overview

HOLDINGS: [1]-Where a probationary employee alleged that he was terminated in violation of the New York City Human Relations Law due to his status as a Syrian Muslim Arab, summary judgment in favor of the employer was not warranted because there were disputed material facts, warranting consideration by the trier of fact, as to whether the employee's termination was due to unlawful discrimination; [2]-In particular, a supervisor's comment about the 9/11 terrorist attack and his weird or strange smile to the employee while making this statement at the employee's termination hearing, which occurred on September 11, provided evidence of a discriminatory intent, and this evidence created a triable issue of fact as to whether the employee was improperly terminated due to his status as a Syrian Muslim Arab.

**Outcome**

Motion granted in part and denied in part.

## LexisNexis® Headnotes

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

*HN1* **At Will Employment, Duration of Employment**

A probationary employee may be dismissed for almost any reason, or for no reason at all so long as the termination was not in bad faith, for a constitutionally impermissible or an illegal purpose, or in violation of statutory or decisional law.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine

77 Misc. 3d 1063, *1063; 177 N.Y.S.3d 433, **433; 2022 N.Y. Misc. LEXIS 5994, ***5994; 2022 NY Slip Op 22318, ****1

Disputes

## *HN2* Entitlement as Matter of Law, Appropriateness

The proponent of a motion for summary judgment bears the burden of showing that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law. The movant's burden is heavy, and the facts must be viewed in the light most favorable to the nonmoving party. Upon proffer of evidence establishing a prima facie case by the movant, the party opposing a motion for summary judgment bears the burden of producing evidentiary proof in admissible form sufficient to require a trial of material questions of fact. A motion for summary judgment should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility., The function of the court on a motion for summary judgment is not to resolve issues of fact or determine matters of credibility, but merely to determine whether such issues exist.

Labor & Employment
Law > Discrimination > Actionable Discrimination

## *HN3* Discrimination, Actionable Discrimination

The court does not sit as a super-personnel department that reexamines an entity's business decisions in an employment discrimination case. Thus a plaintiff alleging discrimination must do more than challenge the employer's decision as contrary to sound business or economic policy, since such an argument, without more, does not give rise to an inference that the adverse action was due to discrimination.

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

## *HN4* Discrimination, Actionable Discrimination

To establish a prima facie case of racial discrimination under Title VII and both the New York State Human Relations Law and the New York City Human Relations Law, the plaintiff must establish that he: (1) is a member of a protected class; (2) is qualified for the position; (3) suffered an adverse employment action; and that (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. An inference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios. The burden shifts to the employer to demonstrate that the employment decisions taken against the plaintiff were for legitimate, independent, and nondiscriminatory reasons to support its employment decision. Plaintiff must then prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination and that discrimination was the real reason. The burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff.

Civil Procedure > Judgments > Summary
Judgment > Burdens of Proof

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

Civil Procedure > Judgments > Summary
Judgment > Entitlement as Matter of Law

## *HN5* Summary Judgment, Burdens of Proof

To establish entitlement to summary judgment dismissing a claim of alleged discrimination under the New York City Human Relations Law, the defendant must demonstrate that the plaintiff cannot make out a prima facie claim or, after offering a legitimate, nondiscriminatory reason for the employment action, that there is no material issue of fact as to whether the explanations were pretextual. To defeat the motion, the plaintiff must raise a triable issue of fact as to whether the reasons proffered by the defendant were merely a pretext for discrimination.

77 Misc. 3d 1063, *1063; 177 N.Y.S.3d 433, **433; 2022 N.Y. Misc. LEXIS 5994; ***5994; 2022 NY Slip Op 22318, ****1

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### *HN6* Burdens of Proof, Nonmovant Persuasion & Proof

Conclusory allegations — claims consisting of bare legal conclusions with no factual specificity -- are insufficient to survive a motion for a judgment dismissing the complaint. Mere conclusions, expressions of hope or unsubstantiated allegations are insufficient for this purpose. Even in the discrimination context, a plaintiff must provide more than conclusory allegations and show more than some metaphysical doubt as to the material facts.

Governments > Legislation > Interpretation

Labor & Employment Law > Discrimination > Actionable Discrimination

### *HN7* Legislation, Interpretation

Claims brought pursuant to the New York City Human Relations Law require a separate analysis; the City Human Relations Laws provisions must be construed independently and more liberally from their similar state and federal counterparts and broadly in favor of discrimination plaintiffs, even when such protection is not available under federal or state law. The federal standard should be considered a floor below which the City Human Relations Laws falls, rather than a ceiling above which the law cannot rise.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Age Discrimination > Evidence > Mixed Motives

Labor & Employment Law > ... > Disparate Treatment > Evidence > Mixed Motive

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

### *HN8* Burdens of Proof, Burden Shifting

When analyzing discrimination cases under the New York City Human Relations Law, the court must use the burden shifting analysis under McDonnell Douglas as well as a mixed motive analysis which imposes a lesser burden on a plaintiff opposing such a motion. The McDonnell Douglas and mixed motive frameworks diverge only after the plaintiff has established a prima facie case of discrimination and the defense has responded by presenting admissible evidence of legitimate, independent and non discriminatory reasons to support its employment decision. Whereas under McDonnell Douglas, the plaintiff must show that the legitimate reasons proffered by the defendant were pretextual, under the mixed motive analysis, the plaintiff must produce evidence that the unlawful discrimination was one of, even if not the sole motivating factors for the employment decision. The salient difference between the two standards is that at the final step, the plaintiff has the lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or was more likely than not based in whole or in part of discrimination.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### *HN9* Entitlement as Matter of Law, Appropriateness

Under the New York City Human Relations Law, summary judgment should not be granted unless the employer establishes as a matter of law that discrimination played no role in its actions. A defendant, as the moving party, must therefore make a prima facie showing that there is no evidentiary route that would could allow a jury to find that discrimination played a role in their challenged actions. If this burden is met, a plaintiff may defeat summary judgment by offering some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete.

Evidence > Inferences & Presumptions > Inferences

77 Misc. 3d 1063, *1063; 177 N.Y.S.3d 433, **433; 2022 N.Y. Misc. LEXIS 5994, ***5994; 2022 NY Slip Op 22318, ****1

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

### *HN10* Inferences & Presumptions, Inferences

No one particular type of proof is required to show that a plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. An inference of discrimination can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action.

Labor & Employment Law > ... > Sexual
Harassment > Burdens of Proof > Employee
Burdens of Proof

Labor & Employment Law > ... > Burdens of
Proof > Standards of Proof > Pervasive & Severe
Standards

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Hostile Work Environment

Labor & Employment Law > ... > Racial
Harassment > Burdens of Proof > Employee
Burdens of Proof

Labor & Employment
Law > Discrimination > Harassment > Religious
Harassment

### *HN11* Burdens of Proof, Employee Burdens of Proof

To establish a prima facie case of discrimination under a hostile work environment theory a plaintiff must show that its workplace was permeated with discriminatory intimidation, ridicule and intimidation that is sufficiently severe and pervasive to alter the conditions of employment and create an abusive environment. A plaintiff need not establish severe and pervasive conduct under the more relaxed New York City Human Relations Law  standard, and only has to demonstrate

differential treatment--that he was treated less well than other employees due to his protected status because of discriminatory intent.

Labor & Employment
Law > Discrimination > Actionable Discrimination

### *HN12* Discrimination, Actionable Discrimination

The New York City Human Relations Law is not a general civility code and petty slights and trivial inconveniences are nonactionable under the law. A plaintiff must do more than cite to his mistreatment and then ask the court to conclude that the mistreatment must have been related to his protected status.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

### *HN13* Evidence, Burdens of Proof

In employment discrimination cases, the term prima facie case denotes the establishment by plaintiff of facts sufficient to create a legally mandatory rebuttable presumption rather than the traditional meaning of describing a plaintiff 's burden of setting forth sufficient evidence to go before the jury. In considering whether a defendant has sufficiently established plaintiff's inability to establish all elements of intentional discrimination, the court must consider that plaintiff's prima facie showing is a low threshold.

Labor & Employment
Law > Discrimination > Actionable Discrimination

### *HN14* Discrimination, Actionable Discrimination

In considering whether a comment is probative of employment discrimination or rather a non-probative stray remark, a court must consider 1) whether the remark was made by a decisionmaker or supervisor; 2) when the remark was made in relation to the employment decision at issue; 3) the context of the comment; and 4) the context in which the remark was made-whether it was related to the decision making process.

77 Misc. 3d 1063, *1063; 177 N.Y.S.3d 433, **433; 2022 N.Y. Misc. LEXIS 5994; ***5994; 2022 NY Slip Op 22318, ****1

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

### *HN15* Discrimination, Actionable Discrimination

The court does not sit as a super-personnel department that reexamines an entity's business decisions in an employment discrimination case. The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct but whether it was discriminatory. Courts do not have a roving commission to review business judgments. Thus, a plaintiff's subjective disagreement with the employer's assessment of her performance is not actionable under the discrimination statutes.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > Appropriateness

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Age
Discrimination > Evidence > Mixed Motives

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Mixed Motive

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

### *HN16* Entitlement as Matter of Law, Appropriateness

Under the mixed motive theory recognized by the New York City Human Relations Law the plaintiff must produce evidence that the unlawful discrimination was one of, even if not the sole motivating factors for the employment decision. Plaintiff need only respond with some evidence that at least one of the reasons proffered by the defendant is false. Summary judgment should not be granted under the New York City Human Relations Law unless the record establishes as a matter of law that discrimination played no role in the defendant's employment decision.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

### *HN17* Evidence, Burdens of Proof

Verbal stray comments can raise an inference of discrimination only where there is a demonstrated nexus between the remarks and the negative employment action. The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

### *HN18* Discrimination, Actionable Discrimination

In determining whether a comment is probative of an intent to discriminate or is merely a non probative stray remark a court must consider the following factors: (1) whether the comment was made by a decisionmaker, a supervisor, or a low-level coworker, (2) was the remark made close in time to the adverse employment decision at issue, (3) given the context of the remark, whether a reasonable juror could view the remark as discriminatory, and (4) the context in which the remark was made-was it related to the decision-making process. Even stray remarks by persons who are not supervisors or involved in the pertinent decision-making process may suffice to present a prima facie case of discrimination.

## Headnotes/Summary

### Headnotes

**Civil Rights—Discrimination in Employment—Single Remark and Strange Smile Made during Termination of Cardiologist's Employment—Triable Issue of Fact**

1. Plaintiff, a Syrian Muslim cardiologist who was terminated from his probationary employment at defendant hospital at a meeting during which defendant associate director for medicine allegedly commented

77 Misc. 3d 1063, *1063; 177 N.Y.S.3d 433, **433; 2022 N.Y. Misc. LEXIS 5994, ***5994; 2022 NY Slip Op 22318, ****1

"Today is 9/11, right?" and made a weird or strange smile, raised a triable issue whether his termination was based upon discriminatory motives in violation of the New York City Human Rights Law. In considering whether a comment is probative of discrimination or rather a non-probative "stray remark," a court must consider whether the remark was made by a decisionmaker or supervisor; when the remark was made in relation to the employment decision at issue; the context of the comment; and the context in which the remark was made. The case presented a very close question of law, given that the associate director allegedly only made one comment and one strange smile and that plaintiff's past history of work at the hospital could warrant termination since he was a probationary employee. However, plaintiff raised triable issues of fact as to the associate director's supervisory position in the cardiology department and whether the associate director played a role in plaintiff's termination. Notably, plaintiff's direct supervisor, the chief of cardiology, could think of no reason for his termination and was never asked about his job performance by the individual defendants. All of these factors, coupled with the associate director's incendiary comment, which could be viewed as a code word, made on the very day of plaintiff's termination which, perhaps coincidentally, occurred on 9/11, inured against the court awarding summary judgment to defendants.

**Counsel:** [***1] *Sylvia O. Hinds-Radix*, *Corporation Counsel*, New York City, for defendants.

*Ranni Law Firm*, Florida (*Joseph J. Ranni* of counsel), for plaintiff.

**Judges:** Hon. Katherine A. Levine, J.S.C.

**Opinion by:** Katherine A. Levine

# Opinion

 [*1064]

 [**442] Katherine A. Levine, J.

Plaintiff Eyad Alhaj, a cardiologist employed by defendants New York City Health and Hospitals Corporation and Physician Affiliate Group of New York (PAGNY), claims that Kenneth Hupart, M.D., Lana Vardanian, M.D., Eric Chaikin, and Sabina Zak (collectively defendants) violated the *New York State*

*Human Rights Law* (SHRL) and *New York City Human Rights Law* (CHRL) by subjecting him to a hostile work environment and subsequently retaliating against him because he wrote an email, based upon his race, national origin, and religion.

Plaintiff also claims, within his count on hostile environment, that he was terminated "for absolutely no reason," and that he was terminated on September 11 "as retribution for the horror that unfolded that day." He asserts that during the termination meeting, Chaikin commented to Dr. Hupart "Today is 9/11, right?," wherein Dr. Hupart shook his head and said "Yes, it is," and Chaikin then made a weird smile. Defendants [***2] moved for summary judgment dismissing the claim pursuant to *CPLR § 3212*.

As will be set forth below, the court grants in part and denies in part defendants' motion for summary judgment. Simply put, there is absolutely no evidence that any defendant who hired or arranged for plaintiff's working schedule, assignments and conditions created a hostile work environment for plaintiff out of some discriminatory bias under the SHRL or CHRL. Nor is there any evidence that any of the defendants treated Alhaj in a disparate fashion. Defendants had the right to terminate plaintiff, who was a probationary employee, for any reason so long as it was not in violation of a statute or constitution.

However, the court believes that a jury could find that Chaikin's alleged comment about 9/11, and his "weird" or "strange" [*1065] smile[1] to Hupart while making that statement at plaintiff's termination hearing on 9/11, evinced a discriminatory intent. Furthermore, Chaikin was much more intimately involved in the congestive heart failure program than disclosed by defendants, thus creating an issue of fact as to whether he was a supervisor or manager and played a role in plaintiff's termination. As such, the court will permit these issues concerning [***3] Chaikin's actions and whether they could be imputed to the hospital to go to trial.

Facts

Plaintiff was hired by PAGNY to work as a cardiologist at Coney Island Hospital (CIH) on September 14, 2014, and was an at-will employee subject to a one-year probationary period ending on September 14, 2015. On or about January 16, 2015, plaintiff had a fractious

---

[1] Alhaj interchangeably asserts that Chaikin's smile was weird or strange.

77 Misc. 3d 1063, *1065; 177 N.Y.S.3d 433, **442; 2022 N.Y. Misc. LEXIS 5994, ***3; 2022 NY Slip Op 22318, ****1

interaction with Dr. Brady, the Chief Medical Officer at CIH and one of his supervisors, over his [**443] being one-half hour late to a scheduled meeting. Plaintiff made a written complaint to his immediate supervisor, Dr. Khanna, claiming that Brady repeatedly used derogatory and profane language at him in front of coworkers, i.e. to "move his ass" after he was one-half hour late to a meeting which Brady had requested. Nowhere did Alhaj assert in this complaint that Brady's [****2] comments to him had anything to do with his race, national origin or religion. Plaintiff claims that he was late because he was treating other patients at the time.

In contrast, by email to Sabina Zak dated January 16, 2015, Dr. Brady memorialized that he had a "disturbing conversation" with Alhaj. Alhaj failed to attend a meeting requested by Brady at 9:45 a.m. so that he could make [***4] rounds with a cardiology fellow. Brady asserted that Alhaj and another doctor refused to provide coverage because they were "inappropriate, unprofessional and insubordinate."

In or about late July 2015, Dr. Hupart, the chairperson of medicine at Coney Island Hospital[2] who is responsible for the medical care of all patients and the practice of doctors, asked plaintiff to prepare a program to improve outcomes for congestive heart failure (CHF) patients. Hupart asked plaintiff because he had "specific expertise and training in managing CHF patients" and in fact had completed a fellowship in CHF. [*1066] Defendants claim that plaintiff did not produce an outline for the program in a timely manner, and that when he did put together a plan, it violated Dr. Hupart's instructions not to use extra resources or new hires, as his plan called for six to eight new hires and new resources. Plaintiff claims that the reason he was assigned to prepare the CHF program was "in hopes that he would fail," although he presented no evidence to support this claim. Dr. Khanna, plaintiff's supervisor, averred that Dr. Alhaj "was not hired to perform this task, but was supposed to function as a general cardiologist." [***5]

Sometime between late July and August 2015, plaintiff attended a counseling session where Dr. Hupart discussed plaintiff's alleged continued failure to meet job expectations, including his failure to properly establish a cardiac program. Hupart invited Eric Chaikin, associate executive director for medicine, to attend the meeting and serve as a witness. According to plaintiff's *General*

Municipal Law § 50-h* testimony, there was no mention of his termination at this meeting.

Plaintiff claims that he was assigned to the CHF program after the "Dr. Brady incident," and that he was given the "most undesirable work shifts and overtime assignments" and was "requested to take on impossible assignments, tasks that could never be completed successfully or effectively, to the detriment of patient care." However, apart from his assignment to the CHF program, plaintiff offered no specifics. He also complained that defendants "created a hostile work environment where they treated Dr. Alhaj as a lesser person based on his country of origin and background as a Syrian Muslim Arab," although he presented no evidence that while he was working at Coney Island Hospital any of the defendants possessed any animus towards him based [***6] on his nationality or religion or that his assignment to the CHF program was outside of his job responsibilities. Plaintiff admitted that prior to his termination date, no one at Coney Island Hospital—doctors, nurses, etc.—ever made any negative or derogatory comments concerning his ethnicity or where he obtained his medical degree.

[**444] Aside from the Brady incident and plaintiff's failure to properly establish a CHF program, defendants documented a number of other incidents. On June 3, 2015, the director of human resources received a complaint that Alhaj, who was required to attend the new employee orientation, signed in each day but then left as soon as he signed in resulting in one Young Lee not giving him credit for having completed any of [*1067] the three sessions (exhibit J to defendants' mot for summary judgment). On August 7, 2015, Dr. John Maese notified Dr. Khanna by [****3] email that Alhaj had failed to fulfill his obligation to handle an admission denial. Alhaj refused to discuss this case with the medical director, claiming that he was too busy.

Sometime around Labor Day in 2015, Dr. Hupart decided to terminate Alhaj and informed Dr. Brady and Dr. Maese, to whom he reported; he also [***7] discussed the termination with PAGNY human resources. On September 11, 2015, Dr. Hupart called plaintiff to a meeting to inform him that his services were no longer needed at CIH; Sabina Zak, chief affiliation officer at PAGNY, Eric Chaikin, and Dr. Vardanian were also present. Plaintiff testified at his examination before trial (EBT) that with a "strange smile on his face," Chaikin looked at Dr. Hupart and said, "Today is 9/11, right?, and that Dr. Hupart shook his head and said \'Yes, it is.' " Plaintiff further testified that he interpreted

---

[2] Dr. Hupart reported to Dr. Brady.

77 Misc. 3d 1063, *1067; 177 N.Y.S.3d 433, **444; 2022 N.Y. Misc. LEXIS 5994, ***7; 2022 NY Slip Op 22318,
****3

the statements to mean that he was terminated on 9/11 to send the message: "Look, you are Middle Eastern, and you are a Muslim. Remember 9/11, and hush."

Plaintiff claims that Chaikin was involved in the decision to terminate him because of his comment about 9/11 during the termination meeting, and his role in administering the cardiology department and the CHF program. Defendants argue that Chaikin's comment was neutral on its face, and there is no evidence that one stray remark was connected to any decisions made by the hospital through Dr. Hupart concerning plaintiff's employment. They also claim that Chaikin played no role in Alhaj's termination and that he had no authority **[***8]** over Alhaj. Chaikin testified at the 50-h hearing that his duties included "planning any programs in medicine, organizing, budgeting, directing what the executive director of the hospital thought needed to be done, or working with the chairman of medicine and addressing his needs in terms of day-to-day operations of the department."

Defendants, including Chaikin, grossly minimized Chaikin's involvement with the CHF program and Alhaj. While Chaikin claims his first meeting with Alhaj was during a counseling session in August, the record reveals that Chaikin was involved with the CHF program from its inception. By email dated June 29, 2015, Hupart notified Alhaj and Dr. Khanna and cc'd Chaikin that there were disappointing outcomes from CHF data that the hospital reported and that he wanted to meet with both of them regarding "their take" on the hospital's current **[*1068]** CHF initiatives and how the hospital could better address CHF for patients. By email dated August 3, 2015, to his supervisor John Maese, Hupart memorialized his meeting with Alhaj, Khanna and Chaikin the week before wherein they presented (meaning Khanna and Alhaj) a program that was "too large in scope but that they will work with me **[***9]** [Hupart] and Eric [Chaikin] to right size and improve on our 30d re admit rate."

After oral argument, this court, by order dated October 21, 2019, dismissed the case against Lana Vardanian and Sabina Zak because plaintiff presented no evidence at all about them, much less that they created a hostile environment or acted with discriminatory intent based upon **[**445]** his race, national origin or religion. In fact, plaintiff admitted at his December 1, 2015 EBT that during his time at CIH before being terminated, no other staff members, doctors, nurses, or "anyone … employed by the hospital" ever made "any negative comments or derogatory comments" concerning his ethnicity or

religious beliefs. Plaintiff also agreed to withdraw his claim concerning Dr. Brady. Specifically, there is no evidence any defendant subjected Alhaj to disparate treatment by treating him in an abusive or derogatory manner or worse than other non-Arab or Muslim doctors. Nor is there any evidence that anyone retaliated against plaintiff after he wrote a January 18, 2015 email concerning Brady's alleged treatment of him. A hostile work **[****4]** environment exists only where the workplace is "permeated with discriminatory intimidation, **[***10]** ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of … employment and create an abusive working environment." *Chiara v. Town of New Castle, 126 AD3d 111, 120, 2 N.Y.S.3d 132 (2d Dept. 2015)*.)

To the extent that the court did not explicitly dismiss plaintiff's claim of hostile work environment as against the remaining defendants it does so now. Plaintiff's bare allegation that non-Muslim doctors did not receive similarly unfavorable treatment, and hence were not subject to such a hostile environment, is simply not supported by any evidence. Plaintiff complained that he was treated as a "lesser person based on his count[r]y of origin and background as a Syrian Muslim" to the extent that he was given "impossible" work assignments and the "most undesirable work shift." However, plaintiff did not proffer any evidence, much less even specify how his work assignments were impossible or undesirable, or how the non-Muslim doctors were treated more favorably than Muslim doctors. Furthermore, plaintiff presented absolutely no evidence **[*1069]** that Brady or Hupart assigned Alhaj to the CHF program as a retaliatory act or for any reason other than that Alhaj was eminently qualified to work on improving the program.

The court allowed the case to proceed **[***11]** solely on the issue of whether Alhaj's termination occurred under circumstances giving rise to an inference of discrimination. Plaintiff contends that defendants purposely set Alhaj up for failure by assigning him to the CHF program without providing him with the requisite staff or resources and then used his "designed failure" as pretext. Plaintiff also contends that after defendants terminated Alhaj they adopted Alhaj's CHF plan and realigned resources at the administrative level. After the hearing the court requested that the parties brief whether Chaikin's alleged singular comment and "weird smile" to Hupart at the termination hearing was indicative of discrimination which could be imputed back to the decisionmakers (Hupart and CIH) to terminate Alhaj, and whether Chaikin played a role in that

77 Misc. 3d 1063, *1069; 177 N.Y.S.2d 433, **445; 2022 N.Y. Misc. LEXIS 5994, ***11; 2022 NY Slip Op 22318,
****4

decision.[3]

Legal Analysis

The court has already dismissed the action against two defendants and, as set forth above, finds that there is no evidence that plaintiff was assigned to extra duties or responsibilities or treated in a disparate fashion during his probationary period up to the date of his termination due to his national origin, religion or race. *HN1* A probationary employee may "be dismissed [***12] for almost any reason, or for no [**446] reason at all" so long as the termination was not in bad faith, for a constitutionally impermissible or an illegal purpose, or in violation of statutory or decisional law. *Mtr. of Gagedeen v Ponte, 170 AD3d 1013, 1014, 96 N.Y.S.3d 349 (2d Dept. 2019)*; *Mtr. of Johnson v County of Orange, 138 AD3d 850, 851, 29 N.Y.S.3d 502 (2d Dept. 2016)*; *Mtr. of Young v City of New York, 68 Misc 3d 514, 517, 124 N.Y.S.3d 892 (Sup. Ct. Kings Co. 2020).)*

*HN2* The proponent of a motion for summary judgment bears the burden of showing that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law. [****5] (*Alvarez v Prospect Hosp., 68 N.Y2d 320, 324, 501 N.E.2d 572, 508 N.Y.S.2d 923 (1986)*; *Dallas-Stephenson v Waisman, 39 AD3d 303, 306, 833 N.Y.S.2d 89 (1st Dept 2007)* The movant's burden is "heavy," and the facts "must be viewed [*1070] in the light most favorable to the non-moving party." *William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475, 982 N.Y.S.2d 813, 5 N.E.3d 976 (2013)*; *Ledbetter v Department of Educ. of the City of N.Y, 2021 NY Misc. LEXIS 449, 2021 NY Slip Op 30324(U) (Sup. Ct., NY Co. 2021) at 20.)* Upon proffer of evidence establishing a prima facie case by the movant, "the party opposing a motion for summary judgment bears the burden of produc[ing] evidentiary proof in admissible form sufficient to require a trial of material questions of fact." *People v Grasso, 50 AD3d 535, 545, 858 N.Y.S.2d 23(1st Dept 2008).)* "A motion for summary judgment should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility." *Ruiz v Griffin, 71 AD3d 1112, 1115, 898 N.Y.S.2d 590 (2d Dept 2010)* marks omitted]; *see also Walker v Ryder*

*Truck Rental & Leasing, 206 AD3d 1036, 1037-38, 168 N.Y.S.3d 861 (2d Dept. 2022)*; *Ledbetter, supra at 21*.) "The function of the court on a motion for summary judgment is not to resolve issues of fact or determine matters of credibility, but merely to determine whether such issues exist." *Walker, supra, 206 AD3d at 1038*; *Charlery v Allied Tr. Corp., 163 AD3d 914, 915, 81 N.Y.S.3d 523 (2d Dept. 2018)*; *see Chimbo v Bolivar, 142 AD3d 944, 945, 37 N.Y.S.3d 339 (2d Dept. 2016).)*

*HN3* The court does not sit "as a super-personnel [***13] department that reexamines an entity's business decisions" in an employment discrimination case. *Baldwin v Cablevision Sys. Corp. 65 AD3d 961. 966, 888 N.Y.S.2d 1 (1st dept 2009).)* Thus a plaintiff alleging discrimination "must do more than challenge the employer's decision as contrary to \`sound business or economic policy,' " since such an argument, without more, "does not give rise to the inference that [the adverse action] was due to … discrimination" *Melman v Montefiore Med. Ctr., 98 AD3d 107, 120, 946 N.Y.S.2d 27 (1st Dept. 2012)* [plaintiff's questioning of business judgment by suggesting that the departmental problems cited by Montefiore were "stale," not plaintiff's fault, and, in any event, outweighed by plaintiff's alleged achievements as chairman did not give rise to inference of discrimination]; *Bailey v New York Westchester Sq. Med. Ctr., 38 AD3d 119, 124, 829 N.Y.S.2d 30 (1st Dept 2007).* However, an employer's invocation of the business judgment rule does not insulate its decisions from all scrutiny in a discrimination case. *Weiss v. JPMorgan Chase & Co., 332 Fed. Appx. 659 (2d Cir. 2009)*; *see Melman, supra, 98 AD3d at 134.)* Therefore, it does not matter whether the employer's decision was fair or correct, or whether the stated reason for adverse [*1071] action was good, bad or petty, so long as the stated reason for the action [**447] was nondiscriminatory. *Melman, supra, 98 AD3d at 121,* citing to *Forrest v. Jewish Guild for the Blind, 3 NY3d 295, 308 n.5, 819 N.E.2d 998, 786 N.Y.S.2d 382 (2004)*

*HN4* To establish a prima facie case of racial discrimination under title VII and both the SHRL and CHRL, the plaintiff must establish that he: (1) is a member [***14] of a protected class; (2) is qualified for the position; (3) suffered an adverse employment action; and that (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Forrest, supra, 3 NY3d at 305*; *Averbeck v Culinary Inst. of Am., 180 AD3d 862, 862, 119 N.Y.S.3d 514 (2d Dept. 2020)*; *Hamburg v. N.Y.U. Sch. Of Medicine, 155 AD3d 66, 74, 62 N.Y.S.3d 26 (2d*

---

[3] Since this comment and smile occurred at the termination meeting, i.e. the last day of Alhaj's employment, they hardly can be used ex post facto to provide proof of a hostile work environment that did not exist throughout Alhaj's one year of employment at CIH.

77 Misc. 3d 1063, *1071; 177 N.Y.S.3d 433, **447; 2022 N.Y. Misc. LEXIS 5994, ***14; 2022 NY Slip Op 22318, ****5

*Dept. 2017); Godino v Premier Salons, Ltd., 140 AD3d 1118, 1119, 35 N.Y.S.3d 197 (2d Dept. 2016).*)

An inference of discrimination "is a `flexible [standard] that can be satisfied differently in differing factual scenarios.' " *Sethi v. Narod, 12 F. Supp. 3d 505, 536 (E.D. NY 2014)* citing to *Howard v. MTA Metro—N. Commuter R.R., 866 F. Supp. 2d 196, 204 (S.D.N.Y.2011); see also* **[****6]** *Moore v. Kingsbrook Jewish Med. Ctr., 2013 WL 3968748, 2013 U.S. Dist. LEXIS 107111 [ED NY, July 30, 2013, No. 11-CV-3625 (MKB)]* [same].)

The burden then shifts to the employer to demonstrate that the employment decisions taken against the plaintiff were for "legitimate, independent, and nondiscriminatory reasons to support its employment decision" *Melman v Montefiore Med. Ctr., 98 AD3d 107, 114, 946 N.Y.S.2d 27 (1st Dept. 2012); Balsamo v. Savin Corp., 61 AD3d 622, 622-23, 877 N.Y.S.2d 146 (2d Dept. 2009).* Plaintiff must then prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination and that discrimination was the real reason. (*Gorzynski v. Jet Blue Airways Corp., 596 F. 3d 93, 106 (2d Cir. 2010); Dawson v. City of New York, 2013 U.S. Dist. LEXIS 117744 ( S.D. NY 2013); Forrest, supra, 3 NY3d at 305.*) The burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff. *Stephenson v. Hotel Emples. & Rest. Emples. Union Local 100 of AFL-CIO, 6 NY3d 265, 271, 844 N.E.2d 1155, 811 N.Y.S.2d 633 (2006)*

**HN5** To establish entitlement to summary judgment dismissing a claim of alleged discrimination under the SHRL, the defendant must demonstrate that the plaintiff cannot make out a prima facie claim or, after offering a legitimate, nondiscriminatory reason for the employment action, that there is no material issue of fact as to **[***15]** whether the explanations were pretextual. ( **[*1072]** *Ellison v. Chartis Claims, Inc., 178 AD3d 665, 667, 115 N.Y.S.3d 53 ( 2d Dept. 2019); see Forrest v Jewish Guild for the Blind, 3 NY3d at 305; Keceli v Yonkers Racing Corp., 155 AD3d 1014, 1015, 66 N.Y.S.3d 280.*) To defeat the motion, the plaintiff must raise a triable issue of fact as to whether the reasons proffered by the defendant were merely a pretext for discrimination. (*Ellison supra at 668; see Forrest, supra. 3 NY3d at 307; Furfero v St. John's Univ., 94 AD3d at 697.*)

The Second Circuit has advised district courts to be particularly cautious "about granting summary judgment to an employer in a discrimination case" where "the merits turn on a dispute **[**448]** as to the employer's intent."[4] *LeBlanc v. UPS, 2014 WL 1407706, *10, 2014 U.S. Dist. LEXIS 50760 at *28 [SD NY, Apr. 11, 2014, No. 11 Civ 6983(KPF)]* citing to *Gorzynski v. JetBlue Airways Corp., 596 F. 3d 93, 101 (2d Cir.2010); see Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 2011 WL 3586060, *5, 2011 U.S. Dist. LEXIS 84790, *15-16 [SD NY, July 29, 2011, No. 09 Civ 1251(DAB)].)* This is because "[e]mployers are rarely so cooperative" as to notate in the file that they are taking an adverse action "for a reason expressly forbidden by law." *Bickerstaff v. Vassar College, 196 F.3d 435, 438 (2d Cir. 1999); Hawkins v. City of NY, 2005 WL 1861855, *7, 2005 U.S. Dist. LEXIS 15898, *18 [SD NY, Aug. 5, 2005, No. 99 Civ 11704(RWS)].)* Since direct evidence of an employer's discriminatory intent will "rarely be found, `affidavits and depositions must be carefully scrutinized for circumstantial' " evidence. (*Schwapp v. Town of Avon, 118 F. 3d 106, 110 (2d Cir. 1997); Mihalik, 2011 WL 3586060, *5, 2011 US Dist LEXIS 84790, *16.*) Defendants can only meet their prima facie burden by tendering sufficient evidence to demonstrate the absence of any material issues of fact with regard to plaintiff's discrimination claims. *Jacobsen v. New York City Health & Hosps. Corp., 22 NY3d 824, 833, 988 N.Y.S.2d 86, 11 N.E.3d 159 (2014); Chiara v. Town of New Castle, supra, 126 AD3d at 120.*) This is a heavy burden because the facts must be viewed in the light most favorable to the nonmoving party. (*Id.*)

On the other hand, "the favorable treatment accorded to a plaintiff's **[***16]** complaint is not limitless and, as such, **HN6** conclusory allegations—claims consisting of bare legal conclusions with no factual specificity" are insufficient to survive a motion for a **[*1073]** judgment dismissing the **[****7]** complaint. (*Cagino v. Levine, 199 AD3d 1103, 1104, 157 N.Y.S.3d 561 (3d Dept. 2021).*) "[M]ere conclusions, expressions of hope or unsubstantiated allegations … are insufficient for this purpose." *Bailey v. Bklyn Hosp. Ctr, 2017 NY Slip Op. 30013(U) (Sup. Ct, NY Co. 2017).*) Even in the discrimination context, a plaintiff must provide more than conclusory allegations and show more than "some metaphysical doubt as to the material facts." *Gorzynski, supra, 596 F.3d at 101*

**HN7** Claims brought pursuant to the CHRL require a

---

[4] Because the CHRL must be construed more broadly than title VII and the SHRL, the Second Circuit's admonition is particularly apt.

77 Misc. 3d 1063, *1073; 177 N.Y.S.3d 433, **448; 2022 N.Y. Misc. LEXIS 5994, ***16; 2022 NY Slip Op 22318, ****7

separate analysis. (*See Mihalik v. Credit Agricole Chevvreux N. Am., Inc., 715 F.3d 102, 109, 113 (2d Cir. 2013)*; *Hollemon v. Art Crating Inc, 2014 U.S. Dist. LEXIS 139916 [ED NY, Sept. 30, 2014, No. 12 Civ 2719(VMS)].*) The Local Civil Rights Restoration Act of 2005 (Local Law No. 85 (2005) of City of NY)) clarified that the CHRL's provisions must be construed independently and more liberally from their similar state and federal counterparts (*Mihalik v. Credit Agreicole Cheuvreux N.A., supra, 715 F. 3d at 109* citing to *Williams v. NYC Hous Auth. 61 AD3d 62, 66, 872 N.Y.S.2d 27 (1st Dept. 2009)*) and "broadly in favor of discrimination plaintiffs," even when such protection is not available under federal or state law. *Albunio v. City of New York, 16 NY3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011)* The federal standard should be considered "a floor below which the City [HRL] cannot fall," rather than a ceiling above which the local law cannot rise. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc. at 109* omitted], citing to *Williams, supra, 61 AD3d at 66-67.*)

*HN8* When analyzing discrimination cases under the CHRL, the court must use the burden shifting analysis under *McDonnell Douglas (McDonnell Douglas Corp v Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 [1973])* as well **[*\*\*17]** as a mixed motive **[\*\*449]** analysis which imposes a lesser burden on a plaintiff opposing such a motion. (*Ellison v Chartis Claims, Inc, supra, 178 AD3d at 668*; *Hamburg, 55 AD3d at 73*; *Melman, supra, 98 AD3d at 113, 127*; *Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, 45, 936 N.Y.S.2d 112 (1st Dept. 2011)*.) The *McDonnell Douglas* and mixed motive frameworks diverge only after the plaintiff has established a prima facie case of discrimination and the defense has responded by presenting admissible evidence of "legitimate, independent, and nondiscriminatory reasons" to support its employment decision. (*Hamburg, supra, 155 AD3d at 73*.) Under *McDonnell Douglas*, the plaintiff must show "that the legitimate reasons proffered by the defendant were [pretextual]," **[\*1074]** whereas under the mixed motive analysis, the plaintiff must produce evidence that the unlawful discrimination was one of, even if not the sole motivating factors for the employment decision. *Hamburg, supra, 155 AD3d at 73* citing to *Melman, supra 98 AD3d at 127 see Aulicino v New York City Dept. of Homeless Servs., 580 F3d 73, 80 [2d Cir 2009]*; *Weiss v JPMorgan Chase & Co., 2010 U.S. Dist LEXIS 2505 [SD NY, Jan. 13, 2010, No. 06 Civ 4402(DLC)]*; *Crookendale v. NYC Health & Hosps. Corp., 2018 NY Misc LEXIS 2586, 2018 NY Slip Op 31309(U) (Sup. Ct. NY Co. 2018).*) The "salient difference" between the two

standards is that at the final step, the plaintiff has the "lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or … was more likely than not based in whole or in part on discrimination." *LeBlanc v. UPS, 2014 U.S. Dist. Lexis 50760 (S.D.NY 2014)*; *Dozier v Federal Express, Inc., 2018 NY Misc. LEXIS 3058, 2018 NY Slip Op 31638U ( Sup, Ct., NY Co. 2018).*)

The Appellate Divisions have held that *HN9* under the CHRL, summary judgment should not be granted unless the employer establishes as a matter of law that "discrimination **[\*\*\*18]** play[ed] no role" in its actions. (*Mihalik, 715 F.3d at 110* quoting *Williams v. N.Y.C. Hous. Auth., supra. 61 AD3d at 78*; *Bailey v. Bklyn Hosp Ctr, supra, 2017 NY Slip Op. 30013(U)*; **[\*\*\*\*8]** *Lefort v. Kingsbrook Jewish Med. Ctr, 64 Misc 3d 522, 1116], [A], 116 N.Y.S.3d 499, 2019 NY Slip Op 51018[U] at 3 (Sup. Ct., Kings Co. 2019) Ellison v Chartis Claims, Inc. 178 AD3d 665, 668, 115 N.Y.S.3d 53 ( 2d Dept. 2019)*; see *Hamburg v. NYU Sch. Of Medicine, 155 AD3d 66, 73, 62 N.Y.S.3d 26 (1st Dep't 2017)*.) A defendant, as the moving party, must therefore make a prima facie showing that "there is no evidentiary route" that could allow a jury to find that discrimination played a role in their challenged actions. *Ellison supra 178 AD3d at 668*; *Watson v Emblem Health Servs., 158 AD3d 179, 183, 69 N.Y.S.3d 595(1st Dept. 2018)*; *Cadet -Legros v New York Univ. Hosp. Ctr., 135 AD3d 196, 200, 21 N.Y.S.3d 221 (1st Dept. 2015)*; *Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, 45, 936 N.Y.S.2d 112 (1st Dept 2011).*)

If this burden is met, a plaintiff may defeat summary judgment by offering "some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete" *158 AD3d at 183*; *Cadet-Legros, supra, 135 AD3d at 200 (1st Dept 2015) Melman, supra, 98 AD3d at 127*; *Dozier, supra, 2018 NY Misc. LEXIS 3028 at *13*. This is because once a plaintiff introduces "pretext" evidence, "a host of determinations **[\*\*450]** properly made only by a jury come into play" (*Watson, supra, 158 AD3d at 183*; *Bennett, supra, 92 AD3d at 43*), **[\*1075]** including whether a "false[, misleading, or incomplete] explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive coexisting with other legitimate reasons" *Bennett, supra at 43*.

Here, it is undisputed that plaintiff has established the first three elements of a prima facie case of discrimination. As a Syrian Muslim Arab, plaintiff is a

77 Misc. 3d 1063, *1075; 177 N.Y.S.3d 433, **450; 2022 N.Y. Misc. LEXIS 5994, ***18; 2022 NY Slip Op 22318, ****8

member of a protected class. (*See Abdelal v Kelly, 857 Fed. Appx. 30, 2021 U.S. App. LEXIS 15140(2d Cir. 2021)* [Egyptian national origin, Middle Eastern ancestry and Muslim religion]; *Tihan v Apollo Mgt. Holdings, L.P., 2021 NY Misc. LEXIS 334,*25, 2021 NY Slip Op 30247(U), *25 (Sup. Ct. NY Co. 2021)* [plaintiff, as a Muslim of Turkish descent, was a member of **[***19]** a protected class; *Sarr v Saks Fifth Ave. LLC, 2016 NY Misc. LEXIS 3362, *3, 2016 NY Slip Op 31751(U) (Sup. Ct. NY Co. 2016)* [same].) Furthermore, plaintiff suffered an adverse employment action when he was terminated from his position (*see Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)*), and was also likely qualified to hold the position of physician as he was hired for the position.

Therefore, the sole issue is whether Alhaj's termination occurred under circumstances giving rise to an inference of discrimination. Per set precedent cited above, this court agrees with defendants that they are under no obligation to justify their assignment of Alhaj to the CHF program or the strictures or requirements they imposed upon him in planning for the program. Therefore it is not for this court to conduct a mini-hearing as to the veracity of Alhaj's success or failure in the CHF program so long as discrimination played no role in his termination.

"No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Sethi v. Narod, supra 12 F. Supp. 3d at 536* citing to *Moore 2013 U.S. Dist. LEXIS 107111, *20, 2013 WL 3968748, at *6*.) An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's **[***20]** protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001); Sethi, supra 12 F. Supp.3d at 536*.) Alhaj claims that an inference of discrimination can be discerned by Chaikin's comment to Dr. **[*1076]** Hupart "Today is 9/11, right?," **[****9]** wherein Dr. Hupart shook his head and said "Yes, it is," and Chaikin then made a weird smile. Plaintiff interprets this statement and gesture to mean that he was terminated on 9/11 to send the message: "Look, you are Middle Eastern, and you are a Muslim. Remember 9/11, and hush."

There are a dearth of cases which address whether one

comment is sufficient to raise an inference of unlawful termination due to discrimination, as opposed to a legion of cases which state that random comments are usually not sufficient to establish a hostile work environment.[5] *HN10* To establish a prima facie case under **[**451]** a hostile work environment theory a plaintiff must show that its workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter" the conditions of employment and create an abusive environment. *Gorzynski v. JetBlue Airways Corp., 596 F. 3d 93, 102 ( 2d Cir. 2010); Fullwood v. Ass'n for the Help of Retarded Children, 2010 WL 3910429, 2010 U.S. Dist. LEXIS 107713 [SD NY, Sept. 28, 2010, No. 08 Civ 6739(DAB)].)* A plaintiff need no longer establish **[***21]** severe and pervasive conduct under the more relaxed CHRL standard, and only has to demonstrate "differential treatment"—that he was treated less well than other employees due to his protected status because of discriminatory intent, and summary judgment should be denied in "borderline" cases *Williams v. N.Y.C. Housing Auth., supra, 61 AD3d at 75, 80 see Golston-Green v City of NY, 184 AD3d 24, 43, 123 N.Y.S.3d 656 (2d Dept. 2020); Nelson v HSBC Bank USA, 87 AD3d 995, 999, 929 N.Y.S.2d 259( 2d Dept.2011).*

*HN11* The courts have also noted that the CHRL is not a "general civility code" and that "petty slights and trivial inconveniences" were still nonactionable under the law. *Golston-Green, supra, 184 AD3d at 43; Williams, supra, 61 A.D3d at 78 -80*.) A plaintiff still must "do more than cite to [his] mistreatment" and then ask the court to conclude that the mistreatment must have been related to his protected status. (*Sims v. Trustees of Columbia Univ. City of NY, 2017 NY Misc. LEXIS 4204 at *13-14, 2017 NY Slip Op. 32331(U) (Sup. Ct. NY Co. 2017)*.) Therefore, most courts have **[*1077]** granted summary judgment to defendants under the CHRL where a plaintiff's proof of a hostile work environment is limited to sporadic insensitive comments. (*See Mihalik, supra 2011 U.S. Dist. LEXIS 84790 at *27-28* and cases cited therein]; *Williams, supra at 80; Nelson, supra, 87 AD3d at 999; Sims v. Trustees of Columbia Univ., supra at 16-18*.)

---

[5] This court has already found there is no merit to Alhaj's contention that he was subject to a hostile work environment throughout his year's work at the hospital because there is simply no evidence that anyone commented or otherwise judged Alhaj due to his national origin or race until the date of his termination, and no evidence that Alhaj was assigned to the CHF program because of his national origin or race.

77 Misc. 3d 1063, *1077; 177 N.Y.S.3d 433, **451; 2022 N.Y. Misc. LEXIS 5994, ***21; 2022 NY Slip Op 22318, ****9

While the court can look at the aforementioned precedent for guidance, that paradigm only goes so far since hostile environment cases presume that discrimination occurred over a prolonged time span which created an untenable working environment, whereas a termination based in part upon discriminatory intent of the employer may be more **[***22]** subtle and not require proof of a pattern of pervasive discriminatory conduct. *HN12* The courts have recognized that hostile work environment claims are different in kind from discrete acts as "[t]heir very nature involves repeated conduct" (*Julius v Department of Human Resource Admin., 2010 WL 1253163, *8, 2010 US Dist LEXIS 33259, *22 [SD NY, Mar. 24, 2010, No. 08 Civ 3091(PKC)]*, quoting *National RR Passenger Corp. v Morgan, 536 U.S. 101, 115, 153 L. Ed. 2d 106, 122 S. Ct. 2061 [2002]*; *Sims v Trustees of Columbia Univ. in the City of NY, 2017 NY Misc. LEXIS 4204, *14, 2017 NY Slip Op 32331(U), 15 (Sup. Ct., NY Co. 2017)*. A hostile work environment cannot by definition occur on one **[****10]** particular day but over a series of days or months or years, and "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Khalil v. State of NY, 17 Misc 3d 777, 783, 847 N.Y.S.2d 390 (Sup Ct., NY Co. 2007)* citing to *Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L Ed 2d 106 (2002)* Therefore, mere utterances which engender offensive feelings in an employee do not sufficiently affect the conditions of **[**452]** employment to create a hostile work environment since such claims must be based on the "cumulative effect of individual acts" *Khalil, supra,17 Misc 3d at 783* citing to *Morgan at 115*; *see Gorokhovsky v. N.Y.C. Housing Auth., 552 F. App'x 100, 102 (2d Cir. 2014)*.

Plaintiff alleges that Chaikin's referral to the 9/11 "tragedy" and his "strange smile" at Hupart during plaintiff's termination meeting, which coincidentally was held on 9/11, are sufficient to raise an inference that discrimination played a role in his termination. Defendants contend that the statement allegedly made by Chaikin was "neutral on its face" and "merely stated the date" which happens to be an important **[***23]** day for those in NYC who lived through it.

**[*1078]** In employment discrimination cases, the term "prima facie case" denotes the establishment by plaintiff of facts sufficient to create "a legally mandatory, rebuttable presumption" rather than the traditional meaning of describing a plaintiff's burden of setting forth sufficient evidence to go before the jury. *Melman v. Montefiore Med. Ctr, supra, 98 AD3d at 122*; *Sogg v. American Airlines, 193 AD2d 153, 156, 603 N.Y.S.2d 21*

*(2d Dept. 1993)*.) In considering whether a defendant has sufficiently established plaintiff's inability to establish all elements of intentional discrimination, the court must consider that plaintiff's prima facie showing is a "low threshold." *Singh v. State of NY Office of Real Prop Serv., 40 AD3d 1354, 1356, 837 N.Y.S.2d 378 (3d Dept 2007)*; *Gonzalez v. NY State Off. Of Mental Health, 26 Misc 3d 1227[A], 907 N.Y.S.2d 100, 2010 NY Slip Op 50282[U] (Sup. Ct Kings Co. 2010)*.)

*HN13* It is "rare" that a court would grant a motion for summary judgment based upon the absence of a prima facie showing of circumstances giving rise to an inference. *Hamburg v. N.Y.U Sch. Of Medicine, 155 AD3d 66, 71, 62 N.Y.S.3d 26 (1st Dept. 2017)* citing to *Melman, supra, 98 AD3d at 114-15*; *Bennett, supra, 92 AD3d at 38*; *Murphy v. Wolford Am. Inc., 2019 NY Misc. LEXIS 441, 2019 NY. Slip Op. 30267[U], *17-18 [Sup Ct, NY County 2019]* [court assumes that circumstances surrounding plaintiff's termination gave rise to inference of discrimination, but defendants met burden of providing legitimate business reason for termination and plaintiff failed to raise inference of pretext].) However, a prima facie showing by a plaintiff only creates a "legally mandatory, rebuttable presumption" rather than the traditional showing that plaintiff has set forth sufficient evidence to **[***24]** go before the jury. *Melman, supra, 98 AD3d at 122* citing to *Sogg v. American Airlines, 193 AD2d at 156*.)

In fact, the courts often bypass requiring the plaintiff to make a prima facie case and skip directly, on a defendant's motion for summary judgment under the CHRL, to inquiring whether a defendant has shown, based on all the evidence, that "no jury could find defendant liable under any of the evidentiary routes [applicable to discrimination cases]" *Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD2d at 200*. Courts must exercise special caution in granting summary judgment because "discrimination seldom announces itself openly." (*Id. at 204*.) "Because an employer who discriminates for an unlawful reason rarely announces a discriminatory motive or intent, verbal comments may provide sufficient evidence to support a claim for employment discrimination" ( **[*1079]** **[****11]** *Gonzalez v. NY State Off. of Mental Health 26 Misc 3d 1227[A], 2010 NY Slip Op 50282[U], *15 [Sup Ct, Kings County 2010])*.

**[**453]** In considering whether a comment is probative of discrimination or rather a non-probative "stray remark," a court must consider (1) whether the remark was made by a decisionmaker or supervisor; (2) when

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 14 of 321

Page 14 of 19

77 Misc. 3d 1063, *1079; 177 N.Y.S.3d 433, **453; 2022 N.Y. Misc. LEXIS 5994, ***24; 2022 NY Slip Op 22318, ****11

the remark was made in relation to the employment decision at issue; (3) the context of the comment (i.e. whether a juror would regard the remark as discriminatory); and (4) the context in which the remark was made—whether it was related to the decision [***25] -making process. (*Henry v. Wyeth Pharms. Inc. 616 F. 3d 134, 149-50 (2d Cir. 2010)*; *Holleman v. Art Crating Inc, supra. 2014 US. Dist LEXIS 139916 at \*89-90*; *Tomassi v. Insignia Fin. Grp Inc. 478 F. 3d 111 115 ( 2d Cir. 2007)*; *see also Obinabo v. Radioshack Corp., 522 F. App'x 55, 57 (2d Cir. 2013)* ["When considering \`stray remarks' as evidence of discrimination, courts consider who made the remark, when the remark was made in relation to the employment decision, the remark's content, and the context in which the remark was made"], citing *Henry, 616 F.3d at 149*) A remark will be "more probative" of discriminatory intent where it evinces a discriminatory state of mind and is in close relation to the allegedly discriminatory behavior. *Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007)* [citation omitted]; *Sethi, supra, 12 F. Supp. 3d at 535-36*.) Even stray remarks in the workplace made by individuals who are not involved in the pertinent decision-making process may suffice to make a prima facie case if the remarks evidence "invidious discrimination." *Chiara, supra, 126 AD3d at 124*; *see Belgrave v City of New York, 1999 WL 692034, \*29, 1999 US Dist LEXIS 13622, \*89-90 (E.D.NY 1999)* affd 216 F.3d 1071 (2d Cir 2000).)

In *Cadet-Legros, supra*, the Court assumed that a supervisor's comment that "a leopard does not change its spots" was sufficient for plaintiff to make a prima facie case but ultimately found that said comment was not discriminatory as it was no longer "imbued with racial meaning" and granted summary judgment to the defendant. (*Cadet-Legros, 135 AD3d at 205*; *see Vega v Hempstead Union Free Sch. Dist., 801 F3d 72, 86 (2d Cir 2015)*; *Lloyd v. Holder, 2013 U.S. Dist. LEXIS 178456, \*19 SD NY, Dec. 17, 2013, No. 11 Civ 3154(AT)].*) *HN14* The Court recognized that a plaintiff alleging discrimination must be allowed to "present a wide range of indirect evidence of discrimination, including the fact that a defendant [***26] (or its agent [*1080] or employee) used coded language, that is probative of discriminatory intent," and that it must examine the language and its historical usage, in addition to the context in which it was used. *Cadet, supra, 135 AD3d at 204-205*.)

A plaintiff's subjective interpretation of critical but facially nondiscriminatory terms does not "itself" reveal discriminatory animus. *Thelwell v City of New York, 2015 WL 4545881, \*11, 2015 U.S. Dist. LEXIS 98406, \*27 [SD NY, July 28, 2015, No. 13 Cv 1260(JGK)]* [defendants' purported use of the words "angry" and "abrasive" did not rise to the level of racial code words such as "boy" or "thug"]; *see also Cook v. Emblem Health Servs. Co., LLC, 59 Misc. 3d 1209[A], 98 N.Y.S.3d 500, 2018 NY Misc. LEXIS 1138 at 19-20, 2018 NY Slip Op 50451[U], [Sup Ct. NY Co. 2018]* [supervisor's use of the facially nondiscriminatory terms "very authoritarian," "critical," and "aggressive" did not constitute racial coding or evidence of discrimination where the supervisor was describing the plaintiff's leadership skills].)

In *Lloyd v. Holder (2013 WL 6667531, \*9, 2013 U.S. Dist. LEXIS 178456 SD NY, Dec. 17, 2013, 11 Civ 3154(AT)])*, the court found that "[d]rawing the line between facially race-neutral statements [**454] and racially charged code words is difficult." The court found that the employer's use of adjectives to describe plaintiff, such as lazy, shiftless, incompetent, entitled, slacking off, and dumb, without any other evidence of discrimination, did not reveal discriminatory animus. However, certain facially [****12] nondiscriminatory terms can invoke racist concepts that are already planted [***27] in the public consciousness—words like "welfare queen," "terrorist," "thug," "illegal alien." (*See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006)* [The use of the word "boy," standing alone, is not always benign]; *Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1085 (8th Cir. 2010)* [code words such as "fried chicken" and "ghetto" may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications]; *Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 278 (3d Cir. 2001)* [noting that the use of code words such as "all of you" and "one of them" could be sufficient evidence from which a jury could find an intent to discriminate].)

And yet, even a seemingly banal term such as "selected clientele" may, within a certain context, raise an inference of discrimination. In *Camp-of-the-Pines, Inc. v. New York Times Co., 184 Misc. 389, 53 N.Y.S.2d 475 (Sup. Ct. Albany Co. 1945 )*, defendant New York Times edited the advertising copy sent by plaintiff [*1081] — an owner of a vacation club—by striking out the words "selected clientele" and substituting in the words "congenial following" and thereafter published the ad. Plaintiff sued the New York Times for breach of contract, alleging it had not consented to the omission of the words "selected clientele" and the substitution

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 15 of 321

Page 15 of 19

77 Misc. 3d 1063, *1081; 177 N.Y.S.3d 433, **454; 2022 N.Y. Misc. LEXIS 5994, ***27; 2022 NY Slip Op 22318, ****12

thereof. The court granted the Times' motion to dismiss plaintiff's suit for damages based upon the Times' refusal to publish the advertisement exactly as [***28] sent by plaintiff on the grounds that said alleged contract was illegal and void.

The court found that the term was "[n]ot only … injurious and offensive to morals," but that it contravened *Civil Rights Law §40*. *184 Misc at 399*.) The use of the words "selected clientele" to describe members in good standing who would be eligible to use the facilities was a "sham," a "mask and subterfuge" and "merely a cloak and disguise" and an indirect means to hide discrimination. *(Id. at 398.)* "As a practical matter such words as `selected clientele' connote in the public mind that colored persons, Jews and others who are not lily-white need not apply to plaintiff for accommodation." (*Id.*)

Based upon this de minimis standard, this court finds that Chaikin's comment that "Today is 9/11, right?," coupled with his strange smile at Hupart during plaintiff's termination meeting held on 9/11, is more than a generic neutral comment made about the horrific event that occurred on that day. A jury could find that Chaikin's comment and strange smile were directed at Alhaj, who is a Syrian Muslim, and could be deemed to be a code word, i.e. that as a Muslim, Alhaj was associated with the 9/11 catastrophe—a racist concept that is already planted in the public consciousness. [***29] Furthermore, Chaikin's comment was made on the day of Alhaj's termination and the facts are not clear as to his supervisory or decision-making role in the cardiology department.

To state the obvious, there has been a marked increase in anti-Islam phobia since 9/11. (*See Sulehria v. New York, 2012 WL 1284380, *1, 2012 U.S. Dist. LEXIS 52836, *3 [ND NY, Apr. 16, 2012, No. 1:12-CV-0021(LEK/ATB)]* [plaintiff alleges that he has been the victim of racial prejudice, xenophobia, and religious intolerance in the wake of the September 11, 2001. "His account of the climate of [**455] discrimination and fear felt by many Muslim Americans and individuals of Middle Eastern descent is unfortunately not a new one"]; *see* Liz Mineo, *Born to take on Islamophobia*, The Harvard Gazette, Sept. 9, 2021, available at https://news.harvard.edu/gazette/ [*1082] story/2021/09/muslim-americans-reflect-on-the-impact-of-9-11/ [" `It has been 20 years since the atrocities of 9/11, yet the wound continues to dig deep,' said Ijaz [****13] in an email. `It digs into the families that lost loved ones on that ill-fated day… . It also digs into

the lives of Muslim Americans, marked by the scarlet letters imprinted on them by terrorists with whom they shared nothing in common save for one imperfect classification: Muslim' "].)

Having found previously that Chaikin's comment to [***30] Hupart "Today is 9/11, right?" and his immediate "strange smile" to Hupart could be found by a jury to be a code word, the court must now discern whether defendants produced evidence of a legitimate reason for the termination and if so, whether plaintiff can show that the termination was motivated at least in part by discrimination and that there is a nexus between said comment and his termination.

Defendants assert that there are no evidentiary routes by which a jury could find that discrimination played any role in the decision to terminate plaintiff, either under the mixed motive or *McDonnell Douglas* tests. In their original motion for summary judgment and accompanying brief, defendants state that three doctors (Vardanian, Hupart and Brady) filed a complaint against Alhaj for being insubordinate in refusing to provide coverage for a clinic after having been requested to do so by his supervisors. As set forth previously, by email dated January 16, 2015, Dr. Brady informed Sabina Zak that Alhaj and another doctor refused to provide coverage of the Cardiac Care Unit as per Brady's request, because they were upset about schedules of part-time doctors. Neither [***31] had a busy schedule and Alhaj's excuse was that he was in another meeting in the morning and had to cover the clinic in the afternoon. Brady informed Alhaj that had he come to the meeting on time in the morning, he would have had ample time to do his rounds and cover the clinic in the afternoon, and wrote that Alhaj "continued to argue in circles for another half an hour, refusing to leave my office as requested multiple times, wasting precious time from patient care." Brady said that plaintiff's behavior was "completely inappropriate, unprofessional and insubordinate."

Subsequently, on or about August 7, 2015, one Valerie Dener informed Dr. Maese that Alhaj had refused to discuss a case and give patient information concerning a denial claiming that he was too busy and that he was not an attendant. Maese told [*1083] Dr. Khanna to address this issue as it was the obligation of every attending to participate in the UM process and in denials. Finally, defendants contend that Dr. Khanna's affirmation praising Alhaj and stating that he "never received any complaints about [his] work performance, professionalism [and] his work ethic" is belied by the

77 Misc. 3d 1063, *1083; 177 N.Y.S.3d 433, **455; 2022 N.Y. Misc. LEXIS 5994, ***31; 2022 NY Slip Op 22318, ****13

aforementioned record.

As to Alhaj's unsatisfactory [***32] performance on the CHF program, Hupart testified that he had initially instructed Alhaj that he had to use existing resources and could not hire new staff but that he could redeploy existing staff and that he had to produce an outline within two weeks. Hupart stated that plaintiff did not produce an outline for the program in a timely manner, and that when he did put together a plan, it violated Dr. Hupart's instructions as his plan called for six to eight new hires and new resources. Chaikin testified that Hupart called Alhaj in for a counseling [**456] session about his failure to establish a cardiac program and other deficiencies. Curiously, Hupart did not deem his meetings with Alhaj in late July to be counseling sessions; rather he testified he "followed up" with Alhaj to see if he had problems and to offer his assistance. Defendants never presented a counseling memo about the CHF program.

Based upon the above, this court finds that defendants have produced sufficient evidence that Alhaj behaved in an inappropriate, unprofessional and insubordinate manner which [****14] constitutes a legitimate reason for termination. Furthermore, the Hospital and Hupart were within their right to determine that [***33] Alhaj did not perform satisfactorily on the CHF program since Hupart told plaintiff to use only existing resources and not to hire any new staff for the program.

As the court has stated previously, it does not sit "as a super-personnel department that reexamines an entity's business decisions" in an employment discrimination case. *Melman, supra. 98 AD3d at 121 (2d Dept. 2012); Baldwin v Cablevision Sys. Corp. 65 AD3d 961. 966, 888 N.Y.S.2d 1 (1st dept 2009).*) "In a discrimination case, the court is "decidedly not interested in the truth of the allegations against [the] plaintiff," but rather in what motivated the employer. (*McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)* quoting *USPS Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)* "The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct but whether it was discriminatory. *DeFina v. Meenan Oil Co., 924 F. Supp. 2d 423, 435 (E.D.NY 2013); see [*1084] Tuccio v. FJC Sec. Servs., Inc., 2014 WL 4438469, 2014 U.S. Dist. LEXIS 125090 [ED NY, Sept. 8, 2014, No. 12-CV-5506(JFB)(GRB)]* [same]; *Rothenberger v New York City Police Dept., 2008 WL 2435563, 2008 US Dist LEXIS 46614 [ED NY, June 16, 2008, No. 06-CV-868 (NGG)(LB)]*, quoting *Thornley v. Penton Publ., 104 F.3d*

*26, 29 (2d Cir. 1997)*) Courts do not have a " `\`roving commission to review business judgments' " *Rosenberg v. Chesapeake Pharm. & Health Care Packaging, 888 F. Supp. 2d 302, 309 (E.D.NY 2012)* and the only issue before them is whether there is sufficient information by which a jury could find that the employer's decision was discriminatory, not whether it was wise. *Holleman v. Art Crating Inc, supra, 2014 U.S. Dist. LEXIS 139916.*)

**HN15** Thus, a plaintiff's subjective disagreement with the employer's assessment of her performance is not actionable under the discrimination statutes. (*See White v. Pacifica Found., 973 F. Supp. 2d 363, 382 (D.NY 2013); see also Potash v. Florida Union Free Sch. Dist., 972 F. Supp. 2d 557, 592 (S.D.NY 2013)* ["Plaintiff's personal disagreements with (defendants') evaluation of her job performance are [***34] insufficient … to preclude summary judgment"]; *Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 385 (S.D.NY 2007)* [the employer, not the employee, decides what constitutes satisfactory performance]; *cf. McNamee v. Starbucks Coffee Co., 914 F. Supp. 2d 408, 420 (W.D.NY 2012)* ["Plaintiff's subjective belief that she was performing satisfactorily, by itself, is not sufficient to create a triable issue of fact as to pretext"].) Therefore, it does not matter whether the employer's decision was fair or correct, or whether the stated reason for adverse action was good, bad or petty, so long as the stated reason for the action was nondiscriminatory. (*Melman, supra; la, 98 AD3d at 121*, citing to *Forrest v. Jewish Guild for the Blind, supra, 3 NY3d at 308 n.5 (2004)*

This precedent is even stronger when the employer's actions are challenged by a probationary employee who [**457] may be discharged for "almost any reason, or for no reason at all" as long as it is not "in bad faith or for an improper or impermissible reason." *Mtr. of Duncan v. Kelly, 9 NY3d 1024,1025, 882 N.E.2d 872, 853 N.Y.S.2d 260 (2008); Mtr. Of Hirji v Chase, 151 AD3d 857, 56 N.Y.S.3d 562 (2d Dept 2017); Mtr. Of Johnson v County of Orange, 138 AD3d 850, 851, 29 N.Y.S.3d 502 (2d Dept 2016); Mtr of Young v City of New York, 68 Misc 3d 514, 517, 124 N.Y.S.3d 892 (Sup Ct. Kings Co. 2020).*) A bad faith determination is one based upon a constitutionally impermissible or illegal purpose, or "in violation of statutory or decisional law." [*1085] *Mtr of Lake v. Town of Southhold, 189 AD3d 1588, 1591, 140 N.Y.S.3d 95 (2d Dept. 2020); Mtr of Lane v. City of NY 92 AD3d 786, 938 N.Y.S.2d 597 (2d Dept. ); Card v. Sielaff, 154 Misc. 2d 239, 244, 586 N.Y.S.2d 191 (Sup. Ct., NY Co., 1992).*) The petitioner has the burden of proving bad faith by producing competent evidence, rather than mere speculation. (*Mtr.*

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 17 of 321

Page 17 of 19

77 Misc. 3d 1063, *1085; 177 N.Y.S.3d 433, **457; 2022 N.Y. Misc. LEXIS 5994, ***34; 2022 NY Slip Op 22318, ****14

*Of Young, supra at 517*; see **[\*\*\*\*15]** *Mtr of Swinton v Safir, 93 NY2d 758, 763, 720 N.E.2d 89, 697 N.Y.S.2d 869(1999)*; *Walsh v New York State Thruway Auth., 24 AD3d 755, 757, 808 N.Y.S.2d 710 (2d Dept 2005).*)

Given the above, this court will not sit as an arbiter as to whether defendants or Alhaj more accurately describe what occurred in the CHF **[\*\*\*35]** program. Furthermore, it finds no credence to Alhaj's claim that by being assigned to create a CHF program he was handed a mission to fail (not substantiated) or that Chaikin and the department adopted many of his recommendations for the program after he was fired.

Since defendants have produced evidence of legitimate, nondiscriminatory reasons for terminating Alhaj from his probationary position, the burden shifts back to plaintiff to produce evidence that the action was "motivated at least in part by … discrimination." *Melman, supra, 98 AD3d at 127*; see *Cadet - Legros, supra, 135 AD3d at 200, n.1*; *Coronado v.Weill Cornell Med. Coll. 66 Misc 3d 404, 407, 114 N.Y.S.3d 193 (Sup. Ct., NY CO. 2019)*; *Ortiz v. Gazes LLC2017 N.Y. Misc. LEXIS 4221, 2017 NY Slip Op 32339(U) (Sup. Ct. N.Y Co. 2017).*) Under the mixed motive theory recognized by the CHRL the plaintiff must produce evidence that the unlawful discrimination was one of, even if not the sole motivating factors for the employment decision. *Hamburg, supra, 155 AD3d at 73*, citing to *Melman, supra. 98 AD3d at 127*; see *Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir 2009)*; *Crookendale v. NYC Health & Hosps. Corp., 2018 NY Misc LEXIS 2586, 2018 NY Slip Op 31309(U) (Sup. Ct. NY Co. 2018).*) Plaintiff need only respond with "some evidence" that at least one of the reasons proffered by the defendant is false and the court should deny the motion for summary judgment. *Melman, supra, 98 A.D 3d at 127*; *Dozier, supra, 2018 NY Misc. LEXIS 3028 at 13.*) Summary judgment should not be granted under the City HRL unless the record establishes as a matter of law that "discrimination … play[ed] no role in [the defendant's] employment decision." *Lefort v. Kingsbrook Jewish Med. Ctr, 203 AD3d 708, 711, 164 N.Y.S.3d 183 (2d Dept. 2022)*; *Singh v Covenant Aviation Sec. LLC 131 AD3d 1158 1161, 16 N.Y.S.3d 611 (2d Dept. 2015)*; *Bennett v. Health Mgt Svs. Inc., supra 92 AD3d at 40* see *Ellison v Chartis Claims, Inc. 178 AD3d 665, 668, 115 N.Y.S.3d 53 (2 Dept. 2019 )*

**[\*\*458] [\*1086]** Defendants argue that there is absolutely no evidence **[\*\*\*36]** that either the Hospital or Chaikin acted in a discriminatory manner in terminating Alhaj, which was due to his various

infractions throughout the year and his nonperformance in working on the CHF program. They first reiterate that Chaikin's comment was neutral on its face, as he was just commenting that the weather on that day was the same as it was on 9/11 when the attacks took place, and there is no evidence that one stray remark was connected to any decisions made by the Hospital through Dr. Hupart concerning plaintiff's employment. They cite to precedent that stray remarks made by non-decisionmakers or decisionmakers without more cannot prove a claim of employment discrimination. *Godbolt v. Verizon NY, Inc. 115 AD3d 493, 494, 981 N.Y.S.2d 694 ( 1st Dept. 2014)*; *Gonzalez v. NY State Off. Of Mental Health, 26 Misc 3d 1227[A], 907 N.Y.S.2d 100, 2010 NY Slip Op 50282[U] ( Sup. Ct., Kings Co. 2010).*) Defendants claim there is no "more" insofar as Chaikin was not involved in the decision to terminate Alhaj's employment.

This court has already ruled that Chaikin's comment and strange smile to Hupart could be viewed, by a reasonable jury, as a code word as opposed to a banal innocent comment about the day of 9/11. **HN16** However, verbal stray comments can raise an inference of discrimination only where there is a "demonstrated nexus" between the remarks and the negative employment action. **[\*\*\*\*16]** (*Dawson v City of New York, 2013 WL 4504620, \*10, 2013 US Dist LEXIS 117744, \*29*; *Cherry v New York City Hous. Auth., 2017 WL 4357344, 2017 US Dist LEXIS 161830 [ED NY, Sept. 29, 2017, 15-CV-6949 (MKB)]*; *Sandiford v City of New York Dept. of Educ., 22 NY3d 914, 916, 999 N.E.2d 1144, 977 N.Y.S.2d 699 (2013)*; *Chiara, supra, 126 AD3d at 124* see **[\*\*\*37]** *Sandiford v City of NY Dept. of Educ., 94 AD3d 593, 604, 943 N.Y.S.2d 48 ( Dept. 2013)*"(T)he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"]; *Holleman, supra, 2014 U.S. Dist. LEXIS 139916 at 88-89.*)

**HN17** In determining whether a comment is probative of an intent to discriminate or is merely a non-probative stray remark a court must consider the following factors: (1) whether the comment was made by a decisionmaker, a supervisor, or a low-level coworker, (2) was the remark made close in time to the adverse employment decision at issue, (3) given the context of the remark, whether a reasonable juror could view the remark **[\*1087]** as discriminatory, and (4) the context in which the remark was made—was it related to the decision-making process. (*Chiara, supra, 126 AD3d at 124*; *Wiggins v Mount Sinai Hosps. Group, Inc., 2020*

77 Misc. 3d 1063, *1087; 177 N.Y.S.3d 433, **458; 2022 N.Y. Misc. LEXIS 5994, ***37; 2022 NY Slip Op 22318, ****16

*NY Misc. LEXIS 10819, \*39 (Sup. Ct. NY Co. 2020)*; *Gomez v Cablevision Sys. New York City Corp., 2016 NY Misc. LEXIS 2353, \*17-18, 2016 NY Slip Op 31177(U), \*13*, *Breistein v. Michael C. Fina Co., 2016 NY Misc. LEXIS 3591, 2016 NY Slip Op. 31858U, \*26 (Sup. Ct., NY Co. 2016)*; *Gonzalez, 26 Misc 3d 1227[A], 2010 NY Slip Op 50282[U]*.) Even stray remarks by persons who are not supervisors or involved in the pertinent decision-making process may suffice to present a prima facie case of discrimination. *Chiara, supra, 126 AD3d at 124* see *Belgrave v City of New York, 1999 WL 692034, \*29, 1999 US Dist LEXIS 13622, \*89-90 [ED NY, Aug. 31, 1999, No. 95-CV-1507 (JG)]*, *affd 216 F.3d 1071 (2d Cir 2000)*

Defendants claim that Chaikin did not play a supervisory role in the CHF program **[**459]** and that there is simply "no evidence linking Mr. Chaikin to any input" over Alhaj's job performance in either the CHF program or generally in substantively reviewing plaintiff's progress at work, or in Hupart's **[***38]** decision to fire him. Rather it was Dr. Hupart who assigned plaintiff and then monitored his progress. Specifically Chaikin testified that he first met Alhaj at a meeting in late July or August where Dr. Hupart counseled him on failing to meet his job expectations re the CHF program. Chaikin was only there to serve as a witness. The only other interaction he had with Alhaj was during the 9/11 termination meeting where he served solely as a witness with no input as to the decision-making about Alhaj's continued employment. Chaikin stated he did not know whose decision it was to terminate Alhaj, although Dr. Khanna was his immediate supervisor and Hupart was the chairman of the department. Defendants also point to Alhaj's deposition testimony that he "only saw Chaikin" but never interacted with him.

Defendants then contend that Chaikin's only job responsibilities concerning the CHF program was "a future expectation of an administrative nature" in terms of moving resources around the hospital and working with Hupart to reassign resources, i.e. staff, which "made sense" since he was not a doctor. They quoted this court's observation during a conference that plaintiff needed to do more than say **[***39]** that "Chaikin came in and was an administrator." Plaintiff claims that Chaikin was involved in the decision to terminate him because of his com ment **[*1088]** about 9/11 during the termination meeting, and his role in administering the cardiology department and the CHF program.

Chaikin's official title was "Associate Executive Director for Medicine." His duties were to plan programs in medicine, implement what the executive director of the hospital thought **[****17]** needed to be done and "work with the chairman of medicine" to address his day-to-day needs to the operation of the hospital. Hupart testified that because Chaikin was not a doctor, he had an administrative role in all of his assigned projects, including the CHF program, and *worked to achieve Hupart's goals for the hospital.* Chaikin's main role was to work collaboratively with Hupart to bring people together, get them to agree to and move forward on a plan. *Chaikin not only worked on the CHF program, but was involved in all of Hupart's major initiatives to improve the department of medicine.* Hupart testified that Chaikin started working on the CHF program about a month prior to Alhaj's termination, and had attended a series of twice weekly one-on-one **[***40]** meetings to discuss various initiatives. Hupart did not expect Chaikin to work with Alhaj to create the program, but rather expected Alhaj to update Chaikin about the resources that he would need to implement the program.

The facts in *Lefort v. Kingsbrook Jewish Med Ctr., 203 AD3d 708, 164 N.Y.S.3d 183 (2d Dept. 2022)* are quite similar to the facts presented in this case. The Second Department found there were triable issues of fact as to whether a supervisor's remarks concerning the plaintiff's maternity leave were "indicative of a discriminatory motive to terminate" her employment. (*Id. at 710*.) While the Medical Center argued that the supervisor had no involvement in the decision to terminate, the record contained evidence that the chief operating officer, who made the decision to terminate plaintiff, met with the supervisor to discuss plaintiff's return from maternity leave and that the supervisor was present at the termination meeting. *HN18* Where there are factual issues concerning the supervisor's involvement **[**460]** and whether an inference of discriminatory motive can be drawn from this evidence, the court must follow the precept that "all of the evidence must be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences must be resolved in that **[***41]** party's favor." *Rollins v Fencers Club, Inc., 128 AD3d 401, 402, 8 N.Y.S.3d 202 (1st Dept. 2015)*; *Udoh v Inwood Gardens, Inc., 70 AD3d 563, 565, 897 N.Y.S.2d 12 (1st Dept 2010)*.) See also *Abdelal v. Kelly, supra, 857 Fed. Appx. 30* where the Second Circuit **[*1089]** denied summary judgment to the City defendants despite their proffering legitimate, nondiscriminatory reasons for plaintiff's discharge—namely, his guilty plea to and conviction of numerous instances of misconduct. The Second Circuit found that plaintiff presented sufficient evidence to raise a triable issue of fact as to whether the investigation and

77 Misc. 3d 1063, *1089; 177 N.Y.S.3d 433, **460; 2022 N.Y. Misc. LEXIS 5994, ***41; 2022 NY Slip Op 22318, ****17

termination occurred in circumstances giving rise to an inference of discrimination, such as two statements defendants made where they noted his national origin (Egyptian) and his ancestry (Middle Eastern) while investigating his alleged misconduct.

This admittedly is a very difficult case which presents a very close question of law, given that Chaikin only made one comment and one strange smile (assuming plaintiff's version of the event which the court must do on a motion for summary judgment) and given that plaintiff's past history of work at the hospital could warrant termination since he was a probationary employee. However, plaintiff has raised triable issues of fact as to Chaikin's supervisory position in the cardiology department and whether Chaikin played a role in Alhaj's **[\*\*\*42]** termination. Implicit in Hupart's testimony is an admission that he relied upon Chaikin to be the eyes and ears of the CHF program and cardiology department.

Defendants, including Chaikin, grossly minimized Chaikin's involvement with the CHF program and Alhaj. While Chaikin claims his first meeting with Alhaj was during a counseling session in August, the record reveals that Chaikin was involved with the CHF program from its inception. By email dated July 28, 2015, Hupart informed Khanna and Alhaj that he wanted to **[\*\*\*\*18]** meet with them about the proposal they were developing for the new CHF program designed to improve quality of care and a decreased need for hospitalization and rehospitalization after discharge; Chaikin was cc'd on this and another similar email dated June 29, 2015. By email dated August 3, 2015, to his supervisor John Maese, Hupart memorialized his meeting with Alhaj, Khanna and Chaikin the week before wherein "[t]hey presented [meaning Khanna and Alhaj] a program that was too large in scope but [that they] will work with me [Hupart] and Eric [Chaikin] to right size and improve on our 30d re **[\*\*\*43]** admit rate." Contrary to Hupart's testimony, there is no evidence that an actual "counseling session" on the CHF program was ever held or that Hupart wrote Alhaj up on his deficiencies.

Alhaj's direct supervisor is Dr. Ashok Khanna, who is the chief of cardiology. She stated in an affidavit that Alhaj's work **[\*1090]** performance while he was employed at Coney Island Hospital was of the "highest quality" and that she never received any complaints about his work performance, professionalism or work ethic. No one in the hospital informed her that Alhaj was to be terminated and she was never asked about his job

performance by the individual defendants.[6] She could think of no reason for his termination.

**[\*\*461]** All of these factors, coupled with Chaikin's incendiary comment, which could be viewed as a code word, made on the very day of Alhaj's termination which, perhaps coincidentally, occurred on 9/11, inures against this court awarding summary judgment to defendants. As such, this case shall proceed to trial on the narrow issue of whether Alhaj's termination was based upon discriminatory motives.

---

**End of Document**

---

[6] Since this court has already dismissed Alhaj's hostile environment and retaliation claims it will not summarize Khanna's affidavit on those points.


Positive
As of: June 23, 2025 9:41 PM Z

## *Anderson v. City of New York*

United States District Court for the Southern District of New York

January 17, 2024, Decided; January 17, 2024, Filed

No. 22 Civ. 3990 (NSR)

**Reporter**

712 F. Supp. 3d 412 *; 2024 U.S. Dist. LEXIS 8834 **; 2024 WL 183103

TAMEEKA ANDERSON, Plaintiff, -against- CITY OF NEW YORK, Defendant.

**Prior History:** *Anderson v. City of New York, 2022 U.S. Dist. LEXIS 164370 (S.D.N.Y., Sept. 12, 2022)*

## Core Terms

retaliation, alleges, harassment, disability, night shift, vaccination, retaliation claim, gender, plaintiff's claim, medical leave, seniority, termination, religion, factual allegations, quotation, Amend, gender discrimination, impairment, employees, assigned, fails, hostile work environment claim, hostile work environment, discrimination claim, major life activity, protected activity, return to work, discriminatory, adverse employment action, motion to dismiss

**Counsel:** **[**1]** Tameeka Anderson, Plaintiff, Pro se, Yonkers, NY.

**Judges:** NELSON S. ROMÁN, United States District Judge.

**Opinion by:** NELSON S. ROMÁN

## Opinion

[*421] OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Tameeka Anderson ("Plaintiff"), a former paramedic for the New York City Fire Department ("FDNY"), brings this action against Defendant City of New York (the "City") alleging that her former employer discriminated against her by reassigning her from the night shift, created a hostile work environment, and retaliated against her for taking medical leave and

complaining about the discrimination. Plaintiff asserts claims sounding in discrimination, retaliation, and harassment in violation of the (1) *Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17*; (2) *42 U.S.C. 1981* ("*Section 1981*"); (3) *Rehabilitation Act of 1973, 29 U.S.C. §§ 701 to 796*; (4) *Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213*; (5) *Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§2601 to 2654*; (6) *New York State Human Rights Laws ("SHRL"), N.Y. Exec. Law §§ 290 to 297*; and (7) *New York City Human Rights Law ("CHRL"), N.Y. City Admin. Code§§ 8-101 to 131*.

Before the Court is Defendant's motion to dismiss Plaintiff's Amended Complaint. For the following reasons, the Court grants in part and denies in part Defendant's motion and dismisses Plaintiff's claims without prejudice. Specifically, the Court grants Defendant's motion to dismiss Plaintiff's claims for: (1) discrimination based on race, color, religion, and disability under all statutes; (2) retaliation and harassment due to her gender under Title VII, the CHRL, and **[**2]** the SHRL; and disability discrimination under the ADA, *Rehabilitation Act*, CHRL, and SHRL. The Court denies Defendant's motion to dismiss Plaintiff's claims for (1) gender-based discrimination under Title VII, the CHRL and the SHRL and (2) disability-based retaliation under the ADA, Rehabilitation Act, CHRL, and SHRL.

## BACKGROUND

### I. Factual Allegations

The following facts are drawn from Plaintiff's Amended Complaint and opposition papers,[1] and are taken as

_____

[1] In Plaintiff's Opposition Memorandum, Plaintiff alleges

712 F. Supp. 3d 412, *421; 2024 U.S. Dist. LEXIS 8834, **2

true for the **[\*422]** purposes of this motion.[2] *See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

In April 2008, Plaintiff began working as an EMT with the New York City Fire Department ("FDNY") and in 2019, was promoted to the role of paramedic. (Amend. Compl. ¶ 1.) In April 2020, Plaintiff—a Christian, African American woman—allegedly began to face discrimination on account of her race, gender, a combination of her race and gender, vaccination status, religion, and taking medical leave. (*Id.* ¶ 2) Plaintiff further alleges Defendant (1) "retaliated against [her] for taking medical leave and complaining about the discrimination" and (2) "failed to accommodate [her] religious beliefs." (*Id.*) Finally, Plaintiff alleges Defendant denied her due process because "FDNY's vaccination policy **[\*\*3]** was arbitrary and capricious." (*Id.*)

*Plaintiff's Allegations of Discrimination and Retaliation at FDNY*

---

additional facts to supplement her operative complaint. (Pl. Opp. at 1 (requesting that the Court "read any new additional facts in [her] opposition brief as supplementing the operative complaint".) The Court's "mandate to read the papers of pro se litigants generously makes it appropriate to consider [a] plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord, No. 96-CV-7544, 1997 U.S. Dist. LEXIS 18131, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997)* (citing *Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)*); *see also Veras v. Jacobson, No. 18-CV-6724, 2020 U.S. Dist. LEXIS 174632, 2020 WL 5659551, at \*1 n.1 (S.D.N.Y. Sept. 23, 2020)* ("The Court properly considers factual allegations contained in [the] [p]laintiff's opposition papers and other materials submitted by [the] [p]laintiff to the extent that those allegations are consistent with the Amended Complaint."), *reconsideration denied, 2020 U.S. Dist. LEXIS 213259, 2020 WL 6694410 (S.D.N.Y. Nov. 13, 2020)*. Because they relate to the original wrongdoing, the Court will consider the new facts alleged in Plaintiff's Opposition. *See Davila v. Lang, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018)* ("A pro se plaintiff may not raise 'entirely new' causes of action for the first time in his opposition papers, but the Court may consider new claims appearing for the first time in briefing if 'the claims could have been asserted based on the facts alleged in the complaint.'") (italics omitted) (quoting *Vlad-Berindan v. MTA New York City Transit, No. 14-CV-675, 2014 U.S. Dist. LEXIS 170985, 2014 WL 6982929, at \*5 (S.D.N.Y. 2014)* (collecting cases)).

[2] For citations to the Amended Complaint, the Court refers to Exhibit A of the Gordon Declaration, which uses numbered paragraphs for ease of reference. (Gordon Decl ¶ 2, Ex. A.)

In April 2020, Plaintiff was reassigned to Station 18 in the Bronx and placed on the night shift, which pays 10 percent higher wages than the day shift. (*Id.* ¶ 3.) Of the eight positions on the night shift, Plaintiff was the only woman. (*Id.*) Plaintiff worked the night shift until December 2020, when she was placed on medical leave after contracting COVID-19. (*Id.*)

In April 2021, Plaintiff returned to Station 18 but received notice that she would be assigned to the lower-paying morning shift and could no longer work the night shift. (*Id.* ¶ 4.) After her reassignment, men held all of the eight night shift positions. (*Id.*) Of the twelve positions on the morning shift, women filled four. (*Id.*) Upon her return, Plaintiff requested reassignment to her previous position based on seniority, as she was more senior than two of the men on the night shift. (*Id.*) Although FDNY follows a seniority system to assign shifts wherein "a longer tenured employee possesses a priority right to his or her desired shift," Plaintiff was denied her seniority right to be assigned the night shift. (*Id.*) Plaintiff **[\*\*4]** was told that the two junior male employees were assigned to the night shift because one was in training and the other had spent more time on the night shift, despite Plaintiff's longer tenure as an employee overall. (*Id.*)

Plaintiff alleges "[t]hese given reasons were pretextual and dishonest," and that she was denied her seniority rights due to discrimination and in retaliation for taking medical leave. (*Id.*) Specifically, she alleges she did not receive her seniority rights due to her "gender, race, combination of gender and race, [her] perceived disability from having taken medical leave when [she] got COVID-19, and/or in retaliation for having taken leave." (*Id.*) In support, Plaintiff notes that "for the entirely of [her] FDNY employment, employees in training are customarily assigned to the morning shift, as this was seen as the best way to build experience," and during this same time, a female employee in training was assigned to the day shift. (*Id.*) Moreover, "seniority had always been calculated by reference to one's entire tenure with **[\*423]** FDNY, not one's experience on a particular shift." (*Id.*) At this time, Plaintiff had "consistently excellent" attendance as well as "consistently **[\*\*5]** excellent" performance reviews, which were superior to the two more junior male employees on the night shift. (*Id.* ¶ 5.) As a result of the discrimination and retaliation, Plaintiff received lower pay. (*Id.* ¶ 4.)

In May 2021, after her assignment to the morning shift, Plaintiff alleges she was subjected to verbal abuse and

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 22 of 321

Page 3 of 14

712 F. Supp. 3d 412, *423; 2024 U.S. Dist. LEXIS 8834, **5

harassment from her assigned partner. (*Id.* ¶ 5.) Her partner "engaged in a campaign of intimidation," "including throwing objects, slamming doors, and staring at [her] in common spaces." (*Id.*) Plaintiff argues she faced the verbal abuse and harassment due to her "protected characteristics," and "other employees—who did not share her gender and racial identities—were not subjected to the same conditions." (*Id.*) As a result of this alleged harassment, Plaintiff filed a workplace violence complaint on May 13, 2021. (*Id.* ¶ 6.) Plaintiff further alleges two other co-workers also harassed her. Plaintiff notified her superiors in writing of each instance of harassment. (*Id.*) She filed her last complaint on October 27, 2021, and the next day, Plaintiff's employer told her not to return to work. (*Id.*)

On October 26, 2021, Plaintiff learned that FDNY employees without proof [**6] of COVID-19 vaccination were prohibited from returning to work on November 1, 2021. (*Id.* ¶ 7) "Due to [her] deeply held Christian beliefs and under advice of [her] religious mentor," Plaintiff did not receive the vaccine. (*Id.*) As a result, Plaintiff was placed on leave without pay. (*Id.*) "At no point did FDNY inform [Plaintiff] [of] the process for requesting a religious exemption to the COVID-19 requirement." (*Id.*) By the time Plaintiff learned of the process from the news, the deadline had already passed. (*Id.*) Plaintiff alleges that "on information and belief," FDNY failed to inform her of the process and reinstate her employment in "retaliation of her efforts to speak out against gender discrimination in the department." (*Id.*)

On February 11, 2022, Plaintiff's employment with FDNY was terminated. (*Id.* ¶ 8.) On February 24, 2022,[3] Plaintiff received an email informing her of her termination and that the FDNY now required COVID-19 vaccination as a condition of employment. (*Id.*) "Prior to this email," Plaintiff alleges, "the only communications [she] had received from the FDNY during [her] mandatory leave had been emails and letters requesting that [she] submit proof of vaccination, [**7] which did not identify any option to request a religious exemption." (*Id.*) Plaintiff alleges her termination was in retaliation for her "attempts to speak out against and resist the discrimination [she] faced as an FDNY employee." (*Id.* ¶1.) Specifically, Plaintiff alleges she "complained about the harassment and discrimination [she] faced multiple

times, and she was fired less than a month after the investigation of [her] final complaint concluded." (*Id.*)

*Plaintiff's EEOC Complaint*

On May 21, 2021, Plaintiff filed an internal FDNY Equal Employment Opportunity ("EEO") complaint alleging gender discrimination, specifically that men are given higher priority for the higher earning night shift position, and as a result, are allowed to earn higher wages than women. (*Id.* ¶ 6.) In July 2021, after the EEO Office failed to act on her complaint, Plaintiff requested a transfer to another FDNY [*424] Station in the Bronx, which was denied in August 2021. (*Id.*) In August 2021, Plaintiff filed a complaint (the "Charge") with the New York State Division of Human Rights ("SDHR") and U.S. Equal Employment Opportunity Commission ("EEOC").[4] (*Id.*) In September 2021, Plaintiff filed another complaint with the [**8] FDNY EEO office, who completed their investigation in January 2022. (*Id.*) On February 17, 2022, Plaintiff received a right to sue letter from the EEOC. (*Id.* ¶ 8.)

**II. Procedural History**

Plaintiff filed this action on May 16, 2022. (ECF No. 1.) On November 28, 2022, Defendant filed a letter motion seeking leave to dismiss Plaintiff's Complaint. (ECF No. 15.) On December 7, 2022, Plaintiff filed a letter motion seeking leave to amend the Complaint "to address the alleged insufficiencies identified by Defendant." (ECF No. 16.) That same day, the Court granted Plaintiff's request to amend her Complaint, and set a briefing schedule for Defendant's motion to dismiss in the event Plaintiff filed amended pleadings. (ECF No. 17.) On January 20, 2023, Plaintiff filed her Amended Complaint. (ECF No. 18.) In her Amended Complaint, Plaintiff identified adverse employment actions taken by her employer as: (1) termination of her employment; (2) not promoting her; (3) not accommodating her disability; (4) providing her with terms and conditions of employment different from those of similar employees; (5) retaliation; and (5) harassment. (*Id.*)

---

[3] Plaintiff identifies the date of the email informing her of the termination of her employment and the COVID-19 vaccination requirement as February 24, 2021. Within the broader context of the Complaint, the Court construes the date as February 24, 2022.

---

[4] In her Amended Complaint, Plaintiff states that she filed a Complaint with the EEOC on August 21, 2021. (Amend. Compl. ¶ 6.) Defendant's Bonaparte Declaration includes a copy of Plaintiff's EEOC charge, which she simultaneously filed with the NYSDHR and digitally signed on August 25, 2021. (Bonaparte Decl., Exhibit B.)

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 23 of 321

Page 4 of 14

712 F. Supp. 3d 412, *424; 2024 U.S. Dist. LEXIS 8834, **8

On June 20, 2023, the parties filed their respective papers **[\*\*9]** on Defendant's motion to dismiss: Defendant filed its motion to dismiss (ECF No. 30), Declaration of Ernst Bonaparte in Support (ECF No. 31, "Bonaparte Decl."), Memorandum in Support (ECF No. 32, "Def. Mem.") and Reply (ECF No. 34, "Reply"); and Plaintiff filed her opposition (ECF No 33, "Pl. Opp.").

## LEGAL STANDARD

To survive a _12(b)(6)_ motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_ (quoting _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." _Twombly, 550 U.S. at 570_. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable for the unlawful activity alleged. _Iqbal, 556 U.S. at 678_. "In considering a motion to dismiss for failure to state a claim, the district court is normally required to look only to the allegations on the face of the complaint . . . the court may [also] consider documents that are attached to the complaint, incorporated in it by reference, [or] integral to the complaint." _United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020)_ (quotation marks omitted).

In assessing the sufficiency of the claims, the court is "not required to credit conclusory allegations or legal **[\*\*10]** conclusions couched as factual allegations." _Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013)_. While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, **[\*425]** do not suffice." _Iqbal, 556 U.S. at 678-79_. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." _Id. at 678_.

## DISCUSSION

Plaintiff asserts claims sounding in discrimination, retaliation, harassment, and discrimination in violation of (1) Title VII; (2) _42 U.S.C. § 1981_ ("_Section 1981_"); (3) the _Rehabilitation Act_; (4) the _Americans with Disabilities Act ("ADA")_; (5) the _Family Medical Leave Act ("FMLA")_; (6) the New York State Human Rights

Law ("SHRL"); and (7) the New York City Human Rights Law ("CHRL"). For the following reasons, the Court grants in part and denies in part Defendant's motion to dismiss Plaintiff's Amended Complaint.[5] The Court dismisses all of Plaintiff's claims _except_ those claims for sex-based discrimination and disability-based retaliation under the ADA, _Rehabilitation Act_, CHRL, SHRL, and Title VII.

## I. Exhaustion

At the outset, Defendant argues Plaintiff failed to exhaust her administrative remedies for her disability, race, and religious discrimination claims because Plaintiff's Charge to the SDHR, which she simultaneously filed with the EEOC, failed to mention discrimination based on her disability, race, **[\*\*11]** or religion. (Def. Mem. at 4.) Plaintiff responds that her race discrimination claims are reasonably related to her gender discrimination claims sufficient to give adequate notice to the EEOC. (Pl. Opp. at 2.)

Title VII and the ADA requires a plaintiff to first exhaust her administrative remedies before filing suit in federal court. _42 U.S.C. § 2000e-5(e)_; _42 U.S.C. § 12117(a)_; _see also Williams v. New York City Hous. Auth., 458_

_____

[5] As Defendant argues, Plaintiff's Opposition fails to address all the Defendant's arguments for dismissal of her Amended Complaint, including Defendant's arguments regarding Plaintiff's race and religious discrimination claims. (Reply at 3.) Accordingly, the Court has discretion to view these claims as abandoned by the Plaintiff. _See e.g., Robinson v. Fischer, No. 09 Civ 8882(LAK)(AJP), 2010 U.S. Dist. LEXIS 137660, 2010 WL 5376204, at \*10 (S.D.N.Y. Dec. 29, 2010)_ ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim."); _Masciotta v. Clarkstown Cent. Sch. Dist., No. 14-CV-7128 (KMK), 2016 U.S. Dist. LEXIS 112432, 2016 WL 4449660, at \*28 n.10 (S.D.N.Y. Aug. 23, 2016)_ (exercising its discretion to dismiss claims on the merits, despite the _pro se_ plaintiff's opposition not discussing the claims). However, given the Plaintiff's _pro se_ status, the Court exercises its discretion and declines to deem these claims as abandoned and addresses them on the merits. _See Ransom v. Banks, No. 1:20-cv-10232, 2022 U.S. Dist. LEXIS 45005, 2022 WL 769344, at \*4 (S.D.N.Y. Mar. 14, 2022)_ (exercising its discretion to review allegations plaintiff failed to address in its opposition to defendant's motion to dismiss); _White v. CSX Transportation, Inc., No. 19-CV-500 (HKS), 2023 U.S. Dist. LEXIS 195308, 2023 WL 7166523, at \*4 (W.D.N.Y. Oct. 31, 2023)_ (same).

712 F. Supp. 3d 412, *425; 2024 U.S. Dist. LEXIS 8834, **11

*F.3d 67, 70 (2d Cir. 2006)*. Exhaustion requires timely filing of charges with the EEOC and obtaining notice of the right to sue. *Id.; see also Williams, 458 F.3d at 69-70*. In certain circumstances, claims not raised in an original EEOC charge may still be pursued if they are "reasonably related" to the initial charge. "Reasonably related conduct is that 'which would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir. 2001)*); *see also Mathirampuzha v. Potter, 548 F.3d 70, 77 (2d Cir. 2008)* (providing that claim is reasonably related when "administrative **[*426]** complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised."). Whether a claim is "reasonably related" to the EEOC charge depends on "the factual allegations made in the [EEOC] charge itself" and whether those allegations **[**12]** "gave the [EEOC] adequate notice to investigate the claims asserted in court." *Williams, 458 F.3d at 70* (quoting *Deravin v. Kerik, 335 F.3d 195, 201-02 (2d Cir. 2003)*) (cleaned up).

Here, Plaintiff fails to present facts sufficient to provide notice of her race or religion discrimination claims in her Charge, and her Charge cannot be read to include either of those claims either. On her Charge, Plaintiff checked the box for discrimination based on sex and wrote "I am Female and because of that I have been discriminated against." (Bonaparte Decl., Ex. B at 1.) Plaintiff then alleges that after returning from sick leave, her spot on the night shift was filled "with a trainee (Meghee/Male)" whom she had seniority over. Plaintiff further plead that the trainee "was able to remain on the overnight shift along with Paramedic Watson (male)." Plaintiff's factual assertions centers sex discrimination by focusing on the gender of the employees who replaced her on the night shift. Nowhere does Plaintiff's description of the alleged discrimination mention, or even hint at, her race or religion. Accordingly, the Court dismisses Plaintiff's claims based on race and religious discrimination under Title VII.

That said, Court will liberally construe her EEOC charge to include **[**13]** a disability discrimination claim.[6]

Plaintiff plead facts that she contracted COVID-19 and took sick leave, and therefore, reading her charge as liberally as possible, she explicitly ties her sick leave to her removal from the night shift. The Court finds this is sufficient to apprise the EEOC of a potential claim for discrimination due to disability. Accordingly, the Court will assess Plaintiff's claims arising under the ADA and Title VII based on her sex and disability.

## II. Title VII Claims

Having dismissed Plaintiff's Title VII claims based on race and religious discrimination, the Court turns to her Title VII claims for discrimination, retaliation, and harassment due to her gender. Plaintiff alleges that Defendant reassigned her to the morning shift due to her gender, retaliated against her for speaking out about discrimination, and harassed her. For the reasons stated below, Plaintiff sufficiently plead a gender discrimination claim under Title VII, but fails to state a hostile work environmental claim and a retaliation claim.

### A. Title VII Discrimination

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice **[**14]** made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing **[*427]** under this subchapter." *42 U.S.C. § 2000e-3*. At the pleading stage, "in an employment discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015)*. "[A] Plaintiff need only give plausible support to a *minimal inference* of discriminatory motivation." *O'Toole v. Cnty. of Orange, 255 F. Supp. 3d 433, 438 (S.D.N.Y. 2017)* (citing *Vega, 801 F.3d at 84*) (emphasis in original). That said, a plaintiff asserting a claim for discrimination under Title VII "must still at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *Id.* (citing *EEOC v. Port Auth. of N.Y. &*

---

[6] Administrative exhaustion in the Title VII and ADA context "is not a jurisdictional [prerequisite], but only a precondition to bringing [suit] ... that can be waived by the parties or the court." *Gomez v. New York City Police Dep't, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016)* (citing *Francis v. City of New York,*

*235 F.3d 763, 768-69 (2d Cir.2000)*). However, the Court should grant a motion to dismiss if exhaustion is clear from the face of the complaint (and incorporated documents). *Id.* (citing *McCoy v. Goord, 255 F. Supp.2d 233, 251 (S.D.N.Y. 2003)*).

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 25 of 321

Page 6 of 14

712 F. Supp. 3d 412, *427; 2024 U.S. Dist. LEXIS 8834, **14

*N.J., 768 F.3d 247, 254 (2d Cir. 2014)*) (cleaned up).

Defendant argues Plaintiff's gender discrimination allegations are insufficient to state a claim because they are "based on a vague seniority policy and the demographic composition of her unit." (Def. Mem. at 10.) Specifically, Defendant argues (1) the seniority policy is vague because Plaintiff fails to cite a "source" for the policy, **[**15]** i.e., whether it was "written rule . . . or an unwritten workplace practice"; (2) Plaintiff failed to allege whether any women requested and were denied a night shift position; and (3) Plaintiff does not plead any "remarks or written statements conveying discriminatory animus." (*Id.* at 10-11.)

Plaintiff alleges she was denied the higher-paying night shift position due to her gender. Prior to her taking medical leave, Plaintiff was the only woman on the night shift and upon her return, there were no women on the night shift. While Plaintiff does not have any direct evidence of gender discrimination, she alleges the following facts from which the Court can plausibly infer gender discrimination: (1) the FDNY uses a seniority system for shift assignments; (2) in several other situations, employees used their seniority to obtain their preferred shift; (3) despite her seniority, Plaintiff's request for a night shift position was denied and the position was given to two more junior, male employees; (4) a similarly-situated white, male employee also requested the night shift upon his return from medical leave, which FDNY approved. (Amend. Compl. ¶ 4; Pl. Opp. at 3-4.) Although the FDNY's explained **[**16]** that the junior male employees were either more senior in the night shift or in training, Plaintiff further alleges these explanations were pretextual because a female employee in training was assigned to the day shift. (Amend. Compl. ¶ 4.) Moreover, Plaintiff alleges her performance reviews were "superior" to those of the male employees. (*Id.* ¶ 5.)

These factual allegations go beyond "false syllogisms." *Bermudez v. City of New York, 783 F.Supp.2d 560, 581 (S.D.N.Y. 2011)*. Plaintiff does more than allege she was denied the night shift because she is a woman— she alleges her employer contravened the established seniority system to assign men to the night shift over qualified women, which resulted in her receiving lower pay. Taken together, Plaintiff just barely "create[es] a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Vega, 801 F.3d at 87* (internal quotations and citation omitted). Because Plaintiff's allegations suffice just enough to "nudge" her

claims from conceivable to plausible, the Court declines to grant Defendant's motion to dismiss Plaintiff's Title VII claim for sex-based discrimination at this stage. *See Heap v. Cnty. of Schenectady, 214 F. Supp. 2d 263, 269 [*428] (N.D.N.Y. 2002)* (plaintiff established prima facie case of gender discrimination **[**17]** by showing she was denied promotion despite her superior qualifications).

*B. Title VII Retaliation*

Plaintiff alleges she faced retaliation for speaking out against gender discrimination and harassment. In support of her retaliation claim, Plaintiff alleges (1) the day after filing a workplace harassment complaint, she was told not to return to work and (2) her employer failed to inform her of the process for seeking a religious exemption to the COVID-19 vaccine. (Amend. Compl. ¶¶ 5, 8.) Defendant argues Plaintiff has failed to plausibly allege a retaliation claim because it hinges "solely on proximity" without any causal connection. (Def. Mem. at 18-19.) The Court agrees with Defendant.

""[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against him, (2) because he has opposed any unlawful employment practice." *Vega, 801 F.3d at 90 (2d Cir. 2015)* (internal quotation marks omitted). "The mere fact that [a] plaintiff [has] earlier filed an EEOC complaint is not enough to support a contention that the subsequent conduct of defendants was a result of the earlier complaint." **[**18]** *Wilson v. Reuben H. Donnelley Corp., 98 Civ. 1750, 1998 U.S. Dist. LEXIS 17220, 1998 WL 770555, at *4 (S.D.N.Y. Nov. 2, 1998)*. However, "[i]n this Circuit, an inference of causation is defeated . . . if there was an intervening causal event that occurred between the protected activity and the alleged retaliatory discharge." *Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005)*; *see also Brennan v. Legal Aid Soc'y, No. 19-CV-7756 (VSB), 2020 U.S. Dist. LEXIS 219181, 2020 WL 6875059, at *4 (S.D.N.Y. Nov. 23, 2020)* (collecting cases).

Here, Plaintiff's factual allegations are insufficient to "establish a plausible causal nexus between the adverse employment actions and her protected activity." *Dechberry v. New York City Fire Dep't, 124 F. Supp. 3d 131, 154 (E.D.N.Y. 2015)*. Plaintiff does not provide any other evidence that she was placed on leave and later terminated for speaking out against discrimination, and

therefore her allegations are solely based on the temporal proximity (approximately three months) between the filing of her complaint and being told not to return to work. This temporal proximity, however, is defeated by a far more plausible explanation for Plaintiff's termination: her failure to receive the COVID-19 vaccine as required by her employer.

The most plausible reading of the alleged retaliation she experienced for speaking out against discrimination is the FDNY's enforcement of the Order of New York City's Commissioner of Health and Mental Hygiene (the "Commissioner") requiring COVID-19 vaccinations for all city employees. (Bonaparte Decl. Ex. [**19] 3.) On Wednesday, October 20, 2021, the Commissioner issued the Order establishing the vaccine mandate (*id.*); the following Wednesday, October 27, 2021, Plaintiff was informed that unvaccinated employees could not return to work on November 1, 2021. (Amend. Compl. ¶ 5.) On November 1, 2021, Plaintiff was placed on leave without pay for failure to receive the vaccine, and on February 24, 2022, Plaintiff's employer informed her of her termination as vaccination became a condition of employment. (*Id.* ¶¶ 7-8.) These series of events plainly indicate that Plaintiff's termination was the direct result her failure to obtain the vaccine or an exemption, and therefore Plaintiff's factual allegations cannot plausibly **[*429]** support a claim of retaliation. Finally, even if the Court were to consider Plaintiff experienced any retaliation for filing of her EEOC complaint, the time between the filing of her final EEOC complaint in October 2021 and her termination in February 2022 is "too attenuated to establish causation." *Dechberry v. New York City Fire Dep't, 124 F. Supp. 3d 131, 155 (E.D.N.Y. 2015)* ("[D]istrict courts within the Second Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not [**20] allow for an inference of causation.") (citation and internal quotation marks omitted) (collecting cases).

Similarly, Plaintiff's conclusory allegations that her employer failed to inform her of the process for obtaining an exemption to the vaccination requirement is far too speculative to plausibly state a retaliation claim. Plaintiff does not provide any specific facts to support a causal nexus between the employer's alleged failure to inform her of the exemption process and her discrimination complaints, or to create plausible inference of retaliatory motive. *Edwards v. Elmhurst Hosp. Ctr., No. 11 CV 5348 RRM LB, 2013 U.S. Dist. LEXIS 32571, 2013 WL 839554, at *7 (E.D.N.Y. Feb. 4, 2013)*, report and recommendation adopted, *No. 11-CV-*

*5348 RRM LB, 2013 U.S. Dist. LEXIS 31790, 2013 WL 831162 (E.D.N.Y. Mar. 6, 2013)* ("Plaintiff must do more than invoke the word 'retaliation' to sustain an employment discrimination claim under federal law."). Per Plaintiff's factual allegations, the vaccine requirement and exemption option were publicly reported. (Amend. Compl. ¶ 7 ("[Plaintiff] only learned of the process for requesting a religious exemption from the news.").) Plaintiff fails to allege she requested information on the vaccine exemption and FDNY refused to provide it, or that FDNY provided the information to other similarly-situated individuals. Thus, that her employer withheld such information from [**21] her in retaliation to her complaints of discrimination is far from plausible. Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's Title VII retaliation claim.

## C. Title VII Hostile Work Environment

A plaintiff asserting a claim for hostile work environment under Title VII must plead facts that would tend to show the complained of conduct: (1) "is objectively severe or pervasive—that it creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex." *Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)* (citing *Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001)*) (cleaned up). To survive a motion to dismiss, a plaintiff need only "plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Donahue v. Asia TV USA Ltd., 208 F. Supp. 3d 505, 514 (S.D.N.Y. 2016)* (alterations in original) (quoting *Patane, 508 F.3d at 113*). Courts will look at "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether [**22] it unreasonably interferes with an employee's work performance" *Yan v. Ziba Mode Inc., No. 15-cv-47 (RJS), 2016 U.S. Dist. LEXIS 42328, 2016 WL 1276456, at *5 (S.D.N.Y. Mar. 29, 2016)* (internal quotations omitted). "While each of these elements is relevant to the inquiry, no single factor is required." *Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004)* (internal quotations omitted).

**[*430]** Plaintiff alleges after FDNY assigned her to the morning shift, she was assigned to a partner who

subjected her to verbal abuse, harassment, and a "campaign of intimidation," including "throwing objects, slamming doors, and staring at [her] in common spaces." (Amend. Compl. ¶ 5.) In her Opposition, Plaintiff further specified that on or around May 13, 2021, her coworker Anthony Perez harassed her due to her gender by shouting at her, throwing equipment, slamming doors, and blocking her in the office. (Pl. Opp. at 4.) In addition to the abuse from this partner, Plaintiff also alleges two other employees harassed her several times as well. (*Id.*) Plaintiff further alleges other individuals of a different race and gender did not experience harassment. (Amend. Compl. ¶5.) Defendant again argues Plaintiff has failed to state sufficient factual allegations to support her claim, and the Court agrees.

"[I]t is axiomatic that in order to establish a sex-based hostile work environment **[**23]** under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)* (internal quotation marks and citation omitted). Plaintiff fails to allege a causal connection between the alleged workplace abuse she experienced and her gender, instead making conclusory allegations. Although Mr. Perez's alleged behavior indicate he is unpleasant to work with, Plaintiff's factual allegations fail to plausibly establish any discriminatory motive. *Vito v. Bausch & Lomb Inc., 403 F. App'x 593, 596 (2d Cir. 2010)* (plaintiff's hostile work environment claims "amount to, at most, workplace bullying completely detached from any discriminatory motive"). Furthermore, without more facts to show discriminatory motive, the allegation that male employees were not subject to the harassment also falls short of stating a claim. Also far from sufficient are the facts describing the instances of harassment from the two other employees—Plaintiff only alleges they harassed her "several times," and fails to identify over what period of time, the number of times, or any specifics of their behavior.

Even if Plaintiff sufficiently alleged she experienced harassment and abuse because of her gender, the alleged instances of harassment from Mr. Perez are not sufficiently **[**24]** severe or pervasive to constitute a hostile work environment. The Second Circuit has found singular instances of workplace abuse may create a hostile work environment. *See Perry v. Slensby, No. 16-CV-08947 (NSR), 2018 U.S. Dist. LEXIS 33602, 2018 WL 1136922, at *6 (S.D.N.Y. Feb. 28, 2018)* (collecting cases). However, the harassment Mr. Perez allegedly subjected Plaintiff to here does not rise to a similar level. (*See e.g., Marquez v. City of New York, No. 14-CV-*

*8185 (AJN), 2016 U.S. Dist. LEXIS 123897, 2016 WL 4767577, at *9 (S.D.N.Y. Sept. 12, 2016)* (harassing conduct not sufficiently severe where no evidence conduct physically threatened plaintiff or interfered with plaintiff's work); *Spina v. Our Lady of Mercy Med. Ctr., No. 97* **CIV**.4661 RCC, 2003 U.S. Dist. LEXIS 19091, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003)*, *aff'd, 120 F. App'x 408 (2d Cir. 2005)* (defendant's behavior of yelling, staring at, and following the plaintiff too "mild" for harassment claim); *Annunziata v. Int'l Bhd. of Elec. Workers Loc. Union # 363, No. 15-CV-03363 (NSR), 2018 U.S. Dist. LEXIS 89234, 2018 WL 2416568, at *16 (S.D.N.Y. May 29, 2018)* (harassment not especially severe where comments "not sexual in nature," "overly profane," or "accompanied by any rude or physically threatening gestures"). Plaintiff fails to allege that she felt physically threatened, the harassment interfered with her work, or that Mr. Perez's behavior or statements were particularly obscene, profane, **[*431]** or offensive. The Court thus dismisses Plaintiff's hostile work environment claim under Title VII.

### III. *Section 1981* Claims

Plaintiff alleges that Defendant violates *Section 1981*. However, a separate private right of action is unavailable against state actors under *Section 1981*. *Duplan v. City of New York, 888 F.3d 612, 621 (2d Cir. 2018).* Plaintiff's claims against the City of New York **[**25]** must be brought pursuant to *42 U.S.C. § 1983* ("*Section 1983*"). Under *Section 1983*, "[m]unicipalities may be sued directly under *§ 1983* for constitutional deprivations inflicted upon private individuals pursuant to governmental custom, policy, ordinance, regulation, or decision." *Brandon v. City of New York, 705 F. Supp. 2d 261, 267 (S.D.N.Y. 2010).* However, even if the Court were to construe Plaintiff's claims as a *Section 1983* action, Plaintiff's claims would still fail. To state a claim under *Section 1983*, a plaintiff must allege an official policy or custom caused the alleged constitutional violation. *Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)* (citing *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694 n.58, 98 S. Ct. 2018, 2037 n.56 L. Ed. 2d 611 (1978)*). Plaintiff's Amended Complaint lacks any allegation "of an official policy or custom," and therefore the Court dismisses her claims under *Section 1983*.

### IV. *Rehabilitation Act* and ADA Claims

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 28 of 321

Page 9 of 14

712 F. Supp. 3d 412, *431; 2024 U.S. Dist. LEXIS 8834, **25

Plaintiff alleges she faced retaliation and discrimination for taking medical leave after contracting COVID-19 and her perceived disability from contracting COVID-19.[7] (Amend. Compl. ¶¶ 2-3.) Specifically, Plaintiff experienced temporary disability after contracting COVID-19 as the disease impaired her abilities in "several major life activities," including breathing and speaking. (Pl. Opp. at 5.) Although Plaintiff returned from leave when she was no longer disabled, Plaintiff alleges her employer immediately retaliated against her for taking leave **[**26]** by reassigning her to the lower-paying morning shift. (*Id.*) Defendant avers, *inter alia*, that Plaintiff has failed to allege she had a disability. As explained below, the Court grants Defendant's motion to dismiss Plaintiff's discrimination claim under the ADA and Rehabilitation Act but denies its motion to dismiss with respect to her retaliation claims.

### A. Discrimination Claim

As explained below, Plaintiff's allegations are insufficient to support Plaintiff's assertion that she has a disability, and therefore the Court dismisses her discrimination claim under the ADA and the Rehabilitation Act.

As this Court has previously noted, "the standards under the [ADA and Rehabilitation Act] are generally the same." *Langella v. Mahopac Cent. Sch. Dist., No. 18-CV-10023 (NSR), 2023 U.S. Dist. LEXIS 43926, 2023 WL 2529780, at *3 (S.D.N.Y. Mar. 15, 2023)* (citing *Wright v. N.Y.S. Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016)*). The *Rehabilitation Act* prohibits disability-based discrimination by government agencies and other recipients of federal funds. *Section 504(a) of the Rehabilitation Act* provides:

> **[*432]** No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

*29 U.S.C. § 794(a)*.

The ADA prohibits an employer from discriminating against an employee **[**27]** "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. As defined by the ADA, "discrimination" includes, *inter alia*,

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the . . . [employer's] business.

Id. *§ 12112(b)(5)(A)* (emphasis added). "[O]therwise qualified" means that the individual, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id. § 12111(8)*.

Therefore, to plead a *prima facie* claim of discrimination under the ADA or *Rehabilitation Act*, a Plaintiff must allege "(1) that [he] is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that [he] was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise **[**28]** discriminated against by defendants, by reason of [his] disabilit[y].'" *Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 85 (2d Cir. 2004)*, *opinion corrected*, *511 F.3d 238 (2d Cir. 2004)* (quoting *Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)*) (all but first alterations in original). That said, at the pleading stage, "a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Langella v. Mahopac Cent. Sch. Dist., No. 18-CV-10023 (NSR), 2023 U.S. Dist. LEXIS 43926, 2023 WL 2529780, at *3 (S.D.N.Y. Mar. 15, 2023)* (citing *Dooley v. Jetblue Airways Corp., 636 Fed. Appx. 16, 19-21 (2d Cir. 2015)*).

"Under the ADA, a qualifying disability must limit a major life activity and the limitation must be substantial." *2023 U.S. Dist. LEXIS 43926, [WL] at *3* (citing *Laface v. E. Suffolk BOCES, No. 2:18-CV-1314 (ADS) (AKT), 2020 U.S. Dist. LEXIS 85343, 2020 WL 2489774, at *10 (E.D.N.Y. May 14, 2020)*. The ADA contains a non-exhaustive list of "major life activities," which includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

---

[7] Defendant construes Plaintiff's pleadings as alleging disability-based discrimination under the ADA and the Rehabilitation Act. Applying that standard, Defendant argues Plaintiff's claims fail because she fails to allege she had a disability. The Court construes Plaintiff's claims as alleging both a discrimination claim and a retaliation claim under the ADA and Rehabilitation Act: (1) retaliation for taking medical leave and (2) discrimination due to her perceived disability from taking medical leave. (*See* Amend. Compl. ¶ 4.)

Case 1:25-cv-03496-JPC-SLC   Document 20-3   Filed 07/09/25   Page 29 of 321

Page 10 of 14
712 F. Supp. 3d 412, *432; 2024 U.S. Dist. LEXIS 8834, **28

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." _42 U.S.C. § 12102(2)._ "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of its impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." _O'Hara v. Bd. of Coop. Educ. Servs. S. Westchester, No. 18-CV-8502 (KMK), 2020 U.S. Dist. LEXIS 47210, 2020 WL 1244474, at *12 (S.D.N.Y. Mar. 16, 2020)_ (citing _Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005)_).

The Department of Health and Human Services promulgated regulations under the _Rehabilitation Act_ that define a "handicapped person" as "any person who (i) has a physical or mental impairment which substantially limits one or more major life [**29] activities, (ii) has a record of such an impairment, or (iii) is regarded as having [*433] such an impairment," _45 C.F.R. § 84.3(j)(1)_, and a "qualified handicapped person" as one who "with reasonable accommodation, can perform the essential functions of the job in question." _45 C.F.R. § 84.3(l)(1)._

Here, Plaintiff fails to plausibly allege her illness from COVID-19 substantially impaired a major life activity sufficient to plead a disability under the ADA. Rather, Plaintiff asserts a single, conclusory allegation that her abilities in "several major life activities" have been impaired, without any additional details. (_See_ Pl. Opp. at 5.) Plaintiff's vague factual allegations do not describe the conditions or disorders causing the alleged impairments, or how these impairments substantially impacted "several major life activities" or her ability to work. _See Collins v. Giving Back Fund, No. 18 CIV. 8812 (CM), 2019 U.S. Dist. LEXIS 132088, 2019 WL 3564578, at *13 (S.D.N.Y. Aug. 6, 2019)_ (plaintiff is required "to do more than simply allude to her impairments in her pleading; she must plead _how_ those impairments significantly impacted her major life activities, or she will not survive a motion to dismiss.") (emphasis in original). Furthermore, any notion that Plaintiff had a qualifying disability is further dispelled by Plaintiff herself noting that she was able [**30] to return to work after approximately four months on medical leave without a disability. (_See_ Pl. Op. at 5 (noting she was "no longer disabled").). Plaintiff thus fails to plausibly allege disability discrimination under the ADA or the _Rehabilitation Act._

_B. Retaliation Claim_

Despite the Court's dismissal of Plaintiff's discrimination claim, a plaintiff may still assert a retaliation claim "so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." _Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)_ (citing _Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.1999)_). There are no factual allegations or other arguments indicating that Plaintiff lacked a good faith belief that she had a disability from contracting COVID-19 and her employer discrimination against her due to that disability. Accordingly, for the purposes of this motion, the Court analyzes Plaintiff's retaliation claim under the _Rehabilitation Act_ and the ADA.

For a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against [him or her], (2) 'because' he [or she] has opposed any unlawful employment practice." _Riddle v. Citigroup, 640 F. App'x 77, 79 (2d Cir. 2016)_ (quoting _Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015)_). In the context of a retaliation claim, an adverse [**31] employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." _Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)_ (internal quotations omitted). This is broader than the adverse action element of employment discrimination claims. _Moore v. Consol. Edison Co. of N.Y., Inc., No. 00 Civ. 7384(PAC), 2007 U.S. Dist. LEXIS 19118, 2007 WL 831807, at *6 (S.D.N.Y. Mar. 20, 2007)_. To plead causation, a plaintiff must allege "that his [or her] protected activity was the but-for cause of the adverse employment action." _Ninying v. N.Y.C. Fire Dep't, 807 F. App'x 112, 115 (2d Cir. 2020)_. Temporal proximity between the adverse action and the protected activity is sufficient to establish a causal connection. _Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019)_.

[*434] Here, Defendant does not dispute Plaintiff's retaliation claim under the _Rehabilitation Act_ or the ADA. Plaintiff alleges that immediately after taking medical leave, her employer denied her request for assignment to the night shift. Specifically, Plaintiff returned from medical leave in April 2021, and was notified that she was prohibited from working overnights in May 2021. (Amend. Compl. 4.) Medical leave is a protected activity, and assignment to a position with reduced pay is a materially adverse employment action. _Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)_ (examples of adverse employment actions include "termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of [**32] benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (citations omitted). Moreover, the Second Circuit has found a month between the adverse action and the protected activity sufficient to establish a causal connection. *Treglia, 313 F.3d at 721* (a period of one month between protected activity and adverse employment activity sufficient to establish causation for *prima facie* retaliation claim). Accordingly, at this stage, Plaintiff's allegations are sufficient to plead a claim of retaliation under the ADA and the Rehabilitation Act.

## V. FMLA Claims

Defendant argues Plaintiff fails to state a claim under the FMLA because she failed to plead she was entitled to benefits under the FMLA. (Def. Mem. at 20-21.) The Court agrees.

The FMLA makes it unlawful for employers to (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA; or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA." *29 U.S.C. 2615(a).* Because Plaintiff fails to plead she is an eligible employee, that she was entitled to FMLA benefits, or that Defendant interfered [**33] with her ability to exercise her rights under the FMLA, the Court dismisses this claim.

## VI. SHRL Claims

The SHRL prohibits discrimination, retaliation, and harassment based on sex, race, national origin, disability, and other protected classes. *N.Y. Exec. Law §§ 290 et seq.* The SHRL applies the same standards for employment discrimination under Title VII and the ADA. *See Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020)* (Claims under both Title VII and the NYSHRL . . . are generally treated as 'analytically identical,' and addressed together.") (citations omitted); *Kopchik v. Town of E. Fishkill, New York, 759 F. App'x 31, 37 (2d Cir. 2018)* ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.") (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004)*). The standards for retaliation are also similar across the

SHRL, the ADA, and Title VII. *See Farmer, 473 F. Supp. At 330* ("The same standards govern retaliation claims under [the SHLR and Title VII]."); *Viruet v. City of New York, No. 16-CV-8327 (JGK), 2019 U.S. Dist. LEXIS 75159, 2019 WL 1979325, at *16 (S.D.N.Y. May 3, 2019)* (applying the same standards to a retaliation claim under the ADA and the SHRL). Finally, courts apply the same standard when assessing hostile work environment claims arising under Title VII, the SHRL and the ADA. *See Farmer, 473 F.Supp. at 334* ("Hostile work environment claims under Title VII and the [SHRL] are judged by the same standard.") (citing *Summa v. Hofstra Univ., 708 F.3d 115, 123-24 (2d Cir. 2013)*); *Berger v. New York [*435] City Police Dep't, 304 F. Supp. 3d 360, 373 (S.D.N.Y. 2018)* (analyzing hostile work environment claims under the SHRL and the ADA using [**34] the same standard). Accordingly, for the same reasons discussed above for the federal claims, the Court dismisses Plaintiff's NYSHRL claims for race-, religion-, and disability-based discrimination, gender-based retaliation, and harassment. Plaintiff's remaining SHRL claims based on sex-based discrimination and disability-based retaliation survive.

## VII. CHRL Claims

CHRL provides it should "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)* (quoting *N.Y.C. Admin. Code § 8-130*). Broader scope, however, is not unlimited scope. "[T]he [CHRL] is not a general civility code," and "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Id. at 113.* Courts may construe the [CHRL] broadly, but "only to the extent that such a construction is reasonably possible." *Makinen v. City of New York, 857 F.3d 491, 495 (2d Cir. 2017)* (internal quotation marks omitted). Beyond the broader scope of CHRL claims, the standards are similar to those for discrimination, retaliation, and hostile work environment claims under Title VII and the ADA. *See Farmer, 473 F.Supp.3d at 327* ("The [CHRL] uses the same framework as Title VII and the NYSHRL, but contains, as to some elements, more liberal pleading and [**35] proof standards.") (citing *Deveaux v. Skechers USA, Inc., No. 19 **Civ.** 9734 (DLC), 2020 U.S. Dist. LEXIS 63356, 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020)*); *Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009)* (when interpreting CHRL claims, courts should treat "similarly worded provisions of federal and state civil rights law as a *floor below*

Case 1:25-cv-03496-JPC-SLC   Document 20-3   Filed 07/09/25   Page 31 of 321

Page 12 of 14

712 F. Supp. 3d 412, *435; 2024 U.S. Dist. LEXIS 8834, **35

which [the CHRL] cannot fall."). That said, a plaintiff's claims under the CHRL must be analyzed "separately and independently from any federal and state law claims." *Mihalik, 715 F.3d at 109*.

Plaintiff has asserted claims for discrimination based on her sex, race, religion, and disability; harassment due to her gender; and retaliation for speaking out against gender discrimination and for taking medical leave. As the Court has already determined Plaintiff plausibly stated claims for gender-based discrimination under Title VII and retaliation for taking medical leave under the ADA and Rehabilitation Act, these allegations are also sufficient to state those same claims under the CHRL. Accordingly, the Court only analyzes whether Plaintiff may assert claims for harassment, retaliation for speaking out against gender discrimination, and discrimination based on her race, religion, and disability under the CHRL's more liberal pleading standards. The Court determines Plaintiff cannot.

*A. Hostile Work Environment*

To assert a hostile work environment claim **[**36]** under the CHRL, a plaintiff must merely prove "the existence of unwanted gender-based conduct." *Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011)* (citing *Williams v. New York City Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 38, 39 (2009)*). A hostile work environment due to sexual harassment "occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.* (internal quotations and citations omitted). That said, "pretty slights or trivial inconveniences" **[*436]** are insufficient to state a claim. *Id.* (citation omitted).

As discussed above, Plaintiff still fails to allege Mr. Perez's and two other unnamed male employees' behavior was motivated by one of her protected characteristics. Plaintiff's conclusory assertion she was "subjected to these conditions based on [her] protected characteristics" is insufficient to plausibly state the "campaign of intimidation" she experienced was due her gender, race, religion, or perceived disability. *See, e.g., Kumaga v. New York City Sch. Const. Auth., 27 Misc. 3d 1207[A], 910 N.Y.S.2d 405, 2010 NY Slip Op 50619[U], 2010 WL 1444513, at *15 [Sup. Ct. 2010]* (dismissing hostile work environment claim where plaintiff did not show negative assessment and harassment were motivated by his protected status);

*Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429, 451 (E.D.N.Y. 2013)* ("[A] plaintiff must still establish that she suffered a hostile work environment *because of her* **[**37]** *gender.*") (emphasis in original) (collecting cases dismissing hostile work environment claims because plaintiffs failed to show animus was due to their protected characteristics). Accordingly, Plaintiff's claim cannot survive even under CHRL's more liberal pleading standard.

*B. Retaliation*

In contrast to ADA, Title VII, or SHLR retaliation claims, under the CHRL, "retaliation in any manner is prohibited, and the retaliation need not result in an ultimate action with respect to employment or in a materially adverse change in the terms and conditions of employment." *Viruet, 2019 U.S. Dist. LEXIS 75159, 2019 WL 1979325, at *16* (citing *Belton v. City of New York, No. 12 **Civ.** 6346, 2014 U.S. Dist. LEXIS 136471, 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014)*), *aff'd, 629 F. App'x 50 (2d Cir. 2015)*) (cleaned up). "The proper inquiry under the CHRL is whether a jury could "reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was, in the words of the [CHRL], reasonably likely to deter a person from engaging in protected activity," without taking account of whether the employer's conduct was sufficiently deterrent so as to be "material[ ]." *Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010)* (quoting *Williams, 61 A.D.3d at 71*).

Applying the "reasonably likely" standard, Plaintiff has not plausibly alleged she faced retaliation for complaining about discrimination. As discussed above, Plaintiff relies solely on the temporal proximity between **[**38]** the filing of her complaint and being told not to return to work. However, the Court cannot plausibly infer a retaliatory motive based on temporal proximity given the far more plausible explanation for the adverse employment action: Defendant failed to comply with COVID-19 vaccination requirements.

Plaintiff, who elected to not receive the vaccine, was placed on leave in November 2021 pursuant to FDNY policy that prohibited employees without a proof of vaccination to return to work. Still unvaccinated, Plaintiff was terminated in February 2021. (Amend. Compl. ¶¶ 7-8.) FDNY's COVID-19 vaccination requirement and Plaintiff's failure to comply therewith sever any causal connection between Plaintiff filing her EEOC charges and her being placed on leave without pay then

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 32 of 321

Page 13 of 14

712 F. Supp. 3d 412, *436; 2024 U.S. Dist. LEXIS 8834, **38

ultimately terminated to break any. *See Brennan v. Legal Aid Soc'y, 2020 U.S. Dist. LEXIS 219181, 2020 WL 6875059, at \*4*. Finally, as discussed above, Plaintiff pushes the limits of plausibility in alleging that her employer retaliated against her by failing to provide information about religious exemptions to the vaccine mandate when such information was widely available. As plead, a factfinder could not reasonably **[*437]** conclude Plaintiff faced retaliation for filing complaints about discrimination.

*C. Discrimination* **[**39]**

Under the less stringent pleading standard of the CHRL, to plausibly state a claim for discrimination, a plaintiff "need only show differential treatment—that she is treated 'less well'— because of discriminatory intent." *Mihalik, 715 F.3d at 109*. Plaintiff's allegations still fall short. Beyond conclusory allegations, Plaintiff does not plead facts that she was treated differently due to her disability—Plaintiff does not allege her employer knew about her disability, and even asserts that she was no longer disabled upon returning to work. (Pl. Opp. at 5.) As Defendant observes, Plaintiff returned to full duty, just on a different shift. (Def. Mem. at 11.)

Plaintiff's race and religious discrimination claims also remain too speculative. Beyond conclusory allegations that she faced discrimination due to her race and religion, Plaintiff fails to allege facts indicating her race or religion influenced in any way her employer's decision to reassign her to the day shift, place her on leave, or terminate her employment. Accordingly, Plaintiff's claims alleging discrimination based on her disability, race, and religion also fails under the CHRL. *See Farmer, 473 F.Supp.3d at 330* (plaintiff's subjective belief she experienced race discrimination **[**40]** insufficient to state a claim under the CHRL).

**VIII. Leave to Amend**

"Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Matima v. Celli, 228 F.3d 68, 81 (2d Cir.2000)* (internal quotation marks and citation omitted). "A *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir.2010)* (internal brackets and

quotation marks omitted). However, "leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Philip Morris Cos., 470 F.3d 481, 491 (2d Cir.2006)*.

Certain claims are legally unavailable to Plaintiff, such as her FMLA and *Section 1983* claims, as well as the claims she failed to exhaust under Title VII and the ADA. However, Plaintiff may plead additional facts to flesh out her claims for gender-based harassment and retaliation under Title VII and disability-based discrimination under the ADA and Rehabilitation Act. Moreover, as Plaintiff's Amended Complaint was the first complaint for which motion practice occurred, the claims the Court dismisses are deemed dismissed without prejudice and **[*438]** Plaintiff is granted leave to file amended **[**41]** pleadings.

**CONCLUSION**

The Court GRANTS in part and DENIES in part Defendant's motion to dismiss. Specifically, the Court dismisses with prejudice Plaintiff's claims for: (1) discrimination based on race, color, and religion under Title VII; (2) *Section 1981*; and (3) the FMLA. The Court dismisses without prejudice Plaintiff's claims for: (1) harassment under Title VII, the CHRL, and the SHRL; (2) sex-based retaliation under Title VII, the CHLR, and the SHRL; and (3) disability-based discrimination under the *Rehabilitation Act* and ADA. The Court denies Defendant's motion to dismiss Plaintiff's claims for (1) sex-based discrimination under Title VII, the CHRL, and the SHRL; and (2) disability-based retaliation under the *Rehabilitation Act*, ADA, CHLR, and SHRL.

Plaintiff is granted leave to file a Second Amended Complaint by February 16, 2024, consistent with this Order. Plaintiff is advised that the Second Amended Complaint will replace, not supplement, the Amended Complaint, and so any claims that she wishes to pursue must be included in, or attached to, the Second Amended Complaint. Should Plaintiff file a Second Amended Complaint, Defendant is directed to answer or otherwise respond by March 15, 2024. If Plaintiff fails to file a Second **[**42]** Amended Complaint within the time allowed, those claims that were dismissed without prejudice will be deemed dismissed with prejudice.

The Clerk of Court is further directed to terminate the motion at ECF No. 30.

Dated: January 17, 2024

712 F. Supp. 3d 412, *438; 2024 U.S. Dist. LEXIS 8834, **42

SO ORDERED.

White Plains, NY

/s/ Nelson S. Román

NELSON S. ROMÁN

United States District Judge

---

**End of Document**

 Positive
As of: June 23, 2025 9:57 PM Z

## *Appleton v City of New York*

Supreme Court of New York, New York County

March 13, 2019, Decided

157849/2017

**Reporter**

2019 N.Y. Misc. LEXIS 1051 *; 2019 NY Slip Op 30627(U) **

 **[**1]**  ROSEMARIE APPLETON, Plaintiffs, -against-
CITY OF NEW YORK, DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK, CHARLES
OGUNDIMU, EVELYN KATZ, and MICHAEL
FALZONE, Defendants. Index No. 157849/2017

**Notice:** THIS OPINION IS UNCORRECTED AND WILL
NOT BE PUBLISHED IN THE PRINTED OFFICIAL
REPORTS.

## Core Terms

notice of claim, allegations, high school, disability,
notice, retire, discrimination claim, return to work,
harassed, hostile work environment, motion to dismiss,
cause of action, discriminatory, employees, assigned,
severe, plaintiff's claim, teachers, accommodations,
younger, hostile work environment claim, adverse
employment action, racial discrimination, defendants',
classroom, injuries, meetings, resign, disability
discrimination, assistant principal

**Judges:**  [*1] HON. ALEXANDER M. TISCH, J.S.C.

**Opinion by:** ALEXANDER M. TISCH

## Opinion

DECISION & ORDER

**ALEXANDER M. TISCH, J.**:

Plaintiff brings this action seeking damages on the
ground that she experienced age, racial, and disability
discrimination at work, as well as a hostile work
environment. Defendants make this pre-answer motion
to dismiss the complaint on the ground that plaintiff fails
to state a cause of action. For the reasons stated
herein, the defendants motion is granted and the action

is dismissed.

**Factual and Procedural Background**

Plaintiff, a 65-year-old African-American female, is
employed by defendant Department of Education of the
City of New York (DOE) as an Assistant Principal (AP).
She has been an AP at Frederick Douglass Academy VI
High School in Far Rockaway, Queens (the high school)
since 2008. Defendant Charles Ogundimu, a person of
color under the age of 50 who, as described by plaintiff,
"thinks he is White," became the principal of the high
school in September 2014 (see Weinstein affirmation,
Exhibit B). Defendant Evelyn Katz, also an AP at the
high school since February 2014, is about 40 years old
and Caucasian. Defendant Michael Falzone, a dean at
the high school since 2008, is about 40 years **[*2]**  old
and Caucasian.

Plaintiff commenced this action on September 3, 2017,
claiming that defendants created a hostile work
environment and discriminated against her based on her
age, race and physical restrictions. Plaintiff first cause
of action seeks damages for such discrimination
pursuant to New York State **[**2]**  *Executive Law § 296
et seq.*; her second cause of action seeks damages
pursuant to the *New York City Administrative Code 8-
101 et seq.*; and her third cause of action seeks
damages pursuant to the Local Civil Rights Restoration
Act of 2005. Plaintiff also states that she filed a notice
of claim with the DOE on November 15, 2016, that a 50-h
hearing was held on April 24, 2017, and that this action
was commenced within one year and 90 days of the
alleged occurrences of discrimination.

In her complaint, plaintiff states that sometime after
February 2016, defendants continuously harassed her
both publicly and privately. Plaintiff cites the following
incidents of harassment:

(a) Defendants shouted at her and demeaned in
front of her peers during staff meetings and over

2019 N.Y. Misc. LEXIS 1051, *2; 2019 NY Slip Op 30627(U), **2

the school's public-address system;

(b) Katz suggested to another high school employee that plaintiff should retire so that Falzone would take her position as AP;

(c) In November 2015, plaintiff **[*3]** sustained personal injuries from a car accident. Due to those injuries, she went out on medical leave until February 2016. Shortly after returning to work, plaintiff was injured again trying to break up a fight between two students. Plaintiff then went out on medical leave for five months, returning on June 2016. Upon her return to work, plaintiff was not provided with a reasonable accommodation for her "known medical condition" and "known reported physical restrictions";

(d) In June 2016, upon her return to work, plaintiff was reassigned more vigorous and physically challenging responsibilities, even though she was physically restricted. Prior to her medical leave, plaintiff was assigned to supervise school aides, secretaries, and testing coordinators, and do some programming. Upon her return to work, she was assigned to supervise the cafeteria, patrol the hallways, collect cell phones, handle the morning entry and afternoon dismissals, and other duties that had previously been done by school aides or other non-administrative personnel;

 **[**3]** (e) Defendants intentionally and improperly denied her Line of Duty Injury (LODI) benefits request;

(f) After plaintiff returned to work, she was assigned **[*4]** to a new office, which was formerly a storage classroom, without the proper equipment and technology she needed to perform her duties as an AP;

(g) DOE employees routinely asked her when she was going to retire;

(h) Plaintiff was not invited to meetings between Ogundimu and Katz;

(i) Ogundimu told her that the school had run well in her absence;

(j) Defendants issued disciplinary letters to her for the first time in her career;

(k) Falzone treated her like a subordinate, when he was her subordinate.

Plaintiff states that defendants took these actions to force her to retire so that Falzon could take her position. She also states that no other employee at the high school was treated in this manner. In fact, plaintiff

claims that this continuing harassment caused her to submit a proposed resignation letter effective July 1, 2017.[1]

Plaintiff had filed a notice of claim with the DOE in February 2016, stating that she re-injured her neck, shoulders, knees, right wrist, and back, while trying to prevent a fight between two students on February 24, 2016 (see Coyne aff, exhibit 1).

On November 15, 2016, plaintiff filed a second notice of claim with the DOE setting forth the nature of her claim as:

> To **[*5]** recover for personal and psychological injuries, medical, and medicine expenses sustained as a result of the carelessness, recklessness and negligence and intentional actions of the CITY OF NEW YORK, and the DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK and [sic] by their agents, servants and/or employees in the control and supervision sustained by reason of the hostile work environment created by their employees and specifically by Charles Ogundimu Ms. Katz and Mr. Falzone by intentionally discriminating without justification and in harassing the claimant by reason **[**4]** of the claimant's age, race, religion and/or National origin in order that she be forced to resign from her position as assistant principal, and by reason, [sic] and in failing to supervise their employees by allowing the aforementioned discriminatory conduct to take place and which continues to date.

(see Coyne aff, exhibit 1).

Plaintiff described the manner in which the claim arose as:

> That commencing on or before September 7, 2016, the respondents, by their agents, servants and/or employees above listed set out on an illegal and discriminatory course of conduct for the sole purpose of forcing the claimant to resign her **[*6]** position as the assistant principal at the said school. The hostile actions of the said agents, servants and/or employees against the claimant were premised upon her age, her race, her religion and/or her national Origin

(*id.*).

---

[1] Plaintiff, however, did not retire and is still employed as an AP at the high school.

2019 N.Y. Misc. LEXIS 1051, *6; 2019 NY Slip Op 30627(U), **4

At her 50-h hearing, plaintiff testified that in 2014, when Ogundimu started working as the principal of the high school, she and Ogundimu had a good relationship. However, that relationship changed after she returned to work in June 2016. Plaintiff testified that, as a result of her car accident, she suffered back, neck, knee and shoulder injuries, and that she reinjured those areas in February 2016 when she attempted to prevent a fight between two students at the high school. Plaintiff testified that she applied for LODI benefits which were denied by Ogundimu, who found her claims unsubstantiated (27-29).[2] Plaintiff has a pending grievance for that denial of LODI benefits (29-30).

Plaintiff further testified that the "biggest" discrimination she experienced was when she returned to work in June 2016 and was assigned a classroom, which was being used for storage, as her new office (22). She claims Ogundimu told her that she could not return to her former office [*7] because it was being used by two newly hired employees, a part-time computer programmer and an assistant principal reserve, each of whom performed a portion of plaintiff's duties while she was out on medical leave. After she returned to work, the part-time programmer remained employed at the high school, and the assistant principal reserve retired, but continued to work at the high school part time (22-26). Plaintiff's new office [**5] did not have a locker for her personal items, desk, computer or printer. After being assigned the classroom as an office, plaintiff immediately contacted her union representative about the situation. After a meeting with Ogundimu and a union representative, the classroom was cleaned of storage items and plaintiff was given a locker, a desk, a computer and a printer (33-34).

Plaintiff also testified that when she returned to work, she was not given her previous job responsibilities, but was assigned to patrolling the hallways and supervising the cafeteria, tasks that were previously performed by teachers and aides (25). Plaintiff asked Ogundimu to change her job responsibilities so that she wouldn't have to be in the hallways and cafeteria every day, and asked [*8] to be permitted to perform more supervisory duties. However, Ogundimu refused to change her duties (26). Plaintiff testified that when she returned to work, due to her disability, her job restrictions were that she should not be in a crowded hall and that she needed a foot rest (27). However, she did not receive those accommodations. Rather, in July 2016, she was

sent to "medical," where she was examined by a physician and cleared for work without accommodations (27-28).

Plaintiff also testified that Ogundimu improperly blamed her, instead of Falzone, for an incident where a student was permitted to enter the school without a parent (36-37). After that incident, a disciplinary meeting was held with Ogundimu and a union representative (36). Plaintiff testified that she also received a disciplinary letter due to her absences (37-38). Plaintiff testified that she received a second disciplinary letter the same week, when Ogundimu claimed that she was not meeting her job requirement by not preparing certain reports (37). Plaintiff also received an unsatisfactory rating (37).

Plaintiff testified that once Katz told her, in a demeaning way, to attend to an issue in a classroom while plaintiff [*9] was at lunch (38-39). Plaintiff testified that in meetings, when she would make a point, Katz would make the opposite point (39). Plaintiff further testified that Ms. Reece, a social studies teacher, told her that she had overheard Katz say that the reason Katz and Ogundimu were treating plaintiff so poorly was because they wanted plaintiff to retire and have Falzone replace her (40-41).

 [**6] Plaintiff testified that she thinks she is being discriminated against because Katz and Falzone are young and Caucasian, and Ogundimu, although a person of color, "thinks he's white", and she "is black and old (43)." However, she had no emails to support this feeling. She only had the oral statement of Ms. Reece, with whom she discussed the matter one or two times, and with whom she hasn't spoken in a while (43-44). Plaintiff testified that she has not suffered a change in salary, but is having headaches from the stress (45-46). Plaintiff also sees a psychologist, Dr. Reiss, for stress reduction (50).

Defendants make this pre-answer motion to dismiss the complaint for failure to state a cause of action. Initially, defendants argue that plaintiff failed to file a proper notice of claim. Defendants argue [*10] that _Education Law § 3813(1)_ requires that a notice of claim be filed in accordance with _General Municipal Law § 50-e_ prior to the commencement of an action against the DOE. Defendants argue that although plaintiff filed two notices of claims, one in February 2016, alleging injuries from the school fight, and another on November 15, 2016, asserting claims of age and racial discrimination, and hostile work environment, neither of these notices provide any factual allegations. Moreover, according to

---

[2] The page references are for plaintiff's 50-h hearing transcript (see Weinstein affirmation, exhibit B).

2019 N.Y. Misc. LEXIS 1051, *10; 2019 NY Slip Op 30627(U), **6

defendants, neither of the notices assert a claim of discrimination based upon a disability.

Defendants also argue that since plaintiff's second notice of claim, asserting claims of discrimination, was filed on November 15, 2016, it could only refer to events that occurred 90 days prior to filing of the notice of claim; August 16, 2016. Thus, any claims that rose prior to August 16, 2016 must be dismissed.

Defendants also argue that to assert a discrimination claim under NYSHRL, plaintiff must allege, in a non-conclusory manner, that she is a member of protected class, that she was qualified to hold her position, that she suffered an adverse employment action, and that the adverse employment action occurred under circumstances giving rise to [**11] an inference of discrimination. However, plaintiff has not sufficiently alleged any facts to support her claim that she suffered an adverse employment action since she is still employed as an AP at the high school.

[**7] With respect to her disability discrimination claim, defendants argue that the complaint provides no factual description of her disability, other than "she suffers from certain physical disabilities," and is "partially disabled," from a "known medical condition" (see Weinstein affirmation, exhibit A - paragraphs 18, 24, 25). Defendants note that plaintiff has not identified her legal disability, has not claimed that she asked for specific accommodations, nor has she specified how defendants failed to provide adequate accommodations.

Defendants also argue that plaintiff has not alleged any discriminatory acts; rather her claims that she was belittled and treated like a subordinate by school employees, are merely instances of personality conflicts, and not unlawful discrimination. Further, plaintiff's claim that she was forced to submit a proposed resignation letter effective July 1, 2017, is not a discriminatory act, since plaintiff did not resign and is still employed at [**12] the high school.

With respect to her age discrimination claim, defendants argue that plaintiff's claim that: (1) Ogundimu told her things had gone well at the high school in her absence; (2) Katz told another employee that she thought plaintiff should retire; and (3) some school employees asked her when she planned to retire, are not sufficient to allege an age discrimination case.

Defendants also argue that Ogundimu is the same race as plaintiff, and therefore, an inference of discrimination does not exist because plaintiff and Ogundimu are in the same protected class. Likewise, defendants argue that plaintiff did not allege that she was treated differently than similarly situated APs.

With respect to her hostile work environment claim, defendants argue that plaintiff did not allege facts that establish that her work place was permeated with discriminatory intimidation, ridicule, and insult that were sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

Finally, defendants argue that defendant the City of New York is not a proper party because it is a separate entity from the DOE, and therefore, the complaint must be dismissed [**13] as to The City of New York.

[**8] In opposition, plaintiff, who only submits her attorney's affirmation, argues that her notice of claims is sufficiently factual to provide defendants with the proper notice to be able to investigate her claims. Further, plaintiff appeared and participated in a 50-h hearing during which she set forth facts supporting her age, race, and disability discrimination claims, and her hostile work environment claim. Plaintiff contends that her allegations that her job was more difficult after she returned from her injuries were sufficient to factually support her claim of discrimination. Plaintiff notes that, while defendants assert that she did not suffer an adverse action by defendants and that any actions taken by them were minor annoyances, such claims were factual issues and do not warrant dismissal.

With respect to the scope of her notice of claims, plaintiff contends that she was subjected to a continuous pattern of harassment and discrimination and that there is no legal requirement for her to file numerous notices of claim for such a continuous pattern of discrimination. Further, even if the scope of the notice of claim, as against the DOE, is limited [**14] by the language of the Education Law, there is no such notice of claim requirement or limitation for the claims asserted against the individual defendants. Plaintiff also alleges that defendants Ogundimu and Katz are currently being investigated by the DOE Office of Investigations for carrying on inappropriate liaisons outside and inside the school. Plaintiff submits a photograph of a man and woman embracing, which she alleges is evidence of a liaison between Ogundimu and Katz. Plaintiff alleges that Katz consorted with Ogundimu to influence her to resign.

With respect to defendants' claim that the City of New York is not a proper party, plaintiff argues that

Case 1:25-cv-03496-JPC-SLC   Document 20-3   Filed 07/09/25   Page 38 of 321

Page 5 of 10

2019 N.Y. Misc. LEXIS 1051, *14; 2019 NY Slip Op 30627(U), **8

defendants did not prove that the City of New York did not own, operate or control the high school where plaintiff worked. Therefore, dismissal of the complaint against the City of New York should be denied.

In reply, defendants again argue that the notice of claims filed by plaintiff never mentioned or set forth any allegations regarding disability discrimination and defendants' failure to provide proper disability accommodations. Therefore, those claims must be dismissed. Defendants argue further that a **[\*\*9]** 50-h hearing is held for **[\*15]** the purpose of adding facts to claims asserted in a notice of claim, not to add new theories of liability. Defendants argue that, even if the disability discrimination claims were properly raised in the notice of claims, they must be dismissed because plaintiff has not plead any facts regarding that claim. Defendants note that plaintiff never sets forth what type of disability she suffers from, and what her limitations are.

**DISCUSSION**

**Sufficiency of the November Notice of Claim**

*Education Law § 3813 (1)* requires that a notice of claim be filed in accordance with *General Municipal Law § 50-e* prior to commencing an action against the DOE. The underlying rationale of the notice of claim requirement in *General Municipal Law § 50—e* is to protect the municipality from unfounded claims and ensure that it has an adequate opportunity to timely explore the merits of the claim while the facts are still "fresh" (*Adkins y City of New York, 43 NY2d 346, 350, 372 N.E.2d 311, 401 N.Y.S.2d 469 [1977]*; *see also Brown v City of New York, 95 NY2d 389, 392, 740 N.E.2d 1078, 718 N.Y.S.2d 4 [2000]* [in order "[t]o enable authorities to investigate, collect evidence and evaluate the merits of a claim, persons seeking to recover in tort against a municipality are required, as a precondition to suit, to serve a Notice of Claim"]). The General Municipal Law requires that the notice of claim set forth, among other things, "the nature of the claim" and "the **[\*16]** time when, the place where and the manner in which the claim arose" (*General Municipal Law § 50-e [2]*; *see Brown, 95 NY2d at 393*). "The requirements of the statute are met when the notice describes the [incident] with sufficient particularity so as to enable the defendant to conduct a proper investigation thereof and to assess the merits of the claim" (*Palmer v Society for Seamen's Children, 88 AD3d 970, 971, 931 N.Y.S.2d 389 [2d Dept 2011]*; *see Vargas v City of New York, 105 AD3d 834, 836, 963 N.Y.S.2d 278 [2d Dept 2013]*, lv granted *22 NY3d 858, 981 N.Y.S.2d 368, 4 N.E.3d 380 [2013]*).

"In making a determination on the sufficiency of a notice of claim, a court's inquiry is not limited to the four corners of the notice of claim" (*Vallejo-Bayas v New York City Tr. Auth., 103 AD3d 881, 882-883, 962 N.Y.S.2d 203 [2d Dept 2013]*; *see D'Alessandro v New York City Tr. Auth., 83 NY2d 891, 893, 636 N.E.2d 1382, 613 N.Y.S.2d 849 [1994]*). A court may **[\*\*10]** consider the testimony provided during an examination conducted pursuant to *General Municipal Law § 50-h* and any other evidence properly before it to correct a good faith and nonprejudicial technical mistake, omission, irregularity, or defect in the notice of claim (*see Castillo v Kings County Hosp. Ctr., 149 AD3d 896, 52 N.Y.S.3d 451 [2d Dept 2017]*; *Vallejo-Bayas, 103 AD3d at 882-883*; *see also General Municipal Law § 50-e [6]*; *D'Alessandro v New York City Tr. Auth., 83 NY2d at 893*). However, in determining the sufficiency of a notice of claim, testimony during an examination conducted pursuant to *General Municipal Law § 50-h* cannot be used to substantively change the nature of the claim or the theory of liability set forth in the notice of claim (*see Scott v City of New York, 40 AD3d 408, 410, 836 N.Y.S.2d 140 [1st Dept 2007]*; *Figueroa v New York City Hous. Auth., 271 AD2d 238, 239, 707 N.Y.S.2d 37 [1st Dept 2000]*).

Causes of action for which a notice of claim is required, that are not delineated in the plaintiff's original notice of claim, may not be interposed because "'[t]he addition of such causes of action which **[\*17]** were not referred to, either directly or indirectly in the original notice of claim, would substantially alter the nature of the plaintiffs' claims'" (*Mazzilli v City of New York, 154 AD3d 355, 357, 545 N.Y.S.2d 833 [2d Dept 1989]*, quoting *Demorcy v City of New York, 137 AD2d 650, 650-651, 524 N.Y.S.2d 742 [2d Dept 1988]*).

Here, plaintiff filed two notices of claims, neither of which made any reference to disability discrimination and defendants' failure to accommodate plaintiff's alleged disability. Accordingly, those claims must be dismissed. Nevertheless, plaintiff argues that even if her notice of claims did not reference her disability discrimination claims, she raised these issues at her April 24, 2017 50-h hearing, thereby providing defendants with sufficient notice of her claims. Contrary to plaintiff's arguments, while testimony at a 50-h hearing may be used to provide further factual support for a claim set forth in that notice of claim or to correct

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 39 of 321

Page 6 of 10

2019 N.Y. Misc. LEXIS 1051, *17; 2019 NY Slip Op 30627(U), **10

an error in the notice of claim, it cannot be used to assert a new theory of liability. Accordingly, plaintiff cannot rely on her 50-h testimony as a basis to assert new claims of disability discrimination or failure of defendants to accommodate her disability (*see Mazzilli, 154 AD2d at 357*).

 **[**11]** With respect to plaintiff's age and race discrimination claims, taking into consideration the allegations in the November **[*18]** 15, 2016 notice of claim[3] as well as plaintiff's 50-h testimony, plaintiff has set forth sufficient facts to put defendants on notice of the nature of her claims (*see Portillo v New York City Tr. Auth., 84 AD3d 535, 536, 922 N.Y.S.2d 397 [1st Dept 2011]* [even if notice of claim was not sufficient other evidence permitted defendants to investigate plaintiff's allegations]). However, since such claims are limited to the 90-days prior to the filing of the November 15, 2016 notice of claim, all claims against the DOE that pre-date August 17, 2016 must be dismissed (*see Education Law§ 3813 [1]*; *see also Clune v Garden City Union Free School Dist., 34 AD3d 618, 619, 826 N.Y.S.2d 87 [2d Dept 2006]* [a notice of claim must be presented to the governing body of the school district within three months from the accrual of the claim]). Likewise, any of plaintiff's claims against the DOE which accrued after November 15, 2016, must be dismissed (*see Varsity Tr., Inc. v Board of Educ. of City of N.Y., 5 N.Y.3d 532, 533, 840 N.E.2d 569, 806 N.Y.S.2d 457 [2005]*; *see also Agostinello v Great Neck Union Free School Dist., 102 AD3d 638, 958 N.Y.S.2d 166 [2d Dept 2013]* [plaintiff's notice of claim dated February 4, 2003 did not satisfy the statutory requirement of placing the school district on notice of those allegedly discriminatory acts which took place subsequent to the date of the notice]).

**Failure to State a Cause of Action**

In considering a *CPLR 3211 (a) (7)* pre-answer motion to dismiss a complaint for failure to state a cause of action, a "court must accept all of the allegations in the complaint as true, and, drawing **[*19]** all inferences from those allegations in the light most favorable to the plaintiff, determine whether a cognizable cause of action can be discerned therein, not whether one has been properly stated" (*see MatlinPatterson ATA Holdings LLC v Federal Express Corp., 87 AD3d 836, 839, 929 N.Y.S.2d 571 [1st Dept 2011]*, citing *Rovello v Orofino*

*Realty Co., 40 NY2d 633, 634, 636, 357 N.E.2d 970, 389 N.Y.S.2d 314 [1976]*). However, "allegations consisting of bare legal conclusions, as well as factual claims inherently incredible or flatly contradicted by documentary **[**12]** evidence are not entitled to such consideration" (*Caniglia v Chicago Tribune-N. Y. News Syndicate, 204 AD2d 233, 233-234, 612 N.Y.S.2d 146 [1st Dept 1994]*).

A plaintiff alleging discrimination in employment, pursuant to the New York State Human Rights Law (NYSHRL) (Exec L *§§ 296, et seq.*), has the initial burden to establish a prima facie case of discrimination. To meet this burden, plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified to hold the position; (3) she was terminated from employment or suffered another adverse employment action; and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination (*see Ferrante v American Lung Ass'n, 90 NY2d 623, 629, 687 N.E.2d 1308, 665 N.Y.S.2d 25 [1997]*).

Under the New York City Human Rights Law (NYCHRL) (*New York City Administrative Code §§ 8-101, et seq.*), "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent **[*20]** that such a construction is reasonably possible'" (*Mihalik v Credit Agricole Cheuvreux N. Am., Inc., 715 F3d 102, 109 [2d Cir 2013]* [citations omitted]; *see Dillon v Ned Mgmt., 85 F Supp 3d 639, 653 [EDNY 2015]* ["[The] NYCHRL is no longer construed to be coextensive with its federal and state counterparts."]). "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive" (*Gorokhovsky v New York City Hous. Auth., 552 Fed Appx 100, 102 [2d Cir 2014]* citing *Mihalik, 715 F3d at 114*). However, even under this more liberal pleading standard, a plaintiff must plausibly allege that she was subjected to unequal treatment because of her protected characteristic (*see Mathew v N. Shore-Long Island Jewish Health Sys., Inc., 582 Fed Appx 70, 71 [2d Cir 2014]* [disability discrimination]; *Mihalik, 715 F3d at 110* [gender-based discrimination]; *LaSalle v City of New York, No. 13-CV-5109, 2015 U.S. Dist. LEXIS 41163, 2015 WL 1442376, at *6 [SDNY Mar. 30, 2015]* [race discrimination]). "[C]ourts must be mindful that the NYCHRL is not a general civility code . . . [and] t]he plaintiff still bears the burden of showing that the conduct is caused by a **[**13]** discriminatory motive" (*Mihalik, 715 F3d at 110* [internal quotation

---

[3] The February 2016 notice of claim contains no allegations of discriminatory conduct by defendants.

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 40 of 321

Page 7 of 10

2019 N.Y. Misc. LEXIS 1051, *20; 2019 NY Slip Op 30627(U), **13

marks and citations omitted]).

"An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of **[\*21]** events leading to the plaintiff's discharge" (*Littlejohn v City of New York, 795 F3d 297, 312 [2d Cir 2017]* quoting *Leibowitz v Cornell Univ., 584 F3d 487, 502 [2d Cir 2009])*.

"A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case" (*Mandell v County of Suffolk, 316 F3d 368, 379 [2d Cir 2003]* quoting *Graham v Long Island R.R., 230 F3d 34, 39 [2d Cir 2000])*. "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself'" (*id.* [citations omitted]).

Here, on this motion to dismiss, accepting all the allegations in the complaint as true and drawing all inferences from those allegations in the light most favorable to the plaintiff, the Court finds that plaintiff has not sufficiently alleged a cause of action for age or race discrimination. While there is no dispute that plaintiff is in a protected racial and age class or that she was qualified to hold her position as AP, plaintiff has not alleged that she suffered an adverse employment action which gave rise to an inference of discrimination.

At the outset, the Court notes that plaintiff has not alleged that defendants made any explicitly **[\*22]** or implicitly invidious comments regarding her race or age. Rather, she alleges in a general, conclusory manner that "defendants routinely asked her when she was going to retire" (see Weinstein affirmation, exhibit A). Further, the only allegation regarding a specific comment made by defendants about her age or race, is plaintiff's claim that a social studies teacher, Ms. Reece, overheard Katz say the reason she and **[\*\*14]** Ogundimu were treating plaintiff poorly was because they wanted her to retire. However, even accepting that alleged statement as discriminatory, it was made by Katz, plaintiff's peer, not made by Ogundimu, plaintiff's superior (see *Mete v NYS Off. Of Mental Retardation &*

*Dev. Disabilities, 21 AD3d 288, 294, 800 N.Y.S.2d 161 [1st Dept 2005]*; *see also Schreiber v Worldco, LLC, 324 F Supp 2d 512, 519 [SDNY 2004]*; *Ezold v Wolf Block, Schorr & Solis—Ezold, 983 F.2d 509, 545 [3d Cir 1992]* ["Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight."]). Plaintiff does not set forth how Katz, her peer, was involved in any decision making with regard to her job duties. In fact, plaintiff states that it was Ogundimu who assigned her to new job responsibilities and to a new office space.

While plaintiff claims that, upon her return to work in June 2016, defendants improperly reassigned her office to a classroom that was **[\*23]** used as storage; assigned her more vigorous and physical responsibilities; denied her LODI benefits; issued two disciplinary letters; and excluded her from meetings, she fails to make a factual connection between these alleged acts and how they are related to her age or race. Further, she has not alleged that Katz or any other AP or employee at the high school, received better treatment because of their race or age. The fact that Ogundimu and Katz maybe in a personal intimate relationship, or that Ogundimu, a person of color, "thinks he is white," does not give rise to an inference of age or racial discrimination against plaintiff. Moreover, since plaintiff is still employed as an AP at the high school she has not made a factual connection about how any actions taken by defendants have resulted in an adverse employment outcome for her.

With respect to plaintiff's hostile work environment claims, "[i]n order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that 'the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'; and (2) that there is a 'specific basis **[\*24]** for imputing the conduct creating the hostile work environment to the employer'" (*Duch v Jakubek, 588 F3d 757, 762 [2d Cir 2009]* [quoting *Feingold v* **[\*\*15]** *New York, 366 F3d 138, 149-50 [2d Cir 2004])*. A hostile work environment claim contains both an objective and subjective component. "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive'" (*Alfano v Costello, 294 F3d 365, 374 [2d Cir 2002]* quoting *Harris v Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 [1993])*. "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order

2019 N.Y. Misc. LEXIS 1051, *24; 2019 NY Slip Op 30627(U), **15

to be deemed pervasive'" (*id.* quoting *Perry v Ethan Allen, Inc., 115 F3d 143, 149 [2d Cir 1997]*).

"Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness" (*Alfano, 294 F3d at 374*). Therefore, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted' to have altered the conditions of her working environment" (*Perry 115 F3d at 149*). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse" (*Alfano, 294 F3d at 374*; *see also Harris, 510 U.S. at 23* [noting relevant factors to a hostile work environment determination to be "frequency of the discriminatory [*25] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"]).

Plaintiff's hostile work environment claims must also be dismissed. Again, plaintiff fails to support her claims with any facts relating to her being in a protected class regarding her age or race. The grievances alleged by plaintiff, that defendants belittled her, shouted at her, and demeaned her in front of her peers; and discussed her retirement, were minor annoyances and not adverse employment actions pursuant to the NYSHR and NYCHRL. Notably, the only factual allegations to support these contentions is that Katz spoke to her in a condescending manner, that Katz disagreed with her during meetings, and that Falzone treated her as a subordinate. These allegations, while offensive, are not of sufficient severity or such a continuous pattern to create a hostile work environment (*see Whitfield-Otiz v Department of Educ. of City [**16] of N. Y., 116 AD3d 580, 581, 984 N.Y.S.2d 327 [1st Dept 2014]*).

The Court notes that while the vast majority of the cases relied upon by defendants are decisions on motions for summary judgment (*e.g., Forrest v Jewish Guild for the Blind, 3 NY3d 295, 819 N.E.2d 998, 786 N.Y.S.2d 382 [2004]*; *Hernandez v Kaisman, 103 AD3d 106, 957 N.Y.S.2d 53 [1st Dept 2012]*; *Melman v Montefiore Med. Ctr., 98 AD3d 107, 946 N.Y.S.2d 27 [1st Dept 2012]*; *Silvis v City of New York, 95 AD3d 665, 946 N.Y.S.2d 22 [1st Dept 2012]*; *Williams v New York City Hous. 61 AD3d 62, 872 N.Y.S.2d 27 [1st Dept 2009]*; *Mete v NYS Off. of Mental Retardation & Dev. Disabilities, 21 AD3d 288, 800 N.Y.S.2d 161 [1st Dept 2005]*; *Gonzalez v New York State Office of Mental Health, 26 Misc 3d 1227[A], 907 N.Y.S.2d 100, 2010 NY Slip Op 50282[U]*

*[Sup Ct, Kings County 2010]*; [*26] *Joseph v Leavitt, 465 F3d 87 [2d Cir 2006]*; *Woodman v WWOR-TV, Inc., 411 F3d 69 [2d Cir 2005]*; *Bermudez v City of New York, 783 F Supp 2d 560 [SDNY 2011]*; *Walder v White Plains, 738 F Supp 2d 483 [SDNY 2010]*), defendants do rely on two cases determining pre-answer motions to dismiss which are instructive: *Whitfield-Ortiz v Department of Educ. of City of N. Y.* (2012 WL 11045620 [Sup Ct NY County 2012], *affd 116 AD3d 580, 984 N.Y.S.2d 327 [1st Dept 2014]* and *Massaro v Department of Educ. of City of New York (2013 N.Y. Misc. LEXIS 1987, 2013 WL 2142259 [Sup Ct, NY County 2013]*, *affd 121 AD3d 569, 993 N.Y.S.2d 905 [1st Dept 2014]*).

In *Whitfield*,[4] the plaintiff, a 51 year-old African-American teacher, alleged that she had been subjected to a continuing pattern of age and racial discrimination because defendants: monitored to whom she spoke on a daily basis, subjected her to micro management, harassed her in an effort to force her to retire, threatened her, demeaned her, treated her differently with regard to personal time off, falsely accused her of not following procedures, and informed parents that plaintiff was crazy and that they should remove their children from her class. In granting defendants' motion to dismiss and denying plaintiff's cross motion to amend her complaint the court (Engoron, J.), held that there was nothing in the complaint or proposed amended complaint to suggest that plaintiff was treated any different than her co-workers or that defendants' actions had any effect on her pay or had any other adverse employment outcome. Further, the court held that plaintiff's claim of a hostile work environment must be dismissed because the alleged [**17] incidents were not sufficiently [*27] severe or such a continuous pattern to create a hostile work environment, rather than merely being offensive.

In *Massaro*, the plaintiff, a 51-year-old art teacher, claimed that she suffered age discrimination, among other things, because the younger teachers had the best schedules and students, access to computers, printers, books, materials, supplies, that the younger teachers often missed departmental meetings, and that many of the school's staff had asked plaintiff when she is going to retire (*id.* at *4). Plaintiff also stated that she was harassed at work, but the younger teachers were

_____

[4] The recited claims of discrimination are taken from pages 2-3 of the underlying complaint in *Whitfield*, index No. 150118/2012.

2019 N.Y. Misc. LEXIS 1051, *27; 2019 NY Slip Op 30627(U), **17

not (*id.*). However, the complaint did not state the ages of the younger teachers. In dismissing plaintiff's age discrimination claim, the court (Singh, J.), found plaintiff's age discrimination claim to border on frivolous, stating that the complaint "failed to allege a single fact to support the conclusion that any of the work conditions about which plaintiff complains were imposed on her because of her age" (*id.*).

Here, like the plaintiff's allegations in *Whitfield* and *Massaro*, plaintiff's claims do not sufficiently allege a cause of action for age or racial discrimination because plaintiff has failed **[*28]** to sufficiently allege any connection between her treatment by defendants and her age or race, or that suffered any adverse employment outcome.

In contrast, the plaintiff in *Wiesen v New York Univ. (304 AD2d 459, 758 N.Y.S.2d 51 [1st Dept 2003])*, alleged sufficient facts in support of his age discrimination claim to survive a motion to dismiss. In *Wiesen*, the plaintiff alleged, among other things, that after teaching graduate level entrepreneurship studies courses at the Stern School of Business for at least 15 years, he was informed by a superior that he was being reassigned because of a desire for younger faculty; that after he filed a grievance, defendant retaliated by assigning him to teach less desirable undergraduate courses; and that he was informed, while on sabbatical, that he was dismissed.

Likewise, the plaintiff in *Godino v Premier Salons, Ltd. (140 AD3d 1118, 35 N.Y.S.3d 197 [2d Dept 2016])*, also set forth sufficient factual allegations to survive a motion to dismiss. In *Godino*, the plaintiff alleged in **[**18]** the complaint that she was a 54—year—old hairstylist with more than 20 years of experience and a loyal clientele when she began working for the defendants. She alleged that her coworkers, managers, and supervisors frequently ridiculed and harassed her because of her age by stating that she was "too old" and that she **[*29]** "should retire." According to the complaint, the plaintiff's work station was moved by a supervisor to a less desirable location in the salon, facing a fire exit, which resulted in a decrease in the plaintiff's income. She alleged that a younger hairstylist, who happened to be one of the individuals who harassed her, was assigned to her former work station. The plaintiff claimed that her manager informed her that the supervisor made this decision "to promote the young girl with lots of energy." The plaintiff alleged that she complained to management about the harassment and the change of work station, but that no remedial action was taken. She

further alleged that on a particular occasion, she was attacked by two younger hairstylists, one of whom scratched her arm and screamed that she was "ugly and old," and told her she "should retire." According to the complaint, the plaintiff's managers and supervisors failed to intervene during the attack, and, thereafter, the defendants terminated the plaintiff's employment.

Unlike the *Wiesen* and *Godino* plaintiffs, plaintiff herein has not connected how the actions taken by defendants related to her age or race, or that she suffered an adverse **[*30]** employment outcome. In *Wiesen*, the complaint alleged that plaintiff was expressly told he was being replaced because his superior wanted a younger more youthful faculty, and he was ultimately fired after filing a grievance against his employer. In *Godino*, the plaintiff alleged that her salon chair was moved to a less desirable location and that she lost income. Further, she alleged specific instances of severe acts including a physical altercation during which was called "ugly and old." Notably, the *Godino* plaintiff was ultimately fired. Here, the complaint makes no such specific factual allegations of conduct upon which an inference of age and racial discrimination, or a hostile work environment, can be drawn.

Accordingly, plaintiff's claims of age and racial discrimination and her hostile work environment claims under New York State *Executive Law § 296 et seq.*, *New York City Administrative Code 8-101* et **[**19]** seq., and the Local Civil Rights Restoration Act of 2005,[5] must be dismissed.

Finally, defendants move to dismiss the claims against the City of New York as said defendant is an improper party. While this Court has dismissed all claims against all defendants for the reasons stated above, for clarity the Court finds that the City of New York is **[*31]** a separate legal entity from, and not responsible for, the actions of the DOE.

Accordingly, it is ORDERED that defendants' motion to dismiss the complaint is granted and the complaint is dismissed.

DATED: March 13, 2019

_____

[5] Plaintiff's separate claim under the Local Civil Rights Restoration Act of 2005, is duplicative of her claims under the NYCHRL since the Local Civil Rights Restoration Act of 2005 was an amendment to the NYCHLR (*see Williams v New York City Hous. Auth., 61 AD3d 62, 66-68, 872 N.Y.S.2d 27 [2d Dept 2009])*.

2019 N.Y. Misc. LEXIS 1051, *31; 2019 NY Slip Op 30627(U), **19

ENTER:

/s/ Alexander M. Tisch

J.S.C.

---

**End of Document**

Q Questioned
As of: June 23, 2025 9:41 PM Z

# *Ashcroft v. Iqbal*

Supreme Court of the United States

December 10, 2008, Argued; May 18, 2009, Decided

No. 07-1015

**Reporter**

556 U.S. 662 *; 129 S. Ct. 1937 **; 173 L. Ed. 2d 868 ***; 2009 U.S. LEXIS 3472 ****; 77 U.S.L.W. 4387; 2009-2 Trade Cas. (CCH) P76,785; 73 Fed. R. Serv. 3d (Callaghan) 837; 21 Fla. L. Weekly Fed. S 853

JOHN D. ASHCROFT, FORMER ATTORNEY GENERAL, et al., Petitioners v. JAVAID IQBAL et al.

**Subsequent History:** On remand at, Remanded by *Iqbal v. Ashcroft, 574 F.3d 820, 2009 U.S. App. LEXIS 16571 (2d Cir., July 28, 2009)*

**Prior History:** **[****1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

*Iqbal v. Hasty, 490 F.3d 143, 2007 U.S. App. LEXIS 13911 (2d Cir. N.Y., 2007)*

**Disposition:** *490 F.3d 143*, reversed and remanded.

## Core Terms

allegations, supervisory, subordinate, discriminatory, qualified immunity, petitioners', detainees, pleadings, motion to dismiss, discovery, court of appeals, factual allegations, national origin, religion, confinement, condoned, district court, conclusory, arrested, high interest, conspiracy, terrorist, attacks, conditions, complaint alleges, designated, detention, suspected, deliberate indifference, restrictive conditions

## Case Summary

**Procedural Posture**
Respondent detainee, who was designated a person "of high interest" to the September 11 investigation, filed a Bivens action against numerous federal officials including petitioner former Attorney General of the United States and the Director of the Federal Bureau of Investigation. The U.S. Court of Appeals for the Second Circuit upheld a denial of petitioners' motion to dismiss based on qualified immunity. Certiorari was granted.

**Overview**
The detainee pled guilty to criminal charges, served a term of imprisonment, and was removed to his native Pakistan. The complaint did not challenge the detainee's arrest or his confinement in a general prison population. Rather, it concentrated on his treatment while confined to an administrative maximum special housing unit. The complaint contended that petitioners designated him a person of high interest on account of his race, religion, or national origin, in contravention of the *U.S. Const. amends. I* and *V*. Evaluating the sufficiency of the complaint was not a "fact-based" question of law, so the denial of the motion to dismiss was a final decision under the collateral-order doctrine over which the Court of Appeals had jurisdiction. To state a claim based on a violation of a clearly established right, the detainee had to have pled sufficient factual matter to show that petitioners adopted and implemented the detention policies not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. The complaint had not nudged the claims of invidious discrimination across the line from conceivable to plausible.

**Outcome**
The judgment of the Second Circuit was reversed, and the case was remanded for further proceedings. 5-4 Decision; 1 Dissent.

## LexisNexis® Headnotes

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

*HN1* **Jurisdiction, Subject Matter Jurisdiction**

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***868; 2009 U.S. LEXIS 3472, ****1

Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt.

Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine

*HN2* **Appellate Jurisdiction, Collateral Order Doctrine**

With exceptions, Congress has vested the courts of appeals with jurisdiction of appeals from all final decisions of the district courts of the United States. *28 U.S.C.S. § 1291*. Though the statute's finality requirement ensures that interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule, it does not prevent review of all prejudgment orders. Under the collateral-order doctrine a limited set of district-court orders are reviewable though short of final judgment. The orders within this narrow category are immediately appealable because they finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

Civil Rights Law > Protection of Rights > Immunity From Liability > Federal Officials

*HN3* **Appellate Jurisdiction, Final Judgment Rule**

A district court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite the absence of a final judgment. This is so because qualified immunity--which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights--is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation. Provided it turns on an issue of law, a district-court order denying qualified immunity conclusively determines that the defendant must bear the burdens of discovery, is conceptually distinct from the merits of the plaintiff's claim, and would prove effectively unreviewable on appeal from a final judgment. As a general matter, the collateral-order doctrine may have expanded beyond

the limits dictated by its internal logic and the strict application of the criteria set out in Cohen. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of *28 U.S.C.S. § 1291*.

Civil Rights Law > Protection of Rights > Immunity From Liability > Federal Officials

*HN4* **Immunity From Liability, Federal Officials**

Whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded.

Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine

*HN5* **Appellate Jurisdiction, Collateral Order Doctrine**

The collateral orders that are final turn on abstract, rather than fact-based, issues of law.

Civil Rights Law > Protection of Rights > Implied Causes of Action

*HN6* **Protection of Rights, Implied Causes of Action**

In Bivens--proceeding on the theory that a right suggests a remedy--the U.S. Supreme Court recognizes for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights. Because implied causes of action are disfavored, the Court has been reluctant to extend Bivens liability to any new context or new category of defendants.

Civil Rights Law > Protection of Rights > Implied Causes of Action

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

*HN7* **Protection of Rights, Implied Causes of Action**

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***868; 2009 U.S. LEXIS 3472, ****1

In the limited settings where Bivens does apply, the implied cause of action is the federal analog to suits brought against state officials under *42 U.S.C.S. § 1983*. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. It is undisputed that supervisory Bivens liability cannot be established solely on a theory of respondeat superior. A federal official's liability will only result from his own neglect in not properly superintending the discharge of his subordinates' duties. A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to Bivens and *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Civil Rights Law > Protection of Rights > Implied Causes of Action

**HN8** Protection of Rights, Implied Causes of Action

The factors necessary to establish a Bivens violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the *First* and *Fifth Amendments*, the plaintiff must plead and prove that the defendant acted with discriminatory purpose. Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.

Civil Rights Law > Protection of Rights > Implied Causes of Action

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

**HN9** Protection of Rights, Implied Causes of Action

Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN10** Motions to Dismiss, Failure to State Claim

Under *Fed. R. Civ. P. 8(a)(2)*, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The pleading standard *Rule 8* announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN11** Motions to Dismiss, Failure to State Claim

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***868; 2009 U.S. LEXIS 3472, ****1

The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Although for the purposes of a motion to dismiss courts must take all of the factual allegations in the complaint as true, they are not bound to accept as true a legal conclusion couched as a factual allegation. *Fed. R. Civ. P. 8* marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

#### *HN12* Motions to Dismiss, Failure to State Claim

Only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

#### *HN13* Motions to Dismiss, Failure to State Claim

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

#### *HN14* Complaints, Requirements for Complaint

*Fed. R. Civ. P. 8* governs the pleading standard in all civil actions and proceedings in the United States district courts. *Fed. R. Civ. P. 1*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

#### *HN15* Motions to Dismiss, Failure to State Claim

*Fed. R. Civ. P. 9(b)* requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally. But "generally" is a relative term. In the context of *Rule 9*, it is to be compared to the particularity requirement applicable to fraud or mistake. *Rule 9* merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of *Fed. R. Civ. P. 8*. And *Rule 8* does not empower a plaintiff to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

## Lawyers' Edition Display

#### Decision

 [***868]  Federal Court of Appeals held to have subject-matter jurisdiction to affirm Federal District Court's order denying federal officials' motion to dismiss former detainee's complaint on basis of qualified immunity; complaint held to have failed to state claim for purposeful and unlawful discrimination.

#### Summary

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***868; 2009 U.S. LEXIS 3472, ****1

**Procedural posture:** Respondent detainee, who was designated a person "of high interest" to the September 11 investigation, filed a Bivens action against numerous federal officials including petitioner former Attorney General of the United States and the Director of the Federal Bureau of Investigation. The U.S. Court of Appeals for the Second Circuit upheld a denial of petitioners' motion to dismiss based on qualified immunity. Certiorari was granted.

**Overview:** The detainee pled guilty to criminal charges, served a term of imprisonment, and was removed to his native Pakistan. The complaint did not challenge the detainee's arrest or his confinement in a general prison population. Rather, it concentrated on his treatment while confined to an administrative maximum special housing unit. The complaint contended that petitioners designated him a person of high interest on account of his race, religion, or national origin, in contravention of the _U.S. Const. amends. I_ and _V_. Evaluating the sufficiency of the complaint was not a "fact-based" question of law, so the denial of the motion to dismiss was a final decision under the collateral-order doctrine over which the Court of Appeals had jurisdiction. To state a claim based on a violation of a clearly established right, the detainee had to have pled sufficient factual matter to show that petitioners adopted and implemented the detention policies not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national **[***869]** origin. The complaint had not nudged the claims of invidious discrimination across the line from conceivable to plausible.

**Outcome:** The judgment of the Second Circuit was reversed, and the case was remanded for further proceedings. 5-4 Decision; 1 Dissent.

# Headnotes

COURTS §245 COURTS §247 > JURISDICTION -- WAIVER > Headnote:
_**LEdHN[1]**_ [1]

Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

APPEAL §23.5 APPEAL §31 > JURISDICTION -- FINALITY -- INTERLOCUTORY MATTERS -- COLLATERAL ORDERS > Headnote:
_**LEdHN[2]**_ [2]

With exceptions, Congress has vested the courts of appeals with jurisdiction of appeals from all final decisions of the district courts of the United States. _28 U.S.C.S. § 1291_. Though the statute's finality requirement ensures that interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule, it does not prevent review of all prejudgment orders. Under the collateral-order doctrine a limited set of district-court orders are reviewable though short of final judgment. The orders within this narrow category are immediately appealable because they finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

**[***870]**

APPEAL §23 APPEAL §23.5 APPEAL §38PUBLIC OFFICERS §56 > JURISDICTION -- FINALITY -- COLLATERAL ORDER -- DISMISSAL -- QUALIFIED IMMUNITY > Headnote:
_**LEdHN[3]**_ [3]

A district court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite the absence of a final judgment. This is so because qualified immunity--which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights--is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation. Provided it turns on an issue of law, a district-court order denying qualified immunity conclusively determines that the defendant must bear the burdens of discovery, is conceptually distinct from the merits of the plaintiff's claim, and would prove effectively unreviewable on appeal from a final judgment. As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in Cohen. But the

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***870; 2009 U.S. LEXIS 3472, ****1

applicability of the doctrine in the context of qualified-immunity claims is well established; and a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of *28 U.S.C.S. § 1291*.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §130 > ALLEGING VIOLATION OF LAW > Headnote:
*LEdHN[4]* [4]

Whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

APPEAL §23.5 > FINALITY -- COLLATERAL ORDERS > Headnote:
*LEdHN[5]* [5]

The collateral orders that are final turn on abstract, rather than fact-based, issues of law.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

ACTIONS §2 > CONSTITUTIONAL RIGHT -- BIVENS > Headnote:
*LEdHN[6]* [6]

In Bivens--proceeding on the theory that a right suggests a remedy--the U.S. Supreme Court recognizes for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.  Because implied causes of action are disfavored, the Court has been reluctant to extend Bivens liability to any new context or new category of defendants.   (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PUBLIC OFFICERS §63 > UNCONSTITUTIONAL CONDUCT -- LIABILITY -- ACTS OF SUBORDINATES  > Headnote:
*LEdHN[7]* [7]

In the limited settings where Bivens does apply, the implied cause of action is the federal analog to suits brought against state officials under *42 U.S.C.S. § 1983*. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.   It is undisputed that supervisory Bivens liability cannot be established solely on a theory of respondeat superior.  A federal official's liability will only result from his own neglect in not properly superintending the discharge of his subordinates' duties.  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties.    Because vicarious liability is inapplicable to Bivens and *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

**[***871]**

CONSTITUTIONAL LAW §316.8 CONSTITUTIONAL LAW §925 > BIVENS VIOLATION -- FIRST AND FIFTH AMENDMENTS  > Headnote:
*LEdHN[8]* [8]

The factors necessary to establish a Bivens violation will vary with the constitutional provision at issue.   Where the claim is invidious discrimination in contravention of the *First* and *Fifth Amendments*, the plaintiff must plead and prove that the defendant acted with discriminatory purpose.   Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences.   It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §179.5 PLEADING §191PUBLIC OFFICERS §56

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***871; 2009 U.S. LEXIS 3472, ****1

PUBLIC OFFICERS §56 PUBLIC OFFICERS §63 > LIABILITY -- QUALIFIED IMMUNITY  > Headnote:
*LEdHN[9]* [9]

Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.  In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §103 PLEADING §130 > STATEMENT OF CLAIM -- FACTUAL ALLEGATIONS -- DISMISSAL  > Headnote:
*LEdHN[10]* [10]

Under *Fed. R. Civ. P. 8(a)(2)*, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  The pleading standard *Rule 8* announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me  accusation.  A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §103 PLEADING §130 > LEGAL CONCLUSIONS -- FACTUAL ALLEGATIONS -- DISMISSAL  > Headnote:

*LEdHN[11]* [11]

The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Although for the purposes of a motion to dismiss courts must take all of the factual allegations in the complaint as true, they are not bound to accept as true a legal conclusion couched as a factual allegation.  *Fed. R. Civ. P. 8* marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.   (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

**[***872]**

PLEADING §103 > MOTION TO DISMISS -- PLAUSIBILITY OF CLAIM  > Headnote:
*LEdHN[12]* [12]

Only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief.   *Fed. R. Civ. P. 8(a)(2).* (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §103 > MOTION TO DISMISS -- LEGAL CONCLUSIONS -- FACTUAL ALLEGATIONS  > Headnote:
*LEdHN[13]* [13]

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

556 U.S. 662, *662; 129 S. Ct. 1937, **1937; 173 L. Ed. 2d 868, ***872; 2009 U.S. LEXIS 3472, ****1

PLEADING §1 > GOVERNING STANDARD > Headnote:
*LEdHN[14]* [14]

Fed. R. Civ. 8 governs the pleading standard in all civil actions and proceedings in the United States district courts. *Fed. R. Civ. P. 1.* (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

PLEADING §103 PLEADING §171 PLEADING §172 > GENERAL ALLEGATIONS -- FRAUD -- MISTAKE -- DISCRIMINATORY INTENT -- DISMISSAL > Headnote:
*LEdHN[15]* [15]

*Fed. R. Civ. P. 9(b)* requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally. But "generally" is a relative term. In the context of *Rule 9*, it is to be compared to the particularity requirement applicable to fraud or mistake. *Rule 9* merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of *Fed. R. Civ. P. 8*. And *Rule 8* does not empower a plaintiff to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss. (Kennedy, J., joined by Roberts, Ch. J., and Scalia, Thomas, and Alito, JJ.)

## Syllabus

**[*662] [***873] [**1939]** Following the September 11, 2001, terrorist attacks, respondent Iqbal, a Pakistani Muslim, was arrested on criminal charges and detained by federal officials under restrictive conditions. Iqbal filed a *Bivens* action against numerous federal officials, including petitioner Ashcroft, the former Attorney General, and petitioner Mueller, the Director of the Federal Bureau of Investigation (FBI). See *Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619.* The complaint alleged, *inter alia,* that petitioners designated Iqbal a person "of high interest" on account of his race, religion, or national origin, in contravention of the *First* and *Fifth Amendments*; that the FBI, under Mueller's direction,

arrested and detained thousands of Arab Muslim men as part of its September 11 investigation; that petitioners knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect" **[****2]** and Mueller was "instrumental" in its adoption and execution. After the District Court denied petitioners' motion to dismiss on qualified-immunity grounds, they invoked the collateral order doctrine to file an interlocutory appeal in the Second Circuit. Affirming, that court assumed without discussion that it had jurisdiction and focused on the standard set forth in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929,* for evaluating whether a complaint is sufficient to survive a motion to dismiss. Concluding that *Twombly*'s "flexible plausibility standard" obliging a pleader to amplify a claim with factual allegations where necessary to render it plausible was inapplicable in the context of petitioners' appeal, the court held that Iqbal's complaint was adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law.

*Held:* 1. The Second Circuit had subject-matter jurisdiction to affirm the District **[**1940] [***874]** Court's order denying petitioners' motion to dismiss. Pp. 671-675.

(a) Denial of a qualified-immunity claim can fall within the narrow class of prejudgment orders reviewable under the collateral-order doctrine **[*663]** so long as the **[****3]** order "turns on an issue of law." *Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411.* The doctrine's applicability in this context is well established; an order rejecting qualified immunity at the motion-to-dismiss stage is a "final decision" under *28 U.S.C. § 1291*, which vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts." *Behrens v. Pelletier, 516 U.S. 299, 307, 116 S. Ct. 834, 133 L. Ed. 2d 773.* Pp.671-672.

(b) Under these principles, the Court of Appeals had, and this Court has, jurisdiction over the District Court's order. Because the order turned on an issue of law and rejected the qualified-immunity defense, it was a final decision "subject to immediate appeal." *Behrens, supra, at 307, 116 S. Ct. 834, 133 L. Ed. 2d 773.* Pp. 672-675.

2. Iqbal's complaint fails to plead sufficient facts to state

556 U.S. 662, *663; 129 S. Ct. 1937, **1940; 173 L. Ed. 2d 868, ***874; 2009 U.S. LEXIS 3472, ****3

a claim for purposeful and unlawful discrimination. Pp. 675-687

(a) This Court assumes, without deciding, that Iqbal's *First Amendment* claim is actionable in a *Bivens* action, see *Hartman v. Moore, 547 U.S. 250, 254, n. 2, 126 S. Ct. 1695, 164 L. Ed. 2d 441*. Because vicarious liability is inapplicable to *Bivens* and *§ 1983* suits, see, *e.g., Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611*, the plaintiff in a suit such as the present one must plead **[****4]** that each Government-official defendant, through his own individual actions, has violated the Constitution. Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences"; it involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870*. Iqbal must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. Pp. 675-677

(b) Under *Federal Rule of Civil Procedure 8(a)(2)*, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, *Twombly, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference **[****5]** that the defendant is liable for the misconduct alleged. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Two working principles underlie *Twombly*. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Second, determining whether a complaint states a plausible claim is context-specific, requiring the **[*664]** reviewing court to draw on its experience and common sense. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. A court considering a motion **[***875]** to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded **[**1941]** factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 677-680

(c) Iqbal's pleadings do not comply with *Rule 8* under *Twombly*. Several of his allegations--that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no legitimate penological interest; that **[****6]** Ashcroft was that policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution--are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was **[****7]** based on discriminatory factors. Pp. 680-684

(d) Three of Iqbal's arguments are rejected. Pp. 684-687

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied *Rule 8*, which in turn governs the pleading standard "in all civil actions," *Rule 1*, the case applies to antitrust and discrimination suits alike, see *550 U.S., at 555-556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 and n.3*. P. 684

(ii) *Rule 8*'s pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion. The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process. *Twombly,*

*supra*, at 559, 127 S. Ct. 1955, 167 L. Ed. 2d 929. And because Iqbal's **[*665]** complaint is deficient under *Rule 8*, he is not entitled to discovery, cabined or otherwise. Pp. 684-686

(iii) *Rule 9(b)* --which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"--does not require courts to credit a complaint's conclusory statements without **[****8]** reference to its factual context. *Rule 9* merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade *Rule 8*'s less rigid, though still operative, strictures. Pp. 686-687

(e) The Second Circuit should decide in the first instance whether to **[***876]** remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint. P. 23687

*490 F.3d 143*, reversed and remanded.

**Counsel: Gregory G. Garre** argued the cause for petitioners.

**Alexander A. Reinert** argued the cause for respondents.

**Judges:** Kennedy, J., delivered the opinion of the Court, in which Roberts, C.J., and Scalia, Thomas, and Alito, JJ., joined. Souter, J., filed a dissenting opinion, in which Stevens, Ginsburg, and Breyer, JJ., joined, *post*, p. 687. Breyer, J., filed a dissenting opinion, *post*, p. 699.

**Opinion by:** KENNEDY

# Opinion

 **[*666]** **[**1942]** Justice **Kennedy** delivered the opinion of the Court.

Javaid Iqbal (hereinafter respondent) is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials, including John Ashcroft, the former **[****9]** Attorney General of

the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a claim despite petitioners' official status at the times in question. Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit. The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here. **[****10]** This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, **[**1943]** plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights. We hold respondent's pleadings are insufficient.

 **[*667]** I

Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew. The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor. By September 18 "the FBI had received more than 96,000 tips or potential leads from the public." Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11-12 (Apr. 2003), **[***877]** http://www.usdoj.gov/oig/special/0306/full.pdf?bcsi_scan_61073EC0F747 59AD0&bcsi_scan_filenamefull.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks **[****11]** in particular or to terrorism in general. *Id.*, at 1. Of those individuals, some 762 were held on

immigration charges; and a 184-member subset of that group was deemed to be "of 'high interest'" to the investigation. *Id.,* at 111. The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world. *Id.,* at 112-113.

Respondent was one of the detainees. According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States. *Iqbal v. Hasty, 490 F.3d 143, 147-148 (CA2 2007).* Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York. Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit **[*668]** (ADMAX SHU). *Id., at 148.* As the facility's name indicates, the ADMAX SHU incorporates the maximum security conditions allowable under Federal Bureau of Prisons **[****12]** regulations. *Ibid.* ADMAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. *Ibid.*

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. *Id., at 149.* He then filed a *Bivens* action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See *Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).* The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners--officials who were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04-CV-1809 (JG)(JA), PP 10–11, App. to Pet. for Cert. 157a (hereinafter Complaint).

The 21-cause-of-action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his **[**1944]** treatment while confined to the ADMAX SHU. The **[****13]** complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailers "kicked him in the stomach, punched him in the face,

and dragged him across" his cell without justification, *id.,* P 113, at 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, *id.,* PP 143-145, at 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," *id.,* P 154, at 184a.

**[***878]** The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners designated **[*669]** respondent a person of high interest on account of his race, religion, or national origin, in contravention of the *First* and *Fifth Amendments to the Constitution.* The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." *Id.,* P 47, at 164a. It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement **[****14]** until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.,* P 69, at 168a. Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.,* P 96, at 172a-173a. The pleading names Ashcroft as the "principal architect" of the policy, *id.,* P 10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation," *id.,* P 11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. *Id.,* at 136a-137a (relying on *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* Invoking the collateral-order **[****15]** doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),* which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

**[*670]** The Court of Appeals considered *Twombly's*

applicability to this case. Acknowledging that *Twombly* retired the *Conley* no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings." *490 F.3d at 155*. It concluded that *Twombly* called for a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Id., at 157-158*. The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law. *Id., at 174*.

[**1945] Judge [****16] Cabranes concurred. He agreed that the majority's "discussion of the relevant pleading standards reflect[ed] the uneasy compromise . . . between a qualified immunity privilege rooted in the need to preserve the effectiveness of government as contemplated by our constitutional structure and the pleading requirements [***879] of *Rule 8(a) of the Federal Rules of Civil Procedure*." *Id., at 178* (internal quotation marks and citations omitted). Judge Cabranes nonetheless expressed concern at the prospect of subjecting high-ranking Government officials--entitled to assert the defense of qualified immunity and charged with responding to "a national and international security emergency unprecedented in the history of the American Republic"--to the burdens of discovery on the basis of a complaint as nonspecific as respondent's. *Id., at 179*. Reluctant to vindicate that concern as a member of the Court of Appeals, *ibid.*, Judge Cabranes urged this Court to address the appropriate pleading standard "at the earliest opportunity," *id., at 178*. We granted certiorari, *554 U.S. 902, 128 S. Ct. 2931, 171 L. Ed. 2d 863 (2008)*, and now reverse.

[*671] II

We first address whether the Court of Appeals had subject-matter jurisdiction to affirm the District [****17] Court's order denying petitioners' motion to dismiss. Respondent disputed subject-matter jurisdiction in the Court of Appeals, but the court hardly discussed the issue. We are not free to pretermit the question. *HN1* *LEdHN[1]* [1] Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. *Arbaugh v. Y & H Corp., 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*

(citing *United States v. Cotton, 535 U.S. 625, 630, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002))*. According to respondent, the District Court's order denying petitioners' motion to dismiss is not appealable under the collateral-order doctrine. We disagree.

A

*HN2* *LEdHN[2]* [2] With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." *28 U.S.C. § 1291*. Though the statute's finality requirement ensures that "interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule," *Johnson v. Jones, 515 U.S. 304, 309, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995)*, it does not prevent "review of all prejudgment orders." *Behrens v. Pelletier, 516 U.S. 299, 305, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)*. Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short [****18] of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Ibid.* (quoting *Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949))*.

*HN3* *LEdHN[3]* [3] A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class [*672] of appealable orders despite "the absence of a final judgment." *Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. This is so because qualified immunity--which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights," *Harlow v. Fitzgerald, [**1946] 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)* --is both a defense to liability [***880] and a limited "entitlement not to stand trial or face the other burdens of litigation." *Mitchell, 472 U.S., at 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411*. Provided it "turns on an issue of law," *id., at 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411*, a district-court order denying qualified immunity [****19] "'conclusively determine[s]" that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effectively unreviewable on appeal from a final judgment," *id., at 527–528, 105 S. Ct. 2806, 86 L. Ed. 2d 411* (citing

*Cohen, supra, at 546, 69 S. Ct. 1221, 93 L. Ed. 1528*). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen* But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of *§ 1291*. *Behrens, 516 U.S., at 307, 116 S. Ct. 834, 133 L. Ed. 2d 773*.

B

Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state **[****20]** a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction." Brief for Respondent Iqbal 15 (hereinafter Iqbal Brief). In other words, respondent **[*673]** contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)*, the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a *First Amendment* retaliation claim. *Id., at 257, n. 5, 126 S. Ct. 1695, 164 L. Ed. 2d 441*. Similarly, two Terms ago in *Wilkie v. Robbins, 551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007)*, the Court considered another interlocutory order denying qualified immunity. The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights. *551 U.S., at 549, n. 4, 127 S. Ct. 2588, 168 L. Ed. 2d 389*. These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate **[****21]** jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation.

Iqbal Brief 15. Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie*, since *HN4* *LEdHN[4]* [4] whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation **[***881]** from the facts pleaded. In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S. Ct. 1203, 131 L. Ed. 2d 60 (1995)*, and "directly implicated by," *Hartman, supra, at 257, n. [**1947] 5, 126 S. Ct. 1695, 164 L. Ed. 2d 441*, the qualified-immunity defense.

Respondent counters that our holding in *Johnson, 515 U.S. 304, 115 S. Ct. 2151, 132 L. Ed. 2d 238*, confirms the want of subject-matter jurisdiction here. That is incorrect. The allegation in *Johnson* was that five defendants, all of them police officers, unlawfully beat the plaintiff. *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order **[*674]** that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine **[****22]** issue of material fact that three of the defendants participated in the beating. *Id., at 313, 115 S. Ct. 2151, 132 L. Ed. 2d 238*.

In finding that order not a "final decision" for purposes of *§ 1291*, the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning "'*on an issue of law*'" are subject to immediate appeal. *515 U.S., at 313, 115 S. Ct. 2151, 132 L. Ed. 2d 238*. Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson*, it is a "fact-related" legal inquiry. *Id., at 314, 115 S. Ct. 2151, 132 L. Ed. 2d 238*. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id., at 316, 115 S. Ct. 2151, 132 L. Ed. 2d 238*. That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. *Ibid.* Finding those concerns predominant, *Johnson* held that *HN5* *LEdHN[5]* [5] the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law. *515 U.S., at 317, 115 S. Ct. 2151, 132 L. Ed. 2d 238*.

The concerns that animated the decision in *Johnson* are absent when an appellate court considers **[****23]** the disposition of a motion to dismiss a complaint for

insufficient pleadings. True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined. Here, however, the order denying petitioners' motion to dismiss falls well within the latter class. Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id., at 316, 115 S. Ct. 2151, 132 L. Ed. 2d 238*. And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency. *Twombly, 550 U.S., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson* [*675] is not implicated here. The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction. We proceed to consider the merits of petitioners' appeal.

[***882] III

In *Twombly, supra, at 553-554, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, the Court found it necessary first to discuss [****24] the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

**HN6** **LEdHN[6]** [6] In *Bivens*--proceeding on the theory that a right suggests a remedy--this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp. v. Malesko, 534 U.S. 61, 66, 122 S. Ct. 515, 151 L. Ed. 2d 456 [**1948] (2001)*. Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." *534 U.S., at 68, 122 S. Ct. 515, 151 L. Ed. 2d 456*. See also *Wilkie, 551 U.S., at 549-550, 127 S. Ct. 2588, 168 L. Ed. 2d 389*. That reluctance might well have disposed of respondent's *First Amendment* claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the *Due Process Clause of the Fifth Amendment*, see *Davis v. Passman, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979)*, we have not found an implied damages remedy under the *Free Exercise Clause*. Indeed, we

have declined to extend *Bivens* to a claim sounding [****25] in the *First Amendment*. *Bush v. Lucas, 462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)*. Petitioners do not press this argument, however, so we assume, without deciding, that respondent's *First Amendment* claim is actionable under *Bivens*.

**HN7** **LEdHN[7]** [7] In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. § 1979, *42 U.S.C. § 1983*." [*676] *Hartman, 547 U.S., at 254, n. 2, 126 S. Ct. 1695, 164 L. Ed. 2d 441*. Cf. *Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)*. Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). See *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (finding no vicarious liability for a municipal "person" under *42 U.S.C. § 1983*); see also *Dunlop v. Munroe, 11 U.S. 242, 7 Cranch 242, 269, 3 L. Ed. 329 (1812)* (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S. Ct. 1286, 32 L. Ed. 203 (1888)* [****26] ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the sub-agents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

[***883] **LEdHN[8]** [8] **HN8** The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the *First* and *Fifth Amendments*, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 540-541, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)* (opinion of Kennedy, J.)*First Amendment*); *Washington v. Davis, 426 U.S. 229, 240, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)* (*Fifth Amendment*). Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel*

*Administrator of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)*. It instead involves a decisionmaker's **[****27]** undertaking **[*677]** a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that **[**1949]** petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

Respondent disagrees. He argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45-46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a *§ 1983* suit or a *Bivens* action--where masters do not answer for the torts of their **[****28]** servants--the term "supervisory liability" is a misnomer. **HN9** **LEdHN[9]** [9] Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

IV

A

We turn to respondent's complaint. **HN10** **LEdHN[10]** [10] Under *Federal Rule of Civil Procedure 8(a)(2)*, a pleading must contain a "short and plain statement of the claim showing that the pleader is **[*678]** entitled to relief." As the Court held in *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, the pleading standard *Rule 8* announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (citing *Papasan v. Allain, 478 U.S. 265, 286, 106 S.*

*Ct. 2932, 92 L. Ed. 2d 209 (1986))*. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Nor does a complaint **[****29]** suffice if it **[***884]** tenders "naked assertion[s]" devoid of "further factual enhancement." *Id., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929*.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, **HN11** **LEdHN[11]** [11] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (Although for the purposes of a motion **[****30]** to dismiss we must take all of the factual allegations in the complaint as true, we **[**1950]** "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). *Rule 8* marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for **[*679]** a plaintiff armed with nothing more than conclusions. Second, **HN12** **LEdHN[12]** [12] only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *490 F.3d at 157-158*. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "show[n]"--"that the pleader is entitled to

556 U.S. 662, *679; 129 S. Ct. 1937, **1950; 173 L. Ed. 2d 868, ***884; 2009 U.S. LEXIS 3472, ****30

relief." *Fed. Rule Civ. Proc. 8(a)(2)*.

In keeping with these principles *HN13* *LEdHN[13]* [13] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the **[****31]** assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, *15 U.S.C. §1*. Recognizing that *§1* enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*, the plaintiffs in *Twombly* **[***885]** flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another." *550 U.S., at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the **[*680]** unlawful agreement alleged. **[****32]** *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under *Rule 8*. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. *Id., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint--the well-pleaded, nonconclusory factual allegation of parallel behavior--to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id., at 565-566, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. *Id., at 567, 127*

*S. Ct. 1955, 167 L. Ed. 2d 929*. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929*.

B

Under *Twombly*'s construction **[****33]** of *Rule 8*, we conclude that respondent's complaint **[**1951]** has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible." *Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint P 96, App. to Pet. for Cert. 173a-174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, **[*681]** *id.,* P 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, *id.,* P 11, at 157a. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, *550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, namely, that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney, 442 U.S., at 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870*. As such, the allegations are conclusory **[****34]** and not entitled to be assumed true. *Twombly, 550 U.S., at 554-555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in **[***886]** *Twombly* rejected the plaintiffs' express allegation of a "'contract, combination or conspiracy to prevent competitive entry,'" *id., at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September

11." Complaint P 47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions [****35] in the weeks after September 11, 2001." *Id.,* P 69, at 168a. Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

 [*682] The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group.   Al Qaeda was headed by another   Arab   Muslim--Osama   bin   Laden--and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.   On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts.   As between that "obvious alternative   [****36] explanation" for the arrests, *Twombly, supra, at 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929,* and the purposeful, invidious discrimination respondent [**1952] asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief.   It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC.   Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September-11th detainees" in the ADMAX SHU once they were categorized as "of high interest."   Complaint P 69, App. to Pet. for Cert. 168a.   To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do.   Though respondent alleges that various other defendants, who are not before us, may   [*683]   have labeled him a [***887] person "of high interest" for impermissible [****37] reasons, his only factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post-September-11 detainees until they were "'cleared' by the FBI." *Ibid.*   Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations.   He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly, 550 U.S., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929.*

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here.   In *Twombly,* the complaint alleged general wrongdoing that extended over a   [****38] period of years, *id., at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929,* whereas here the complaint alleges discrete wrongs--for instance, beatings--by lower level Government actors.   The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part. Despite these distinctions, respondent's pleadings do not suffice to state a claim.   Unlike in *Twombly,* where the doctrine of *respondeat superior* could bind the corporate defendant,   here,   as   we   have   noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic.   Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind.   His pleadings thus do not meet the standard necessary to comply with *Rule 8*.

 [*684]  It is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here.   Our decision is limited to the determination that

556 U.S. 662, *684; 129 S. Ct. 1937, **1952; 173 L. Ed. 2d 868, ***887; 2009 U.S. LEXIS 3472, ****38

respondent's complaint does not entitle him to relief **[****39]** from petitioners.

C

Respondent offers three arguments that bear on our disposition of his case, but none is persuasive.

1 **[**1953]**

Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. Iqbal Brief 37-38. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of *Rule 8*. *550 U.S., at 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. **HN14** **LEdHN[14]** [14] That Rule in turn governs the pleading standard "in all civil actions and proceedings in the United States district courts." *Fed. Rule Civ. Proc. 1*. Our decision in *Twombly* expounded the pleading standard for "all civil actions," **[***888]** *ibid.*, and it applies to antitrust and discrimination suits alike, see *550 U.S., at 555-556, and n. 3, 127 S. Ct. 1955, 167 L. Ed. 2d 929.*

2

Respondent next implies that our construction of *Rule 8* should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have **[****40]** held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls **[*685]** placed upon the discovery process. *Twombly, supra, at 559, 127 S. Ct. 1955, 167 L. Ed. 2d 929* ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity. The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery."

*Siegert v. Gilley, 500 U.S. 226, 236, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)* (Kennedy, J., concurring in judgment). There are serious and legitimate reasons for this. If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that **[****41]** is attendant to participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government. The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic." *490 F.3d at 179.*

It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even **[*686]** if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax **[****42]** the pleading requirements on the **[**1954]** ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under **[***889]** *Rule 8*, he is not entitled to discovery, cabined or otherwise.

3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing *Fed. Rule Civ. Proc. 9*). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his]

religion, race, and/or national origin and for no legitimate penological interest." Complaint P 96, App. to Pet. for Cert. 172a-173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's **[****43]** conclusory statements without reference to its factual context.

It is true that **HN15** **LEdHN[15]** [15]*Rule 9(b)* requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of *Rule 9*, it is to be compared to the particularity requirement applicable to fraud or mistake. *Rule 9* merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license **[*687]** to evade the less rigid--though still operative-- strictures of *Rule 8*. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in *Rule 8(a)* . . . should control the second sentence of *Rule 9(b)*"). And *Rule 8* does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his **[****44]** complaint to survive a motion to dismiss.

V

We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Dissent by:** SOUTER

## Dissent

Justice **Souter,** with whom Justice **Stevens,** Justice **Ginsburg,** and Justice **Breyer** join, dissenting.

This case is here on the uncontested assumption that *Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*, allows personal liability based on a federal officer's violation of an individual's rights under the *First* and *Fifth Amendments*, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat* **[**1955]** *superior*. The Court apparently rejects this concession **[***890]** and, although it has no bearing on the majority's **[*688]** resolution of this case, does away with supervisory liability **[****45]** under *Bivens*. The majority then misapplies the pleading standard under *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy *Rule 8(a)(2) of the Federal Rules of Civil Procedure*.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal v. Hasty, 490 F.3d 143, 147-148 (CA2 2007)*. He alleges that Federal Bureau of Investigation (FBI) officials carried out a discriminatory policy by designating him as a person "'of high interest'" in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial. *Id., at 148*. As I will mention more fully below, Iqbal contends that Ashcroft and Mueller **[****46]** were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his *First* and *Fifth Amendment* rights.[1]

_____

[1] Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud

556 U.S. 662, *688; 129 S. Ct. 1937, **1955; 173 L. Ed. 2d 868, ***890; 2009 U.S. LEXIS 3472, ****46

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stomach, **[\*689]** punched him in the face, and dragged him across the room." First Amended Complaint in No. 04-CV-1809 (JG) (JA), P 113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks. *Id.,* PP 187-188, at 189a. According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.,* PP 136-140, at 181a, verbally berated him as a "'terrorist'" and "'Muslim killer,'" *id.,* P 87, at 170a-171a, refused to give him adequate food, *id.,* P 91, at 171a-172a, **[\*\*\*\*47]** and intentionally turned on air conditioning during the winter and heating during the summer, *id.,* P 84, at 170a. He claims that prison staff interfered with his attempts to pray and engage in religious study, *id.,* PP 153-154, at 183a-184a, and with his access to counsel, *id.,* PP 168, 171, at 186a-187a.

The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed. Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

"1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate **[\*\*\*891]** officials is sufficient to state individual-capacity claims against those officials under *Bivens.*

 **[\*\*1956]** "2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Pet. for Cert. I.

The Court granted certiorari on both questions. **[\*\*\*\*48]** The first is about pleading; the second goes to the liability standard.

 **[\*690]** In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to

liability under *Bivens.* In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited "'deliberate indifference'" to that discrimination. Pet. for Cert. 29 (quoting *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).* Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy *Rule 8(a)(2),* and in particular whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11-24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.,* at 25-33. This **[\*\*\*\*49]** was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens.* In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as **[\*691]** being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50; see also Reply Brief for Petitioners 21-22. Iqbal argued that the allegations in his complaint were sufficient under *Rule 8(a)(2)* **[\*\*\*\*50]** and *Twombly*, and conceded that as a matter of law he could not recover under a theory of *respondeat superior.* See Brief for Respondent Iqbal 46. Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied *Rule 8(a)(2)*.

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it must *sua sponte* decide the **[\*\*\*892]** scope of supervisory liability here. *Ante, at 675-677, 129 S. Ct.*

---

charges. See *Bell v. Wolfish, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).*

*1937, 173 L. Ed. 2d, at 882-883*.  I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim.  See *Twombly, 550 U.S., at 557-558, 127 S. Ct. 1955, 167 L. Ed. 2d 929*.  But deciding the scope of supervisory **[**1957]** *Bivens* liability in this case is uncalled for.  There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct **[****51]** are grounds for *Bivens* liability.  Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will satisfy Ashcroft and Mueller's own test for supervisory liability.  See *Farmer, supra, at 842, 114 S. Ct. 1970, 128 L. Ed. 2d 811* (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm").  We do not normally override a party's concession, see, *e.g., United States v. International Business Machines Corp., 517 U.S. 843, 855, 116 S. Ct. 1793, 135 L. Ed. 2d 124 [*692] (1996)* (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra, at 694, 129 S. Ct. 1937, 173 L. Ed. 2d, at 894*.  I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper **[****52]** scope of supervisory liability, much less the full-dress argument we normally require.  *Mapp v. Ohio, 367 U.S. 643, 676-677, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961)* (Harlan, J., dissenting).  We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals.  See *infra, at 693-694, 173 L. Ed. 2d, at 893-894*.  This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson v. Callahan, 555 U.S. 223, 239, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*), yet today the majority answers a question with no briefing at all.  The attendant risk of error is palpable.

Finally, the Court's approach is most unfair to Iqbal.  He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference.  By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

B

The majority, however, does ignore the concession.  According to the majority, because Iqbal concededly cannot **[***893]** recover on a theory of *respondeat superior*, it follows that he cannot recover under **[****53]** any theory of supervisory liability.  *Ante, at 677, 173 L. Ed. 2d, at 883*.  The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants," "the term 'supervisory liability' is a misnomer," and **[*693]** that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Ibid.*  Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely.  The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.  *Ante, at 683, 173 L. Ed. 2d, at 887* ("[P]etitioners cannot be held liable unless they themselves **[**1958]** acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here:  *respondeat superior* liability, in which "[a]n employer is subject to liability for torts committed by employees while acting within the scope **[****54]** of their employment," *Restatement (Third) of Agency § 2.04* (2005), or no supervisory liability at all.  The dichotomy is false.  Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate.  See, *e.g., Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (CA1 2005)* (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett v. Eastpointe, 410 F.3d 810, 818 (CA6*

*2005*) (same); *Richardson v. Goord, 347 F.3d 431, 435 (CA2 2003)* (same); *Hall v. Lombardi, 996 F.2d 954, 961 (CA8 1993)* (same).

In fact, there is quite a spectrum of possible tests for supervisory liability:  it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, *e.g., Baker v. Monroe Twp., 50 F.3d 1186, 1194 (CA3 1995)*; *Woodward v. Worland, 977 F.2d 1392, 1400 (CA10 1992)*; or where supervisors "'know about the conduct and facilitate it, approve it, condone it, or turn a **[*694]** blind eye for fear of what they might see,'" *International Action Center v. United States, 365 F.3d 20, 28, 361 U.S. App. D.C. 108 (CADC 2004)* **[****55]** (Roberts, J.) (quoting *Jones v. Chicago, 856 F.2d 985, 992 (CA7 1988)* (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e.g., Hall, supra, at 961*; or where the supervisor was grossly negligent, see, *e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (CA1 1988)*.  I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case. The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true." *Ante, at 681, 173 L. Ed. 2d, at 885.* **[***894]** As I explain below, this conclusion is unsound, but on the majority's understanding of *Rule 8(a)(2)* pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate **[****56]** indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed.[2]

II

Given petitioners' concession, the complaint satisfies

*Rule 8(a)(2).*  Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects **[*695]** as being 'of high interest' and they were deliberately indifferent to that discrimination."  Brief for Petitioners 50.  Iqbal alleges **[**1959]** that after the September 11 attacks the FBI "arrested and detained thousands of Arab Muslim men," Complaint P 47, App. to Pet. for Cert. 164a, that many of these men were designated by high-ranking FBI officials as being "'of high interest,'" *id.,* PP 48, 50, at 164a, and that in many cases, including Iqbal's, this designation was made "because of the **[****57]** race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," *id.,* P 49, at 164aThe complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged," *id.,* P 10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged," *id.,* P 11, at 157a. According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  *Id.,* P 96, at 172a-173a.  The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out.  Actually, the complaint goes further in alleging that Ashcroft and Mueller affirmatively acted to create the discriminatory detention policy.  If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately **[****58]** indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*.  They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command."  Brief for Petitioners 28.   But this response bespeaks a fundamental misunderstanding of the enquiry **[*696]** that *Twombly* demands.  *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true.  We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be.  See *550 U.S., at 555,* **[***895]** *127 S. Ct. 1955, 167 L. Ed. 2d 929* (a court must proceed "on the assumption that all the allegations in the complaint are

---

[2] If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra, at 692, 173 L. Ed. 2d, at 879*, for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

true (even if doubtful in fact)"); *id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929* ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)* ("*Rule 12(b)(6)* does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole exception to **[****59]** this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here.

Under *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly*'s words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct." *550 U.S., at 564, n. 8, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. In *Twombly*, we were faced with allegations of a conspiracy to violate *§ 1* of the Sherman Act through parallel conduct. The difficulty was that the conduct alleged was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id., at 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. We held that in **[**1960]** that sort of circumstance, "[a]n allegation of parallel conduct is . . . much like a naked assertion of conspiracy in a *§ 1* complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement **[****60]** to relief.'" *Id., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (brackets omitted). Here, by contrast, the allegations in the complaint are neither confined to naked legal conclusions nor consistent **[*697]** with legal conduct. The complaint alleges that FBI officials discriminated against Iqbal solely on account of his race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal action. Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face." *Id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929*.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly*. Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in the complaint:

that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11," Complaint P 47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement **[****61]** until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001," *id.*, P 69, at 168a. See *ante, at 681, 173 L. Ed. 2d, at 886*. I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the **[***896]** suspects could be cleared of terrorist activity," *ante, at 683, 173 L. Ed. 2d, at 887*, and that this produced "a disparate, incidental impact on Arab Muslims," *ante, at 682, 173 L. Ed. 2d, at 886*. And I agree that the two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allegations linking Ashcroft and Mueller to the discriminatory practices of their subordinates. See Complaint P 10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy); **[*698]** *id.*, P 11, at 157a (Mueller was "instrumental" in adopting and executing the discriminatory policy); *id.*, P 96, at 172a-173a (Ashcroft and Mueller "knew of, condoned, and willfully **[****62]** and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true." *Ante, at 681, 173 L. Ed. 2d, at 885* (quoting *Twombly, supra, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See **[**1961]** Complaint PP 47-53, supra, at

164a-165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim **[****63]** is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the complaint as a whole, it gives Ashcroft and Mueller "'fair notice of what the . . . claim is and the grounds upon which it **[*699]** rests.'" *Twombly, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory. For example, the majority takes as true the statement that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' **[****64]** by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after **[***897]** September 11, 2001." Complaint P 69, supra, at 168a; see *ante, at 681, 173 L. Ed. 2d, at 886*. This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of "'high interest'" "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," Complaint PP 48-50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.*, P 96, at 172a. By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

I respectfully dissent.

Justice **Breyer,** dissenting.

I agree with Justice Souter and join **[****65]** his dissent. I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government." *Ante, at 685, 173 L. Ed. 2d, at 888*. But I cannot find in that need adequate justification for the Court's interpretation of *Bell* **[*700]** *Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, and *Federal Rule of Civil Procedure 8*. The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference. As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials. See *Iqbal v. Hasty, 490 F.3d 143, 158 (2007)*. A district court, for example, can begin discovery with lower level Government defendants before determining whether a case can be made to allow **[**1962]** discovery related to higher level Government officials. See *ibid.* Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative **[****66]** case-management tools inadequate, either in general or in the case before us. For this reason, as well as for the independently sufficient reasons set forth in Justice Souter's opinion, I would affirm the Second Circuit.

# References

*28 U.S.C.S. § 1291*; U.S.C.S. Court Rules, *Federal Rules of Civil Procedure, Rule 8*

*Moore's Federal Practice §§ 8.04, 9.05, 202.13* (Matthew Bender 3d ed.)

L Ed Digest, Appeal § 23; Pleading § 191

L Ed Index, Bivens Action

When will private right of action for damages ("Bivens" action) be implied from provision of Federal Constitution--Supreme Court cases. *127 L. Ed. 2d 715.*

Supreme Court's construction and application of *Rules 8* and *9 of Federal Rules of Civil Procedure*, concerning general rules of pleading and pleading special matters. *122 L. Ed. 2d 897.*

556 U.S. 662, *700; 129 S. Ct. 1937, **1962; 173 L. Ed. 2d 868, ***897; 2009 U.S. LEXIS 3472, ****66

Supreme Court's views as to application or applicability of doctrine of qualified immunity in action under *42 U.S.C.S. § 1983*, or in Bivens action, seeking damages for alleged civil rights violations.  *116 L. Ed. 2d 965.*

What constitutes "collateral order" which is immediately appealable under *28 U.S.C.S. § 1291*--Supreme Court cases.  *99 L. Ed. 2d 991.*

---

**End of Document**

⚠️ Caution
As of: June 23, 2025 9:42 PM Z

## *Atuahene v. City of Hartford*

United States Court of Appeals for the Second Circuit

May 31, 2001, Decided

00-7711

**Reporter**
10 Fed. Appx. 33 *; 2001 U.S. App. LEXIS 11694 **

STEVE ATUAHENE, Plaintiff-Appellant, v. CITY OF HARTFORD, CHARLES AYERS, CAPONETTO ENTERPRISES LLC, PRECISION FOREIGN CAR SERVICE, VALDIS VINKELS, JOHN and JANE DOES, Defendants-Appellees.

**Notice: [**1]** RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:** Appeal from the United States District Court for the District of Connecticut (Goettel, J.).

**Disposition:** AFFIRMED.

## Core Terms

district court, motions, fail to identify, factual basis, conclusory, violations, vague

## Case Summary

**Procedural Posture**

Plaintiff appealed from the order of the United States District Court for the District of Connecticut, which pursuant to *Fed. R. Civ. P. 8*, granted defendants' motion to dismiss plaintiff's second amended complaint alleging several constitutional and state common law claims.

**Overview**

Because the complaint failed to differentiate among the defendants, alleging instead violations by the defendants as a group and failing to identify any factual basis for the legal claims made, the district court twice allowed plaintiff to amend his complaint. Although plaintiff's second amended complaint stilled named defendants individually, it still did not identify which defendants were alleged to be responsible for which alleged violations. The court affirmed the judgment of the district court dismissing the complaint. The court noted that although *Fed. R. Civ. P. 8* did not demand that a complaint be a model of clarity or exhaustively present the facts alleged, its minimum requirements were that a complaint give each defendant fair notice of what the plaintiff's claim was and the ground upon which it rested. The court concluded that by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, the complaint failed to satisfy the minimum standard of *Rule 8*, even after the district court accorded him several opportunities to correct it. Therefore, the district court did not abuse its discretion in dismissing the complaint.

**Outcome**
The court affirmed the district court's dismissal of the complaint.

## LexisNexis® Headnotes

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN1* **Pleadings, Rule Application & Interpretation**

Although *Fed. R. Civ. P. 8* does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.

**Counsel:** APPEARING FOR APPELLANT: STEVE ATUAHENE, Pro se, Philadelphia, PA.

10 Fed. Appx. 33, *33; 2001 U.S. App. LEXIS 11694, **1

APPEARING FOR APPELLEES: JOHN B. FARLEY, ESQ., Halloran & Sage LLP (Stephen H. Broer, Esq., on the brief), Hartford, CT.

**Judges:** PRESENT: Hon. John M. Walker, Jr., Chief Judge, Hon. Dennis Jacobs, Circuit Judge, Hon. David G. Larimer, Chief District Judge. [*]

# Opinion

### [*33] SUMMARY ORDER

[*34] Plaintiff-appellant Steve Atuahene appeals from a May 5, 2000 judgment of the United States District Court for the District of Connecticut (Goettel, *J.*) dismissing his complaint.

On April 7, 1999, Atuahene filed suit against defendants-appellees in district court, alleging a host of constitutional and state common law claims. The complaint failed to differentiate among the defendants, alleging instead violations [**2] by "the defendants," and failed to identify any factual basis for the legal claims made. Appellees moved under *Fed. R. Civ. P. 12(b)(6)* to dismiss the complaint as vague and conclusory in violation of *Fed. R. Civ. P. 8* and, in the alternative, for a more definite statement. The district court denied the motions and instead granted a motion by Atuahene to amend the complaint. After Atuahene amended his complaint by adding an introductory paragraph and five new causes of action, appellees repeated their motions. The district court granted appellees' motion in the alternative, and Atuahene filed a second amended complaint. In the second complaint, Atuahene replaced the allegations against "the defendants" with the names of all of the defendants, still failing to identify which defendants were alleged to be responsible for which alleged violations. Appellees once again moved to dismiss the complaint as vague and conclusory, and the district court granted their motions. Atuahene appealed.

*HN1* Although *Fed. R. Civ. P. 8* does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant "fair notice [**3] of what the plaintiff's claim is and the ground upon which it

rests." *Ferro v. Ry. Express Agency, Inc., 296 F.2d 847, 851 (2d Cir. 1961)*; *see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)*. By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, Atuahene's complaint failed to satisfy this minimum standard, even after the district court graciously accorded him several opportunities to correct its manifest flaws. Consequently, the district court did not abuse its discretion in dismissing the complaint. *See Simmons, 49 F.3d at 87*.

For the foregoing reasons, the judgment of the district court is hereby **AFFIRMED**.

---

**End of Document**

---

[*] The Honorable David G. Larimer of the United States District Court for the Western District of New York, sitting by designation.

Q Questioned
As of: June 23, 2025 9:43 PM Z

# *Bell Atl. Corp. v. Twombly*

Supreme Court of the United States

November 27, 2006, Argued ; May 21, 2007, Decided

No. 05-1126

### Reporter

550 U.S. 544 *; 127 S. Ct. 1955 **; 167 L. Ed. 2d 929 ***; 2007 U.S. LEXIS 5901 ****; 75 U.S.L.W. 4337; 2007-1 Trade Cas. (CCH) P75,709; 68 Fed. R. Serv. 3d (Callaghan) 661; 20 Fla. L. Weekly Fed. S 267; 41 Comm. Reg. (P & F) 567

BELL ATLANTIC CORPORATION, et al., Petitioners v.WILLIAM TWOMBLY, et al.

**Prior History:** **[****1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

*Twombly v. Bell Atl. Corp., 425 F.3d 99, 2005 U.S. App. LEXIS 21390 (2d Cir., 2005)*

**Disposition:** Reversed and remanded.

## Core Terms

conspiracy, discovery, allegations, antitrust, set of facts, pleadings, markets, district court, federal rule, Sherman Act, territory, network, cases, local telephone, Telecommunications, compete, resist, factual allegations, motion to dismiss, civil procedure, antitrust case, competitors, entitle, decisions, appears, survive, summary judgment stage, alleged conspiracy, internet service, legal conclusion

## Case Summary

### Procedural Posture

Respondent subscribers to local telephone and Internet services brought an action against petitioner local exchange carriers, alleging that the carriers engaged in parallel conduct to preclude competition in violation of *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*. Upon the grant of a writ of certiorari, the carriers appealed the judgment of the U.S. Court of Appeals for the Second Circuit which held that the subscribers sufficiently stated a claim.

### Overview

The subscribers asserted that the carriers were former local monopolies which engaged in parallel billing and contracting misconduct designed to discourage new competitors from entering their markets through sharing of the carriers' networks. The subscribers also alleged that the carriers agreed not to compete outside their own markets. The U.S. Supreme Court held that the subscribers' allegations that the carriers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, were insufficient to state a claim under *§ 1* of the Sherman Act. To state such a violation, allegations of parallel conduct were required to be placed in a factual context which raised a plausible suggestion of a preceding agreement rather than identical independent action. Further, the subscribers' complaint did not indicate that the carriers' resistance to competitors was anything more than the natural, unilateral reaction of each carrier which was intent on keeping its regional dominance. Also, the alleged anti-competitive conduct of the carriers itself indicated that a carrier's attempt to compete in another carrier's market would not be profitable.

### Outcome

The judgment finding that the subscribers' complaint stated a claim was reversed, and the case was remanded for further proceedings.

## LexisNexis® Headnotes

Antitrust & Trade Law > Sherman Act > Scope > General Overview

*HN1* **Sherman Act, Scope**

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***929; 2007 U.S. LEXIS 5901, ****1

Liability under *§ 1* (*15 U.S.C.S. § 1*) of the Sherman Act requires a contract, combination, or conspiracy, in restraint of trade or commerce.

Antitrust & Trade Law > Sherman Act > Scope > General Overview

*HN2* **Sherman Act, Scope**

*15 U.S.C.S. § 1* prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations.

Antitrust & Trade Law > Sherman Act > Scope > General Overview

*HN3* **Sherman Act, Scope**

Because *§ 1* (*15 U.S.C.S. § 1*) of the Sherman Act does not prohibit all unreasonable restraints of trade, but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN4* **Complaints, Requirements for Complaint**

*Fed. R. Civ. P. 8(a)(2)* requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what

the claim is and the grounds upon which it rests.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN5* **Motions to Dismiss, Failure to State Claim**

While a complaint attacked by a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Antitrust & Trade Law > Sherman Act > Scope > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN6* **Sherman Act, Scope**

Stating a claim under *§ 1* (*15 U.S.C.S. § 1*) of the Sherman Act requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. In identifying facts that are suggestive enough to render a *§ 1* conspiracy plausible, courts have the benefit of the prior rulings and considered views of leading commentators that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a *§ 1* claim, they must be placed in a context that raises a suggestion of a

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***929; 2007 U.S. LEXIS 5901, ****1

preceding agreement, not merely parallel conduct that could just as well be independent action.

Antitrust & Trade Law > Sherman Act > Scope > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

## *HN7* Sherman Act, Scope

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement in violation of *§ 1* (*15 U.S.C.S. § 1*) of the Sherman Act reflects the threshold requirement of *Fed. R. Civ. P. 8(a)(2)* that a plain statement possess enough heft to show that the pleader is entitled to relief. A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a claim under *§ 1* of the Sherman Act; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a *§ 1* complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

## *HN8* Motions to Dismiss, Failure to State Claim

When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

## *HN9* Motions to Dismiss, Failure to State Claim

A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.

Evidence > Burdens of Proof > General Overview

## *HN10* Evidence, Burdens of Proof

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

## *HN11* Motions to Dismiss, Failure to State Claim

When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.

# Lawyers' Edition Display

### Decision

[***929] Telephone and Internet service subscribers held to have failed to state claim against local exchange carriers for alleged parallel billing and contracting designed to discourage competition in asserted violation of § 1 of Sherman Act (*15 U.S.C.S. § 1*).

### Summary

**Procedural posture:** Respondent subscribers to local telephone and Internet services brought an action against petitioner local exchange carriers, alleging that the carriers engaged in parallel conduct to preclude competition in violation of § 1 of the Sherman Act, *15 U.S.C.S. § 1*. Upon the grant of a writ of certiorari, the carriers appealed the judgment of the U.S. Court of Appeals for the Second Circuit which held that the subscribers sufficiently stated a claim.

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***929; 2007 U.S. LEXIS 5901, ****1

**Overview:** The subscribers asserted that the carriers were former local monopolies which engaged in parallel billing and contracting misconduct designed to discourage new competitors from entering their markets through sharing of the carriers' networks. The subscribers also alleged that the carriers agreed not to compete outside their own markets. The U.S. Supreme Court held that the subscribers' allegations that the carriers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, were insufficient to state a claim under § 1 of the Sherman Act. To state such a violation, allegations of parallel conduct were required to be placed in a factual context which raised a plausible suggestion of a preceding agreement rather than identical independent action. Further, the subscribers' complaint did not indicate that the carriers' resistance to competitors was anything more than the natural, unilateral reaction of each carrier which was intent on keeping its regional dominance. Also, the alleged **[***930]** anti-competitive conduct of the carriers itself indicated that a carrier's attempt to compete in another carrier's market would not be profitable.

**Outcome:** The judgment finding that the subscribers' complaint stated a claim was reversed, and the case was remanded for further proceedings.

## Headnotes

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5 > SHERMAN ACT LIABILITY > Headnote:
***LEdHN[1]*** [1]

Liability under § 1 (*15 U.S.C.S. § 1*) of the Sherman Act requires a contract, combination, or conspiracy, in restraint of trade or commerce. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5 > SHERMAN ACT PROHIBITIONS > Headnote:
***LEdHN[2]*** [2]

*15 U.S.C.S. § 1* prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 14 RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 15 > SHERMAN ACT -- TRADE RESTRAINTS PROHIBITED -- PARALLEL BUSINESS BEHAVIOR > Headnote:
***LEdHN[3]*** [3]

Because § 1 (*15 U.S.C.S. § 1*) of the Sherman Act does not prohibit all unreasonable restraints of trade, but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

PLEADING § 130 > PLEADING -- PLAIN STATEMENT > Headnote:
***LEdHN[4]*** [4]

*Fed. R. Civ. P. 8(a)(2)* requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what the claim is and the grounds upon which it rests. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***930; 2007 U.S. LEXIS 5901, ****1

[***931]

PLEADING § 103 > COMPLAINT -- MOTION TO DISMISS > Headnote:

*LEdHN[5]* [5]

While a complaint attacked by a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 63 > SHERMAN ACT -- STATING ANTITRUST CLAIM -- ILLEGAL AGREEMENT -- PARALLEL CONDUCT > Headnote:

*LEdHN[6]* [6]

Stating a claim under § 1 (*15 U.S.C.S. § 1*) of the Sherman Act requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.   Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.  In identifying facts that are suggestive enough to render a *§ 1* conspiracy plausible, courts have the benefit of the prior rulings and considered views of leading commentators that lawful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

PLEADING § 176 > PLEADING -- ANTITRUST ALLEGATIONS -- ENTITLEMENT TO RELIEF  > Headnote:

*LEdHN[7]* [7]

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement in violation of § 1 (*15 U.S.C.S. § 1*) of the Sherman Act reflects the threshold requirement of *Fed. R. Civ. P. 8(a)(2)* that a plain statement possess enough heft to show that the pleader is entitled to relief.  A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a claim under *§ 1* of the Sherman Act; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.  An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint:  it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[***932]

PLEADING § 106 > FAILURE TO RAISE CLAIM  > Headnote:
*LEdHN[8]* [8]

When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

PLEADING § 103 > PLEADING -- SPECIFICITY  > Headnote:
*LEdHN[9]* [9]

A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***932; 2007 U.S. LEXIS 5901, ****1

PLEADING § 130 > PLEADING -- CONSISTENT FACTS
> Headnote:
*LEdHN[10]* [10]

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

**[***933]**

PLEADING § 103 > DISMISSAL OF COMPLAINT
> Headnote:
*LEdHN[11]* [11]

When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

## Syllabus

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834.* It also authorized them to enter the long-distance market. **[****2]** "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs). *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823.*

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of *§ 1* of the Sherman Act, which prohibits "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct **[****3]** allegations, taken alone, do not state a claim under *§ 1*; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*Held:*

1. Stating a *§ 1* claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6-17

(a) Because *§ 1* prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628,* "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. [***934] Ed. 273.* While **[****4]** a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id., at 540-541, 540, 74 S. Ct. 257, 98 L. Ed. 273.* The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial

sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538.*

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a *§ 1* claim. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80.* **[****5]** While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects *Rule 8(a)(2)*'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel conduct allegation gets the § 1 complaint close to stating a claim, but without further factual enhancement **[****6]** it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with "'a largely groundless claim'" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible

**[***935]** entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main **[****7]** argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing *Rule 8*: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement **[****8]** among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try to avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did **[****9]** not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the

550 U.S. 544, *544; 127 S. Ct. 1955, **1955; 167 L. Ed. 2d 929, ***935; 2007 U.S. LEXIS 5901, ****9

ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact **[***936]** pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*425 F.3d 99*, reversed and remanded.

**Counsel: Michael Kellogg** argued the cause for petitioners.

**Thomas O. Barnett** argued the cause for the United States, as amicus curiae, by special leave of court.

**J. Douglas Richards** argued the cause for respondents.

**Judges:** Souter, J., delivered the opinion **[****10]** of the Court, in which Roberts, C. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ., joined. Stevens, J., filed a dissenting opinion, in which Ginsburg, J., joined, except as to Part IV, *post*, p. 570.

**Opinion by:** SOUTER

# Opinion

**[*548] [**1961]** Justice **Souter** delivered the opinion of the Court.

*HN1* *LEdHN[1]* [1]  Liability under *§ 1* of the Sherman Act, *15 U.S.C. § 1*, requires a "contract, combination . . ., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a *§ 1* complaint can survive a motion to dismiss when it alleges that major telecommunications providers

engaged in certain parallel conduct unfavorable to **[*549]** competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade **[****11]** later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), *110 Stat. 56*, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999)*. In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See *47 U.S.C. § 271*.

"Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*, which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n 1.  A CLEC could make use of an ILEC's network in any of three ways:  by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,'" or (3) "interconnect[ing] its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra, at 371, 119 S. Ct. 721, 142 L. Ed. 2d 834* (quoting *47 U.S.C. § 251(c)* **[****12]** ).  Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra, at 410, 124 S. Ct. 872, 157 L. Ed. 2d 823*, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) **[***937]** three times **[*550]** revised **[**1962]** its regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Communs. Co. v. FCC, 450 F.3d 528, 533-534 (CADC 2006)* (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

550 U.S. 544, *550; 127 S. Ct. 1955, **1962; 167 L. Ed. 2d 929, ***937; 2007 U.S. LEXIS 5901, ****12

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, *HN2 LEdHN[2]* [2]*15 U.S.C. § 1*, which prohibits "[e]very contract, [****13] combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth [****14] of upstart CLECs. Complaint P 47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs' [**551] "compelling common motivatio[n]" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . ., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.*, P 50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure

"meaningfully [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.*, PP 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer [****15] (CEO) of the ILEC Qwest, that competing in the territory of another ILEC "'might be a good way to turn a quick dollar but that doesn't make it right,'" *id.*, P 42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within [***938] their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information [**1963] and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, P 51, App. 27.[2]

[*552] [****16] The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while '[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . .] "conscious parallelism" has not yet

---

[1] The 1984 divestiture of AT&T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint P 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.*, P 48, App. 26.

---

[2] In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

"Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of *Section 1* of the Sherman Act." Id., P 64, App. 30-31.

read conspiracy out of the Sherman Act entirely.'" *313 F. Supp. 2d 174, 179 (2003)* (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*; alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under *§ 1*; plaintiffs must allege additional facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *313 F. Supp.2d, at 179*. The District Court found plaintiffs' allegations of parallel ILEC actions to discourage competition inadequate [****17] because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id., at 183*. As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "alleg[e] facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy." *Id., at 188*.

[*553] The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *425 F.3d 99, 114 (2005)* (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct [****18] fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a [***939] plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, *548 U.S. 903, 126 S. Ct. 2965, 165 L. Ed. 2d 949 (2006)*, and now reverse.

[**1964] II

A

*HN3* *LEdHN[3]* [3] Because *§ 1* of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract,

combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enterprises, 346 U.S., at 540, 74 S. Ct. 257, 98 L. Ed. 273*. While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id., at 540-541, 74 S. Ct. 257, 98 L. Ed. 273*. Even "conscious [****19] parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" [*554] is "not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*; see 6 P. Areeda & H. Hovenkamp, Antitrust Law P 1433a, p 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act *§ 1*"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy").

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.*, AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss [****20] Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*; and at the summary judgment stage a *§ 1* plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita*

550 U.S. 544, *554; 127 S. Ct. 1955, **1964; 167 L. Ed. 2d 929, ***939; 2007 U.S. LEXIS 5901, ****20

*Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* [***940]

B

This case presents the antecedent question of what a plaintiff must plead in order to state a claim under *§ 1* of the [*555] Sherman Act. **HN4** **LEdHN[4]** [4]*Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in [****21] order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* **HN5** **LEdHN[5]** [5] While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (CA7 1994),* a plaintiff's obligation to provide the [**1965] "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)* (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[3] on the assumption that all the allegations [****22] in the complaint are true (even if doubtful in fact), see, *e.g., Swierkiewicz v. [*556] Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)* ("*Rule 12(b)(6)* does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

[****23] In applying these general standards to a § 1 claim, we hold that **HN6** **LEdHN[6]** [6] stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [***941] of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit [**1966] of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without [*557] more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified

---

[3] The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post, at 580, 167 L. Ed. 2d, at 955* (opinion of Stevens, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (emphasis added), *Rule 8(a)(2)* still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (*Rule 8(a)* "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

[4] Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.,* 6 Areeda & Hovenkamp P 1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

point does not supply facts adequate to show illegality. Hence, when [****24] allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*LEdHN[7]* [7] [****25] *HN7* The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of *Rule 8(a)(2)* that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (CA1 1999)* ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court [****26] is not required to accept such terms as a sufficient basis for a complaint").[5]

We alluded to the practical significance of the *Rule 8* entitlement requirement in *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, when we explained that something beyond the mere possibility of loss causation must be [*558] alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id., at 347, 125 S. Ct. 1627, [***942] 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975))*. So, *HN8 LEdHN[8]* [8] when the allegations in a complaint, however true, could not raise a claim of entitlement to

relief, "'this basic deficiency [****27] should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co., 114 F. Supp. 643, 645 (Haw. 1953))*; see also *Dura, supra, at 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577*; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F. Supp. 2d 986, 995 (ND Ill. 2003)* (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. [**1967] *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, *HN9 LEdHN[9]* [9]"a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy [****28] to proceed." See also *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (CA7 1984)* ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, *78 N. Y. U. L. Rev. 1887, 1898-1899 (2003)* (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, [*559] Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all [****29] subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven

---

[5] The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post, at 573, 167 L. Ed. 2d, at 951*, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.*, Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638 (1989)* ("Judges can do little about impositional discovery when parties control the legal claims **[***943]** to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post, at 573, 167 L. Ed. 2d, at 951*; the threat of discovery expense will push cost-conscious defendants to settle even **[****30]** anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura, [*560] 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, supra, at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*; alteration in *Dura*).[6]

---

[6] The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be """phased""" and "limited to the existence of the alleged conspiracy and class certification." *Post, at 593, 167 L. Ed. 2d, at 963*. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line-drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not--cannot--know the

**[****31] [**1968]** Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises, Monsanto*, and *Matsushita*, and their main argument against the plausibility standard at the pleading stage is its ostensible **[*561]** conflict with an early statement of ours construing *Rule 8*. Justice Black's opinion for the Court in *Conley* v. *Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80*. This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see *425 F.3d at 106, 114* (invoking *Conley*'s "no set **[****32]** of **[***944]** facts" language in describing the standard for dismissal).[7]

---

expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638-639 (1989)* (footnote omitted).

---

[7] The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp., 248 F.2d 319 (CA2 1957)*, that facts indicating parallel conduct alone suffice to state a claim under *§ 1*. *425 F.3d at 114* (citing *Nagler, supra, at 325*). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*, and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary

[****33] On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint [**1969] does not set forth a single [*562] fact in a context that suggests an agreement. *425 F.3d, at 106, 114.* It seems fair to say that this approach to pleading would dispense with any showing of a "'reasonably founded hope'" that a plaintiff would be able to make a case, see *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, 421 U.S., at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g.*, *Car Carriers, 745 F.2d at 1106* ("*Conley* has never been interpreted literally" and, "[i]n practice, a complaint . . . must contain either direct or [****34] inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (CA9 1989)* (tension between *Conley*'s "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. Di Grazia, 544 F.2d 543, 546, n. 3 (CA1 1976)* ("[W]hen a plaintiff . . . supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (CA6 1988)* (quoting *O'Brien*'s analysis); Hazard, From Whom No Secrets Are Hid, *76 Texas L. Rev. 1665, 1685 (1998)* (describing *Conley* as having "turned *Rule 8* on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, *86 Colum. L. Rev. 433, 463-465 (1986)* (noting tension between [****35] *Conley* and subsequent understandings of *Rule 8*).

We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained

---

implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's [*563] concrete allegations, which the Court quite reasonably understood as amply stating a claim for [***945] relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: *HN10* *LEdHN[10]* [10]once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan, 40 F.3d at 251* (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*; *National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994)*; [****36] *H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*; *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.[8]

---

[8] Because *Conley*'s "'no set of facts'" language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. *Post, at 577, 167 L. Ed. 2d, at 953.* Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura Pharmaceuticals, Inc. v Broudo, 544 U.S., at 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* (requiring "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support the claim (alteration in *Dura*) (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)*; alteration in *Dura*)); *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler, 365 U.S. 381, 383, 81 S. Ct. 632, 5 L. Ed. 2d 620 (1961)* ("In the absence of . . . an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed . . . a narcotics offense"). Nor are we reaching out to decide this

550 U.S. 544, *563; 127 S. Ct. 1955, **1969; 167 L. Ed. 2d 929, ***945; 2007 U.S. LEXIS 5901, ****36

[***946]

[****37] [**1970] [*564]  III

When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short.  To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs.  *Supra, at 550-551, 167 L. Ed. 2d, at 937-938*.  Although in form a few stray statements speak directly of agreement,[9] on fair reading these are merely legal conclusions resting on the prior allegations.  Thus, the complaint  [*565] first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of

_____

issue in a case where the matter was not raised by the parties, see *post, at 579, 167 L. Ed. 2d, at 955*, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley*'s "no set of facts" language and seek clarification of the standard.  Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "[p]etitioners and their amici" as mounting an "attack on *Conley*'s 'no set of facts' standard")

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to Conley's "no set of facts" language.  *See post, at 580-583, 167 L. Ed. 2d, at 955-957*.  Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, e.g., *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass., 108 F.2d 302, 305 (CA8 1940)* ("'[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted'"); *Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (CA3 1942)* ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it").  Rather, these cases stand for the unobjectionable proposition that,  *HN11 LEdHN[11]* [11] when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf.  *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

[9] See Complaint PP 51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another."  Complaint P 51, App. 27.[10] [****39]   The nub of the [**1971] complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out [****38] and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[11]

 [*566] We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy.  As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent

_____

[10] If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by *Rule 8*.  Apart from identifying a 7-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present," *id.*, P 64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies.  This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post, at 576, 167 L. Ed. 2d, at 953*.  Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place.  A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the  *§ 1* context would have little idea where to begin.

[11] The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized.  See *313 F. Supp. 2d 174, 182 (SDNY 2003)*; *425 F.3d 99, 102-104 (CA2 2005)*.

on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at **[***947]** wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 **[****40]** Act in all the ways the plaintiffs allege, see *id.,* P 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.,* P 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." *313 F. Supp. 2d, at 184*; cf. *Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (SDNY 1995)* (while the **[****41]** plaintiff "may believe the defendants conspired . . ., the defendants' allegedly conspiratorial actions **[*567]** could equally have been prompted by lawful, independent goals which do not constitute a conspiracy").[12]

 **[**1972]** Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was **[****42]** supposedly passed in the "'hop[e] that the large incumbent local monopoly companies . . . might attack

their neighbors' service areas, as they are the best situated to do so.'" Complaint P 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p 12 (Feb. 2000)). Contrary to hope, the ILECs declined "'to enter each other's service territories in any significant way,'" Complaint P 38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.,* P 40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, **[****43]** but here we have an obvious alternative **[***948]** explanation. In the decade **[*568]** preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See *Verizon Communs., Inc. v. FCC, 535 U.S. 467, 477-478, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002)* (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint P 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[13] **[****45]** and **[**1973]** the complaint is replete

---

[12] From the allegation that the ILECs belong to various trade associations, see Complaint P 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post, at 591, 594, 167 L. Ed. 2d, at 962, 963-964.* If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

---

[13] The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it "'might be a good way to turn a quick dollar.'" P 42, App. 22 (quoting

550 U.S. 544, *568; 127 S. Ct. 1955, **1973; 167 L. Ed. 2d 929, ***948; 2007 U.S. LEXIS 5901, ****45

with indications that any CLEC faced [****44] nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.*, P 47, App. [*569] 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp P 307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim.[14]

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A., 534 U.S. at 508, 122 S. Ct. 992, [***949] 152 L. Ed. 2d 1*, which held that "a

---

Chicago Tribune, Oct. 31, 2002, Business Section, p 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See *Fed. Rule Evid. 201*. Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just . . . nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p 1 (cited at Complaint P 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p 2 (cited at Complaint P 45, App. 23).

[14] In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993))*. On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than *Rule 8* requires. *Fed. Rules Civ. Proc. 9(b)-(c)*. Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized]," *ibid.;* rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

---

complaint in an employment discrimination [****46] lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*, "transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid *Rule 12(b)(6)* pleading standard . . . would be unwise," Brief for Respondents 39. As the District Court [*570] correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *313 F. Supp. 2d, at 181* (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed [****47] his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyondthose necessary to state his [**1974] claim and the grounds showing entitlement to relief. *Id., at 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*    *    *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Dissent by:** STEVENS

# Dissent

550 U.S. 544, *570; 127 S. Ct. 1955, **1974; 167 L. Ed. 2d 929, ***949; 2007 U.S. LEXIS 5901, ****47

Justice **Stevens,** with whom Justice **Ginsburg** joins except as to Part IV, dissenting.

In the first paragraph of its 23-page opinion the Court states that the question to be **[****48]** decided is whether allegations that "major telecommunications providers engaged in certain **[*571]** parallel conduct unfavorable to competition" suffice to state a violation of § 1 of the Sherman Act. *Ante, at 548-549, 167 L. Ed. 2d, at 936*. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*, would adequately resolve **[***950]** this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id., at 540-542, 74 S. Ct. 257, 98 L. Ed. 273*.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. The plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not "plausible" provide a legally acceptable reason **[****49]** for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have **[*572]** refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard

Notebaert, the former chief executive officer of one such ILEC, as saying that competing in a neighboring ILEC's territory "'might be a good way to turn a quick dollar but that doesn't make it right.'" *Id.,* P 42, App. 22. Moreover, respondents allege that petitioners "communicate **[****50]** amongst themselves" through numerous industry associations. *Id.,* P 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* **[**1975]** violation of the Sherman Act. See Reportof the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises*, a judge ruling on a defendant's motion to dismiss a complaint "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; see *Overstreet v. North Shore Corp., 318 U.S. 125, 127, 63 S. Ct. 494, 87 L. Ed. 656 (1943)*. But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery--and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement--the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that **[****51]** "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *ante, at 566, 167 L. Ed. 2d, at 947*; that "there was just no need for joint encouragement **[***951]** to resist the 1996 Act," *ibid.*; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante, at 568, 167 L. Ed. 2d, at 948*.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence **[*573]** of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante, at 564, 167 L. Ed. 2d, at 946*; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

550 U.S. 544, *573; 127 S. Ct. 1955, **1975; 167 L. Ed. 2d 929, ***951; 2007 U.S. LEXIS 5901, ****51

Two practical concerns presumably explain the Court's dramatic departure from settled procedural [****52] law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of _Federal Rule of Civil Procedure 12(b)(6)_ that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

_Rule 8(a)(2)_ of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Rule did not come about by happenstance, and its language is not inadvertent. The English experience with Byzantine special pleading rules [****53] -- illustrated by the hypertechnical Hilary rules of [*574] 1834[1] -- made [**1976] obvious the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

[****54] [***952] A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

> "it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of [*575] fact' and 'conclusions of law'"). _Rule 8_ was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. [****55] Wright & A. Miller, Federal Practice and Procedure § 1216, p 207 (3d ed. 2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' . . .").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See _Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1_ ("The liberal notice pleading of _Rule 8(a)_ is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules,[2] put it thus:

> "Experience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their

---

[1] See 9 W. Holdsworth, History of English Law 324-327 (1926).

[2] _Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 283, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988)._

550 U.S. 544, *575; 127 S. Ct. 1955, **1976; 167 L. Ed. 2d 929, ***952; 2007 U.S. LEXIS 5901, ****55

function. We can expect a general statement distinguishing the case from all others, so **[****56]** that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The **[**1977]** New Federal Rules of Civil Procedure: The Last Phase-- Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, **[*576]** a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then **[***953]** crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief--namely, the defendant's negligent driving--would have been called a "'conclusion of law'" under the code pleading of old. See, *e.g.*, Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to **[****57]** the task of general notice-giving and invest[s] the deposition-discovery process with a vital role in the preparation for trial."[3] *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)*; see also *Swierkiewicz, 534 U.S., at 513, n. 4, 122 S. Ct. 992, 152 L. Ed. 2d 1* (citing Form 9 as an example of "'the simplicity and brevity of statement which the rules contemplate'"); *Thomson v. Washington, 362 F.3d 969, 970 (CA7 2004)* (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

II

**[****58]** It is in the context of this history that *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local

had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing **[*577]** for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of *Rule 8*. *Id., at 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80*. In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80*.

Consistent with the design of the Federal Rules, *Conley*'s "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond **[****59]** would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley*'s "no set of facts " language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante, at 562, 167 L. Ed. 2d, at 944*, the Court dismisses it as careless composition.

**[**1978]** If *Conley*'s "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years," *ante, at 563, 167 L. Ed. 2d, at 945*, has been cited as authority in a dozen opinions of this Court and four separate **[***954]** writings.[4] **[****61]**

---

[3] The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," *Fed. Rule Civ. Proc. 9(b)*, neither of which has been alleged in this case. We have recognized that the canon of *expressio unius est exclusio alterius* applies to *Rule 9(b)*. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*.

---

[4] *SEC v. Zandford, 535 U.S. 813, 818, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002)*; *Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)*; *Hartford Fire Ins. Co. v. California, 509 U.S. 764, 811, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993)*; *Brower v. County of Inyo, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)*; *Hughes v. Rowe, 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (per curiam)*; *McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980)*; *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*; *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)*; *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*; *Cruz v. Beto, 405*

550 U.S. 544, *577; 127 S. Ct. 1955, **1978; 167 L. Ed. 2d 929, ***954; 2007 U.S. LEXIS 5901, ****61

In not one of **[*578]** those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation.  Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language **[****60]** the majority repudiates:  whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.[5]

---

*U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972)* (per curiam); *Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (per curiam); *Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)* (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 554, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)* (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin, 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984)* (Stevens, J., dissenting); *United Air Lines, Inc. v. Evans, 431 U.S. 553, 561, n. 1, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977)* (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 55, n. 6, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)* (Brennan, J., concurring in judgment).

[5] See, *e.g.*, *EB Invs., LLC v. Atlantis Development, Inc., 930 So. 2d 502, 507 (Ala. 2005)*; *Department of Health & Social Servs. v. Native Village of Curyung, 151 P. 3d 388, 396 (Alaska 2006)*; *Newman v. Maricopa Cty., 167 Ariz. 501, 503, 808 P.2d 1253, 1255* (App. 1991*)*; *Public Serv. Co. of Colo. v. Van Wyk, 27 P. 3d 377, 385-386 (Colo. 2001)* (en banc); *Clawson v. St. Louis Post-Dispatch, LLC, 906 A.2d 308, 312 (D. C. 2006)*; *Hillman Constr. Corp. v. Wainer, 636 So. 2d 576, 578 (Fla. App. 1994)*; *Kaplan v. Kaplan, 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996)*; *Wright v. Home Depot U.S.A., Inc., 111 Haw. 401, 406, 142 P. 3d 265, 270 (2006)*; *Taylor v. Maile, 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005)*; *Fink v. Bryant, 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349*; *Gagne v. Cianbro Corp., 431 A.2d 1313, 1318-1319 (Me. 1981)*; *Gasior v. Massachusetts Gen. Hospital, 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006)*; *Ralph Walker, Inc. v. Gallagher, 926 So. 2d 890, 893 (Miss. 2006)*; *Jones v. Montana Univ. System, 337 Mont. 1, 7, 155 P. 3d 1247, 1252 (2007)*; *Johnston v. Neb. Dep't of Corr. Servs., 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006)*; *Blackjack Bonding v. Las Vegas Munic. Ct., 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000)*; *Shepard v. Ocwen Fed. Bank, 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006)*; *Rose v. United Equitable Ins. Co., 2001 ND 154, P10, 632 N.W.2d 429, 434*; *State ex rel. Turner v. Houk, 112 Ohio St. 3d 561, 562, 2007-Ohio-814, P5, 862 N.E.2d 104, 105 (per curiam)*; *Moneypenney v. Dawson, 2006 OK 53, P2, 141 P. 3d 549, 551*; *Gagnon v. State, 570 A.2d 656, 659 (R. I. 1990)*; *Osloond v. Farrier, 2003 SD 28, P4, 659 N.W.2d 20, 22 (per curiam)*; *Smith v. Lincoln Brass Works, Inc., 712 S.W.2d 470, 471 (Tenn. 1986)*; *Association of*

**[****62] [**1979] [*579]** Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed **[***955]** briefs in support of petitioners.  I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process--a rulemaking process--for revisions of that order.  See *28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV)*.

Today's majority calls *Conley*'s "'no set of facts'" language "an incomplete, negative gloss on an accepted pleading standard:  once a claim has been stated adequately, it may be **[*580]** supported by showing any set of facts consistent with the allegations in the complaint." *Ante, at 563, 167 L. Ed. 2d, at 945*. This is not and cannot be what the *Conley* Court meant.

---

*Haystack Property Owners, Inc. v. Sprague, 145 Vt. 443, 446, 494 A.2d 122, 124 (1985)*; *In re Coday, 156 Wn. 2d 485, 497, 130 P. 3d 809, 815 (2006)* (en banc); *Haines v. Hampshire Cty. Comm'n, 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004)*; *Warren v. Hart, 747 P.2d 511, 512 (Wyo. 1987)*; see also *Malpiede v. Townson, 780 A.2d 1075, 1082-1083 (Del. 2001)* (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka, 212 Ill. 2d 311, 318, 818 N.E.2d 311, 317, 288 Ill. Dec. 623 (2004)* (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young, 522 N.E.2d 386, 388 (Ind. 1988)* (per curiam) (replacing "appears beyond doubt" with "appears to a certainty"); *Barkema v. Williams Pipeline Co., 666 N.W.2d 612, 614 (Iowa 2003)* (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty., 104 S. W. 3d 757, 759 (Ky. 2003)* (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004)* (per curiam) (holding that a motion for judgment on the pleadings should be granted only "'if no factual development could possibly justify recovery'"); *Oberkramer v. Ellisville, 706 S.W.2d 440, 441 (Mo. 1986)* (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd., 795 P.2d 622, 624 (Utah 1990)* (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Mgmt. Servs. Corp. v. First Va. Bank - Southwest, 63 Va. Cir. 68, 70 (2003)* ("The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts.[6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion--a statement of the permissible factual support for an adequately **[****63]** pleaded complaint--would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of **[**1980]** the complaint." *355 U.S., at 45, 78 S. Ct. 99, 2 L. Ed. 2d 80* (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante, at 563, 167 L. Ed. 2d, at 945*.

**[****64]** We can be triply sure as to *Conley*'s meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not **[*581]** be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of **[***956]** facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80*. In the first case, *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass., 108 F.2d 302 (CA8 1940)*, the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing

---

[6] The majority is correct to say that what the Federal Rules require is a "'showing'" of entitlement to relief. *Ante, at 555, n 3, 167 L. Ed. 2d, at 940*. Whether and to what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra, at 570-571, 167 L. Ed. 2d, at 949*. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, "'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.'" *Id., at 305* (quoting *Winget v. Rockwood, 69 F.2d 326, 329 (CA8 1934))*.

The *Leimer* court viewed the Federal Rules--specifically *Rules 8(a)(2)*, *12(b)(6)*, *12(e)* (motion for **[****65]** a more definite statement), and 56 (motion for summary judgment)--as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *108 F.2d at 306*. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer*'s admonition in *Continental Collieries, Inc. v. Shober, 130 F.2d 631 (1942)*, which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state **[****66]** law. The Court of Appeals reversed, **[*582]** concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer*: "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *130 F.2d at 635*.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning, 139 F.2d 774 (CA2 1944)*, the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it--and indeed for an amount equal to the plaintiff's own bid--and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held

the lead rein in drafting, Judge Clark said that the defendant **[****67]**

"could have disclosed the facts from his point of view, in advance of a trial if he **[**1981]** chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so **[***957]** firmly believes and what for present purposes defendant must be taken as admitting." *Id., at 775*.

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise *Rule 8* to require a plaintiff to plead a "'cause of action.'"  See 5 Wright & Miller § 1201, at 86-87.  The movement failed, see *ibid.; Dioguardi* was explicitly approved in *Conley;* and "[i]n retrospect the case itself seems to be a **[*583]** routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer, Continental Collieries*, and *Dioguardi, Conley*'s statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante, at 562-563, 167 L. Ed. 2d, at 945*.  It reflects a philosophy that, unlike **[****68]** in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process.  *Conley*'s language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*.  For example, in *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that the petitioners' claims were barred by sovereign immunity.  In a unanimous opinion by then-Justice Rehnquist, we emphasized:

"[W]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.  *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*"  *Id., at 236, 94 S.*

*Ct. 1683, 40 L. Ed. 2d 90* (emphasis added). **[****69]**

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct."  *Krause v. Rhodes, 471 F.2d 430, 433 (CA6 1972)*.  We reversed the Court of Appeals on the ground that "[w]hatever **[*584]** the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the *Eleventh Amendment* because they were styled as suits against the defendants in their individual capacities. *416 U.S., at 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90*.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*.  Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," **[****70]** *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, [***958] 954 F.2d 1054, 1057 (1992)* (internal quotation marks omitted), by requiring a plaintiff to "state with factual **[**1982]** detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity," *507 U.S., at 167, 113 S. Ct. 1160, 122 L. Ed. 2d 517* (internal quotation marks omitted).  We found this language inconsistent with *Rules 8(a)(2)* and *9(b)* and emphasized that motions to dismiss were not the place to combat discovery abuse:  "In the absence of [an amendment to *Rule 9(b)*], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id., at 168-169,113 S. Ct. 1160, 122 L. Ed. 2d 517*.

Most recently, in *Swierkiewicz, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1*, we were faced with a case more similar to the present one than the majority will allow.  In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting **[****71]** evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v.*

*Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See, e.g., Trans World Airlines, Inc. v. Thurston, [*585] 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985)*. Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz, 534 U.S., at 511, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We also observed that *Rule 8(a)(2)* does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious [****72] claims." *Id., at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*; see Brief for United States et al. as *Amici Curiae* in *Swierkiewicz* v. *Sorema N. A.*, O. T. 2001, No. 00-1853, p 10 (stating that a *Rule 12(b)(6)* motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)).[7]

As in the discrimination context, we have developed [****73] an evidentiary framework for evaluating claims under *§ 1* of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita [***959] Elec. Industrial [*586] Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Under *Matsushita*, a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct

of the defendants. In order to survive a *Rule 56* motion, a *§ 1* plaintiff "must present evidence 'that tends [**1983] to exclude the possibility' that the alleged conspirators acted independently.'" *Id., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538* (quoting *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984))*. That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." *475 U.S., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538*.

Everything today's majority says would therefore make perfect sense if it were ruling on a *Rule 56* motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* [****74] that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because--in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior--the claimed conspiracy is "conceivable" but not "plausible," *ante, at 570, 167 L. Ed. 2d, at 949*. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with *Rule 8* and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation do not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample [*587] opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)* [****75] (quoting *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962))*; see also *Knuth v. Erie-Crawford Dairy Cooperative Asso., 395 F.2d 420, 423 (CA3 1968)* ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather

---

[7] See also 5 Wright & Miller § 1202, at 89-90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

than discourage, private enforcement of the law.  See *Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390, 1 L. Ed. 2d 456 (1957)* ("Congress itself has placed the private antitrust litigant in a most favorable position . . . .  In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws").  It is therefore more, not less, important in antitrust cases to resist the urge to **[***960]** engage in armchair economics at the pleading stage.

The same year we decided *Conley* **[****76]**, Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties.  Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular.*"  Special Pleading in the "Big Case"?  in Procedure--The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter **[**1984]** Clark, Special Pleading in the Big Case) (emphasis added).

**[*588]**  In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted.[8]  While the majority assures us that it is not

---

[8] Our decision in *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, is not to the contrary.  There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action.  Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provid[e] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation."  *Id., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.*  Here, the failure the majority identifies is not a failure of notice--which "notice pleading" rightly condemns--but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred.  That being a question not of *notice* but of *proof*, it should not be answered without first hearing from the defendants (as apart from their lawyers).  Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries as alleged were not "the type that the antitrust statute was intended to forestall."  *Id., at 540, 103 S. Ct. 897,*

applying any "'heightened'" pleading standard, see *ante, at 569, n 14, 167 L. Ed. 2d, at 948-949*, I shall now explain why I have a difficult time understanding its opinion any other way.

**[****77]** III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, *see, e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526-527, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).*  Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).*  Rather, the theory on which the Court permits **[*589]** dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all.  This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other.  The new statute was enacted to replace a monopolistic market with a competitive one.  The Act did not merely require the regional monopolists **[***961]** to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*; it also permitted the existing firms to compete with each **[****78]** other and to expand their operations into previously forbidden territory.  See *47 U.S.C. § 271.*  Each of the defendants decided not to take the latter step.  That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision.  I am even willing to entertain the majority's belief that any agreement among the companies is unlikely.  But the plaintiffs allege in three places in their complaint, PP 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other.  And as the Court **[**1985]** recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations

---

*74 L. Ed. 2d 723*; see *id., at 526, 103 S. Ct. 897, 74 L. Ed. 2d 723* ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint.  It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

550 U.S. 544, *589; 127 S. Ct. 1955, **1985; 167 L. Ed. 2d 929, ***961; 2007 U.S. LEXIS 5901, ****78

in the complaint are true (even if doubtful in fact)." *Ante, at 555, 167 L. Ed. 2d, at 940*.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel **[****79]** conduct. *Ante, at 564, 167 L. Ed. 2d, at 946*. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra, at 574-576, 167 L. Ed. 2d, at 938-939*. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in **[*590]** Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Ass'n, 347 U.S. 186, 188, 74 S. Ct. 452, 98 L. Ed. 618 (1954)* (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader'"); *Brownlee v. Conine, 957 F.2d 353, 354 (CA7 1992)* ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (CA9 1963)* ("[O]ne purpose of *Rule 8* **[****80]** was to get away from the highly technical distinction between statements of fact and conclusions of law . . ."); *Oil, Chemical & Atomic Workers Int'l Union v. Delta, 277 F.2d 694, 697 (CA6 1960)* ("Under the notice system of pleading established by the Rules of Civil Procedure, . . . the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra, at [***962] 575-576, 167 L. Ed. 2d, at 952*. Indeed it is less of one.[9]

**[****81] [*591]** Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint **[**1986]** points not only to petitioners' numerous opportunities to meet with each other, Complaint P 46, App. 23,[10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.,* P 42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest **[****82]** to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.,* P 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone

_____

[9] The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by *Rule 8* because it lacks specificity. *Ante, at 565, n 10, 167 L. Ed. 2d, at 946*. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a *Rule*

12(e) motion for a more definite statement. See *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. Petitioners made no such motion and indeed have conceded that "[o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante, at 565, n 10, 167 L. Ed. 2d, at 946*, is, for our purposes, academic.

[10] The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante, at 567, n 12, 167 L. Ed. 2d, at 947*. Quite the contrary: An allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with--though not sufficient to prove--the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," *ante, at 564, 167 L. Ed. 2d, at 946*, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

550 U.S. 544, *591; 127 S. Ct. 1955, **1986; 167 L. Ed. 2d 929, ***962; 2007 U.S. LEXIS 5901, ****82

monopolies to not compete **[\*592]** against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.,* P 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs'"very apparent non-competition policy'" was coordinated).

**[\*\*\*\*83]** Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other **[\*\*\*963]** quotes from that and other articles and decides that what he meant was that entering new markets as a competitive local exchange carrier would not be a "'sustainable economic model.'" *Ante, at 568, n 13, 167 L. Ed. 2d, at 948.* Never mind that--as anyone ever interviewed knows--a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor.[11] See *Allen v. Wright, 468 U.S. 737, 767-768, n. 1, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)* (Brennan, J., dissenting). The inference the statement supports--that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to **[\*593]** do so were the product of an agreement--sits comfortably within **[\*\*\*\*84]** the realm of possibility. That is all the Rules require.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint **[\*\*1987]** without requiring the defendants to answer the charge that they "have

agreed not to compete with **[\*\*\*\*85]** one another and otherwise allocated customers and markets to one another."[12] Complaint, P 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

Respondents in this case proposed a plan of "'phased discovery'" limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation.[13]

---

[12] The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante, at 565, n 10, 167 L. Ed. 2d, at 946.* A defendant could, of course, begin by either denying or admitting the charge.

[13] The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante, at 560, n 6, 167 L. Ed. 2d, at 943*, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a defendant's *Rule 12(e)* motion; *Rule 7(a)* permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*; and *Rule 23* requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L. Ed. 2d 740 (1982)*; see *In re Initial Public Offering Securities Litigation, 471 F.3d 24 (CA2 2006)* (holding that a district court may not certify a class without ruling that each *Rule 23* requirement is met, even if a requirement overlaps with a merits issue). *Rule 16* invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia,* "the elimination of frivolous claims or defenses," *Rule 16(c)(1)*; "the necessity or desirability of amendments to the pleadings," *Rule 16(c)(2)*; "the control and scheduling of discovery," *Rule 16(c)(6)*; and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," *Rule 16(c)(12).* Subsequently, *Rule 26* confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See *523 U.S., at 598-599, 118 S. Ct. 1584, 140 L. Ed. 2d 759.* Indeed, *Rule 26(c)* specifically permits a court to take actions "to

---

[11] It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante, at 568, n 13, 167 L. Ed. 2d, at 948.* Under *Federal Rule of Evidence 201(b),* a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

Given the charge in the complaint [*594] --buttressed [***964] by the common sense of Adam Smith--I cannot say that the possibility that joint discussions [****86] [**1988] and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity [*595] to prove their claims. See Clark, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

[****87] I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar--among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante, at 559, 167 L. Ed. 2d, at 942*--should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend

───────────────

protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope. In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility vel non without requiring an answer from the defendant. See Societe Internationale pour Participations Industrielles et *Commerciales, S. A. v. Rogers, 357 U.S. 197, 206, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958)* ("*Rule 34* is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an in terrorem suit, the district court has at its call its own in terrorem device, in the form of a wide array of *Rule 11* sanctions. See *Rules 11(b), (c)* (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991)* (holding that *Rule 11* applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer, 232 F.R.D. 116, 126 (DC 2005)* ("As possible sanctions pursuant to *Rule 11*, the court has an arsenal of options at its disposal").

the Federal Rules--not our interpretation of them.[14] See *Swierkiewicz, 534 U.S., at 515, 122 S. Ct. 992, 152 L. [***965] Ed. 2d 1; Crawford-El v. Britton, 523 U.S. 574, 595, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); Leatherman, 507 U.S., at 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517*.

[****88] IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language [*596] is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., ante*, p. 108 (Scalia, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. *Ante, at 106* (Stevens, J., concurring). This is a case in which the intentions of the drafters of three important sources of law--the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure--all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to [****89] respond [**1989] to any congressional command is glaringly obvious.

───────────────

[14] Given his "background in antitrust law," *ante, at 560, n 6, 167 L. Ed. 2d, at 943*, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country--although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority . . . . If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery--impositional and otherwise." Discovery as Abuse, *69 B. U. L. Rev. 635, 645 (1989)*.

550 U.S. 544, *596; 127 S. Ct. 1955, **1989; 167 L. Ed. 2d 929, ***965; 2007 U.S. LEXIS 5901, ****89

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants--who in this case are some of the wealthiest corporations in our economy--from the burdens of pretrial discovery. *Ante, at 558-560, 167 L. Ed. 2d, at 942-943*. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their *Rule 12(b)* motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners,[15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly **[*597]** serious factual allegations, that could account for this stark break from precedent.

 **[****90]** If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental--and unjustified--change in the character of pretrial practice.

Accordingly, I respectfully dissent.

# References

15 U.S.C.S. § 1

*Antitrust Laws and Trade Regulation §§ 11.02*, *164.01*, *164.02* (Matthew Bender)

*Moore's Federal Practice §§ 8.02*, *12.03* (Matthew Bender 3d ed.)

L Ed Digest, Restraints of Trade, Monopolies, and Unfair Trade Practices *§ 45*

L Ed Index, Sherman Act

Supreme Court's construction and application of *Rules 8* and *9 of Federal Rules of Civil Procedure*, concerning general rules of pleading and pleading special matters. *122 L. Ed. 2d 897*.

Supreme Court's views as to what constitutes per se illegal "price fixing" under the Sherman Act (*15 U.S.C.S. § 1 et seq.*). *64 L. Ed. 2d 997*.

Applicability of federal antitrust laws as affected by other federal statutes or by Federal Constitution--Supreme Court cases. *45 L. Ed. 2d 841*.

---

**End of Document**

---

[15] It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See *Fed. Rule Civ. Proc. 54(d)(1)* ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

⚠ Caution
As of: June 23, 2025 9:43 PM Z

# *Bernstein v. Seeman*

United States District Court for the Southern District of New York

January 9, 2009, Decided; January 9, 2009, Filed

08 Civ. 5899

**Reporter**
593 F. Supp. 2d 630 *; 2009 U.S. Dist. LEXIS 3811 **

JEFFERY BERNSTEIN, Plaintiff, - against - MAY SEEMAN et al., Defendants.

**Subsequent History:** Motion denied by *Bernstein v. Seeman, 601 F. Supp. 2d 555, 2009 U.S. Dist. LEXIS 16703 (S.D.N.Y., Mar. 3, 2009)*

## Core Terms

amended complaint, alleges, defamation, motion to dismiss, defamation claim, employees, proceedings, retaliation, unnamed, absolutely privileged, identity of interest, absolute privilege, accusations, extortion, argues

## Case Summary

### Procedural Posture

Pro se plaintiff employee filed suit against defendants, a CEO, an employer, and corporations, alleging defendants discriminated against him based on his religion, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* The employee also alleged defendants retaliated against him after he filed his discrimination claim and defamed him. Defendants moved to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*.

### Overview

The claims against CEO failed as individual employees could not be liable under Title VII. Although the corporations argued that the Title VII claims must fail as the corporations did not actually employ the employee and he did not name the corporations in his Employment Opportunities Commission (EEOC) complaint, based on the allegations, it was plausible the corporations could be considered an employer under the common law of agency used to interpret that term for Title VII purposes. Given the allegation that the corporation had some role in determining the employee's compensation, the exact relationship between the defendants was unclear. The corporations' argument that the Title VII claim failed because the employee did not name the corporations in his EEOC charge was also unavailing as there was an identity of interest exception to the general rule that a plaintiff may bring Title VII claims only against parties originally named in an EEOC charge. The two statements contained in the employer's submission to the EEOC and in counsel's letter to the employee could not form the basis of a defamation claim as both statements were made under the protection of absolute immunity.

### Outcome

The motion by the employer and the CEO to dismiss was granted, and the motion by the corporation to dismiss was denied with respect to the Title VII claim, and granted with respect to the defamation claim.

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

**HN1** Defenses, Demurrers & Objections, Motions to Dismiss

For the purposes of deciding a motion to dismiss, a court accepts as true the factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor. In the case of a pro se litigant, the court reads the pleadings leniently and construes them to raise the strongest arguments that they suggest. Dismissal of the complaint is appropriate if the plaintiff has failed to offer any factual allegations making his or

593 F. Supp. 2d 630, *630; 2009 U.S. Dist. LEXIS 3811, **3811

her claim plausible. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently raise a right to relief above the speculative level.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

*HN2* **Title VII Discrimination, Scope & Definitions**

There can be no individual liability under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

*HN3* **Civil Actions, Exhaustion of Remedies**

There is an identity of interest exception to the general rule that a plaintiff may bring Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, claims only against parties originally named in an Equal Employment Opportunities Commission (EEOC) charge. This exception is available only to litigants who were not represented by counsel before the EEOC, and it allows a Title VII action to proceed against a party that was not named before the EEOC where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge. In determining whether to apply the identity of interest exception, courts consider: 1) whether the role of the unnamed party was known to plaintiff at the time of filing the EEOC charge; 2) whether the interests of the named party are so similar to the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether the unnamed party's absence from the EEOC proceedings resulted in actual prejudice to it; and 4) whether the unnamed party has in some way represented to the plaintiff that its relationship is to be through the named party.

Civil

Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Torts > ... > Defamation > Elements > General Overview

*HN4* **Complaints, Requirements for Complaint**

To state a claim for defamation, a plaintiff must allege: (1) a false statement, (2) published without privilege or authorization to a third party, (3) constituting fault as judged by, at a minimum, a negligence standard, and (4) causing special harm or constituting defamation per se. *N.Y. C.P.L.R. § 3016(a)* requires that the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally. However, to state a claim for defamation in federal court, a plaintiff need only comply with *Fed. R. Civ. P. 8(a)(2)*, which requires only a short and plain statement of the claim showing that the plaintiff is entitled to relief.

Torts > ... > Defenses > Privileges > Absolute Privileges

*HN5* **Privileges, Absolute Privileges**

Statements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged so long as they are material and pertinent to the questions involved notwithstanding the motive with which they are made. This absolute privilege attaches to every step of a judicial proceeding, not just the hearing and trial phase. Furthermore, the privilege attaches to witnesses as well as judges, parties, and attorneys. This privilege applies to statements submitted to agencies such as the Equal Employment Opportunities Commission.

Torts > ... > Defenses > Privileges > Absolute Privileges

*HN6* **Privileges, Absolute Privileges**

Statements made in the course of litigation often become part of the court record available to the public, but these statements remain absolutely privileged, for the purposes of defamation liability.

**Counsel:** [**1] Jeffrey Isiah Bernstein, Plaintiff, Pro se, San Diego, CA.

593 F. Supp. 2d 630, *630; 2009 U.S. Dist. LEXIS 3811, **1

For May Seeman, Meag NY Corporation, Defendants: Carol M. Goodman, Herrick, Feinstein LLP, New York, NY.

For Munich RE America, Defendant: Joyce M. Pratt, Robert Harris Bernstein, LEAD ATTORNEYS, PRO HAC VICE, Robert Harris Bernstein, Thompson Coburn LLP, St. Louis, MO.

**Judges:** VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** VICTOR MARRERO

# Opinion

[*631]  *DECISION AND ORDER*

**VICTOR MARRERO, United States District Judge**.

Pro se plaintiff Jeffery Bernstein ("Bernstein") brought this action against **[*632]** defendants May Seeman ("Seeman"), MEAG NY Corporation ("MEAL NY"), Munich Reinsurance America, Inc. ("Munich Re"), and Munich Reinsurance Germany (collectively, "Defendants"), alleging that Defendants discriminated against him on the basis of his religion, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"). Bernstein also alleges that Defendants retaliated against him after he initially filed his discrimination claim, and that Defendants defamed him. Seeman and MEAG NY move to dismiss Bernstein's amended complaint (the "Amended Complaint") pursuant to *Federal Rule of Civil Procedure 12(b)(6)* ("*Rule 12(b)(6)*"). In a letter **[**2]** to the Court dated October 31, 2008 (the "Munich Re Letter"), Munich Re requested permission to file a motion to dismiss pursuant to *Rule 12(b)(6)*. The Court has deemed that letter to be a motion to dismiss the Amended Complaint. [1] For the reasons stated below, the motion by Seeman and MEAG NY is GRANTED, and the motion by Munich Re is GRANTED in part and DENIED in part.

## I. BACKGROUND [2]

---

[1] Although Munich Re's letter requesting permission to file a motion to dismiss predates the Amended Complaint, the Court finds that there is no need for further briefing on Munich Re's arguments for dismissal, as explained more fully below.

[2] The factual summary that follows derives primarily from the

Bernstein, who describes himself as Jewish, was employed by MEAG NY, an asset management company for Munich Re. Bernstein alleges that because of his religion, he was harassed, discriminated against, and paid less than other employees doing similar work. Specifically, Bernstein alleges that Seeman, CEO and Chairman of MEAG NY, demeaned and humiliated him in front of his co-workers and supervisor, and that Seeman made the determination to give Bernstein a bonus at the bottom end of the range of bonuses paid to other employees. Bernstein also alleges that Seeman systematically discriminated against employees of Jewish descent; the Amended Complaint recounts various incidents of alleged abuse or discrimination involving other Jewish employees, and conversations that Bernstein had with these employees.

With regard to Munich Re, Bernstein alleges that it was involved in the discrimination against him because employees of Munich Re, including a person named Wolfgang Engshuber ("Engshuber"), sat on the compensation committee that approved his bonuses.

Bernstein alleges that he was eventually forced to resign from MEAL NY, and on February 20, 2008, Bernstein filed **[**4]** a claim with the Equal Employment Opportunities Commission ("EEOC") against MEAL NY and an entity called "Munich Re Capital." (*See* Affidavit of Kerris Wigfall ("Wigfall Aff."), Ex. B. at 3.) MEAG NY reported to the EEOC that Bernstein had been granted seven weeks of leave, after which he refused to return to work. MEAL NY also reported that Bernstein sent various emails to MEAL NY personnel regarding his claims. Bernstein alleges that MEAG NY retaliated against him for filing the EEOC charge by characterizing **[*633]** these efforts as "extortion," and by accusing him of "illegal acts," such as emailing himself MEAG NY documents. (Amended Complaint P 1.) Bernstein alleges that MEAG NY defamed him when it disseminated these accusations to MEAL NY board members, and that these accusations have impaired his ability to find a job in the financial sector.

---

Amended Complaint, filed November 3, 2008. The Amended Complaint consists of the entire text of the initial complaint (the "Initial Complaint"), plus four new paragraphs under the heading "Statement of Claim," as well as a list of damages claimed under the heading "Relief." The Court will refer to the new paragraphs as consecutive to the paragraphs that were contained in the Initial Complaint, such that the new paragraphs begin with the paragraph number 19. Except where specifically quoted, no further reference **[**3]** to this document will be made.

593 F. Supp. 2d 630, *633; 2009 U.S. Dist. LEXIS 3811, **3

The EEOC issued a Dismissal and Notice of Rights on March 31, 2008. Bernstein commenced this action on June 5, 2008. MEAG NY and Seeman filed a pre-answer motion to dismiss. Bernstein then filed the Amended Complaint, and Seeman and MEAL NY filed the pre-answer motion to dismiss the Amended Complaint under consideration here. Seeman and MEAG NY argue **[**5]** that the claims against Seeman fail because individual employees cannot be held liable under Title VII, and that absolute immunity attaches to the supposedly defamatory statements specified by Bernstein.

In support of its motion to dismiss, Munich Re argues that the Title VII claims against it must fail because Munich Re did not actually employ Bernstein, and because Bernstein did not name Munich Re in his complaint to the EEOC. Munich Re also argues that Bernstein failed to state a claim for defamation against it with the requisite particularity.

The Court will first address the motions as they pertain to the Title VII claims, and then as they pertain to the defamation claims.

## II. DISCUSSION

### A. LEGAL STANDARD

*HN1* For the purposes of deciding a motion to dismiss, the Court accepts as true the factual allegations in the Amended Complaint, and draws all reasonable inferences in the plaintiff's favor. See *Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999)*. In the case of a pro se litigant, the Court reads the pleadings leniently and construes them to raise "the strongest arguments that they suggest." *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)* (citation **[**6]** and internal quotation marks omitted). Dismissal of the complaint is appropriate if the plaintiff has failed to offer any factual allegations making his or her claim plausible. See *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)*. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)*.

### B. TITLE VII CLAIMS AGAINST SEEMAN

Bernstein alleges that Seeman discriminated against him on the basis of his religion, in violation of Title VII. The Amended Complaint also alleges retaliation in violation of Title VII, but it does not specify which

Defendants allegedly committed the retaliation. In any event, the case law in this jurisdiction is clear that *HN2* there can be no individual liability under Title VII. See *Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995)* ("Congress never intended to hold agents individually liable for violations of [Title VII]"), *abrogated on other grounds by Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*; *see also Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 n.8 (2d Cir. 2006)*; *Meckenberg v. New York City Off-Track Betting, 42 F. Supp. 2d 359, 370 n.2 (S.D.N.Y. 1999)*. **[**7]** This rule applies to claims of retaliation as well. See *McKenzie v. Gibson, No. 07 Civ. 6714, 2008 U.S. Dist. LEXIS 64850, 2008 WL 3914837, at *2 (S.D.N.Y. Aug. 25, 2008)* (dismissing Title VII discrimination *[*634]* and retaliation claims against individual defendants). Seeman's motion to dismiss the Title VII claims against her is therefore granted.

### C. TITLE VII CLAIMS AGAINST MUNICH RE

Munich Re argues that it is a separate and distinct business entity from MEAG NY, and that it never employed Bernstein or had any "authority, control or input into MEAG NY's employment practices." (Munich Re Letter, at 3.) Munich Re also argues that because it was not named in Bernstein's EEOC charge, it cannot be a proper defendant to the Title VII claim.

The Amended Complaint alleges that Munich Re "had direct and numerous involvements related to the discrimination against" Bernstein, but it offers only one specific allegation of discrimination. (Amended Complaint P 22.) The Amended Complaint alleges that members of Munich Re, including Engshuber, sat on the compensation committee that approved Bernstein's bonuses.

This allegation is enough to defeat Munich Re's motion to dismiss the Title VII claim against it. Bernstein has alleged that **[**8]** Munich Re had some kind of control or influence over his compensation. Based on this allegation, it is plausible that Munich Re could be considered an "employer" under the common law of agency used to interpret that term for the purposes of Title VII. See *Gulino v. New York State Educ. Dep't, 460 F.3d 361, 371 (2d Cir. 2006)*. Given the allegation that Munich Re had some role in determining Bernstein's compensation, the exact relationship between MEAG NY and Munich Re is unclear, and it could be that Munich Re would be liable under Title VII as a parent of MEAG NY. See *Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995)*; *Velez v. Novartis Pharms. Corp., 244 F.R.D. 243, 250 (S.D.N.Y. 2007)*

593 F. Supp. 2d 630, *634; 2009 U.S. Dist. LEXIS 3811, **8

(*citing Cook*). Munich Re might ultimately be able to demonstrate that it cannot be held liable as an employer under Title VII, but this issue requires the presentation of additional facts to the Court, and a motion to dismiss is not the appropriate stage at which to resolve such matters. [3]

Munich Re's argument that the Title VII claim fails because Bernstein did not name Munich Re in his charge to the EEOC is also unavailing. *HN3* There is an "identity of interest" exception to the general rule that a plaintiff may bring Title VII claims only against parties originally named in an EEOC charge. *See Cook, 69 F.3d at 1241*. This exception is available only to litigants who, like Bernstein, were not represented by counsel before the EEOC, and it allows a Title VII action to proceed against a party that was not named before the EEOC "where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Harrington v. Hudson Sheraton Corp., 2 F. Supp. 2d 475, 477-78 (S.D.N.Y. 1998)*.

In determining whether to apply the identity of interest exception, courts consider:

> 1) whether the role of the unnamed party was known to plaintiff at the time of filing the EEOC charge; 2) whether the interests of the named party are so similar to the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance **[**10]** it would be unnecessary **[*635]** to include the unnamed party in the EEOC proceedings; 3) whether the unnamed party's absence from the EEOC proceedings resulted in actual prejudice to it; and 4) whether the unnamed party has in some way represented to the plaintiff that its relationship is to be through the named party.

*Id. at 478* (citation omitted).

Here, the second and third factors weigh in favor of allowing the identity of interest exception to apply. The interests of MEAL NY and Munich Re for the purposes of "obtaining voluntary conciliation and compliance" are

identical, *id.*, and Munich Re's absence from the EEOC proceedings did not prejudice it, as the EEOC determined that it could find no evidence of a violation. *See Cook, 69 F.3d at 1242* (applying identity of interest exception when second and third factors were satisfied). Munich Re's motion to dismiss Bernstein's Title VII claim against it is therefore denied.

## D. *DEFAMATION CLAIMS*

*HN4* To state a claim for defamation, a plaintiff must allege: (1) a false statement, (2) published without privilege or authorization to a third party, (3) constituting fault as judged by, at a minimum, a negligence standard, and (4) causing special harm or constituting **[**11]** defamation per se. *See Salvatore v. Kumar, 45 A.D.3d 560, 845 N.Y.S.2d 384, 388 (N.Y. App. Div. 2d Dep't 2007)*. *New York Civil Practice Law & Rules § 3016(a)* requires that "the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally." However, to state a claim for defamation in federal court, a plaintiff need only comply with *Federal Rule of Civil Procedure 8(a)(2)* ("*Rule 8*"), which requires only "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." *See Pasqualini v. MortgageIT Inc., 498 F. Supp. 2d 659, 671-72 (S.D.N.Y. 2007)*.

The Amended Complaint makes a number of general allegations of defamation. Bernstein alleges that MEAG NY "sent out emails all over the place accusing me of committing all sorts of illegal acts and compliance violations," and "spread word around the street that I was committing extortion … [which] hurts my future earning and employment power in the industry." (Amended Complaint P 1.) Bernstein contends, "I was accused of extortion, when I was only trying to come to a settlement." (*Id.*) The Amended Complaint also makes reference to MEAG NY's "spreading of accusations **[**12]** that I have committed the crime of extortion to various financial professionals." (*Id.* P 19.)

These kinds of assertions may be sufficient to state a claim for defamation when applying *Rule 8*, but Bernstein's defamation claim against MEAG NY fails for a different reason. The Amended Complaint presents only two specific statements that are alleged to be defamatory. Bernstein contends that MEAL NY responded to the EEOC charge with an allegation that Bernstein "has been attempting to extort money from the Company," and that MEAL subsequently "forward[ed] these statements around to other members in the financial community." (*Id.* P 19, *quoting* Wigfall

---

[3] Although the Munich Re Letter predates the Amended Complaint, in which Bernstein first articulated this specific allegation, the Court finds it appropriate to rule on Munich Re's motion to dismiss **[**9]** without further briefing because Munich Re cannot successfully contest this factual allegation in a motion to dismiss.

593 F. Supp. 2d 630, *635; 2009 U.S. Dist. LEXIS 3811, **12

Aff., Ex. C, at 3.) Bernstein also alleges that counsel for MEAG NY and Seeman wrote, in a letter to Bernstein dated May 18, 2007 regarding Bernstein's internal complaint against Seeman, "we have reason to believe that you sent Company proprietary and confidential information to yourself to assist in another (simultaneous and conflicting) business opportunity. Such conduct constitutes a breach of duty of loyalty and, if proven, is a clear violation of the law…." (*Id.* P 20, *quoting* Wigfall Aff., Ex. E.) With respect [*636] to Munich Re, Bernstein states [**13] in the Amended Complaint, "I also hold Munich of America responsible for defamation of character since they were advisors to MEAG NY with regards to the statements MEAG NY made against me …." (*Id.* P 22.)

The two statements contained in MEAG NY's submission to the EEOC and in counsel's letter to Bernstein cannot form the basis of a defamation claim because both statements were made under the protection of absolute immunity. Both statements were made by participants in the course of litigation, and they were relevant to that litigation. As the court explained in *Weitz v. Wagner*,

> *HN5* Statements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged so long as they are material and pertinent to the questions involved notwithstanding the motive with which they are made. This absolute privilege attaches to every step of a judicial proceeding, not just the hearing and trial phase. Furthermore, the privilege attaches to witnesses as well as judges, parties, and attorneys.

*No. CV-07-1106, 2008 U.S. Dist. LEXIS 62729, 2008 WL 3835618, at \*7 (E.D.N.Y. Aug. 8, 2008)* (internal citations and quotation marks omitted); *see also Long v. Marubeni Am. Corp., 406 F. Supp. 2d 285, 293-95 (S.D.N.Y. 2005)* [**14] (discussing the absolute privilege that attaches to "defamatory statements made prior to, in the institution of, or during the course of, a proceeding" (*quoting* Sack on Defamation: Libel, Slander, and Related Problems, § 8.2.1.4 at 8-14 (2004))). This privilege applies to statements submitted to agencies such as the EEOC. See *Daniels v. Alvarado, No. 03 CV 5832, 2004 U.S. Dist. LEXIS 3893, 2004 WL 502561, at \*\*7-8 (E.D.N.Y. Mar. 12, 2004)* (dismissing defamation claim based on employer's submission to the New York State Division of Human Rights, which was protected by absolute privilege); *Allen v. St. Cabrini Nursing Home, Inc., No. 00 CIV 8558, 2001 U.S. Dist. LEXIS 3340, 2001 WL 286788, at \*6 (S.D.N.Y. Mar. 9, 2001)* (dismissing defamation claim based on employer's submission to the EEOC); *Hinds v. Magna Fabrics, Inc., No. 96 Civ. 1383, 1997 U.S. Dist. LEXIS 8071, 1997 WL 309378, at \*5 (S.D.N.Y. June 9, 1997)* ("It is well settled in New York … that statements made in quasi-judicial proceedings, including proceedings by agencies such as the EEOC, are protected by an absolute privilege.").

Bernstein argues that Defendants can still be held liable for defamation based on these statements because the statements were circulated to persons who were not involved in the litigation, [**15] and the Amended Complaint alleges that this will be proven over the course of discovery. Even if these facts were proven, however, these statements would still be absolutely privileged. *HN6* Statements made in the course of litigation often become part of the court record available to the public, but these statements remain absolutely privileged, for the purposes of defamation liability. *See, e.g., Kelly v. Albarino, 485 F.3d 664, 665 (2d Cir. 2007)* (per curiam) (affirming dismissal of defamation claim based on statement made in affidavit filed in court, because of "the absolute privilege that applies to statements made by participants in judicial proceedings") There does not appear to be any authority supporting Bernstein's argument. Bernstein's defamation claims, based as they are on absolutely privileged statements, must be dismissed as against Seeman, MEAG NY, and Munich Re. [4]

[*637] Although leave to replead a complaint should normally be freely granted, Bernstein has already amended his original complaint in response to the deficiencies pointed out by Seeman and MEAG NY in their first pre-answer motion to dismiss. That motion argued that Seeman could not be subject to individual liability under Title VII, and that Bernstein had failed to state a prima facie claim for defamation. The Amended Complaint articulated more detailed allegations of defamation, arguing that the two statements discussed here were defamatory. A defamation claim based on absolutely privileged statements cannot succeed, and there is no question that an individual cannot be liable under Title VII. Because Bernstein would not be able to

---

[4] Once again, the Court finds it appropriate to rule on Munich Re's motion to dismiss without further briefing with respect to Munich Re's argument that Bernstein failed to state a defamation claim against it, Bernstein articulated his theory of the defamation claim against Munich Re in the Amended Complaint, which [**16] was filed a few days after the Munich Re letter was sent to the Court and the parties.

593 F. Supp. 2d 630, *637; 2009 U.S. Dist. LEXIS 3811, **16

rescue these claims by repleading with greater specificity, and because Bernstein was already afforded an opportunity to cure the deficiencies of the original complaint, the Court will not now grant Bernstein leave to replead these claims. The Court may consider an application to amend the complaint at some point in the future upon a showing that such an amendment would not **[**17]** be futile.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 15) of defendants May Seeman and MEAG NY Corporation to dismiss in its entirety the amended complaint against May Seeman with prejudice, and to dismiss the amended complaint as against MEAG NY Corporation with prejudice with respect to the defamation claim, is GRANTED; and it is further

**ORDERED** that the motion (Docket No. 26) of defendant Munich Reinsurance America, Inc. to dismiss the Amended Complaint is DENIED with respect to the Title VII claim, and GRANTED with respect to the defamation claim.

**SO ORDERED**.

Dated: New York, New York

9 January 2009

/s/ Victor Marrero

VICTOR MARRERO

U.S.D.J.

---

**End of Document**

 Positive
As of: June 23, 2025 9:57 PM Z

## *Brown v City of New York*

Supreme Court of New York, Appellate Division, First Department

November 17, 2020, Decided ; November 17, 2020, Entered

Appeal No. 12411, Case No. 2020-02127

**Reporter**

188 A.D.3d 518 *; 135 N.Y.S.3d 103 **; 2020 N.Y. App. Div. LEXIS 6916 ***; 2020 NY Slip Op 06700 ****; 2020 WL 6731830

 **[****1]**  Eric Brown, Appellant, v City of New York, Respondent. Index No. 152006/19

## Core Terms

demoted, cancer, discriminatory intent, complaint alleges, medical leave, give rise, circumstances, disabilities, conditions, terminated, asthma

## Headnotes/Summary

**Headnotes**

**Civil Rights—Discrimination in Employment— Motion to Dismiss—Failure to Allege Facts Giving Rise to Inference of Discriminatory Intent**

**Counsel:  [***1]** Kreisberg & Maitland, LLP, New York (Jeffrey L. Kreisberg of counsel), for appellant.

James E. Johnson, Corporation Counsel, New York (Kate Fletcher of counsel), for respondent.

**Judges:** Before: Manzanet-Daniels, J.P., Singh, Scarpulla, Shulman, JJ.

## Opinion

 **[**104]  [*518]** Order, Supreme Court, New York County (Arthur F. Engoron, J.), entered on or about November 26, 2019, which granted defendant's *CPLR 3211 (a) (7)* motion to dismiss the complaint, unanimously affirmed, without costs.

The complaint fails to state a cause of action for employment discrimination under the State or City HRLs because it does not contain any factual allegations showing that plaintiff's employment was terminated under circumstances giving rise to an inference of discrimination (*see Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305, 310, 819 NE2d 998, 786 NYS2d 382 [2004]*; *Melman v Montefiore Med. Ctr., 98 AD3d 107, 112-113, 946 NYS2d 27 [1st Dept 2012]*; *Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, 35, 936 NYS2d 112 [1st Dept 2011]*, lv denied 18 NY3d 811 [2012]; *see also Pimentel v Citibank, N.A., 29 AD3d 141, 811 NYS2d 381 [1st Dept 2006]*, lv denied 7 NY3d 707 [2006]).

The complaint alleges, in conclusory fashion, that plaintiff's employment with the Department of Correction was terminated **[*519]** on account of his alleged disabilities of asthma, chronic obstructive pulmonary disease (COPD), and cancer. Assuming his employer knew about his asthma and COPD, plaintiff was promoted twice while he had those conditions. Although he was later demoted in 2016, the complaint does not state why he was demoted or allege that **[***2]** he was demoted on account of these conditions. His demotion predates his cancer diagnosis in August 2017. The complaint alleges that plaintiff took an approved medical leave of absence from December 2017 to March 2018 for treatment of his cancer, and that he was discharged in November 2018, roughly 10 months after his leave started and 8 months after he returned. This passage of time is too long to establish any causal connection between any decisionmaker's knowledge of his cancer or medical leave and plaintiff's discharge to raise an inference of discrimination (*Matter of Parris v New York City Dept. of Educ., 111 AD3d 528, 529, 975 NYS2d 42 [1st Dept 2013]*, lv denied 23 NY3d 903 [2014]). The complaint does not allege that any decisionmakers made remarks that showed any discriminatory intent (*Whitfield-Ortiz v Department of Educ. of City of N.Y., 116 AD3d 580, 581, 984 NYS2d 327 [1st Dept 2014]*; compare *Anderson v Edmiston & Co., Inc., 131 AD3d 416, 417, 14 NYS3d 376 [1st Dept 2015]*), nor does it allege facts that would establish that similarly situated persons who did not share his alleged disabilities were treated more favorably than he was (*see Askin v  **[**105]  Department of Educ. of the City of N.Y., 110*

188 A.D.3d 518, *519; 135 N.Y.S.3d 103, **105; 2020 N.Y. App. Div. LEXIS 6916, ***2; 2020 NY Slip Op 06700, ****1

*AD3d 621, 973 NYS2d 629 [1st Dept 2013])*. Plaintiff was not, as the motion court's order suggests, required to plead this last fact to state a claim of discrimination; however, the complaint does not allege any other facts that establish circumstances giving rise to an inference of discriminatory intent, and thus, dismissal pursuant to *CPLR 3211 (a) (7)* was proper. Concur—Manzanet-Daniels, J **[***3]** .P., Singh, Scarpulla, Shulman, JJ.

---

**End of Document**

⚠ Caution
As of: June 23, 2025 9:44 PM Z

# *Castillo v. Hudson Theatre, LLC*

United States District Court for the Southern District of New York

September 30, 2019, Decided; September 30, 2019, Filed

18-CV-7931 (JPO); 18-CV-7943 (JPO)

**Reporter**

412 F. Supp. 3d 447 *; 2019 U.S. Dist. LEXIS 170234 **; 2019 WL 4805648

EVELYN CASTILLO, on behalf of herself and all others similarly situated, Plaintiff, -v- HUDSON THEATRE, LLC, d/b/a Hudson Theatre, Defendants.EVELYN CASTILLO, on behalf of herself and all others similarly situated, Plaintiff, -v- LYRIC THEATRE OF NEW YORK, INC., d/b/a Lyric Theatre, Defendant.

## Core Terms

Theaters, accommodations, disability, policies, Defendants', notice, place of public accommodation, reasonable modification, futile, food, allegations, modification, visiting, gesture

**Counsel:** **[\*\*1]** For Evelyn Castillo, on behalf of herself and all others similarly situated, Plaintiff (1:18-cv-07931-JPO): Anne Melissa Seelig, C.K. Lee, Lee Litigation Group, PLLC, New York, NY.

For Hudson Theatre, LLC, doing business as Hudson Theatre, Defendant (1:18-cv-07931-JPO): Lisa Marie Griffith, LEAD ATTORNEY, Littler Mendelson, P.C.(Melville), Melville, NY; Daniella Adler, Littler Mendelson, P.C. (NYC), New York, NY.

For Lyric Theatre Of New York, Inc., doing business as Lyric Theatre, Consolidated Defendant (1:18-cv-07931-JPO): Lisa Marie Griffith, LEAD ATTORNEY, Littler Mendelson, P.C.(Melville), Melville, NY; Daniella Adler, Littler Mendelson, P.C. (NYC), New York, NY. For Evelyn Castillo, on behalf of herself and all others similarly situated, Plaintiff (1:18-cv-07943-JPO): Anne Melissa Seelig, C.K. Lee, Lee Litigation Group, PLLC, New York, NY.

For Lyric Theatre Of New York, Inc., doing business as Lyric Theatre, Defendant (1:18-cv-07943-JPO): Daniella Adler, Littler Mendelson, P.C. (NYC), New York, NY; Lisa Marie Griffith, Littler Mendelson, P.C.(Melville), Melville, NY.

**Judges:** J. PAUL OETKEN, United States District Judge.

**Opinion by:** J. PAUL OETKEN

## Opinion

**[\*448]** OPINION AND ORDER

J.PAUL OETKEN, District Judge:

In these **[\*\*2]** consolidated putative class actions, Plaintiff Evelyn Castillo, who has diabetes, alleges that two Broadway theaters in Manhattan — Hudson Theatre, LLC ("Hudson") and Lyric Theatre of New York, Inc. ("Lyric") (collectively, "the Theaters" or "Defendants") — discriminate against her and other individuals disabled by diabetes and other metabolic disorders through the imposition of policies banning outside food from Defendants' facilities. Castillo alleges that those policies created an access barrier excluding people with metabolic disorders from full and equal enjoyment of the services provided by Defendants' facilities. She asserts claims under the *Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.;* the *New York State Civil Rights Law ("NYSCRL"), N.Y. Exec. Law § 290 et seq.;* and the *New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.* The Theaters move to dismiss Castillo's complaints for **[\*449]** failure to state a claim upon which relief can be granted. (Dkt. No. 17.)[1] For the reasons that follow, the Theaters' motions are granted.

### I. Background

---

[1] Castillo filed a complaint against each Defendant in this case, but the complaints are identical in form and substance. Both Defendants have also filed the same briefs in both cases. Accordingly, the citations in this opinion refer only to the docket of Case No. 18 Civ. 7931.

412 F. Supp. 3d 447, *449; 2019 U.S. Dist. LEXIS 170234, **2

The facts below are drawn from Castillo's complaint (*see* Dkt. No. 1 ("Compl.")) and are presumed true for the purposes of this motion.

Plaintiff Evelyn Castillo is a resident **[**3]** of Brooklyn, New York, who was diagnosed with diabetes mellitus and put on a restricted diet in 2006. (Compl. ¶ 19.) She cannot eat outside the parameters of her meal plan, and she must maintain constant and ready access to predetermined snacks to manage her blood sugar in case it drops suddenly. (Compl. ¶ 19.) If she is unable to have her snacks with her, she is susceptible to symptoms of low blood sugar such as weakness, dizziness, and confusion. (Compl. ¶¶ 20-21.) Waiting to eat — say, because she must stand in line to buy food — may exacerbate these symptoms further. *Id.* Buying food with an unknown amount of sugar, such as what might be available at the Theaters' concession stands, is also risky for Castillo, as she cannot anticipate either the effect it will have on her blood sugar or how much insulin she must consume along with it. (Compl. ¶ 20.)

Defendants Hudson and Lyric own and operate two theaters in New York City, which, it is undisputed, are "places of public accommodation under *Title III of the ADA*." (Compl. ¶ 23.) Among other things, the Theaters host events open to the public, including games, concerts, and other benefits. (*Id.*) Defendants state on the Theaters' websites **[**4]** that outside food and beverage is prohibited in the Theaters. (*See* Compl. ¶¶ 1, 12.)

Castillo alleges that in the summer and fall of 2018, she intended to buy tickets to attend events at Defendants' theaters but did not do so due to their advertised policies of not allowing outside food. (Compl. ¶ 22.) She contends that this constitutes an "access barrier" for the purposes of the ADA, preventing "full and equal access to the goods and services provided by Defendant" to her and Class members. (Compl. ¶¶ 22, 24.)

On August 30, 2018, Castillo filed a Class Action Complaint against the Theaters, on behalf of herself and all others similarly situated, asserting that the Theaters' no-outside-food policies violate her and class members' rights under the ADA, the NYSCRL, and the NYCHRL. (Compl. ¶¶ 52-111.) Castillo seeks to represent a class composed of "all legally metabolically-disabled individuals in the United States who have attempted to access [Defendants' theaters] and as a result have been denied access to the enjoyment of goods and services offered [there] during the relevant statutory period." (Compl. ¶ 25.) On December 19, 2018, Defendants

moved to dismiss Castillo's complaint pursuant **[**5]** to *Federal Rule of Civil Procedure 12(b)(6)*. (Dkt. No. 17.)

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim is facially plausible when plaintiffs have **[*450]** pleaded facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "Court[s] must accept as true all well-pleaded factual allegations in the complaint, and 'draw all inferences in the plaintiff's favor.'" *Goonan v. Fed. Reserve Bank of N.Y., 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013)* (quoting *Allaire Corp. v. Okumus, 433 F.3d 248, 250 (2d Cir. 2006))* (formatting altered). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678*.

## III. Discussion

"The ADA was promulgated 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities,' as well as to establish 'clear, strong, consistent, enforceable standards' for scrutinizing such discrimination." *Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1995)* (quoting *42 U.S.C. § 12101(b)(1)-(2)*). Title III of the ADA governs places of public accommodations. It guarantees that "[n]o individual shall be discriminated **[**6]** against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation," *42 U.S.C. § 12182(a)*, such as a "theater . . . or other place of exhibition or entertainment," *id.* at *§ 12181(7)(C)*. Thus, to state a claim under Title III, Castillo must adequately allege "that (1) . . . she is disabled within the meaning of the ADA; (2) [the Theaters] own, lease, or operate a place of public accommodation; and (3) [they] discriminated against [her] within the meaning of the ADA." *Roberts v. Royal Atl. Corp., 542 F.3d 363, 368*

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 111 of 321

Page 3 of 5

412 F. Supp. 3d 447, *450; 2019 U.S. Dist. LEXIS 170234, **6

*(2d Cir. 2008)*.

The Theaters do not contest that Castillo has satisfied the first and second elements of the claim; only the third — that the Theaters discriminated against her within the meaning of the ADA — is at issue here. The relevant provision of the ADA defines discrimination as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, or accommodations to individuals with disabilities." *42 U.S.C. § 12182(b)(2)(A)(ii)*.[2] Castillo maintains that the "no-outside-food" policies deny her **[\*\*7]** access to the Theaters and prevent her from receiving the services they offer because of her disability. (Compl. ¶ 61.) The Theaters argue that Castillo's complaint must be dismissed because she has not adequately pleaded that Defendants "fail[ed] to make reasonable modifications **[\*451]** in policies." (Dkt. No. 18 at 5-6.) Specifically, the Theaters argue that they did not have notice of Castillo's disability and that she did not request a "reasonable modification" to their policies. (*Id.*)

**A. Notice**

"[N]otice of the alleged disability . . . is an assumed prerequisite" of a Title III claim for failure to make reasonable accommodations. *Shaywitz v. Am. Bd. of Psychiatry & Neurology, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012)*; *see also McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009)* (listing notice as a required element of a failure to accommodate claim in an employment discrimination case). Thus, a "plaintiff must show that defendants had notice of her disability . . . [and] has the initial duty to

---

[2] Castillo also asserts that Defendants discriminated against her pursuant to another provision of the ADA, in that they "fail[ed] to take such steps as may be necessary to ensure that no individual with a disability is excluded . . . because of the absence of auxiliary aids and services." *42 U.S.C. § 12182(b)(2)(A)(iii)*. The statute defines "auxiliary aids and services" to include: "(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments; (C) acquisition or modification of equipment or devices; and (D) other similar services and actions." *42 U.S.C. § 12103(1)*. Because Castillo does not allege any "auxiliary aid or service" that Defendants could provide to her, this argument is unavailing.

inform the [defendant] of a disability before ADA liability may be triggered for failure to provide accommodations." *Thompson v. City of New York, No. 98 Civ. 4725, 2002 U.S. Dist. LEXIS 23675, 2002 WL 31760219, at \*7 (S.D.N.Y. Dec. 9, 2002)*.

Castillo does not allege that she notified the Theaters that she needed to bring in outside food due to her metabolic disorder. Instead, she states that she attempted to purchase tickets and was deterred from doing so **[\*\*8]** upon reading the Defendants' policies against bringing outside food into the Theaters. In defense of this omission, Castillo cites *Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133, 1136 (9th Cir. 2002)*, for the proposition that deterrence from visiting a place of public accommodation due to access barriers constitutes injury for the purposes of Title III. *See Pickern, 293 F.3d at 1136-37*. That opinion, however, pertained to the issue of constitutional standing, holding that deterrence from visiting a place of public accommodation can constitute an Article III injury. *See id.* Though Castillo may have suffered an "actual injury" by being deterred from visiting the Theaters, she has not pleaded facts to show that the injury is due to the Theaters' refusal to modify their policies to accommodate her within the meaning of the ADA. This failure to provide notice of her disability to the Theaters or to allege some other means by which they might have had an opportunity to consider her need for accommodations is fatal to Castillo's claim.

**B. Reasonable Modification**

Castillo also fails to allege that she requested a reasonable modification to Defendants' policies that was subsequently refused. A plaintiff's request for a reasonable modification is necessary to determine whether the defendant **[\*\*9]** could reasonably provide such modification and whether the defendant's subsequent failure to do so constitutes discrimination. *See Shaywitz, 848 F.Supp.2d at 467*. That is because "Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the [plaintiff] was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test." *Id.* (citing *Dudley v. Hannaford Bros. Co., 333 F.3d 299, 309 (1st Cir. 2003)*). "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the

412 F. Supp. 3d 447, *451; 2019 U.S. Dist. LEXIS 170234, **9

effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron, 51 F.3d at 356*.

Castillo contends that the current policies and procedures on the Theaters' websites made it clear that the Theaters were unwilling to accommodate individuals with metabolic disorders. (Compl. ¶ 41.) Without her requesting an actual modification, **[*452]** though, it is impossible to determine whether the Theaters were actually unwilling to accommodate Castillo, rendering her allegations merely conclusory. *See, e.g.,* **[**10]** *Camarillo v. Carrols Corp., 518 F.3d 153, 157 (2d Cir. 2008)* (finding that ADA claim had been stated only when "on numerous occasions, employees at defendants' restaurants were . . . willing to read [a blind person] [only] part of the menu, and. . . were unwilling to communicate effectively the range of options available to her.").

## C. "Futile Gesture" Exception

Castillo argues that her failure to notify the Theaters of her disability and her failure to seek a "reasonable modification" are excusable because taking those measures would have been "futile gesture[s]." (Dkt. No. 21 at 8-9.) The ADA does not require "a person with a disability to engage in a futile gesture [such as attempting to gain access to an inaccessible location] if such person has actual notice that a person or organization does not intend to comply [with the ADA]." *42 U.S.C. § 12188(a)(2)* (emphasis added); *see also Shaywitz, 848 F. Supp. 2d at 469* (noting that an ADA plaintiff need not lodge a futile request for an accommodation).

Castillo has not alleged any facts, however, to suggest that she had actual notice that the Theaters did not intend to comply with the ADA. She has not alleged, for example, that the Theaters maintained policies against individual exceptions to the no-outside-food rules or that the Theaters had a pattern **[**11]** of declining such requests, *see Davoll v. Webb, 194 F.3d 1116, 1133 (10th Cir. 1999)* (disabled employee not required to engage in "futile gesture" of requesting reasonable accommodation when employer had established policy against such accommodation), or that an employee or agent of the Theaters warned her that she would not receive an accommodation if she requested it, *see Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)* ("[Plaintiff] may have thought it was futile to ask, after [someone] told him that he would not

receive any more special treatment.").[3] To the contrary, the Theaters' websites contained several resources regarding ADA compliance, including contact information for a representative who could be reached regarding ADA accessibility. See Hudson Theatre, Frequently Asked Questions, http://www.thehudsonbroadway.com/faqs/ (last visited Sept. 26, 2019); Lyric Theatre, Frequently Asked Questions, http://www.lyricbroadway.com/plan-your-visit/accessibility/ (last visited Sept. 26, 2019). The defects in her pleadings therefore cannot be excused on the basis that notice and a request for an accommodation would have been futile gestures.

## D. Plaintiff's Supplemental Claims

Because Castillo's federal claims have been dismissed, and because Castillo does **[*453]** not **[**12]** argue this Court should retain jurisdiction over her remaining state and city law claims, this Court declines to exercise its supplemental jurisdiction. See *28 U.S.C. § 1367(c)(3)*. Accordingly, Castillo's remaining claims are dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED, and the Plaintiffs' complaints in these two actions are DISMISSED.

The Clerk of Court is directed to close the motions at Docket Number 17 in Case Number 18 Civ. 7931 and Docket Number 12 in Case Number 18 Civ. 7943.

---

[3] The many cases cited by Castillo in support of her "futile gesture" argument deal with the issue of constitutional standing and are simply inapposite. *See, e.g., Pickern, 293 F.3d at 1136-37* (plaintiff, who used a wheelchair, was not required to have attempted to enter a visibly inaccessible grocery store to have suffered a concrete injury to confer standing); *Chapman v. Pier 1 Imps. (U.S.), Inc., 631 F.3d 939, 949-50 (9th Cir. 2011)* ("Plaintiffs need not engage in the futile gesture of returning to a building with known barriers that the owner does not intend to remedy [to assert standing to bring a claim]."); *Steger v. Franco, 228 F.3d 889, 892 (8th Cir. 2000)* ("[P]laintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying [to prove injury] . . . ."). Castillo's standing is not the issue here. Similarly, cases pertaining to architectural and structural barriers to access — which are covered by a separate provision of the ADA, and which are often difficult to remedy and thus for which futility can perhaps sometimes be inferred — are not applicable to this case.

412 F. Supp. 3d 447, *453; 2019 U.S. Dist. LEXIS 170234, **12

SO ORDERED.

Dated: September 30, 2019

New York, New York

/s/ J. Paul Oetken

J. PAUL OETKEN

United States District Judge

---

**End of Document**

⚠️ Caution
As of: June 23, 2025 9:45 PM Z

## *Deravin v. Kerik*

United States Court of Appeals for the Second Circuit

June 27, 2003, Argued ; July 11, 2003, Decided

Docket No. 02-7729

**Reporter**

335 F.3d 195 *; 2003 U.S. App. LEXIS 13948 **; 92 Fair Empl. Prac. Cas. (BNA) 472; 84 Empl. Prac. Dec. (CCH) P41,472

ERIC H. DERAVIN, III, Plaintiff-Appellant, -v.- BERNARD KERIK, Commissioner, and NEW YORK CITY DEPARTMENT OF CORRECTIONS, Defendants-Appellees.

**Subsequent History:** On remand at, Magistrate's recommendation at, Summary judgment proceeding at *Deravin v. Kerik, 2006 U.S. Dist. LEXIS 8612 (S.D.N.Y., Feb. 28, 2006)*

**Prior History: [**1]** Appeal from a judgment of the United States District Court for the Southern District of New York (Kimba M. Wood, Judge), granting defendants' motion for judgment on the pleadings as to plaintiff's Title VII claims. Because we conclude that plaintiff adequately exhausted his race discrimination claim, and also that defending oneself against charges of sexual harassment by testifying in a Title VII proceeding qualifies as "protected activity" under *42 U.S.C. § 2000e-3(a)*, we vacate the judgment of the District Court and remand for further proceedings.

*Deravin v. Kerik, 2002 U.S. Dist. LEXIS 2623 (S.D.N.Y., Feb. 19, 2002)*

**Disposition:** Vacated and remanded.

## Core Terms

national origin, promotion, race discrimination, retaliation, employees, allegations, discrimination claim, exhaustion, protected activity, charges, defending, harassment, preferential treatment, reasonably related, courts, sexual, marks, racial discrimination, retaliation claim, investigate, proceedings, quotation, male

## Case Summary

**Procedural Posture**

Plaintiff employee appealed the judgment of the United States District Court for the Southern District of New York granting defendant employer's motion for judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(c)* in the employee's race discrimination and retaliation action filed under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*

**Overview**

The employee sued his employer, the former Commissioner of the New York City, New York, Department of Corrections, alleging that he blocked the employee's promotion to the position of deputy warden because of race and because he had successfully defended himself against sexual harassment charges filed by a corrections officer. The district court granted the employer's motion for judgment on the pleadings, holding that the employee had failed to exhaust his race discrimination claim and that defending himself against charges of discrimination did not qualify as protected activity under Title VII. On appeal, the court held that the employee adequately exhausted his race discrimination claim because a claim of race discrimination could reasonably be expected to grow out of his Equal Employment Opportunity Commission complaint; the employee's allegation of preferential treatment for Irish-American employees fairly encompassed a claim of discrimination against minority employees. The court also held that the employee's defending himself against the sexual harassment charges constituted engaging in a protected activity under *42 U.S.C.S. § 2000e-3(a)*.

**Outcome**

The judgment granting the employer's motion for judgment on the pleadings was vacated and the case was remanded for further proceedings.

## LexisNexis® Headnotes

335 F.3d 195, *195; 2003 U.S. App. LEXIS 13948, **1

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > Judgments > Pretrial Judgments > General Overview

Civil Procedure > Judgments > Pretrial Judgments > Judgment on Pleadings

Civil Rights Law > General Overview

*HN1* **Standards of Review, De Novo Review**

A court of appeals reviews de novo the dismissal of claims pursuant to a *Fed. R. Civ. P. 12(c)* motion for judgment on the pleadings, accepting the allegations in the amended complaint as true and drawing all reasonable inferences in favor of the plaintiff. A complaint may be dismissed under *Fed. R. Civ. P. 12(c)* only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. This standard applies with particular strictness where the plaintiff files a pro se complaint alleging civil rights violations. Indeed, the United States Court of Appeals for the Second Circuit has repeatedly warned that the pleading requirements in discrimination cases are very lenient, even de minimis.

Civil Rights Law > ... > Procedural Matters > Federal Versus State Law > Exhaustion Doctrine

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

*HN2* **Federal Versus State Law, Exhaustion Doctrine**

As a precondition to filing a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the Equal Employment Opportunity Commission (EEOC). The United States Court of Appeals for the Second Circuit has recognized, however, that claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency. A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. This exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering.

Business & Corporate Compliance > ... > Discrimination > National Origin Discrimination > Enforcement

Labor & Employment Law > Discrimination > National Origin Discrimination > Enforcement

Labor & Employment Law > Discrimination > National Origin Discrimination > Exhaustion of Remedies

Labor & Employment Law > Discrimination > National Origin Discrimination > General Overview

Labor & Employment Law > Discrimination > National Origin Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > Racial Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > Racial Discrimination > Exhaustion of Remedies

Labor & Employment Law > ... > Civil

335 F.3d 195, *195; 2003 U.S. App. LEXIS 13948, **1

Actions > Exhaustion of Remedies > General Overview

### _HN3_ **National Origin Discrimination, Enforcement**

In determining whether claims are reasonably related, the focus should be on the factual allegations made in the Equal Employment Opportunity Commission (EEOC) charge itself, describing the discriminatory conduct about which a plaintiff is grieving. Because an assertion of racial bias is conceptually distinct from a claim of discrimination on the basis of national origin, raising a national origin claim before the EEOC does not automatically suffice to alert the agency to investigate incidences of racial discrimination. However, courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case.

Labor & Employment
Law > Discrimination > National Origin
Discrimination > Scope & Definitions

### _HN4_ **National Origin Discrimination, Scope & Definitions**

See _29 C.F.R. § 1606.1_.

Business & Corporate
Compliance > ... > Discrimination > National Origin
Discrimination > Enforcement
Labor & Employment
Law > Discrimination > National Origin
Discrimination > Enforcement

Civil Rights Law > ... > Procedural
Matters > Federal Versus State Law > Exhaustion
Doctrine

Labor & Employment Law > Affirmative
Action > Enforcement

Labor & Employment
Law > Discrimination > General Overview

Labor & Employment Law > Discrimination > Racial
Discrimination > Exhaustion of Remedies

Labor & Employment Law > ... > Civil

Actions > Exhaustion of Remedies > General Overview

### _HN5_ **National Origin Discrimination, Enforcement**

Precise pleading is not required for Title VII of the Civil Rights Act of 1964, _42 U.S.C.S. § 2000e et seq.,_ exhaustion purposes, and even in the absence of an express linkage between race and national origin, the specific facts alleged by a plaintiff in his or her Equal Employment Opportunity Commission complaint may suggest both forms of discrimination, so that the agency receives adequate notice to investigate discrimination on both bases. For example, read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial discrimination in addition to an illegitimate preference premised on national origin.

Business & Corporate
Compliance > ... > Discrimination > National Origin
Discrimination > Enforcement
Labor & Employment
Law > Discrimination > National Origin
Discrimination > Enforcement

Labor & Employment
Law > Discrimination > National Origin
Discrimination > Exhaustion of Remedies

Labor & Employment
Law > Discrimination > National Origin
Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > Racial
Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > Racial
Discrimination > Exhaustion of Remedies

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > General
Overview

### _HN6_ **National Origin Discrimination, Enforcement**

Because racial categories may overlap significantly with nationality or ethnicity, the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible, or at least sufficiently blurred so that courts may infer that

335 F.3d 195, *195; 2003 U.S. App. LEXIS 13948, **1

both types of discrimination would fall within the reasonable scope of the ensuing Equal Employment Opportunity Commission investigation for exhaustion purposes.

Labor & Employment Law > Discrimination > Racial Discrimination > Exhaustion of Remedies

Labor & Employment Law > Discrimination > National Origin Discrimination > General Overview

Labor & Employment Law > Discrimination > National Origin Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > National Origin Discrimination > Exhaustion of Remedies

Labor & Employment Law > Discrimination > Racial Discrimination > Scope & Definitions

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

### *HN7* Racial Discrimination, Exhaustion of Remedies

Where the line between national origin discrimination and racial discrimination is difficult to trace, courts have warned that an attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate. Similarly, courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry prior to the full development of a plaintiff's claims, given the potential overlap between the two forms of discrimination, and the "loose pleading" which is permitted in the Equal Employment Opportunity Commission complaint.

Civil Rights Law > ... > Procedural Matters > Federal Versus State Law > Exhaustion Doctrine

Labor & Employment Law > Discrimination > Racial Discrimination > Exhaustion of Remedies

Labor & Employment Law > ... > Civil

Actions > Exhaustion of Remedies > General Overview

### *HN8* Federal Versus State Law, Exhaustion Doctrine

A plaintiff may present evidence of agency error as evidence that her Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, discrimination claim was properly exhausted.

Labor & Employment Law > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities
Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Labor & Employment Law > ... > Retaliation > Statutory Application > General Overview

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

### *HN9* Employer Violations, Interference With Protected Activities

Title VII of the Civil Rights Act of 1964's (Title VII), *42 U.S.C.S. § 2000e et seq.*, anti-retaliation provision is broadly drawn. Section 704(a) of Title VII makes it unlawful to retaliate against an employee, because he has opposed any practice made an unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the subchapter. *42 U.S.C.S. § 2000e-3(a).*

Labor & Employment Law > Discrimination > Retaliation > General Overview

### *HN10* Discrimination, Retaliation

Section 704(a) of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, has two separate clauses: an opposition clause as well as an independent

335 F.3d 195, *195; 2003 U.S. App. LEXIS 13948, **1

participation clause. Where a plaintiff's claim of retaliation is best understood as falling under § 704(a)'s participation clause, it should not be analyzed solely under the narrower opposition clause.

Commercial Law (UCC) > Negotiable Instruments (Article 3) > General Overview

Labor & Employment Law > Discrimination > Retaliation > General Overview

### *HN11* Commercial Law (UCC), Negotiable Instruments (Article 3)

The explicit language of § 704(a)'s of the Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, participation clause is expansive and seemingly contains no limitations. As the United States Supreme Court has noted, read naturally, the word "any" has an expansive meaning, and thus, so long as Congress did not add any language limiting the breadth of that word, the term "any" must be given literal effect.

Labor & Employment Law > ... > Sexual Harassment > Defenses > Antiharassment Policy

Labor & Employment Law > ... > Sexual Harassment > Defenses > General Overview

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

### *HN12* Defenses, Antiharassment Policy

Relying on the explicit language of § 704(a) of the Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, the United States Court of Appeals for the Eleventh Circuit has held that even involuntary participation in Title VII proceedings by an employee accused of sexual harassment qualifies as protected activity. The Equal Employment Opportunity Commission adopts the same position. The United States Court of Appeals for the Second Circuit accordingly holds that defending oneself against charges of discrimination--to the extent that such

defense involves actual participation in a Title VII proceeding or investigation--is "protected activity" within the scope of § 704(a) based on a plain reading of the statute's text.

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

### *HN13* Discrimination, Retaliation

While it is indisputably true that United States Court of Appeals for the Second Circuit must interpret Title VII of the Civil Rights Act of 1964's (Title VII), *42 U.S.C.S. § 2000e et seq.*, anti-retaliation provision in light of Title VII's overall remedial purpose, and while it generally avoids statutory interpretations that would result in absurd or plainly inconsistent results, the court discerns no absurdity or necessary inconsistency in barring retaliation based on an accused harasser's participation in Title VII proceedings. Activities under the participation clause are essential to the machinery set up by Title VII. Because the primary purpose of Title VII's anti-retaliation clause is to maintain unfettered access to Title VII's remedial mechanisms, it may well advance the remedial purpose of Title VII to shield all participation, including participation by an employee accused of illegal discrimination, to ensure the overall integrity of the administrative process and encourage truthful testimony.

Labor & Employment Law > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities
Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Labor & Employment Law > ... > Gender & Sex Discrimination > Employment Practices > Discharges

Labor & Employment Law > Discrimination > General Overview

Labor & Employment Law > ... > Sexual Harassment > Employment Practices > Discharges

335 F.3d 195, *195; 2003 U.S. App. LEXIS 13948, **1

& Failures to Hire

Labor & Employment
Law > Discrimination > Retaliation > General
Overview

Labor & Employment Law > Discrimination > Title
VII Discrimination > General Overview

*HN14* **Employer Violations, Interference With
Protected Activities**

The United States Court of Appeals for the Second
Circuit's interpretation of § 704(a) of the Title VII of the
Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e
et seq.*, should not be read as prohibiting employers
from legitimately disciplining employees who engage in
discriminatory conduct. The court emphasizes that Title
VII only protects the specific act of participating in
administrative proceedings--not the underlying conduct
which is being investigated. Thus, while an employer
may not retaliate against an employee solely because
the employee participated in a Title VII proceeding, an
employer may discipline an employee if its investigation
reveals culpable conduct.

**Counsel:** GREGORY S. LISI, Rockville Centre, NY, for
Plaintiff-Appellant.

PAUL L. HERZFELD, (Michael A. Cardozo, Corporation
Counsel for the City of New York, on the brief, and
Francis F. Caputo, of counsel), New York, NY, for
Defendants-Appellees.

**Judges:** Before: STRAUB and POOLER, Circuit
Judges, [*] and HURD, District Judge.

**Opinion by:** STRAUB

# Opinion

 [*198] STRAUB, *Circuit Judge*: Plaintiff Eric H.
Deravin, III ("Deravin"), a former employee of
defendant [**2] New York City Department of
Corrections ("DOC") asserts claims of race
discrimination and retaliation under Title VII of the Civil
Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et
seq.* Deravin alleges that defendant Bernard Kerik

("Kerik"), the former Commissioner of the DOC, blocked
his promotion to the position of Deputy Warden,
because Deravin is African-American, and because
Deravin successfully defended himself against sexual
harassment charges filed by Jeanette Pinero ("Pinero"),
a DOC corrections officer whom Deravin contends was
romantically involved with Kerik. The United States
District Court for the Southern District of New York
(Kimba M. Wood, *Judge*) dismissed Deravin's claims
pursuant to *Fed. R. Civ. P. 12(c)*. The District Court
concluded that Deravin's race discrimination claim had
not been adequately exhausted, because the claim was
not reasonably related to the national origin and
retaliation claims originally raised in Deravin's Equal
Employment Opportunity Commission ("EEOC")
complaint. As for Deravin's retaliation claim, the District
Court ruled that "defending oneself against charges of
discrimination" does not qualify as protected [**3]
activity under Title VII. On appeal, Deravin challenges
both of these rulings. Because we find that Deravin
administratively exhausted his race discrimination claim,
and, further, because we hold today that defending
oneself against charges of discrimination by testifying in
a Title VII proceeding qualifies as protected activity
under *42 U.S.C. § 2000e-3(a)*, we vacate the judgment
of the District Court and remand for further proceedings.

I.

Deravin has been an employee of the DOC for over
twenty years. In October 1989, Deravin was promoted
to the position of Captain and, in August 1996, Deravin
was again promoted to the position of Assistant Deputy
Warden. In January 1998, as soon as he became
eligible, Deravin applied for but was denied further
promotion to the position of Deputy Warden. Between
January 1998 and April 2000, Deravin applied five more
times for promotion to Deputy Warden. Although he was
recommended and approved each time by the chief of
his department, Deravin's successive applications for
promotion were also unsuccessful. Deravin contends
that Kerik deliberately blocked his promotion to Deputy
Warden, and that Kerik instead promoted [**4] far less
qualified applicants, including applicants with only high
school diplomas or GEDs while Deravin had a Ph.D. in
Criminal Justice Management [*199] as well as a
Master's Degree in Public Administration.

Deravin alleges that Kerik refused to promote him for
two discriminatory reasons: (1) because there was a
preferential policy within the DOC to promote white
employees, and Kerik did not want to promote an

---

[*] The Honorable David N. Hurd, Judge of the United States
District Court for the Northern District of New York, sitting by
designation.

African-American employee to a position of authority and responsibility; and (2) because Deravin had successfully defended himself against false sexual harassment charges brought by Pinero, a DOC officer whom Kerik had purportedly dated. [1] After Deravin filed a complaint with the EEOC, he was finally promoted to the position of Deputy Warden, on his sixth try, in June 2000.

 [**5]  In his EEOC complaint, Deravin checked only the boxes marked "retaliation" and "national origin" as the grounds for his discrimination claim. The written description of claim also focuses on Kerik's alleged retaliation as well as on the allegedly preferential treatment given to DOC employees who are members of the Emerald Society due to their "Irish-American Status." Deravin explains: "If you look at those members who have been given promotions and preferential treatment, you will see the majority are members of the Emerald Society. Both the retaliation I have experienced as well as this ongoing preferential treatment is in violation of the _Civil Rights Act of 1964_."

After receiving a notice of charge from the EEOC, the DOC investigated Deravin's claims. In June 2000, the DOC issued a position statement denying Deravin's claims of discrimination. As part of its investigation, the DOC reviewed a list of all applicants for promotion to the position of Deputy Warden from January 1998 to June 2000, specifying the race of each applicant. The DOC noted at the conclusion of its analysis, that out of the successful candidates:

> three (3) were male Hispanics, seven (7) were African-American [**6]  males, four (4) were 19 African-American females, four (4) were male Italians, eight (8) were male Irish, and one (1) was male Greek. There were a total of twenty-seven promotions. There is no disproportion in promotions of Irish descent as alleged by the complainant. Therefore, the allegations made by the complainant that members of the Emerald Society were given preferential treatment and promotions are unsubstantiated.

The EEOC issued Deravin a right-to-sue letter in August

2000, and Deravin filed this present action *pro se* in October 2000, asserting claims of race discrimination and retaliation under Title VII. Defendants subsequently moved to dismiss the complaint. The matter was referred by the District Court to Magistrate Judge Kevin N. Fox who recommended that defendants' motion for judgment on the pleadings be granted.

By written order issued on May 20, 2002, the District Court adopted the recommendation of the Magistrate Judge. The District Court agreed that Deravin had failed to administratively exhaust his race discrimination claim, because "nothing in the [EEOC] complaint suggests that defendants discriminated against plaintiff on account of his race." The **[**7]** District Court also rejected Deravin's explanation that the EEOC counselor who helped him fill out the complaint form erroneously failed to specify race as a basis for Deravin's **[*200]** discrimination claim. Although Deravin submitted two letters dated April 4, 2001 and May 7, 2001 in which he requested that the EEOC rectify the alleged administrative error, the District Court characterized the May 7, 2001 letter as "a disingenuous, post-hoc attempt to remedy the deficiencies in the administrative complaint." The District Court noted that the May 7, 2001 letter was sent months after Deravin received his right to sue letter from the EEOC as well as after defendants filed their answer notifying Deravin that they intended to argue that his claims "are barred to the extent that [the] allegations were not contained in his EEOC charge." The District Court also noted that there was no evidence that the letter had actually been sent to the EEOC, [2] nor was there any evidence confirming that Deravin had worked with an EEOC counselor in filing his administrative complaint.

 [**8]  In analyzing Deravin's retaliation claim, the District Court further agreed with the Magistrate Judge, concluding that defending oneself against charges of discrimination does not qualify as protected activity under Title VII. The District Court reasoned: "To be protected activity, plaintiff himself must have taken some action to protest or oppose illegal discrimination. Because plaintiff has not alleged in the Complaint that he engaged in any such activity, he cannot make out a claim for retaliation, even if the Court assumes all inferences in his favor."

Accordingly, the District Court dismissed Deravin's

---

[1] Both the DOC EEO office as well as the New York State Division of Human Rights investigated Pinero's charges against Deravin. Both concluded that there was no evidence of any harassment or discrimination by Deravin. Deravin contends that he testified in his own defense as part of both investigations.

---

[2] It is unclear from the record why the District Court focused solely on the May 7, 2001 letter without discussing Deravin's earlier April 4, 2001 letter.

335 F.3d 195, *200; 2003 U.S. App. LEXIS 13948, **8

claims, and this timely appeal followed.

**II.**

*HN1* We review *de novo* the dismissal of claims pursuant to a *Rule 12(c)* motion for judgment on the pleadings, "accepting the allegations in the amended complaint as true and drawing all reasonable inferences in favor of the [plaintiff]." *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*, cert. denied, 155 L. Ed. 2d 227, 123 S. Ct. 1486 (2003). A complaint may be dismissed under *Rule 12(c)* only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim [**9] which would entitle him to relief." *Id. at 135* (internal quotation marks and citation omitted). This standard applies with particular strictness where the plaintiff files a *pro se* complaint alleging civil rights violations. *See id.*; *Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002)*. Indeed, this Court has repeatedly warned that "the pleading requirements in discrimination cases are very lenient, even *de minimis.*" *Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)*. It is with these principles in mind that we examine plaintiff's claims.

**III.**

*HN2* As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC. *See Fitzgerald v. Henderson, 251 F.3d 345, 358-59 (2d Cir. 2001)*, cert. denied, 536 U.S. 922 (2002); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001)* (per curiam). "We have recognized, however, that claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they [**10] are reasonably related to those that were filed with the agency." *Legnani, 274 F.3d at 686* (internal quotation marks and citation omitted). "A claim is considered reasonably related if the conduct [*201] complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Fitzgerald, 251 F.3d at 359-60* (internal quotation marks and citation omitted). This exception to the exhaustion requirement "is essentially an allowance of loose pleading" and is based on the recognition that "EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering."

*Butts v. City of N. Y. Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402 (2d Cir. 1993)*, superseded by statute on other grounds as stated in *Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998)*. [3]

[**11] *HN3* In determining whether claims are reasonably related, the focus should be "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 637 (9th Cir. 2002)*; see also *Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)* ("It is the substance of the charge and not its label that controls."). Because "an assertion of racial bias is conceptually distinct from a claim of discrimination on the basis of national origin," raising a national origin claim before the EEOC does not automatically suffice to alert the agency to investigate incidences of racial discrimination. [4] *Dixit v. City of N. Y. Dep't of Gen. Servs., 972 F. Supp. 730, 734 (S.D.N.Y. 1997)*. However, courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case. *See, e.g., Sinai v. New England Tel. and Tel. Co., 3 F.3d 471, 475 (1st Cir. 1993)* ("Race and national origin discrimination may present [**12] identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group' . . . [and thus] in certain circumstances . . . national origin and race discrimination may overlap.") (quoting *Saint Francis College v. Al-Khazraji, 481 U.S. 604, 614, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987)* (Brennan, J., concurring)), cert. denied, 513 U.S. 1025 (1994); *Bullard v. OMI Georgia, Inc., 640 F.2d 632, 634 (5th Cir. Unit B 1981)* ("In some contexts, national origin discrimination is so closely related to racial discrimination as to be indistinguishable.") (internal quotation marks and

_____

[3] We have also recognized two other types of claims that are reasonably related to the claims asserted in an EEOC complaint: (1) a claim "alleging retaliation by an employer against an employee for filing an EEOC charge," and (2) a claim where the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts, 990 F.2d at 1402-03*.

[4] *HN4* The EEOC "defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." *29 C.F.R. § 1606.1*.

335 F.3d 195, *201; 2003 U.S. App. LEXIS 13948, **12

citation omitted); *cf. Dennis v. Pan Am. World Airways, Inc., 746 F. Supp. 288, 291 (E.D.N.Y. 1990)* (acknowledging that "race . . . may sometimes be correlated with national origin because of certain historical or demographic facts").

 **[\*\*13]**  In this case, the District Court correctly observed that Deravin's EEOC complaint fails to expressly allege race discrimination or use terms suggestive of a potential confusion between the concepts of race and nationality. *Cf. Dixit, 972 [\*202] F. Supp. at 734-35* (race and national origin discrimination claims were reasonably related where plaintiff identified himself as an "Asian Indian," a term suggestive of both race and national origin, in his EEOC complaint); *Alonzo, 25 F. Supp. 2d at 460* (concluding that race discrimination claim was reasonably related to national origin claim "due to [plaintiff's] pronouncement that he was discriminated against because he is a Hispanic, because it has not been established that the designation of being an Hispanic precludes a claim of racial discrimination, and given the uncertainty among courts as to whether 'Hispanic' is better characterized as a race or a national origin"). Indeed, the EEOC complaint does not even reveal that Deravin is African-American. Nonetheless, **HN5** precise pleading is not required for Title VII exhaustion purposes, *Alvarado v. Bd. of Tr. of Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988),* **[\*\*14]** and even in the absence of an express linkage between race and national origin, the specific facts alleged by a plaintiff in his or her EEOC complaint may suggest both forms of discrimination, so that the agency receives adequate notice to investigate discrimination on both bases.

For example, read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial discrimination in addition to an illegitimate preference premised on national origin. Significantly, upon reviewing Deravin's EEOC complaint, the DOC itself recognized as much, for although it analyzed comparable white candidates in terms of ethnicity, it also specifically noted the number of successful Hispanic and African-American candidates. In such circumstances, **HN6** because racial categories may overlap significantly with nationality or ethnicity, "the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible," *Adames v. Mitsubishi Bank, Ltd., 751 F. Supp. 1548, 1559 (E.D.N.Y. 1990)* (quoting *Enriquez v. Honeywell, Inc., 431 F. Supp. 901, 904 (W.D. Okla. 1977)),* **[\*\*15]**  or at least sufficiently blurred

so that courts may infer that both types of discrimination would fall within the reasonable scope of the ensuing EEOC investigation for exhaustion purposes. [5]

**HN7** Where the line between national origin discrimination and racial discrimination is difficult to trace, courts have warned that "an attempt to make **[\*\*16]** such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate." *Bullard, 640 F.2d at 634-35.* Similarly, courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry prior to the full development of a plaintiff's claims, given the potential overlap between the two forms of discrimination, and the "loose pleading" which is permitted in the EEOC complaint, *see Butts, 990 F.2d at 1402.*

Looking to the specific facts of this case, we conclude that the absence of an explicit reference to race discrimination in Deravin's EEOC complaint is not dispositive, [\*203] because an allegation of preferential treatment for Irish-American employees fairly encompasses a claim of discrimination against minority employees. While there may be a conceptual difference between simply favoring white employees and favoring a distinct subset of white Irish-Americans, Deravin's allegations are sufficient to alert the EEOC to look for potential race discrimination. In sum, because a claim of race discrimination could reasonably be expected to grow out of Deravin's **[\*\*17]** EEOC complaint, Deravin adequately exhausted his race discrimination claim.

Moreover, in this case, there is an additional reason why dismissal of Deravin's race discrimination claim was inappropriate. Regardless of the actual content of his EEOC complaint, Deravin also alleges that the failure to specify race as a basis for his discrimination claim can be blamed on the EEOC counselor who helped him fill out the complaint form. *See B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1102 (9th Cir. 2002)* (concluding that

---

[5] Although there may be fundamental conceptual differences between race and national origin discrimination, "prejudice is as irrational as is the selection of groups against whom it is directed," *Manzanares v. Safeway Stores, Inc., 593 F.2d 968, 971 (10th Cir. 1979)* -- thus we cannot simply assume that employment discrimination invariably fits into neat, clearly distinct legal categories. *Cf. Sinai, 3 F.3d at 475* (explaining that while race and national origin discrimination are not identical, "national origin discrimination could be used [by a jury], together with other evidence, to arrive at a conclusion vis-a-vis race discrimination").

*HN8* a plaintiff may present evidence of agency error as evidence that her Title VII discrimination claim was properly exhausted. While the District Court identified several reasons to doubt Deravin's story, there is also evidence in this case that verifies Deravin's claim of administrative error. For example, the EEOC notice of charge fails to list retaliation as an independent basis for Deravin's discrimination claim, although Deravin undisputedly alleged retaliation in his initial administrative complaint. While we acknowledge that Deravin's claim of administrative error may ultimately prove to be non-credible, the District Court was not entitled to make an **[**18]** adverse credibility finding on a *Rule 12(c)* motion. *See generally Patel, 305 F.3d at 134-35*. Accepting *all* of Deravin's allegations as true, dismissal for failure to meet Title VII's administrative exhaustion requirement was inappropriate at this early stage in the litigation, and we therefore vacate the District Court's dismissal of Deravin's race discrimination claim.

**IV.**

The District Court also rejected Deravin's retaliation claim, concluding that defending oneself against charges of discrimination is not protected activity within the meaning of Title VII. However, *HN9* Title VII's anti-retaliation provision is broadly drawn. *Section 704(a) of Title VII* makes it unlawful to retaliate against an employee, "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)* (emphasis added). [6]

**[**19]** As courts have consistently recognized, *HN11* the explicit language of *§ 704(a)*'s participation clause is expansive and seemingly contains no limitations. *See,*

e.g., *Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1353 (11th Cir. 1999)* ("The words 'participate in any manner' express Congress' intent to confer 'exceptionally broad protection' **[*204]** upon employees covered by Title VII."); *see also Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir.)*, *cert. denied, 531 U.S. 1052, 148 L. Ed. 2d 560, 121 S. Ct. 657 (2000)*; *Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 414 (4th Cir. 1999)*. As the Supreme Court has noted, "read naturally, the word 'any' has an expansive meaning," and thus, so long as "Congress did not add any language limiting the breadth of that word," the term "any" must be given literal effect. *United States v. Gonzales, 520 U.S. 1, 5, 137 L. Ed. 2d 132, 117 S. Ct. 1032 (1997)*.

*HN12* Relying on the explicit language of *§ 704(a)*, the Eleventh Circuit has held that even involuntary participation in Title VII proceedings by an employee accused of sexual harassment qualifies as **[**20]** protected activity. *See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185-89 (11th Cir. 1997)*. We find the reasoning and analysis of *Merritt* persuasive and note that the EEOC adopts the same position. *See* EEOC Compliance Manual § 8-II(C)(1) n.24 (May 20, 1998) (citing *Merritt* and explaining that "the participation clause protects those who testify in an employment discrimination case about their own discriminatory conduct, even if such testimony is involuntary"). [7] We accordingly hold that defending oneself against charges of discrimination -- to the extent that such defense involves actual participation in a Title VII proceeding or investigation -- is "protected activity" within the scope of *§ 704(a)* based on a plain reading of the statute's text. *Cf. McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001)* (refusing to adopt a limitation which was not supported by the plain language of Title VII's anti-retaliation provision).

**[**21]** Although we adopt *Merritt*'s reasoning and find no need to reiterate the cogent analysis of the Eleventh Circuit, we pause here to emphasize two points. First, *HN13* while it is indisputably true that we must interpret Title VII's anti-retaliation provision in light of Title VII's

---

[6] Although the District Court reasoned that, "to be protected activity, plaintiff himself must have taken some action to protest or oppose illegal discrimination," *HN10* *section 704(a)* has two separate clauses: an opposition clause as well as an independent participation clause. *See Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 413 (4th Cir. 1999)*. As Deravin's claim of retaliation is best understood as falling under *§ 704(a)*'s participation clause, it should not be analyzed solely under the narrower opposition clause. *See Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997)*, *cert. denied, 523 U.S. 1122, 140 L. Ed. 2d 943, 118 S. Ct. 1803 (1998)*.

---

[7] Such informal agency interpretations are entitled to deference so long as they are persuasive. *See McMenemy v. City of Rochester, 241 F.3d 279, 284 (2d Cir. 2001)* (relying on interpretation contained in EEOC Compliance Manual, because the EEOC's interpretation was consistent with the plain language of Title VII as well as the remedial purpose of Title VII's anti-retaliation provision).

335 F.3d 195, *204; 2003 U.S. App. LEXIS 13948, **21

overall remedial purpose, *see generally Robinson v. Shell Oil Co., 519 U.S. 337, 136 L. Ed. 2d 808, 117 S. Ct. 843 (2001)*, and while we generally avoid statutory interpretations that would result in absurd or plainly inconsistent results, *see Yerdon v. Henry, 91 F.3d 370, 376 (2d Cir. 1996)*, we discern no absurdity or necessary inconsistency in barring retaliation based on an accused harasser's *participation* in Title VII proceedings. "Activities under the participation clause are essential to the machinery set up by Title VII." *Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 n.4 (4th Cir. 1998)* (internal quotation marks and citation omitted). Because the primary purpose of Title VII's anti-retaliation clause is to maintain unfettered access to Title VII's remedial mechanisms, *see McMenemy, 241 F.3d at 284*, it may well advance **[**22]** the remedial purpose of Title VII to shield all participation, including participation by an employee accused of illegal discrimination, to ensure the overall integrity of the administrative process and encourage truthful testimony. *See Merritt, 120 F.3d at 1188* ("Congress could well have decided that encouraging truthful testimony by even the sexual harassers themselves was important enough to justify whatever vindication of Title VII claims to justify whatever deleterious effect [such protection] might have on the vigor with which **[*205]** employers discipline guilty employees."); *Glover, 170 F.3d at 414* ("*Section 704(a)*'s protections ensure not only that employers cannot intimidate their employees into foregoing the Title VII grievance process, but also that investigators will have access to the unchilled testimony of witnesses."). [8]

Second, **[**23]** *HN14* our interpretation of *§ 704(a)* should not be read as prohibiting employers from legitimately disciplining employees who engage in discriminatory conduct. We emphasize that Title VII only protects the specific act of *participating* in administrative proceedings -- not the *underlying conduct* which is being investigated. *See Merritt, 120 F.3d at 1188* (noting that an employer may unquestionably impose discipline, "including termination, on any employee who sexually harasses or otherwise discriminates against other employees"); *cf. Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000)* ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise."); *Laughlin, 149 F.3d at 259 n.3* ("It is black letter law that illegal actions are not protected activity under Title VII.") Thus, while an employer may not retaliate against an employee solely because the employee participated in a Title VII proceeding, an employer may discipline an employee if its **[**24]** investigation reveals culpable conduct.

In conclusion, accepting the truth of Deravin's allegations -- that Kerik blocked his promotion in retaliation for Deravin's testimony in the investigation of Pinero's sexual harassment charges -- we hold that Deravin has alleged that he engaged in protected activity within the meaning of *§ 704(a)*'s participation clause and therefore vacate the District Court's dismissal of Deravin's retaliation claim.

**V.**

For the reasons stated above, we VACATE the judgment of the District Court and remand for further proceedings consistent with this opinion. [9]

---

**End of Document**

---

[8] Indeed, truthful testimony by the employee actually accused of wrongdoing may serve as the best evidence in support of a claim of illegal discrimination.

[9] Because we vacate the judgment of the District Court on these grounds, we express no view on the other arguments raised by the parties which were not reached by the District Court.

⚠ Caution
As of: June 23, 2025 9:58 PM Z

# *Doe v. Bloomberg L.P.*

Court of Appeals of New York

January 7, 2021, Argued ;  February 11, 2021, Decided

No. 8

**Reporter**

36 N.Y.3d 450 *; 167 N.E.3d 454 **; 143 N.Y.S.3d 286 ***; 2021 N.Y. LEXIS 50 ****; 2021 NY Slip Op 00898; 2021 WL 496608

 **[1]**  Margaret Doe, Appellant, v Bloomberg L.P. et al., Defendants, and Michael Bloomberg, Respondent.

**Prior History:** Appeal from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered September 24, 2019. The Appellate Division, with two Justices dissenting, (1) reversed, on the law, an order of the Supreme Court, Bronx County (Fernando Tapia, J.; op *2018 NY Slip Op 33961[U] [2018]*), which had, upon reargument, denied defendant Michael Bloomberg's motion to dismiss the first, second and third causes of action as against him; and (2) granted the motion.

*Doe v Bloomberg L.P., 178 AD3d 44, 109 NYS3d 254*, affirmed.

**Disposition:** Order affirmed.

## Core Terms

employees, vicarious liability, human rights law, discriminatory conduct, sexual harassment, purposes, allegations, principles, local law, provisions, courts, worded, discriminatory act, personnel decision, workplace, federal statute, carry out, corporate employee, ownership interest, anti-discrimination, vicariously liable, offensive conduct, subject to suit, common law, encouraged, managerial, quotation, cultures, fostered, marks

## Case Summary

### Overview

HOLDINGS: [1]-The president of a company was not an "employer" within the meaning of the New York City Human Rights Law (HRL), Administrative Code of the City of NY § 8-107, and accordingly, the dismissal of an employee's claims that sought to hold him vicariously liable for a supervisor's offending conduct was affirmed; [2]-The employee failed to allege that the president was her employer for purposes of liability under the City HRL because her allegations concerning his position at the company demonstrated only that he was an owner or officer. The employee's allegations that the president fostered a culture of discrimination and sexual harassment at the company, based primarily on news articles and reports of a deposition in an unrelated case, did not transform him into an employer for purposes of vicarious liability for the supervisor's discriminatory conduct under § 8-107(13)(b).

### Outcome
Order affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

*HN1* **Motions to Dismiss, Failure to State Claim**

When reviewing a defendant's motion to dismiss a complaint for failure to state a cause of action, a court must give the complaint a liberal construction, accept the allegations as true and provide plaintiffs with the benefit of every favorable inference. The ultimate question is whether, accepting the allegations and affording these inferences, "plaintiff can succeed upon any reasonable view of the facts stated.

36 N.Y.3d 450, *450; 167 N.E.3d 454, **454; 143 N.Y.S.3d 286, ***286; 2021 N.Y. LEXIS 50, ****50; 2021 NY Slip
Op 00898, *****00898

Labor & Employment
Law > Discrimination > Actionable Discrimination

Torts > ... > Multiple Defendants > Concerted
Action > Civil Aiding & Abetting

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination

*HN2* Discrimination, Actionable Discrimination

The New York City Human Rights Law makes it
unlawful for an employer or an employee or agent
thereof to discriminate on the basis of gender.
Administrative Code of the City of NY § 8-107(1)(a). The
statute also prohibits any person from aiding and
abetting discrimination.

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN3* Discrimination, Actionable Discrimination

The New York City Human Rights Law is clear as to
when an employer is liable: for the employer's own
offending conduct and vicariously for some actions of
others. Administrative Code of the City of NY § 8-
107(13)(b).

Business & Corporate Law > ... > Management
Duties & Liabilities > Causes of Action > Negligent
Acts of Directors & Officers

*HN4* Causes of Action, Negligent Acts of Directors
& Officers

Some participation in the specific conduct committed
against the plaintiff is required to hold an individual
owner or officer of a corporate employer personally
liable in his or her capacity as an employer.

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN5* Discrimination, Actionable Discrimination

The New York Human Rights Law's (HRL) minimum
culpability standard is irrelevant to assessing whether

an employer is liable under this provision of the New
York City HRL. The court may not apply cases under
the State Human Rights Law imposing liability only
where the employer encourages, condones or approves
the unlawful discriminatory acts.

Business & Corporate Compliance > Labor &
Employment > Discrimination > Statutory Prohibition
of Gender & Sex Based Discrimination
Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > Federal & State Interrelationships

Business & Corporate
Compliance > ... > Discrimination > Age
Discrimination > Federal & State Interrelationships
Labor & Employment Law > Discrimination > Age
Discrimination > Federal & State Interrelationships

*HN6* Discrimination, Statutory Prohibition of
Gender & Sex Based Discrimination

A corporate employee, though he or she has a title as
an officer and is the manager or supervisor of a
corporate division, is not individually subject to suit with
respect to discrimination based on age or sex under
New York's Human Rights Law or its Labor Law or
under the Federal Age Discrimination in Employment
Act or Equal Pay Act if he or she is not shown to have
any ownership interest or any power to do more than
carry out personnel decisions made by others.

Business & Corporate Compliance > Labor &
Employment > Discrimination > Statutory Prohibition
of Gender & Sex Based Discrimination
Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > Federal & State Interrelationships

Business & Corporate
Compliance > ... > Discrimination > Age
Discrimination > Federal & State Interrelationships
Labor & Employment Law > Discrimination > Age
Discrimination > Federal & State Interrelationships

*HN7* Discrimination, Statutory Prohibition of
Gender & Sex Based Discrimination

A corporate employee, though the employee has a title
as an officer and is the manager or supervisor of a

36 N.Y.3d 450, *450; 167 N.E.3d 454, **454; 143 N.Y.S.3d 286, ***286; 2021 N.Y. LEXIS 50, ****50; 2021 NY Slip Op 00898, *****00898

corporate division, (1) is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law (HRL) or its Labor Law and (2) is not individually subject to suit with respect to discrimination based on age or sex under the Federal Age Discrimination in Employment Act or Equal Pay Act if the employee is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others. The definition for "employer" provided in the State HRL relates only to the number of persons employed and provides no clue to whether individual employees of a corporate employer may be sued under its provisions. However, other parts of the law specifically impose liability on "employees" and "agents," demonstrating that the Legislature differentiated that provision from the general definition of "employer." In other words, the statutory language recognized a difference between an "employer" and other "employees" and "agents" of that employer. Accordingly, the State HRL does not render employees liable as individual employers.

Governments > Local Governments > Ordinances & Regulations

*HN8* **Local Governments, Ordinances & Regulations**

Similarly worded provisions of federal and state civil rights laws should be viewed] as a floor below which the New York City Human Rights law cannot fall. New York City, N.Y. Loc. Laws No. 85 (2005).

Labor & Employment
Law > Discrimination > Actionable Discrimination

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN9* **Discrimination, Actionable Discrimination**

The language in the New York City Human Rights Law (HRL), like that found in the State HRL, is itself circumscribed and requires no external limiting principle exempting employees from individual suit as employers. Instead, where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers within the meaning of the City HRL. Rather, those individuals may incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for

retaliation against protected conduct. Administrative Code of the City of NY § 8-107(1), (6), (7).

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN10* **Discrimination, Actionable Discrimination**

The New York City Human Rights Law (HRL) specifically imposes primary liability on employees and agents for some discriminatory acts, (Administrative Code of the City of NY § 8-107(1)(a) makes it unlawful for an employer or an employee or agent thereof to discriminate based on gender) but conspicuously does not impose vicarious liability on these individuals under § 8-107(13)(b). The use of "employee" and "agent" elsewhere in State HRL indicates that those individuals are not included in the term "employer." Furthermore, the vicarious liability provision itself applies when the employee or agent exercised managerial or supervisory responsibility. Section 8-107(13)(b)(1) differentiates between the liable party (employer) and the party committing the offending conduct (employee or agent with managerial or supervisory responsibility). Similarly, the legislature chose to make an owner, manager, agent or employee of a place of public accommodation, § 8-107(14)(a), and the owner of a housing accommodation, § 8-107(5)(a), directly liable for discrimination, but again does not make those categories of individuals subject to vicarious liability as employers under § 8-107(13)(b). These differences in the statutory provisions demonstrate that employees, agents, and others with an ownership stake are not employers within the meaning of the City HRL.

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals

*HN11* **Negligent Acts of Agents, Liability of Principals**

Employees and agents of a company are not ordinarily understood to be employers, and are not normally subject to vicarious liability for the wrongs of corporate employees. Rather, an employee is someone who works in the service of another person (the employer). The principle that respondeat superior is a form of secondary liability that cannot be imposed upon the fellow employee of a wrongdoer is certainly well-defined

36 N.Y.3d 450, *450; 167 N.E.3d 454, **454; 143 N.Y.S.3d 286, ***286; 2021 N.Y. LEXIS 50, ****50; 2021 NY Slip Op 00898, *****00898

and explicit in New York. Similarly, although possessing more power to act on the corporation's behalf, an agent is someone who is authorized to act for or in place of another, and a corporate agent is an agent authorized to act on behalf of a corporation; broadly, all employees and officers who have the power to bind the corporation. Though the common law imposes vicarious liability on the corporation for torts of its employees and agents committed within the scope of their job duties (directors or officers are not subject to personal liability for the torts of corporation employees simply because the directors or officers hold corporate office.

Torts > Vicarious Liability > Employers

### HN12 Vicarious Liability, Employers

Shareholders are not commonly understood to be employers, and to designate them as such for the purpose of imposing vicarious liability would go against the principles underlying the legal distinction. The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability.

Business & Corporate
Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

### HN13 Shareholder Duties & Liabilities, Personal Liability

As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and consequently, will not impose liability upon shareholders for the acts of the corporation. Indeed, the avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in the corporate form.

Governments > Courts > Common Law

Torts > Vicarious Liability > Corporations

### HN14 Courts, Common Law

At common law, shareholders are not subject to vicarious liability for the torts of a corporation's agents or

employees.

Torts > Vicarious Liability > Employers

### HN15 Vicarious Liability, Employers

The unique provisions of the New York City Human Rights Law provide for broad vicarious liability for employers but that liability does not extend to individual owners, officers, employees, or agents of a business entity.

Governments > Legislation > Interpretation

### HN16 Legislation, Interpretation

Any broad construction must be reasonable and grounded in the language of the local law.

## Headnotes/Summary

### Headnotes

**Civil Rights — New York City Human Rights Law — Discrimination in Employment — Vicarious Liability of Individual Owner or Officer of Corporate Employer**

In plaintiff employee's action alleging discrimination, sexual harassment, and sexual abuse by her supervisor, defendant owner and officer of the company was not an "employer" within the meaning of the New York City Human Rights Law (Administrative Code of City of NY, title 8 [City HRL]) and could not be held vicariously liable under Administrative Code of City of NY § 8-107 (13) (b) for the supervisor's offending conduct. Where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers within the meaning of the City HRL. The City HRL specifically imposes primary liability on employees and agents for some discriminatory acts but conspicuously does not impose vicarious liability on those individuals under section 8-107 (13) (b). Furthermore, the vicarious liability provision itself applies when "[t]he employee or agent exercised managerial or supervisory responsibility" (Administrative Code of City of NY § 8-107 [13] [b] [1]), differentiating between the liable party (employer) and the party committing the offending

36 N.Y.3d 450, *450; 167 N.E.3d 454, **454; 143 N.Y.S.3d 286, ***286; 2021 N.Y. LEXIS 50, ****50; 2021 NY Slip Op 00898, *****00898

conduct (employee or agent with managerial or supervisory responsibility). The difference demonstrates that employees, agents, and others with an ownership stake are not employers within the meaning of the City HRL. Moreover, at common law, shareholders are not subject to vicarious liability for the torts of a corporation's agents or employees, and the text of the City HRL demonstrates no intent to displace those settled principles. Plaintiff's allegations that defendant owner fostered a culture of discrimination and sexual harassment at the company, based primarily on news articles and reports of a deposition in an unrelated case, did not transform him into an employer for purposes of vicarious liability for the supervisor's discriminatory conduct.

**Counsel:**  **[****1]** *Law Office of Niall Macgiollabhuí*, New York City (*Niall Macgiollabhuí* of counsel), and *The Clancy Law Firm, P.C.*, New York City (*Donna H. Clancy* of counsel), for appellant. I. All provisions of the New York City Human Rights Law must be construed broadly in favor of discrimination plaintiffs, for the accomplishment of its uniquely broad and remedial purposes. (*Williams v New York City Hous. Auth., 61 AD3d 62*; *Albunio v City of New York, 16 NY3d 472*.) II. Section 8-107 (13) (b) of the New York City Human Rights Law (Administrative Code of City of NY) provides for strict liability of all employers for the discriminatory conduct of managers and supervisors. (*Zakrzew-ska v New School, 14 NY3d 469*; *Matter of Totem Taxi v New York State Human Rights Appeal Bd., 65 NY2d 300*; *Matter of Carr v New York State Bd. of Elections, 40 NY2d 556*.) III. Michael Bloomberg qualifies as an "employer" under the New York City Human Rights Law. (*Patrowich v Chemical Bank, 63 NY2d 541*; *Berkey v Third Ave. Ry. Co., 244 NY 84*; *Irizarry v Catsimatidis, 722 F3d 99*; *Makinen v City of New York, 167 F Supp 3d 472*.)

*Proskauer Rose LLP*, New York City (*Elise M. Bloom, Rachel S. Philion* and *Andrew A. Smith* of counsel), for respondent. I. The term "employer" in Administrative Code of the City of New York § 8-107 (13) does not include an owner or executive of a corporate employer who does not participate in or have a connection to the specific conduct giving rise to a plaintiff's claim. (*Albunio v City of New York, 16 NY3d 472*; *Makinen v City of New York, 30 NY3d 81*; *Chauca v Abraham, 30 NY3d 325*; *Rose v Mount Ebo Assoc., 170 AD2d 766*; *Hoffman v Parade Publs., 15 NY3d 285*; *Murphy v ERA United Realty, 251 AD2d 469*; *Malena v Victoria's Secret Direct, LLC, 886 F Supp 2d 349*; *Forrest v*

*Jewish Guild for the Blind, 3 NY3d 295*; *Thoreson v Penthouse Intl., 80 NY2d 490*; *Matter of Notre Dame Leasing v Rosario, 2 NY3d 459*.) II. Plaintiff failed to allege that Michael Bloomberg was her "employer" under any "reasonably possible" interpretation of the term. (*Barsella v City of New York, 82 AD2d 747*.)

*Ritz Clark & Ben-Asher LLP*, New York City (*Miriam F. Clark* of counsel), for National Employment Lawyers Association-New York, amicus curiae. I. The Court should remand with instructions that this matter be considered in light of section 8-107 (1) (a) and (6) of the Administrative Code of the City of New York. (*Kaplan v New York City Dept. of Health & Mental Hygiene, 142 AD3d 1050*.) II. In determining whether an individual is an employer under the city law, the court should not be guided by restrictive state law concepts derived from *Matter of Totem Taxi v New York State Human Rights Appeal Bd. (65 NY2d 300 [1985]*). (*Patrowich v Chemical Bank, 63 NY2d 541*; *Makinen v City of New York, 167 F Supp 3d 472*; *Boyce v Gumley-Haft, Inc., 82 AD3d 491*; *Marchuk v Faruqi & Faruqi, LLP, 100 F Supp 3d 302*; *McRedmond v Sutton Place Rest. & Bar, Inc., 95 AD3d 671*; *Faragher v Boca Raton, 524 US 775*; *Burlington Industries, Inc. v Ellerth, 524 US 742*; *Zakrzewska v New School, 14 NY3d 469*.)

*Debevoise & Plimpton LLP*, New York City (*Jyotin Hamid, Morgan A. Davis, Malini Malhorta* and *Jonathan B. Mangel* of counsel), for Partnership for New York City, amicus curiae. I. Plaintiff's interpretation would not meaningfully advance the New York City Human Rights Law's remedial aims. (*Albunio v City of New York, 16 NY3d 472*; *Williams v New York City Hous. Auth., 61 AD3d 62*; *Zakrzewska v New School, 14 NY3d 469*.) II. Plaintiff's interpretation would undermine foundational tenets of corporate law. (*Matter of Franklin St. Realty Corp. v NYC Envtl. Control Bd., 34 NY3d 600*; *Rapid Tr. Subway Constr. Co. v City of New York, 259 NY 472*; *Halsted v Globe Indem. Co., 258 NY 176*; *Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135*; *We're Assoc. Co. v Cohen, Stracher & Bloom, 65 NY2d 148*; *Matter of Seagroatt Floral Co. [Riccardi], 78 NY2d 439*; *Lloyd v Moore, 115 AD3d 1309*; *Bernstein v Starrett City, 303 AD2d 530*; *Joan Hansen & Co. v Everlast World's Boxing Headquarters Corp., 296 AD2d 103*; *Matter of Brookside Mills, Inc. [Raybrook Textile Corp.], 276 App Div 357*.) III. Plaintiff's interpretation would have far-reaching costs for New York City businesses.

36 N.Y.3d 450, *450; 167 N.E.3d 454, **454; 143 N.Y.S.3d 286, ***286; 2021 N.Y. LEXIS 50, ****1; 2021 NY Slip Op 00898, *****00898

**Judges:** Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein, Fahey, Wilson and Feinman concur. Judge Rivera dissents in an opinion.

**Opinion by:** GARCIA

# Opinion

 [\*\*\*288]  [\*\*456]  [\*453] Garcia, J.

Plaintiff, an employee of Bloomberg L.P. using the pseudonym "Margaret Doe," brought suit against defendants Bloomberg L.P., her supervisor Nicholas Ferris, and Michael Bloomberg, asserting several causes of action arising from alleged discrimination, sexual harassment, and sexual abuse. The question before us is whether Bloomberg, in addition to Bloomberg L.P., may be held vicariously liable as an employer under the New York City Human Rights Law (Administrative Code of City of NY, title 8 [City HRL]) based on his status as "owner" and officer of the company. We hold that Bloomberg is not an "employer" within the meaning of the City HRL and accordingly, we affirm the dismissal of plaintiff's claims that seek to hold Bloomberg vicariously liable for Ferris's offending conduct.

I.

Plaintiff's complaint asserted various causes of action, including sex discrimination and hostile work [\*\*\*\*2] environment claims under the City HRL.[1] Plaintiff alleged that Ferris, her direct supervisor at Bloomberg L.P., [2] engaged in a continuous pattern of sexual harassment, including rape. She alleged that Bloomberg, in addition to Bloomberg L.P., was her "employer" and as a result was subject to vicarious liability under the City HRL. Plaintiff asserted that "[a]t all relevant times" Bloomberg was the "Co-Founder, Chief Executive Officer and President of [Bloomberg L.P.]," and that he had fostered an environment that accepted and encouraged "sexist and sexually-charged behavior." She does not claim that Bloomberg had any "personal participation" in the specific offending conduct.

Bloomberg moved to dismiss the claims against him. Supreme Court, after first granting the motion to dismiss, granted [\*454] reargument and denied the motion (*2018 NY Slip Op 33961[U] [2018]*). The Appellate Division, with two Justices dissenting, reversed and dismissed the causes of action against Bloomberg (*178 AD3d 44, 109 NYS3d 254 [1st Dept 2019]*). Plaintiff appealed to this Court as of right pursuant to *CPLR 5601 (a)*.

II.

*HN1* "When reviewing a defendant's motion to dismiss a complaint for failure to state a cause of action, a court must give the complaint a liberal construction, accept the allegations as true and provide [\*\*\*\*3] plaintiffs with the benefit of every favorable inference" (*Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30, 38, 73 NYS3d 95, 96 NE3d 191 [2018]* [internal quotation marks omitted]). The ultimate question is whether, accepting the allegations and affording these inferences, "plaintiff can succeed upon any reasonable view of the facts stated" (*Aristy-Farer v State of New York, 29 NY3d 501, 509, 58 NYS3d 877, 81 NE3d 360 [2017]* [internal quotation marks omitted]). Applying this standard, we conclude that the claims against Bloomberg must be dismissed, but our reasoning differs from that of the courts below.

 [\*\*\*289]  [\*\*457] A.

*HN2* The City HRL makes it unlawful for "an employer or an employee or agent thereof" to discriminate on the basis of gender (Administrative Code of City of NY § 8-107 [1] [a]). The statute also prohibits "any person" from aiding and abetting discrimination (*id.* § 8-107 [6]) or from retaliating against another person for engaging in certain protected activities (*id.* § 8-107 [7]).

In addition, the City HRL imposes vicarious liability on employers in the following circumstances:

"An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision 1 or 2 of this section only where:

"(1) The employee or agent exercised managerial or supervisory responsibility; or

"(2) The employer knew of the employee's or agent's discriminatory conduct, and [\*\*\*\*4] acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed [\*455] to have knowledge of an employee's or agent's

---

[1] Plaintiff also sued Bloomberg for aiding and abetting sex discrimination and negligent infliction of emotional distress. Those claims, along with the remaining claims against Bloomberg L.P. and Ferris, are not at issue here.

36 N.Y.3d 450, *455; 167 N.E.3d 454, **457; 143 N.Y.S.3d 286, ***289; 2021 N.Y. LEXIS 50, ****4; 2021 NY Slip Op 00898, *****00898

discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

"(3) The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct" (Administrative Code of City of NY § 8-107 [13] [b]).

*HN3* The statute is clear as to when an employer is liable: for the employer's own offending conduct and vicariously for some actions of others. But the term "employer" is undefined, generating confusion as courts have endeavored to determine who is an employer in the context of the extensive—and at times strict—liability imposed.

B.

We do not find persuasive the analysis adopted by the Appellate Division majority. That Court held that *HN4* "some participation in the specific conduct committed against the plaintiff is required in order to hold an individual owner or officer of a corporate employer personally liable in his or her capacity as an employer" (*178 AD3d at 50*). Because plaintiff failed to allege that Bloomberg "encouraged, condoned or approved **[****5]** [of] the specific discriminatory conduct allegedly committed by Mr. Ferris," the Court dismissed the complaint against Bloomberg (*id. at 50, 52*).

The Appellate Division majority's test is derived from our case law interpreting the New York State Human Rights Law (*Executive Law art 15* [State HRL]). In *Matter of Totem Taxi v New York State Human Rights Appeal Bd.*, we held that a common carrier or place of public accommodation, like a typical private employer, could not be **[3]** held liable under the State HRL for an employee's discriminatory act "unless the employer became a party to it by encouraging, condoning, or approving it" (*65 NY2d 300, 305, 480 NE2d 1075, 491 NYS2d 293 [1985]*; *see also Matter of State Div. of Human Rights v St. Elizabeth's Hosp., 66 NY2d 684, 687, 487 NE2d 268, 496 NYS2d 411 [1985]*; *Hart v Sullivan, 84 AD2d 865, 866, 445 NYS2d 40 [3d Dept 1981]*, *affd 55 NY2d 1011, 434 NE2d 717, 449 NYS2d 481 [1982]*). In *Totem Taxi*, the Court was not considering who was an employer under the State HRL—it was the corporation that employed the driver who engaged in offensive conduct. Rather, the issue was whether, under that statute, the corporate employer

could be liable under a respondeat **[*456]** superior theory for the acts **[**458]** **[***290]** of an employee. Concluding that the State HRL did not impose vicarious liability on employers, the Court held that only an employer who "became a party to" the discriminatory act could be held liable (*Totem Taxi, 65 NY2d at 305* [statute did not provide "that a person who employs one who commits a discriminatory **[****6]** act is also guilty of a violation irrespective of fault"]). By contrast, this Court held in *Zakrzewska v New School* that City HRL § 8-107 (13) (b) (1), unlike any provision in the State HRL, is a vicarious liability provision which imposes strict liability on an employer—the employer need not have "participated" in the offending conduct (*14 NY3d 469, 480-481, 928 NE2d 1035, 902 NYS2d 838 [2010]*). *HN5* Accordingly, in *Zakrzewska*, we made clear that the State HRL's minimum culpability standard was irrelevant to assessing whether an employer is liable under this provision of the City HRL (*id. at 481* ["we may not apply cases under the State Human Rights Law imposing liability only where the employer encourages, condones or approves the unlawful discriminatory acts"]).

Nonetheless, some courts have applied the State HRL's culpability standard to determine whether individuals are employers under the City HRL because of their relationship to the business entity employing the perpetrator of the offending conduct (*see Boyce v Gumley-Haft, Inc., 82 AD3d 491, 492, 918 NYS2d 111 [1st Dept 2011]* [defendant who was the 50% owner of an LLC with the power to hire and fire employees, could be held liable as an employer under section 8-107 (13) (b) provided that "he encouraged, condoned or approved (the) alleged discriminatory conduct"]; *McRedmond v Sutton Place Rest. & Bar, Inc., 95 AD3d 671, 673, 945 NYS2d 35 [1st Dept 2012]* [the general manager of a restaurant "can be held **[****7]** liable (under the State HRL) as an employer if, as the record suggests, he had the authority to do more than carry out personnel decisions and he . . . participated in the conduct . . . (and) (f)or the same reasons, (he) may also be held liable under the City HRL"]). However, the *Totem Taxi* test for determining *whether* an employer is liable under the State HRL has no application in determining *who* is an employer for purposes of the City HRL.

The test proposed by the dissent below, purportedly drawn from our decision in *Patrowich v Chemical Bank (63 NY2d 541, 473 NE2d 11, 483 NYS2d 659 [1984])*, is even less suitable. According to the dissent an individual qualifies as an employer under the City HRL when shown to have either (1) an ownership interest in

36 N.Y.3d 450, *456; 167 N.E.3d 454, **458; 143 N.Y.S.3d 286, ***290; 2021 N.Y. LEXIS 50, ****7; 2021 NY Slip Op 00898, *****00898

the organization or (2) the power to do more than carry out personnel decisions [*457] made by others (*Doe, 178 AD3d at 53* [Manzanet-Daniels, J., dissenting]). This is a misreading of *Patrowich.*

In *Patrowich*, the Court considered whether a corporate officer or employee could be an "employer" subject to liability under the State HRL and Labor Law, as well as under two federal statutes:

> *HN6* "A corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect [****8] to discrimination based on age or sex under New York's Human Rights Law or its Labor Law or under the *Federal Age Discrimination in Employment Act* or *Equal Pay Act* if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others" (*63 NY2d at 542* [citations omitted]).

[***291] [**459] The dissent below, the dissent here, and a number of other courts misinterpret *Patrowich* as making the "ownership/personnel decisions" test relevant to defining "employer" in each of the state and federal statutes at issue, including the State HRL (*see e.g. Matter of New York State Div. of Human Rights v ABS Elecs., Inc., 102 AD3d 967, 969, 958 NYS2d 502 [2d Dept 2013]; Barbato v Bowden, 63 AD3d 1580, 1581, 880 NYS2d 817 [4th Dept 2009]; Pepler v Coyne, 33 AD3d 434, 435, 822 NYS2d 516 [1st Dept 2006]; Strauss v New York State Dept. of Educ., 26 AD3d 67, 72, 805 NYS2d 704 [3d Dept 2005]; Hafez v Avis Rent A Car Sys., Inc., 242 F3d 365 [2d Cir 2000]* [table; text at *2000 U.S. App. LEXIS 31032, 2000 WL 1775508 (2000)*]).

*Patrowich*, however, applied two different standards, one to the state laws and one to the federal statutes at issue: "A corporate employee, though [the employee] has a title as an officer and is the manager or supervisor of a corporate division, [1] is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law or its Labor Law" and "[2] is not individually subject to suit with respect to discrimination based on age or sex . . . under the Federal Age Discrimination in Employment Act or *Equal Pay Act* if [the employee] is not shown to have any ownership interest [****9] or any power to do more than carry out personnel decisions made by [4] others" (*63 NY2d at 542* [citations omitted]). The analysis that follows makes this distinction clear. In discussing the

State HRL, the Court remarked that the definition [*458] for "employer" provided in the State HRL "relates only to the number of persons employed and provides no clue to whether individual employees of a corporate employer may be sued under its provisions" (*id. at 543*). The Court noted, however, that other parts of the law specifically impose liability on "employee[s]" and "agent[s]," demonstrating that "the Legislature differentiated that provision from the general definition of 'employer' "; in other words, the statutory language recognized a difference between an "employer" and other "employees" and "agents" of that employer (*id.*). *HN7* Accordingly, we held in *Patrowich* that the State HRL does not render employees liable as individual employers.

We contrasted this narrow meaning of "employer" under the State HRL with the definitions of that same term found in the two federal statutes at issue, under which, according to the Court, "[t]he question [was] a closer one" (*id.*). Those statutes broadly defined an employer as "any person acting [****10] directly or indirectly in the interest of an employer in relation to an employee" and as "a person engaged in an industry affecting commerce . . . [and] any agent of such person" (*id.*). Nevertheless, this expansive language required some limitation, and the Court concluded that

> "the weight of Federal authority is that 'economic reality' governs who may be sued under both [federal] statutes and that a corporate employee . . . who . . . has not been shown to have any ownership interest or power to do more than [*459] carry out personnel decisions made by others is not individually subject to suit under either statute" (*id. at 543-544* [citing federal cases]).

The "ownership" language was a way to limit which employees could qualify as employers under the expansive definitions in the federal statutes.

In *Patrowich*, it is clear that this Court distinguished between (1) the state statutes, under which a corporate employee simply does not qualify as an "employer," regardless of the employee's position or relationship to the employer, and (2) the [**460] [***292] federal statutes, under which, according to "Federal authority," individual employees may be subject to suit as "employers" if shown to have an ownership interest or power [****11] to do more than carry out personnel

36 N.Y.3d 450, *459; 167 N.E.3d 454, **460; 143 N.Y.S.3d 286, ***292; 2021 N.Y. LEXIS 50, ****11; 2021 NY Slip Op 00898, *****00898

decisions made by others.[2] Of course, *Patrowich* did not examine the meaning of "employers" pursuant to the City HRL, and we address it here only in light of the City Council's directive that *HN8* "similarly worded provisions of federal and state civil rights laws [should be viewed] as a floor below which the City's Human Rights law cannot fall" (Local Law No. 85 [2005] of City of NY § 1).

III.

The language in the City HRL, like that found in the State HRL, is itself circumscribed and requires no external limiting principle exempting employees from individual suit as employers. *HN9* Instead, where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers within the meaning of the City HRL. Rather, those individuals may incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct (Administrative Code of City of NY § 8-107 [1], [6], [7]). This rule aligns with the structure of the City HRL and comports with the Court's interpretation of similar language in *Patrowich*. It is also consistent with the principles of vicarious and limited **[****12]** liability governing certain business structures (*see e.g. Partnership Law §§ 26, 121-303; Limited Liability Company Law § 609; Business Corporation Law § 719*).

*HN10* The City HRL specifically imposes primary liability on employees and agents for some discriminatory acts (*see e.g.* Administrative Code of City of NY § 8-107 [1] [a] [making it unlawful for "an employer or an employee

or agent thereof" to discriminate based on gender]) but conspicuously does not **[*460]** impose vicarious liability on these individuals under section 8-107 (13) (b) (*see Patrowich, 63 NY2d at 543* [use of "employee" and "agent" elsewhere in State HRL indicated that those **[5]** individuals were not included in the term "employer"]). Furthermore, the vicarious liability provision itself applies when "[t]he employee or agent exercised managerial or supervisory responsibility" (Administrative Code of City of NY § 8-107 [13] [b] [1]), differentiating between the liable party (employer) and the party committing the offending conduct (employee or agent with managerial or supervisory responsibility). Similarly, the legislature chose to make an "owner, . . . manager, . . . agent or employee" of a place of public accommodation (*see id.* § 8-107 [4] [a]) and the "owner . . . of a housing accommodation" (*id.* § 8-107 [5] [a]) directly liable for discrimination, **[**461] [***293]** but again did not make those categories of individuals subject to vicarious liability as employers under section 8-107 (13) (b). These differences in the statutory provisions **[****13]** demonstrate that employees, agents, and others with an ownership stake are not employers within the meaning of the City HRL (*see Matter of Tonis v Board of Regents of Univ. of State of N.Y., 295 NY 286, 293, 67 NE2d 245 [1946])*.

*HN11* Indeed, employees and agents of a company are not ordinarily understood to be "employers," and are not normally subject to vicarious liability for the wrongs of corporate employees. Rather, an employee is "[s]omeone who works in the service of another person (the employer)" (Black's Law Dictionary [11th ed 2019], employee). "The principle that respondeat superior is a form of secondary liability that cannot be imposed upon the fellow employee of a wrongdoer is certainly well-defined and explicit in New York" (*Hardy v Walsh Manning Sec., L.L.C., 341 F3d 126, 130 [2d Cir 2003])*. Similarly, although possessing more power to act on the corporation's behalf, an agent is "[s]omeone who is authorized to act for or in place of another" (Black's Law Dictionary [11th ed 2019], agent) and a "corporate agent" is an agent "authorized to act on behalf of a corporation; broadly, all employees and officers who have the power to bind the corporation" (Black's Law Dictionary [11th ed 2019], corporate agent). Though the common law imposes vicarious liability on the corporation for torts of its employees and agents committed within the scope **[*****14]** of their job duties (*see Riviello v Waldron, 47 NY2d 297, 302, 391 NE2d 1278, 418 NYS2d 300 [1979])*, "directors or officers are not subject to personal liability for the torts of corporation employees simply because the directors or

---

[2] The "economic reality" test advanced by plaintiff, used to determine individual employer liability under the *Fair Labor Standards Act (FLSA)*, has no application here (*see Irizarry v Catsimatidis, 722 F3d 99, 109 [2d Cir 2013])*. In the FLSA, like the federal statutes at issue in *Patrowich*, Congress broadly defined "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" (*id. at 103*). The City Council did not include such expansive language in the City HRL definition of employer and, as discussed below, chose to differentiate between the liability of employers and those acting on an employer's behalf. Likewise, the "control test" articulated in *Griffin v Sirva, Inc. (29 NY3d 174, 54 NYS3d 36, 76 NE3d 1063 [2017])*—discussed at oral argument but not raised in either party's submissions—is inapplicable. In *Griffin*, the Court, responding to a certified question from the Second Circuit, provided guidance for determining whether a second corporation could be held liable as an employer under a provision of the State HRL addressing employment discrimination based on criminal history.

36 N.Y.3d 450, *460; 167 N.E.3d 454, **461; 143 N.Y.S.3d 286, ***293; 2021 N.Y. LEXIS 50, ****14; 2021 NY Slip Op 00898, *****00898

officers hold corporate [*461] office" (19 CJS, Corporations § 635; see *Connell v Hayden, 83 AD2d 30, 58, 443 NYS2d 383 [2d Dept 1981]).*

Shareholders are also not commonly understood to be employers, and to designate them as such for the purpose of imposing vicarious liability would go against the principles underlying the legal distinction. **HN12** "The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability" (*Walkovszky v Carlton, 18 NY2d 414, 417, 223 NE2d 6, 276 NYS2d 585 [1966]).*

**HN13** "As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and, consequently, will not impose liability upon shareholders for the acts of the corporation. Indeed, the avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in the corporate form" (*Billy v Consolidated Mach. Tool Corp., 51 NY2d 152, 163, 412 NE2d 934, 432 NYS2d 879 [1980]* [citation omitted]).

**HN14** Accordingly, at common law, shareholders are not subject to vicarious liability for the torts of a corporation's agents or employees (*Connell, 83 AD2d at 58*). The text of the City HRL demonstrates no intent to displace these settled legal principles.[3] Nor is there merit to [****15] the dissent's suggestion that the structure of [**462] [***294] the employer business at issue here, a limited partnership, serves somehow to create "employer liability" for the partners (dissenting op at 472, 480). Whatever liability individual partners may have for unsatisfied judgments against the partnership, and the effect of the partnership structure on that liability, has no bearing on whether the partner has individual "employer liability" under the City HRL. Furthermore, given the amorphous nature of its "interpretive approach" (dissenting op at 476 n 10), it is unclear what import a "limited" rather than a "limited liability" label on the entity would have on the dissent's assessment of an individual's liability.

_____

[3] The dissent argues that the City HRL's use of the term "employer" "is not subordinate to principles of corporate or agency law" (dissenting op at 471), but given our holding we need not address any potential conflict between the state statutes delineating corporate or agency liability and employer liability imposed by the City HRL (see *Zakrzewska v New School, 14 NY3d 469, 480-481, 928 NE2d 1035, 902 NYS2d 838 [2010]).*

Our conclusion does not run afoul of the City Council's instruction that "similarly worded provisions of federal and [*462] state civil rights laws [are] a floor below which the City's Human Rights law cannot fall, rather than a [6] ceiling above which the local law cannot rise" (Local Law No. 85 [2005] of City of NY § 1). The liability imposed on employers by the City HRL is substantially broader than that provided by its state counterpart, and as a result it is not necessary to distort the [****16] ordinary meaning of the term "employer" to accomplish the goal of the City Council's interpretive guidance. Moreover, the federal statutes plaintiff cites as supporting a broader definition are not "similarly worded" (see *Patrowich, 63 NY2d at 543* [describing broader language of Equal Pay Act and Age Discrimination in Employment Act]; n 3, *supra* [discussing broad language of FLSA]). **HN15** The unique provisions of the City HRL provide for broad vicarious liability for employers but that liability does not extend to individual owners, officers, employees, or agents of a business entity.

The dissent advocates for a contrary result based solely on *Albunio v City of New York's (16 NY3d 472, 477-478, 947 NE2d 135, 922 NYS2d 244 [2011])* rule of construction that the City HRL be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (dissenting op at 463, 468, 475-476, 484). **HN16** But any such broad construction must be *reasonable* and grounded in the language of the local law (see e.g. *Chauca v Abraham, 30 NY3d 325, 332, 67 NYS3d 85, 89 NE3d 475 [2017]).* Indeed, the dissent does not propose a workable rule— or indeed any rule—for reaching a contrary result in this case. Although the dissent cites the opinion of the dissenting Justices (dissenting op at 470), it conspicuously fails to adopt the rule the dissent below applied. And [****17] while the dissent here speaks of "owners" (dissenting op at 483-484), it does not address whether its suggested approach turns on ownership, or principles of control, or corporate titles, or some other formulation. Indeed, the dissent points to Bloomberg's role as a "co-founder, chief operating officer, president, and majority owner of the business" and of his "commanding role in the company" (dissenting op at 464, 472), but does not identify which of these roles render him an employer. The litany of titles may well, in the dissent's view, make Bloomberg a "captain[ ] of industry" (dissenting op at 464), but provides no guidance for imposing individual liability. Similarly, the dissent speaks favorably of *Griffin's* application of New York common law to clarify the meaning of "employer" (dissenting op at 474-475), and agrees that case is "not

36 N.Y.3d 450, *462; 167 N.E.3d 454, **462; 143 N.Y.S.3d 286, ***294; 2021 N.Y. LEXIS 50, ****17; 2021 NY Slip Op 00898, *****00898

directly on point" (dissenting op at 474-475), **[\*\*463]** **[\*\*\*295]** yet fails to identify what **[\*463]** common law would supply a rule here. Criticism alone, however forceful, provides no reasonable alternative.

<u>IV.</u>

Applying our rule to the present case, plaintiff has failed to allege that Bloomberg is her employer for purposes of liability under the City HRL. Her allegations concerning his **[\*\*\*\*18]** position at the company demonstrate only that he is an owner or officer of Bloomberg L.P. Additionally, plaintiff's allegations that Bloomberg fostered a culture of discrimination and sexual harassment at Bloomberg L.P., based primarily on news articles and reports of a deposition in an unrelated case, do not transform him into an employer for purposes of vicarious liability for Ferris's discriminatory conduct. Any claims that Bloomberg engaged in offending conduct against plaintiff by discriminating, aiding and abetting discrimination, or retaliating are not advanced in this appeal.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

**Dissent by:** RIVERA

# Dissent

Rivera, J. (dissenting). The New York City Human Rights Law (NYCHRL) is "the most progressive in the nation, and reaffirms New York's traditional leadership in civil rights" (Rep of Governmental Affairs Div, Comm on Gen Welfare at 2, Aug. 17, 2005, Local Law Bill Jacket, Local Law No. 85 [2005] of City of NY, quoting Mayor David Dinkins, available at http://www.antibiaslaw.com/sites/default/files/all/Commit teeReport081705.pdf [last accessed Jan. 25, 2021]). To cement its status as a powerful deterrent to discrimination, the NYCHRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes **[\*\*\*\*19]** thereof" and its text interpreted independently of other similarly worded federal and state legislation (*Administrative Code of City of NY § 8-130 [a]*). The New York City Council could not be clearer in this directive that our Court is prohibited from ascribing a narrow intention or construction to the purpose and statutory text of the NYCHRL. Accordingly, "we must construe . . . the City's Human Rights Law . . . broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio*

*v City of New York, 16 NY3d 472, 477-478, 947 NE2d 135, 922 NYS2d 244 [2011]*).

That rule of construction is dispositive in this appeal, in which we consider whether defendant Michael Bloomberg is an **[\*464]** employer of those who work for Bloomberg L.P., the company that he built and that bears his name. The NYCHRL does not expressly limit "employer" to a business entity or exclude business owners from employer status. To the contrary, the statutory text and remedial scheme suggest the legislature's intent for a broad and flexible definition of "employer," in line with the public policy undergirding the NYCHRL. In that vein, the NYCHRL applies generally to businesses with as few as four employees and subjects employers to liability for their own discriminatory conduct and that of their supervisors **[\*\*\*\*20]** (*see Administrative Code §§ 8-102*, 8-107 [1]). Maximizing the accountability of those at the top encourages preemptive action by captains of industry with the means to effectuate broad workplace change.

The question, then, is whether, affording the statute its broadest possible reading, as we must, this defendant is an "employer" based on his relationship to the business. Viewed in this light, plaintiff adequately alleges that defendant is an employer for purposes of the NYCHRL because he is co-founder, chief operating **[\*\*464]** **[\*\*\*296]** officer, president, and majority owner of the business.

The majority repeats the errors of the past, retreats from our mandate, and narrowly construes the NYCHRL to adopt a per se rule that favors corporate defendants. Applying its new rule, the majority concludes that this defendant is not an employer, notwithstanding his commanding role in the company. This interpretation of the statute is untenable, and so I dissent.

<u>I.</u>

The New York City Human Rights Law was born of the City Council's recognition that "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because **[\*\*\*\*21]** of their actual or perceived differences" (*Administrative Code § 8-101*). The law, therefore, strikes directly at "prejudice, intolerance, bigotry, and discrimination, bias-related violence or harassment and disorder occasioned thereby," which "threaten the rights and proper privileges of [New York City's] inhabitants and menace the institutions and

36 N.Y.3d 450, *464; 167 N.E.3d 454, **464; 143 N.Y.S.3d 286, ***296; 2021 N.Y. LEXIS 50, ****21; 2021 NY Slip Op 00898, *****00898

foundation of a free democratic state" (id.).

 **[*465]** In furtherance of this public policy, the NYCHRL has been amended on several occasions to expand its coverage.[4] These amendments were intended to address retrenchment in federal civil rights law and our state courts' overly narrow interpretation of the NYCHRL (Rep of Governmental Affairs Div, Comm on Gen Welfare at 2, Aug. 17, 2005 [quoting Mayor Dinkins, who explained that amendments to the NYCHRL were necessary because "there is no time in the modern civil rights era when vigorous local enforcement of anti-discrimination laws has been more important. Since 1980, the federal government has been steadily marching backward on civil rights issues"]; Rep of Governmental Affairs Div, Comm on Civ **[7]** Rights at 8, Mar. 8, 2016, Local Law Bill Jacket, Local Law No. 35 [2016] of City of NY ["Over at least the last 25 years, the Council has sought to protect the HRL from being narrowly construed by courts . . . . Some courts **[****22]** have recognized and followed this vision, but others have not"]). As a committee of the City Council concluded, the amendments were in service of "a very specific vision: a Human Rights Law designed as a law enforcement tool with *no tolerance for discrimination in public life*" (Rep of Governmental Affairs Div, Comm on Civ Rights at 8, Mar. 8, 2016 [emphasis added]).

In the past, our Court has, as it does today, parsimoniously interpreted state and city anti-discrimination laws. And, on several occasions, the City Council has repudiated such interpretations by adopting broader protections against unlawful discrimination. For instance, in *Matter of Totem Taxi v New York State Human Rights Appeal Bd. (65 NY2d 300, 480 NE2d 1075, 491 NYS2d 293 [1985])*, the Court considered a case brought under the New York State Human Rights

Law **[**465]** **[***297]** (NYSHRL), in which a taxi driver hurled a racial slur at four Black women and threatened them with violence. The women filed complaints with the New York State Division of Human Rights against the taxi company. **[*466]** The charges against the company were sustained. The company appealed, arguing that it could not be held liable for the acts of its employees under a theory of respondeat superior.[5] This Court determined that liability ran only to the individual. **[****23]** Thus, the discriminatory conduct—which the Court described as "not only embarrassing and demeaning to [the women subjected to it] but to all civilized persons who hear of it," and "the kind of conduct which the Human Rights Law condemns and seeks to eliminate"—nonetheless did not give rise to vicarious liability on the part of the company (*65 NY2d at 305-306*).

This approach drew the ire of the New York City Council and high-ranking city officials. In explaining the 1991 amendments to the NYCHRL, then-Mayor David Dinkins specifically mentioned the Court's holding in *Totem Taxi* as a motivation for expanding the anti-discrimination protections available under the City's law:

> "Even on the state level, narrow interpretations of civil rights laws have retarded progress. For example, the State Court of Appeals has made it virtually impossible to hold taxi companies responsible for the discriminatory acts committed by their drivers. There is, therefore, no incentive for these companies to curb bias on the part of their drivers, and persons of color still routinely face difficulty in getting a cab to take us where we want to go" (Mayor David N. Dinkins, *Remarks by Mayor David N. Dinkins at Public Hearing on Local **[****24]** Laws*, June 18, 1991 at 1-2, available at http://www.antibiaslaw.com/sites/default/files/all/LL39LegHist-Mayor.pdf [last accessed Jan. 15, 2021]).[6]

---

[4] As I discuss, *infra*, in 1991, the New York City Council enacted comprehensive reforms to the NYCHRL in response to a perceived civil rights counterrevolution, which saw state and federal courts across the country adopt restrictive interpretations of anti-discrimination law (*see* Administrative Code tit 8 [1991]). Then in 2005, the Council passed the Local Civil Rights Restoration Act in response to decisions of this Court declining to afford the NYCHRL a broader interpretation than its state counterpart (*see* Local Law No. 85 [2005] of City of NY). And again in 2016, the Council sought to clarify its intent that the NYCHRL be construed liberally in favor of discrimination plaintiffs by identifying certain New York State court decisions that accurately reflected the properly broad construction of the statute (*see* Local Law No. 35 [2016] of City of NY).

---

[5] "Under the doctrine of *respondeat superior*, an employer will be liable for the negligence of an employee committed while the employee is acting in the scope of [the employee's] employment" (*Lundberg v State of New York, 25 NY2d 467, 470, 255 NE2d 177, 306 NYS2d 947 [1969]*).

[6] *See also e.g.* William Neuman, *New York Office to Address Discrimination by Taxis and For-Hire Vehicles*, NY Times, July 31, 2018, available at https://www.nytimes.com/2018/07/31/nyregion/uber-taxis-minorities-bias-refusal-nyc.html (last accessed Jan. 25, 2021);

36 N.Y.3d 450, *466; 167 N.E.3d 454, **465; 143 N.Y.S.3d 286, ***297; 2021 N.Y. LEXIS 50, ****24; 2021 NY Slip Op 00898, *****00898

Despite the intent of the City Council, this Court continued to ignore textual and historical support for independent [*467] consideration of the NYCHRL and applied "rote parallelism" which merely tracked contemporary analysis under the NYSHRL and title VII of the Civil Rights Act of 1964, the federal employment anti-discrimination analog. Frustrated with this interpretive approach, the City Council enacted the Local Civil Rights Restoration Act (LCRRA) in 2005. The LCRRA was intended "to clarify the scope" of the NYCHRL because

> "[i]t is the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal [**466] [***298] statutes" ( [****25] Local Law No. 85 [2005] at City of NY § 1).

Critically, the Council explained that

> "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws *as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise*" (*id.* [emphasis added]).

To further emphasize the Council's intent that courts employ an independent and robust analysis of the NYCHRL, the LCRRA amended the section titled "Construction" to declare that "[t]he provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have so been construed" (*Administrative Code § 8-130 [a]*).[7]

When the law was amended in 2005, this Court was again singled out for its failure to give the NYCHRL the liberal, far-reaching application intended by the Council. The Committee [*468] on General Welfare's report on the proposed legislation, for example, specifically [****26] cited *McGrath v Toys "R" Us, Inc. (3 NY3d 421, 821 NE2d 519, 788 NYS2d 281 [2004])* as one of several "recent judicial decisions [which] underscore the need to clarify the breadth of protections afforded by New York City's human rights law" (Rep of Governmental Affairs Div, Comm on Gen Welfare at 4, Aug. 17, 2005, Local Law Bill Jacket, Local Law No. 85 [2005] of City of NY, available at http://www.antibiaslaw.com/sites/default/files/all/CommitteeReport081705.pdf [last accessed Jan. 25, 2021]).

In *McGrath*, the Court determined that broad statements regarding the intended liberal construction of the NYCHRL were insufficient to justify interpreting the law more broadly than its state counterpart—a holding the City Council explicitly rejected in enacting the 2005 amendments (*see* Statement of Council Member Annabel Palma, Hearing Tr of Stated Council Meeting at 41-42, Sept. 15, 2005 ["Insisting that our local law be interpreted broadly and independently will safeguard New Yorkers at a time when . . . state civil rights protections are in jeopardy. There are many illustrations of cases, like . . . *McGrath* and *Forrest (v Jewish Guild for the Blind, 3 NY3d 295, 819 NE2d 998, 786 NYS2d 382 [2004])* that have either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore the text of specific provisions of the law, or both"]).[8]

Following the 2005 amendments, it appeared that the Court understood this clear expression of legislative [****27] intent. In *Albunio*, the Court unanimously declared [**467] [***299] that, in

---

the accomplishment of the purposes thereof."

---

[8] In *Forrest*, the plaintiff alleged that her supervisor had discriminated against her on account of race and that she was subjected to a hostile work environment. Our Court asserted that the NYCHRL's provisions "mirror" the NYSHRL's and should be "analyzed according to the same standards" (*3 NY3d at 305 n 3*). Additionally, the Court held that, even if the quantum of alleged harassment the plaintiff experienced were sufficient to be actionable, the defendant employer would still not be liable for its supervisor's harassment under either the NYSHRL or the NYCHRL because an "employer cannot be held liable [under state law] for an employee's discriminatory act unless the employer became a party to it" (*id. at 311* [internal quotation marks omitted]).

---

Gabrielle Gurley, *Racism Merges into New York's Ride-Hailing Debate*, Am Prospect, Aug. 7, 2018, available at https://prospect.org/civil-rights/racism-merges-new-york-s-ride-hailing-debate/ (last accessed Jan. 25, 2021).

[7] Prior to the 2005 amendments, *section 8-130* provided that "[t]he provisions of this chapter shall be construed liberally for

36 N.Y.3d 450, *468; 167 N.E.3d 454, **467; 143 N.Y.S.3d 286, ***299; 2021 N.Y. LEXIS 50, ****27; 2021 NY Slip
Op 00898, *****00898

accordance with the LCRRA, we "must construe . . . the City's Human Rights Law . . . broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio, 16 NY3d at 477-478*; *see also Williams v New York City Hous. Auth., 61 AD3d 62, 68-69, 872 NYS2d 27 [1st Dept 2009]* ["(T)he text and legislative history represent a desire that the City HRL meld the broadest vision of social justice with the strongest **[*469]** law enforcement deterrent" (internal quotation marks omitted)]). Finally, and in no uncertain terms, the Court recognized that the legislative intent of the NYCHRL obligates the judiciary to interpret the law in favor of plaintiffs in discrimination suits, to the furthest extent reasonably possible. With this background in mind, I now turn to the interpretive issue presented on this appeal.


II.

Plaintiff, under the pseudonym Margaret Doe,[9] filed the underlying complaint alleging violations of the NYCHRL for gender discrimination at her workplace, Bloomberg L.P., a limited partnership. She averred that she was 22 and had just graduated college when she commenced her first professional job at Bloomberg L.P. Shortly after starting and continuing for the next three years she worked **[****28]** in a hostile work environment where her supervisor, Nicholas Ferris, relentlessly sexually harassed her and on two occasions raped her. She further averred that, due to the toxic work environment and the harm she suffered as an employee, she was forced to take indefinite medical leave.

Plaintiff named as defendants Bloomberg L.P., Ferris, and Michael Bloomberg, the majority owner[10] of Bloomberg L.P. As alleged in the complaint, Bloomberg

_____

[9] Plaintiff filed her action pseudonymously, explaining the need for anonymity given the severe nature of her injuries, the emotional distress she suffered, her current fragile emotional and physical state, her ongoing need for psychotherapy and other medical treatment, and the risk of retaliatory physical or mental harm.

[10] Defendant, at various points in his briefing, concedes ownership in Bloomberg L.P., and does not controvert the Appellate Division's assumption that he holds an ownership interest in the company. Nor does he deny plaintiff's assertion in opposition to his motion to dismiss that he is a majority owner. Therefore, given the pre-answer posture of this appeal, and the parties' representations throughout this litigation, I assume as fact for purposes of this appeal that defendant is the majority owner of Bloomberg L.P.

was at all relevant times the co-founder, chief executive officer, and president of Bloomberg L.P. He served as CEO until his election as Mayor of New York City and resumed that position after his term as Mayor ended and while plaintiff was employed with the company. Plaintiff alleges that, while Mayor, Bloomberg maintained communication with those who had replaced him as CEO, including on matters related to Bloomberg L.P.'s **[*470]** handling of sexual harassment and discrimination claims by employees, of which there were many.

Plaintiff further alleges that the corporate culture at Bloomberg L.P. was deeply misogynist, and female employees were regularly sexually objectified and subjected to comments regarding their physical appearance. Plaintiff maintains that **[****29]** this sexist and sexually charged behavior was known and encouraged by Bloomberg himself, and that he was a defendant in another lawsuit charging him and several managers with sexist behavior. She alleges that Bloomberg L.P.'s human resources department was notoriously indifferent towards the sexual harassment complaints of lower-level female employees and lax in its **[**468]** **[***300]** enforcement of policies meant to prevent sex discrimination and harassment. Plaintiff further maintains this was indicative of a "top-down culture that is blatantly hostile towards women" and that, following Bloomberg's lead, sexual harassment is rampant, leaving female employees vulnerable to abuse.

Bloomberg moved to dismiss the complaint against him in its entirety for failure to state a cause of action, arguing that he was not an "employer" within the meaning of the NYCHRL. Upon reargument the court held that plaintiff sufficiently stated claims against Bloomberg as an employer (*2018 NY Slip Op 33961[U] [2018]*).

On appeal, a divided Appellate Division reversed, holding that plaintiff had failed to allege that Bloomberg qualified as her employer under the NYCHRL because she failed to allege that he encouraged, condoned, or approved the specific conduct **[****30]** which gave rise to the claim (*Doe v Bloomberg L.P., 178 AD3d 44, 50-51, 109 NYS3d 254 [1st Dept 2019]*). The majority explained that the NYCHRL could not be read to impose strict liability on any individual holding an ownership stake or leadership position in a company, because doing so would increase the number of individuals who could be held strictly liable and would hold vicariously liable any individual owner or high-ranking executive of

36 N.Y.3d 450, *470; 167 N.E.3d 454, **468; 143 N.Y.S.3d 286, ***300; 2021 N.Y. LEXIS 50, ****30; 2021 NY Slip Op 00898, *****00898

any corporation in New York City, in contravention of the principles underlying New York corporate law. The dissenting Justices argued that the majority disregarded the plain wording of the NYCHRL detailing when an employer is strictly liable for the discriminatory conduct of its employees and agents and the general judicial principle that anti-discrimination laws should be liberally construed.

[*471]  III.

On a motion to dismiss pursuant to *CPLR 3211 (a) (7)*, the Court must "accept the facts as alleged in the complaint as true, accord plaintiff[ ] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez, 84 NY2d 83, 87-88, 638 NE2d 511, 614 NYS2d 972 [1994]*). "Accepting the allegations as true, [the Court's] sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations [****31] are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (*Polonetsky v Better Homes Depot, 97 NY2d 46, 54, 760 NE2d 1274, 735 NYS2d 479 [2001]* [internal quotation marks and citation omitted]).

Assuming the facts alleged about Bloomberg's role vis-à-vis Bloomberg L.P., the next step is to consider whether he is an "employer" for purposes of the NYCHRL. I agree with the majority that the Appellate Division's reasoning is erroneous. Indeed, as one of the principal drafters of the amendments to the NYCHRL has explained, "[s]ection 8-107(13)(b)(1) imposes no requirement that the employer encourage, condone, or acquiesce in the conduct," because the Council sought to impose strict liability on employers (Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, *33 Fordham Urb LJ 255, 270-271 and n 66* [2006]). Rather, whether a party is an "employer" for purposes of the NYCHRL turns on their relationship to the plaintiff and the workplace. In other words, the starting point is not whether a party will be strictly liable for the actions of another; the measure of liability is the end point, to be considered after the party is established to be an employer. That is where our agreement ends because the majority essentially [****32] replicates this flaw in its analysis and adopts [**469] [***301] an overly narrow rule that undermines the purpose of the NYCHRL. The majority concludes that because plaintiff worked for a business entity, vicarious liability can only be imposed

on Bloomberg L.P., not Bloomberg the individual. But the NYCHRL does not limit "employer" to any single party, and the NYCHRL's use of that term is not subordinate to principles of corporate or agency law. The purpose, public policy, and text of the NYCHRL do not tolerate the majority's interpretation of "employer," which allows owners to avoid vicarious liability, not by compliance with the NYCHRL but by adoption of a business model intended for a different purpose—to maximize profit and limit investor debt liability.

[*472]  The majority incorrectly assumes that principles of *corporate* liability resolve the questions presented on this appeal. The business here, however, is a limited partnership, which, under New York law, passes some personal risks onto the business's partners, and defendant allegedly occupies a commanding role in the company (*see e.g. Ederer v Gursky, 9 NY3d 514, 522, 881 NE2d 204, 851 NYS2d 108 [2007]* ["Just as a principal is liable for the acts of its agents, each partner is personally responsible for the acts [****33] of other partners in the ordinary course of the partnership's business"]). The majority insists that the difference between a corporation and a limited partnership is irrelevant and that, in any event, partners in limited partnerships would not face liability on the facts presented on this appeal. This is incorrect; even limited partners will become liable as general partners when they "take[ ] part in the control of the business" (*Partnership Law § 96*). In contrast, shareholders' liability does not increase as they accumulate more shares in the corporation.[11]

_____

[11] While the majority asserts that the structure of the business entity has no bearing on its liability here (majority op at 461), that contention has no basis in the laws of this state. For instance, even a brief review of *Partnership Law § 26* demonstrates the overbreadth of the majority's rule. *Section 26 (c) (i)* provides that "each partner, employee or agent of" a limited liability partnership (LLP) "shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by . . . any person under [their] direct supervision and control while rendering professional services on behalf of" the LLP (*see also Partnership Law § 26 [c] [ii]* [extending the same liability to "each shareholder, director, officer, member, manager, partner, employee and agent of" a business entity that is a partner in a LLP]). In other words, the Partnership Law affirmatively contemplates vicarious liability for partners of LLPs (and, in the case of corporate partners of LLPs, for their officers and shareholders) for the wrongful acts of supervisees under their control. (The majority mischaracterizes this liability as applying only to "unsatisfied judgments" [majority op at 461].) This statutorily authorized

36 N.Y.3d 450, *472; 167 N.E.3d 454, **469; 143 N.Y.S.3d 286, ***301; 2021 N.Y. LEXIS 50, ****33; 2021 NY Slip Op 00898, *****00898

The parties dispute the definition of "employer" as it relates to section 8-107 (13) (b), which outlines when an employer may be held liable for the unlawful discriminatory act of an employee or agent. The provision states,

"An employer shall be liable for an unlawful **[*473]** discriminatory practice based **[**470] [***302]** upon the conduct of an employee or agent . . . only where:

"(1) The employee or agent exercised managerial or supervisory responsibility; or

"(2) The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's **[****34]** or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

"(3) The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct" (Administrative Code § 8-107 [13] [b]).

Both parties agree that section 8-107 (13) (b), while indicating *when* an employer is liable for the unlawful discriminatory acts of an employee or agent, does not, on its own, define *who* is an employer in the first instance.[12]

_____

vicarious liability is markedly different from the liability faced by a corporation's shareholders and officers and, therefore, demonstrates the inaccuracy of the majority's claim that, irrespective of the "the structure of the employer business at issue," the same principles of liability apply (*id.*). Second, this statutory liability undermines the majority's contention that extending "broad vicarious liability for employers [under the NYCHRL] . . . to individual owners, officers, employees, or agents of a business entity" (*id.* at 462) would mark a radical departure from "settled legal principles" of the liability of business entities (*id.* at 461).

[12] Section 8-107 (13) (d) allows an employer to present mitigation evidence when facing liability based on the conduct of its employees, agents, or independent contractors. The employer may show, for example, that it established policies and procedures for preventing and detecting unlawful discrimination, such as robust reporting processes and mechanisms for dealing with employees found to have

Section 8-102, titled "Definitions," states that

"the term 'employer' does not include any employer that has fewer than four persons in the employ of such employer at all times during the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice, provided however, that in an action for unlawful discriminatory practice based on a claim of gender-based harassment pursuant to subdivision one of section 8-107, the term 'employer' shall include any employer, including those with fewer than four persons in their employ. For purposes of this definition, **[*474]** (i) natural persons working as independent **[****35]** contractors in furtherance of an employer's business enterprise shall be counted as persons in the employ of such employer and (ii) the employer's parent, spouse, domestic partner or child if employed by the employer are included as in the employ of such employer."

The NYCHRL contains no further explication of what constitutes an employer, except by differentiation and implication. The NYCHRL distinguishes employer from various subordinate actors, namely "employee," "agent," an employee or agent who exercises "managerial or supervisory responsibility," "independent contractor," and "intern" (*id.*). Also distinguished are a "labor organization"—which deals with employers—and an "employment agency"—responsible for procuring employees or work opportunities (*id.*).

Bloomberg does not fall within any of these defined categories of actors. He is not a subordinate; he was at all relevant times and remains the majority owner, president, CEO, and co-founder of the business that bears his name. Further, plaintiff alleges that, from his high-level position, he fostered the sexist culture that created the sexually hostile workplace she joined, thereby connecting him to the alleged conduct of defendant **[****36]** Ferris. It **[**471] [***303]** takes no great leap of logic to conclude that the owner of a business is the employer of those who work for the business. This is why, for instance, the Appellate Division rightly noted that a sole proprietor is an employer for purposes of the NYCHRL (*Bloomberg, 178 AD3d at 47-48*). Nothing in the NYCHRL limits the definition of employer, as applied to an individual, to a

_____

discriminated; additionally, an employer may show that it has a record of no, or relatively few, prior incidents of discrimination (*see* Administrative Code § 8-107 [13] [d]).

36 N.Y.3d 450, *474; 167 N.E.3d 454, **471; 143 N.Y.S.3d 286, ***303; 2021 N.Y. LEXIS 50, ****36; 2021 NY Slip Op 00898, *****00898

sole proprietor. And it is logical to treat an individual with control over the business as an employer in fact, if not in name—particularly given the liability faced by low-level supervisors and managers for their discriminatory conduct. It is, of course, eminently reasonable to hold individuals personally liable for their own discriminatory acts. But it beggars belief that this company's owner—alleged to have fostered a pernicious culture of misogyny that facilitated the egregious conduct to which plaintiff was subjected—should nonetheless escape liability by virtue of his position at the top of the company hierarchy.

Indeed, this commonsensical conclusion is clear from our recent decision in *Griffin v Sirva, Inc. (29 NY3d 174, 54 NYS3d 360, 76 NE3d 1063 [2017])*. While I agree with the majority that *Griffin* is not directly on **[*475]** point (majority op at 459 n 2), that case nonetheless elucidates an important **[****37]** principle for our construction of anti-discrimination statutes. In *Griffin* we recognized that the NYSHRL, like its city counterpart, provides no clear definition of "employer" (*29 NY3d at 185*, citing *Patrowich v Chemical Bank, 63 NY2d 541, 543 [1984]*). To clarify the term's meaning, we held that "we need look no further than our own lower courts to determine who is an employer under the Human Rights Law" (*Griffin, 29 NY3d at 186*), recognizing that those lower courts frequently "applied New York common law to make that determination" (*id.*). *Griffin*, then, establishes that state common law cannot be disregarded in determining who counts as an employer under New York anti-discrimination statutes. This is, in fact, the approach prescribed by the United States Supreme Court, which has held that, in the absence of statutory definitions in anti-discrimination legislation, courts should look to the common law to supply those definitions (*see Nationwide Mut. Ins. Co. v Darden, 503 US 318, 322-323, 112 S Ct 1344, 117 L Ed 2d 581 [1992]*; *cf. id. at 323-324* ["In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished" (internal quotation marks omitted)]; *see also Gulino v New York State Educ. Dept., 460 F3d 361, 371-372 [2d Cir 2006]* [holding that, because title VII contains a "nominal" or "unhelpful" definition **[****38]** of "employer," "the common-law element of control is the principal guidepost that should be followed" (citations and internal quotation marks omitted)]). Applying "common-law principles . . . [to] determine who may be liable as an employer," requires us to place the "greatest emphasis . . . on the alleged employer's power 'to order and control' the employee in [the employee's]

performance of work" (*29 NY3d at 186*); here, plaintiff alleges that defendant had a significant degree of power to order and control the work performance of Bloomberg L.P.'s employees. Indeed, she alleges that, while Mayor, he maintained communication with the CEO at that time regarding Bloomberg L.P.'s handling of employee sexual harassment and discrimination claims. Thus, under the relevant common-law principles (reaffirmed in our recent decision in *Griffin*), defendant would qualify as **[**472]** **[***304]** an employer. That the majority cites corporate and agency law purportedly disfavoring finding defendant to be an employer (majority op at 460-461) ultimately matters very little, given that the City Council **[*476]** has expressed its clear intent that, as between multiple, competing, reasonable interpretations, "we must construe . . . the [NYCHRL] **[****39]** broadly in favor of discrimination plaintiffs" (*Albunio, 16 NY3d at 477-478*).

The Court's prior decision in *Patrowich v Chemical Bank (63 NY2d 541, 473 NE2d 11, 483 NYS2d 659 [1984])* is also instructive. In *Patrowich* we held that

> "[a] corporate employee, though [such employee] has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law or its Labor Law or under the Federal Age Discrimination in Employment Act or Equal **[8]** Pay Act if [the employee] is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others" (*id. at 542* [citations omitted]).

In other words, a corporate employee—including CEOs like defendant—will not be held liable as an employer under the NYSHRL unless "shown to have [an] ownership interest or . . . power to do more than carry out personnel decisions made by others" (*id.*).[13]

The majority asserts that this plain language is, actually,

---

[13] The majority attempts to distract from its flawed analysis by claiming I merely criticize but fail to provide a rule by which to discern an employer for purposes of the NYCHRL (majority op at 462-463). I do not concoct a novel "rule" but rather apply the interpretive approach established by common law and precedent. As I clearly state, plaintiff has sufficiently pleaded facts supporting defendant's ownership interest in the company and his control over the workplace, thereby supporting her claim that he should be treated as an employer. The majority must understand my points of law, given how hard it attempts to counter them.

36 N.Y.3d 450, *476; 167 N.E.3d 454, **472; 143 N.Y.S.3d 286, ***304; 2021 N.Y. LEXIS 50, ****39; 2021 NY Slip Op 00898, *****00898

quite muddled. Apparently, what the Court meant to say is that a corporate employee is not individually subject to suit under the NYSHRL or the State Labor Law—full stop. Separately, a corporate employee is not subject to suit under the Federal Age **[****40]** Discrimination in Employment Act or Equal Pay Act unless it is established that they have an ownership interest or the power to do more than carry out personnel decisions made by others. While the actual text of the opinion contains no punctuation or clarifying language that might indicate that the *Patrowich* Court was drawing such a distinction between the state and federal statutes, that this distinction, according to the majority, is evident from the Court's ensuing **[*477]** analysis. Not so. The *Patrowich* Court acknowledged that the NYSHRL "provides no clue to whether individual employees of a corporate employer may be sued under its provisions" (*id. at 543*). The Court also noted that one subdivision of that law distinguished between a certain class of employers and "employee[s] or agent[s] thereof" (*id.* [emphasis omitted]). The majority claims that this portion of the opinion "demonstrat[es] that . . . the State HRL does not render employees liable as individual employers" (majority op at 458). That is a strained and unsupportable reading of the case. In the words of the *Patrowich* Court, that subdivision of the NYSHRL merely "suggested" that individual employees of a corporate employer are not liable (*63 NY2d at 543*). **[**473]** **[***305]** But even assuming **[****41]** the majority were correct, it would not matter. *Patrowich* considered liability under the NYSHRL while the issue here turns on the meaning of "employer" under the NYCHRL.

Notably, *Patrowich* was the law when the Council amended the NYCHRL in 1991 and 2005. By that time, lower courts had understood the case to stand for the same proposition that I do—that a party will be held vicariously liable when "shown to have [an] ownership interest or [the] power to do more than carry out personnel decisions made by others" (*id. at 542*). We must assume the Council was aware of the state of the law when it amended the NYCHRL (*see People ex rel. Postal Tel.-Cable Co. v State Bd. of Tax Commrs., 224 NY 167, 183, 120 NE 192 [1918]*; *see also People ex rel. Sibley v Sheppard, 54 NY2d 320, 325, 429 NE2d 1049, 445 NYS2d 420 [1981]*; *Easley v New York State Thruway Auth., 1 NY2d 374, 379, 135 NE2d 572, 153 NYS2d 28 [1956]* ["Legislatures are presumed to know what statutes are on the books"]). Yet, the Council never sought to limit strict liability to the business entity rather than its owners or high-level executives. To the contrary, with each amendment it expanded liability.

Indeed, it added employer vicarious liability as part of the 1991 amendments. That is a long time to allow an erroneous interpretation to go uncorrected, especially if, as the majority claims, the interpretation violates tenets of corporate and agency law meant to protect those same actors from liability. **[****42]**

Particularly telling is the fact that the New York State Division of Human Rights brought a number of anti-discrimination enforcement actions against owners and high-ranking employees, which various Appellate Divisions affirmed by citation to *Patrowich* (*see e.g. Matter of State Div. of Human Rights v Steve's Pier One, Inc., 123 AD3d 728, 729, 998 NYS2d 206 [2d Dept 2014]* [holding **[*478]** that "(s)ubstantial evidence also supports the determination (of the Commissioner of the New York State Division of Human Rights) that . . . the owner and general manager of the restaurant where the complainant was employed at the time . . . is individually liable for the discrimination" and citing *Patrowich*]; *Matter of New York State Div. of Human Rights v ABS Elecs., Inc., 102 AD3d 967, 969, 958 NYS2d 502 [2d Dept 2013]* [finding that the "Commissioner . . . properly imposed liability on" an individual manager because "there is substantial evidence in the record that . . . (the manager) had the authority 'to do more than carry out personnel decisions made by others' " and citing *Patrowich*]; *Matter of State Div. of Human Rights v Koch, 60 AD3d 777, 777-778, 875 NYS2d 180 [2d Dept 2009]* [holding that **[9]** "(s)ubstantial evidence . . . supports the (Comisioner's) determination that (an individual), as owner and president . . . , was individually liable for the discrimination" and citing *Patrowich*]; *Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights, 105 AD3d 1106, 1109, 962 NYS2d 748 [3d Dept 2013]* [determining that discrimination plaintiff was entitled to enforcement awards against corporation *and* owner of corporation and citing **[****43]** *Patrowich*]; *Matter of New York State Div. of Human Rights v Nancy Potenza Design & Bldg. Servs., Inc., 87 AD3d 1365, 1366, 930 NYS2d 151 [4th Dept 2011]* [determining that "respondent . . . , as the owner and president of the employer who condoned sexual harassment, may be held individually liable for the discriminatory actions that damaged the complainant" and citing *Patrowich*]). While it is true that the individuals determined to be employers in these cases *also* took part in the discriminatory **[**474]** **[***306]** conduct, that is also wholly irrelevant. Unlike the NYCHRL, there is no vicarious liability provision under the NYSHRL (*see Forrest, 3 NY3d at 311* ["(A)n employer cannot be held liable (under state law) for an employee's discriminatory act unless the employer

36 N.Y.3d 450, *478; 167 N.E.3d 454, **474; 143 N.Y.S.3d 286, ***306; 2021 N.Y. LEXIS 50, ****43; 2021 NY Slip
Op 00898, *****00898

became a party to it" (internal quotation marks omitted)]).[14] Thus, the threshold inquiry before liability attaches under the NYSHRL is whether an individual is an employer. In answering that inquiry, the Appellate Division **[\*479]** in each of these cases cited *Patrowich*. The majority has put forward no explanation for why so many courts would regularly invoke *Patrowich* if not for its definition of "employer" under the NYSHRL.

The majority may be correct in its implicit assumption that the state agency charged **[\*\*\*\*44]** with enforcing the NYSHRL—as well as the courts which upheld that agency's determinations—were simply mistaken as to what *Patrowich* actually said. However, at a minimum, these decisions show that, for purposes of the NYSHRL, a definition of employer that reaches owners and high-ranking employees is a reasonable one. All the more so, then, would such an interpretation be reasonable under the *NYCHRL*, whose drafters made perfectly clear that the statute was to be interpreted more broadly than its state counterpart. Put another way, in accordance with the Council's directive, the NYSHRL is "*a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise*" (Local Law No. 85 [2005] of City of NY § 1 [emphasis added]).[15]

The majority also suggests that the structure of the NYCHRL precludes finding high-ranking corporate employees and owners vicariously liable (majority op at 459-460). But the subdivisions the majority invokes do no such thing. For instance, the fact that the "City HRL specifically imposes *primary* liability on employees and

---

[14] The statute also extends liability to individual non-employers who "aid, abet, incite, compel or coerce" discriminatory conduct (*see Executive Law § 296 [6]*). However, in *Steve's Pier One*, *ABS Elecs.*, *Koch*, and *West Taghkanic Diner* there do not appear to be any allegations of aiding and abetting. In *Nancy Potenza Design*, the individual owner determined to be an employer under the NYSHRL was alleged to have condoned the discriminatory conduct, rather than having aided and abetted it. Thus, in each of these cases, the Courts were required to decide whether the individual owners and managers were, in the first instance, "employers." In determining that they were, the Courts all relied on *Patrowich*.

[15] As of February 8, 2020, the NYSHRL defines "employer" to "include all employers within the state" (***Executive Law § 292 [5]***). Previously, the NYSHRL applied only to employers with four or more employees. This amendment demonstrates that, contrary to the majority's holding today, anti-discrimination protections in New York are trending towards *expanding* employer liability for discriminatory conduct.

agents for some discriminatory acts" is irrelevant (*id.* at 459 [emphasis added]). The fact that individuals who directly **[\*\*\*\*45]** participate in unlawful discrimination may face personal liability says precisely nothing about any vicarious liability they may *also* face. Thus, the majority's conclusion that the NYCHRL "conspicuously does not impose vicarious liability on these individuals under section 8-107 (13) (b)" is no more than question-begging (*id.* at 459-460). Similarly, that section 8-107 (13) (b) mentions both the vicariously liable employer *and* the individual employee responsible for the unlawful discrimination cannot possibly illuminate **[\*\*475]** **[\*\*\*307]** the meaning of the term "employer" for purposes of that subdivision.

**[\*480]** Lastly, the majority concludes that broad principles of corporate and agency law demonstrate that individual corporate employees and shareholders face no vicarious liability under the NYCHRL. As an initial matter, as I have discussed, Bloomberg L.P. is a limited partnership, and the principles relied upon by the majority are inapplicable. In any event, the majority's conclusion fails to account for the specific allegations that plaintiff has made with respect to defendant. Far from alleging that defendant was a "fellow employee" (majority op at 460, citing *Hardy v Walsh Manning Sec., L.L.C., 341 F3d 126, 130 [2d Cir 2003]*), plaintiff's factual allegations—which must be deemed true for purposes of assessing the motion to dismiss— identify **[\*\*\*\*46]** defendant as co-founder, president, and CEO, who, during his tenure as Mayor, played an outsize role in shaping the company's handling of sexual harassment of the kind plaintiff was subjected to. Plaintiff alleged that Bloomberg's control over the business promoted a culture of sexism and harassment, fostering the unlawful discrimination she suffered. And while the majority concludes that the "text of the City HRL demonstrates no intent to displace these settled legal principles" (majority op at 461), that conclusion can hardly be reconciled with either the legislative intent undergirding the NYCHRL or its unambiguous declaration of that intent.

The structure and legislative history of the NYCHRL make plain its purpose to impose liability broadly. The Council determined that accountability should not be limited to individual bad actors but also to those with controlling authority over those actors. This approach furthers the purpose of rooting out discrimination in all its forms by imposing liability on those who can most effectively bring about change. So, while a person is liable for their own discriminatory conduct (Administrative Code § 8-107 [1] [a]), owners and those

Case 1:25-cv-03496-JPC-SLC     Document 20-3     Filed 07/09/25     Page 144 of 321

Page 20 of 21

36 N.Y.3d 450, *480; 167 N.E.3d 454, **475; 143 N.Y.S.3d 286, ***307; 2021 N.Y. LEXIS 50, ****46; 2021 NY Slip
Op 00898, *****00898

with high-level executive status are vicariously **[****47]** liable as employers because they have the power to change the culture and ferret out discrimination in their business (*see* Gurian, *A Return to Eyes on the Prize*, *33 Fordham Urb LJ at 270 n 66* [drafter of the 2005 amendments explaining that the New York City "Council designed the vicarious liability section to, inter alia, hold employers to a high level of liability for employment discrimination" (citation and internal quotation marks omitted)]).

Although the state legislature has expressly permitted vicarious liability in circumstances not dissimilar from the those present in this appeal (*see* n 8, *supra*), the majority nonetheless **[*481]** insists that reading the NYCHRL to permit such vicarious liability would not be "reasonable" (majority op at 462-463). This misguided approach—predicated on the misapplication of corporate liability to a limited partnership—makes the majority's willingness to jettison the requirement of liberal construction in favor of discrimination plaintiffs all the more unsupportable. In any event, even if these "long-standing principles of corporate liability" applied here, it is plainly the intent of the New York City Council to displace those principles to achieve a society in which there is "no **[****48]** tolerance for discrimination in public life" (Rep of Governmental Affairs Div, Comm on Civ Rights at 8, Mar. 8, 2016). Despite this and other unambiguous statements of legislative intent, the majority makes the startling claim that, "given [its] holding [it] need not address any potential conflict between the state statutes delineating corporate **[**476]** **[***308]** or agency liability and employer liability imposed by the City HRL" (majority op 461 n 3)—notwithstanding the fact that its holding only serves to exacerbate that conflict.

**[10]** IV.

If owners and high-ranking employees wish to avoid strict liability, they simply need to bring their business into compliance with the NYCHRL and purge discrimination from their workplace. The Council sought to encourage such conduct both by imposing vicarious liability on employers and providing the opportunity for mitigation of liability with proof of diligent efforts to achieve a discrimination-free workplace (Administrative Code § 8-107 [13] [d]). For example, an employer may avoid vicarious liability by proving that it established a "meaningful and responsive procedure for investigating complaints" of discrimination by employees or by demonstrating a "record of no, or relatively few, prior

incidents **[****49]** of discriminatory conduct" by employees (*id.* § 8-107 [13] [d] [1] [i]; [2]). The Council was within its authority to choose both the carrot and the stick to further its progressive, robust anti-discrimination agenda.

Leadership starts at the top. Legal scholarship on workplace sexual harassment has long identified the "top-down" nature of discriminatory workplace cultures. Scholars have noted that CEOs play a powerful role in shaping workplace cultures, either hampering or fostering discriminatory behavior, even when they have not personally discriminated against an individual plaintiff:

"For men to behave more responsibly toward their **[*482]** female colleagues, they must work in a corporate culture that supports and affirms gender equity . . . . The chief executive officer (CEO) establishes that culture. Male employees and managers will adapt to the corporate culture in order to survive and succeed within that culture. It seems, therefore, that for companies to change, the men who work for them must change. The best way to inspire change among male executives, managers, and employees is to inspire change among America's CEOs" (*see* Cheryl L. Wade, *Transforming Discriminatory Corporate Cultures: This is Not Just Women's Work* **[****50]** , *65 Md L Rev 346, 347 [2006]*).

In other words, ensuring that powerful individuals at the top of powerful companies face liability when their managers repeatedly harass and assault vulnerable employees provides the employer with exactly the sort of incentive to "curb bias" that Mayor Dinkins hoped the 1991 amendments to the NYCHRL would accomplish.

The recent emergence of the #MeToo movement laid bare the extent to which sexual harassment is common within business entities, where powerful company executives both tolerate and foster sexism in their ranks. For decades, businesses "would avoid liability by proliferating policies and offering trainings in cultures in which sexual harassment festered" (Amelia Miazad, *Sex, Power, and Corporate Governance*, 54 UC Davis L Rev [forthcoming 2021]). However, "#MeToo . . . exposed just how anemic sexual harassment training programs are" (*id.*). Male-dominated business cultures facilitate sexual harassment, and, recently, such cultures have become sources of concern for stakeholders (*see e.g.* verified derivative complaint at 1-2 in *City of Monroe Employees' Retirement Sys. v*

36 N.Y.3d 450, *482; 167 N.E.3d 454, **476; 143 N.Y.S.3d 286, ***308; 2021 N.Y. LEXIS 50, ****50; 2021 NY Slip
Op 00898, *****00898

*Murdoch*, Del Ch, No. 2017-0833 [filed Nov. 20, 2017]; fifth amended class action complaint at 61 in *In re Signet Jewelers Ltd. Sec. Litig.*, US Dist Ct, SD NY, No. 1:16-cv-06728-JMF **[****51]** [filed Mar. 22, 2018], available at 2018 WL 2191300). As the legal scholarship suggests, these derivative actions have shifted the focus from mere compliance with sexual harassment training **[**477]** **[***309]** programs to accountability for high-ranking executives (*see* Miazad, *Sex, Power, and Corporate Governance*, 54 UC Davis L Rev). The majority bucks this welcomed trend, ignores clear legislative direction, and embraces an exceedingly narrow approach to the **[*483]** NYCHRL which would hold liable only those lower-ranking employees who commit discriminatory acts, while leaving higher-ups (who may be the chief architects of these discriminatory workplace cultures) exempt from the NYCHRL's vicarious liability provisions.

Assume the following hypothetical: A person who is the founder and sole owner of a business adopts a policy that no female shall be promoted to a managerial position. The owner then transforms the business into a limited partnership, and holds positions of majority owner, president, and CEO. The person subsequently leaves for another opportunity but retains status as an owner and appoints a successor as CEO. The policy of no female managers remains unchanged. A few years later, the person returns to the business and **[****52]** retakes the reins as CEO. The policy continues throughout this entire period, even as internal complaints increase and litigation ensues, challenging the policy. Under the majority's rule, a victim of the discriminatory policy cannot sue the architect of that policy for the actions of the managers and supervisors who effectuated that policy. That is the case even if the person holds a 99% ownership interest in the business. According to the majority, if this person structured the business in such a way as to shield themselves from individual liability for the company's debts, then they must also be shielded from liability for **[11]** expressly promoting discrimination as well, regardless of their control of the workplace.[16] That undermines the NYCHRL, which holds employers vicariously liable for the actions of supervisors.

In contrast, the interpretation I adopt ensures accountability from the top down. Owners cannot escape the consequences of the policies that they impose or the cultures that they foster within their businesses. Owners would thus diligently ensure full compliance with the NYCHRL, knowing that, if they did not, they would face vicarious liability for their supervisors' actions. **[****53]**

**[*484]** V.

A majority of the Court has departed once more from our mandate to "construe . . . the [NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio, 16 NY3d at 477-478*). As it did in *McGrath*, the majority rejects the plain language of the NYCHRL, declining—despite an expression of legislative intent that could hardly be clearer—to adopt the reasonable definition of employer that would be most favorable to discrimination plaintiffs. This error is particularly troubling because, unlike the *McGrath* Court, which did not have the benefit of the Court's opinion in *Albunio*, the majority today is entirely aware of our obligation to construe the statute in this way. Nonetheless, it refuses to do so.

A proper definition of "employer" would enforce the rule that every workplace—including those controlled by a limited **[**478]** **[***310]** partnership—is subject to the prohibitions of the NYCHRL. The NYCHRL holds owners accountable for discrimination and all employees are subject to its protections, regardless of how owners structure their businesses.

Chief Judge DiFiore and Judges Stein, Fahey, Wilson and Feinman concur; Judge **[****54]** Rivera dissents in an opinion.

Order affirmed, with costs.

---

[16] Supreme Court dismissed plaintiff's aiding and abetting claim pursuant to Administrative Code § 8-107 (6). As plaintiff's counsel explained in oral argument, lower courts have interpreted the NYCHRL's aiding and abetting provision to be limited to the specific discriminatory conduct charged. Plaintiff did not appeal this portion of the decision below, and so I take no position on the correctness of Supreme Court's interpretation of section 8-107 (6).

⚠️ Caution

As of: June 23, 2025 9:45 PM Z

## *First Nationwide Bank v. Gelt Funding Corp.*

United States Court of Appeals for the Second Circuit

October 18, 1993, Argued ; June 9, 1994, Decided

Docket No. 93-7422

**Reporter**

27 F.3d 763 *; 1994 U.S. App. LEXIS 14436 **

FIRST NATIONWIDE BANK, A Federal Savings Bank, A Federal Stock Association, Plaintiff-Appellant, v. GELT FUNDING CORP., ALLEN I. GROSS, RALPH HERZKA, SHIMON ECKSTEIN, 505 REALTY ASSOCIATES, PROSPECT REALTY ASSOCIATES, JUDAH WOLF, MEIR UNSDORFER, NEW HEIGHTS 765 RIVERSIDE LIMITED PARTNERSHIP, NEW HEIGHTS (765 RIVERSIDE) MANAGEMENT CORP., 1691 EASTBURN REALTY CO., SOL GROSS (a/k/a EUGENE GROSS), JOSEPH FRIEDMAN, 1261 CENTRAL AVENUE OWNERS CORP., 65-11 REALTY CO., AVIEZIER COHEN, ELAINE COHEN, 730 REALTY ASSOCIATES, DAVID MALEK, PETER REBENWURZEL, 36 PLAZA STREET OWNERS CORP., ROBERT WOLF, 350 STERLING ASSOCIATES, EDITH GROSS, BROOKHAVEN REALTY ASSOCIATES, CROWN EQUITIES LIMITED PARTNERSHIP, ADAR TWO REALTY CO., 100 REALTY COMPANY, ESTHER SHUR, E. PHILLIP WEINGARTEN, NEW HEIGHTS (173-174) LIMITED PARTNERSHIP, TEMPLE APARTMENTS MANAGEMENT CORPORATION, 740 REALTY ASSOCIATES, 2344 DAVIDSON ASSOCIATES, JACOB RABINOWITZ, 1958 REALTY ASSOCIATES, MENACHEM HALBERSTAM, MORDECHAI HALBERSTAM, 273 REALTY ASSOCIATES, 2608 REALTY ASSOCIATES, SOLOMON WERDIGER, ESTHER WERDIGER, Defendants-Appellees.

**Subsequent History: [**1]** As Amended June 20, 1994. Second Amendment June 22, 1994. Certiorari Denied January 9, 1995, Reported at: *1995 U.S. LEXIS 132*.

**Prior History:** Plaintiff-appellant appeals from a judgment of the United States District Court for the Southern District of New York (Mukasey, J.) granting defendants-appellees' motion to dismiss the complaint for failure to state a claim upon which relief can be granted. See *Fed. R. Civ. P. 12(b)(6)*. The complaint contained state common-law claims and alleged

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1962(c)* and *(d)*, in connection with loan transactions between plaintiff-appellant as lender, and the defendants as borrower or mortgage broker. The district court dismissed the complaint after concluding that plaintiff-appellant had not sufficiently alleged: (1) that it suffered an injury cognizable under RICO; (2) that the alleged fraud proximately caused any damages; or (3) a RICO enterprise with respect to the borrower defendants.

**Disposition:** Affirmed.

## Core Terms

loans, proximate cause, borrower, collateral, damages, properties, property value, factors, real estate market, amended complaint, district court, Funding, allege fraud, misrepresentations, causation, estimate, allegations, foreclosed, defendants', nonrecourse, magnitude, default, lender, losses, alleged misrepresentation, fraudulently induce, fraud damages, mortgage, operating income, external

## Case Summary

### Procedural Posture

Appellant lender challenged a ruling of the United States District Court for the Southern District of New York, which dismissed appellant's action against appellee borrowers under *18 U.S.C.S. § 1962(c)* and *(d)* of the Racketeer Influenced and Corrupt Organizations Act (RICO) for failure to state a claim upon which relief could have been granted.

### Overview

Appellant lender brought a claim under *18 U.S.C.S. § 1962(c)* and *(d)* of RICO, alleging that appellee borrowers fraudulently misrepresented the value of

27 F.3d 763, *763; 1994 U.S. App. LEXIS 14436, **1

properties pledged as collateral to secure certain nonrecourse loans. Appellant claimed that appellees fraudulently induced appellant to make loans it otherwise would not have made that it was entitled to damages in an amount equal to the fraudulently induced portion of the loans. The trial court found that appellant failed to show an injury cognizable under RICO and that it failed to sufficiently allege proximate cause. The trial court dismissed appellant's complaint under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim. Appellant challenged that ruling and the court affirmed. The court found that as to the loans which were not foreclosed, appellant failed to allege an injury ripe for suit under RICO. As to any loans that were foreclosed, appellant failed adequately to allege proximate cause where it was not shown through the facts that appellees' conduct proximately caused appellant's injuries.

**Outcome**

The court affirmed the trial court ruling, which dismissed appellant lender's action against appellee borrowers under RICO for failure to state a claim upon which relief could be granted. The court found that appellant's action was not ripe under the applicable statute as to loans not foreclosed, and as to loans foreclosed appellant failed to show proximate cause.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1* **Standards of Review, De Novo Review**

Appellate courts review de novo the district court's dismissal under *Fed. R. Civ. P. 12(b)(6)*, taking as true the factual allegations in the complaint, and drawing all reasonable inferences therefrom in appellant's favor.

Antitrust & Trade Law > ... > Racketeer Influenced & Corrupt Organizations > Claims > General Overview

Civil Procedure > ... > Justiciability > Standing > General Overview

*HN2* **Racketeer Influenced & Corrupt Organizations,**

**Claims**

See *18 U.S.C.S. § 1964(c)*.

Civil Procedure > ... > Justiciability > Standing > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

*HN3* **Justiciability, Standing**

The conditions a plaintiff must meet to satisfy the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1962(c)* and *(d)*, standing requirements are: (1) a violation of *§ 1962*; (2) injury to business or property; and (3) causation of the injury by the violation.

Torts > ... > Types of Damages > Compensatory Damages > General Overview

*HN4* **Types of Damages, Compensatory Damages**

The general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud.

Civil Procedure > ... > Justiciability > Standing > General Overview

*HN5* **Justiciability, Standing**

A Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiff only has standing if, and can only recover to the extent that, he is injured in his business or property by the conduct constituting the violation. Furthermore, as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite. Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment are frustrated.

27 F.3d 763, *763; 1994 U.S. App. LEXIS 14436, **1

Antitrust & Trade Law > ... > Private
Actions > Racketeer Influenced & Corrupt
Organizations > Remedies

Civil
Procedure > ... > Justiciability > Standing > General
Overview

### HN6 Racketeer Influenced & Corrupt Organizations, Remedies

To show that an injury resulted by reason of the
defendant's action, and therefore to have standing
under the Racketeer Influenced and Corrupt
Organizations Act (RICO), the plaintiff must allege that
the defendant's violations are a proximate cause of the
plaintiff's injury, i.e., that there is a direct relationship
between the plaintiff's injury and the defendant's
injurious conduct. This requires a showing not only that
the defendant's alleged RICO violation was the "but-for"
or cause-in-fact of his injury, but also that the violation is
the legal or proximate cause.

Torts > ... > Elements > Causation > Intervening
Causation

Torts > ... > Causation > Proximate
Cause > General Overview

### HN7 Causation, Intervening Causation

In the context of predicate acts grounded in fraud, the
proximate cause requirement means that the plaintiff
must prove both transaction and loss causation. Thus,
in addition to showing that but for the defendant's
misrepresentations the transaction would not come
about, the defendant must also show that the
misstatements are the reason the transaction turned out
to be a losing one. Furthermore, when factors other than
the defendant's fraud are an intervening direct cause of
a plaintiff's injury, that same injury cannot be said to
occur by reason of the defendant's actions.

Torts > ... > Causation > Proximate
Cause > General Overview

Torts > ... > Elements > Causation > General
Overview

### HN8 Causation, Proximate Cause

Many considerations enter into the proximate cause
inquiry including the foreseeability of the particular
injury, the intervention of other independent causes, and
the factual directness of the causal connection.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil Procedure > ... > Pleadings > Heightened
Pleading Requirements > General Overview

Civil Procedure > ... > Pleadings > Heightened
Pleading Requirements > Fraud Claims

### HN9 Motions to Dismiss, Failure to State Claim

Under _Fed. R. Civ. P. 12(b)(6)_, the well-pleaded
material allegations of the complaint are taken as
admitted; but conclusions of law or unwarranted
deductions of fact are not admitted. This principle
applies with even greater force in a fraud case governed
by the more stringent pleading requirements of _Fed. R.
Civ. P. 9(b)_.

**Counsel:** JAMES L. STENGEL, New York, NY (Andrew
M. Calamari, Jodi E. Freid, Deanna R. Waldron,
Donovan, Leisure, Newton & Irvine, New York, NY,
Roger B. Mead, Folger & Levin, San Francisco, CA, of
counsel), for Plaintiff-Appellant **[**2]** .

LEWIS R. CLAYTON, New York, NY (Mark A.
Silberman, Paul, Weiss, Rifkind, Wharton & Garrison,
New York, NY, of counsel), for Defendants-Appellees
Gelt Funding Corp., Allen I. Gross, Sol Gross a/k/a
Eugene Gross, 350 Sterling Associates, Edith Gross,
Brookhaven Realty Associates, 2608 Realty Associates,
Solomon Werdiger, and Esther Werdiger.

NATHAN LEWIN, New York, NY (Miller, Cassidy,
Larroca & Lewin, Washington, D.C., Sara Moss,
Howard, Darby & Levin, New York, NY, of counsel) for
Defendant-Appellee Ralph Herzka.

Edward D. Fagan, New York, NY (Fagan & Associates,
New York, NY, of counsel) for Defendants-Appellees
Shimon Eckstein and 505 Realty Associates.

Rosenfeld & Maidenbaum, Cedarhurst, NY (Meir
Rosenfled, New York, NY, of counsel) for Defendant-
Appellee Judah Wolf.

27 F.3d 763, *763; 1994 U.S. App. LEXIS 14436, **2

Robin Feingold Singer, New York, NY (Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York, NY, of counsel) for Defendants-Appellees New Heights 765 Riverside Limited Partnership, New Heights 765 Riverside Management Corp., New Heights (173-174) Limited Partnership, Temple Apartments Management Corporation and Crown Equities Limited Partnership.

Irving P. Seidman, P.C., New York, **[**3]** NY (Irving P. Seidman, New York, NY, of counsel) for Defendants-Appellees 1261 Central Avenue Owners Corp., 36 Plaza Street Owners Corp., and Robert Wolf.

Sheldon Rudoff, New York, NY (Goodkind Labaton Rudoff & Sucharow, New York, NY, Mark S. Arisohn, James W. Johnson, New York, NY, of counsel) for Defendants-Appellees 730 Realty Associates, David Malek, Peter Rebenwurzel, Adar Two Realty Co., 740 Realty Associates, and 2344 Davidson Associates.

**Judges:** Before: MAHONEY and WALKER, Circuit Judges, and METZNER, District Judge. *

**Opinion by:** WALKER

# Opinion

 **[*765]** WALKER, *Circuit Judge*:

This appeal raises issues surrounding the requirements for pleading a private civil cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), _18 U.S.C. § 1962(c)_ and _(d)_. Principal among these is whether, where the predicate to the RICO claim is fraud by a borrower in misrepresenting the value of collateral, the fraud is complete before any actual loss is realized because the lender incurs additional concealed risk. Plaintiff-appellant **[**4]** First Nationwide Bank ("FNB" or the "Bank") appeals from a judgment of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge*), dismissing its complaint for failure to state a claim upon which relief can be granted. *See_ Fed. R. Civ. P. 12(b)(6)_. In its amended complaint, FNB alleges that the defendants misrepresented the value of properties pledged as collateral to secure nonrecourse loans, and thereby fraudulently induced FNB to make loans it otherwise would not have made. FNB claims that it was damaged in an amount equal to the fraudulently induced portion of

the loans. The amended complaint contains two counts under RICO, _18 U.S.C. § 1962(c)_ and _(d)_, and seven pendent state law claims.

The district court concluded that FNB had not sufficiently alleged: (1) that it suffered an injury cognizable under RICO; (2) that the alleged fraud proximately caused FNB's loss; or (3) that the eighteen borrowers named as defendants were part of a RICO enterprise. The court thus dismissed the RICO counts of the amended complaint, and absent a substantial federal question, the pendent state law claims as well. **[**5]** Because we agree that FNB has not adequately plead injury and proximate cause, we affirm.

## BACKGROUND

_HN1_ We review *de novo* the district court's dismissal under _Rule 12(b)(6)_, taking as true the factual allegations in the complaint, and drawing all reasonable inferences therefrom in FNB's favor. _Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir. 1993)_.

FNB is a federal stock association based in San Francisco, California with offices in New York City. Prior to 1985, FNB's business consisted primarily of making purchase money mortgage loans to individuals. In 1985, FNB's parent corporation, First Nationwide Financial Corp., was purchased by Ford Motor Company. In May of that year, FNB began a significant expansion of its lending activities in New York by offering nonrecourse mortgage loans to owners and purchasers of commercial properties, principally multi-unit apartment buildings. Over the next five years FNB made over 1,000 nonrecourse loans to commercial property investors in the New York Metropolitan area in an aggregate amount of approximately $ 1.3 billion. In November 1990, in the midst of a severe downturn in the New York real estate market, **[**6]** FNB phased out its commercial lending business and stopped making commercial loans through its New York office.

Defendant Gelt Funding Corp. ("Gelt Funding") is a commercial mortgage broker that represents owners and potential buyers of commercial property, and helps them obtain financing for their transactions. Defendants Allen I. Gross and Ralph Herzka are Gelt Funding's principals: Gross its president and principal or sole shareholder, Herzka **[*766]** an officer and employee. Between 1985 and 1990, Gross and Herzka cultivated a lucrative relationship with FNB on Gelt Funding's behalf in which Gelt Funding served as mortgage broker for

---

* Hon. Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

borrowers of about $ 900 million in loans comprising roughly seventy percent of FNB's commercial mortgage portfolio. Eighteen of those borrowers are alleged to have supplied fraudulent information in their loan applications and are named as defendants in this action. The remaining individual defendants are alleged to be partners in, or otherwise affiliated with, one or more of the defendant borrowers.

FNB made all the loans in question on a nonrecourse basis. In a nonrecourse loan transaction, the lender gives up its right to sue the borrower personally upon **[**7]** default, and is confined to recourse against the collateral property. Because the lender's remedy upon default is limited to the value of the property, that value is critical to the lender's decision whether to make the loan. Accordingly, before making a loan, FNB required borrowers to supply information about the property's operating income; the price for which the property was to be purchased; sale prices for the property in the previous three years; and whether the borrower intended to encumber the property with additional debt. FNB ordinarily would not make a nonrecourse loan unless the collateral property's net operating income was at least 1.05 times greater than the combination of principal and interest due on the loan, and the property value exceeded the loan amount by at least twenty-five percent.

During an audit of its commercial loan portfolio in 1991, FNB determined that a higher proportion of loans brokered by Gelt Funding had defaulted compared to other loans. In January 1992, FNB filed its original complaint in nine counts consisting of two RICO counts and seven state common-law claims. The first RICO count was brought against Gross, Herzka, and Gelt Funding (collectively, **[**8]** the "Gelt Defendants"). The second RICO count named, in addition to the Gelt Defendants, all the borrower entities and affiliated individuals (the "Borrower Defendants") who allegedly operated as a single organization, the so-called "Borrower Enterprise." The remaining seven state law counts alleged fraud, conspiracy to defraud, negligent misrepresentation, conversion, conspiracy to convert, unjust enrichment, and breach of fiduciary duty.

In its complaint, FNB alleged that Gross and Herzka used Gelt Funding to obtain nonrecourse loans by misrepresenting information pertinent to FNB's lending decision. Specifically, FNB claimed that Gross and Herzka intentionally misstated the operating income of the properties and concealed both the borrowers' intention to use the property to secure additional debt

and the fact that artificial sales transactions were used to overstate property values. The complaint also alleged that FNB was led to believe that the borrowers and Gelt Funding were independent entities, when in fact Gross, Herzka, and a small group of undisclosed principals controlled most of the borrower entities.

Judge Mukasey dismissed FNB's original complaint without prejudice primarily **[**9]** on the ground that FNB had not adequately alleged two essential elements of a RICO claim -- injury and proximate causation -- because there were no specific allegations concerning the magnitude of the alleged misrepresentations or whether there was a causal connection between those misrepresentations and FNB's loss. *First Nationwide Bank v. Gelt Funding, Inc.*, No. 92 Civ. 0790 (MBM), 1992 WL 358759 (S.D.N.Y. Nov. 30, 1992). FNB then filed an amended complaint which set out in detail the current status of thirty allegedly fraud-tainted loans. FNB claimed that the thirty loans were representative of other fraudulent loans that FNB eventually would aver and prove at trial. For each of the thirty loans, FNB stated the original loan amount, the outstanding balance, the current market value of the property, and the amount of loss FNB attributed to the defendants' alleged fraud as opposed to declines in the real estate market.

The amended complaint relied on two injury theories to support the damages element of FNB's claims. First, FNB claimed that because the value of the collateral properties was overstated, FNB loaned more than it would have if it had known the true value, and was **[**10]** therefore undersecured for the additional **[*767]** amounts (the "Excess Loan Loss"). In calculating the Excess Loan Loss, FNB estimated the true value of the collateral properties at the time the loans were made, the amount FNB would have loaned if it had known the true value, and the loss it claims it would have sustained if it had not loaned the greater amount in reliance on the defendants' representations. By subtracting this estimated loss from the actual loss FNB claims it sustained on the loans, FNB arrived at its Excess Loan Loss. Second, FNB asserted that upon discovering the alleged fraud in 1991 it was required to restrict its use of additional assets to adhere to the federally mandated level of capital reserves. This, FNB claims, necessarily reduced the income it otherwise would have earned if it had loaned out the restricted funds (the "Excess Reserve Loss"). FNB includes this lost income as a consequential damage from the alleged fraud.

The district court again dismissed FNB's complaint.

*First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89 (S.D.N.Y. 1993)*. Upon careful review, Judge Mukasey found FNB's additional fact allegations and injury [**11] theories still insufficient to overcome the deficiencies found in the first complaint; namely, the failure to allege RICO injury and proximate cause. Moreover, the district court held that FNB's second RICO count was incomplete because FNB did not sufficiently allege that all the named defendants constituted a RICO "enterprise." This appeal followed.

DISCUSSION

On appeal, FNB continues to press the injury and proximate cause issues raised in the district court. We hold that to the extent FNB's complaint is predicated on loans that have not been foreclosed, its claims are not ripe for adjudication because it is uncertain whether FNB will sustain any injury cognizable under RICO. Furthermore, even where FNB relies on loans that have been foreclosed, its complaint still must be dismissed because, as Judge Mukasey correctly concluded, the complaint does not adequately allege proximate cause.

*RICO Standing*

In examining FNB's standing to assert its RICO claims, we begin, as we must, with the language of the statute. The *HN2* private civil cause of action under RICO provides that:

> Any person injured in his business or property by reason of a violation of *section 1962* of this chapter [**12] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

*18 U.S.C. § 1964(c)*. From this language, courts have extracted *HN3* the conditions a plaintiff must meet to satisfy RICO's standing requirements: "(1) a violation of *section 1962*; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)*. Most important for purposes of this appeal are the two elements relied on by the district court in dismissing FNB's complaint, injury and causation.

*I. Injury*

FNB contends that its claims with respect to all fraudulent loans were "ripe" for suit the moment the loans were made, regardless of whether the borrowers presently were in default or whether FNB completed efforts to foreclose on the collateral properties. FNB asserts that although several of the loans in the amended complaint have not been sold, foreclosed, or restructured, FNB has standing to assert a RICO claim with respect to those loans, [**13] as well as other similar loans FNB might discover in the future. We find FNB's hypothesis that it may assert a RICO claim based on unforeclosed loans to be inconsistent with this circuit's precedent governing RICO standing and insufficient to support an allegation of injury under RICO.

*A. The Measure of Fraud Damages*

Under its Excess Loan Loss theory, FNB would classify all excess amounts loaned as fraud damages, recoverable even if the borrower repaid the loan in full with interest. FNB argues that any amounts recovered through foreclosure on the collateral properties would be applied in mitigation of damages, **[*768]** and are irrelevant to the determination of whether FNB has been or will be injured. According to FNB, it suffered immediate quantifiable injury when the loans were made because the loans were undersecured, FNB assumed additional risk of loss, and "for all practical purposes, the[] additional funds were lost the moment the loans were made." We find this argument unpersuasive.

*HN4* The general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud. *See Disher v. Information Resources, Inc., 691 F. Supp. 75, 79 (N.D. Ill. 1988),* [**14] *aff'd, 873 F.2d 136 (7th Cir. 1989)*. In this case, the damages issue arises in the specific context of a fraudulently induced loan. In such cases, although the loan is procured through fraud, any amounts paid on the debt reduce the amount the plaintiff can claim as damages resulting from the fraud. *See Hermes v. Title Guarantee & Trust Co., 282 N.Y. 88, 93, 24 N.E.2d 859, 861 (1939); Sager v. Friedman, 270 N.Y. 472, 480-81, 1 N.E.2d 971, 973-74 (1936)*. Thus, the amount of loss cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much. *Sager, 270 N.Y. at 482, 1 N.E.2d at 974* ("The value of the stock . . . deposited as collateral for the loan, and the value it would have had if the defendants' representations as to the financial condition of that company had been true, furnishes no measure of any loss suffered by the plaintiff through wrongful inducement to make the loan.").

27 F.3d 763, *768; 1994 U.S. App. LEXIS 14436, **14

In determining fraud damages, any amount recovered by the **[\*\*15]** fraudulently induced lender necessarily reduces the damages that can be claimed as a result of the fraud. Because the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-for remedies available to it can the lender assert that it was damaged by the fraud, and then only to the extent of the deficiency. FNB does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud. *See Berg v. First State Ins. Co., 915 F.2d 460, 464-65 (9th Cir. 1990)* (rejecting corporate directors' claim that they suffered injury when insurance policies protecting them against risk of loss from shareholder derivative suit were cancelled, even though suit resulted in no award against them). Thus, we reject FNB's novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined.

### B. The Ripeness of FNB's RICO Injury

The rule of fraud damages described above has been adopted by this court in the context of deciding **[\*\*16]** whether a defrauded plaintiff has standing under RICO. **HN5** A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)*; *see Hecht, 897 F.2d at 23*. Furthermore, as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite. *See Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988)*, cert. denied, 490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989). Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated. *See Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1166 (2d Cir.)*, cert. denied, 126 L. Ed. 2d 334, 114 S. Ct. 385 (1993). **[\*\*17]**

For example, in *Stochastic Decisions* the plaintiff, a judgment creditor of a bankrupt company, brought a RICO action claiming that the company fraudulently conveyed assets to prevent the plaintiff from collecting on several judgments. We held that to the extent plaintiff successfully collected on the judgments, those amounts would reduce the RICO injury *pro tanto*, before any trebling occurred. *Id. at 1165-66*. Because plaintiff's

collection efforts were ongoing and the actual amount of its injury was indefinite and unprovable, plaintiff did not yet have standing under RICO.

**[\*769]** Similarly, in *Commercial Union Assurance Co. plc v. Milken, 17 F.3d 608 (2d Cir. 1994)*, RICO plaintiffs argued that they were "entitled to a trebling of their damage award *before* any offset through settlements, restitution, recoupment or otherwise." *Id. at 612*. The plaintiffs maintained that they were fraudulently induced into investing approximately $ 10.5 million, none of which had been recouped when they initiated suit, and that they were entitled to trebling of this sum even though the entire amount subsequently **[\*\*18]** was repaid with interest. Citing *Stochastic Decisions*, we rejected this claim and held that to the extent the plaintiffs received the return actually bargained for, they had suffered no compensable RICO injury. *Id*.

In this case, the loss FNB would suffer as to those loans FNB has not finally foreclosed cannot yet be determined. Only when FNB's actual loss becomes clear and definite will the claims be ripe for suit. Until that time, FNB lacks standing under RICO to assert claims as to those loans.

### II. Proximate Cause

Even with respect to those loans that have been finally foreclosed, FNB's complaint suffers from the equally fundamental defect of not adequately alleging proximate cause. RICO provides a civil remedy only to those persons injured "by reason of" the defendant's predicate acts. **HN6** To show that an injury resulted "by reason of" the defendant's action, and therefore to have standing under RICO, the plaintiff must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P., 985 F.2d 102, 104 (2d Cir. 1993).* **[\*\*19]** This requires a showing not only that the defendant's alleged RICO violation was the "but-for" or cause-in-fact of his injury, but also that the violation was the legal or proximate cause. *Holmes v. Securities Investor Protection Corp., 117 L. Ed. 2d 532, 112 S. Ct. 1311, 1316-18 (1992)*; *Standardbred Owners, 985 F.2d at 104*; *Hecht, 897 F.2d at 23*.

**HN7** In the context of predicate acts grounded in fraud, the proximate cause requirement means that the plaintiff must prove both transaction and loss causation.

27 F.3d 763, *769; 1994 U.S. App. LEXIS 14436, **19

*Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)*; *Bastian v. Petren Resources Corp., 892 F.2d 680, 684 (7th Cir.)*, cert. denied, 496 U.S. 906, 110 L. Ed. 2d 270, 110 S. Ct. 2590 (1990)*. Thus, in addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the defendant must also show that the misstatements were the reason the transaction turned out to be a losing one. *K-H Corp., 968 F.2d at 1495*; [**20] *Bastian, 892 F.2d at 684*. Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions. *See Brandenburg v. Seidel, 859 F.2d 1179, 1190 (4th Cir. 1988)*.

The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts. *See Holmes, 112 S. Ct. at 1318*; *Sperber v. Boesky, 849 F.2d 60, 63 (2d Cir. 1988)*. Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were "a substantial factor in the sequence of responsible causation," and whose injury was "reasonably foreseeable or anticipated as a natural consequence." *Hecht, 897 F.2d at 23-24*. Although we are mindful of the admonition that RICO is to be liberally construed, the foregoing holds true in a RICO setting because proximate cause, a common law [**21] concept, exists independently of the statute. *See Sperber, 849 F.2d at 60*; *Brandenburg, 859 F.2d at 1189 n.11*.

*HN8* Many considerations enter into the proximate cause inquiry including "the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg, 859 F.2d at 1189*. We have recognized that the proximate cause determination "is not free from normative legal policy considerations," *Hecht, 897 F.2d at 23*, and indeed involves a judgment based upon [*770] "'some social idea of justice or policy.'" *Sperber, 849 F.2d at 63* (quoting W. P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts* 264 (5th ed. 1984)). The key reasons for requiring direct causation include avoiding unworkable difficulties in ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors, and in apportioning damages between causes. *See Holmes, 112 S. Ct. at 1320*. [**22] Although the likelihood that the injury would result from the wrongful

conduct is a consideration, the rule often has as much to do with problems of proof as with foreseeability. *See Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1312 (9th Cir. 1992)*, cert. denied, 123 L. Ed. 2d 266, 113 S. Ct. 1644 (1993)*; *Sperber, 849 F.2d at 65-66*.

In examining the issue of whether the defendants' alleged fraud was the proximate cause of FNB's injuries, Judge Mukasey articulated a three-part test:

> [A] borrower who misstates the value of loan property or its rental income proximately causes injury to a bank when (1) the misrepresented value of the property was substantially above its actual value at the time of the misrepresentation, (2) the injury was sustained soon after the misrepresentation, and (3) external factors did not contribute to the injury.

1992 WL 358759, at *5. While these factors do not constitute an exhaustive list of the considerations that go into the proximate cause calculus, they do provide a useful guide for evaluating the sufficiency of FNB's proximate [**23] cause allegations. In determining whether the required directness is present in the context of a fraudulently induced loan, important considerations are the magnitude of the misrepresentations, the amount of time between the loan transaction and the loss, and the certainty with which the loss can be attributed to the defendant's conduct. With these precepts in mind, we turn to the question of whether FNB adequately pleaded proximate cause.

*A. Magnitude of the Overstatements*

At the outset, we are unable to tell accurately whether the alleged misrepresentations "substantially" overstated the value of the collateral properties because FNB's complaint provides no reliable measure of the alleged misrepresentations. The district court dismissed FNB's original complaint because in pleading causation it failed to provide any "order of magnitude" for the misrepresentations to support FNB's assertion that they were material. The court concluded that "the bald assertion that misrepresentations were material is not a fact."

In response, FNB's amended complaint provides, for each of the thirty representative loans, a schedule purporting to set out the approximate amount by which the defendants [**24] overstated the property values. The value and profitability of multi-unit apartment complexes in New York, however, depend upon many

27 F.3d 763, *770; 1994 U.S. App. LEXIS 14436, **24

factors that influence the general real estate market including changes in rent control laws, property taxes, vacancy rates, the level of city services provided, and increased operating expenses including electric and heating oil prices. Given the complexity of the New York real estate market, and the fact that FNB's losses came in the wake of a downturn in the real estate market, FNB must allege loss causation with sufficient particularity such that we can determine whether the factual basis for its claim, if proven, could support an inference of proximate cause. *See Finkel v. Stratton Corp., 754 F. Supp. 318, 330 (S.D.N.Y. 1990).* FNB's attempt to meet this burden suffers from several defects.

First, as with any estimate, the result of a property appraisal is only as reliable as the information used and the manner in which it is employed to approximate the factors that influence property values in the real world. Given the number of variables that can influence real estate values, an estimate necessarily involves a substantial **[\*\*25]** amount of guesswork about how both present and future conditions will impact on the market, making it difficult to construct a reliable model. *Cf.* Collins, *A Question of Value*, 51 Mortgage Banking 33 (July 1991).

 **[\*771]**  Second, FNB's task is made more difficult since it is attempting to reconstruct the value of the collateral properties at the time the loans were made, without accurate information regarding many of the variables that would go into that calculation. For instance, FNB's calculation of the "actual," as opposed to represented, property values when the loans were made, relies in turn on another estimate of the property's "true" net operating income ("NOI") at that time. *See* Amended Complaint P 70. The Bank's NOI estimate was based on rent roll figures compiled by the New York Department of Housing and Community Renewal ("DHCR"), which often understate rental incomes and thus would understate property values, in some cases by a significant amount. Since the Bank's NOI figures were lower than the actual NOI, its estimate of the amount of fraud damages must to some extent be artificially high. Unfortunately, the same problems that hinder FNB in trying to estimate these **[\*\*26]** figures also prevent us from determining the actual degree of discrepancy.

In addition, the amount of damages FNB claims to have suffered from the defaults is distorted because it includes contractual charges and penalties that are not generally recoverable under RICO as damages caused by the fraud. *See Sager, 270 N.Y. at 481, 1 N.E.2d at 974* (damages for fraud do not include benefit of

contractual bargain). For example, with respect to one loan in December 1985, FNB claims that it loaned $ 485,000 based on a represented property value of $ 850,000, whereas if it knew the property was worth only $ 260,000 (according to FNB's *post hoc* estimate), it would have loaned only $ 170,000. Despite the fact that the loan was paid for six years without default, FNB alleges that the amount due on the $ 485,000 loan in December 1991 was approximately $ 551,000 including penalties and charges.

It is also apparent that FNB's methodology does not adequately account for the contribution of external market factors to the loss. For instance, with respect to the loan previously mentioned, FNB claims that the property value according to its latest **[\*\*27]** appraisal is $ 400,000, fifty-three percent higher than its purported value of $ 260,000 in 1985. FNB advances this position despite the fact of a general decline in the real estate market during which other collateral properties, by FNB's own account, lost fifty percent of their value or more. It is also noteworthy that despite the fact that most of the properties listed in the complaint are alleged to have suffered a significant decline in market value since the loans were made, with respect to only three loans does FNB attribute any of its own loss to market decline.

The guesswork and inconsistencies in determining the magnitude of the alleged misrepresentations highlights the difficulty of proving damages in this case with a reasonable degree of certainty. Nor is FNB's complaint rescued by the principle that in deciding a *Rule 12(b)(6)* motion all reasonable inferences must be drawn in FNB's favor. **HN9** Under *Rule 12(b)(6)*, "the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." 2A Moore & Lucas, *Moore's Federal Practice* P 12.08, at 2266-69 (2d ed. 1984); *see Fleming v. Lind-Waldock & Co., 922 F.2d 20, 23-24 (1st Cir. 1990).* **[\*\*28]**  This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of *Fed. R. Civ. P. 9(b).* *See O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676-77 (2d Cir. 1991); McCoy v. Goldberg, 748 F. Supp. 146, 155 (S.D.N.Y. 1990).* The amended complaint does allege that FNB's "losses are not the result of any general decline in the real estate market." Amended Complaint P 67. However, this conclusory statement is based on FNB's faulty damages theories and its unsupported claims regarding the "actual" value of the collateral properties when the loans were made. *See id.* In the absence of a factual basis underlying

27 F.3d 763, *771; 1994 U.S. App. LEXIS 14436, **28

FNB's causation claim, we cannot accept its allegation as fact. *See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, Slip op. 4407, 4417 (2d Cir. 1994)* (dismissing fraud complaint where facts alleged did not support inference that defendants knew "continuing erosion of the real estate market would render the loan portfolio precarious"); *Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971)* (conclusory [**29] allegation of fraud insufficient [*772] where facts alleged did not support inference thereof); *see also Kadar Corp. v. Milbury, 549 F.2d 230, 233 (1st Cir. 1977)* ("Courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened . . . .'") (quoting Wright & Miller, *Federal Practice and Procedure: Civil* § 1357).

The methodology employed by FNB in determining the magnitude of the defendants' alleged overstatements of income is so defective, and the conclusions reached so defy logic, that no "reasonable inferences" can be drawn therefrom. No amount of detail can save FNB's complaint when the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions.

*B. Temporal Connection and Intervening Factors*

Even if we were to accept FNB's questionable methodology for alleging the magnitude of the defendants' alleged fraud, the complaint still falls short of pleading proximate cause because FNB's alleged injury was insufficiently close in time to the alleged misrepresentations to warrant the inference of a nexus [**30] between the two. The second and third factors relied on by Judge Mukasey, dealing with the time lapse between the alleged fraud and the plaintiff's injury, and the presence of external factors, are related. When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim. Similarly, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases. *Bastian, 892 F.2d at 684*.

In this case, the substantial period between the alleged fraud and FNB's loss, coupled with the concurrence of that loss with the real estate market crash, is additional support for the conclusion that the fraud was not a substantial cause of FNB's injury. Despite FNB's allegation that the net operating income for most of the collateral properties was insufficient to service the principal and interest payments due on the loans, few of the properties went into default until mid-1990, when the real estate market collapsed. We agree with **[**31]** the district court that the five year interval between the bank's losses and the defendants' alleged misrepresentations strongly suggests that external factors were a substantial cause of those losses.

As noted above, the proximate cause determination necessarily involves a component of policy. *See Hecht, 897 F.2d at 23*. Here, "no social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through [loan applications] with a fine-tooth comb in the hope of uncovering a misrepresentation." *Bastian, 892 F.2d at 685*. As in *Bastian*, FNB may "have alleged the cause of [its] entering into the transaction in which [it] lost money" but it has not alleged "the cause of the transaction's turning out to be a losing one." *Id. at 684*. FNB's claims fail because it has not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.

We do not mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate cause when **[**32]** the claim follows a market collapse. In this case, it is the cumulative effect of the considerations discussed above, rather than any single factor, that compels our decision.

CONCLUSION

With respect to those loans not foreclosed, FNB has not alleged an injury ripe for suit under RICO. As to those and the other loans enumerated in the complaint, proximate cause has not been adequately alleged. Accordingly, the judgment of the district court is affirmed.

---

**End of Document**

Q Questioned
As of: June 23, 2025 9:46 PM Z

# *Fowlkes v. Ironworkers Local 40*

United States Court of Appeals for the Second Circuit

September 24, 2014, Argued; June 19, 2015, Decided

Docket No. 12-336-cv

**Reporter**

790 F.3d 378 *; 2015 U.S. App. LEXIS 10339 **; 203 L.R.R.M. 3312; 99 Empl. Prac. Dec. (CCH) P45,342

COLE FOWLKES, Plaintiff-Appellant, -v.- IRONWORKERS LOCAL 40, DANNY DOYLE, KEVIN O'ROURKE, Defendants-Appellees. *

**Prior History: [**1]** Plaintiff-Appellant Cole Fowlkes appeals from a December 20, 2011 judgment of the United States District Court for the Southern District of New York (Preska, Chief Judge) dismissing his in forma pauperis complaint for lack of subject matter jurisdiction. Fowlkes, who self-identifies as male but was born biologically female, alleges that his labor union, Ironworkers Local 40, and two of its business agents, Danny Doyle and Kevin O'Rourke, discriminated against him on the basis of sex and retaliated against him for filing an earlier action against them. Invoking its authority to screen an in forma pauperis complaint at any time, the District Court, acting sua sponte, held that Fowlkes's failure to exhaust administrative remedies deprived the court of subject matter jurisdiction over his federal claims. The District Court thus also dismissed Fowlkes's state-and city-law claims for lack of jurisdiction.

We conclude that the administrative exhaustion requirement of Title VII, *42 U.S.C. § 2000e-5(e)*, is not a jurisdictional prerequisite to suit in federal court, but rather is a necessary precondition to suit and is subject to equitable defenses. We therefore VACATE the District Court's judgment dismissing Fowlkes's **[**2]** federal claims for lack of jurisdiction and REMAND for the District Court to determine whether any equitable defenses excuse Fowlkes's failure to exhaust his administrative remedies. On remand, the District Court shall also entertain Fowlkes's claim under the National Labor Relations Act, *29 U.S.C § 151, et seq.*, for breach of the duty of fair representation, and shall revisit, in light of the pending federal claims, whether to exercise supplemental jurisdiction over related state- and city-law claims.

*Fowlkes v. O'Rouke, 2011 U.S. Dist. LEXIS 159203 (S.D.N.Y., Dec. 20, 2011)*

**Disposition:** VACATED AND REMANDED.

## Core Terms

district court, allegations, fair representation, exhaustion, federal court, subject matter jurisdiction, administrative remedy, amended complaint, equitable defense, city-law, pro se, sex, required to exhaust, failure to exhaust, federal claim, failure to exhaust administrative remedies, discriminatory, retaliation, quotation, pleaded, futile, marks, exhaustion of administrative remedies, further proceedings, in forma pauperis, hiring hall, precondition, defendants', transgender, equitable

## Case Summary

### Overview

HOLDINGS: [1]-The district court erred in its determination that the union member's failure to exhaust administrative remedies deprived it of subject matter jurisdiction over his Title VII claims because the failure of a Title VII plaintiff to exhaust administrative remedies raised no jurisdictional bar to the claim proceeding in federal court, and the district court did not consider any potential equitable defenses that the member might have presented to excuse his failure to exhaust his administrative remedies; [2]-Although the member's amended pro se complaint did not flag the National Labor Relations Act, the member stated a plausible claim for a breach of the duty of fair representation because he alleged that the union refused to refer him for work for which he was qualified because of his transgender status and in retaliation for instituting legal proceedings against the union.

---

* The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

**Outcome**

Judgment vacated. Case remanded.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of
Review > General Overview

Civil Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Jurisdiction > Subject Matter
Jurisdiction > General Overview

*HN1* **Appeals, Standards of Review**

On review of a dismissal for lack of subject matter
jurisdiction, an appellate court construes the facts in the
light most favorable to the plaintiff.

Civil Procedure > ... > Pleadings > In Forma
Pauperis > General Overview

*HN2* **Pleadings, In Forma Pauperis**

Under *28 U.S.C.S. § 1915(e)(2)(B)(ii)*, a court must
dismiss at any time an in forma pauperis complaint that
fails to state a claim on which relief may be granted.

Civil Procedure > Appeals > Standards of
Review > De Novo Review

Civil Procedure > ... > Pleadings > In Forma
Pauperis > General Overview

*HN3* **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's sua
sponte dismissal of an in forma pauperis complaint
pursuant to *28 U.S.C.S. § 1915(e)(2)(B)*.

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > General
Overview

*HN4* **Civil Actions, Exhaustion of Remedies**

A plaintiff's failure to exhaust administrative remedies
available for Title VII of the Civil Rights Act of 1964, *42
U.S.C.S. § 2000e et seq.*, claims does not pose a
jurisdictional bar to a district court's consideration of
those claims.

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > General
Overview

*HN5* **Civil Actions, Exhaustion of Remedies**

Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §
2000e et seq.*, requires a plaintiff to exhaust
administrative remedies before filing suit in federal
court. The purpose of this exhaustion requirement is to
give the administrative agency the opportunity to
investigate, mediate, and take remedial action. The
administrative exhaustion requirement applies to pro se
and counseled plaintiffs alike.

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > General
Overview

*HN6* **Civil Actions, Exhaustion of Remedies**

Exhaustion of administrative remedies through the
Equal Employment Opportunity Commission is an
essential element of the Title VII of the Civil Rights Act
of 1964, *42 U.S.C.S. § 2000e et seq.*, statutory scheme;
accordingly, it is a precondition to bringing such claims
in federal court. The weight of precedent demonstrates
that administrative exhaustion is not a jurisdictional
requirement; rather, it is merely a precondition of suit
and, accordingly, it is subject to equitable defenses.

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > General
Overview

*HN7* **Civil Actions, Exhaustion of Remedies**

Filing a timely charge of discrimination with the Equal
Employment Opportunity Commission is not a
jurisdictional prerequisite to suit in federal court, but a
requirement that is subject to waiver, estoppel, and

790 F.3d 378, *378; 2015 U.S. App. LEXIS 10339, **2

equitable tolling.

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

*HN8* **Civil Actions, Exhaustion of Remedies**

The exhaustion of administrative remedies is a precondition to bringing a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, claim in federal court, rather than a jurisdictional requirement.

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

*HN9* **Civil Actions, Exhaustion of Remedies**

Occasionally, passing descriptions of the exhaustion requirement as "jurisdictional" can be found in the U.S. Court of Appeals for the Second Circuit's jurisprudence. But when the Second Circuit's decisions have turned on the question whether proper administrative exhaustion of a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, claim is a jurisdictional prerequisite to bringing suit, the Second Circuit has consistently held that it is not. The failure of a Title VII plaintiff to exhaust administrative remedies raises no jurisdictional bar to the claim proceeding in federal court.

Civil Procedure > Preliminary Considerations > Jurisdiction > General Overview

Governments > Courts > Authority to Adjudicate

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Waiver

*HN10* **Preliminary Considerations, Jurisdiction**

A court has no authority to create equitable exceptions to jurisdictional requirements. In contrast, a mandatory but nonjurisdictional prerequisite to suit may be subject to equitable defenses.

Administrative Law > Judicial

Review > Reviewability > Exhaustion of Remedies

*HN11* **Reviewability, Exhaustion of Remedies**

When an agency has previously taken a firm stand against a plaintiff's position, the plaintiff's failure to exhaust administrative remedies may be excused on the ground that exhaustion would be futile.

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

*HN12* **Civil Actions, Exhaustion of Remedies**

Where the complaint is one alleging retaliation by an employer against an employee for filing an Equal Employment Opportunity Commission (EEOC) charge, or where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge, the failure to raise the allegations in the complaint before the EEOC may not bar federal court proceedings.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN13* **Motions to Dismiss, Failure to State Claim**

When a plaintiff appears pro se before a district court, he is entitled to special solicitude, and a court will read his pleadings to raise the strongest arguments that they suggest. Dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases. At the same time, a pro se complaint must allege enough facts to state a claim to relief that is plausible on its face.

Labor & Employment Law > ... > Unfair Labor Practices > Union Violations > Breach of Duty of Fair Representation

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

790 F.3d 378, *378; 2015 U.S. App. LEXIS 10339, **2

<u>HN14</u> **Union Violations, Breach of Duty of Fair Representation**

The duty of fair representation is a statutory obligation under the National Labor Relations Act, *29 U.S.C.S. § 151 et seq.*, requiring a union to serve the interests of all members without hostility or discrimination, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. This duty applies in the hiring hall setting because, there, members of the union have entrusted the union with the task of representing them and it is essential that work be assigned in a nonarbitrary and nondiscriminatory fashion. A union breaches its duty of fair representation if its actions with respect to a member are arbitrary, discriminatory, or taken in bad faith.

    Labor & Employment Law > ... > Unfair Labor Practices > Union Violations > Breach of Duty of Fair Representation

    Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

<u>HN15</u> **Union Violations, Breach of Duty of Fair Representation**

Allegations that a union abused its hiring hall procedures to undermine a member's employment opportunities warrant particularly close scrutiny when a union wields special power as the administrator of a hiring hall.

    Labor & Employment Law > ... > Unfair Labor Practices > Union Violations > Breach of Duty of Fair Representation

    Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

<u>HN16</u> **Union Violations, Breach of Duty of Fair Representation**

A union need not completely eliminate a member's employment opportunities before the member may be entitled to relief.

    Civil Procedure > Judicial Officers > Judges > Discretionary Powers

    Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

    Evidence > Burdens of Proof > Allocation

    Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Union Violations

<u>HN17</u> **Judges, Discretionary Powers**

A union, not the member, bears the burden of demonstrating that the member failed to exhaust intra-union grievance procedures, and courts have discretion to decide whether to require exhaustion of internal union procedures.

    Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

    Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

<u>HN18</u> **Standards of Review, Abuse of Discretion**

A district court's decision to dismiss pendent state- and city-law claims is reviewed for abuse of discretion. To find an abuse of discretion, an appellate court must conclude that a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.

**Counsel:** ROBERT T. SMITH (Tami Kameda Sims and Howard R. Rubin, on the brief), Katten Muchin Rosenman LLP, Washington, DC, and Los Angeles, CA, for Appellant.

JOHN S. GROARKE (Jennifer D. Weekley, on the brief), Colleran, O'Hara & Mills LLP, Woodbury, NY, for Appellees.

**Judges:** Before: LEVAL, CHIN, and CARNEY, Circuit Judges.

**Opinion by:** SUSAN L. CARNEY

# Opinion

    **[*380]** SUSAN L. CARNEY, *Circuit Judge*:

790 F.3d 378, *380; 2015 U.S. App. LEXIS 10339, **2

Plaintiff-Appellant Cole Fowlkes appeals from a December 20, 2011 judgment of the United States District Court for the Southern District of New York (Preska, *Chief Judge*), dismissing his *in forma pauperis* complaint for lack of subject matter jurisdiction. Fowlkes, who self-identifies as male but was born biologically female, **[*381]** alleges that his **[**3]** union, Ironworkers Local 40 (the "Local"), and two of its business agents, Danny Doyle and Kevin O'Rourke (the Local, Doyle, and O'Rourke, together, "defendants"), discriminated against him on the basis of sex and retaliated against him for filing an earlier action against them. The discrimination and retaliation alleged by Fowlkes primarily consisted of refusing to refer Fowlkes for work through the Local's hiring hall.

The District Court construed Fowlkes's complaint as stating federal claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e, et seq.*, and related state- and city-law claims. Invoking its authority pursuant to *28 U.S.C. § 1915(e)(2)(B)* to screen an *in forma pauperis* complaint at any time, the District Court, acting *sua sponte*, held that Fowlkes's failure to exhaust administrative remedies for his Title VII claims deprived the court of subject matter jurisdiction over those claims. On the understanding that no federal claim remained after the Title VII claims' dismissal, the District Court declined to exercise supplemental jurisdiction over the related state- and city-law claims, and entered a judgment dismissing Fowlkes's complaint *in toto*.

For the reasons stated below, we conclude **[**4]** that the District Court erred in its determination that Fowlkes's failure to exhaust administrative remedies deprived it of subject matter jurisdiction over his Title VII claims. In addition, we conclude that Fowlkes has stated a federal claim under the National Labor Relations Act ("NLRA"), *29 U.S.C. § 151, et seq.*, for the Local's breach of its duty of fair representation. Accordingly, we vacate the judgment dismissing Fowlkes's amended complaint and remand the cause to the District Court. On remand, the District Court shall: (1) consider whether any equitable defenses excuse Fowlkes's failure to exhaust his administrative remedies for his Title VII claims; (2) conduct further proceedings on Fowlkes's duty of fair representation claim; and (3) reevaluate whether to exercise supplemental jurisdiction over Fowlkes's pendent state- and city-law claims and conduct any further proceedings on those claims as it determines may be warranted.

**BACKGROUND**

## I. Factual Background[1]

Fowlkes is a journeyman ironworker and a member of Local 40. As a journeyman ironworker, Fowlkes would **[**5]** (in his words) detonate "caps/blow cement from steel/use torch to cut/burn steel[,] preparing it for the welder." 2011 Am. Compl. at 15. Although Fowlkes was born biologically female and was named "Colette," he now self-identifies as a man, preferring to be called "Cole" and to be referred to in the masculine. *Id.* at 1; Appellant's Br. at 3.

To place its members at job sites, the Local ran a hiring hall, and Doyle and O'Rourke, as business agents for the Local, participated in the placement process. Fowlkes alleges that, beginning as early as 2005, the Local refused to refer him to jobs for which he was qualified, "[i]ntentionally passing over [Fowlkes] by choosing other men to receive [the] construction work" that he sought. 2011 Am. Compl. at 17. Fowlkes further alleges that O'Rourke received calls specifically requesting him for particular jobs for which he had the requisite skills, but that O'Rourke and Doyle passed him over in favor of others "with lesser skill level." **[*382]** *Id.* at 19. The Local's failure to refer Fowlkes for assignments allegedly continued through 2011; in that year, Fowlkes claims to have worked a total of only sixty-seven hours as a journeyman, again as a result of defendants' "refusal to refer **[**6]** and give [him] work." *Id.* at 21.

Fowlkes alleges that defendants failed to refer him for work for two primary reasons. First, he asserts that defendants discriminated against him on the basis of sex: Fowlkes claims that if he had "acted with a femin[in]e character or worked with less musc[le], he might [have] not [incurred] [i]ntentional passing over." *Id.* at 16; *see also id.* at 25 (alleging that defendants told him that he "would get a good job if [he] would act like a girl"). Second, Fowlkes recounts that Doyle and O'Rourke each told him that they refused to refer him for work because he had previously filed a suit against the Local.[2] He explains that, when he inquired why he was not receiving work despite his position at the "top of the

---

[1] **HN1** On review of this dismissal for lack of subject matter jurisdiction, we construe the facts in the light most favorable to Fowlkes. *See TradeComet.com LLC v. Google, Inc., 647 F.3d 472, 475 (2d Cir. 2011).*

[2] As discussed *infra*, Fowlkes filed a discrimination charge against the Local in 2007.

out of work list," O'Rourke allegedly responded by saying "well you're sueing [sic] us," and Doyle similarly replied that Fowlkes "should[n't] [have] tried to sue us." *Id.* at 17.

Beyond defendants' alleged refusal to refer him for work, Fowlkes also claims that he was subjected to discriminatory treatment at job sites on account of his sex, and he suggests that the defendants' response to that treatment reflects their discriminatory **[**7]** stance towards him. For example, he alleges that in 2008, a welder at a job site told him, "I always thought you would be a girl that would work and make the man happy." *Id.* at 15. The welder became angry at Fowlkes's response and began "throwing welding leads around," endangering Fowlkes, who then reported the incident to a superior at the job site. *Id.* at 16. The superior informed Doyle and O'Rourke of Fowlkes's report and the welder's behavior. Fowlkes complains that "there were no attempts . . . to correct or remove the situation" and that Doyle and O'Rourke "found the actions of the welder . . . amus[]ing" and "told [Fowlkes] to just keep working." *Id.*

## II. Procedural Background

### a. Fowlkes's Prior Action

On May 29, 2007, Fowlkes initiated proceedings before the Equal Employment Opportunity Commission ("EEOC"), charging the Local with discrimination and alleging that the Local subjected him to retaliation and sex-based discrimination in violation of Title VII.[3] The EEOC issued Fowlkes a "Right to Sue" letter dated July 10, 2007: The letter notified him that, after concluding its investigation, the EEOC had decided not to take further action against the Local. It advised that Fowlkes was free to pursue **[**8]** his Title VII claims by filing a federal suit against the Local within ninety days of his receipt of the letter. It was not until more than 180 days later, however—on January 25, 2008—that Fowlkes filed a complaint against defendants in the United States District Court for the Southern District of New York.

Proceeding *pro se* in that 2008 action, Fowlkes made essentially the same allegations as he had in his EEOC

charge. Defendants moved for summary judgment. In early 2010, Magistrate Judge Freeman issued a Report and Recommendation ("R&R") concluding, on the ground that **[*383]** Fowlkes's action was untimely, that defendants' motion should be granted. Shortly thereafter, Judge Kaplan granted defendants' motion for substantially the reason given in the R&R.

### b. Fowlkes's Second Action

In July 2011, Fowlkes filed a second complaint, again in the Southern District of New York and again proceeding *pro se*, alleging that defendants violated his "Civil Rights (involving Employment)" by subjecting him to harassment **[**9]** and refusing to refer him for work based on his sex.[4] 2011 Compl. at 2. The allegations in this 2011 complaint covered the period from 2005 through 2011. Concurrently, Fowlkes sought permission to proceed *in forma pauperis*.

In October 2011, the District Court granted Fowlkes's request to proceed *in forma pauperis* and directed Fowlkes to submit an amended complaint within sixty days. In the same order, the District Court, citing its authority under *28 U.S.C. § 1915(e)(2)(B)* "to screen *sua sponte* an *in forma pauperis* complaint at any time,"[5] considered its jurisdiction over the matter. J.A. 17. It first construed Fowlkes's complaint as raising claims under three statutes: Title VII; the New York State Human Rights Law ("NYSHRL"), *N.Y. Exec. Law § 290, et seq.*; and the New York City Human Rights Law ("NYCHRL"), *N.Y. City Admin. Code § 8-101, et seq.* The District Court then observed, "Before a federal court may review a claim under Title VII, a plaintiff must first exhaust his administrative remedies by filing a charge with the EEOC or an appropriate state agency within 300 days of the unlawful discriminatory act." *Id.* at 22. Because Fowlkes did not allege that he had filed a complaint with **[**10]** the EEOC or any New York agency relating to conduct occurring *after* May 29, 2007,[6] the District Court's subject matter jurisdiction

---

[3] At that time, Fowlkes self-identified as a female in formal documents and referred to himself as "Ms. Cole Fowlkes." The substance of his claims, however, mirrored that presented in the current suit.

---

[4] In this complaint, Fowlkes referred to himself as "Mr. Cole Fowlkes."

[5] **HN2** Under *28 U.S.C. § 1915(e)(2)(B)(ii)*, a court must dismiss "at any time" an *in forma pauperis* complaint that "fails to state a claim on which relief may be granted." *See also Giano v. Goord, 250 F.3d 146, 149 (2d Cir. 2001).*

[6] As noted above, Fowlkes filed a charge with the EEOC on May 29, 2007, and the federal suit based on the conduct alleged in that charge was dismissed on timeliness grounds in

790 F.3d 378, *383; 2015 U.S. App. LEXIS 10339, **10

over Fowlkes's Title VII claim was uncertain, it warned. In light of Fowlkes's *pro se* status, the District Court granted him leave to amend his complaint to "(1) detail his Title VII and New York State and City Human Rights Law claims of discrimination that were not already raised in the Prior [Action] as set forth above, and (2) allege whether he received a Determination or Right to Sue Letter or whether he otherwise attempted to exhaust his administrative remedies." *Id.* at 26.

In November 2011, Fowlkes filed an amended complaint, as directed. On December 20, 2011, again acting *sua sponte* pursuant to its authority under *28 U.S.C. § 1915(e)(2)(B)*, the District Court held that Fowlkes's Title VII claim "must be dismissed because he does not allege that he exhausted [**11] his administrative remedies." *Id.* at 73 (citing *42 U.S.C. § 2000e-5(e)(1)*). The District Court elaborated that "because Plaintiff has not exhausted his Title VII claim, the Court does not have jurisdiction over that Title VII claim." *Id.* Having dismissed the Title VII claims, the District Court then determined that only state- and city-law claims remained and concluded that it lacked subject matter jurisdiction to adjudicate those claims [*384] standing alone. It therefore dismissed the case *in toto*.

Fowlkes timely appealed.[7]

### DISCUSSION[8]

On appeal, Fowlkes argues that the District Court erred in dismissing his amended complaint because exhaustion of administrative remedies before filing a Title VII action in federal court is a not a jurisdictional requirement, but rather a precondition of suit that may be subject to equitable defenses. On the merits, Fowlkes asserts that he has adequately pleaded claims for both violations of Title VII and breach of the duty of fair representation under the NLRA. He further argues [**12] that, assuming he sufficiently pleaded at least one federal claim, the District Court erroneously declined to exercise supplemental jurisdiction over his

---

early 2010.

[7] Although he proceeded in the District Court *pro se*, Fowlkes is now ably represented by court-appointed counsel.

[8] *HN3* We review *de novo* a district court's *sua sponte* dismissal of an *in forma pauperis* complaint pursuant to *28 U.S.C. § 1915(e)(2)(B). McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)*.

pendent state- and city-law claims.

For the reasons discussed below, we agree with Fowlkes that *HN4* a plaintiff's failure to exhaust administrative remedies available for Title VII claims does not pose a jurisdictional bar to a district court's consideration of those claims. We also conclude that he has pleaded an NLRA claim that survives *§ 1915(e)* review. We therefore vacate the judgment of the District Court and remand for further proceedings.

## I. Subject Matter Jurisdiction and the Failure to Exhaust Administrative Remedies for Title VII Claims

It is well established that *HN5* Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court. *See, e.g., Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010)* (citing *42 U.S.C. § 2000e-5(e)* and *(f)*); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001)* (same). "The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)* (internal quotation marks omitted). The administrative exhaustion requirement applies to *pro se* and counseled plaintiffs alike. *See Pikulin v. City Univ. of N.Y., 176 F.3d 598, 599-600 (2d Cir. 1999)* (per curiam).

*HN6* "Exhaustion of administrative remedies through [**13] the EEOC is an essential element of the Title VII . . . statutory scheme[]"; accordingly, it is "a precondition to bringing such claims in federal court." *Legnani, 274 F.3d at 686* (internal quotation marks omitted); *see also Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003)* ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies . . . ."). The weight of precedent demonstrates that administrative exhaustion is not a *jurisdictional* requirement; rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses.

The distinction has been effectively drawn by the Supreme Court. In *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)*, a group of flight attendants brought a class action alleging that TWA unlawfully discriminated against them on the basis of sex in violation of Title VII, *id. at 388*. Approximately 92% of the [*385] plaintiffs had not timely filed claims with the EEOC before the suit was

790 F.3d 378, *385; 2015 U.S. App. LEXIS 10339, **13

brought in federal court. *Id. at 390*. After the Seventh Circuit Court of Appeals held that these claims were "jurisdictionally barred," the plaintiffs appealed, asking the Supreme Court to address the "single question . . . whether the timely filing of an EEOC charge is a jurisdictional prerequisite to bringing a Title VII suit in federal **[**14]** court or whether the requirement is subject to waiver and estoppel." *Id. at 390, 392*. The Supreme Court sided with the plaintiffs, holding that **HN7** "filing a timely charge of discrimination with the EEOC is *not* a jurisdictional prerequisite to suit in federal court, but a requirement that . . . is subject to waiver, estoppel, and equitable tolling." *Id. at 393* (emphasis added). According to the Court, this conclusion was dictated by "[t]he structure of Title VII, the congressional policy underlying it, and the reasoning of [its] cases." *Id.* Particularly relevant here, the Court cited in support of its conclusion two cases in which at least some of the plaintiffs seeking relief in federal court—like Fowlkes with regard to his allegations of post-May 29, 2007 misconduct—had never filed an EEOC charge at all. *See id. at 396-97* (citing *Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976)*, and *Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975)*).

In line with *Zipes*, our Court has previously ruled that **HN8** the exhaustion of administrative remedies "is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement." *Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000)* (internal quotation marks omitted); *see also Boos v. Runyon, 201 F.3d 178, 182 (2d Cir. 2000)* (analyzing the statutory structure of Title VII to conclude that "the exhaustion requirement, while weighty, is not jurisdictional"). For **[**15]** example, in *Francis*, we held that the district court had subject matter jurisdiction to hear the plaintiff's Title VII failure-to-promote claim, even though his proper exhaustion of the claim was "not free from uncertainty," because failure to exhaust was merely a defense subject to waiver. *Id. at 766*. Similarly here, the question whether Fowlkes properly exhausted his claims is "not free from uncertainty," *id.*, but this ambiguity has no bearing on the subject matter jurisdiction of the District Court.

**HN9** Occasionally, passing descriptions of the exhaustion requirement as "jurisdictional" can be found in our Circuit's jurisprudence. *See, e.g., Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)* ("If a [Title VII] claimant has failed to pursue a given claim in administrative proceedings, the federal court generally lacks jurisdiction to adjudicate that claim."); *Shah v.*

*N.Y.S. Dep't of Civil Serv., 168 F.3d 610, 613 (2d Cir. 1999)* ("The federal courts generally have no jurisdiction to hear claims not alleged in an employee's EEOC charge."). But "when our decisions have turned on the question . . . whether proper administrative exhaustion [of a Title VII claim] is a jurisdictional prerequisite . . . to bringing suit," we have "consistently" held that it is not. *Francis, 235 F.3d at 768*. We therefore take this opportunity to underscore **[**16]** that the failure of a Title VII plaintiff to exhaust administrative remedies raises no jurisdictional bar to the claim proceeding in federal court.

As suggested above, the mischaracterization of a Title VII plaintiff's administrative exhaustion requirement as "jurisdictional" has practical effect. **HN10** A "[c]ourt has no authority to create equitable exceptions to jurisdictional requirements." *Bowles v. Russell, 551 U.S. 205, 214, 127 S. Ct. 2360, 168 L. Ed. 2d 96 (2007)*. In contrast, a mandatory but nonjurisdictional **[*386]** prerequisite to suit may be subject to equitable defenses. *See id. at 216* (Souter, J., dissenting); *see also Fernandez v. Chertoff, 471 F.3d 45, 58 (2d Cir. 2006)* ("Because [the] failure to exhaust [one's] administrative remedies is not a jurisdictional defect, it is subject to equitable defenses."). By treating the issue of subject matter jurisdiction as a threshold matter here, the District Court did not consider any potential equitable defenses that Fowlkes might present to excuse his failure to exhaust his administrative remedies.

It is not clear from the record, at this stage, whether an equitable principle may excuse Fowlkes's failure to exhaust before filing his 2011 complaint. As Fowlkes has urged in his brief on appeal—and defendants have challenged—two equitable doctrines that the District Court will be called **[**17]** on to consider on remand are futility and "reasonable relatedness." Because of their direct bearing on the facts as alleged, we discuss aspects of each of these possible defenses below.

**HN11** When an agency has previously "taken a firm stand" against a plaintiff's position, the plaintiff's failure to exhaust administrative remedies may be excused on the ground that exhaustion would be futile. *Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997)* (internal quotation marks omitted); *cf. Kirkendall v. Halliburton, Inc., 707 F.3d 173, 179 (2d Cir. 2013)* (noting that the exhaustion requirement for ERISA claims "is not absolute" and may be excused when a plaintiff demonstrates that pursuing administrative remedies would be futile).

Though our Circuit has not had occasion to consider this particular equitable defense in the context of EEOC Title VII exhaustion, Fowlkes may have a colorable argument that filing a charge alleging discrimination based on his transgender status would have been futile. When Fowlkes filed his 2011 complaint, the EEOC had developed a consistent body of decisions that did not recognize Title VII claims based on the complainant's transgender status. *See, e.g., Kowalczyk v. Dep't of Veterans Affairs, No. 01942053, 1994 EEOPUB LEXIS 4891, 1994 WL 744529, at *2 (E.E.O.C. Dec. 27, 1994)* (concluding that an "appellant's allegation of discrimination based on her acquired sex (transsexualism) is not a basis protected **[**18]** under Title VII"); *Campbell v. Dep't of Agriculture, No. 01931730, 1994 EEOPUB LEXIS 695, 1994 WL 652840, at *1 n.3 (E.E.O.C. July 21, 1994)* (recognizing precedent holding that "gender dysphoria or transsexualism is not protected under Title VII under the aegis of sex discrimination"); *Casoni v. U.S. Postal Serv., No. 01840104, 1984 EEOPUB LEXIS 876, 1984 WL 485399, at *3 (E.E.O.C. Sept. 28, 1984)* ("[A]ppellant's allegation of sex discrimination on account of being a male to female preoperative transsexual . . . [is] not cognizable . . . under the provisions of Title VII."). It was not until *Macy v. Holder, No. 0120120821, 2012 EEOPUB LEXIS 1181, 2012 WL 1435995 (E.E.O.C. Apr. 20, 2012)*, published after Fowlkes filed his 2011 complaint, that the EEOC altered its position and concluded that discrimination against transgender individuals based on their transgender status does constitute sex-based discrimination in violation of Title VII. *2012 EEOPUB LEXIS 1181, [WL] at *11* & n.16. Thus, Fowlkes's failure to exhaust could potentially be excused on the grounds that, in 2011, the EEOC had "taken a firm stand" against recognizing his Title VII discrimination claims.

A second equitable defense potentially available to Fowlkes is that his more recent allegations of discrimination may be "reasonably related" to the discrimination about which he had filed an earlier charge with the EEOC. **HN12** "[W]here the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge," or "where the complaint alleges **[*387]** further incidents of discrimination carried **[**19]** out in precisely the same manner alleged in the EEOC charge," the failure to raise the allegations in the complaint before the EEOC may not bar federal court proceedings. *Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003)* (internal quotation marks omitted).

Here, Fowlkes alleges in his amended complaint that he

was not referred for work as retaliation for having previously sued defendants. In addition, the District Court may reasonably determine that Fowlkes was discriminated against by defendants "in precisely the same manner" in the years leading up to the amended complaint as was alleged in the earlier EEOC charge. Given the contents of Fowlkes's amended complaint and the close resemblance that it bore to his earlier EEOC charge, his more recent allegations may be "reasonably related" to those included in his earlier administrative filing with the EEOC.

As we have mentioned, the District Court has not yet had an opportunity to consider whether futility is a cognizable equitable defense in the context of EEOC Title VII exhaustion and, in this particular case, whether futility, "reasonable relatedness," or any other equitable doctrine excuses Fowlkes's failure to exhaust his administrative remedies. We therefore remand to the District **[**20]** Court to address these questions in the first instance, on full briefing by the parties.[9]

## II. Duty of Fair Representation Claim

The District Court construed Fowlkes's complaint as raising claims under only one federal statute: Title VII. Fowlkes contends on appeal that he also stated a claim against the Local under the NLRA for breach of the duty of fair representation. Although he articulated that claim less than plainly, we are inclined to agree with Fowlkes on appeal.

**HN13** Because Fowlkes appeared *pro se* before the District Court, he is "entitled to special solicitude," and we will read his pleadings "to raise the strongest arguments they suggest." *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006)* (internal quotation marks omitted). "[D]ismissal of a *pro se* claim as insufficiently pleaded is appropriate **[**21]** only in the most unsustainable of cases." *Boykin v. KeyCorp, 521 F.3d 202, 216 (2d Cir. 2008)*. At the same time, a *pro se* complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

---

[9] We further decline to consider the merits of Fowlkes's Title VII claims at this juncture. If the District Court determines that Fowlkes's failure to exhaust his administrative remedies cannot be excused, then Fowlkes has not satisfied a necessary predicate for his Title VII claims, and those claims may be dismissed without examining his substantive allegations. Thus, our consideration of the merits of Fowlkes's Title VII claims would be premature.

790 F.3d 378, *387; 2015 U.S. App. LEXIS 10339, **21

*Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).*

**HN14** The duty of fair representation is a "statutory obligation" under the NLRA, requiring a union "to serve the interests of all members without hostility or discrimination . . . , to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967).* This duty applies in the hiring hall setting because, there, "members of the [union] have entrusted the union with the task of representing them" and it is essential that work be assigned "in a nonarbitrary and nondiscriminatory fashion." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union [*388] No. 6, 493 U.S. 67, 88, 110 S. Ct. 424, 107 L. Ed. 2d 388 (1989).* A union breaches its duty of fair representation if its actions with respect to a member are arbitrary, discriminatory, or taken in bad faith. *Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 111 S. Ct. 1127, 113 L. Ed. 2d 51 (1991).*[10]

Although Fowlkes's amended *pro se* complaint did not flag the NLRA, we nonetheless are persuaded, with the benefit of a counseled brief on Fowlkes's behalf, that Fowlkes has stated a plausible **[**22]** claim for a breach of the duty of fair representation. In his amended complaint, Fowlkes alleges that the Local refused to refer him for work for which he was qualified because of his transgender status and in retaliation for instituting legal proceedings against the Local. **HN15** Allegations that a union abused its hiring hall procedures to undermine a member's employment opportunities warrant particularly close scrutiny when a union wields special power as the administrator of a hiring hall. *Breininger, 493 U.S. at 89; see also Gilbert v. Country Music Ass'n, Inc., 432 F. App'x 516, 521 (6th Cir. 2011).* Assuming, as we must, that Fowlkes's allegations are true, the Local's conduct was at the very least arbitrary, if not discriminatory or indicative of bad faith.

In urging us to sustain the dismissal of this claim, too, defendants assert that a six-month statute of limitations applies to duty of fair representation claims, arguing that, to survive, Fowlkes's claim must arise out of events occurring in the six months prior to the filing of his 2011

complaint.[11] *See Coureau v. Granfield, 556 F. App'x 40, 41 (2d Cir. 2014).* Because Fowlkes's allegations regarding their conduct during the relevant six-month period—from January 29, 2011 through July 29, 2011—fail to plausibly state a claim, they say, his suit on this ground is barred.

Even assuming the applicability of a six-month statute of limitations, defendants are incorrect that Fowlkes has failed to plausibly state a claim. Fowlkes asserts in his amended complaint that the Local would not provide him employment *throughout* 2011. 2011 Am. Compl. at 3. He alleges that he received only 67 hours of work in all of 2011, "less than a two week period" in total, and that he was told in May and June of that year that he "could forget about getting any work." *Id.* at 21. Based on the foregoing, Fowlkes plausibly stated a duty of fair representation claim based on conduct occurring within the six-month statute of limitations period.

Second, defendants contend that Fowlkes's claim for breach of the duty of fair representation is irretrievably undermined by the complaint's own allegations, which reflect that Fowlkes was, in fact, referred for **[**24]** work in May and June 2011. This argument rests on an obvious fallacy: the mere fact that Fowlkes was referred for *some* work during the relevant period does not defeat a claim that he was subjected to arbitrary, discriminatory, or bad-faith treatment by the Local's overall distribution of work. **HN16** A union need not completely **[*389]** eliminate a member's employment opportunities before the member may be entitled to relief.

Finally, defendants argue that Fowlkes may not pursue a duty of fair representation claim in court because he failed to demonstrate that he exhausted his remedies within the union. This argument, too, is unavailing. **HN17** The union, not the member, bears the burden of demonstrating that the member failed to exhaust intra-union grievance procedures, *see Johnson v. Gen. Motors, 641 F.2d 1075, 1079 (2d Cir. 1981),* and "courts have discretion to decide whether to require exhaustion of internal union procedures," *Clayton v. Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am., 451 U.S. 679, 689, 101 S. Ct. 2088, 68 L. Ed. 2d*

---

[10] A duty of fair representation cause of action does not lie against the individual defendants Doyle and O'Rourke. *See Morris v. Local 819, Int'l Bhd. of Teamsters, 169 F.3d 782, 784 (2d Cir. 1999)* (per curiam). Such a claim may be stated only against a union. *Id.*

[11] As previously discussed, **[**23]** Fowlkes originally filed his complaint in the District Court in July 201I. At the instruction of the court, he amended the complaint and refiled in November 2011. The parties do not dispute that the statute of limitations period for Fowlkes's duty of fair representation claim would run from the date of the original pleading—here, July 29, 2011.

790 F.3d 378, *389; 2015 U.S. App. LEXIS 10339, **23

*538 (1981)*. Defendants may attempt to meet this burden before the District Court on remand, but a cursory invocation of an intra-union exhaustion requirement in their appellate brief certainly does not suffice to bar the duty of fair representation claim from proceeding past the pleadings stage.

In sum, we conclude that Fowlkes has stated a claim **[**25]** for breach of the duty of fair representation against the Local. We vacate the District Court's determination that Fowlkes stated federal claims under only Title VII, and we remand for further proceedings on his duty of fair representation claim.

### III. Pendent State- and City-Law Claims

Fowlkes also appeals the District Court's dismissal of his pendent state- and city-law claims under the NYSHRL and NYCHRL. *HN18* This decision is reviewed for abuse of discretion. *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd., 726 F.3d 62, 84 (2d Cir. 2013)*. To find an abuse of discretion, "we must conclude that a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 99 (2d Cir. 2014)*.

Here, the District Court dismissed the state- and city-law claims based on the premise that Fowlkes did not plead a federal claim for which there exists subject matter jurisdiction. Because we have now concluded that (1) Fowlkes's failure to exhaust administrative remedies did not deprive the District Court of jurisdiction over his Title VII claims, and (2) Fowlkes has stated a claim under the NLRA for breach of the duty of fair representation, we vacate the dismissal of Fowlkes's pendent state- and city-law claims to allow **[**26]** the District Court to reconsider on remand whether exercising supplemental jurisdiction is appropriate given our conclusions regarding his federal claims.

### CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the District Court and **REMAND** for further proceedings consistent with this opinion.

⚠ Caution
As of: June 23, 2025 9:47 PM Z

# *Harris v. Mills*

United States Court of Appeals for the Second Circuit

February 2, 2009, Argued; July 9, 2009, Decided

Docket No. 07-2283-cv

**Reporter**

572 F.3d 66 *; 2009 U.S. App. LEXIS 15101 **; 22 Am. Disabilities Cas. (BNA) 379

MONROE S. HARRIS, B.S., D.O., Plaintiff-Appellant, - v. - RICHARD P. MILLS, Commissioner of Education, MERRYL H. TISCH, Regent Chancellor, DAVID A. PATERSON, Governor, Defendants-Appellees, NEW YORK STATE EDUCATION DEPARTMENT, Defendant. *

**Subsequent History:** Related proceeding at *Vann v. New York City Comm'r of Corr., 2011 U.S. Dist. LEXIS 87656 (S.D.N.Y., Apr. 5, 2011)*

**Prior History: [**1]** Appeal from a judgment of the United States District Court for the Southern District of New York (Victor Marrero, Judge). The district court granted the defendants' motion to dismiss the plaintiff's pro se amended complaint. We conclude that the plaintiff's claims are legally insufficient, even when liberally construed, although we disagree with the district court's decision to base that conclusion in part on the theory that the plaintiff's claims under Title II of the Americans with Disabilities Act and the Rehabilitation Act cannot be asserted against individuals in their official capacity.

*Harris v. Mills, 478 F. Supp. 2d 544, 2007 U.S. Dist. LEXIS 23102 (S.D.N.Y., 2007)*

**Disposition:** Affirmed.

## Core Terms

disability, accommodation, Rehabilitation, license, district court, amended complaint, medical license, reinstatement, reasonable accommodation, alleges, injunctive relief, official capacity, pro se, revocation, medicine, restore, entity, qualified individual, due process claim, motion to dismiss, defendants', revoked

# Case Summary

### Procedural Posture

Pro se plaintiff doctor brought an action pursuant to, inter alia, Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*, the Rehabilitation Act of 1973, *29 U.S.C.S. § 794 et seq.*, and *42 U.S.C.S. § 1983*. The doctor appealed a judgment of the United States District Court for the Southern District of New York in favor of defendants, the Commissioner of Education, the Regent Chancellor, and the Governor.

### Overview

The doctor's medical license was revoked because he was found to have committed fraud and engaged in improper medical practices. At issue was the New York State Education Department's denial of the doctor's petition to reinstate his license. The doctor claimed to have been illegally denied a reasonable accommodation for his cognitive disabilities and unconstitutionally deprived of due process of law. The district court granted defendants' motion to dismiss the ADA and Rehabilitation Act accommodation claims because the district court improperly concluded that those statutes did not provide for individual liability. The district court also dismissed the Rehabilitation Act claim and the remaining claims for failure to state a claim upon which relief could be granted. Although the instant court disagreed with some of the district court's reasoning, it agreed with the district court that the doctor's claims were legally insufficient, even when read with the lenity that must attend the review of pro se pleadings. The doctor's contention that his medical licensing qualifications should be relaxed in light of his disability was not a reasonable accommodation claim.

---

* The Clerk of the Court is respectfully directed to amend the official caption to conform to this one. David A. Paterson and Merryl H. Tisch are substituted for George E. Pataki and Robert M. Bennett, respectively, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

572 F.3d 66, *66; 2009 U.S. App. LEXIS 15101, **1

**Outcome**
The judgment of the district court was affirmed.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN1* **Standards of Review, De Novo Review**

An appellate court reviews de novo the grant of a motion to dismiss for failure to state a claim upon which relief can be granted under *Fed. R. Civ. P. 12(b)(6)*. The appellate court considers the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor. The appellate court applies a plausibility standard, which is guided by two working principles. First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. A court remains obligated to construe a pro se complaint liberally.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Scope

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

*HN2* **Protection of Disabled Persons, Federal Employment & Services**

Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*, and Rehabilitation Act of 1973, *29 U.S.C.S. § 794 et seq.*, suits for prospective injunctive relief may, under the doctrine established by Ex parte Young, proceed against individual officers in their official capacity.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Accommodations

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Scope

*HN3* **Federal Employment & Services, Accommodations**

Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*, proscribes discrimination against the disabled in access to public services. It provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. *42 U.S.C.S. § 12132*. To assure that those requirements are met, reasonable accommodation may have to be provided to the qualified individual. Similarly, the Rehabilitation Act of 1973, *29 U.S.C.S. § 794 et seq.*, requires that specified otherwise qualified disabled individuals receive reasonable accommodations from programs receiving federal financial assistance. *29 U.S.C.S. § 794(a)*. In most cases, the standards are the same for actions under both statutes. In order for a plaintiff to establish a prima facie violation under these Acts, she must demonstrate (1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Accommodations

*HN4* **Federal Employment & Services, Accommodations**

Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*, requires the accommodation

572 F.3d 66, *66; 2009 U.S. App. LEXIS 15101, **1

of disabled persons who are entitled to a public benefit whether or not they are given an accommodation. The term qualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices meets the essential eligibility requirements for the relevant benefit.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Accommodations

*HN5* **Federal Employment & Services, Accommodations**

The Americans with Disabilities Act mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally.

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > Interactive Process
Business & Corporate Compliance > ... > Disability Discrimination > Reasonable Accommodations > Interactive Process

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Accommodations

*HN6* **Reasonable Accommodations, Interactive Process**

The Americans with Disabilities Act envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. *29 C.F.R. § 1630.2*. To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN7* **Protection of Rights, Section 1983 Actions**

*42 U.S.C.S. § 1983* is not a means for litigating in a federal forum whether a state or local administrative decision was arbitrary and capricious.

**Counsel:** DOUGLAS G. WADLER (Kenneth Joel Haber, of counsel), Law Office of Kenneth Joel Haber, P.C., Rockville, MD, for Appellant.

MARION R. BUCHBINDER, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Michael S. Belohlavek, Senior Counsel, Andrew M. Cuomo, Attorney General of the State of New York, of counsel), New York, NY, for Appellees.

**Judges:** Before: SACK and PARKER, Circuit Judges, and COTE, District Judge. **

**Opinion by:** SACK

# Opinion

[*68] SACK, *Circuit Judge*:

Monroe S. Harris appeals [**2] from a judgment of the United States District Court for the Southern District of New York (Victor Marrero, *Judge*). Harris was formerly licensed by the state of New York as a doctor of osteopathic medicine; his medical license was revoked because he was found to have committed fraud and engaged in improper medical practices. At issue is the New York State Education Department's denial of Harris's petition to reinstate his license. Harris brought this action *pro se* pursuant to, *inter alia*, Title II of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12131 et seq.*, the Rehabilitation Act of 1973, *29 U.S.C. § 794 et seq.*, and *42 U.S.C. § 1983*. He claims to have been illegally denied a reasonable accommodation for his cognitive disabilities and unconstitutionally deprived of due process of law.

The district court granted the individual defendants' motion to dismiss the ADA and Rehabilitation Act accommodation claims because the court concluded that those statutes do not provide for individual liability. The district court also dismissed the Rehabilitation Act claim and the remaining claims for failure to state a claim upon which relief can be granted. Although we disagree with some [**3] of the district court's

---

** The Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

reasoning, we agree with it that the plaintiff's claims are legally insufficient, even when read with the lenity that must attend the review of *pro se* pleadings.

We therefore affirm the judgment.

## [*69]  BACKGROUND

This appeal is but the latest chapter in a litigation arising out of the 1999 revocation of Harris's license to practice medicine by the New York State Board for Professional Medical Conduct (the "Board").

### *The Revocation of the License*

The Board revoked Harris's license to practice osteopathic medicine in part because it found, after an investigation and a hearing, that Harris had committed "fraudulent practice" and had made false statements when he submitted applications for reappointment to three different hospitals. *See Harris v. N.Y. State Dep't of Health, 202 F. Supp. 2d 143, 148-49 (S.D.N.Y. 2002)* ("*Harris I*"). Harris had asserted in the applications that he was not at the time a subject of disciplinary action, even though he was in fact then under investigation by the Bureau of Controlled Substances of the New York State Department of Health for allegations of illegally storing and dispensing controlled substances. *See id. at 148.* [1] He also failed to disclose [**4] his previous misconduct in two other reappointment applications and failed to disclose, in an application to the New York State Education Department for renewal of his medical license, that his practice privileges at a hospital had been terminated. *See id.*

The Board also found that Harris had provided negligent and incompetent medical care. He had, for example, inappropriately prescribed diet pills to one patient and had prescribed to another patient a drug contraindicated for that patient's heart condition. *See id. at 149.* The Board also found that Harris had failed to maintain records adequately. *See id.*

The Board's revocation was affirmed by the State Administrative Review Board. *See id. at 150.* Harris then initiated a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules, *N.Y. C.P.L.R. § 7801 et seq.*, in the New York State Supreme Court,

Appellate Division. The Appellate Division confirmed the Administrative Review Board's decision and dismissed the petition. *Harris v. Novello, 276 A.D.2d 848, 714 N.Y.S.2d 365 (3d Dep't 2000).*

Thereafter, Harris [**5] brought a lawsuit against the New York State Department of Health ("DOH") in the district court. In it, he challenged the Board's revocation of his license, "alleg[ing] that DOH refused to acknowledge evidence of his learning disabilities and revoked his medical license without considering or offering him reasonable means to accommodate those disabilities," in violation of Section 504 of the Rehabilitation Act of 1973, *29 U.S.C. § 794*, and Title II of the ADA. *Harris I, 202 F. Supp. 2d at 164*. He also alleged "deficiencies in DOH's procedures" in violation of the *Due Process Clause of the Fourteenth Amendment to the United States Constitution. Id.*

The district court granted DOH's motion to dismiss in light of the prior state proceedings, concluding that "Harris's efforts to relitigate . . . the revocation of his medical license are barred by application of the *Rooker-Feldman* doctrine." *Id. at 165*; *see D.C. Court of Appeals v. Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)*; *Rooker v. Fid. Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923)*. The court also concluded that the ADA and Rehabilitation Act claims against the state agency were barred by operation of the *Eleventh Amendment*, *Harris I, 202 [*70] F. Supp. 2d at 173-74*, and [**6] that the due process claim against the DOH was barred because that agency is not a "person" within the meaning of *42 U.S.C. § 1983*, and because the *Eleventh Amendment* precluded the due process claim insofar as it sought money damages, *id. at 178.*

### *The Petition for Restoration*

In February 2002, Harris applied to the New York Board of Regents, seeking to restore his license to practice medicine. [2] After meeting with Harris, a "Peer Committee" issued a report recommending that the Education Department deny his application. On June 7, 2004, the Education Department's Committee on the Professions met with Harris. It subsequently issued a report following the Peer Committee's recommendation.

---

[1] That investigation resulted in a formal acknowledgment of wrongdoing by Harris. *See Harris I, 202 F. Supp. 2d at 148.*

---

[2] That body of the Education Department has jurisdiction to "restore a license" of a "former licensee found guilty of professional misconduct." *N.Y. Educ. Law § 6511.*

572 F.3d 66, *70; 2009 U.S. App. LEXIS 15101, **6

The Board of Regents affirmed. Harris does not assert that he made any further attempt to obtain review from New York state courts.

Harris brought this action *pro se* against the Education Department pursuant to the ADA, Section 504 of the Rehabilitation Act, and *42 U.S.C. § 1983*. The district court dismissed the action *sua sponte. Harris v. N.Y. State Educ. Dep't, 419 F. Supp. 2d 530, 535-36 (S.D.N.Y. 2006)* [**7] ("*Harris II*"). The court observed that Harris's complaint was, in large part, an attempt to relitigate matters the court had already resolved in *Harris I. Id. at 532*. Insofar as the complaint "related to [Harris's] petition to restore his medical license," *id.*, the court dismissed the ADA and *Section 1983* claims against the state agency on sovereign immunity grounds, *id. at 532-34*. The court concluded that the state's sovereign immunity had been waived for the purposes of Harris's Rehabilitation Act claim. *Id. at 534*. But the court observed that the complaint failed to make clear what sort of "accommodation" Harris was denied, and the court therefore dismissed the Rehabilitation Act claim "with leave to amend to more fully articulate what reasonable accommodation [Harris] requested and how the alleged failure to accommodate resulted in the State's discriminatory refusal to restore his medical license." *Id. at 535*.

*The Amended Complaint*

Harris, continuing to act *pro se*, filed an amended complaint -- the complaint at issue on this appeal -- against the Commissioner of Education, the Regent Chancellor, and the Governor of the State of New York. [3] Harris requests injunctive, declaratory, [**8] and monetary relief under the ADA; the Rehabilitation Act; *Section 1983* and *42 U.S.C. § 1988*; the *First*, *Fourth*, and *Fourteenth Amendments to the United States Constitution*; and also pursuant to his assertion that the decision to deny the reinstatement petition was "[a]rbitrary and capricious" inasmuch as the defendants failed to follow their own procedural rules. Am. Compl. PP 184-95. In the amended complaint, Harris seeks, *inter alia*, an order granting Harris's application for reinstatement of his license, together with such "accommodation[]s . . . as might be necessary," and additional injunctive relief. *Id.* PP a-b.

The amended complaint alleges that in 1998, on the

advice of counsel and while his investigation by the Board was ongoing, *see id.* P 34, Harris was diagnosed with "learning disabilities . . . i.e. disorder of written expression and 'rule out' reading disorder and Attention Deficit Hyperactivity Disorder," *id.* P 7. Harris alleges that as [**71**] a result of those conditions, he has "difficulty with comprehending the written word" and "a related problem with written expression." *Id.* P 11. Harris further alleges that [**9**] it is possible for him to "compensate" for these disabilities and, in theory, to "practice medicine or law, or any other discipline." *Id.* P 14. Harris asserts that that is just what he has done, obtaining degrees from college and a school of osteopathic medicine "after initially failing out of both" as a result of "various self taught techniques and determination of will." *Id.* PP 15-16.

Though it's not entirely clear from the *pro se* pleadings, Harris appears also to allege that he made two requests for accommodation from the Department of Education, both of which were denied.

First, Harris apparently applied for "understanding of the impact of [his] disabilities." *Id.* P 22. Harris says, in this regard, that "he could not have a fair medical license restoration hearing . . . without reasonable accommodation of understanding of LD & ADHD and it[]s past behavioral impact," *id.* P 25, and similarly that "[w]ithout understanding [the] impact of [Harris's] impairment [the state officials] can not make a proper evaluation . . . of [his] rehabilitation," *id.* P 37. Harris's application for "understanding" relates to his demand for reinstatement of his license.

Second, Harris says, he made and was [**10**] denied a request to read a written "explanation" before the Committee on the Professions because his oral explanation before the Peer Committee was thought by the Peer Committee to be "unfocused" and "not clearly presented." *Id.* PP 43-44. He "thought it would be more organized and clearly presented" to do it in writing. *Id.* P 44. This sought-for accommodation relates to whether he received an adequate hearing.

The amended complaint also contests the judgment of the Committee regarding the impact of Harris's alleged disability, in part on the ground that the agency lacked expert testimony on the subject, and in part because it failed to adequately "acknowledge" evidence of his disability. *Id.* PP 153-54. The amended complaint asserts this as a separate basis for relief.

Included in the amended complaint, too, is much discussion in mitigation or denial of the actions for which

---

[3] The Education Department is no longer a defendant in this action.

572 F.3d 66, *71; 2009 U.S. App. LEXIS 15101, **10

Harris's license was revoked, all of which is "not presented for re[]litigation" but "to illustrate an understand[ing] [i.e., on Harris's part] of the past issues and to prevent [their] reoccurrence in the future ([i.e.,] rehabilitation)." *Id.* P 63.

The district court granted the defendants' motion to dismiss the amended **[**11]** complaint. *Harris v. Mills, 478 F. Supp. 2d 544 (S.D.N.Y. 2007)* ("*Harris III*"). Harris's motion to reconsider that decision, in part in light of his withdrawal of a claim for damages relief, was denied by endorsed order.

Harris, represented by counsel, appeals.

## DISCUSSION

I. Standard of Review

*HN1* We review *de novo* the grant of a motion to dismiss for failure to state a claim upon which relief can be granted under *Federal Rule of Civil Procedure 12(b)(6). City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 392 (2d Cir. 2008)*, cert. denied, 129 S. Ct. 1579, 173 L. Ed. 2d 675 (2009). We consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor. *See id.*

In accordance with the Supreme Court's decision *Bell Atlantic Corp. v. [*72] Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, we apply a "plausibility standard," which is guided by "[t]wo working principles," *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. First, although "a court must accept as true all of the allegations contained in a complaint," that "tenet" "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory **[**12]** statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. at 1950*. Even after *Twombly*, though, we remain obligated to construe a *pro se* complaint liberally. *See Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (per curiam); *Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008)*; *Boykin v. KeyCorp, 521 F.3d 202, 213-14, 216 (2d Cir. 2008)*.

II. The Accommodation Claims

The district court concluded that "the ADA does not . . . provide for individual liability, either in the individual's official or personal capacity." *Harris III, 478 F. Supp. 2d at 547*. It reached the same conclusion with respect to the Rehabilitation Act. *Id. at 547-48* ("Because claims under the Rehabilitation Act may not be brought against individuals, either in their personal or official capacity, Harris's Rehabilitation Act claim must also be dismissed."). The district court also dismissed the Rehabilitation Act claim **[**13]** on the ground that fails to state a claim upon which relief can be granted. *See id. at 548*.

A. Individual Liability

As the defendants concede, the district court incorrectly concluded that claims under Title II of the ADA and the Rehabilitation Act cannot be asserted against individuals in their official capacity. In *Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003)*, cert. denied, 541 U.S. 936, 124 S. Ct. 1658, 158 L. Ed. 2d 356 (2004), we wrote:

> We . . . cannot embrace the state defendant's statutory claim that an individual sued in his or her official capacity under the doctrine of *Ex parte Young* is not a "public entity" subject to liability under the ADA, *42 U.S.C. § 12132*. The real party in interest in an official-capacity suit is the government entity. As a result, it is irrelevant whether the ADA would impose individual liability on the officer sued; since the suit is in effect against the "public entity," it falls within the express authorization of the ADA.

*Id. at 288* (citation omitted). In other words, we concluded that *HN2* Title II and Rehabilitation Act suits for prospective injunctive relief may, under the doctrine established by *Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*, proceed against individual officers in their **[**14]** official capacity, *see Henrietta D., 331 F.3d at 289* ("[T]here is no basis for holding that the ADA or Rehabilitation Act intended to create the kind of comprehensive enforcement scheme that would preclude prospective injunctive relief against a state official in her official capacity."). Insofar as the amended complaint seeks prospective injunctive relief, then, it may be asserted against the individual defendants here

in their official capacities. [4]

[*73] The district court relied upon two cases to conclude otherwise: *Lennon v. NYC, 392 F. Supp. 2d 630, 640 (S.D.N.Y. 2005)*, which noted prior district court rulings that individually named defendants cannot be held personally liable under the ADA, and *Hartnett v. Fielding Graduate Institute, 400 F. Supp. 2d 570, 575 (S.D.N.Y. 2005)*, aff'd in part and rev'd in part on other grounds, *198 Fed. Appx. 89 (2d Cir. 2006)* (summary order), which quoted a *pre-Henrietta D.* case, *Menes v. CUNY, 92 F. Supp. 2d 294, 306 (S.D.N.Y. 2000)*, for the proposition that individuals cannot "'be [**16] named in their official or representative capacities as defendants in ADA or Rehabilitation Act suits.'" *Harris III, 478 F. Supp. 2d at 547*. Insofar as *Hartnett, Menes*, and another *post-Henrietta D.* case that was relied upon by *Lennon, Gentile v. Town of Huntington, 288 F. Supp. 2d 316, 322 (E.D.N.Y. 2003)*, hold that individual defendants cannot be sued in their official capacities for prospective injunctive relief under the ADA or the Rehabilitation Act, those holdings are contrary to *Henrietta D.*, by which we are of course bound.

### B. Legal Sufficiency

We conclude, nonetheless, that the amended complaint fails to state accommodation claims upon which the injunctive relief Harris seeks can be granted, even under the liberal standard of review for *pro se* pleadings.

---

[4] It appears Harris intended to amend the complaint further to limit his request to injunctive relief only. Four days after the district court's dismissal of the amended complaint, Harris sent a communication to the court requesting "[r]econsideration" of the court's "[d]ecision" for six reasons that had previously been argued, but also for a seventh: "Drop money damages." *See* Endorsed letter of Monroe Harris entitled "Reconsideration," Mar. 26, 2007 (Docket Entry 21). By endorsement, the district court construed the letter as a "request [for] reconsideration," and denied the request because the letter "provides no controlling facts or law that the court overlooked in its prior rulings on this matter that would alter the outcome of the [**15] Court's decision." *Id.* But the part of the application that sought to "[d]rop money damages" was, strictly speaking, not a motion that "renew[ed] arguments previously made," and therefore did not "bring up for review the underlying order." *"R" Best Produce, Inc. v. DiSapio, 540 U.S. 115, 121 (2d Cir. 2008)*. Liberally construed, it was an attempt to withdraw a claim for relief pursuant to *Federal Rule of Civil Procedure 15(a)(2)*. Whether the district court should have granted that application is not at issue on this appeal.

*1. Applicable Legal Standards.* **HN3** Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84-85 (2d Cir.)*, corrected, *511 F.3d 238 (2d Cir. 2004)*. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities [**17] of a public entity, or be subjected to discrimination by any such entity." *42 U.S.C. § 12132*. To assure that those requirements are met, "reasonable accommodation" may have to be provided to the qualified individual. *See Henrietta D., 331 F.3d at 273-74*. Similarly, the Rehabilitation Act requires that specified "otherwise qualified" disabled individuals receive reasonable accommodations from programs receiving federal financial assistance. *29 U.S.C. § 794(a)*; *Alexander v. Choate, 469 U.S. 287, 301, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985)*; *Henrietta D., 331 F.3d at 273*.

"[I]n most cases," [5] the standards are the same for actions under both statutes. *Powell, 364 F.3d at 85*.

> In order for a plaintiff to establish a *prima facie* violation under these Acts, she must demonstrate (1) that she is a [*74] qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.

*Id.* (internal quotation marks and brackets omitted).

*2. The [**18] Standards Applied.* Harris makes two accommodation claims. The first is that the Education Department wrongly denied him an "understanding of the impact of [his] disabilities." Am. Compl. P 22. Without such understanding, he alleges, the reinstatement hearing was not "fair," *id.* P 25, in that the Department could undertake no "proper" assessment of his "rehabilitation," *id.* P 37. Even read liberally, Harris's complaint does not, however, identify how Harris's disabilities affected the behavior that caused the revocation of his license, nor how those disabilities could be accommodated to reform this behavior. Harris thus alleges, at core, that if only the defendants would "understand" the impact of his disabilities, they would be willing to overlook the actions that caused him to lose

---

[5] The differences among the cases referred to do not affect the analysis here.

his license in the first place. Generally construed, this allegation amounts only to the contention that Harris's medical licensing qualifications should be relaxed in light of his disability.

This is not a reasonable accommodation claim. *HN4* Title II of the ADA requires the accommodation of disabled persons who are entitled to a public benefit "whether or not [they are] given an accommodation." *Powell, 364 F.3d at 84-85*; **[**19]** *see also 42 U.S.C. § 12131* ("The term 'qualified individual with a disability' means an individual with a disability who, *with or without reasonable modifications to rules, policies, or practices* . . . meets the essential eligibility requirements for [the relevant benefit]." (emphasis added)). The paradigmatic example is a person who must use a wheelchair to access the courts -- a citizen is entitled to access the court system irrespective of whether he or she can walk. *See Tennessee v. Lane, 541 U.S. 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004)*. Here, by contrast, Harris would be entitled to a reinstatement of his license only if his disability is accommodated by the state's relaxation of its license qualifications. Title II of the ADA requires no such diminishment of otherwise applicable standards. *See Felix v. N.Y. City Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003)* (*HN5* "The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally.").

Similarly with respect to the Rehabilitation Act claim, because Harris does not contest the Board's view that his past acts of fraud and improper **[**20]** practices disentitle him to the license, but asks only for the state's "understanding" of the reasons why he committed those actions, he cannot demonstrate that he is "otherwise qualified" for a medical license. Harris's first accommodation claim is therefore legally insufficient under both statutes.

Harris's second accommodation claim arises out of the denial of his request for permission to read to the Committee on the Professions a written explanation so his case "would be more organized and clearly presented." Am. Compl. P 44. The district court concluded that Harris "did not make clear how this denial related to the final determination not to restore his medical license." *Harris III, 478 F. Supp. 2d at 548*.

The problem with this conclusion is that it assumes that Harris seeks the written-presentation accommodation in order to **[*75]** obtain his license to practice. But under

a liberal reading of the amended complaint, Harris asks only for reasonable access to a hearing in which to make his case for reinstatement. The relation of the state's denial and the benefit Harris seeks -- a fair hearing -- is clear under this reading. Moreover, there is no dispute that Harris was otherwise entitled **[**21]** to such a hearing.

Even so construed, however, Harris's claim is insufficient. As an initial matter, there is no allegation (beyond *ipse dixit*) that Harris was denied the opportunity to read from a written statement "by reason" of his disability, let alone "solely by reason" of his disability, as the Rehabilitation Act requires. *29 U.S.C. § 794*; *accord Powell, 364 F.3d at 85*; *Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998)*. Moreover, it is not clear how such an accommodation would have helped Harris. According to the amended complaint, Harris has "difficulty with comprehending the written word" and "a related problem with written expression." Am. Compl. P 11. If those are the disabilities with which Harris is afflicted, allowing him to prepare and read a written statement would not have accommodated his disabilities; it would have frustrated them.

We reject Harris's remaining arguments. He contends that the Committee failed in its "responsibility" to initiate "an interactive process" with him to discover an accommodation that would help him obtain his medical license. Pl.'s Br. 20. *HN6* The ADA "envisions an 'interactive process' by which employers and employees work together to assess whether **[**22]** an employee's disability can be reasonably accommodated." *Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir.)*, *cert. denied, 531 U.S. 931, 121 S. Ct. 314, 148 L. Ed. 2d 251 (2000)*; *see 29 C.F.R. § 1630.2* ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."); *accord Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219 (2d Cir. 2001)*. This, however, does not help Harris; he received hearings in which he was permitted to make his case for reissuance of his license. "There [is] no need for injunctive relief" if Harris was "already being reasonably accommodated." *Henrietta D., 331 F.3d at 282*.

Harris also argues that the Committee should have considered more documentary evidence on his behalf and wrongly found his claims of disability implausible. But he fails to explain how these arguments relate to his accommodation claim.

572 F.3d 66, *75; 2009 U.S. App. LEXIS 15101, **22

III. The Due Process Claim

The district court dismissed Harris's due process claim on the ground that Article 78 provided an adequate post-deprivation hearing for the denial of his petition to reinstate his license. *Harris III, 478 F. Supp. 2d at 549.* [**23] The district court concluded that "Harris was certainly familiar with Article 78 proceedings, having availed himself of that remedy after his medical license was initially revoked," *id.*, and that "[b]ecause New York provides a meaningful post-deprivation remedy and Harris does not indicate that he pursued this remedy, his due process claim must be dismissed," *id. at 549-50.*

Harris argues that the defendants' failure to consider evidence of his character and disabilities wrongfully deprived him of a constitutionally protected interest. In addition, he argues, the defendants baselessly "assumed that Harris was not disabled." Pl.'s Reply Br. 10. Harris characterizes these arguments as challenges to the "state procedural scheme" as a whole, not merely a discrete set of unauthorized acts, *id.* at 11, and therefore contends **[*76]** that he was entitled to a pre-deprivation hearing under *Zinermon v. Burch, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990).* We need not grapple with whether any of the defendants, by virtue of their decision-making authority or role, would be unable to avail themselves of the principle that "[w]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process [**24] requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006).* Harris was given notice and an opportunity to be heard before his petition for reinstatement was denied. That, coupled with the Article 78 post-deprivation remedy, is enough to satisfy due process. *See id. at 466-67.*

Finally, Harris's amended complaint states as a separate cause of action that the defendants' decisions were "[a]rbitrary and capricious" inasmuch as the defendants failed to follow their own procedural rules. Am. Compl. 21. Insofar as this is intended to be a stand-alone legal claim based solely on violations of state regulations, it is not actionable in federal court. *See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 888 (2d Cir. 1987)* (*HN7* "*Section 1983* is not a means for litigating in a federal forum whether a state or local administrative decision was arbitrary and capricious."). It therefore states no claim upon which relief can be granted.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is affirmed.

---

**End of Document**

 Neutral

As of: June 23, 2025 9:58 PM Z

## *Henvill v Metropolitan Transp. Auth.*

Supreme Court of New York, New York County

July 21, 2017, Decided

162088/2014

**Reporter**

2017 N.Y. Misc. LEXIS 2837 *; 2017 NY Slip Op 31559(U) **

[**1] WINSTON HENVILL, Plaintiff, -against- METROPOLITAN TRANSPORTATION AUTHORITY, Defendant. Index No.: 162088/2014

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Prior History:** *Henvill v. Metro. Transp. Auth., 2014 U.S. Dist. LEXIS 149066 (S.D.N.Y., Oct. 10, 2014)*

## Core Terms

hostile work environment, allegations, collateral estoppel, Discipline, title vii, Notice, retaliation, discrimination claim, discriminatory, retaliation claim, cause of action, termination, summonses, protected activity, amended complaint, quotation, marks, motion to dismiss, retaliatory, plaintiff's claim, race-based, overtime, amend, memo, adverse employment action, discriminatory animus, federal action, discriminated, violations, partially

**Judges:** [*1] HON. SHLOMO S. HAGLER, J.S.C.

**Opinion by:** SHLOMO S. HAGLER

## Opinion

### DECISION/ORDER

**HON. SHLOMO S. HAGLER, J.S.C.:**

This action arises out of plaintiff Winston Henvill's claims that he was subject to discrimination, retaliation, hostile work environment and retaliatory hostile work environment in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Defendant Metropolitan Transportation Authority ("MTA") moves, pursuant to *CPLR 3211 (a) (5)* and *(7)*, for an order partially dismissing the complaint.

### BACKGROUND AND FACTUAL ALLEGATIONS

Prior to being terminated in April 2015, plaintiff was employed by the MTA as a police officer. Plaintiff, who is African-American, had been working for the MTA for approximately 14 years prior to his termination. According to plaintiff, during the course of his employment, he was subject to discrimination, a hostile work environment and retaliation, as a result of his race/color, and because he engaged in protected activity. Plaintiff claims that he was treated differently than his Caucasian co-workers, who did not engage in protected [**2] activity, and that the supervisors who participated in the discriminatory conduct were all Caucasian. He provides [*2] examples, as set forth below, of the MTA's allegedly unlawful discriminatory practices:

a) In "late 2008," plaintiff alleges that he was subject to-an "unjustified and illegitimate investigation" for not properly documenting summonses'. In September 2009, as a result of the investigation, plaintiff was placed on a "base post assignment" (Amended Verified Complaint [the "Amended Complaint"], ¶ 15). According to plaintiff, this is "considered a punishment assignment" (*Id*). Plaintiff was assigned to the base post for approximately one year, during which he was ."deprived of overtime, although overtime was given to junior officers" (*Id*., ¶ 16). Plaintiff alleges that Caucasian officers, who "have committed far worse infractions," had not been involuntarily placed on a base post (*Id*., ¶ 17).

b) On October 20, 2009, plaintiff received a Notice of Intent to Discipline as a result of failing to

2017 N.Y. Misc. LEXIS 2837, *2; 2017 NY Slip Op 31559(U), **2

properly document vehicle and traffic law summonses. Plaintiff states that in or about May 2010, he was compelled to forfeit sixty hours of accrued vacation time as a result of this disciplinary notice (*Id.*, ¶ 18).

c) On March 25, 2010, plaintiff received another Notice of Intent to Discipline as a result **[*3]** of improperly documenting summonses and failing to notify the Communications Unit while making traffic stops. As a result, plaintiff was subsequently disciplined and surrendered more accrued time. He claims that "this said notice was unfair in that Caucasian officers perform car stops that do not adhere to the Patrol Guide. These Caucasian officers are not disciplined and are not required to account for their actions as was plaintiff." Plaintiff alleges he was disciplined and therefore was "compelled to surrender additional accrued time" (*Id.*, ¶ 19).

d) In October 20,10, plaintiff was assigned to the base post again, as a result of issuing moving violations while working at a "fixed post." According to plaintiff, under similar circumstances, Caucasian **[**3]** officers are not assigned to the base post (*Id.*, ¶ 20).

e) On November 9, 2011, plaintiff received a "Letter of Instruction" as a result of losing a memo book.. Plaintiff believes that "[t]here are similar or worse occurrences committed by Caucasian officers and [the MTA] does nothing" (*Id.*, ¶ 21).

f) On November 9, 2011, plaintiff received a "Command Discipline" from his supervisor, Police Lieutenant Lee Dittrich ("Dittrich"), "because he had **[*4]** allegedly accepted two tours of overtime on the same day, in different commands" (*Id.*, ¶ 22). Subsequently, plaintiff was suspended from duty and forfeited overtime duties as a result of this incident. Plaintiff believes that he was targeted for no justifiable reason, stating that Caucasian officers, including Officers Torone, Doscher, Scheck and. Pfeiffer, had not appeared for overtime assignments, yet were not given a Command Discipline (*Id.*).

g) On January 9, 2012, as a result of allegedly abandoning his train partner, plaintiff received a Notice of Intent to Discipline. Plaintiff maintains that he did not do anything wrong and that other Caucasian officers, such as Officer Piwowarska, who take the train by themselves in similar

circumstances, had not been disciplined (*Id.*, ¶ 24).

h) On February 12, 2012, plaintiff was counseled for not handing in summonses in a timely manner. Plaintiff believes that other officers have not been disciplined for similar behavior (*Id.*, ¶ 25).

i) On February 25, 2012, plaintiff was required to write a memo as to why he was one hour late for the beginning of overtime. Plaintiff claims that Caucasian officers regularly report late for overtime with no consequences **[*5]** (*Id.*, ¶ 27).

j) On February 28, 2012, plaintiff issued three summonses to a wheel-chair bound individual. Plaintiff was required to Write a memo explaining why he issued the summonses. According to plaintiff, the summonses were valid, and he knows of no other officer who had to write a memo explaining why summonses were issued. Plaintiff was issued a Command Discipline for this incident (*Id.*, ¶ 26).

 **[**4]** k) On February 27, 2012, plaintiff was told to report to Internal Affairs in his civilian clothes. Plaintiff claims that this is "highly irregular," and as a result he had to "change his tour" (*Id.*, ¶ 28).

l) On March 12, 2012, plaintiff was advised that he no longer was allowed to issue summonses. He is unaware of any officer having these duties taken away (*Id.*, ¶ 29).

m) According to plaintiff, although at least six other Caucasian officers received DWI, standard field sobriety testing. and MP-5 training, he was denied this training that he should have received in 2011 (*Id.*, ¶ 31).

In addition, plaintiff alleges that he was subject to a hostile work environment. He provides as an example of how, in "2011," he was required to write a memo about an incident that occurred months earlier and then **[*6]** asked by a supervisor to provide more information about the incident. Plaintiff's supervisor then "threatened plaintiff with insubordination" and did not allow him to speak to his union representative prior to signing the memo (*Id.*, ¶ 30).

In January 2012, plaintiff filed a discrimination claim with the U.S. Equal Employment Opportunity Commission ("EEOC") and served a Notice of Claim on the MTA.[1]

---

[1] The MTA advises that plaintiff filed a written charge of

2017 N.Y. Misc. LEXIS 2837, *6; 2017 NY Slip Op 31559(U), **4

On or about May 4, 2012, plaintiff filed a supplemental charge of discrimination with the EEOC and served a supplemental Notice of Claim on the MTA **[**5]** (Affirmation in Opposition, ¶¶ 13-14; Notice of Motion, Affirmation of Counsel, at 9, fnt 3).

On June 17, 2013, plaintiff received a Notice of Intent to Discipline. Such notice set forth, in pertinent part, that the MTA sought to terminate plaintiff as a result of his behavior in relation to the disappearance of a supervisor's memo book. Plaintiff denies the allegations, stating that there was no just cause for dismissal and that dismissal was excessive (Amended Complaint, ¶ 34). An arbitration hearing was held and, in an award dated April 24, 2015, plaintiff's termination was upheld (*Id.*, ¶ 35).

Plaintiff believes that his dismissal was discriminatory **[*7]** and retaliatory, and that defendant, by its actions created a hostile work environment (*Id.*, ¶¶ 42, 44). He states that many Caucasian police officers, who had committed far more egregious acts, or who had not engaged in protected activity, were not terminated (*Id.*, ¶ 43).

In plaintiff's first cause of action, he contends that the MTA's actions were in violation of the NYSHRL, in that he was discriminated against and subject to a hostile work environment, based on his race/color. He states that he was treated differently than other employees on account of his race/color (*Id.*, ¶¶ 42-43). Plaintiff alleges that defendant discriminated against him with respect to compensation, terms, conditions and **[**6]** privileges of employment. (*Id.*, ¶ 42).[2]

Plaintiff's second cause of action claims that, similar to the allegations set forth in the first cause of action, the MTA's also violated the NYCHRL. by engaging in unlawful discriminatory practices and subjected plaintiff to a hostile work environment due to plaintiff's race/color (*Id.*, ¶¶ 50-56).

The third cause of action claims that the actions taken by the MTA against him after January 2012, constitute an unlawful employment practice due to plaintiff's **[*8]** protected activity in violation of the NYSHRL. Plaintiff

also alleges that he has been subjected to a hostile work environment because of this protected activity (*Id.* ¶¶ 58-65).

Plaintiff's fourth cause of action based on the same allegations as set forth in the third cause of action, alleges violations of the NYCHRL.

*Procedural History*

On October 24, 2013, prior to commencing this action, plaintiff filed an action the "Federal Action") in the United States District Court for the Southern District of New York ("District Court") against the MTA and nine individual defendants, alleging federal and state claims of race-based discrimination, "hostile Work environment and retaliation. **[*7]** July 9, 2014, following oral argument, the District Court granted the defendants' motion to dismiss, but permitted plaintiff to request leave to amend his complaint (Notice of Notion, Exhibit "C"). Plaintiff subsequently sought leave to amend his federal complaint, attaching a proposed amended complaint ("PAC"), asserting claims against the MTA only for violations of Title VII of the Civil Rights Act of 1964, 42 USC § 2000 *et seq.* (Title VII), the NYSHRL and NYCHRL.[3]

By Order, dated October 10, 2014, the District Court denied plaintiff's **[*9]** leave to amend his complaint as futile on grounds that the PAC failed to state a claim (Notice of Motion, Exhibit The District Court dismissed the Title VII claims but it declined to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims. The District Court held that the discrimination claim must be dismissed "given the Absence of factual allegations in support of an adverse employment action and an inference of discriminatory intent" (*Id.*, *Henvill v Metropolitan Transp. Auth., 2014 WL 5375115, *2, 2014 U.S. Dist LEXIS 149066, *3 (SDNY 2014)*). The District Court identified the complained-of actions, namely "[plaintiff's] reassignments to a **[**8]** base post position; his receipt of various disciplinary actions in November 2011 and January 2012; the determination in March 2012 that he could no longer issue summonses; and the denial of

---

discrimination with the EEOC on January 11, 2012 and served a Notice of Claim on the MTA on January 10, 2012. It states that plaintiff misidentifies these dates as January 9, 2012.

[2] The Amended Complaint alleges that plaintiff engaged in protected activity by filing the EEOC charge and the Notices of Claim (*Id.*, ¶ 9)

---

[3] The claims and alleged occurrences of discriminatory practices in the federal action tare identical to the ones alleged in plaintiff's amended State Court complaint. However, the federal action does not contain allegations related to plaintiff's termination, as that occurred in April 2015, which was after the federal action was commenced in October 2013.

2017 N.Y. Misc. LEXIS 2837, *9; 2017 NY Slip Op 31559(U), **8

training in 2011" and found that such fail to constitute "adverse employment actions" (*Id.* at *2). The District Court noted that plaintiff failed to show how these alleged actions by defendant "materially changed his terms of employment or job responsibilities" (*Id.* at *2). With respect to the discrimination claims, the District Court concluded,

> "Plaintiff fails to link the purported adverse employment actions to any race-based discriminatory motive. Plaintiff's **[*10]** proposed Amended Complaint continues to rely on the mere conclusory allegation that, because Plaintiff believes that he was treated differently than some of his Caucasian colleagues, his employer must have discriminated against him on, the basis of his race-despite this Court's repeated - warnings during Oral argument that such an argument was by itself inadequate to show an inference of discriminatory intent. (*See, e.g.,* July 9, 2014 Tr. 48:16-24, 49:9-18, 50:2-7.) In fact, Plaintiff's unsupported pleading does not explain how these actions were racially motivated, as opposed to legitimate consequences following regular workplace monitoring and review", (*Id.* at *2, [footnotes omitted]).

In addition, the District Court found that plaintiff could not sustain a cause of action for hostile work environment. It held, among other things, that "nowhere in the Amended Complaint does Plaintiff demonstrate-although he is required to do so-that the incidents of which he complains were the result of racial, bias or discrimination on Defendant's part" (*Id.* at *3). The District Court noted that the conduct was neither severe nor **[**9]** pervasive, consisting largely of reprimands in isolated incidents over four years. The **[*11]** District Court stated "[p]laintiff's sweeping assertions that he suffered a hostile work environment because of his race, without more, are insufficient to show a workplace 'permeated with discriminatory intimidation' (*Id.*). It further dismissed the retaliatory hostile work environment claims, stating that this claim is governed by the same standard as the hostile work environment claim.

With respect to plaintiff's proposed retaliation claim, the District Court stated that, for purposes of a retaliation claim, "actions are deemed adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" (*Id.* at *3) (internal quotation marks and citation omitted).

The District Court also found that plaintiff was unable to establish causation, given that he received numerous admonitions "concerning his workplace performance prior to filing the Notice of Claim on January 10, 2012" (*Id.* at *4). It found, in pertinent part:

> "Similar to Plaintiff's discrimination claim, Plaintiff's retaliation claim identifies employment actions that took place after the January 10, 2012 filing of a Notice of Claim which amount to minor disciplinary actions. The remaining **[*12]** incidents in February, March, and May 2012 do not constitute an adverse employment action because Plaintiff has not pleaded sufficient facts concerning the resulting harm he suffered, let alone why these actions would have dissuaded Plaintiff from pursuing his discrimination **[**10]** claim" (*Id.* at *3).

Shortly thereafter, on December 8, 2014, plaintiff Commenced the instant action in State Court. After he was terminated, in April 2015, plaintiff amended his State Court complaint to allege that his termination was an additional act of discrimination and retaliation by the MTA (Amended Complaint, ¶¶ 32-37).

Plaintiff appealed the District Court decision regarding the dismissal. Subsequently, on May 11, 2015, the Second Circuit affirmed the District Court's July 2014 determination granting the defendants' motion to dismiss plaintiff's employment discrimination complaint, and affirmed in part and, vacated and remanded in part, the District Court's October 10, 2014 judgment denying plaintiff's request for leave to amend the complaint (Notice of Motion, Exhibit "G" [*Henvill v Metropolitan Transp. Auth., 600 Fed Appx 38 (2d Cir 2015)*]. At the outset, the Second Circuit held that plaintiff's claims in the PAC that were based on incidents occurring between 2008 and October 2010 **[*13]** are time-barred and do not allege a "continuous practice and policy of discrimination" (*Id. at *39*). The Court affirmed the denial of plaintiff's motion to amend his claims for a hostile work environment. It further affirmed that the PAC failed to allege any facts that the denial of training, January 2012 Notice of Intent to Discipline and the threat of discipline "created 'a materially adverse change in the terms and conditions of **[**11]** employment'" (*Id.* [internal citation omitted]). The Second Circuit Court further affirmed that there were no plausible claims for retaliation and held that by verbally counseling plaintiff, requiring him to go to Internal Affairs or Write two memoranda, the MTA did not act in a way that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'." *Id.* (internal

citation omitted).

The Second Circuit Court explained that, with respect to plaintiff's request for leave to amend, "which the District Court denied on the ground that the proposed amended complaint (PAC) would not survive a motion to dismiss, we affirm the ruling as to most of [plaintiff's] Title VII claims" (*Id.*). The Second Circuit Court held, however, that the District **[\*14]** Court erred in denying plaintiff's request to amend "as it pertained to the race-based discrimination claim regarding the command discipline issued by Lieutenant Lee Dittrich and the retaliation claim regarding the removal of Henvill's summons-issuing responsibilities" (*Id*). The Second Circuit remanded these two remaining Title VII claims back to the District Court for further proceedings.

The MTA now moves to partially dismiss only plaintiff's NYSHRL and NYCHRL claims alleged in the present action that are based on the same factual allegations that were found to be insufficient to state a cause of action under Title VII in the **[\*\*12]** Second Circuit, based on collateral estoppel. Except for the allegations related to the Dittrich incident race-based discrimination claim, and the retaliation claim related to the March 2012 removal of summons-issuing responsibilities, the Second Court affirmed the District Courts determination that the allegations in the PAC were insufficient to state a claim for discrimination, hostile work environment or retaliation under Title VII.

The MTA argues that standards for establishing a NYSHRL hostile work environment, discrimination or retaliation claim under the **[\*15]** NYSHRL mirror Title VII standards are identical. As a result, according to the MTA, because the issues alleged in the State Court action are identical to the issues that were raised and decided in the federal action, this Court should dismiss the NYSHRL claims that are grounded in the same allegations, The MTA further argues that, although the NYCHRL is to be construed more broadly than the NYSHRL, collateral estoppel should still apply because the claims are based on the same allegations that the Second Circuit already found to be insufficient to sustain Title VII claims.

In the alternative, the MTA argues that the plaintiff's Amended Complaint should be partially dismissed for failure to state a cause of action under the NYSHRL and the NYCHRL. It alleges that plaintiff's NYSHRL and NYCHRL claims based **[\*\*13]** on incidents that occurred prior to October 24, 2010 are time-barred, and should be dismissed., Although plaintiff's Amended

Complaint was filed in July 2015, except for the new allegations related to plaintiff's termination in April 2015, the MTA maintains that the relevant date for statute of limitations purposes is October 24, 2013.[4]

Plaintiff believes that the MTA has not met its burden **[\*16]** to demonstrate the elements of collateral estoppel with respect to his NYSHRL and NYCHRL claims. "Since the issue of the propriety of the State and City claims were [sic] not decided against plaintiff . . . it cannot be said that collateral estoppel applies" (Affirmation in Opposition, ¶ 55). Plaintiff further contends that the federal court's analysis of the plaintiff's Title VII claim cannot be applied to defeat the NYCHRL claim, as the standards are different.

Plaintiff does not dispute the relevant date for determining the Statute of limitations, but argues that, based on the continuing violation doctrine, all of his claims should be considered timely. He alleges that the MTA's conduct constitutes "the occurrence of a whole pattern of activity," and that the statute of limitations should be tolled to the date of the last **[\*\*14]** wrongful act (*Id.* at ¶ 49).

Plaintiff does not substantiate any of his claims but argues that, as all of his claims allegedly meet the liberal pleading standards, the MTA's motion to dismiss should be denied.

## DISCUSSION

### Dismissal

On a motion to dismiss pursuant to *CPLR 3211*, "the facts as alleged in the complaint [are] accepted as true, the plaintiff is [given] the benefit of **[\*17]** every possible favorable inference," and the court must determine simply "whether the facts as alleged fit within any cognizable legal theory" (*Mendelovitz v Cohen, 37 AD3d 670, 671, 830 N.Y.S.2d 577 [2d Dept-2007]; see also P.T. Bank Cent. Asia, N.Y. Branch. v ABN AMRO Bank N.V., 301 AD2d 373., 375, 754 N.Y.S.2d 245 [1st Dept 2003]).* "In addition, employment discrimination cases are themselves generally reviewed under notice

---

[4] October 24, 2013 is the date that plaintiff commenced his federal action, and then chose to later assert his claims in State Court after the federal court declined to exercise supplemental jurisdiction over the NYSHRL and NYCHRL claims.

2017 N.Y. Misc. LEXIS 2837, *17; 2017 NY Slip Op 31559(U), **14

pleading standards. For example under the Federal Rules of Civil Procedure, it has been held that a plaintiff alleging employment discrimination need not plead [specific facts establishing] a prima facie case of discrimination' but need only give 'fair notice' of the nature of the claim and its grounds" (*Vig v New York Hairspray Co., L.P., 67 AD3d 140, 145, 885 N.Y.S.2d 74 [1st Dept 2009]* [internal citation omitted]).

NYSHRL

The standards for evaluating discrimination, hostile work environment and retaliation claims are identical under Title VII [**15] and the NYSHRL (*see e.g. Kelly v Howard I. Shapiro & Assocs. Consulting Engrs., P.C., 716 F3d 10, 14 [2d Cir 2013]* ["[t]he standards for evaluating hostile work environment and retaliation claims are identical under Title VII and NYSHRL"]).

Actions, to recover damages for alleged discrimination under the NYSHRL and the NYCHRL are subject to a three-year statute of limitations (*see CPLR 214 (2); Administrative Code of the City of New York § 8-502 (d)*) The standard for applying the continuing-violation doctrine to claims under Title VII and NYSHRL is governed by *National R.R. Passenger Corp. v Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 [2002]* (*Sotomayor v City of New York, 862 F Supp 2d 226, 250 (ED NY 2012)*, aff'd *713 F3d 163 [2d Cir 2013])*.

Collateral Estoppel

"Collateral estoppel is a doctrine based on general [*18] notions of fairness involving a practical inquiry into the realities of the litigation; it should never be rigidly or mechanically applied" (*Matter of Halyalkar v Board of Regents of State of N.Y., 72 NY2d 261, 268-269, 527 N.E.2d 1222, 532 N.Y.S.2d 85 [1988]* [internal citation omitted]). Contrary to plaintiff's contentions, even when a federal court declines to exercise jurisdiction over state claims, those state claims can be barred by collateral estoppel when the federal court addresses issues that are identical to those raised in the state claims (*Sanders v Grenadier Realty, Inc., 102 AD3d 460, 461, 958 N.Y.S.2d 120 [1st Dept 2013])*.

[**16] "The doctrine of collateral estoppel applies where '[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded

from relitigating the issue . . . had a full and fair opportunity to contest the prior determination'" (*Simmons-Grant v Quinn Emanuel Urquhart & Sullivan, LLP, 116 AD3d 134, 138, 981 N.Y.S.2d 89 [1st Dept 2014]* [internal quotation marks and citation omitted]).

As set forth at length in the facts, the Second Circuit has already determined that, except for a race-based discrimination claim regarding the command discipline involving Dittrich and the retaliation claim regarding the removal of summons-issuing responsibilities, plaintiff's allegations cannot support Title VII claims. The Second Circuit also found that claims based on incidents that occurred [*19] outside the statute of limitations were time-barred, and that the continuing violations doctrine was not applicable to those claims.

Plaintiff's allegations in this action are identical to those in the federal action, except for those related to his April 2015 termination, which the MTA is not seeking to dismiss at this time. "[T]he burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue" (*Matter of Press, 30 AD3d 154, 156, 816 N.Y.S.2d 441 [1st Dept 2006]* [internal quotation marks and citation omitted]). [**17] The MTA has met its burden demonstrating that the issue in question, namely whether or not plaintiff can set forth claims under the NYSHRL, is identical and decisive to plaintiff's ability to plausibly state a cause of action under Title VII. In opposition, plaintiff is unable to establish that he lacked a full and fair opportunity to litigate the issue, based on the record. Therefore, the MTA's motion to partially dismiss plaintiff's NYSHRL claim's on the ground of collateral estoppel is granted.

NYCHRL

The doctrine of collateral estoppel also bars and precludes plaintiff from relitigating those NYCHRL claims that did not survive Title VII, in this state court action. As the identical issue has [*20] already been decided in the federal action, plaintiff is precluded from maintaining his NYCHRL claims based on those same allegations (*see e.g. Hudson v Merrill Lynch & Co., Inc., 138 AD3d 511, 515, 31 N.Y.S.3d 3 [1st Dept 2016]* (Court held that collateral estoppel precluded plaintiffs from "relitigating many 'strictly factual' issues underlying their [NYCHRL] claims," after federal court dismissed plaintiffs' federal and state discrimination claims and refused to exercise supplemental jurisdiction over plaintiff's NYCHRL claims).

2017 N.Y. Misc. LEXIS 2837, *20; 2017 NY Slip Op 31559(U), **17

*Continuing Violations*

For purposes of determining a continuing violation under the **[**18]** NYCHRL, "[o]therwise time-barred discrete acts can be considered timely where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice" (*Sotomayor v City of New York, 862 F Supp 2d at 250* [internal quotation marks and citations omitted]).

The Second Circuit found that the claims alleged between 2008 and 2010 were time-barred, as they fail to plausibly allege a continuous practice or policy of discrimination, and as such, these claims as presented in the instant action are dismissed based on collateral estoppel (*See e.g. Peterkin v Episcopal Social Servs. of N.Y., Inc. 24 AD3d 306, 308, 808 N.Y.S.2d 31 [1st Dept 2005]* [NYSHRL and NYCHRL age discrimination claims dismissed as they had already been "actually litigated, **[*21]** squarely addressed and specifically decided," by the District Court's decision]).

Even if this issue was not precluded by collateral estoppel, the MTA's motion for dismissal would be granted with respect to the incidents alleged prior to October 24, 2010. Plaintiff fails to plead any facts to allege that the disciplinary actions prior to 2010 were part of a discriminatory practice or policy, and not merely legitimate consequences of his behavior. In addition, courts have found that negative performance evaluations are discrete acts that do not trigger the continuing violations policy exception (*see e.g. Dimitracopoulos v City of New York, 26 F Supp 3d 200, 212 [ED NY 2014]*). **[**19]** Moreover, the disciplinary actions were given by at least two different supervisors, making each action a discrete act (*Id. at 212*)("Later evaluations and letters to file by separate individuals are not part of the same continuing pattern of discriminatory conduct by a prior principal").

*Discrimination*

Pursuant to the NYCHRL, as stated in Administrative Code § 8-107 (1) (a), it is an unlawful discriminatory practice for an employer to refuse to hire or employ or to fire or to discriminate against an individual in the terms, conditions or privileges of employment **[*22]** because of the individual's race or color.

The NYCHRL is to be construed more liberally than its state or federal counterparts. The court must evaluate the claims with regard for the NYCHRL's "*uniquely broad and remedial purposes*" . . . ." (*Williams v New York. City Hous. Auth., 61 AD3d 62, 66, 872 N.Y.S.2d 27 [1st Dept 2009]* (emphasis in original)). "For NYCHRL liability, therefore, the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that [he] has been treated less well than other employees because of [his protected status]" (*Id. at 78*).

Under the NYCHRL, when analyzing employment discrimination **[**20]** claims, courts have reaffirmed the applicability of the burden-shifting analysis as developed in *McDonnell Douglas Corp. v Green (411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 [1973])*, in addition to the mixed-motive analysis (*See Hudson v Merrill Lynch & Co., Inc, 138 AD3d at 514*) [1st Dept 2016] (internal quotation marks and citation omitted) ["A motion for summary judgment dismissing a City Human Rights Law claim can be granted only if the defendant demonstrates that it is entitled to summary judgment under both the *McDonnell Douglas* burden-shifting framework and the mixed-motive framework"]).[5]

In the burden-shifting **[*23]** analysis, the plaintiff must set forth that he or she "is a member of a protected class, was qualified for the position, and was terminated or suffered some other adverse employment action, and that the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination" (*Baldwin v Cablevision Sys. Corp., 65 AD3d 961, 965, 888 N.Y.S.2d 1 [1st Dept 2009]*).

If the plaintiff is able to set forth a prima facie case of discrimination, then the burden shifts to the defendants to rebut the presumption by demonstrating nondiscriminatory reasons for **[**21]** its employment actions (*Id. at 965*). If the employer meets this burden, the plaintiff must "prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination" (*Id.* [internal quotation marks and citation omitted]).

---

[5] Although this motion is one for dismissal and not for summary judgment, the same burden shifting standards apply when analyzing claims made under NYCHRL. *See e.g., Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 116 AD3d at 141* ("Although defendant's motion is not for summary judgment, once defendant established its nonretaliatory reason in the federal action, plaintiff was required to identify an issue of fact").

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 183 of 321

Page 8 of 10

2017 N.Y. Misc. LEXIS 2837, *23; 2017 NY Slip Op 31559(U), **21

Under the mixed-motive analysis, 'the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser-burden of raising an issue as to whether the action was motivated at least in part by . . . discrimination" (*Melman v Montefiore Med. Ctr.*, 98 AD3d 107, 127, 946 N.Y.S.2d 27 [1st Dept 2012]) [internal quotation marks and citations omitted]).

In considering plaintiff's allegations that he was subject to discrimination, the District Court found that plaintiff failed to link the alleged [*24] adverse employment actions to any race-based discriminatory motive. Affirming all but one incident, the Second Circuit found that there were no facts alleged that would give rise to a plausible claim that plaintiff was disciplined in the remaining three instances, because of his race and color.

Although the pleading standard is more permissive under the NYCHRL, plaintiff must still adequately plead that the "conduct is caused at least in part by discriminatory or retaliatory motives . . . ." (*Mihalik v Credit Agricole Cheuvreux N. Am., Inc.*, 715 F3d 102, 113 [2d Cir 2013]; *see also Llanos v City of New York*, 129 AD3d 620, 620, 10 N.Y.S.3d 870 [1st Dept 2015] [**22] ["Plaintiff has not made any factual allegations that she was adversely treated under circumstances giving rise to an inference of discrimination, as requited to state a claim for discrimination Under the New York State and City Human Rights Laws"]).

This Court is aware that "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible" (*Ya-Chen. Chen v City Univ. of N.Y.*, 805 F3d 59, 75 [2d Cir 2015] [internal quotation marks and citation omitted]). However, collateral estoppel may still be applied in certain circumstances. For example, in *Simmons-Grant v Quinn Emanuel Urquhart & Sullivan, LLP* (116 AD3d at -140-141), [*25] the plaintiff was collaterally estopped from litigating NYCHRL claims in state court after federal court granted summary judgment in favor of the defendant as to the Title VII discrimination claims. The Court held, among other things, that

"in opposition to defendant's collateral estoppel motion, plaintiff has not identified any evidence on the relevant issue that the court in the previous litigation overlooked. Thus, the frequent risk that evidence winds up being undervalued for City NYCHRL purposes because it has been filtered

through a title VII lens is not present here."

In addition, as one court recently noted, "as to the [**23] standards of liability, in certain areas, courts have recognized that city law is more plaintiff-friendly than federal law. But the Restoration Act did not provide that federal and city law may *never* be construed as coextensive" (*Bivens v Institute for Community Living*, 2016 U.S. Dist LEXIS 13538, *3 [SD NY 2016][internal citation omitted]).

Nonetheless, the dispositive issues relevant to plaintiff's NYSHRL and NYCHRL claims are identical to the dispositive issues in plaintiff's federal action: whether or not plaintiff has pled that his treatment was the result of a discriminatory animus. [*26] As these issues were resolved, and plaintiff had a full and fair opportunity to litigate and contest them in the federal action, plaintiff is precluded from asserting them again.

Even if collateral estoppel did not apply, the remaining NYCHRL discrimination claims would be dismissed pursuant to CPLR 3211 (a), (7). Plaintiff claims that he was disciplined, or subjected to adverse actions', while other Caucasian police officers were not. However, mere conclusory allegations that plaintiff was treated differently than other employees fail to demonstrate that the MTA's actions were motivated by race. Even construing the complaint liberally, plaintiff does not adequately plead that he was treated less well due to his race (*see e.g. Matter of Khan v New York City Health & Hosps. Corp.*, 144 AD3d 600, 601, 43 N.Y.S.3d 271 [1st Dept 2016] [Court granted defendant's motion [**24] pursuant to CPLR 3211 (a) (5) dismissing the complaint as plaintiff "failed to support his contention that he was discriminated against on account of his race, religion, and national origin with evidence of discriminatory animus on the part of any [defendant]"]); *see also Godbolt v Verizon N.Y. Inc.*, 115 AD3d 493, 494, 981 N.Y.S.2d 694 [1st Dept 2014] ("Even under the mixed-motive analysis applicable to City Human Rights Law claims, plaintiff's claim fails, because there is no evidence from which a reasonable factfinder could infer that [*27] [protected status] played any *role* in defendant's [actions]").

*Hostile Work Environment*

Under the NYSHRL, a hostile work environment is present when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 184 of 321

Page 9 of 10

2017 N.Y. Misc. LEXIS 2837, *27; 2017 NY Slip Op 31559(U), **24

the victim's employment and create an abusive working environment" (*Forrest v Jewish Guild for the Blind, 3 NY3d 295, 310, 819 N.E.2d 998, 786 N.Y.S.2d 382 [2004]* [internal quotation marks and citation omitted]).

Under the NYCHRL, "the conduct's severity and pervasiveness are relevant only to the issue of damages. To prevail on liability, the plaintiff need only show differential treatment — that she is treated 'less well' — because of a discriminatory intent" (*Mihalik v Credit Agricole Cheuvreux N. Am., Inc., 715 F3d at 110*) [internal citation omitted]). "In order to establish a [**25] retaliatory hostile work environment, a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct" (*Sclafani v PC Richard & Son, 668 F Supp 2d 423, 438 [ED NY 2009]*).

The District Court (*Henvill v Metropolitan Transp. Auth., 2014 U.S. Dist LEXIS 149066, 2014 WL 5375115 at *3)* found that plaintiff had not demonstrated, although required to do so, that the incidents allegedly causing a hostile work environment, "were the result of racial bias or discrimination" on the part of the MTA. Again, even though the standard for pleading and [**28] proving a hostile work environment is broader under the NYCHRL, the prior action's explicit finding that there was no discriminatory animus, precludes and collaterally estops plaintiff from asserting his claims for hostile work environment and retaliatory hostile work environment under the NYCHRL. "The broader remediation available under the City law does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids" (*Williams v Metro-North Commuter R.R. Co., 2012 U.S. Dist. LEXIS 86631, 2012 WL 2367049, *13, [SD NY 2012]*; *see also Llanos v City of New York, 129 AD3d at 620* ["Furthermore, plaintiff's failure to adequately - plead discriminatory animus is fatal to her claim of hostile work environment"]).

In any event, even if plaintiff's hostile work environment [**26] claims that are the subject of this dismissal motion were not collaterally estopped, they would be dismissed for the same reasons. Plaintiff has failed to demonstrate how "discrimination was one of the, motivating factors for the defendant's conduct" (*Chin v New York City Hous. Auth., 106 AD3d 443, 445, 965 N.Y.S.2d 42 [1st Dept 2013]*). Although plaintiff speculates that he was treated less well than Caucasian officers, during a time in 2011 when he was threatened with a charge of insubordination, and after he filed his complaint with the EEOC, he has not adequately pled

any discriminatory animus.[6] (*see e.g.* [*29] *Massaro v Department of Educ. of the City of N.Y., 121 AD3d 569, 570, 993 N.Y.S.2d 905 [1st Dept 2014]* [internal citations omitted] ["Plaintiff failed to adequately plead discriminatory animus, which is fatal to both her age discrimination and hostile Work environment claims under the State and City Human Rights Laws (NYCHRL). Indeed, her allegations that she was 51 years old and was treated less well than younger teachers are insufficient to support her claims"]).

*Retaliation*

Under the NYCHRL, it is unlawful to retaliate or discriminate against someone because he or she opposed discriminatory practices (Administrative Code § 8-107 (7)). [**27] "[T]o make out a retaliation claim under the City NYCHRL, the complaint must allege that: (1) [plaintiff] participated in a protected activity known to defendants; (2) [the MTA] took an action that disadvantaged him; and (3) a causal connection exists between the protected activity and the adverse action" (*Fletcher v Dakota, Inc., 99 AD3d 43, 51-52, 948 N.Y.S.2d 263 [1st Dept 2012]*). Under the broader interpretation of the NYCHRL, "[t]he retaliation . . . need not result in an ultimate action . . . or in a materially adverse change . . . [but] must be reasonably likely to deter a person from engaging in protected activity." Administrative Code § 8-107 (7).

The Second Circuit already raised and addressed the issue of whether-or not the MTA's actions would dissuade a reasonable worker from making a charge [*30] of discrimination. It also explicitly noted that causation would be unfounded, given the numerous instances of discipline plaintiff received prior to commencing any protected activity. As plaintiff was given a full opportunity to litigate, including the oral argument, and many subsequent federal court-determinations, the MTA is granted collateral estoppel partially dismissing the remaining claims of retaliation.

In any event, even if plaintiff's claims for retaliation were not precluded by collateral estoppel, the MTA would be granted dismissal of the remaining claims for the reasons already [**28] specified. In pertinent part, plaintiff cannot establish any connection between the EEOC complaint and any alleged adverse actions.

---

[6] Moreover, plaintiff's claims that he was subject to a retaliatory hostile work environment as a result of filing his charge with the EEOC are wholly unsupported in his complaint.

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 185 of 321

Page 10 of 10

2017 N.Y. Misc. LEXIS 2837, *30; 2017 NY Slip Op 31559(U), **28

Plaintiff had been receiving progressive discipline from 2008, well before he filed a charge with the EEOC (*see e.g.* Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD3d 196, 206-207, 21 N.Y.S.3d 221 [1st Dept 2015] [Plaintiff had no claim for retaliation under NYCHRL where there was "no evidence of a causal connection all the discord — in scope, kind, and frequency — preexisted her internal. complaint. The discharge that was effected in 2009 was the culmination of continuous progressive discipline"]).

Accordingly, the MTA's motion for partial dismissal is granted **[*31]** and plaintiff is precluded and estopped from maintaining his NYSHRL and NYCHRL claims that are based on allegations that the Second Circuit has already found to be insufficient to state a cause of action for race-based discrimination, hostile work environment, retaliation and retaliatory hostile work environment under Title VII.

## CONCLUSION

Accordingly, it is

ORDERED, that the Metropolitan Transportation Authority's motion to dismiss Winston Henvill's NYSHRL and NYCHRL discrimination, retaliation, retaliatory hostile work environment and hostile work. environment claims alleged in the present action **[**29]** that are based on the same factual allegations that were found to be insufficient to state a cause of action under Title VII in the Second Circuit, is granted[7]; and it is further

ORDERED, that the remaining claims shall continue.

Dated: July 21, 2017

ENTER:

/s/ Shlomo Hagler

J.S.C.

---

**End of Document**

---

[7] Again, at this time; the MTA is not seeking to dismiss the claims based on plaintiff's ultimate termination in April 2015, the race-based Dittrich discipline incident discrimination claim or the retaliation claim involving the March 2012 removal of summons-issuing responsibilities.

Q Questioned
As of: June 23, 2025 9:49 PM Z

# *Hishon v. King & Spalding*

Supreme Court of the United States

October 31, 1983, Argued ; May 22, 1984, Decided

No. 82-940

**Reporter**

467 U.S. 69 *; 104 S. Ct. 2229 **; 81 L. Ed. 2d 59 ***; 1984 U.S. LEXIS 7 ****; 52 U.S.L.W. 4627; 34 Fair Empl. Prac. Cas. (BNA) 1406; 34 Empl. Prac. Dec. (CCH) P34,387

HISHON v. *KING* & SPALDING

**Prior History:** **[****1]** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT.

**Disposition:** *678 F.2d 1022*, reversed and remanded.

## Core Terms

partnership, alleges, sex, privileges of employment, associates, terms, employment contract, law firm, contractual, conditions, partner

## Case Summary

### Procedural Posture

Petitioner associate attorney sought review of a judgment of the United States Court of Appeals for the Eleventh Circuit which affirmed the district court's dismissal of petitioner's action under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, against respondent law partnership on the ground that Title VII was inapplicable to the selection of partners by a partnership.

### Overview

Petitioner associate attorney accepted a position with respondent law partnership. Petitioner alleged that respondent's promise to consider her on a fair and equal basis created a binding employment contract. Respondent considered and rejected petitioner for admission to the partnership. Petitioner filed an action under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, claiming that respondent had discriminated against her on the basis of sex. The district court dismissed the complaint on the ground that

Title VII was inapplicable to the selection of partners. The court of appeals affirmed. The Court granted certiorari and reversed. The Court stated that if the evidence at trial established that the parties contracted to have petitioner considered for partnership, that promise clearly was a term, condition, or privilege of her employment, and Title VII bound respondent to consider petitioner for partnership without regard to petitioner's sex. Therefore, the Court concluded that petitioner's complaint stated a claim cognizable under Title VII.

### Outcome

The Court reversed the court of appeals' judgment affirming the dismissal of petitioner associate attorney's action against respondent law partnership on the ground that Title VII did not apply to the selection of partners by a partnership. The Court held that if the evidence showed that the parties contracted to have petitioner considered for partnership, then that was a term, condition, or privilege of employment to which Title VII applied.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN1* **Motions to Dismiss, Failure to State Claim**

A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

Civil Rights Law > Protection of Rights > Federally

467 U.S. 69, *69; 104 S. Ct. 2229, **2229; 81 L. Ed. 2d 59, ***59; 1984 U.S. LEXIS 7, ****1

Assisted Programs > Civil Rights Act of 1964
Business & Corporate
Compliance > Governments > Civil Rights Act of
1964

### HN2 Governments, Civil Rights Act of 1964

See *42 U.S.C.S. § 2000e-2(a)*.

Business & Corporate
Compliance > ... > Discrimination > Title VII
Discrimination > Employers
Labor & Employment Law > ... > Title VII
Discrimination > Scope & Definitions > Employers

Labor & Employment Law > Employment
Relationships > At Will Employment > Definition of
Employers

Civil Rights Law > Protection of Rights > Federally
Assisted Programs > Civil Rights Act of 1964
Business & Corporate
Compliance > Governments > Civil Rights Act of
1964

Labor & Employment Law > Discrimination > Racial
Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > Title
VII Discrimination > General Overview

Labor & Employment Law > ... > Title VII
Discrimination > Scope & Definitions > General
Overview

### HN3 Title VII Discrimination, Employers

Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §
2000e et seq.*, defines an "employer" as a person
engaged in an industry affecting commerce who has 15
or more employees for each working day in each of 20
or more calendar weeks in the current or preceding
calendar year. *42 U.S.C.S. § 2000e(b).* A "person" is
explicitly defined to include partnerships. *42 U.S.C.S. §
2000e(a).*

Civil Rights Law > Protection of Rights > Federally
Assisted Programs > Civil Rights Act of 1964
Business & Corporate
Compliance > Governments > Civil Rights Act of

1964

Labor & Employment Law > ... > Employment
Contracts > Conditions & Terms > General
Overview

Labor & Employment Law > Discrimination > Title
VII Discrimination > General Overview

Labor & Employment Law > Employment
Relationships > General Overview

### HN4 Governments, Civil Rights Act of 1964

Once a contractual relationship of employment is
established, the provisions of Title VII of the Civil Rights
Act of 1964, *42 U.S.C.S. § 2000e et seq.*, attach and
govern certain aspects of that relationship. In the
context of Title VII, the contract of employment may be
written or oral, formal or informal. The contractual
relationship of employment triggers the provision of Title
VII governing terms, conditions, or privileges of
employment.

Civil Rights Law > Protection of Rights > Federally
Assisted Programs > Civil Rights Act of 1964
Business & Corporate
Compliance > Governments > Civil Rights Act of
1964

Labor & Employment Law > ... > Employment
Contracts > Conditions & Terms > General
Overview

Labor & Employment Law > Discrimination > Title
VII Discrimination > General Overview

Labor & Employment Law > Employment
Relationships > General Overview

### HN5 Governments, Civil Rights Act of 1964

Those benefits that comprise the "incidents of
employment," or that form an aspect of the relationship
between the employer and employees, may not be
afforded in a manner contrary to Title VII of the Civil
Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

Civil Rights Law > Protection of Rights > Federally
Assisted Programs > Civil Rights Act of 1964

467 U.S. 69, *69; 104 S. Ct. 2229, **2229; 81 L. Ed. 2d 59, ***59; 1984 U.S. LEXIS 7, ****1

Business & Corporate Compliance > Governments > Civil Rights Act of 1964

Civil Rights Law > Protection of Rights > Procedural Matters > Claim Accrual

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN6* **Governments, Civil Rights Act of 1964**

The benefit a plaintiff is denied need not be employment to fall within the protection of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* It need only be a term, condition, or privilege of employment. A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship.

## Lawyers' Edition Display

### Decision

Complaint that law partnership discriminated against woman attorney employed as associate when it failed to invite her to become partner held to state claim cognizable under Title VII.

### Summary

A woman lawyer, who had been employed as an associate with a law firm that was a general partnership and who had been fired after the firm decided not to invite her to become a partner, filed a charge with the Equal Employment Opportunity Commission, alleging that the firm had discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*). After the Commission issued a notice of right to sue, the lawyer brought an action under Title VII in the United States District Court for the Northern District of Georgia. The District Court dismissed the complaint on the ground that Title VII was inapplicable to the selection of partners by a partnership, and the United States Court of Appeals for the Eleventh Circuit affirmed (*678 F2d 1022*).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Burger, Ch. J., expressing the unanimous view of the court, it was held that a complaint which alleges that a law partnership discriminated against a woman attorney employed as an

associate when it failed to invite her to become a partner states a claim that is cognizable under Title VII.

Powell, J., concurring, expressed the view that (1) the female attorney was entitled to the opportunity to prove her allegations against the partnership, and (2) the court's opinion should not be read as extending Title VII to the management of a law firm by its partners.

## Headnotes

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- partnership in law firm --  > Headnote:
***LEdHN[1A]*** [1A]***LEdHN[1B]*** [1B]***LEdHN[1C]*** [1C]***LEdHN[1D]*** [1D]

A sex discrimination complaint states a claim that is cognizable under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), where it alleges that a law partnership discriminated against a woman attorney employed as an associate when it failed to invite her to become a partner.

PLEADING §103 > complaint -- dismissal --  > Headnote:
***LEdHN[2]*** [2]

A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

CIVIL RIGHTS §7.5 > Title VII -- establishment of contractual relationship of employment --  > Headnote:
***LEdHN[3]*** [3]

Once a contractual relationship of employment is established, the provisions of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) attach, and the relationship triggers the antidiscrimination provision of Title VII governing terms, conditions, or privileges of employment.

467 U.S. 69, *69; 104 S. Ct. 2229, **2229; 81 L. Ed. 2d 59, ***59; 1984 U.S. LEXIS 7, ****1

CIVIL RIGHTS §7.5 > Title VII -- nature of employment contract -- > Headnote:

*LEdHN[4]* [4]

In the context of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), which prohibits discrimination in employment, the contract of employment may be written or oral, formal or informal.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- consideration for partnership in law firm -- imposition of fairness requirement -- > Headnote:

*LEdHN[5A]* [5A]*LEdHN[5B]* [5B]

A promise by a law partnership to consider a female attorney for partnership on a "fair and equal basis" is not necessary to the attorney's claim of sex discrimination under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), because even if the employment contract did not afford a basis for an implied condition that the ultimate partnership decision would be fairly made on the merits, Title VII itself would impose such a requirement; if the promised consideration for partnership is a term, condition, or privilege of employment, then the decision must be without regard to sex.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- evidence of contract to have female attorney considered for partnership -- > Headnote:

*LEdHN[6]* [6]

If the evidence in a sex discrimination suit, brought under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) by a woman attorney against a law firm that allegedly discriminated against her when it did not invite her to become a partner, establishes that the parties contracted to have the attorney considered for partnership, that promise was a term, condition, or privilege of her employment, and Title VII would then bind the firm to consider her for partnership without regard to her sex.

CIVIL RIGHTS §7.5 > Title VII -- privilege of employment --

voluntary provision of benefits -- > Headnote:

*LEdHN[7]* [7]

An employer may provide its employees benefits that it is under no obligation to furnish by an express or implied contract, and such a benefit, though not a contractual right of employment, may qualify as a privilege of employment under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), such that the benefit may not be afforded in a discriminatory manner.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- terms, conditions, or privileges of employment -- proof of consideration for partnership in law firm -- > Headnote:

*LEdHN[8]* [8]

In a sex discrimination suit, brought under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) by a woman attorney against a law firm that allegedly discriminated against her when it did not invite her, an associate, to become a partner, proof at trial of allegations that the firm's associates could regularly expect to be considered for partnership at the end of their apprenticeships, that the benefit of partnership consideration was linked directly with an associate's status as an employee, that the firm explicitly used the prospect of ultimate partnership to induce young lawyers to join the firm, and that an associate's employment was terminated if not elected to become a partner would suffice to show that partnership consideration was a term, condition, or privilege of an associate's employment at the firm, and accordingly that partnership consideration must be without regard to sex.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- nature of invitation for partnership in law firm -- > Headnote:

*LEdHN[9]* [9]

Regarding a sex discrimination suit, brought under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) by a woman attorney against a law firm that allegedly discriminated against her when it did not invite her to become a partner, even if a partnership invitation is not itself an offer of employment, Title VII would nonetheless apply and preclude discrimination on the basis of sex, since the benefit the complainant is denied

467 U.S. 69, *69; 104 S. Ct. 2229, **2229; 81 L. Ed. 2d 59, ***59; 1984 U.S. LEXIS 7, ****1

need not "be" employment to fall within the protection of Title VII; it need only be a term, condition, or privilege "of" employment.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- accrual of benefit -- > Headnote:
**_LEdHN[10]_** [10]

With respect to a sex discrimination suit, brought under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) by a woman attorney against a law firm that allegedly discriminated against her when it did not invite her to become a partner, it is of no consequence that employment as an associate necessarily ends when an associate becomes a partner, since a benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship, and therefore, subject to the protection of Title VII.

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- consideration for partnership in law firm -- effect of change in status -- > Headnote:
**_LEdHN[11]_** [11]

Nothing in the change in status that advancement in a law firm from associate to partnership might entail means that partnership consideration falls outside the terms of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*).

CIVIL RIGHTS §7.7 > Title VII -- sex discrimination -- suit against law firm for discrimination in partnership consideration -- infringement of constitutional rights -- > Headnote:
**_LEdHN[12]_** [12]

Application of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) in a sex discrimination case brought thereunder by a woman attorney against a law firm that allegedly discriminated against her when it did not invite her to become a partner does not infringe any of the firm's constitutional rights of expression or association.

## Syllabus

Petitioner, a woman lawyer, was employed in 1972 as an associate with respondent law firm, a general partnership, but her employment was terminated in 1979 after respondent decided not to invite her to become a partner. Petitioner filed a charge with the Equal Employment Opportunity Commission, claiming that respondent had discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964. After the Commission issued a notice of right to sue, petitioner brought this action in Federal District Court under Title VII. Her complaint included allegations that respondent used the possibility of ultimate partnership as a recruiting device to induce her and other young lawyers to become associates at the firm; that respondent represented that advancement to partnership after five or six years was "a matter of course" for associates who received satisfactory evaluations and that associates would be considered for partnership "on a fair and equal basis"; that she relied on these representations when she accepted employment **[****2]** with respondent; that respondent's promise to consider her on a "fair and equal basis" created a binding employment contract; and that respondent discriminated against her on the basis of her sex when it failed to invite her to become a partner. The District Court dismissed the complaint on the ground that Title VII was inapplicable to the selection of partners by a partnership, and the Court of Appeals affirmed.

*Held*: Petitioner's complaint states a claim cognizable under Title VII, and she therefore is entitled to her day in court to prove her allegations. Pp. 73-79.

(a) Once a contractual employment relationship is established, the provisions of Title VII attach, forbidding unlawful discrimination as to the "terms, conditions, or privileges of employment," which clearly include benefits that are part of the employment contract. If the evidence at trial establishes petitioner's allegation that the parties contracted to have her considered for partnership, that promise clearly was a term, condition, or privilege of her employment. Independent of the alleged contract, Title VII would then bind respondent to consider petitioner for partnership as the statute provides, *i.* **[****3]** *e.*, without regard to her sex. Moreover, an employer may provide its employees with benefits that it is under no obligation to furnish by any express or implied contract. Such a benefit, though not a contractual *right* of

employment, may qualify as a "privilege" of employment under Title VII that may not be granted or withheld in a discriminatory fashion. Pp. 73-76.

(b) Even if respondent is correct in its assertion that a partnership invitation is not itself an offer of employment, Title VII would nonetheless apply. The benefit a plaintiff is denied need not *be* employment to fall within Title VII's protection; it need only be a term, condition, or privilege *of* employment. It is also of no consequence that employment as an associate necessarily ends upon elevation to partnership; a benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship. Nor does the statute or its legislative history support a *per se* exemption of partnership decisions from scrutiny. And respondent has not shown how application of Title VII in this case would infringe its constitutional rights of expression or [****4] association. Moreover, "[invidious] private discrimination may be characterized as a form of exercising freedom of association protected by the *First Amendment*, but it has never been accorded affirmative constitutional protections." *Norwood v. Harrison, 413 U.S. 455, 470*. Pp. 77-78.

**Counsel:** Emmet J. Bondurant argued the cause and filed a brief for petitioner.

Deputy Solicitor General Bator argued the cause for the United States as amicus curiae urging reversal. With him on the brief for the United States et al. were Solicitor General Lee, Assistant Attorney General Reynolds, David A. Strauss, Brian K. Landsberg, James W. Clute, and Philip B. Sklover.

Charles Morgan, Jr., argued the cause for respondent. With him on the brief were J. Richard Cohen, Steven E. Vagle, Hamilton Lokey, and Gerald F. Handley. *

---

* Briefs of amici curiae urging reversal were filed for the American Association of University Women et al. by Judith I. Avner and Anne E. Simon; for the American Civil Liberties Union by Samuel Estreicher, Burt Neuborne, Isabelle Katz Pinzler, E. Richard Larson, Charles S. Sims, and Mary L. Heen; for the Anti-Defamation League of B'nai B'rith et al. by Justin J. Finger, Meyer Eisenberg, Jeffrey P. Sinensky, Leslie K. Shedlin, and Nathan Z. Dershowitz; for California Women Lawyers by Elizabeth S. Salveson; for the Dallas Association of Black Women Attorneys et al. by Neil H. Cogan; for the NAACP Legal Defense and Educational Fund, Inc., by Jack Greenberg, Charles S. Ralston, Gail J. Wright, and Elizabeth Bartholet; for the Women's Bar Association of Illinois et al. by Paddy Harris McNamara, Susan N. Sekuler, and Jacqueline

[****5]

**Judges:** BURGER, C. J., delivered the opinion for a unanimous Court. POWELL, J., filed a concurring opinion, post, p. 79.

**Opinion by:** BURGER

# Opinion

[*71]  [***64]  [**2231] CHIEF JUSTICE BURGER delivered the opinion of the Court.

*LEdHN[1A]* [1A] We granted certiorari to determine whether the District Court properly dismissed a Title VII complaint alleging that a law partnership discriminated against petitioner, a woman lawyer employed as an associate, when it failed to invite her to become a partner.

I

A

In 1972 petitioner Elizabeth Anderson Hishon accepted a position as an associate with respondent, a large Atlanta law firm established as a general partnership. When this suit was filed in 1980, the firm [**2232] had more than 50 partners and employed approximately 50 attorneys as associates. Up to that time, no woman had ever served as a partner at the firm.

Petitioner alleges that the prospect of partnership was an important factor in her initial decision to accept employment with respondent. She alleges that respondent used the possibility of ultimate partnership as a recruiting device to induce petitioner and other young lawyers to become associates at the firm. According to the complaint, respondent represented [****6] that advancement to partnership after five or six [*72] years was "a matter of course" for associates "who [received] satisfactory evaluations" and that associates were promoted to partnership "on a fair and equal basis." Petitioner alleges that she relied on

---

S. Lustig; for the Women's Bar Association of Massachusetts by Leah Sprague Crothers; and for Robert Abrams et al. by Paulette M. Caldwell, Lawrence S. Robbins, and Barbara S. Schulman.

Joseph D. Alviani filed a brief for the New England Legal Foundation as amicus curiae urging affirmance.

467 U.S. 69, *72; 104 S. Ct. 2229, **2232; 81 L. Ed. 2d 59, ***64; 1984 U.S. LEXIS 7, ****6

these representations when she accepted employment with respondent. The complaint further alleges that respondent's promise to consider her on a "fair and equal basis" created a binding employment contract.

In May 1978 the partnership considered and rejected Hishon for admission to the partnership; one year later, the partners again declined to invite her to become a partner. [1] [***65] Once an associate is passed over for partnership at respondent's firm, the associate is notified to begin seeking employment elsewhere. Petitioner's employment as an associate terminated on December 31, 1979.

[****7]  B

Hishon filed a charge with the Equal Employment Opportunity Commission on November 19, 1979, claiming that respondent had discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 241, as amended, _42 U. S. C. § 2000e et seq._ Ten days later the Commission issued a notice of right to sue, and on February 27, 1980, Hishon brought this action in the United States District Court for the Northern District of Georgia. She sought declaratory and injunctive relief, backpay, and compensatory damages "in lieu of reinstatement and promotion to partnership." This, of course, negates any claim for specific performance of the contract alleged.

The District Court dismissed the complaint on the ground that Title VII was inapplicable to the selection of partners [*73] by a partnership. [2] _24 FEP Cases 1303_

---

[1] The parties dispute whether the partnership actually reconsidered the 1978 decision at the 1979 meeting. Respondent claims it voted not to reconsider the question and that Hishon therefore was required to file her claim with the Equal Employment Opportunity Commission within 180 days of the May 1978 meeting, not the meeting one year later, see _42 U. S. C. § 2000e-5(e)_. The District Court's disposition of the case made it unnecessary to decide that question, and we do not reach it.

[2] The District Court dismissed under _Federal Rule of Civil Procedure 12(b)(1)_ on the ground that it lacked subject-matter jurisdiction over petitioner's claim. Although limited discovery previously had taken place concerning the manner in which respondent was organized, the court did not find any "jurisdictional facts" in dispute. See _Thomson v. Gaskill, 315 U. S. 442, 446 (1942)_. Its reasoning makes clear that it dismissed petitioner's complaint on the ground that her allegations did not state a claim cognizable under Title VII. Our disposition makes it unnecessary to consider the wisdom

_(1980)_. A divided panel of the United States Court of Appeals for the Eleventh Circuit affirmed. _678 F.2d 1022 (1982)_. We granted certiorari, _459 U.S. 1169 (1983)_, and we reverse.

[****8]  II

_LEdHN[2]_ [2]At this stage of the litigation, we must accept petitioner's allegations as true. _HN1_ A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. _Conley v. Gibson, 355 U.S. 41, 45-46 (1957)_. The issue before us is whether petitioner's allegations state a claim under Title VII, the relevant portion of which provides as follows:

[**2233] _HN2_ "(a) _It shall be an unlawful employment practice for an employer --_

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to _discriminate against any individual with respect to his_ compensation, _terms, conditions, or privileges of employment, because of such individual's_ race, color, religion, _sex_, or national origin." _42 U. S. C. § 2000e-2(a)_ (emphasis added).

A

Petitioner alleges that respondent is an "employer" to whom Title VII [***66] is addressed. [3] She then asserts that consideration [*74] for partnership was one of the "terms, conditions, or privileges of employment" as an associate with respondent. [4] See _§ 2000e-2(a)(1)_. If this is correct, respondent could not base [****9] an adverse partnership decision on "race, color, religion, sex, or national origin."

_LEdHN[3]_ [3] _LEdHN[4]_ [4]_HN4_ Once a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects

---

of the District Court's invocation of _Rule 12(b)(1)_, as opposed to _Rule 12(b)(6)_.

[3] _HN3_ The statute defines an "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year," _§ 2000e(b)_, and a "person" is explicitly defined to include "partnerships," _§ 2000e(a)_. The complaint alleges that respondent's partnership satisfies these requirements. App. 6.

[4] Petitioner has raised other theories of Title VII liability which, in light of our disposition, need not be addressed.

467 U.S. 69, *74; 104 S. Ct. 2229, **2233; 81 L. Ed. 2d 59, ***66; 1984 U.S. LEXIS 7, ****9

of that relationship. [5] In the context of Title VII, the contract of employment may be written or oral, formal or informal; an informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace. The contractual relationship of **[****10]** employment triggers the provision of Title VII governing "terms, conditions, or privileges of employment." Title VII in turn forbids discrimination on the basis of "race, color, religion, sex, or national origin."

*LEdHN[5A]* [5A] *LEdHN[6]* [6]Because the underlying employment relationship is contractual, it follows that the "terms, conditions, or privileges of employment" clearly include benefits that are part of an employment contract. Here, petitioner in essence alleges that respondent made a contract to consider her for partnership. [6] Indeed, this promise was allegedly a key contractual **[*75]** provision which induced her to accept employment. If the evidence at trial establishes that the parties contracted to have petitioner **[****11]** considered for partnership, that promise clearly was a term, condition, or privilege of her employment. Title VII would then bind respondent to consider petitioner for partnership as the statute provides, *i. e.*, without regard to petitioner's sex. The contract she alleges would lead to the same result.

*LEdHN[7]* [7]Petitioner's claim that a contract was made, however, is not the only allegation that would **[****12]** qualify respondent's consideration of petitioner for partnership as a term, condition, or privilege of

————————————————

[5] Title VII also may be relevant in the absence of an existing employment relationship, as when an employer *refuses* to hire someone. See *§ 2000e-2(a)(1)*. However, discrimination in that circumstance does not concern the "terms, conditions, or privileges of employment," which is the focus of the present case.

[6] *LEdHN[5B]* [5B]

Petitioner alleges not only that respondent promised to consider her for partnership, but also that it promised to consider her on a "fair and equal basis." This latter promise is not necessary to petitioner's Title VII claim. Even if the employment contract did not afford a basis for an implied condition that the ultimate decision would be fairly made on the merits, Title VII itself would impose such a requirement. If the promised consideration for partnership is a term, condition, or privilege of employment, then the partnership decision must be without regard to "race, color, religion, sex, or national origin."

employment. An employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract. Such a benefit, though not a contractual *right* of employment, may qualify **[***67]** as a "[privilege]" of employment under Title VII. A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory **[**2234]** fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. *HN5* Those benefits that comprise the "incidents of employment," S. Rep. No. 867, 88th Cong., 2d Sess., 11 (1964), [7] **[****13]** or that form "an aspect of the relationship between the employer and employees," *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., [*76] 404 U.S. 157, 178 (1971),*[8] may not be afforded in a manner contrary to Title VII.

*LEdHN[8]* [8]Several allegations in petitioner's complaint would support the conclusion that the opportunity to become a partner was part and parcel of an associate's status as an employee at respondent's firm, independent of any allegation that such an opportunity was included in associates' employment contracts. Petitioner alleges that respondent's associates could regularly expect to be considered **[****14]** for partnership at the end of their "apprenticeships," and it appears that lawyers outside the firm were not routinely so considered. [9] Thus, the

————————————————

[7] Senate Report No. 867 concerned S. 1937, which the Senate postponed indefinitely after it amended a House version of what ultimately became the Civil Rights Act of 1964. See 110 Cong. Rec. 14602 (1964). The Report is relevant here because S. 1937 contained language similar to that ultimately found in the Civil Rights Act. It guaranteed "equal employment opportunity," which was defined to "include all the compensation, terms, conditions, and privileges of employment." S. Rep. No. 867, 88th Cong., 2d Sess., 24 (1964).

[8] *Chemical & Alkali Workers* pertains to § 8(d) of the National Labor Relations Act (NLRA), which describes the obligation of employers and unions to meet and confer regarding "wages, hours, and other terms and conditions of employment." 61 Stat. 142, as amended, *29 U. S. C. § 158(d)*. The meaning of this analogous language sheds light on the Title VII provision at issue here. We have drawn analogies to the NLRA in other Title VII contexts, see *Franks v. Bowman Transportation Co., 424 U.S. 747, 768-770 (1976)*, and have noted that certain sections of Title VII were expressly patterned after the NLRA, see *Albemarle Paper Co.* v. *Moody, 422 U.S. 405, 419 (1975)*.

[9] Respondent's own submissions indicate that most of

467 U.S. 69, *76; 104 S. Ct. 2229, **2234; 81 L. Ed. 2d 59, ***67; 1984 U.S. LEXIS 7, ****14

benefit of partnership consideration was allegedly linked directly with an associate's status as an employee, and this linkage was far more than coincidental: petitioner alleges that respondent explicitly used the prospect of ultimate partnership to induce young lawyers to join the firm. Indeed, the importance of the partnership decision to a lawyer's status as an associate is underscored by the allegation that associates' employment is terminated if they are not elected to become partners. These allegations, if proved at trial, would suffice to show that partnership consideration was a term, condition, or privilege of an associate's employment at respondent's firm, and accordingly that partnership consideration must be without regard to sex.

**[****15]  [*77]  B**

_LEdHN[9]_  [9]  _LEdHN[10]_  [10]  _LEdHN[11]_ [11]Respondent contends that advancement to partnership may never qualify as a term, condition, or privilege of employment for purposes of Title VII. First, respondent asserts that elevation to partnership **[***68]** entails a change in status from an "employee" to an "employer." However, even if respondent is correct that a partnership invitation is not itself an offer of employment, Title VII would nonetheless apply and preclude discrimination on the basis of sex. _HN6_ The benefit a plaintiff is denied need not _be_ employment to fall within Title VII's protection; it need only be a term, condition, or privilege _of_ employment. It is also of no consequence that employment as an associate necessarily ends when an associate becomes a partner. A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship. Pension benefits, for example, qualify as terms, conditions, or privileges of employment even though they are received only after employment terminates. **[**2235]** _Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris, 463 U.S. 1073, 1079 (1983)_ **[****16]** (opinion of MARSHALL, J.). Accordingly, nothing in the change in status that advancement to partnership might entail means that partnership consideration falls outside the terms of the statute. See _Lucido v. Cravath, Swaine & Moore, 425 F.Supp. 123, 128-129 (SDNY 1977)_.

_LEdHN[1B]_ [1B]Second, respondent argues that Title VII categorically exempts partnership decisions from scrutiny. However, respondent points to nothing in the statute or the legislative history that would support such a _per se_ exemption. [10] **[****17]** When **[*78]** Congress wanted to grant an employer complete immunity, it expressly did so. [11]

_LEdHN[12]_  [12]Third, respondent argues that application of Title VII in this case would infringe constitutional rights of expression or association. Although we have recognized that the activities of lawyers may make a "distinctive contribution . . . to the ideas and beliefs of our society," _NAACP v. Button, 371 U.S. 415, 431 (1963)_, respondent has not shown how its ability to fulfill such a function would be inhibited by a requirement that it consider petitioner for partnership on her merits. Moreover, as we have held in another context, "[invidious] private discrimination may be characterized as a form of exercising freedom of association **[****18]** protected by the _First Amendment_, but it has never been accorded affirmative **[***69]** constitutional protections." _Norwood v. Harrison, 413_

---

[10] The only legislative history respondent offers to support its position is Senator Cotton's defense of an unsuccessful amendment to limit Title VII to businesses with 100 or more employees. In this connection the Senator stated:

"[When] a small businessman who employs 30 or 25 or 26 persons selects an employee, he comes very close to selecting a partner; and when a businessman selects a partner, he comes dangerously close to the situation he faces when he selects a wife." 110 Cong. Rec. 13085 (1964); accord, 118 Cong. Rec. 1524, 2391 (1972).

_LEdHN[1C]_ [1C]Because Senator Cotton's amendment failed, it is unclear to what extent Congress shared his concerns about selecting partners. In any event, his views hardly conflict with our narrow holding today: that in appropriate circumstances partnership consideration may qualify as a term, condition, or privilege of a person's employment with an employer large enough to be covered by Title VII.

[11] For example, Congress expressly exempted Indian tribes and certain agencies of the District of Columbia, _42 U. S. C. § 2000e(b)(1)_, small businesses and bona fide private membership clubs, _§ 2000e(b)(2)_, and certain employees of religious organizations, § 2000e-1. Congress initially exempted certain employees of educational institutions, § 702, 78 Stat. 255, but later revoked that exemption, Equal Employment Opportunity Act of 1972, § 3, 86 Stat. 103.

---

respondent's partners in fact were selected from the ranks of associates who had spent their entire prepartnership legal careers (excluding judicial clerkships) with the firm. See App. 45.

467 U.S. 69, *78; 104 S. Ct. 2229, **2235; 81 L. Ed. 2d 59, ***69; 1984 U.S. LEXIS 7, ****18

*U.S. 455, 470 (1973)*. There is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union. *Runyon v. McCrary, 427 U.S. 160 (1976)*; *Railway Mail Assn.* v. *Corsi, 326 U.S. 88, 93-94 (1945)*.

III

 **LEdHN[1D]**  [1D]We conclude that petitioner's complaint states a claim cognizable under Title VII. Petitioner therefore is entitled to **[*79]** her day in court to prove her allegations. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** POWELL

## Concur

JUSTICE POWELL, concurring.

I join the Court's opinion holding that petitioner's complaint alleges a violation of Title VII and that the motion to dismiss should not have been granted. Petitioner's complaint avers that the law firm violated its promise that she would be considered for partnership on a "fair and equal basis" within the time span that associates generally are so considered. **[****19]** [1] Petitioner is entitled **[**2236]** to the opportunity to prove these averments.

I write to make clear my understanding that the Court's opinion should not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an "employment" relationship to which Title VII would apply. The relationship among law partners differs markedly from that between employer and employee -- including that between the partnership and its associates. [2]

---

[1] Law firms normally require a period of associateship as a prerequisite to being eligible to "make" partner. This need not be an inflexible period, as firms may vary from the norm and admit to partnership earlier than, or subsequent to, the customary period of service. Also, as the complaint recognizes, many firms make annual evaluations of the performances of associates, and usually are free to terminate employment on the basis of these evaluations.

[2] Of course, an employer may not evade the strictures of Title

The **[****20]** judgmental and sensitive decisions that must be made among the partners embrace a wide range of subjects. [3] The essence of the law partnership is the common **[*80]** conduct of a shared enterprise. The relationship among law partners contemplates that decisions important **[***70]** to the partnership normally will be made by common agreement, see, *e. g.*, Memorandum of Agreement, ***King*** & Spalding, App. 153-164 (respondent's partnership agreement), or consent among the partners.

 **[****21]** Respondent contends that for these reasons application of Title VII to the decision whether to admit petitioner to the firm implicates the constitutional right to association. But here it is alleged that respondent as an employer is obligated by contract to consider petitioner for partnership on equal terms without regard to sex. I agree that enforcement of this obligation, voluntarily assumed, would impair no right of association. [4]

---

VII simply by labeling its employees as "partners." Law partnerships usually have many of the characteristics that I describe generally here.

[3] These decisions concern such matters as participation in profits and other types of compensation; work assignments; approval of commitments in bar association, civic, or political activities; questions of billing; acceptance of new clients; questions of conflicts of interest; retirement programs; and expansion policies. Such decisions may affect each partner of the firm. Divisions of partnership profits, unlike shareholders' rights to dividends, involve judgments as to each partner's contribution to the reputation and success of the firm. This is true whether the partner's participation in profits is measured in terms of points or percentages, combinations of salaries and points, salaries and bonuses, and possibly in other ways.

[4] The Court's opinion properly reminds us that "invidious private discrimination . . . has never been accorded affirmative constitutional protections." *Ante*, at 78. This is not to say, however, that enforcement of laws that ban discrimination will always be without cost to other values, including constitutional rights. Such laws may impede the exercise of personal judgment in choosing one's associates or colleagues. See generally Fallon, To Each According to His Ability, From None According to His Race: The Concept of Merit in the Law of Antidiscrimination, 60 Boston Univ. L. Rev. 815, 844-860 (1980). Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the *First* and *Fourteenth Amendments*. Cf. *NAACP v. Button, 371 U.S. 415 (1963)*; *NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958)*.

With respect to laws that prevent discrimination, much depends upon the standards by which the courts examine private decisions that are an exercise of the right of

467 U.S. 69, *80; 104 S. Ct. 2229, **2236; 81 L. Ed. 2d 59, ***70; 1984 U.S. LEXIS 7, ****21

[****22]  [*81]  In admission decisions made by law firms, it is now widely recognized -- as it should be -- that in fact neither race nor sex is relevant.  The qualities of mind, capacity to reason logically, ability to work under pressure, leadership, and the like are unrelated to race or sex. This is demonstrated by the success of women and minorities in law schools, in the practice of law, on the bench, and in positions of community, state, and national leadership.  Law firms -- [**2237] and, of course, society -- are the better for these changes.

# References

Sex discrimination in employment against female attorney in violation of federal civil rights laws--federal cases

*15 Am Jur 2d, Civil Rights 154*, *163*

21 Federal Procedure, L Ed, Job Discrimination 50:1-50:305

12 Federal Procedural Forms, L Ed, Job Discrimination 45:11-45:125

5 Am Jur Pl & Pr Forms (Rev), Civil Rights, Forms 61 et seq.

12 Am Jur Proof of Facts 2d 645, Sex Discrimination in Employment--Promotion Practices

21 Am Jur Trials 1, Employment Discrimination Under Federal Civil Rights Acts

*42 USCS 2000e et seq.*

FRES, Job Discrimination 2:1 et [****23] seq., 3:1 et seq.

US L Ed Digest, Civil Rights 7.5, 7.7; Pleading 103

L Ed Index to Annos, Civil Rights; Labor and Employment ;Sex

ALR Quick Index, Discrimination; Sex Discrimination

Federal Quick Index, Civil Rights; Sex Discrimination

Annotation References:

Sex discrimination in employment against female attorney in violation of federal civil rights laws.  *81 L Ed 2d 894*.

Sex discrimination-- Supreme Court cases. *27 L Ed 2d 935*.

Award of compensatory damages, aside from backpay or frontpay, for violation of Title VII of Civil Rights Act of 1964 (*42 USCS 2000e et seq.*).  *48 ALR Fed 338*.

Construction and application of provisions of Title VII of Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) making sex discrimination in employment unlawful.  *12 ALR Fed 15*.

Construction and application of state equal rights amendments forbidding determination of rights based on sex.  *90 ALR3d 158*.

Application of state law to sex discrimination in employment. *87 ALR3d 93*.

---

End of Document

---

association.  For example, the Courts of Appeals generally have acknowledged that respect for academic freedom requires some deference to the judgment of schools and universities as to the qualifications of professors, particularly those considered for tenured positions. *Lieberman v. Gant, 630 F.2d 60, 67-68 (CA2 1980)*; *Kunda v. Muhlenberg College, 621 F.2d 532, 547-548 (CA3 1980)*. Cf.  *University of California Regents v. Bakke, 438 U.S. 265, 311-315 (1978)* (opinion of JUSTICE POWELL).  The present case, before us on a motion to dismiss for lack of subject-matter jurisdiction, does not present such an issue.

⚡ Questioned
As of: June 23, 2025 9:53 PM Z

## *Hollin v. Scholastic Corp. (in Re Scholastic Corp. Sec. Litig.)*

United States Court of Appeals for the Second Circuit

November 15, 2000, Argued ; June 1, 2001, Decided

Docket No. 00-7517

**Reporter**
252 F.3d 63 *; 2001 U.S. App. LEXIS 11368 **; Fed. Sec. L. Rep. (CCH) P91,455

IN RE: SCHOLASTIC CORPORATION SECURITIES LITIGATION; LAWRENCE B. HOLLIN, individually and on behalf of all others similarly situated, Plaintiff, RICHARD TRUNCELLITO and THE CITY OF PHILADELPHIA, Appellants, v. SCHOLASTIC CORPORATION and RAYMOND MARCHUK, Defendants-Appellees, RICHARD ROBINSON, Defendant.

**Prior History: [**1]** Plaintiffs Richard Truncellito and the City of Philadelphia appeal from a judgment of the United States District Court for the Southern District of New York (Keenan, J.) entered January 31, 2000, which pursuant to *Federal Rule of Civil Procedure 12(b)(6)* dismissed their second amended complaint alleging federal securities fraud.

**Disposition:** Reversed and remanded.

## Core Terms

sales, returns, stock, allegations, percent, retail, press release, class period, recklessness, distributors, plaintiffs', misleading, district court, pleadings, selling, rates, second quarter, announcing, analysts, securities fraud, third quarter, particularity, levels, motive, disseminating, fraudulent, declining, inventory, insider, trading

## Case Summary

### Procedural Posture

Plaintiff class appealed from the judgment of the United States District Court for the Southern District of New York, dismissing its complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, against defendant book publisher alleging federal securities fraud.

### Overview

Plaintiff class brought an action against defendant book publisher and defendant corporate officer alleging federal securities fraud for defendant's announcement that its book return rates were normal when defendant knew returns had increased significantly. The district court dismissed plaintiff's complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, holding that plaintiff's complaint inadequately pleaded the existence of adverse book return trends and therefore found it failed to identify false or misleading statements by defendants. Plaintiff appealed, claiming that it satisfied the heightened pleading requirements. The court reversed and remanded, holding that plaintiff's complaint adequately pleaded federal securities fraud claims. The court concluded that plaintiff's complaint adequately identified false or misleading statements by defendants and adequately alleged controlling person liability, to survive defendants' motion to dismiss.

### Outcome

Judgment was reversed and remanded.

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Denial of Allegations

Civil Procedure > Appeals > Standards of Review > General Overview

*HN1* **Defenses, Demurrers & Objections, Denial of Allegations**

On appeal, the appellate court examines the factual allegations set out in a plaintiff's complaint in some detail, assuming them, as it must, to be true.

252 F.3d 63, *63; 2001 U.S. App. LEXIS 11368, **1

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Appeals > Dismissal of Appeals > General Overview

*HN2* **Standards of Review, De Novo Review**

The grant of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* is reviewed on appeal de novo. Accepting all of the allegations in the complaint as true and drawing all reasonable inferences in favor of plaintiffs, dismissal is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

Securities Law > Blue Sky Laws > Offers & Sales

*HN3* **Express Liabilities, Misleading Statements**

For a plaintiff to state a viable cause of action for securities fraud under § 10(b), *15 U.S.C.S. § 78j(b)*, and *Rule 10b-5*, *17 C.F.R. § 240.10b-5(b)*, the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff -- acting in reliance either on defendant's false representation or its failure to disclose material information -- suffered injury and damages.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

*HN4* **Express Liabilities, Misleading Statements**

See *15 U.S.C.S. § 78u-4(b)(1) (1994 & Supp. V 1999)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

*HN5* **Heightened Pleading Requirements, Fraud Claims**

Specificity is required by the Federal Rules of Civil Procedure, which provide that in all averments of fraud the circumstances constituting fraud shall be stated with particularity. *Fed. R. Civ. P. 9(b)*. The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

Securities Law > ... > Securities Act Actions > Civil Liability > General Overview

*HN6* **Pleadings, Heightened Pleading Requirements**

Even with the heightened pleading standard under *Fed. R. Civ. P. 9(b)* and the Securities Reform Act, the court does not require the pleading of detailed evidentiary matter in securities litigation.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Securities Law > ... > Securities Act Actions > Civil Liability > General Overview

*HN7* **Defenses, Demurrers & Objections, Motions to Dismiss**

An unsupported general claim of the existence of confidential company sales reports that reveal a larger decline in sales is insufficient to survive a motion to dismiss in securities litigation.

Civil Procedure > Special Proceedings > Class Actions > General Overview

*HN8* **Special Proceedings, Class Actions**

252 F.3d 63, *63; 2001 U.S. App. LEXIS 11368, **1

Post-class period data may be relevant to determining what a defendant knew or should have known during the class period.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

**HN9** **Express Liabilities, Misleading Statements**

The Securities Reform Act imposes on plaintiffs the obligation to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *15 U.S.C.S. § 78u-4(b)(2)*. Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness. Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

**HN10** **Express Liabilities, Misleading Statements**

The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit. Unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter. Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN11** **Motions to Dismiss, Failure to State Claim**

Whether a plaintiff can prove its allegations is not to be resolved on a *Fed. R. Civ. P. 12(b)(6)* motion.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

**HN12** **Express Liabilities, Misleading Statements**

See *15 U.S.C.S. § 78u-4(b)(1)*.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

**HN13** **Express Liabilities, Misleading Statements**

To qualify as reckless conduct, a defendant's conduct must have been highly unreasonable and an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

**HN14** **Express Liabilities, Misleading Statements**

Information is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

Securities Law > ... > Secondary Liability > Controlling Persons > General Overview

**HN15** **Secondary Liability, Controlling Persons**

See *15 U.S.C.S. § 78t(a)*.

252 F.3d 63, *63; 2001 U.S. App. LEXIS 11368, **1

Securities Law > ... > Secondary Liability > Controlling Persons > General Overview

**HN16** **Secondary Liability, Controlling Persons**

Controlling-person liability is a separate inquiry from that of primary liability and provides an alternative basis of culpability. A plaintiff may allege a primary § 10(b), *15 U.S.C.S. § 78j(b)*, violation by a person controlled by the defendant, and culpable participation by the defendant in the perpetration of the fraud.

**Counsel:** JEFFREY A. KLAFTER, New York, New York (Bernstein Litowitz Berger & Grossmann, LLP, New York, New York; Stephen A. Whinston, Douglas M. Risen, Berger & Montague, P.C., Philadelphia, Pennsylvania, of counsel), for Appellants.

MICHAEL J. CHEPIGA, New York, New York (Felecia L. Stern, Michael A. Berg, Simpson Thacher & Bartlett, New York, New York, of counsel), for Defendants-Appellees.

**Judges:** Before: CARDAMONE, CALABRESI, Circuit Judges, and HAIGHT *, District Judge.

**Opinion by:** CARDAMONE

# Opinion

**[*66]** CARDAMONE, *Circuit Judge*:

On this appeal we construe a complaint in a securities fraud case brought by stockholders against a book publisher and one of its officers. It is the book publisher's **[**2]** practice to count as income the proceeds of any book it sells to a retailer or distributor, while at the same time granting to such buyers a full right of return. The number of returns is therefore critical to profitability in the publishing business because when returns occur the publisher not only has unsold inventory back on its hands, but, also, income it has previously declared never materializes.

Plaintiffs allege that during the class period defendants knew returns had increased significantly, and that this negative corporate development later precipitated a large loss and a steep plunge in **[*67]** the company's

publicly traded stock. The company is said to track book returns on a monthly and weekly basis, and to have daily information available to it from other sources as well. But despite such data establishing an adverse trend, the company announced publicly that its return rates were running at normal levels.

Defendants maintain, in effect, that there are no allegations in the complaint that would support proofs of either false statements or a fraudulent intent. To the contrary, we think plaintiffs sufficiently allege an unusual business model which, if proven, ignored alarmingly **[**3]** high returns that function as an obvious straw to show which way the wind was blowing in this book business. They may also be able to prove that the defendant officer, represented to stock analysts to be a key spokesperson, cashed in 80 percent of his stock while disseminating information that the company was not experiencing financial difficulties. For a spokesperson to cash in his own stock can in appropriate circumstances be like a ship's captain exiting into the safety of a lifeboat while assuring the passengers that all is well. A jury could find defendants liable for such behavior if its existence were supported by sufficient evidence. As such, plaintiffs in our view have survived the *pleading stage* of this securities fraud litigation.

BACKGROUND

Lawrence B. Hollin, individually and on behalf of all others similarly situated, began the instant class action securities fraud suit against defendant Scholastic Corporation, a book publishing company, and its officer Richard Robinson in the United States District Court for the Southern District of New York (Keenan, J.). The complaint asserted claims pursuant to § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), **[**4]** *15 U.S.C. § 78j(b) (1994)*, *Rule 10b-5* promulgated thereunder, *17 C.F.R. § 240.10b-5 (2000)*, and § 20(a) of the Exchange Act, *15 U.S.C. § 78t(a) (1994)*. [1] A consolidated amended complaint was filed August 13, 1997 and dismissed on December 15, 1998 following a *Rule 12(b)(6)* motion brought by defendants, *see In re Scholastic Corp. Sec. Litig., 1998 U.S. Dist. LEXIS*

--------

* Hon. Charles S. Haight, Jr., United States District Court Judge for the Southern District of New York, sitting by designation.

--------

[1] We recognize that Congress amended §§ 10 and 20 through legislation passed at the end of 2000. *See* Consolidated Appropriations - FY 2001, Pub. L. No. 106-554, Appendix G - H.R. 5660, §§ 205(a)(3), 206(g), 303(d), (i) & (j), 114 Stat. 2763, 2763G-1, 2763G-62, 2763G-68, 2763G-90, 2763G-92 (2000). These changes have no bearing on the merits of this appeal.

*19529*, No. 99 Civ. 2447, 1998 WL 872422 (S.D.N.Y. Dec. 15, 1998), and the district court granted plaintiffs leave to amend.

On March 8, 1999 court-appointed lead plaintiffs Richard Truncellito and the City of Philadelphia filed a corrected **[**5]** second consolidated amended class action complaint. They named Scholastic and Raymond Marchuk, who serves as Scholastic's vice president for finance and investor relations, as defendants. The plaintiff class includes those persons who purchased Scholastic common stock during the class period and who sustained damages allegedly because defendants made materially false and misleading statements and concealed adverse facts regarding their publishing business, thereby causing plaintiffs to purchase the stock at artificially inflated prices.

Defendants in response filed another motion to dismiss under *Rule 12(b)(6)*, arguing that plaintiffs failed to state a claim and failed to plead fraud with particularity, as required under *Federal Rule of Civil Procedure 9(b)* and the Private Securities Litigation Reform Act (Securities Reform Act), Pub. L. No. 104-67, 109 Stat. 737 **[*68]** (1995). The district court granted the motion. *See In re Scholastic Corp. Sec. Litig.* ( *Scholastic Corp.), 2000 U.S. Dist. LEXIS 791*, No. 99 Civ. 2447, 2000 WL 91939 (S.D.N.Y. Jan. 27, 2000).

*HN1* On appeal, we examine the factual allegations set out in plaintiffs' second amended complaint in some detail, assuming them, as we must, **[**6]** to be true. *Novak v. Kasaks, 216 F.3d 300, 305* (2d Cir.), *cert. denied*, 531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000).

A. *Scholastic's Business and Its Operations Prior to the Class Period*

Plaintiffs' allegations reveal that Scholastic is a leading publisher and distributor of children's books, classroom and professional magazines, and other educational products, which it sells through retail distributors, book clubs, book fairs, classrooms and libraries. In the years leading up to 1996-1997, Scholastic's best-selling product was "Goosebumps," a series of "scary" children's books. Prior to December 1996, defendants had expanded Goosebumps distribution to mass merchandisers and other non-traditional retailers. This change in strategy was presented to the public as a significant positive development.

What the public did not know was that Scholastic shipped books to retailers and distributors with a full right of return. In so doing, Scholastic could, under generally accepted accounting principles, record revenues upon shipment to the retailer so long as an adequate reserve provision existed for books that might be returned. In June 1996, Scholastic **[**7]** announced through a press release that it was adopting Statement of Accounting Standard 121, which requires a more frequent evaluation of inventory and a write-down when appropriate.

Prior to its change in distribution strategy, Scholastic boasted one of the lowest book return rates in the children's book publishing industry. On September 12, 1996 Merrill Lynch issued a report on Scholastic's return rates that incorporated statements made at a meeting with senior Scholastic officers that included defendant Marchuk. These officers represented that the company's return rate historically ran at 15 to 20 percent, as compared to 35 percent rates at other book publishers, Goosebumps books were being returned at even less than 20 percent, and while the expansion into the mass retail market could cause the return rate to rise, it would rise only "modestly." Scholastic officials added that "the issue of managing return exposure is one that gets considerable management attention." No one at Scholastic corrected this report when it appeared.

First quarter results, ending August 31, 1996, recorded a loss worse than had been experienced in the same quarter the previous year. Nevertheless, on **[**8]** September 19, 1996 Merrill Lynch issued another report derived from statements by company officials that Scholastic's "return rates remain among the lowest in the industry at less than 20%, which might suggest that Goosebumps has been somewhat underdistributed."

B. *What Allegedly Occurred During the Class Period*

The class period in this lawsuit begins on December 10, 1996, the day Scholastic issued a press release announcing a net income for the second quarter of the 1997 fiscal year, which ended November 30, 1996. The income represented a 24 percent increase over the comparable period for the prior year. The class period ends on February 20, 1997, when Scholastic issued another press release announcing an **[*69]** expected third quarter loss of 70 to 80 cents per share. Prior to this release, Scholastic had expressed "comfort" with income estimates of 64 to 73 cents per share. Scholastic's news of an expected loss also contrasted with estimates by stock analysts that Scholastic would realize a net income of approximately 69 cents per share. The February 20 press release stated further that Scholastic would take a $ 13 million pre-tax special

charge consisting of a reserve for anticipated [**9] additional book returns. The next day, Scholastic stock fell 40 percent or $ 24.75 per share. Another $ 11 million special charge for book returns was taken in the following quarter. Industry analysts thereafter questioned the credibility of Scholastic management with respect to what officials knew and how long they had known it before Scholastic made the third quarter announcement.

What happened between the December 10, 1996 and February 20, 1997 press releases forms the basis for plaintiffs' lawsuit. Defendants are alleged to have disseminated false information, withheld damaging truthful information and failed to update prior public statements that had become materially misleading. In addition, defendant Marchuk is alleged to have sold a large percentage of his Scholastic stock within a week's time (starting at the end of 1996), and plaintiffs further claim that Marchuk influenced Scholastic's decision to disseminate false and misleading statements in ways that would cause him to be liable as a "controlling person" as that term is defined in § 20(a) of the Exchange Act.

DISCUSSION

*HN2* The grant of a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* is reviewed [**10] on appeal *de novo*. See *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)*. Accepting all of the allegations in the complaint as true and drawing all reasonable inferences in favor of plaintiffs, see *Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999)*, dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*. To decide whether plaintiffs have sufficiently pled facts in support of their claims, we look to the elements of a securities fraud and a "controlling-person" liability claim.

I Section 10(b) Securities Fraud Claim

*HN3* For a plaintiff to state a viable cause of action for securities fraud under § 10(b), *15 U.S.C. § 78j(b)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5(b)*, the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff [**11] -- acting in reliance either on defendant's false

representation or its failure to disclose material information -- suffered injury and damages. See *Rothman, 220 F.3d at 89*. The Exchange Act, as amended by the Securities Reform Act also requires that *HN4* "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *15 U.S.C. § 78u-4(b)(1) (1994 & Supp. V 1999)*.

*HN5* Specificity is also required by the Federal Rules of Civil Procedure, which provide that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who [*70] made them, and where and when they were made. *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)*.

A. *False Material Representation or Failure to Disclose Material Information*

In their complaint, plaintiffs identify specific statements or sets of statements believed to be materially false and misleading. The first [**12] is the press release issued by Scholastic on December 10, 1996, announcing its net income for the second quarter of the 1996-97 fiscal year.

The second set of statements arises out of a conference call with analysts the day after the press release was issued, in which defendant Marchuk is alleged to have participated. Merrill Lynch issued a report on December 12 stating that defendants emphasized that the "front list" of newer Goosebumps titles demonstrated strong growth and that any flattening of trade revenues was due to older titles. Although Merrill Lynch also reported defendants as saying the quarterly retail sales results were distorted and had suffered in comparison to the second quarter for the previous year, Deutsche Morgan Grenfell reported on December 13, 1996 that defendants continued to maintain that a 20 percent growth in Goosebumps retail sales was reasonable. Defendants received copies of these reports and made no corrections.

Third, plaintiffs point to the prospectus supplement issued by Scholastic on December 18, 1996 in connection with its sale of $ 125 million in notes, in which the company reported second quarter results and stated that "trade sales remained [**13] constant from the prior year's strong second quarter performance." Profitable second quarter results were also reported in Scholastic's Form 10-Q filed on January 14, 1997.

252 F.3d 63, *70; 2001 U.S. App. LEXIS 11368, **13

Merrill Lynch issued another report on January 31, 1997, again based on discussions with senior Scholastic officials including Marchuk. These officials said no surge in book returns had occurred, which Merrill Lynch considered important since it viewed higher-than-expected returns as a significant stock risk after Scholastic initiated mass market distribution. Merrill Lynch raised its rating on Scholastic stock from neutral to accumulate. That recommendation caused Scholastic's stock to rise by $ 1.50 per share.

Following this report, Merrill Lynch contacted Scholastic in early February to inquire about return rates. Defendant maintained that returns were at "normal" levels, previously represented to be between 15 and 20 percent. Less than three weeks later, Scholastic issued its February 20 press release announcing expected losses for the third quarter.

B. *Trends Adequately Alleged*

Pursuant to *17 C.F.R. § 229.303 (2000)*, promulgated by the Securities and Exchange Commission, defendants **[**14]** were required to disclose on Form 10-Q any known trends that would have or were reasonably likely to have a material impact on revenues. The trial court found the complaint had inadequately pleaded the existence of such trends and therefore found it failed to identify false or misleading statements. *Scholastic Corp.*, 2000 WL 91939, at *9-11. We think plaintiffs were held to a more stringent standard than the law requires and that the trend in declining sales and increasing returns is adequately alleged.

1. *Decline in Sales.* The complaint specifically sets out the distributors through which Goosebumps books were sold, and alleges declines in sales as of specific dates, some in terms of percentage **[*71]** and others in terms of quantity. Such information covers over two-thirds of Scholastic's trade business in Goosebumps.

For example, according to the complaint, Advanced Marketing Services Incorporated (AMS) represents 15 percent of Goosebumps sales. It was selling 20,000 sets of Goosebumps per week in June 1995, but only 10,000 sets per week in the fall of 1996. It downloads point-of-sale data (POS data) into its computers on a daily basis and permits Scholastic to download **[**15]** that same information.

Ingram Distribution Group, Inc. which accounts for 50 percent of the Goosebumps trade, is said to have experienced a "significant decrease" in Goosebumps sales in the fall of 1996. Its orders dropped from 25,000

copies per title in September 1996 to 12,000 per title in January and February 1997. According to a senior manager at Ingram, this decline in a series was the steepest he had seen in his 15 years of experience in the book business. Ingram transmitted this information to Scholastic electronically and also collected POS data that was available to Scholastic.

Further, trade sales of Goosebumps books through Aramark Corporation, a book distributor that sells to mass retailers Target, Walmart and Kmart, allegedly dropped 50 percent between September 1995 and the fall of 1996. Target tracked Goosebumps sales on a weekly basis and sent its reports to the sales department at Scholastic.

The complaint similarly states that Caldor Corporation sold 6,000 to 7,000 books per week in September 1995, but only 3,000 books per week in September 1996. Its retail sales dropped further to 1,800 books per week in January 1997. Scholastic is said to have known of these **[**16]** trends both because Caldor's orders for Goosebumps books decreased, and because Caldor tracked daily sales figures and made them available to Scholastic.

Plaintiffs allege that Scholastic not only had access to POS data, but also reviewed it. Scholastic "thus knew how a substantial percentage of its Goosebumps books were selling in the trade market on at least a weekly basis, and also, therefore, the growing number of unsold Goosebumps books distributors and retailers had in inventory that were subject to full return."

2. *Increase in Returns.* Again, according to plaintiffs, the information on Goosebumps books returned each day to Scholastic's warehouse in Jefferson City, Missouri -- the warehouse through which the company processes and fulfills most orders for trade distribution -- are entered into an "AS400" computer at the warehouse. That information, in turn, is transferred each night to Scholastic's corporate offices. By Christmas 1996, Greg Wong, a Scholastic employee responsible for evaluating inventory levels in Scholastic's New York office, allegedly told the inventory manager at the Jefferson City warehouse that the situation for Goosebumps had taken a turn for the worse **[**17]** and returns would continue to mount because many titles were overstocked and overbought.

Plaintiffs further allege defendant Marchuk monitored internal data. Along with Leslie Lista, Scholastic's comptroller, he compiled and distributed a "Director's Book" each month to all members of the board. The

Director's Book analyzed trade sales data and provided commentary on sales trends. Moreover, trade sales figures were sent to the head of each Scholastic division on a weekly basis, and the sales department received weekly trade book sales reports, title by title, from the company's Jefferson City warehouse.

 **[*72]** With respect to outside information, Toys R Us returned "an unusually high amount" of Goosebumps books in December 1996, after advising Scholastic earlier in the month that their increasingly scary content was resulting in a "significant" growth in returns. Returns from distributor Levy Home Entertainment "began to rise to unprecedented levels" in November and December 1996. Its returns in January 1997 equaled 50 to 70 percent of October and November 1996 sales. By January 1997 the amount of returned books consigned to the employee bookstore had grown to such an extent that little **[**18]** room existed to walk into the store.

The complaint asserts that ultimately, returns for January 1997 amounted to about $ 4 or $ 5 million, an increase of 150 percent over January 1996 levels. The complaint also alleges that this information was known to defendants in early February, prior to the time when defendants allegedly assured Merrill Lynch that returns remained at normal levels.

3. *Pleadings Sufficiently Specific.* The district court viewed certain allegations regarding December 1996 book returns as "too vague." *Scholastic Corp.,* 2000 WL 91939, at *11. Yet, a reasonable inference can be drawn that if Goosebumps sales through AMS and Aramark declined throughout the fall of 1996, and sales through Ingram and Caldor dropped by about 50 percent from September 1996 through January 1997, then a decline was also experienced through the month of December 1996.

With respect to sales, the district court faulted plaintiffs for employing pre-class period information in their pleadings, and for not relying instead on sales data from the relevant period, that is, from December 1996 -- data that it said would have shown that declining sales were made known to defendants. **[**19]** *Scholastic Corp.,* 2000 WL 91939, at *10. Pre-class data is relevant in this case, however, to establish that at the start of the class period, defendants had a basis for knowing increased Goosebumps sales were unlikely in the third quarter due to marked decreased sales experienced in the second quarter. Just as our cases have relied on post-class period data to confirm what a defendant should have known during the class period, *see, e.g.,* *Rothman, 220*

*F.3d at 92;* *Novak, 216 F.3d at 312-13,* so the same logic applies here.

Any information that sheds light on whether class period statements were false or materially misleading is relevant. *HN6* Even with the heightened pleading standard under *Rule 9(b)* and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation. *See* *Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir. 1979).* Moreover, the district court failed to take into account the alleged facts that Scholastic reviewed POS data made available by AMS and Caldor on a daily basis, by Target on a weekly basis and by Ingram to learn returns would be on the **[**20]** rise.

Plaintiffs also include allegations as to company-generated statistics. In *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, 75 F.3d 801, 812 (2d Cir. 1996),* we held that *HN7* an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales is insufficient to survive a motion to dismiss." We then cited cases from other circuits stating that a plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. *Id. at 812-13* (citing *Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 365 (1st Cir. 1994)* (specific identification of **[*73]** internal report held sufficient), *superseded by statute on other grounds, see* *Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999),* and *Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993)* (failure to give specific identification held insufficient)). Plaintiffs have satisfied this standard by specifying who prepared internal company reports, how frequently the reports were prepared and who **[**21]** reviewed them. We further observe that the complaint gives additional indications as to the nature of the reports, because the allegations are immediately preceded and followed by figures from retailers to show sales were declining. In *San Leandro,* we noted that plaintiffs had simply made an unsupported general claim that confidential company sales reports existed to contradict public statements. *See* *75 F.3d at 812.* Plaintiffs have instead gone beyond the bare pleadings found in *San Leandro,* and have met the criteria identified in *Arazie* and *Serabian.*

Moreover, always according to the amended complaint, Scholastic engaged in aggressive sales practices during the second and third quarters of its 1996-97 fiscal year. This, if proven, would furnish additional support for the proposition that company officials were aware of

declining sales and increasing returns. These aggressive tactics, allegedly, included: offering excessive discounts beyond the company's normal practices for the purchase of additional books; altering its return policy to delay the return of Goosebumps books; encouraging distributors to keep unsold books rather than return them; **[**22]** and assuring distributors that Scholastic would extend its billing period for 90 days -- and sometimes for as long as six months. Scholastic gave distributors free advertising dollars, subsidized freight costs when books were finally returned, and repackaged Goosebumps books and merchandise at no cost. In this way, plaintiffs claim, defendant staved off or delayed disclosure of the huge amount of book returns to its inventory and delayed having to set up adequate reserves for the income it had reported, but due to huge returns would never receive.

The $13 million pre-tax special charge taken by Scholastic in February 1997 lends yet more support to the notion that defendants had knowledge of increasing returns. As stated earlier, _HN8_ post-class period data may be relevant to determining what a defendant knew or should have known during the class period. _See Rothman, 220 F.3d at 92; Novak, 216 F.3d at 312-13._ And an inference, from the size of the special charge, that trade business in Goosebumps books declined throughout the third quarter, is not unreasonable. Further, since January 1997 returns amounted to about $ 4 or $ 5 million, the claim that Scholastic **[**23]** took a charge almost three times that amount would support proofs that returns did not pile up only in that month, but throughout the class period.

Consequently, we conclude that plaintiffs pleaded with sufficient particularity facts necessary to show a downward trend with respect to Goosebumps' profitability. The facts alleged are sufficient to establish a trend even in the face of the admittedly cyclical nature of Scholastic's business. Scholastic explained in the September 1996 press release that its first quarter loss was not uncommon because of higher expenses not offset by greater revenues in the summer months. But, with the second and third quarters covering months when revenues should have increased, plaintiffs have alleged enough to permit proofs that Scholastic should have been alerted, by decreased sales and increased returns, to negative business results in the relevant time frame.

**[*74]** Further throwing doubt on its retail sales being subject to the cyclical nature of the school calendar, Scholastic's CEO said in a press release that

Goosebumps books "continued to sell well in trade" even during the first quarter. If the books were selling well during typically slower summer **[**24]** months, and data began to show the books were not selling well during Scholastic's usually busier fall and winter months, plaintiffs could show defendants knew they had a problem that would affect the price of their stock and recklessly failed to acknowledge it at the time.

We conclude therefore that the facts alleged are sufficiently detailed to allow the plaintiffs to present proofs that the defendants knew, despite the fact that their business was cyclical, of a material downward secular trend. It may be that at summary judgment, or even at trial, the defendants demonstrate so profoundly cyclical a business and a strong enough link between normal cycles and the negative information available to them, that a reasonable jury could not find that they violated the securities laws. But any speculation to that effect is inappropriate at the pleadings stage.

_C. Scienter_

_HN9_ The Securities Reform Act imposes on plaintiffs the obligation to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." _15 U.S.C. § 78u-4(b)(2); see also Novak, 216 F.3d at 311_ (reaffirming that Second **[**25]** Circuit case law remains the standard after passage of the Act). Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness. _See Novak, 216 F.3d at 307_.

_1. Motive and Opportunity_

Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct. Plaintiffs allege that defendant Marchuk was motivated to withhold damaging information about Goosebumps sales and returns so that he could sell his Scholastic stock at a higher price.

With respect to opportunity, Marchuk as an officer of Scholastic had access to insider information and thus had an opportunity to commit fraudulent acts. Our focus therefore rests on whether any motive existed for such conduct.

Plaintiffs' complaint alleges that Marchuk realized over $ 1.25 million in gross proceeds from the sale of his stock

in defendant Scholastic during the class period. Marchuk sold a total of 19,400 shares -- [**26] approximately 80 percent of his holdings of Scholastic stock -- through trades on December 31, 1996 and January 2, 3, and 7, 1997. Plaintiffs claim that prior to these sales, he had not sold a single share of company stock since April 11, 1995.

*HN10* The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit. *See Novak, 216 F.3d at 307-08*. "Unusual" insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter. *See Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)*. Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, [*75] and the number of insiders selling. *See Rothman, 220 F.3d at 94*.

In *San Leandro, 75 F.3d at 813-14*, we said that a sale of stock by only one company executive netting over $ 2 million in profit did not give rise to a strong inference of fraudulent intent. In *Rothman, 220 F.3d at 94*, [**27] we held that an alleged $ 1.6 million profit on stock sales was not unusual. In *Acito, 47 F.3d at 54*, stock sales by one officer that amounted to less than 11 percent of his holdings also failed to qualify as "unusual."

But none of these cases established a *per se* rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading. Rather, each case was decided on its own facts. For example, in both *San Leandro* and *Acito*, multiple individual defendants were named. We found in each case that the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price. *See San Leandro, 75 F.3d at 814*; *Acito, 47 F.3d at 54*. The second amended complaint in the present case, however, names only Marchuk as an individual defendant. Consequently, whether other Scholastic officials sold their stock prior to the February 20, 1997 press release is not only unknown, but, as to Marchuk's possible liability, is also irrelevant, since in that regard motive is considered with respect to Marchuk alone.

As to [**28] the amount of the sales, *Rothman* and *San Leandro* make clear that $ 1.25 million standing alone may not be unusual. Yet dollar amount cannot be considered in isolation. Rather the percentage of stock

holdings sold may be indicative of unusual trading. To illustrate, in *Rothman, 220 F.3d at 94*, a second defendant sold shares for a $ 20 million return. Despite this large amount, we did not consider it evidence of unusual trading because the percentage of shares sold in relation to the number held was small. *Id. at 95*.

In contrast, Marchuk is alleged to have sold 80 percent of his holdings within a matter of days for a not insignificant profit, after having sold no Scholastic stock since 1995. Although defendants contest this information, *HN11* whether plaintiffs can prove their allegations is not to be resolved on a *Rule 12(b)(6)* motion. Therefore, in the context of this appeal, plaintiffs have adequately alleged motive and opportunity on Marchuk's part for concealing facts that ultimately caused the price of Scholastic's stock to drop precipitously.

Marchuk counters that despite the sale of his stock, the alleged fraudulent and misleading statements [**29] attributable to Scholastic have not been properly made attributable to him. He notes the complaint pleads that he was involved in disseminating such statements only "upon information and belief." The Securities Reform Act provides that *HN12* "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. Notwithstanding the use of the phrase "all facts," plaintiffs need not plead with particularity every single fact upon which they base their beliefs concerning the false or misleading nature of defendant's statements, but instead are required only to plead with particularity sufficient facts to justify those beliefs. *See Novak, 216 F.3d at 313-14*. Contrary to Marchuk's contentions, plaintiffs have met this standard.

The complaint alleges that Marchuk was vice president for finance and investor relations, and therefore in a position both to access confidential information and to control the extent to which it was [*76] released to the public. *Cf. San Leandro, 75 F.3d at 814 n.14* (observing that [**30] in addition to the sale of stock by only one defendant, "plaintiffs have alleged no facts suggesting that [this defendant] acting alone had the opportunity to manipulate [the company's] plans for his own advantage"). Assuming plaintiffs' allegations to be true, Marchuk was primarily responsible for Scholastic's communications with investors and industry analysts. He was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic during the class period.

252 F.3d 63, *76; 2001 U.S. App. LEXIS 11368, **30

Marchuk had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings. He helped prepare the Director's Books analyzing data and commenting on sales trends.

These alleged facts are detailed enough to justify plaintiffs' belief that Marchuk was one of the senior officials involved in conversations with market analysts such as Merrill Lynch. As such, Marchuk would also have been in a position to know Scholastic's sales/return data and evaluate whether statements disseminated to the public accurately reflected such information.

2. *Conscious* [**31] *Misbehavior and Recklessness*

Plaintiffs' complaint adequately pleads scienter in its allegations concerning conscious misbehavior and recklessness on the part of Scholastic. *HN13* To qualify as reckless conduct, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)*. Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business. *Novak, 216 F.3d at 308*. Plaintiffs claim defendants knew or were reckless in not knowing from information provided by internal monitoring and access to trade sales data that sales of Goosebumps books were declining and returns were increasing.

We recognize Scholastic was required under the law to disclose only material information. *HN14* Information [**32] is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)*. The complaint indicates the information as to increasing returns was important because Merrill Lynch boosted its rating of Scholastic stock in January 1997 based upon representations from the company that no surge in book returns had occurred. The sharp criticism from industry analysts after Scholastic's February 20 press release

further indicates the weight given to information pertaining to Goosebumps sales and returns.

As to whether plaintiffs adequately pled an inference of reckless intent, we find they did. Our discussion in Sections IA and B illustrates that the second amended complaint contains detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture. Defendants [*77] publicly represented that returns were not increasing [**33] and failed to adjust revenues despite their knowledge of rapidly rising returns; these actions, if proven, are consistent with recklessness. *See Rothman, 220 F.3d at 90-91*.

In this respect, the most egregious allegations involve Scholastic's response to inquiries from Merrill Lynch in early February 1997. At this point, even disregarding the information ostensibly received from computer runs, Scholastic knew the return rate for January 1997 had increased 150 percent from the year before. Yet by telling Merrill Lynch that return rates remained at normal levels of 20 percent, defendants acted in ways that could be found to be reckless.

Recklessness may also be shown based on the allegations that defendants learned from Toys R Us in early December 1996 that the newer Goosebumps books were too "scary" and hence were being returned. Defendants allegedly had represented to industry analysts at the time that more recent Goosebumps titles were doing well in the trade. Moreover, the combined total of $ 24 million in special charges during the third and fourth quarters undermines, at the pleading stage, the argument that defendants were unaware of the sharp increase in Goosebumps [**34] returns until shortly before Scholastic's February 20, 1997 press release. *See Rothman, 220 F.3d at 92* (finding that the magnitude of defendant's post-class period write-off, together with the allegations of poor sales, constituted sufficient pleadings as to recklessness).

Finally, defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness. Although Scholastic had adopted Statement of Accounting Standard 121, several months passed from September to February before a special pre-tax charge was taken to account for returns. Despite public statements that considerable management attention was given to monitoring returns, Scholastic issued no warnings or corrections after seeing first quarter sales suffer in comparison to the

previous year and after revealing to Merrill Lynch in December that second quarter sales had suffered in similar fashion. *See Rothman, 220 F.3d at 91* (describing a "reckless failure to follow an announced policy"); *Novak, 216 F.3d at 311* (describing defendants who "knowingly sanctioned procedures that violated the Company's own markdown policy").

II **[\*\*35]** Section 20(a) "Controlling-Person" Liability Claim

The district court also dismissed plaintiffs' § 20(a) claim because it concluded that the primary violation asserted was not adequately pled. Section 20 provides

> *HN15* Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a)*.

*HN16* "Controlling-person liability" is a separate inquiry from that of primary liability and provides an alternative basis of culpability. *See SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 812 (2d Cir. 1975)*. A plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant, and culpable participation by the defendant in the perpetration of the fraud. **[\*78]** *See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)*. **[\*\*36]**

The district court dismissed plaintiffs' § 20(a) claim for failure to plead a primary § 10(b) violation. *Scholastic Corp.*, 2000 WL 91939, at *14. Since on appeal defendants offer no basis for dismissing the secondary liability claim if we reverse the dismissal of the securities fraud causes of action, we hereby reinstate it.

CONCLUSION

Accordingly, for the reasons stated the judgment appealed from is reversed, plaintiffs' complaint is reinstated, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

✚ Positive
As of: June 23, 2025 9:48 PM Z

## *Kaba v. Hope Home Care*

United States District Court for the Eastern District of New York

April 18, 2024, Decided; April 18, 2024, Filed

23-CV-9512 (OEM) (LB)

**Reporter**
2024 U.S. Dist. LEXIS 71151 *; 2024 WL 1679327

AISHA O. KABA, Plaintiff, -against- HOPE HOME CARE, Defendant.

## Core Terms

amended complaint, disability, adverse employment action, administrative remedy, in forma pauperis, federal court, pro se, discriminatory, right-to-sue, exhaust

**Counsel:** **[*1]** Aisha O. Kaba, Plaintiff, Pro se, Staten Island, NY.

**Judges:** ORELIA E. MERCHANT, United States District Judge.

**Opinion by:** ORELIA E. MERCHANT

## Opinion

### MEMORANDUM AND ORDER

**ORELIA E. MERCHANT, United States District Judge**:

On December 26, 2023, plaintiff Aisha O. Kaba ("Plaintiff") filed this *pro se* action against Hope Home Care ("Defendant") pursuant to *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.* ("Title VII"), *42 U.S.C. § 1981*, the *Age Discrimination in Employment Act ("ADEA")*, and the *Americans with Disabilities Act ("ADA")*. Complaint, ECF 1 ("Compl."). On February 21, 2024, the Court granted Plaintiff's application to proceed *in forma pauperis*. For the reasons stated below, Plaintiff's complaint is dismissed, and Plaintiff is granted until May 20, 2024 to file an amended complaint (the "Amended Complaint").

### BACKGROUND

Plaintiff's complaint is an employment discrimination form complaint. On this form complaint, Plaintiff checks off every box to assert claims for failure to hire, termination of employment, failure to promote, failure to accommodate a disability, unequal terms and conditions of employment, and retaliation. Compl. at 4. Plaintiff also checks boxes indicating that she alleges discrimination based on race, color, gender/sex, religion, national origin, and disability or perceived disability. *Id.* at 5. In the statement of facts section, Plaintiff **[*2]** states that Defendant "neglected and lacked of [sic] care for broken toes sustained at client [sic] house while on duty working for Hope Home Care," and that she was thereafter suspended without pay. *Id.* Plaintiff further states that she "[s]uffered from discrimination, retaliation, unequal terms, and other unequal terms." *Id.* Under the Exhaustion of Federal Administrative Remedies section, Plaintiff indicates that the Equal Opportunity Commission ("EEOC") has not issued a right-to-sue letter. *Id.* at 6. Plaintiff seeks monetary damages. *Id.*

### STANDARD OF REVIEW

*28 U.S.C. § 1915* allows a litigant to pursue a claim in federal court "without prepayment of fees or security" so long as they "submit[] an affidavit" that establishes "that the person is unable to pay such fees." *28 U.S.C. § 1915(a)*.[1] However, in exchange for the privilege of maintaining an action without payment and to avoid abuse of the judicial system, *§ 1915(e)* provides a mechanism for the Court to initially review the complaint prior to the issuance of a summons and the commencement of the adversarial process. *See Potnick*

---

[1] *28 U.S.C. § 1915* also contains additional requirements and provisions for incarcerated litigants seeking *in forma pauperis* status which do not apply here. *See, e.g., id.* at *(a)(2)*, *(b)*; *§ 1915A*.

2024 U.S. Dist. LEXIS 71151, *2

_v. E. State Hosp., 701 F.2d 243, 244 (2d Cir. 1983)_ (per curiam) ("[W]e are not unmindful of the mounting concern over the ever-increasing caseload burdening the federal courts, and the growing view that judges **[*3]** must be alert to prevent the dissipation of limited judicial resources on claims that are frivolous or are brought in bad faith.").

With Plaintiff's motion to proceed IFP already granted in the Court's February 21, 2024 Order, the Court's remaining duty at this stage is to review Plaintiff's complaint on the merits. _See id._ ("The statutory scheme recognizes, however, that whether a plaintiff qualifies for _in forma pauperis_ status and whether his claims have merit present two distinct issues.").

At the initial review of the complaint, a district court "shall" dismiss an _in forma pauperis_ action when the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." _28 U.S.C. § 1915(e)(2)(B)_. In practice, "[t]he standard for dismissal of an action or appeal taken in forma pauperis is identical to the standard for dismissal on a motion made pursuant to _Fed. R. Civ. P. 12(b)(6)_." _Fridman, 195 F. Supp. 2d at 538_. That is, the complaint must survive the _Iqbal_-_Twombly_ pleading standard and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_ (quoting _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_).

"It is well established **[*4]** that the submissions of a _pro se_ litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" _Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)_ (cleaned up); _Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)_ (A "_pro se_ complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyer."). Nonetheless, a pro se plaintiff must "still comply with the relevant rules of procedural and substantive law, including establishing that the court has subject matter jurisdiction over the action." _Ally v. Sukkar, 128 F. App'x 194, 195 (2d Cir. 2005)_.

## DISCUSSION

## A. Exhaustion of Administrative Remedies

Before filing a complaint in federal court, plaintiffs asserting Title VII, ADA, and ADEA claims must first exhaust their administrative remedies by filing a complaint with the EEOC or the equivalent state agency and obtaining a notice of right-to-sue. _See, e.g., Rasko v. New York City Admin. for Children's Servs., 734 F. App'x 52, 54 (2d Cir. 2018)_ ("Under Title VII, a plaintiff in New York must file a complaint with the EEOC within 300 days of a discriminatory act.") (cleaned up); _Boonmalert v. City of New York, 721 F. App'x 29, 31 (2d Cir. 2018)_ ("A plaintiff seeking to recover under the ADEA must file a discrimination charge with a state agency within 300 days of the occurrence of the allegedly unlawful employment practice.") (quoting _Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007)_); _Roy v. Buffalo Philharmonic Orchestra, 684 F. App'x 22, 23 (2d Cir. 2017)_ ("A plaintiff raising an ADA claim of discrimination must exhaust **[*5]** all administrative remedies by filing an EEOC charge within 300 days of the alleged discriminatory conduct.") (citing _Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325 (2d Cir. 1999)_).

In New York, a federal employment discrimination claim is time-barred unless the plaintiff first files an EEOC charge within 300 days of the alleged discrimination. _Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015)_ (quoting _42 U.S.C. § 2000e-5(e)(1)_). This requirement is analogous to a statute of limitations. _Vega, 801 F.3d at 79_; _Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)_ (affirming dismissal as untimely for claims based on conduct that occurred more than 300 days prior to the filing of EEOC charge). After filing a charge of discrimination, an individual can then only commence a federal suit if she files a complaint within 90 days of receipt of a "right-tosue" letter from the EEOC. _See Duplan v. City of New York, 888 F.3d 612, 621-22 (2d Cir. 2018)_; _42 U.S.C. § 2000e-5(f)(1)_ (requiring the EEOC to "notify" claimants about agency dismissals and providing that claimants may file suit in federal court within 90 days of notification); _Ziyan Shi v. New York Dept. of State, Div. of Licensing Services, 393 F. Supp. 3d 329, 339 (S.D.N.Y. 2019)_.

Unlike Title VII and the ADA, the ADEA, in contrast, "does not require an aggrieved party to receive a rightto-sue letter from the EEOC before filing suit in federal court." _Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 563 (2d Cir. 2006)_. However, if the EEOC issues a notice to an ADEA claimant that the Commission is dismissing or

2024 U.S. Dist. LEXIS 71151, *5

otherwise terminating the proceeding, then "the claimant must file [his] federal suit [*6] within 90 days after receipt of the letter. *Donahue v. Asia TV USA Ltd., 208 F. Supp. 3d 505, 520 (S.D.N.Y. 2016)*. Here, Plaintiff states that she has not received a right-to-sue letter and does not clarify whether she filed a charge of discrimination with the EEOC. Accordingly, it appears that Plaintiff has failed to exhaust her administrative remedies.

## B. Underlying Title VII, ADEA & ADA Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. In order to plead a Title VII claim, Plaintiff is required to plausibly allege facts that "provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84-85 (2d Cir. 2015)* (quoting *Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)*).

The ADEA establishes that it is "unlawful for an employer [...] to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges or employment, because of such individual's age." *29 U.S.C. § 623(a)(1)*. In order to establish a prima facie case of age discrimination in violation of [*7] the ADEA, a plaintiff must show: (1) that he was within the protected age group (more than 40 years old); (2) that he was qualified for his position; (3) that he experienced adverse employment action; and (4) that such action occurred under circumstances giving rise to an inference of discrimination. *See Gorzynski v. Jet Blue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010)* (citing *Carlton v. Mystic Transp. Inc., 202 F.3d 129, 134 (2d Cir. 2000)*).

To establish a prima facie case of discrimination under the ADA, Plaintiff must show that "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York, 601*

*F.3d 151, 155-56 (2d Cir. 2010)* (citation and internal quotation marks omitted); *see also Adams v. Festival Fun Parks, LLC, 560 Fed.Appx. 47, 48-49 (2d Cir. 2014)* (quoting *McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013)*) (outlining requirements for prima facie case under the ADA).

Each of Title VII, the ADEA, and the ADA require a plaintiff to plead some causal connection between a protected status and an adverse employment action, but Plaintiff's complaint alleges no facts that could possibly connect any adverse employment action to a protected status. Therefore, even [*8] under the most liberal interpretation of Plaintiff's complaint, she fails to allege a prima facie case of discrimination in violation of Title VII, the ADEA, or the ADA. *See Littlejohn v. City of NY, 795 F.3d. 297, 311 (2d Cir. 2015)* ("The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation."); *see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015)* ("[A] plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination.").

## CONCLUSION

Accordingly, Plaintiff's complaint is dismissed without prejudice pursuant to *28 U.S.C. § 1915(e)(2)(B)*. In light of Plaintiff's *pro se* status, she is granted until May 20, 2024 to file an Amended Complaint. *See Cruz v. Gomez, 202 F.3d 593 (2d Cir. 2000)*.

Plaintiff's Amended Complaint must comply with *Rule 8(a) of the Federal Rules of Civil Procedure*, provide all relevant dates, and include a short, plain statement of facts sufficient to support a plausible claim that Defendant discriminated against her in violation of Title VII, the [*9] ADEA and the ADA. Plaintiff should also state whether she filed a charge of discrimination with the EEOC, including the date she filed the charge, and she should attach a copy of the charge to the Amended Complaint.

Plaintiff is advised that the Amended Complaint will completely replace the Original Complaint, must be captioned, "Amended Complaint," and shall include the

same docket number as this Order: 23-CV-9512 (OEM) (LB).

No summons shall issue at this time and all further proceedings shall be stayed for 30 days. If Plaintiff fails to comply with this Memorandum and Order within the time allowed, or fails to cure the deficiencies discussed herein, judgment dismissing the action shall enter.

The Clerk of Court is directed to mail a copy of this Order and an employment discrimination form complaint to Plaintiff. Plaintiff may wish to consult the City Bar Justice Center's Federal Pro Se Legal Assistance Project at (212) 382-4729 for free, confidential, limited-scope legal assistance.

The Court certifies pursuant to _28 U.S.C. § 1915(a)(3)_ that any appeal would not be taken in good faith and therefore _in forma pauperis_ status is denied for the purpose of any appeal. _Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962)._

**SO ORDERED**.

/s/ Orelia E. Merchant

ORELIA **[*10]** E. MERCHANT

United States District Judge

Dated: Brooklyn, New York

April 18, 2024

**End of Document**

⚠️ Caution
As of: June 23, 2025 9:50 PM Z

# *Kittay v. Kornstein*

United States Court of Appeals for the Second Circuit

August 31, 2000, Argued ; October 20, 2000, Decided

Docket No. 00-7306

**Reporter**

230 F.3d 531 *; 2000 U.S. App. LEXIS 26149 **; 48 Fed. R. Serv. 3d (Callaghan) 429; 36 Bankr. Ct. Dec. 259

DAVID R. KITTAY, Trustee, Plaintiff-Appellant, --v.-- DANIEL J. KORNSTEIN AND KORNSTEIN VEISZ & WEXLER, Defendants-Appellees.

**Subsequent History: [**1]** As Amended October 27, 2000.

**Prior History:** Appeal from a judgment of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge), dismissing, partly on the merits and partly with leave to replead, plaintiff's claims against bankrupt's attorneys alleging breach of fiduciary duty, breach of contract, and legal malpractice. We hold that dismissal of part of the complaint for failure to state a claim was appropriate, but that dismissal of the remaining claims on the ground that they were not pleaded in a clear or straightforward fashion was inappropriate.

**Disposition:** Affirmed in part, vacated in part, and remanded.

## Core Terms

state court, allegations, escrow, district court, retention, settlement, special counsel, appointment, claim for relief, professional responsibility, conflicting interest, proceeds, partner, pleaded, replead

## Case Summary

### Procedural Posture

Plaintiff appealed from a judgment of the United States District Court for the Southern District of New York, dismissing, partly on the merits and partly with leave to replead, plaintiff's claims against defendant attorneys alleging breach of fiduciary duty, breach of contract, and legal malpractice.

### Overview

Plaintiff, the trustee in a chapter 7 bankruptcy, brought an action against defendants attorney and law firm, alleging that defendant attorney breached his fiduciary duties and committed legal malpractice by serving as special counsel to debtor in its bankruptcy proceeding while simultaneously representing an entity competing with debtor for proceeds of a state court judgment against debtor's former general partner. These acts, plaintiff alleged, prevented debtor from collecting a share of the state court judgment, resulting in a loss to the estate. On review, the court affirmed the dismissal of plaintiff's claim that defendant attorney improperly represented the other entity in the appeal of the state court judgment. There was no conflict of interest at that point, because the bankruptcy court had ordered that any judgment would be deposited into escrow for later distribution by the bankruptcy court. The court reversed the dismissal of plaintiff's claim alleging that defendant attorney plotted to avoid the escrow order after the appeal, because plaintiff's allegations were not overly confusing, and were sufficient to state claims for relief under *Fed. R. Civ. P. 8*.

### Outcome

Dismissal with respect to the part of the complaint for failure to state a claim was affirmed, but dismissal of the remaining claims on the ground that they were not pleaded in a clear or straightforward fashion was vacated and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State

230 F.3d 531, *531; 2000 U.S. App. LEXIS 26149, **1

Claim

HN1 **Standards of Review, De Novo Review**

The appellate court reviews a district court's grant of a motion to dismiss de novo, assuming the truth of all factual allegations contained in the complaint and drawing all reasonable inferences in the plaintiff's favor. A dismissal under *Fed. R. Civ. P. 12(b)(6)* for failure to state a cognizable claim may be affirmed only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. To survive a motion for dismissal under *Rule 12(b)(6)*, the complaint must allege facts that, if true, would create a judicially cognizable cause of action.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

Legal Ethics > Client Relations > Representation > Acceptance

Legal Ethics > Client Relations > Conflicts of Interest

HN2 **Sanctions, Misconduct & Unethical Behavior**

Under the New York rules of professional conduct, a lawyer generally cannot simultaneously serve clients with conflicting interests. A lawyer shall decline proffered employment and shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of employment or representation of another client, or if it would be likely to involve the lawyer in representing differing interests. N.Y. Code of Prof'l Responsibility DR 5-105(A), (B). However, prior to June 30, 1999, a lawyer could represent multiple clients if it was obvious that the lawyer could adequately represent the interest of each and if each consented to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each. N.Y. Code of Prof'l Responsibility DR 5-105(C).

Bankruptcy Law > Procedural Matters > Professional Responsibility

Civil Procedure > Preliminary

Considerations > Federal & State Interrelationships > Erie Doctrine

Bankruptcy Law > Procedural Matters > General Overview

HN3 **Procedural Matters, Professional Responsibility**

Federal bankruptcy courts sitting in New York apply New York's Code of Professional Responsibility to ethical disputes.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

Legal Ethics > Client Relations > Duties to Client > Effective Representation

HN4 **Sanctions, Misconduct & Unethical Behavior**

The New York Code of Professional Responsibility Disciplinary Rules are mandatory in character. They state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. N.Y. Code of Prof'l Responsibility Preliminary Statement.

Bankruptcy Law > Procedural Matters > Judicial Review > General Overview

HN5 **Procedural Matters, Judicial Review**

Bankruptcy judges' findings on conflict of interest questions are entitled to deference because a bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails.

Bankruptcy Law > ... > Professional Services > Retention of Professionals > General Overview

HN6 **Professional Services, Retention of Professionals**

Where the interest of the special counsel and the interest of the estate are identical with respect to the

230 F.3d 531, *531; 2000 U.S. App. LEXIS 26149, **1

matter for which special counsel is retained, there is no conflict and the representation can stand.

See *11 U.S.C.S. § 327(e)*.

Bankruptcy Law > ... > Professional Services > Retention of Professionals > General Overview

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview

**HN7**  **Professional    Services,    Retention    of Professionals**

*11 U.S.C.S. § 327(e)* allows the appointment of counsel to assist a bankruptcy trustee for a specified special purpose, if counsel does not represent an interest adverse to the estate.

Bankruptcy Law > ... > Professional Services > Retention of Professionals > Debtors in Possession & Trustees

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > General Overview

Bankruptcy Law > ... > Professional Services > Retention of Professionals > General Overview

**HN8**  **Retention of Professionals, Debtors in Possession & Trustees**

Retention of a law firm as special counsel to a bankruptcy trustee is proper where there is an identity of interests between the trustee and special counsel's former client with respect to the specific matter for which special counsel is retained.

Bankruptcy Law > ... > Professional Services > Retention of Professionals > General Overview

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview

**HN9**  **Professional    Services,    Retention    of Professionals**

Bankruptcy Law > ... > Professional Services > Retention of Professionals > General Overview

**HN10**  **Professional    Services,    Retention    of Professionals**

Given the fact-specific nature of parties' interests and their alignments, no general rule of simple application regarding the retention of special counsel to a bankruptcy trustee can be gleaned. Rather, each case must finally turn on its own circumstances, based on a common-sense divination of adversity or commonality.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

**HN11**  **Standards of Review, Abuse of Discretion**

The appellate court reviews a trial court's dismissal of a complaint for failure to comply with *Fed. R. Civ. P. 8*, regarding general rules of pleading, for abuse of discretion.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN12**  **Complaints, Requirements for Complaint**

*Fed. R. Civ. P. 8* requires a complaint to contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. The

230 F.3d 531, *531; 2000 U.S. App. LEXIS 26149, **1

rule also requires that each averment of a pleading shall be simple, concise, and direct. *Fed. R. Civ. P. 8(e)(1)*. Under the liberal pleading standards of the Federal Rules of Civil Procedure, a plaintiff must disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. Dismissal is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN13* **Motions to Dismiss, Failure to State Claim**

Under *Fed. R. Civ. P. 8(a)*, a plaintiff is not required to prove his case at the pleading stage. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN14* **Pleadings, Rule Application & Interpretation**

While a trial court may dismiss a complaint for failure to comply with *Fed. R. Civ. P. 8* sua sponte, the appellate court may nonetheless reverse a dismissal after observing that the defendants did not even remotely suggest that the complaint failed to comply with *Rule 8*, or that it did not give them notice of the substance of the plaintiff's claims, or that it was otherwise unintelligible.

**Counsel:** BARRY S. GOLD, Kittay, Gold & Gershfeld, White Plains, NY, for Plaintiff-Appellant.

DAVID K. BERGMAN, Pollack & Greene, New York, NY, for Defendants-Appellees.

**Judges:** Before: KEARSE, JACOBS, and STRAUB, Circuit Judges.

**Opinion by:** STRAUB

# Opinion

 **[*534]** STRAUB, *Circuit Judge*:

Plaintiff-Appellant David R. Kittay, the trustee in a Chapter 7 bankruptcy proceeding of debtor Luckey Platt Centre Associates ("Luckey Platt"), appeals from a judgment of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *Judge*), dismissing his complaint against Daniel **[**2]** J. Kornstein and Kornstein's law firm, Kornstein Veisz & Wexler (collectively "Kornstein"). Kittay's complaint alleges that Kornstein breached his fiduciary duties and contractual obligations and committed legal malpractice by serving as special counsel to Luckey Platt in its bankruptcy proceeding while simultaneously representing Burstin Investors ("Burstin"), an entity competing with Luckey Platt for proceeds of a New York state court judgment against Luckey Platt's former general partner. These breaches, Kittay alleges, prevented Luckey Platt from collecting **[*535]** the state court judgment, resulting in a loss to the estate of approximately nine million dollars.

The District Court granted Kornstein's motion to dismiss, partly on the merits and partly with leave to replead. The District Court found that Kittay's allegations that Kornstein impermissibly represented multiple clients failed to state a claim upon which relief can be granted, and thus dismissed those claims with prejudice under *Federal Rule of Civil Procedure 12(b)(6)*. The District Court then found that Kittay's allegations regarding improper actions taken by Kornstein after appeal of the state court judgment could state a **[**3]** claim for relief, but were not pleaded in a clear and straightforward fashion. The court thus dismissed those claims with leave to replead. Kittay disclaimed intent to replead, allowing review in this Court.

For the reasons given below, we conclude that Kittay's allegations regarding Kornstein's multiple representation

230 F.3d 531, *535; 2000 U.S. App. LEXIS 26149, **3

fail to state a claim upon which relief can be granted. We find, however, that Kittay's allegations regarding Kornstein's conduct after appeal of the state court judgment were adequately pleaded.

Accordingly, we affirm in part, vacate in part, and remand for further proceedings.

## BACKGROUND

Taking the plaintiff's allegations to be true, as we must on review of a grant of a motion to dismiss, *see Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 409 (2d Cir. 2000)*, the record reveals the following events.

### I. *The New York State Court Action*

Luckey Platt, a real estate development firm, was a limited partnership consisting of K.N. Investors, Ltd. ("KNIL") as sole general partner and Burstin as sole limited partner. Nachum Kalka controlled KNIL. In 1990, Burstin, represented by Kornstein, sued KNIL and Kalka in New York state court **[**4]** for fraud, breach of fiduciary duty, and other tortious conduct relating to KNIL's misconduct as general partner of Luckey Platt. The suit's claims were also brought derivatively for the benefit of Luckey Platt. That is, Luckey Platt was named as a nominal defendant, but the claims in the state court complaint were brought partly for the benefit of the partnership.

In March 1996, Burstin recovered a judgment in the state court awarding approximately nine million dollars, removing KNIL as general partner of Luckey Platt, appointing Burstin as receiver of Luckey Platt, and declaring Kalka personally liable for all of Luckey Platt's debts to third-parties. KNIL immediately appealed from this judgment, filing its notice of appeal also on behalf of Luckey Platt, inasmuch as Luckey Platt was a nominal defendant in the action. Luckey Platt, however, asserts that Kornstein actually represented Luckey Platt in the state court action, since Kornstein represented Burstin and Burstin had asserted derivative claims on behalf of Luckey Platt. In any event, the parties briefed the case between June and August 1996. In its briefs, KNIL argued, *inter alia*, that if a judgment were to be awarded, **[**5]** it should belong to the Luckey Platt partnership, not Burstin. [1] Burstin, through Kornstein, argued in its brief, *inter alia*, that the judgment in favor of

Burstin was proper.

### II. *Luckey Platt's Bankruptcy and the Retention of Kornstein*

In May 1996, during the pendency of the appeal of the state court judgment, Luckey Platt filed a petition for relief under Chapter 11 of the Bankruptcy Code, *11 U.S.C. §§ 101 et seq.* It retained Tracy Klestadt as its bankruptcy counsel. Kornstein, however, had been representing Luckey Platt in a mortgage foreclosure action brought by Bank Leumi in connection with property Luckey Platt owned. Knowing **[*536]** that Kornstein was intimately familiar with the Kalka matter and that Kornstein already represented it in the Bank Leumi matter, Luckey Platt moved, soon after filing its bankruptcy petition, to retain Kornstein as special counsel in the bankruptcy proceeding. In October 1996, after **[**6]** briefing but before oral argument of the state court appeal, the Bankruptcy Court for the Southern District of New York (Jeffry H. Gallet, *Bankruptcy Judge*) appointed Kornstein as special counsel to Luckey Platt to pursue claims related to the state court action against Kalka, as well as claims involving Bank Leumi. The appointment, made pursuant to *11 U.S.C. § 327(e)*, occurred after a hearing at which the parties discussed Kornstein's potentially conflicting roles as counsel to Burstin in the state court appeal and special counsel to Luckey Platt in the bankruptcy action. KNIL and Bank Leumi objected to Kornstein's retention, asserting that Kornstein would argue that the state court judgment was properly awarded to Burstin. The court nonetheless appointed Kornstein as special counsel to Luckey Platt, noting that Luckey Platt and Burstin had the common goal of pursuing the assets of KNIL and Kalka and that, absent Kornstein, Luckey Platt would be unable effectively to pursue its claims against KNIL and Kalka. The court resolved the potential conflict by ruling in a retention order that recoveries against KNIL or Kalka would be placed in escrow with Kornstein, **[**7]** subject to the Bankruptcy Court's later determination as to who would be entitled to what amounts. The court conditioned Kornstein's retention on Burstin's agreement to the escrow order, which Burstin provided. Luckey Platt, represented by Klestadt, did not object to the court's decision.

### III. *The State Court Appeal and Its Aftermath*

Oral argument in the state court appeal took place in January 1997. At argument, Kornstein asserted, consistent with his brief, that Burstin, and not necessarily Luckey Platt, should be awarded the state

---

[1] KNIL still had a partnership interest in Luckey Platt.

230 F.3d 531, *536; 2000 U.S. App. LEXIS 26149, **7

court judgment. Luckey Platt was not separately represented in the appeal. In May 1997, the Appellate Division essentially affirmed the state trial court, with a slight modification by which $ 91,000 (about 1% of the judgment) was shifted from Burstin to Luckey Platt.

Burstin then attempted to enforce the judgment against Kalka. Burstin retained an attorney in Israel, Avigdor Klagsbald, to search for assets Kalka owned in that country. Klagsbald located shares of stock and real property owned by Kalka, but was unable to seize them because the New York judgment was not yet final due to an attempt to mount a subsequent appeal. Upon discovering **[**8]** that Kalka was planning to sell his stock, Klagsbald decided to bring an action in Israel on the New York judgment to enjoin Kalka's planned stock sale. Klagsbald turned to Kornstein for information regarding the state court judgment and the New York court system, and Kornstein obliged with information and various documents. Kornstein also prepared an affidavit to be used in the Israeli proceeding.

Klagsbald succeeded in enjoining Kalka from selling his stock, and also obtained an attachment with respect to Kalka's real estate in Israel. As a result, over $ 16 million of Kalka's assets are frozen. Kalka thereupon decided to enter into a settlement with Burstin through Klagsbald in January 1998, pursuant to which Kalka agreed to pay the full amount of the judgment--over nine million dollars--to Burstin.

Soon thereafter, in February 1998, Luckey Platt's Chapter 11 proceeding was converted into a Chapter 7 liquidation, and Kittay was appointed trustee. Kittay moved, and the Bankruptcy Court ordered, that Burstin's settlement with Kalka should be deposited into escrow, pursuant to the Bankruptcy Court's retention order. Several months passed, however, without the settlement being placed **[**9]** in the escrow **[*537]** account, due to various ministerial obstacles and other delays. During that time, Kornstein engaged in discussions with Klestadt and Burstin regarding the possibility of dismissing Luckey Platt's bankruptcy case so as to avoid the effect of the escrow order. Ultimately, no action was taken to dismiss the bankruptcy case, but, as it turns out, the proceeds of the Israeli settlement were never placed in the escrow account. In August 1999, Kittay entered into a settlement with Burstin pursuant to which Luckey Platt was paid $ 687,500 out of the nine million dollars recovered from Kalka. In an application for approval of the settlement, Kittay wrote that the settlement amount "is not merely substantial in its own right but also a very good deal for the estate in

view of all the circumstances of this case" and that "this is still an excellent settlement for the estate and its creditors." The settlement was approved by the Bankruptcy Court.

## IV. *The Current Action*

Kittay then commenced this action against Kornstein. In his complaint, Kittay claims that by representing both Luckey Platt and Burstin, Kornstein placed himself in a conflict of interest position and **[**10]** impermissibly favored Burstin in the state court appeal. Moreover, Kittay argues, after the state court appeal, Kornstein acted improperly in helping to collect the state court judgment for Burstin while doing nothing on behalf of, and, indeed, acting to the detriment of, Luckey Platt. The District Court dismissed the complaint on two grounds. First, regarding Kornstein's representation of both Luckey Platt and Burstin, the court found that a conflict "did not exist, and could not exist," by virtue of the Bankruptcy Court's retention order. The order, the court held, resolved any conflict, and as a result "it did not matter in whose favor the Appellate Division would grant judgment." Second, regarding Kornstein's post-appeal actions, the court held that Kittay's allegations could state a legally sufficient claim for relief, but found that those allegations were not pleaded "in a clear and straight-forward fashion," causing "unnecessary confusion in understanding plaintiff's theories." Accordingly, the District Court dismissed the complaint with prejudice with regard to the allegations of impermissible conflict, and dismissed the complaint without prejudice and with leave to replead **[**11]** with regard to the allegations based on Kornstein's conduct following the Appellate Division ruling.

Kittay filed a notice of intent not to replead, rendering the District Court's judgment final. This timely appeal followed.

## DISCUSSION

### I. *Dismissal as to Claims Regarding the Alleged Conflict of Interest*

*HN1* "We review a district court's grant of a motion to dismiss *de novo*, assuming the truth of all factual allegations contained in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 409 (2d Cir. 2000).* "A dismissal under *Rule 12(b)(6)* for failure to state a cognizable claim may be affirmed only where it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim that would entitle him to relief." *Id.* (internal quotation marks omitted). "To survive a motion for dismissal under *Rule 12(b)(6)*, the complaint must allege facts that, if true, would create a judicially cognizable cause of action." *South Road Assocs. v. International Bus. Mach. Corp., 216 F.3d 251, 253 (2d Cir. 2000)*.

*HN2* Under the New York rules of professional [**12] conduct, a lawyer generally cannot simultaneously serve clients with conflicting interests. [2] "A lawyer shall decline **[*538]** proffered employment" and "shall not continue multiple employment" if "the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected" by the acceptance of employment or representation of another client, "or if it would be likely to involve the lawyer in representing differing interests . . . ." N.Y. Code of Professional Responsibility DR 5-105(A) & (B), *reprinted in* N.Y. JUD. LAW APP. (McKinney 1992). [3] [**14] However, at the time of the events in this case, a lawyer could represent multiple clients "if it [was] obvious that the lawyer [could] adequately represent the interest of each and if each consented to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each." N.Y. Code of Professional Responsibility DR 5-105(C), *reprinted in* N.Y. JUD. LAW APP. (McKinney 1992) [4];*see also Oneida of Thames Band v. New York, 757*

---

[2] *HN3* Federal bankruptcy courts sitting in New York apply New York's Code of Professional Responsibility to ethical disputes. *See, e.g., In re Allboro Waterproofing Corp., 224 B.R. 286, 291 n.3 (Bankr. E.D.N.Y. 1998); In re Caldor, Inc., 193 B.R. 165, 178 (Bankr. S.D.N.Y. 1996)*.

[3] The Code of Professional Responsibility "consists of three separate but interrelated parts: Canons, Ethical Considerations, and Disciplinary Rules." N.Y. Code of Professional Responsibility Preliminary Statement, *reprinted in* N.Y. JUD. LAW APP. (McKinney 2000). The Canons are "statements of axiomatic norms." *Id.* The Ethical Considerations are "aspirational in character and represent the objectives toward which every member of the profession should strive." *Id. HN4* The Disciplinary Rules "are mandatory in character." *Id.* They "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.*

[4] The New York Code of Professional Responsibility was amended effective June 30, 1999. Disciplinary Rule 5-105(c) now provides that "a lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can

*F.2d 19, 22* (2d Cir.) (noting that "clients may give informed [**13] consent to joint representation despite actual or potential adverse interests"), *cert. denied, 474 U.S. 823, 88 L. Ed. 2d 64, 106 S. Ct. 78 (1985)*.

The first question, then, is whether a conflict situation existed when Luckey Platt sought to retain Kornstein. We believe that a close analysis of the professional responsibility rules leads to the conclusion that, initially, a conflict of interest did exist. Given that Luckey Platt and Burstin were competing for the same pot of money, Kornstein faced a situation in which he represented "differing interests." N.Y. Code of Professional Responsibility DR 5-105(A), *reprinted in* N.Y. JUD. LAW APP. (McKinney 1992). Nonetheless, we believe that the Bankruptcy Court's retention [**15] and escrow order effectively resolved this conflict by, essentially, eliminating any incentive to compete. By acting in a manner that it believed would increase the chance of recovery, and by assuming the task of allocating that recovery, the Bankruptcy Court aligned the interests of Luckey Platt and Burstin for purposes of the state court appeal. *See In re AroChem Corp., 181 B.R. 693, 703 (Bankr. D. Conn. 1995)* (finding that agreement to pool proceeds from judgment for later allocation cured a conflict resulting from rivalry over the judgment), *aff'd, 176 F.3d 610 (2d Cir. 1999)*. Luckey Platt and Burstin shared the common goal of obtaining a judgment against Kalka, and the Bankruptcy Court found--at the urging of Luckey Platt--that Kornstein was best able to procure that judgment. *HN5* "Bankruptcy judges' findings on conflict of interest questions are entitled to deference because a bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails." *In re AroChem Corp., 176 F.3d 610, 628 (2d Cir. 1999)* (internal quotation marks omitted). [**16] The manner in which the judgment was allocated in the **[*539]** Appellate Division was rendered irrelevant by the fact that the parties had vested the Bankruptcy Court with the authority to divide the recovery between Luckey Platt and Burstin. *HN6* "Where the interest of the special counsel and the interest of the estate are identical *with respect to the matter for which special counsel is retained*, there is no conflict and the representation can stand." *Id. at 622*. As

---

competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved." N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.24 (2000). This amendment does not apply here.

a result, we agree with the District Court that, by virtue of the escrow order, "the conflict alleged by plaintiff did not exist, and could not exist."

The question remains whether, even if the canonical conflict was cured, Kornstein's arguments for affirmance in the Appellate Division breached his fiduciary duty to Luckey Platt. We believe that Kornstein's arguments on appeal were not improper. The parties and the Bankruptcy Court were aware that Kornstein would argue for Burstin to be awarded the judgment: not only had Kalka already made that argument in his brief, but Kalka and Bank Leumi challenged Kornstein's appointment on that very ground. Thus, the Bankruptcy Court--and Luckey Platt--were made aware **[**17]** that Kornstein would seek to affirm the judgment on appeal. Moreover, that approach made eminent sense. Kornstein, representing the appellee, could not have been expected to argue for anything but affirmance. It was probably a wise litigation strategy simply to argue for affirmance--to get the money--rather than argue for a reallocation of the judgment, especially since Kornstein knew that the Appellate Division's allocation would give way to the Bankruptcy Court's consensual dominion over the recovery. It is hard to imagine what else Kornstein could have done in the state court, and no reasonable alternatives have been suggested by Kittay. [5]

 **[**18]** Kittay asserts that, even though the Bankruptcy Court reserved the right to divide the judgment, it mattered in whose favor the Appellate Division granted judgment, because the fact that the judgment was in Burstin's name meant that Kalka was forced to settle with Burstin rather than with Luckey Platt. This assertion, however, misses the point. The settlement constituted proceeds of the judgment, and the Bankruptcy Court ordered that the proceeds be placed in escrow. Accordingly, whether Kalka settled with Burstin or with Luckey Platt, the money was to be placed in the common pot for later allocation by the court. As a result, as the District Court found, "it did not matter in whose favor the Appellate Division would grant judgment."

Given that ultimately there was no conflict between the interests of Luckey Platt and Burstin during the course of the state court appeal, we agree that Kittay's allegations do not state a claim for relief. Under the Code of Professional Responsibility, at the time the events of this case occurred, a lawyer could represent multiple clients "if it [was] obvious that the lawyer [could] adequately represent the interest of each and if each consented **[**19]** to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each." N.Y. Code of Professional Responsibility DR 5-105(C), *reprinted in* N.Y. JUD. LAW APP. (McKinney 1992). In our view, it was obvious, at the time, that Kornstein could adequately represent both Luckey Platt and Burstin, since the retention order placed the allocation of any judgment in the hands of the Bankruptcy Court. **[*540]** Moreover, it is quite clear that Luckey Platt consented to the dual representation after full disclosure of the advantages and risks involved. The Bankruptcy Court held a full hearing, and Luckey Platt argued for the retention of Kornstein.

The retention and escrow order also enabled the appointment to avoid running afoul of bankruptcy law. *HN7* *Title 11, section 327(e) of the United States Code* allows the appointment of counsel to assist the trustee for a specified special purpose, if counsel does not represent an interest adverse to the estate. [6] **[**21]** The Bankruptcy Court here found that most of the interests of Luckey Platt and Burstin were the same, and that, absent Kornstein, Luckey Platt would **[**20]** be unable effectively to pursue its claims against Kalka. [7] This

---

[5] Kittay suggested at oral argument that Kornstein should have asked the Appellate Division to transfer some of the judgment from Burstin to Luckey Platt. It is not clear what this would have accomplished, since the Appellate Division's allocation of the judgment would not have been binding on the Bankruptcy Court. Moreover, as a practical matter, there was a judgment and the appeal had been fully briefed. Any change in course by Kornstein would have initiated a state court remand with its attendant delay and uncertainty for the estate.

---

[6] *Title 11, section 327(e) of the United States Code* provides:

> *HN9* The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

*11 U.S.C. § 327(e)*.

[7] As a creditor, Bank Leumi had the right to object to Kornstein's retention. The Bankruptcy Court's determination that Luckey Platt and Burstin did not hold adverse interests entitled it to approve the retention over such objection. *See,*

finding is accorded deference. *See AroChem, 176 F.3d at 628*. The escrow order meant that Burstin's interests in defending the state court appeal were not adverse to the estate. *Cf. id. at 627* (noting that **HN8** retention of law firm as special counsel is proper where there is an identity of interests between the trustee and special counsel's former client with respect to the specific matter for which special counsel is retained); *In re American Avia Assoc.-SEA, 150 B.R. 24, 28 (Bankr. S.D. Tex. 1992)* (allowing retention of law firm as special counsel to represent debtor and other related entities, some of which had also filed for bankruptcy, in state court litigation against some of debtor's joint venturers because case represented potentially major asset of bankruptcy estate and relief had been carefully structured to avoid conflict of interest).

While we hold that the Bankruptcy Court's escrow order effectively resolved any conflict of interest, the court's actions in this case may not be appropriate in all cases. Here, the conflict resolution was sufficient to cover the lawyer in his arguments before the Appellate Division, but, as we now know, did not protect Luckey Platt. **HN10** "Given the fact-specific nature of parties' interests and their alignments . . . no general rule of simple application [regarding the retention of special counsel] . . . can be gleaned. Rather, each case must finally turn on its own circumstances, based on a common-sense divination of adversity or commonality." *AroChem, 176 F.3d at 626-27* (internal quotation marks and citations omitted). Thus, we encourage courts to be aware of the myriad complications that can **[**22]** arise in conflict situations and to craft resolutions with prudence and utmost sensitivity for potential misstep by litigants and their counsel.

In any event, the settlement proceeds were not placed in the escrow account. This, however, could not have been the result of Kornstein's appointment or his arguments on appeal, but rather—assuming the truth of Kittay's allegations—was the result of the events that took place *after* appeal. Accordingly, we affirm the District Court's dismissal of the complaint insofar as it alleged improprieties in Kornstein's dual representation of Luckey Platt and Burstin during the state court appeal.

## II. *Dismissal as to Claims Regarding Kornstein's Alleged Post-Appeal Actions*

As discussed above, by virtue of the Bankruptcy Court's escrow order, **[*541]** Kornstein's representation of both

Luckey Platt and Burstin, and Kornstein's arguments in the state court appeal, could not have prevented Luckey Platt from recovering any judgment to which it was entitled. Kornstein's alleged conduct after the Appellate Division ruling, however, presents a different story. The District Court observed that the funds recovered from Kalka never reached the escrow **[**23]** account, and found that "if, as plaintiff appears to allege, defendants substantially contributed to that result, a legally sufficient claim for relief against defendants can be stated." Nonetheless, the court dismissed Kittay's allegations regarding Kornstein's post-appeal conduct, finding that the allegations were not pleaded in a "clear and straight-forward fashion." We conclude that the allegations were sufficient to state claims for relief. [8]

Given its observation that Kittay's allegations could state a claim for relief, the District Court must have found the allegations deficient only in their form. Thus, while the court dismissed Kittay's complaint for failure **[**24]** to state a claim under *Rule 12(b)(6)*, it appears that its dismissal of the complaint with regard to the post-appeal allegations was actually based on Kittay's failure to satisfy *Federal Rule of Civil Procedure 8*, regarding "General Rules of Pleading." **HN11** We review a district court's dismissal of a complaint for failure to comply with *Rule 8* for abuse of discretion. [9] *See Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995)*.

**HN12** *Federal Rule of Civil Procedure 8* requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The Rule also requires that "each averment of a pleading shall be simple, concise, and direct." *Fed. R. Civ. P. 8(e)(1)*. Under the Rules' liberal **[**25]** pleading standards, a plaintiff must disclose sufficient information to permit the defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Ricciuti v. New York City Transit*

---

[8] Kittay's disclaimer of intent to amend the complaint renders the District Court's judgment final and allows review of the dismissal in this Court. *See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)*; *Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 960-61 (2d Cir. 1987)*.

[9] Since the standard of review with respect to a *Rule 8* dismissal is more deferential to the district court than with respect to a *Rule 12(b)(6)* dismissal, our decision to vacate would obviously stand if we viewed the dismissal as one under *Rule 12(b)(6)*.

---

*e.g., AroChem, 176 F.3d at 628*.

230 F.3d 531, *541; 2000 U.S. App. LEXIS 26149, **25

_Auth., 941 F.2d 119, 123 (2d Cir. 1991)_. "Dismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." _Salahuddin v. Cuomo, 861 F.3d 40, 42 (2d Cir. 1988)_.

We find that the District Court exceeded its allowable discretion in dismissing Kittay's complaint for failure to comply with _Rule 8_. As a preliminary observation, if the court understood the allegations sufficiently to determine that they could state a claim for relief, the complaint has satisfied _Rule 8_. More importantly, in our view, the complaint's allegations are more than sufficiently clear "to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." _Id._ (noting principal function of pleadings under Federal Rules). Kittay alleged specifically that "Burstin **[**26]** Investors and the Kornstein Firm plotted to conceal the Israeli settlement and then to evade the escrowing provision via a dismissal of the entire bankruptcy case . . . ." Kittay also alleged that Kornstein "actively assisted in [Klagsbald's] litigation and collection efforts _on behalf of Burstin Investors_ against Kalka in Israel; that "had Defendants acted properly on behalf of the Debtor . . . [the] judgment could have been enforced against Kalka via legal action in Israel . . ., with the result **[*542]** that what should have been Luckey Platt's . . . judgment would have been paid in full"; that Defendants breached their fiduciary duties by "representing Burstin Investors in its collection efforts against Kalka when [they] knew, or should have known, that successful collection efforts on behalf of Burstin Investors would likely prevent the Debtor from recovering any money on those portions of the modified State Court Judgment in its favor"; and that Kornstein "neglected to advise the Debtor and its principals of their duty to enforce the $ 91,380 portion of the State Court Judgment awarded in its favor." These allegations are sufficiently clear to have provided Kornstein with "a **[**27]** fair understanding of what the plaintiff is complaining about" and to have allowed Kornstein "to know whether there is a legal basis for recovery." _Ricciuti, 941 F.2d at 123_.

In dismissing the complaint, the District Court noted that "at this point in the litigation, I am not able to decide if the deficiency in recovery by the bankrupt estate is the result of unlawful or improper actions by Kornstein, or plaintiff's own failures to advance the bankrupt's interests in Israel against Kalka and Burstin Investors." But at this stage in the litigation, the court need not make that determination, for that seems to be the

ultimate issue in the case. [10] **HN13** "Under _Rule 8(a)_, a plaintiff is not required to prove his case at the pleading stage." _Id. at 123-24; cf. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)_ ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

**[**28]** Finally, we find it significant that Kornstein did not argue below that the complaint was confusing. **HN14** While a district court may dismiss a complaint for failure to comply with _Rule 8_ _sua sponte, see Simmons, 49 F.3d at 86_, we have nonetheless reversed a dismissal after observing that the defendants "did not even remotely suggest that the amended complaint failed to comply with _Rule 8_, or that it did not give them notice of the substance of [the plaintiff's] claims, or that it was otherwise unintelligible." _Id. at 87_. As in _Simmons_, here the defendants "promptly answered" the complaint, thereby demonstrating that it was not "unintelligible." _Id. at 87-88_.

Although a district court is accorded significant deference in dismissing a complaint under _Rule 8_, the court here exceeded its allowable discretion in dismissing the complaint insofar as it alleged misconduct in the actions Kornstein took after the decision in the Appellate Division. Accordingly, we vacate that portion of the District Court's judgment and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of the plaintiff's **[**29]** complaint insofar as it alleges an impermissible conflict of interest, but we vacate the dismissal of the plaintiff's complaint insofar as it alleges improper conduct on the part of the defendants after appeal in the state court action. We accordingly remand for further proceedings. Each party shall bear its own costs on this appeal.

---

**End of Document**

---

[10] There is a certain unavoidable vagueness in the complaint, because it is hard to allege what sum would have been allocated to Luckey Platt if the amounts collected from Kalka had been (as they should have been) placed in escrow.

⚠ Caution
As of: June 23, 2025 9:51 PM Z

## *Maron v. Legal Aid Soc'y*

United States District Court for the Southern District of New York

June 2, 2022, Decided; June 2, 2022, Filed

21 Civ. 5960 (KPF)

**Reporter**
605 F. Supp. 3d 547 *; 2022 U.S. Dist. LEXIS 99225 **; 2022 WL 1910247

MAUD MARON, Plaintiff, -v.- THE LEGAL AID SOCIETY and ASSOCIATION OF LEGAL AID ATTORNEYS, Defendants.

## Core Terms

hostile work environment, allegations, ALAA, severe, public defender, email, hostile work environment claim, racist, sabbatical, pervasive, campaign, hostile, anti-racism, harassment, resign, views, motion to dismiss, fair representation, workplace, color, plaintiff's claim, termination, co-worker, retweet, discriminatory, conversation, initiated, racism, constructive discharge, reasonable person

**Counsel:** **[**1]** For Maud Maron, Plaintiff: Marc John Randazza, Randazza Legal Group, PLLC, Las Vegas, NV USA; Jay Marshall Wolman, Randazza Legal Group PLLC, Hartford, CT USA.

For The Legal Aid Society, Defendant: Christopher Daniel Belelieu, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, New York, NY USA; Jabari Julien, Gibson Dunn & Crutcher LLP, New York, NY USA; Lee Ross Crain, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Association of Legal Aid Attorneys, Defendant: Allyson Leigh Belovin, LEAD ATTORNEY, Levy Ratner, P.C., New York, NY USA; Rebekah Beth Cook-Mack, South Brooklyn Legal Services, Brooklyn, NY USA.

**Judges:** KATHERINE POLK FAILLA, United States District Judge.

**Opinion by:** KATHERINE POLK FAILLA

## Opinion

**[*552]** OPINION AND ORDER

On July 23, 2020, Plaintiff Maud Maron, a career public defender at Defendant The Legal Aid Society ("LAS"), penned an op-ed in the *New York Post* entitled "Racial Obsessions Make it Impossible for NYC Schools to Treat Parents, Kids As People" (the "Op-Ed"). Speaking simultaneously in her capacities as a mother, public defender, elected public school council member, and then-candidate for New York City Council, Plaintiff recounted in the Op-Ed her experience at an anti-bias training run by the **[**2]** New York City Department of Education ("DOE"). She decried what she perceived as DOE's endorsement of the "chilling doctrine called anti-racism," which she asserted "insists on defining everyone by race, invites discrimination[,] and divides all thought and behavior along a racial axis." Responding to the Op-Ed, the Black Attorneys of Legal Aid ("BALA"), a caucus of Defendant Association of Legal Aid Attorneys ("ALAA," or the "Union," and together with LAS, "Defendants"), issued a public statement denouncing Plaintiff's "racist" views and characterizing her "as a classic example of what 21st century racism looks like." LAS followed with its own statement, which similarly rebuked Plaintiff's "racist perspective" and questioned the ability of any public defender to "effectively and fully" engage in public interest work if they do not embrace an anti-racist mandate.

Plaintiff alleges that Defendants' statements were riddled with falsehoods and singled her out because she is white. For such conduct, Plaintiff brings this civil rights suit, asserting claims of hostile work environment and constructive termination pursuant to *Title VII of the Civil Rights Act of 1964*, *42 U.S.C. §§ 2000e to 2000e-17*, on the grounds that Defendants' statements were so permeated **[**3]** with discriminatory intimidation that they altered the terms and conditions of Plaintiff's employment and made it impossible for her to return to LAS from the sabbatical she took to run for City Council. Defendants have each moved to dismiss Plaintiff's claims pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons outlined in the remainder of

605 F. Supp. 3d 547, *552; 2022 U.S. Dist. LEXIS 99225, **3

this Opinion, the Court grants Defendants' motions in their entirety.

## BACKGROUND[1]

### A. Factual Background

#### 1. Plaintiff's Employment at LAS and Campaign for City Council

For most of her legal career, Plaintiff has served as a public defender with LAS, [*553] first from 1998 to 2006 and then from 2017 through at least the initiation of the instant lawsuit in 2021. (Am. Compl. ¶ 7). During her time at LAS, Plaintiff held the titles of staff attorney and Director of Training and received invitations to serve as a faculty lecturer at LAS's trial advocacy programs. (*Id.*).

On December 30, 2019, Plaintiff circulated an officewide email announcing that she would be taking a leave of absence from LAS in 2020 to campaign full time for City Council. (Belovin Decl., Ex. 1).[2] Several hours after

---

[1] This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #24)), the well-pleaded allegations of which are taken as true for purposes of this motion. *See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. The Court also relies on the exhibits appended to the Amended Complaint ("Pl. Ex. [ ]"), which exhibits are deemed part of Plaintiff's pleading. *See Fed. R. Civ. P. 10(c)*. The Court draws additional facts from the exhibits attached to the Declaration of Allyson Belovin in support of ALAA's motion to dismiss the Amended Complaint ("Belovin Decl., Ex. [ ]" (Dkt. #34)); as well as the exhibits attached to the Declaration of Jay M. Wolman in support of Plaintiff's opposition to Defendants' motion to dismiss ("Wolman Decl., Ex. [ ]" (Dkt. #43-8)). *See United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021)* (describing materials extraneous to a complaint that a court may consider on a motion to dismiss).

[2] Plaintiff concedes that at least one of the emails in the chain that proceeded from her announcement of her political campaign is incorporated by reference in the Amended Complaint. (Pl. Opp. 2 n.5). The Court deems it appropriate to consider the entirety of this email chain, as it provides necessary context for and is intimately related to material that is quoted in the Amended Complaint. *See Jones v. Harris, 665 F. Supp. 2d 384, 393 (S.D.N.Y. 2009)* (collecting cases for the proposition that in deciding a motion to dismiss courts "may

---

sending this email, Rigodis Appling, an LAS staff attorney, replied to Plaintiff's message, [**4] copying the office listserv, and stated in full: "Requesting that you please leave the Legal Aid Society's name and recognition out of your campaign materials and speeches." (*Id.*). The message continued, "[i]t's not a good look for us." (*Id.*). Underneath the text of this message, Appling included several links to materials criticizing Plaintiff for her position on New York City's efforts to expand "Culturally Responsive Education" in public schools and calling for Plaintiff to resign from her elected position as a public school council member. (*Id.*; *see also* Wolman Decl., Ex. 2-4).[3] Plaintiff replied to Appling's email explaining that these sources were part of "the smear campaign by people who disagree with [her] and think the way to conduct public discourse is to attack people instead of engaging in constructive conversation." (Belovin Decl., Ex. 1). Appling responded in the final email of the chain by affirming her belief in "engaging in constructive public discourse" and inviting Plaintiff to "discuss [her] position on school segregation with union members[.]" (*Id.*).

#### 2. LAS's Investigation into Plaintiff's Work Performance

Plaintiff [**5] alleges that at the end of 2019, BALA prompted LAS to open a baseless investigation into her. (Am. Compl. ¶ 13). The investigation entailed a wholesale review of Plaintiff's caseload and interviews of three of her supervisors concerning her work as a public defender. (*Id.* at ¶ 15). None of Plaintiff's supervisors identified any concerns regarding the quality or nature of her client representations, and the investigation was ultimately deemed unfounded. (*Id.* at ¶ 16). Plaintiff learned of the results of this investigation

---

consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit"); *accord Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015)*.

[3] Appling included three links in her email. The first link is a change.org petition calling for Plaintiff's resignation from her education council post, endorsed by eighteen current and former students from the school district in which Plaintiff served. (Wolman Decl., Ex. 2). The second link is a *New York Daily News* article summarizing the contents of the students' petition. (*Id.*, Ex. 3). The third link is a summary of a *New York Times* podcast on desegregation efforts in New York City schools, which discussed Plaintiff's criticism of the City's education policies. (*Id.*, Ex. 4).

605 F. Supp. 3d 547, *553; 2022 U.S. Dist. LEXIS 99225, **5

on January 13, 2020, during a meeting with her union representative and Tina Luongo, the Attorney-in-Charge of LAS's Criminal Defense **[\*554]** Practice. (*Id.* at ¶ 17). In addition to informing Plaintiff that she had been fully cleared of any wrongdoing, Luongo warned Plaintiff that the same attorneys who initiated the investigation portended to "leak" the fact of the investigation to the press to harm Plaintiff's campaign. (*Id.* at ¶ 18). Concerned about the risk to her reputation, Plaintiff requested that LAS issue an approbative statement if information concerning the investigation were leaked, prompting Luongo to interrupt and state that "IT WILL be leaked." (*Id.* at ¶¶ 19-20). **[\*\*6]** Luongo then acceded to Plaintiff's request that LAS release a statement acknowledging Plaintiff's exemplary record when the attempt to damage her reputation materialized. (*Id.* at ¶ 21). Plaintiff does not allege that the investigation was leaked, and LAS never released the statement discussed during Plaintiff's meeting with Luongo and her union representative. (*Id.* at ¶ 22).

### 3. Plaintiff's Op-Ed in the *New York Post* and Defendants' Responses

On July 23, 2020, while on sabbatical from LAS, Plaintiff published the Op-Ed in the *New York Post.* (Am. Compl. ¶¶ 8, 23; Pl. Ex. A ("Op-Ed")).[4] In the Op-Ed, Plaintiff took issue with a DOE anti-bias training that she attended, at which she was instructed to refer to herself as a "white woman," and which classified concepts such as "worship of the written word," "individualism," and "objectivity" as "white-supremacy culture." (Op-Ed 1). Drawing from this experience, Plaintiff took aim at the City's push to instill in public schools the "benign-sounding but chilling doctrine called anti-racism, which insists on defining everyone by race, invites discrimination[,] and divides all thought and behavior along a racial axis." (*Id.*). Plaintiff highlighted **[\*\*7]** her perception that "[t]hose who oppose this ideology are shunned and humiliated, even as it does nothing to actually improve our broken schools." (*Id.*). Plaintiff expressed support for "more integrated schools, regardless of whether integration is an academic booster," but urged people to "think through all this with nuance, not by vilifying some parents or setting parents against each other." (*Id.* at 2).

Three days after the publication of the Op-Ed, on July

26, 2020, BALA issued a statement "respond[ing] to [Plaintiff's] recent anti-racism philippic" and "denounc[ing] [her] as the racist that she is." (Pl. Ex. B ("BALA Statement") at 1). According to BALA, that Plaintiff finds anti-racism to be chilling "tells true racial advocates all they need to know: she's racist, and wants the school system ... to remain unequal." (*Id.*). Plaintiff is, in BALA's eyes, one of the "many white practitioners" who subscribes to the "common myth ... that being public defenders preclude[s] them from being racist." (*Id.*). Relatedly, the authors professed that "we know for a fact that [Plaintiff's] commitment to zealous representation of poor people of color is questionable at best" (*id.* at 1), and that **[\*\*8]** she has been "tasked with representing a constituency she clearly has no regard for" (*id.* at 3). The statement proclaimed that one "cannot oppose anti-racism and effectively represent Black and Brown people," and concluded by saying that Plaintiff "has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society." (*Id.*).

LAS's official Twitter account retweeted the BALA Statement, without any commentary. (Am. Compl. ¶ 30; Pl. Ex. C). Thereafter, on July 27, 2020, LAS released its own statement responding to the Op-Ed, **[\*555]** co-signed by LAS leadership, including the organization's Attorney-in-Chief and CEO, General Counsel, Chief Human Resources Officer, and Chief Operating Officer, as well as the Attorneys-in-Charge of the Civil, Juvenile Rights, and Criminal Defense Practices. (Am. Compl. ¶¶ 38-39; Pl. Ex. E ("LAS Statement")).[5] The LAS Statement claimed that Plaintiff "denies the existence of structural and institutional racism," and ascribed to her the position that "by the mere nature of working in public interest and being a public defender you get a pass at looking at your privilege, your role in social dominance and white supremacy." (LAS **[\*\*9]** Statement 1). "This racist perspective," according to LAS, "is disgusting and results in Black and Brown people being harmed by individuals in public interest roles[.]" (*Id.*). On LAS's view, Plaintiff revealed that she is "not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country." (*Id.*).

The LAS Statement went on to declare the

---

[4] The Amended Complaint erroneously states that the Op-Ed was published on June 23, 2020. (Am. Compl. ¶ 23). The Op-Ed is, in fact, dated July 23, 2020. (Pl. Ex. A).

---

[5] Tina Luongo, the Attorney-in-Charge of LAS's Criminal Defense Practice and the supervisor who attended the January 13, 2020 meeting concerning the results of the investigation into Plaintiff, was a signatory to this statement. (*See* LAS Statement).

organization's commitment to anti-racism. According to LAS, anti-racism requires recognizing "that white supremacy drives every policy and law, every opportunity and every advantage." (LAS Statement 2). LAS explained that it has "not taken on the internal work needed to build a truly anti-racist workplace" and that "as an organization we are committing to bravely have the much needed, and long overdue, conversations and engaging in the critical dialogue and discourse concerning racism, transphobia, sexism and intersectionality." (*Id.* at 1). LAS specified that "[f]or those of us who are white, it is a recognition that power and privilege has been granted merely because we are white. While you have dedicated your life to public interest, you cannot do this work effectively and **[**10]** fully unless and until you face that reality and own that you are part of the problem." (*Id.* at 2). LAS added that, "[t]o push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility." (*Id.*). As a closing note, LAS explained that "[w]hite people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds. Enough is enough." (*Id.*).

Based on the foregoing events, Plaintiff alleges that LAS and ALAA have discriminated against her on the basis of her race. Although Plaintiff is currently promised a return from sabbatical under the governing collective bargaining agreement, Plaintiff asserts that LAS has made it impossible for her to return. (Am. Compl. ¶ 33; Pl. Ex. D ("Collective Bargaining Agreement"), § 3.4.4.1.2). Furthermore, Plaintiff alleges that LAS's endorsement of BALA's statement and issuance of its own statement are tantamount to terminating her employment, because "[a]n employer who says, publicly, it is ashamed she works there and has no business working there, is not **[**11]** an employer any reasonable person could be expect[ed] to work for." (Am. Compl. ¶¶ 34-35). Plaintiff also alleges that LAS violated several provisions of the Collective Bargaining Agreement — including her rights to due process, free speech, and confidentiality — by constructively terminating her in this fashion. (*Id.* at ¶¶ 32, 34, 45). Lastly, Plaintiff asserts that ALAA breached the duty it owed her as her bargaining representative by making its **[*556]** own statement denouncing her, allowing LAS to retweet the statement, and prompting LAS to publish its own subsequent statement. (*Id.* at ¶ 72; Pl. Opp. 24).

**B. Procedural Background**

Plaintiff initiated this lawsuit with the filing of the underlying complaint on July 12, 2021. (Dkt. #1).[6] On August 4, 2021, LAS filed a pre-motion letter indicating its intent to move to dismiss the case. (Dkt. #18). The following day, ALAA filed its own pre-motion letter stating its intent to move to dismiss the complaint. (Dkt. #20). On August 9, 2021, Plaintiff submitted a letter opposing both proposed motions. (Dkt. #22). On August 18, 2021, the Court dispensed with its usual practice of holding a pre-motion conference and set a briefing schedule for Defendants' **[**12]** motions to dismiss, which schedule included an opportunity for Plaintiff to amend her pleadings. (Dkt. #23).

On September 1, 2021, Plaintiff filed the Amended Complaint, which is the operative pleading in this matter. (Dkt. #24). On October 1, 2021, Defendants filed their motions to dismiss and supporting papers. (Dkt. #32-34 (ALAA); Dkt. #37-39 (LAS)). On November 10, 2021, Plaintiff filed her opposition papers. (Dkt. #43). Finally, on November 24, 2021, Defendants filed their reply briefs. (Dkt. #44 (ALAA); Dkt. #45 (LAS)). Accordingly, Defendants' motions to dismiss are fully briefed and ready for consideration.

**DISCUSSION**

As noted, Plaintiff asserts Title VII claims for (i) hostile work environment against LAS (Am. Compl. ¶¶ 49-61); (ii) hostile work environment and discrimination against ALAA (*id.* at ¶¶ 62-79); and (iii) constructive termination against LAS (*id.* at ¶¶ 80-92). Defendants seek to dismiss Plaintiff's claims on the grounds that Plaintiff has failed to allege that any of the conduct at issue was motivated by her race, as opposed to her viewpoint, which is not a protected characteristic under the federal civil rights law. (LAS Br. 10-16; ALAA Br. 9-10). Defendants additionally **[**13]** argue that even if they acted against Plaintiff because of her race, her allegations do not satisfy the pleading standards for either a hostile work environment or constructive termination. (LAS Br. 16-24; ALAA Br. 10-15). ALAA makes a separate argument, specific to the union context, that it did not breach the duty of fair representation owed to Plaintiff. (ALAA Br. 5-9).

---

[6] Prior to commencing this action, on January 19, 2021, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission, pursuant to *42 U.S.C. § 2000e-5*. (Pl. Ex. F). Approximately three months later, on April 26, 2021, Plaintiff received right-to-sue letters as to both Defendants. (*Id.*, Ex. G, H).

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 227 of 321

Page 5 of 15

605 F. Supp. 3d 547, *556; 2022 U.S. Dist. LEXIS 99225, **13

In resolving this motion, the Court begins by enunciating the legal standards under *Federal Rule of Civil Procedure 12(b)(6)*. It then discusses the content of BALA's and LAS's statements to ascertain whether either was motivated, even if only in part, by Plaintiff's race. After finding that Plaintiff has plausibly alleged that her race factored into these statements, the Court ultimately concludes that her allegations nevertheless fall short of stating a claim for hostile work environment or constructive discharge because she has not alleged that she experienced a sufficiently hostile work environment to make out a plausible claim under Title VII.

## A. Motions to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*

"To survive a [*Rule 12(b)(6)*] motion to dismiss, a complaint must contain sufficient **[*557]** factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting **[**14]** *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd. v. Klee, 861 F.3d 82, 94-95 (2d Cir. 2017)* (quoting *Iqbal, 556 U.S. at 678*). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)* (quoting *Twombly, 550 U.S. at 570*). "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009)* (internal quotation marks, alterations, and citation omitted); *see also Rolon v. Henneman, 517 F.3d 140, 149 (2d Cir. 2008)* (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under *Rule 12(b)(6)* "may review only a narrow universe of materials." *Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016)*. This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Id.* (internal alterations and citation omitted); **[**15]** *see also United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021)*. Beyond the Amended Complaint and the exhibits attached thereto, the Court may consider on this motion the email communications between Plaintiff and Rigodis Appling that are referenced in the Amended Complaint (Belovin Decl., Ex. 1), as well as the articles referenced in that correspondence (Wolman Decl., Ex. 2-4). Additionally, the Court may take judicial notice of statements that Plaintiff made to media outlets that bear on her allegations in this case. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 127 n.11 (2d Cir. 2013)* ("Generally, courts considering a motion to dismiss may take judicial notice of the fact that press coverage ... contained certain information so long as they do not rely on the truth of that information" (internal quotation marks omitted)).

## B. Discrimination "Because of" Race Under Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin[.]" *42 U.S.C. § 2000e-2(a)(1)* (emphasis added). An essential element of any claim under Title VII is that a plaintiff plead that she experienced some form of discrimination due to a protected characteristic. *See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)* ("It is **[**16]** axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's ... protected characteristic."). Because Defendants have argued principally that none of Plaintiff's allegations implicates a protected characteristic, the Court first discusses Title VII's causation **[*558]** principles, before turning to the remaining elements of Plaintiff's Title VII claims.

Under Title VII, "an action is 'because of' a plaintiff's [protected characteristic] where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015)*; *see also 42 U.S.C. § 2000e-2(m)* ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even

605 F. Supp. 3d 547, *558; 2022 U.S. Dist. LEXIS 99225, **16

though other factors also motivated the practice."). "Thus, to state a claim for hostile work environment, at a minimum, a plaintiff must allege facts that suggest that the complained-of conduct was motived by prohibited animus." *Trujillo v. City of New York, No. 14 Civ. 8501 (PGG), 2016 U.S. Dist. LEXIS 194168, 2016 WL 10703308, at *13 (S.D.N.Y. Mar. 29, 2016)* (internal alterations omitted) **[**17]** (quoting *DeLaurencio v. Brooklyn Children's Ctr., Superintendent, 111 F. Supp. 3d 239, 248 (E.D.N.Y. 2015)), aff'd, 696 F. App'x 560 (2d Cir. 2017)* (summary order). As the text of *42 U.S.C. § 2000e-2(a)(1)* makes clear, one's stance on a political or social issue is not a protected characteristic under Title VII. *See, e.g., Tsanganea v. City Univ. of New York, No. 06 Civ. 15366 (DAB) (JCF), 2008 U.S. Dist. LEXIS 66236, 2008 WL 4054426, at *1 n.4 (S.D.N.Y. Aug. 28, 2008)* ("[C]laims of discrimination based on political belief are not actionable under Title VII[.]"), *report and recommendation adopted, 2008 U.S. Dist. LEXIS 79628, 2008 WL 4548857 (S.D.N.Y. Oct. 8, 2008).*[7]

---

[7] Because Plaintiff brings claims of "reverse discrimination," involving alleged discrimination on the basis that she is white, LAS urges the Court to apply the heightened standard established in *Olenick v. New York Telephone/A NYNEX Co.*, which requires a plaintiff to allege "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *881 F. Supp. 113, 114 (S.D.N.Y. 1995)*. (*See* LAS Br. 11 & n.3).

The Second Circuit has not decided whether such a heightened standard applies in reverse discrimination cases. *See Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 80 n.5 (2d Cir. 2009)* (expressly declining to decide the issue of whether a plaintiff bringing a reverse discrimination claim under Title VII bears a heightened burden). This Court understands the Supreme Court's pronouncements in Title VII cases involving claims of reverse discrimination to undercut LAS's argument that a different standard should apply. *See, e.g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976)* (observing that Title VII prohibits "racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites"). This Court finds persuasive Judge Motley's opinion in *Cully v. Milliman & Robertson, Inc.*, which reasoned that "[a]bsent binding authority to the contrary, this court must assume that *McDonald* means what it says: a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races." *20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998)*. assuming LAS can be held responsible for its retweet of the BALA Statement, the Court concludes that Plaintiff has failed to allege circumstances amounting to a hostile work environment.

The crux of Plaintiff's Title VII claims is that the public statements issued by LAS and BALA criticized Plaintiff and her ability to work as a public defender *because of* her race. (Pl. Opp. 1). Plaintiff highlights the important context that LAS's and BALA's public statements were issued in direct response to Plaintiff's public objections to an ideology that "relentlessly insists all white people are racist" and forced her to identify foremost as a "white woman." (*Id.* at 10-11). Plaintiff also alleges that BALA's and LAS's statements contain "numerous race-based falsehoods and false statements," none of which would have been circulated if she were not white. (Am. Compl. ¶¶ 31, 41). Chief among these asserted falsehoods, the statements present a warped interpretation of Plaintiff's views by **[**18]** painting her as a racist, an opponent of school integration, and a denier of **[*559]** institutional racism. (*Id.*). Extrapolating from this caricature of Plaintiff's views, the statements call into question her commitment to representing indigent people of color and accuse her of affirmatively harming and gaslighting her clients. (*See* BALA Statement 1; LAS Statement 1). Significantly, Plaintiff argues that Defendants labeled her a racist and misconstrued her views *because* she is a white woman who spoke out against anti-racism, thus establishing an inescapable link between Defendants' derogatory remarks and her race. (Pl. Opp. 10-12).

Defendants counter that the Amended Complaint is devoid of any allegations that would permit the Court to infer that they spoke out against Plaintiff because of her race, rather than her perspective on anti-racism. (LAS Br. 13; ALAA Br. 6-7). On Defendants' account, BALA's and LAS's statements condemned only Plaintiff's perspective on anti-racism articulated in the Op-Ed, which perspective would be just as anathema to LAS's mission if expressed by an employee of any other race. (LAS Br. 12; ALAA Br. 8). LAS further contends that Plaintiff *conceded* that her views **[**19]** motivated Defendants' statements through her allegations that she "was subjected to harassment for her political beliefs" (Am. Compl. ¶ 12); was constructively terminated for her "personal political and social beliefs" (*id.* at ¶ 34); and held "beliefs LAS thinks white people should not be allowed to hold" (*id.* at ¶ 57). (LAS Br. 11-12). Lastly, LAS points to several post-filing statements that Plaintiff made to media outlets expressing her displeasure that LAS targeted her for her views. (LAS Br. 14-15).[8]

---

[8] By way of example, LAS cites a July 12, 2021 interview, during which Plaintiff discussed this case and admitted that "[t]he reason they went after me is because I have a different

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 229 of 321

Page 7 of 15

605 F. Supp. 3d 547, *559; 2022 U.S. Dist. LEXIS 99225, **19

The Court's careful review of the BALA and LAS Statements demonstrates that they were not, as Defendants claim, limited to expressing disapproval of Plaintiff's political views on an issue touching upon race. If this were the sum total of the statements, the Court would agree with Defendants that the statements would not implicate Title VII. But the LAS Statement goes further, expressly tying white attorneys' — specifically Plaintiff's — ability to do the work of a public defender to whether they accept the anti-racist credo and assume the attendant responsibilities. Poignantly, the LAS Statement imposes additional obligations on white public defenders **[**20]** "merely because" they are white:

> To be anti-racist, to dismantle racism here at LAS, and in every organization, we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage. For those of us who are white, it is a recognition that power and privilege has been granted merely because we are white. While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem. You cannot stop there, you must actively work to dismantle the systems that lend you privilege and oppress BIPOC people. To push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility.... White people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds.

 **[*560]** (LAS Statement 2). Espousing a similar view, the BALA Statement doubted Plaintiff's "commitment to zealous representation of poor people of color," in part because she falls into the category of "white practitioners **[**21]** [who believe] that being public defenders preclude[s] them from being racist." (BALA Statement 1). BALA characterized Plaintiff as "one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging," and made clear that public defenders "cannot oppose anti-racism and effectively represent Black and Brown people." (*Id.* at 3).

The context and content of Defendants' statements, including in particular LAS's stated expectation that white public defenders must shoulder additional responsibilities based solely on their race, convinces the Court that Plaintiff has adequately alleged that the statements were motivated, at least in part, by her race. *See Vega, 801 F.3d at 85* (explaining that to sustain a claim under Title VII, a plaintiff must provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent"); *see also Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015)* ("An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group[.]"). That these statements also rebuke Plaintiff **[**22]** for the views she articulated in the Op-Ed does not strip the statements of their racial overtones. *See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 23 (2d Cir. 2014)* (citation omitted) (noting that a plaintiff alleging a hostile work environment under Title VII "need not demonstrate that [a protected characteristic] was the only motivating factor," but need show only that a protected characteristic "was a motivating factor in the harassment").

To be clear, the Court's finding that Plaintiff has plausibly alleged that Defendants' criticism of Plaintiff was racially motivated is based on more than the mere fact that Plaintiff is white and was accused of being racist. Indeed, as a matter of both logic and precedent, accusations of racism against a white person are not *ipso facto* indicia of race-based discrimination. *See Maraschiello v. City of Buffalo Police Dep't, 709 F.3d 87, 97 (2d Cir. 2013)* ("[A] statement that someone is a 'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected *because of his race*."). Here, Plaintiff has alleged not just that she was accused of being a racist, but also that a caucus of her union and her employer issued statements impugning her competence to perform legal work for clients of different racial backgrounds because she **[**23]** was a white woman masquerading her "racist" views as a public defender. Given Defendants' avowed disappointment that Plaintiff was a white person who failed to accept that her race and job title obligated her to adhere to their understanding of anti-racism — as expressed in explicit racial lines in their statements — the Court concludes that Plaintiff has adequately alleged that the BALA and LAS Statements were motivated, at least in part, by her race.

point of view." Bari Weiss, *A Witch Trial at the Legal Aid Society*, COMMON SENSE (July 12, 2021), https://bariweiss.substack.com/p/a-witch-trial-at-the-legal-aid-society.

## C. Plaintiff Fails to Allege a Hostile Work Environment

Given its finding that Plaintiff has plausibly alleged that Defendants' statements were motivated by her race, the Court turns next to Plaintiff's claim that she experienced a hostile work environment. Plaintiff asserts such claims against both LAS and ALAA, stemming primarily from **[*561]** their public statements critical of Plaintiff. With regard to her employer, Plaintiff contends that LAS created a hostile work environment by publishing two statements that humiliated her and tarnished her professional reputation. (Pl. Opp. 14). And with regard to her union, Plaintiff alleges that ALAA is responsible for the pattern of hostile conduct she endured at LAS, which included the farcical investigation **[**24]** in 2019, BALA's harmful statement, and permitting LAS's retweet of the BALA Statement. (*Id.* at 24-25). For the reasons that follow, the Court finds that Plaintiff's hostile work environment claims fail as a matter of law against both Defendants because she has not adequately alleged conduct sufficiently severe or pervasive to satisfy the high bar to make out a hostile work environment claim under Title VII.

### 1. The Legal Aid Society

#### a. Applicable Law

To adequately plead a claim against an employer for hostile work environment under Title VII, a plaintiff must plausibly allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn, 795 F.3d at 320-21* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*). This test has both objective and subjective elements: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id. at 321.* "Moreover, to hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show 'a specific **[**25]** basis for imputing the conduct creating the hostile work environment to the employer.'" *Bentley v. AutoZoners, LLC, 935 F.3d 76, 90 (2d Cir. 2019)* (quoting *Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013)*).

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)* (quoting *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)*). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness," although "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.* (citations omitted). Distilling the applicable standard, the Second Circuit has explained that a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Id.*

In determining whether a plaintiff has satisfied this burden, courts "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera, 743 F.3d at 20.* "Hostile **[**26]** work environment claims are meant to protect individuals from abuse and trauma that is severe ... [but] are not intended to promote or enforce civility, gentility or even decency." *Isbell v. City of New York, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018).* Put differently, "excessive criticism and rudeness do not constitute a hostile work environment." *Ramirez v. Temin & Co., Inc., No. 20 Civ. 6258 (ER), 2021 U.S. Dist. LEXIS 183760, 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021).*

#### [*562] b. Analysis

Plaintiff alleges four instances of harassment that, she claims, subjected her to a race-based hostile work environment at LAS: (i) Appling's email, sent to all LAS employees in late December 2019, asking Plaintiff not to associate LAS with her campaign for City Council (Am. Compl. ¶ 12; Belovin Decl., Ex. 1); (ii) BALA's initiation of a baseless investigation into Plaintiff at the close of 2019 (Am. Compl. ¶¶ 13-16); (iii) BALA's July 26, 2020 statement labeling Plaintiff as racist, which LAS retweeted on its official, verified Twitter account (*id.* at ¶¶ 29-31)[9] ; and (iv) LAS's July 27, 2020 statement

---

[9] LAS contends that it is shielded from liability for its retweet of BALA's statement by *Section 230 of the Communications*

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 231 of 321

Page 9 of 15

605 F. Supp. 3d 547, *562; 2022 U.S. Dist. LEXIS 99225, **26

containing "numerous race-based false statements that injured Plaintiff" (*id.* at ¶ 40). As the Court will explain, these allegations, whether viewed individually or collectively, do not rise to the level of pervasiveness or severity to state a claim for hostile work environment under Title VII.

Beginning with Plaintiff's earliest allegation, the Court perceives no hostility or abuse in Appling's officewide email. Appling sent the email in response to Plaintiff's officewide announcement informing her colleagues that she planned to take a leave of absence in 2020 to run for City Council. (Belovin Decl., Ex. 1). Appling's message read, in full, "Requesting that you please leave the Legal Aid Society's name and recognition out of your campaign materials and speeches. It's not a good look for us." (*Id.*). Embedded below the body of the email were three links: (i) a petition urging Plaintiff to resign from her Community Education Council position because she "has consistently attempted to undermine [DOE's] push for more diverse and inclusive schools" (Wolman Decl., Ex. 2); (ii) a news article summarizing the contents of this petition (*id.*, Ex. 3); and (iii) a summary of a podcast exposé on the fight to desegregate schools in New York City, on which Plaintiff was a featured guest (*id.*, Ex. 4).

Plaintiff describes this email as "disparaging" and the first example of "racial harassment" she endured at LAS (Pl. Opp. 1-2), but the Court finds no invidious harassment in the **[**28]** email or the linked materials. Appling's message amounts to a request that Plaintiff distance LAS from her campaign for City Council that she had just announced to the workplace, presumably

_____

*Decency Act, 47 U.S.C. § 230(c)(1)*), which provides that, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (*See* **[**27]** LAS Br. 17 n.5).

The Court harbors doubts as to whether *Section 230* bars an employer from being held liable for retweeting a statement that allegedly contributes to a hostile work environment. *Cf. Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101-02 (9th Cir. 2009), as amended* (Sept. 28, 2009) (explaining that under *Section 230*, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker'" and "[i]f it does, *[S]ection 230(c)(1)* precludes liability."). It need not definitively resolve this issue, however, as even assuming LAS can be held responsible for its retweet of the BALA Statement, the Court concludes that Plaintiff has failed to allege circumstances amounting to a hostile work environment.

out of a concern that doing otherwise might associate LAS with Plaintiff's controversial position on education policy. Appling communicated this view civilly and without resorting to any language that could plausibly be construed as hostile. Subsequent emails exchanged between Appling and Plaintiff on this email chain reveal that Appling accepted Plaintiff's offer to engage in a constructive conversation on the issue of school segregation at a future **[*563]** date. Notably, unlike the BALA and LAS Statements, the links that Appling included in the email do not, in any way, associate Plaintiff's ability to perform as a public defender with her views on education policy or anti-racism. Plaintiff may have been displeased with the content of Appling's email, especially if she wished her colleagues to support her campaign for City Council, but Plaintiff has not plausibly alleged that this email "disparaged" her in any way, let alone based on her race. And even if she had, Plaintiff has not alleged any basis for **[**29]** imputing such disparagement to LAS. *See Bentley, 935 F.3d at 92* ("Where a hostile work environment is created by a co-worker who is not a supervisor, the employer can still be liable, but only for its own negligence." (internal quotation marks omitted)); *see also Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 153 (2d Cir. 2014)* (explaining that in order to impute the discriminatory conduct of a co-worker to an employer, a plaintiff must show that "the employer knew or reasonably should have known about harassment by non-supervisory co-workers, yet failed to take appropriate remedial action" (internal citations, footnote, and quotation marks omitted)).

Next, Plaintiff asserts that the "baseless investigation" initiated by "politically motivated members" of BALA at the end of 2019 added to the air of race-based hostility in her work environment. (Pl. Opp. 15, 25). Accepting as true that this investigation was entirely politically motivated, as the Court must on this motion, LAS's alleged conduct during this investigation undermines Plaintiff's argument that LAS should be held liable for any hostility that may have flowed from the investigation. Plaintiff attributes the opening of the investigation to a "coordinated group of coworkers," who further threatened to leak the **[**30]** fact of the investigation to the press to damage her campaign for City Council. (Pl. Opp. 15; *see also* Am. Compl. ¶¶ 14, 18). Ultimately, following a review of her caseload and interviews of three of her supervisors, Plaintiff was cleared of any wrongdoing, and the investigation was deemed unfounded. (Am. Compl. ¶¶ 15-16). Luongo, the Attorney-in-Charge of LAS's Criminal Defense Practice, is the only supervisor alleged to have been

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 232 of 321

Page 10 of 15

605 F. Supp. 3d 547, *563; 2022 U.S. Dist. LEXIS 99225, **30

involved in the investigation, and, by Plaintiff's own allegations, she affirmatively assisted Plaintiff by promising her that LAS would "release a statement acknowledging [Plaintiff's] exemplary record of service when the fully anticipated and acknowledged attempt to smear her arose in the press." (*Id.* at ¶ 21). Plaintiff argues that LAS's failure to release a statement in defense of Plaintiff reflects the organization's hostility, yet conspicuously absent from the Amended Complaint is any allegation that the BALA attorneys leaked any information regarding this investigation to trigger Luongo's promise. Without any basis to tie it to someone in a supervisory capacity at LAS, the prompting of this ultimately unfounded investigation by a group of Plaintiff's **[**31]** coworkers does not buttress Plaintiff's claim for hostile work environment against LAS. *See Bentley, 935 F.3d at 91* (explaining that one basis for imputing a hostile work environment to an employer is "strict vicarious liability if an employer's supervisor has created the hostile environment").

Turning to the heart of Plaintiff's hostile work environment claim against LAS, Plaintiff contends that LAS worked a transformation of her workplace when it issued a public statement calling into question her ability to perform her responsibilities as a public defender. (Pl. Opp. 14-16). Plaintiff posits that following the publication of the LAS Statement, her clients — a majority of whom are individuals of color **[*564]** — cannot be expected to trust that she will provide them adequate representation when her employer has publicly disavowed her ability to do so. (*Id.* at 14-15). For this reason, Plaintiff argues that this case presents those "unfortunate right circumstances" in which "a single comment can be severe enough to create a hostile work environment." (*Id.* at 14 (quoting *Sanderson v. Leg Apparel LLC, No. 19 Civ. 8423 (GHW), 2020 U.S. Dist. LEXIS 234190, 2020 WL 7342742, at *6 (S.D.N.Y. Dec. 14, 2020)*)). The Court cannot agree.

It is true that "a hostile work environment can ... be established through evidence of a single incident of harassment **[**32]** that is extraordinarily severe." *Miller v. New York State Police, No. 20-3976, 2022 U.S. App. LEXIS 10354, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022)*. But the Court is hard-pressed to compare the LAS Statement to the singular incidents of harassment that courts have found to be so "extraordinarily severe" as to create a hostile work environment. *See, e.g.,* *Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000)* (holding that a single instance of verbal abuse gave rise to a hostile work environment where co-worker went on a "tirade" about female plaintiff being

promoted to lieutenant for performing fellatio, "at length" and "loudly" in front of large group of male subordinates); *see also Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 255, 259 (S.D.N.Y. 2014)* (finding single incident to give rise to hostile work environment where co-worker subjected female plaintiff to sexual advances and forcibly tried to kiss her, despite knowing she was a recent domestic violence victim); *cf. Albert-Roberts v. GGG Constr., LLC, 542 F. App'x 62, 64 (2d Cir. 2013)* (summary order) (rejecting plaintiff's argument "that the single use of the [n-word] is so severe as to make out a *prima facie* case and survive summary judgment").

As critical of Plaintiff as the LAS Statement is, it uses no racial epithets, reveals no personally sensitive or private information, and levies no salacious allegations, any of which would enhance the statement's severity for the purpose of the Title VII analysis.[10] To be sure, the content **[**33]** of the statement makes clear that LAS harbors doubts concerning Plaintiff's ability to represent individuals of color as a public defender, and the Court has already determined that LAS's decision to release this statement was motivated in part by Plaintiff's race. While the Court views the statement as sufficiently implicating Plaintiff's race to bring it within the ambit of the federal civil rights laws, the statement is more than just a missive targeting Plaintiff. It stakes out LAS's stance on an issue of public importance; articulates the organization's mission vis-à-vis the constituencies it works to support; calls on the organization as a whole for failing to realize this mission; and commits the organization to doing more to address issues of systemic racism in the future. Even accepting Plaintiff's characterization that the statement constituted an unfair attack and mischaracterized her views, it does not meet the requisite standard for a Title VII hostile work environment claim. *See, e.g.,* *Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008)* (summary order) (holding that derogatory language from supervisor, dismissive comments from

_____

[10] This is not to say that any such elements are necessary conditions to make out a hostile work environment based on an alleged single incident of racial harassment, but rather that the totality of circumstances in this case do not suggest that these statements exposed Plaintiff to a hostile work environment. *See Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004)* ("Courts look to the totality of the circumstances in determining whether a plaintiff has established a hostile work environment claim ... [and] no single factor is required.").

Case 1:25-cv-03496-JPC-SLC     Document 20-3     Filed 07/09/25     Page 233 of 321

Page 11 of 15

605 F. Supp. 3d 547, *564; 2022 U.S. Dist. LEXIS 99225, **33

management, and intense scrutiny of **[*565]** plaintiff were together "insufficiently severe and pervasive" **[**34]** to create hostile work environment); *Alvarado v. Mt. Pleasant Cottage Sch. Dist., 404 F. Supp. 3d 763, 781-82 (S.D.N.Y. 2019)* (rejecting hostile work environment claim predicated on comments that were "tasteless, meanspirited, and sound of ignorance and bias," and explaining that Title VII "does 'not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are due to [a] protected characteristic"); *Gibson v. Wyeth Pharms., Inc., No. 07 Civ. 946 (LTS), 2011 U.S. Dist. LEXIS 23935, 2011 WL 830671, at *11 (S.D.N.Y. Mar. 9, 2011)* (finding that allegations of explicitly racial comments, three-day suspension, forced overtime, and written warning were insufficient to establish hostile work environment).

Plaintiff urges the Court to consider the public nature of the LAS Statement in assessing its severity. (Pl. Opp. 15). Taking heed of this fact, the Court finds that the content of the statement, when analyzed in its proper context, further suggests that it is insufficient to support Plaintiff's claim for hostile work environment. LAS issued its statement on the heels of the BALA Statement from the day prior and in response to Plaintiff's controversial Op-Ed, which she wrote while on sabbatical and running a campaign for City Council. Needless to say, this political context does not give LAS *carte blanche* to issue derogatory statements premised **[**35]** on any employee's race; however, the fact that Plaintiff injected herself into the public discourse on a matter of public importance implicating race, and identified herself as a public defender in doing so, provides important context to LAS's decision to release the statement in the first place. In other words, the statements were not gratuitous, out-of-the-blue, racialized attacks on Plaintiff, but rather represented LAS's attempt to distance itself from the position articulated in the Op-Ed. (LAS Br. 20-21).

The Court finds several additional factors relevant to its analysis. The Court first notes that the fact that Plaintiff was on sabbatical and not actually present in the workplace when she instigated what became a public debate on this issue unavoidably reduces the degree of hostility Plaintiff experienced. Furthermore, the LAS Statement, even on its own terms, did not represent the organization's final say on the issue, as the organization avowed to "bravely have the much needed, and long overdue, conversations and engag[e] in the critical dialogue and discourse concerning racism, transphobia, sexism and intersectionality." (LAS Statement 1). And

while Plaintiff's writings in **[**36]** the *New York Post* were the impetus for LAS's public proclamation, a swath of the LAS Statement is devoted to expressing LAS's views on how best to "fight for justice for [its] clients" and "advocate against and litigate policies and laws that silence and oppress BIPOC and communities of color." (*Id.*). In this context, the Court does not view the LAS Statement, on its own, as exposing Plaintiff to a hostile work environment.

Plaintiff cites two cases for the proposition that "single statements made in public about private matters can be severe enough to meet the hostile work environment threshold," but both are easily distinguishable from the case at bar. (Pl. Opp. 15 (citing *Cherry v. N.Y.C. Hous. Auth., 564 F. Supp. 3d 140, No. 15 Civ. 6949 (MKB), 564 F. Supp. 3d 140, 2021 U.S. Dist. LEXIS 191353 (E.D.N.Y. Sept. 30, 2021)*; *Roberts v. Clark Cnty. Sch. Dist., 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016)*)). For instance, in *Cherry*, Judge Brodie denied summary judgment on the plaintiff's claims for hostile work environment based on his gender, sexual orientation, and disability status. *Cherry, 564 F. Supp. 3d 140, 2021 U.S. Dist. LEXIS 191353, at *68-88.* Plaintiff highlights Judge Brodie's discussion of the *Cherry* plaintiff's allegation **[*566]** that his supervisor held a town-hall type meeting to discuss plaintiff's HIV-positive status, a medical condition he intended to keep confidential, which allegation supported a claim for disability-based hostile work environment. *2021 U.S. Dist. LEXIS 191353, [WL] at *21-23, 84-88.* But Plaintiff neglects to **[**37]** mention the additional allegations supporting the plaintiff's claim for disability-based hostile work environment, which included his supervisor's "regular" conversations with his co-workers to discuss the plaintiff's upcoming medical appointments and his supervisor's denial of the plaintiff's request to take a leave of absence after publicly humiliating him about his private medical condition. *2021 U.S. Dist. LEXIS 191353, [WL] at *85-86.* The allegations in *Cherry* supporting the hostile work environment in that case were both more pervasive and more severe than those alleged by Plaintiff in this case. Similarly, the allegations sustaining the plaintiff's hostile work environment claim in *Roberts* involved a school district's transmission of emails "to every police-department employee," which messages "disclosed sensitive information about [the plaintiff's] sexual identity." *Roberts, 215 F. Supp. 3d at 1017.* As a result of this disclosure, the plaintiff, who was a transgender police officer, was subjected to "questions about his transition" and "inappropriate remarks about his genitalia." *Id.* No comparable disclosure of sensitive, personalized information is

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 234 of 321

Page 12 of 15

605 F. Supp. 3d 547, *566; 2022 U.S. Dist. LEXIS 99225, **37

alleged to have occurred in this case. To the contrary, LAS's public statement discusses only matters that Plaintiff **[\*\*38]** brought to the fore of the public discourse.

Even expanding Plaintiff's allegations to include LAS's retweet of the BALA Statement does not alter the Court's conclusion. As an initial matter, the publication of two harmful statements, both concerning the same subject matter, in rapid succession — indeed, within 24 hours of each other—cannot qualify as pervasive for purposes of the Title VII analysis. *See, e.g., Sandler v. Montefiore Health Sys., Inc., No. 16 Civ. 2258 (JPO), 2018 U.S. Dist. LEXIS 166438, 2018 WL 4636835, at \*9 (S.D.N.Y. Sept. 27, 2018)* ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Alfano, 294 F.3d at 374*)). While LAS's retweet of the BALA Statement can plausibly be perceived as an endorsement of BALA's repeated assertion that Plaintiff "is racist, and openly so" (BALA Statement 2), such criticism, even if unwarranted, does not suffice to create a hostile work environment in these circumstances. *See Ramirez, 2021 U.S. Dist. LEXIS 183760, 2021 WL 4392303, at \*8* ("[E]xcessive criticism and rudeness do not constitute a hostile work environment."). Just like the LAS Statement, the BALA Statement and LAS's retweet of the same existed in conversation with Plaintiff's Op-Ed on a politicized topic. Further, it is difficult to see how LAS's retweet could have interfered with the performance **[\*\*39]** of Plaintiff's responsibilities as a public defender when Plaintiff was on sabbatical at the time and remains so to this day. (Am. Compl. ¶ 8).

The Court's conclusion that Plaintiff has not alleged a hostile work environment under Title VII is not intended to trivialize the harsh criticism that Plaintiff encountered during the 24-hour period in July 2020 when BALA and LAS released the statements at issue. But harsh criticism, even that Plaintiff alleges was unwarranted, does not itself make out a claim for hostile work environment. Here, the totality of the circumstances — namely, the fact that the statements were in response to a highly politicized Op-Ed authored by Plaintiff, that Plaintiff was on sabbatical campaigning for City Council at the time the statements were issued, and that LAS sought to stake out a broader position on a matter of public policy, beyond merely **[\*567]** criticizing Plaintiff — counsel against finding that LAS's retweet of the BALA Statement and publication of its own statement rise to the level of severity or pervasiveness to state a hostile work environment under Title VII.

Accordingly, the Court dismisses Plaintiff's hostile work environment claim against LAS.[11]

## 2. **[\*\*40]**  Association of Legal Aid Attorneys

Plaintiff brings a separate Title VII hostile work environment claim against ALAA, resting on substantially the same allegations that were addressed above. (Pl. Opp. 24-26). As the Court has already discussed, Plaintiff has not alleged that she endured a hostile work environment, thus necessitating dismissal of her hostile work environment claim against ALAA.

### a. Applicable Law

Under Title VII, a union may not "discriminate against any individual because of his race, color, religion, sex, or national origin" or "cause or attempt to cause an employer to discriminate against an individual in violation of this section." *42 U.S.C. § 2000e-2(c)(1)*, *(3)*. To state a claim of hostile work environment under Title VII against a union organization, a plaintiff must allege "[i] the existence of a hostile work environment, [ii] that a union representative caused or attempted to cause the hostile work environment, and [iii] that the representative's conduct may properly be imputed to the union." *Grandy v. Manhattan and Bronx Surface Transit Operating Auth., No. 16 Civ. 6278 (VEC), 2018 U.S. Dist. LEXIS 165520, 2018 WL 4625768, at \*21 (S.D.N.Y. Sept. 26, 2018)* (citing *Agosto v. Corr. Officers Benev. Ass'n, 107 F. Supp. 2d 294, 307 (S.D.N.Y. 2000)*).

In order for "a union representative's role in causing or attempting to cause a hostile work environment to be properly imputed to a union, a plaintiff must show not

---

[11] LAS additionally argues in a footnote in its opening brief that "Plaintiff's claims plainly implicate New York's recently amended Civil Rights Law addressing strategic lawsuits against public participation ('SLAPPs')." (LAS Br. 21 n.6 (citing *N.Y. Civ. Rights Law §§ 70-a*, *76-a*)). Whether this claim falls within the reach of New York's anti-SLAPP law is of no moment, because the standard outlined by "New York's anti-SLAPP law is inapplicable in federal court." *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc., 551 F. Supp. 3d 408, 432 (S.D.N.Y. 2021)* (reasoning that because the pleading standard articulated in New York's anti-SLAPP law conflicts with those outlined in *Rules 12* and *56 of the Federal Rules of Civil Procedure*, the federal rules control in federal court).

only that the union had **[\*\*41]** actual or imputed knowledge of the improper conduct, but also that the union representative's conduct related to union activity and that therefore, in acting in such a manner, the representative breached the duty of fair representation." *Agosto, 107 F. Supp. 2d at 308*. Put differently, "a union's liability under Title VII rests on the union's duty of fair representation," which requires a union "in relation to all union activity to treat all members 'without hostility or discrimination ... [in] complete good faith and honesty, and to avoid arbitrary conduct.'" *Id.* (quoting *Vaca v. Sipes, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967)*); *see also Grandy, 2018 U.S. Dist. LEXIS 165520, 2018 WL 4625768, at \*24* ("While the Second Circuit case law on the issue is thin, the preponderance of authority suggests that [a union] cannot be liable for hostile work environment under Title VII ... for conduct that does not fall within its duty of fair representation."); *Oparaji v. United Fed'n of Tchrs., 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006)* (observing that "[t]o establish a Title VII claim concerning representation **[\*568]** by a union of its member's interests, the plaintiff must first demonstrate that the union breached its duty of fair representation to the member").

"[B]reach [of the duty of fair representation] occurs only when a union's conduct toward a member ... is arbitrary, discriminatory, or in bad faith," *United Steelworkers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 372, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990)* (internal **[\*\*42]** quotation marks omitted), or "when [the union] causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds," *Ramey v. Dist. 141, Int'l. Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 277 (2d Cir. 2004)*. A union's conduct is "arbitrary" if it is "so far outside a wide range of reasonableness that it is wholly irrational." *Dillard v. SEUI Local 32BJ,, No. 15 Civ. 4132 (CM), 2015 U.S. Dist. LEXIS 152502, 2015 WL 6913944, at \*5 (S.D.N.Y. Nov. 6, 2015)* (quoting *Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45, 119 S. Ct. 292, 142 L. Ed. 2d 242 (1998)*). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Id.* (quoting *Vaughn v. Airline Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010)*). Finally, "[a] showing of bad faith requires a showing of fraudulent, deceitful, or dishonest action" by a union. *Id.* (quoting *White v. White Rose Food, 237 F.3d 174, 179 (2d Cir. 2001)*).

**b. Analysis**

In support of her hostile work environment claim against ALAA, Plaintiff alleges that union representatives engaged in race-based harassment by: (i) initiating a baseless investigation into Plaintiff at the close of 2019 (Pl. Opp. 25); and (ii) publishing the BALA Statement on July 26, 2020 (*id.* at 24).[12] Even assuming that Plaintiff has alleged a breach of the Union's duty of fair representation, her hostile work environment claim cannot survive because she has not adequately alleged the existence of a hostile work environment.

The Court finds certain of Plaintiff's **[\*\*43]** allegations concerning ALAA's breach of the duty of fair representation to be plausible. Plaintiff's most persuasive argument in this regard relates to the publication of the BALA Statement, specifically that ALAA's publication of "a statement maliciously accusing [its] own member of being unable to do her job because of her race" was discriminatory conduct that breached the duty of fair representation. (*See* Pl. Opp. 27). ALAA emphasizes as part of its mission statement that the "Union does not merely represent members in contract negotiations, grievances, and arbitrations ... [because its] mission requires it 'to advocate through political outreach for the advancement of the interests of our membership, our clients and of poor and working people in general.'" (ALAA Reply 4 (quoting *About ALAA*, ASS'N OF LEGAL AID ATT'YS, https://www.alaa.org/about-alaa **[\*569]** (last visited June 2, 2022)). Stated thusly, BALA's statement expressing the caucus's position on racial justice issues falls within the universe of activity contemplated by the Union. Considering the indicia of race-based discrimination that the Court has located in this statement, Plaintiff has plausibly alleged that ALAA breached **[\*\*44]** its duty of fair representation by publishing a statement that harmed Plaintiff, in part,

---

[12] Plaintiff further alleges that ALAA caused LAS to discriminate against Plaintiff by allowing LAS to retweet its statement. (Pl. Opp. 24 & n.17; *see also* Am. Compl. ¶¶ 67-70). This argument is unavailing. According to Plaintiff, ALAA should be held responsible for LAS's retweet because ALAA failed to block LAS's Twitter account or adjust its account settings to prevent LAS from retweeting the statement. (Pl. Opp. 24 n.17). The Court does not believe that ALAA can be held responsible for either of these omissions. ALAA's failure to adopt Plaintiff's preferred course of action does not transform the Union's mere posting of a statement on its public Twitter account into an affirmative inducement of LAS to retweet or endorse the statement. Without any word or deed to support the allegation that ALAA encouraged LAS to retweet the BALA Statement, there is no basis to hold the Union responsible for LAS's conduct.

605 F. Supp. 3d 547, *569; 2022 U.S. Dist. LEXIS 99225, **44

because she is white.

As already discussed above, Plaintiff has failed to plead the existence of circumstances sufficiently severe or pervasive to constitute a hostile work environment. With respect to conduct that may be attributable to the Union, Plaintiff alleges the initiation of a baseless investigation at the end of 2019 and the publication of the BALA Statement in June 2020. As in the context of her employer, these allegations fail to rise to the level of severity or pervasiveness to make out a hostile work environment under Title VII. *First*, even accepting Plaintiff's contention that BALA prompted a baseless investigation into Plaintiff, the course of the investigation does not evince hostility or harassment sufficiently severe to meaningfully contribute to a hostile work environment. Besides the alleged improper motive underpinning the investigation, there is no allegation that ALAA biased, unfairly influenced, or in any way skewed the outcome of the investigation. To the contrary, Plaintiff indicates that she was accompanied by a union representative at the January 13, 2020 meeting where **[**45]** Luongo informed Plaintiff that she had been cleared of any wrongdoing and the investigation was deemed unfounded. (Am. Compl. ¶¶ 16-17). Plaintiff proffers no allegation that her Union representative discriminated against her or provided her deficient representation in connection with this investigation.

*Second*, for substantially the same reasons why the LAS Statement did not expose Plaintiff to a hostile work environment, neither did the publication of the BALA Statement. Plaintiff initiated the public debate that impelled BALA to release its statement. The statement does not merely denigrate Plaintiff because of her race, but also represents BALA's challenge to the views expressed in the Op-Ed. In addition, Plaintiff was on leave from LAS and actively running a campaign for City Council at the time of the statement's release, which necessarily undermines her contention that this statement impacted her work as a public defender. *Cf. Kleinman v. Fashion Inst. of Tech., No. 16 Civ. 4348 (KPF), 2017 U.S. Dist. LEXIS 109744, 2017 WL 3016940, at *11 (S.D.N.Y. July 14, 2017)* (dismissing claim for hostile work environment resting on allegations that occurred after Plaintiff went on medical leave). Plaintiff's attempt to analogize this case to an instance of harassment against an individual who is working remotely is inapt (Pl. **[**46]** Opp. 26), because Plaintiff was not merely physically removed from the office. Instead, she was not working at all for LAS, given that she was on sabbatical and campaigning for a seat on

City Council at the time the statement was released.

*Third*, even when viewed collectively, Plaintiff's allegations do not amount to a hostile work environment. Plaintiff has alleged two incidents attributable to ALAA over the course of approximately six months, which fail to rise to the level of "continuous and concerted" activity necessary to establish a "pervasive" hostile work environment. *Littlejohn, 795 F.3d at 321*; *see also, e.g., Garcia v. New York City Health & Hosps. Corp., No. 19 Civ. 997 (PAE), 2019 U.S. Dist. LEXIS 219048, 2019 WL 6878729, at *7 (S.D.N.Y. Dec. 17, 2019)* (dismissing hostile work environment claim where plaintiff alleged that his "supervisor yelled at him on four occasions over three months"); *Chukwueze v. NYCERS, 891 F. Supp. 2d 443, 455 (S.D.N.Y. [*570] 2012)* (granting motion to dismiss hostile work environment claim where plaintiff alleged three incidents over a year in which he had been chastised and berated in front of coworkers). And for the reasons already discussed at length, these allegations are insufficiently severe to give rise to a hostile work environment.

Accordingly, the Court dismisses Plaintiff's hostile work environment claim against ALAA.

### D. Plaintiff Fails to Allege Constructive Discharge

In **[**47]** her final claim, Plaintiff asserts that LAS constructively terminated her while she was on sabbatical. (Pl. Opp. 16-18). Plaintiff alleges that "[w]here an employer proclaims to the world that you are not capable of performing your job because you are a white woman who holds beliefs the employer opposes white employees from having, it is so intolerable that a reasonable person would feel compelled to resign." (Am. Compl. ¶ 87). LAS advocates for dismissal of this claim on several interrelated grounds, including that Plaintiff has failed to allege (i) the existence of a hostile work environment, (ii) that LAS acted with the requisite intent, and (iii) that she has (or even will) leave LAS. (LAS Br. 22-24; LAS Reply 9-10). Because Plaintiff attempts to dilute the applicable legal standard for constructive termination and because she has failed to allege that she, in fact, resigned from her position at LAS, her claim cannot withstand LAS's motion to dismiss.[13]

---

[13] ALAA also argues that Plaintiff has failed to state a claim of constructive termination. (ALAA Br. 13-15). However, Plaintiff has not asserted such a claim against the Union.

605 F. Supp. 3d 547, *570; 2022 U.S. Dist. LEXIS 99225, **47

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position **[**48]** would have felt compelled to resign.'" *Green v. Brennan, 578 U.S. 547, 555, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016)* (quoting *Pa. State Police v. Suders, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)*); *see also Shultz v. Congregation Shearith Israel of N.Y., 867 F.3d 298, 308 (2d Cir. 2017)* (explaining that a constructive discharge claim under Title VII requires a plaintiff to allege facts indicating (i) "the employer's intent to create an intolerable environment that forces the employee to resign" and (ii) "work conditions so intolerable that [a reasonable person] would have felt compelled to resign"). A claim of constructive discharge has two basic elements: (i) "[a] plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and (ii) a plaintiff "must also show that he actually resigned." *Green, 578 U.S. at 555; see also Brescia v. LTF Club Mgmt. Co., LLC, No. 18 Civ. 8715 (NSR), 2020 U.S. Dist. LEXIS 7163, 2020 WL 137311, at *6 (S.D.N.Y. Jan. 9, 2020)* ("Resignation is the *sine qua non* of a constructive discharge claim.").

Fatal to Plaintiff's constructive discharge claim is her failure to allege that she has actually resigned from LAS. Instead, by Plaintiff's own allegations, she remains on sabbatical with an open offer to return to LAS. (Am. Compl. ¶ 8 ("Plaintiff has been on sabbatical. Although she has been on sabbatical, at all relevant times herein she remained an employee of LAS and a member of ALAA."); *id.* at ¶ 33 ("[Plaintiff] is currently promised **[**49]** a return from sabbatical pursuant to § 3.4.4.1.2 of the [Collective Bargaining Agreement.])). This fact alone compels the dismissal of her constructive discharge claim.

Even if Plaintiff had alleged her resignation from LAS, her allegations would still fail to state a claim for constructive discharge. **[*571]** Constructive discharge is generally "regarded as an aggravated case of hostile work environment." *Lee v. Colvin, No. 15 Civ. 1472 (KPF), 2017 U.S. Dist. LEXIS 16269, 2017 WL 486944, at *15 (S.D.N.Y. Feb. 6, 2017)* (citation omitted); *see also Suders, 542 U.S. at 147-48* (describing a constructive discharge claim as a "'worse case' harassment scenario, harassment ratcheted up to the breaking point"). "Here, because plaintiff has not stated a hostile work environment claim ... *a fortiori* [she] has not stated a claim for constructive discharge." *Lee, 2017*

*U.S. Dist. LEXIS 16269, 2017 WL 486944, at *15* (quoting *Kelly v. N.Y. State Office of Mental Health, 200 F. Supp. 3d 378, 2016 WL 4203470, at *16 (E.D.N.Y. 2016)*).

Plaintiff's argument that a reasonable person might not want to return to a workplace following the release of a statement such as that released by LAS is well taken by the Court. (Am. Comp. ¶ 87). But, letting a constructive discharge claim survive on these allegations runs the risk of diminishing the applicable standard, which is saved for cases in which "the abusive working environment became so intolerable that [plaintiff's] resignation qualified as a fitting response." **[**50]** *Suders, 542 U.S. at 134*. As described above, the circumstances of this case convince the Court that Plaintiff was not exposed to a hostile environment, especially given the fact that she was on sabbatical doing work unconnected to her role as a public defender at the time the statements at issue were released. Therefore, the Court dismisses Plaintiff's claim for constructive discharge.

## CONCLUSION

For the foregoing reasons, LAS's and ALAA's motions to dismiss are GRANTED in full. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: June 2, 2022

New York, New York

/s/ Katherine Polk Failla

KATHERINE POLK FAILLA

United States District Judge

---

ⓘ Cited
As of: June 23, 2025 9:59 PM Z

## *McCormick v International Ctr. for the Disabled*

Supreme Court of New York, New York County

May 10, 2013, Decided; May 15, 2013, Filed

Index No.:114541/2011

### Reporter

2013 N.Y. Misc. LEXIS 2072 *; 2013 NY Slip Op 31063(U) **

 [**2] DEIDRE MCCORMICK, Plaintiff, - against-INTERNATIONAL CENTER FOR THE DISABLED, MARVIN DELUTY, and CATHERINE MINDOLOVICH, Defendants.

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS

## Core Terms

alleges, age discrimination, internship, cause of action, remarks, patients, unpaid, failure to state a cause of action, give rise, intern

**Counsel:** [*1] For Plaintiff: Law Offices of Steven A. Morelli, Garden City, NY.

For Defendants International Center for the Disabled and Marvin Deluty: Jackson Lewis LLP, New York, NY.

For Defendant Catherine Mindolovich: Wilson, Elser Moskowitz, Edelman & Dicker LLP, White Plains, NY.

**Judges:** PRESENT: HON. SALIANN SCARPULLA, Justice.

**Opinion by:** SALIANN SCARPULLA

## Opinion

### DECISION AND ORDER

HON. SALIANN SCARPULLA, J.:

 [**3] In this action alleging age discrimination, defendants International Center for the Disabled ("ICD") and Marvin Deluty ("Deluty") (collectively the "ICD defendants") move pursuant to *CPLR 3211(a)(7)* to

dismiss plaintiff Deidre McCormick's ("McCormick") complaint for failure to state a cause of action (motion seq. 001). Separately, defendant Catherine Mindolovich ("Mindolovich") also moves to dismiss the complaint pursuant to *CPLR 3211(a)(7)* for failure to state a cause of action (motion sequence 002). Motions sequence numbers 001 and 002 are hereby consolidated for disposition.

As alleged in the complaint, McCormick is a 61 year old student, studying for her Ph.D. in clinical psychology at Walden University, a "distance-learning institution headquartered in Minnesota." Her degree requirements included completion of [*2] a 750 hour externship and a 2000 hour internship. After completing her externship, McCormick commenced an internship in September 2010 at ICD. [1] The internship was to last "for at least one year of full-time work."

McCormick was assigned to work in the behavioral medicine department, which treated patients with brain injuries. McCormick alleges she expressed an interested in psychological assessment testing, but her duties consisted mainly of patient intakes, therapy sessions and record-keeping.

 [**4] Deluty was McCormick's therapy supervisor, and Mindolovich her overall supervisor. McCormick alleges in the complaint that from the start of her internship, Deluty and Mindolovich were clearly biased against her "and did not want to help her succeed in her internship."

McCormick alleges that Mindolovich's bias against McCormick's age was apparent by a few comments [*3] she made, including asking if McCormick "wouldn't

---

[1] In paragraph 12 of the complaint McCormick states that internship was to begin in September 2011, yet in paragraph 14 she states that the internship began on September 9, 2010. The remainder of the allegations in the complaint suggest that the internship began in 2010, so that is that date which will be used for purposes of this motion.

2013 N.Y. Misc. LEXIS 2072, *3; 2013 NY Slip Op 31063(U), **4

rather be spending time with her granddaughter" instead of working at ICD, and suggesting that McCormick work part time instead of full time. McCormick also alleges that after remarking to Mindolovich that "it was so different being a student in a new field," Mindolovich responded "that is why most of the therapists do not want to work with older students."

As alleged in the complaint, McCormick began having problems with her supervisors when she began seeing patients in the second week of her internship. McCormick alleges that Mindolovich instructed her how to write progress reports. When McCormick brought the completed progress reports to Deluty, he said they were wrong and had to be done again. Mindolovich then advised McCormick not bring the reports to Deluty.

McCormick alleges that her supervisors were supposed to mentor her and improve her therapy with clients. But, she maintains, their time supervising her was instead spent telling her to "correct trivial writing mistakes in her reports." McCormick claims that she did not receive educational value from these exercises. McCormick also recites instances [**5] in which her supervisors "yelled [*4] at her" for errors, including misreading a date in a report, and playing checkers with a brain injured patient.

In November, McCormick received a required evaluation from Mindolovich, which was "overall satisfactory," but which noted that McCormick was overly defensive. McCormick alleges in the complaint that she was merely responding naturally to unfair criticisms.

McCormick claims that in November and December, her supervisors "unfairly blamed" McCormick for failing to submit her intakes and progress reports on time. McCormick maintains that the reports were late "due to the constant corrections they forced her to make, and to problems with the computers at ICD . . . ." McCormick further alleges that once the reports were submitted, her supervisors often ignored them for weeks or months.

In addition, McCormick alleges that in December and January, Mindolovich complained that McCormick was not seeing enough patients. McCormick maintains she was seeing fifteen (15) patients, but that she wanted to focus on assessments not therapy. McCormick also notes that had she seen additional patients, she would have fallen even further behind on her reports and record keeping.

In mid-January 2011, [*5] the ICD supervisors contacted Walden University's field training director to complain about problems with McCormick's work.

McCormick alleges that when the training director inquired what McCormick could do to improve, the supervisors replied "nothing."

[**6] McCormick alleges that on February 1, 2011 she completed all of her accumulated paperwork. On February 3, security guards confronted her at her desk, told her that she was dismissed and asked her to remove her belongings from the office. At her exit interview with Mindolovich and another ICD staff member, McCormick was told she was being dismissed from the internship because she was not a good fit with ICD, and was promised that all that would be said in future evaluations and recommendation letters.

McCormick received the February evaluation from Mindolovich several weeks later. McCormick claims that, instead of stating that McCormick was not a good fit, the evaluation was "extremely negative and filled with falsehoods about her work," including McCormick had neglected to use a computer to grade her psychological tests as required. [2] The evaluation also stated that McCormick failed to read the assigned textbooks and articles, [*6] which McCormick claims is false. McCormick's dismissal and poor evaluation resulted in McCormick failing the internship course at Walden University, and receiving no credit for the hours she spent at ICD.

In her complaint McCormick alleges one cause of action for unlawful discrimination by defendants based on her age in violation of New York State *Executive Law §§ 296(1)(a)*; *296(1-a)(c)*; *296(3-a)(a)*; *296(4)*; *296(6)* and Title 8 of the New York City Administrative Code. McCormick seeks recovery for all "compensatory, emotional, [**7] physical and punitive damages (where applicable], [and] injunctive relief . . . ." The nature of the injunctive relief is not specified.

On this motion the ICD defendants and Mindolovich separately move to dismiss the complaint for failure to state a cause of action, pursuant to *CPLR 3211(a)(7)*. The ICD defendants argue that McCormick cannot establish a cause of action for age discrimination under either the New York State Human Rights Law ("NYSHRL") or the New York City Human Rights Law ("NYCHRL") because McCormick concedes she was an unpaid intern, and therefore not a [*7] paid employee and without standing under the NYSHRL or the NYCHRL to assert these claims.

---

[2] McCormick claims that she was "able to grade [her psychological tests] by hand without error."

2013 N.Y. Misc. LEXIS 2072, *7; 2013 NY Slip Op 31063(U), **7

In addition, the ICD defendants argue that McCormick's factual allegations are insufficient to establish a claim of age discrimination. The ICD defendants note that in the entire complaint, McCormick alleges only three comments made by Mindolovich as evidence of bias due to McCormick's age, and the complaint lacks any allegations that Deluty or any other ICD employee made reference to McCormick's age. Further, the ICD defendants note that the complaint contains many instances of McCormick being counseled for performance deficiencies and unfavorable evaluations of her work.

In support of her motion, Mindolovich puts forth similar arguments: that the complaint fails to state a cause of action because McCormick was an unpaid intern, and not an employee under the NYSHRL and NYCHRL, and because it fails to allege facts from which an inference of discrimination may be drawn. Mindolovich argues that three [**8] remarks attributed to her, even if said, are innocuous, stray remarks which are not sufficient to establish discriminatory animus.

In opposition, McCormick argues that the complaint alleges facts demonstrating [*8] that an employer/employee relationship existed between McCormick and ICD, and that the complaint states a viable claim of age discrimination under NYSHRL and NYCHRL.

## Discussion

CPLR 3211 (a) states that: "[a] party may move for judgment dismissing one or more causes of action asserted against him on the ground that: . . (7) the pleading fails to state a cause of action . . . ." On such a motion, the test is not whether the opposing party "has artfully drafted the [pleading], but whether, deeming the [pleading] to allege whatever can be reasonably implied from its statements, a cause of action can be sustained." Jones Lang Wooton USA v. LeBoeuf, Lamb, Greene & Macrae, 243 A.D.2d 168, 176, 674 N.Y.S.2d 280 (1st Dep't 1998).

On a motion to dismiss pursuant to CPLR 3211(a)(7), the Court must accept as true all allegations in the pleading, "accord [the pleader] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." Arnav Indus. v. Brown, Raysman, Millstein, Felder & Steiner, LLP, 96 N.Y.2d 300, 303, 751 N.E.2d 936, 727 N.Y.S.2d 688 (2001). "In addition,

employment discrimination cases are themselves generally reviewed under notice pleading standards." Vig v. The New York Hairspray Co., L.P., 67 A.D.3d 140, 145, 885 N.Y.S.2d 74 (1st Dep't 2009).

[**9]  [*9] As a threshold matter, to state a cause of action for age discrimination under either the NYSHRL [3] or the NYCHRL, [4] a plaintiff must plead (1) that he or she is a member of the class protected by the statute; (2) was actively or constructively discharged; (3) was qualified to hold the position from which he was terminated; and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination." Terranova v. Liberty Lines Transit, Inc., 292 A.D.2d 441, 442, 738 N.Y.S.2d 693 (2d Dep't 2002) (citing Ferrante v. American Lung Ass'n, 90 N.Y.2d 623, 629, 687 N.E.2d 1308, 665 N.Y.S.2d 25 (1997)).

For her complaint to withstand a motion to dismiss, McCormick must allege facts to show that she is a member of the class protected by the NYSHRL and/or the NYCHRL. While her age is not in dispute, all defendants challenge her standing on the [**10] basis of whether, as an unpaid interns, she was an ICD employee for purposes of the statutes.

The NYSHRL governs discrimination only "in the traditional employer-employee relationship." See Murphy v. ERA United Realty, 251 A.D.2d 469, 470, 674 N.Y.S.2d 415 (2d Dep't 1998) ("It has been established

---

[3] The NYSHRL, Executive Law §296(1)(a), provides:

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race ,creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of an individual or to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

[4] The NYCHRL, Administrative Code §8-107 provides:

1. Employment. It shall be an unlawful discriminatory [*10] practice:

(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 241 of 321
Page 4 of 5

2013 N.Y. Misc. LEXIS 2072, *10; 2013 NY Slip Op 31063(U), **10

that *Executive Law § 296 (1) (a)* only governs discrimination in the traditional employer-employee relationship and not in the employment of independent contractors. As a general rule, the determination of whether an employer-employee [**11**] relationship exists rests upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results.") ((internal citations omitted). Additionally, the Second Department has held, on review of an order of the New York State Division of Human Rights, that "[t]he protection of *Executive Law §296* does not extend to petitioner's unpaid, voluntary relationship with respondent's school which lacked 'the mutually beneficial economic substance which is the touchstone of an employer/employee relationship.'" *In re Sweeney, 112 A.D.2d 240, 241, 491 N.Y.S.2d 455 (2d Dep't 1985)* (quoting *State Div. Of Human Rights v. Board of Coop. Educ. Servs., 98 A.D.2d 958, 470 N.Y.S.2d 209 (4th Dep't 1983)).*

Here, there is no dispute that McCormick was an unpaid intern at ICD. As such, McCormick can not establish that she is a covered employee under the NYSHRL. [5]

_____

[5] In addition to the cases cited in her papers, at oral argument McCormick cited to three additional cases which she claims support the position that she is covered under both the NYSHRL and NYCHRL. I find that none of these cases assist McCormick in asserting her claim under the NYSHRL. First, McCormick cites *Alper v. Gaffney, 73 A.D.2d 644, 422 N.Y.S.2d 744 (2d Dep't 1979)*. [**12**] *Alper* was an Article 78 proceeding and, as the ICD defendants point out, the Second Department in *Alper* reviewed provisions of the Civil Service Law. Any reference in *Alper* to the NYSHRL was made to the version of the NYSHRL in effect in 1979. At that time, the NYSHRL did not include the current provision which states specifically that volunteer firefighters are afforded NYSHRL protection, and is therefore not instructive in this instance. *See Executive Law § 296(9)*. The court acknowledged as much in *Sweeney v. Board of Education, 112 A.D.2d 240, 241, 491 N.Y.S.2d 455 (2d Dep't 1985)* ("While *Executive Law § 296 (9)* does expressly cover volunteer firemen, the Legislature's failure to include other voluntary, unpaid positions evidences its intent not to extend the protection of the statute to all voluntary positions (cf. *Matter of Alper v. Gaffney, 73 A.D.2d 644, 422 N.Y.S.2d 744;* McKinney's Uncons Laws of NY § 9122 [4] [b] [New York State Defense Emergency Act § 22; L 1951, ch 784, § 22 as amended])).

McCormick next cites *New York State Office of Mental Health v. New York State Division of Human Rights, 75 A.D.3d 1023, 906 N.Y.S.2d 181 (3d Dep't 2010)*. There is no discussion in *New York State Office of Mental Health* about whether an unpaid [**13**] intern is an employee for purposes of the

[**11**] In light of the 2005 Local Civil Rights Restoration Act, the NYCHRL affords a more liberal construction on the issue of whom is covered than the NYSHRL. "Under the 2005 Local Civil Rights Restoration Act, 'it is beyond dispute that the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, an analysis that must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond [**12**] those of counterpart state or federal civil rights issues.'" *Dominguez v. Department of Educ. of the City of N.Y., 37 Misc. 3d 1205[A], 2012 NY Slip Op 51899[U] (N.Y. Misc. 2012)* (quoting *Bennett v. Health Management Systems, Inc., 92 A.D.3d 29, 34, 936 N.Y.S.2d 112 (1st Dep't 2011)* (internal quotations omitted). I found no binding precedent as to whether, under the more liberal analysis under the NYCHRL, an unpaid intern may bring a cause of action for age discrimination. However, I need not address this novel issue, because I find that the allegations in the complaint fail to allege facts to show that the discharge occurred under circumstances [**15**] giving rise to an inference of age discrimination under either the NYSHRL or the NYCHRL.

In the context of reviewing a discrimination claim, "[t]he complaint must be sustained as stating a cause of action unless the conduct complained of consisted of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Lamper v. Pryor Cashman, 242*

_____

NYSHRL, thus the case is not instructive. Finally, McCormick cites *Lynch v. Town of Southampton, 2008 U.S. App. LEXIS 24426 (2d Cir. N.Y. Dec. 2, 2008)*. This decision by the U.S. Court of Appeals for the Second Circuit addresses a post-judgment motion, after a trial over plaintiff's claim that her volunteer position was terminated in retaliation for statements she made regarding the animal shelter where she volunteered in violation of her First Amendment rights. There is no discussion of any claims under either the NYSHRL or the NYCHRL. Moreover, the decision notes that at trial, the Town initially argued that Lynch's loss of an uncompensated volunteer position could not give rise to a First Amendment claim, but later abandoned that position, and argued on appeal "that whether or not the action taken against Lynch triggers First Amendment scrutiny is a question of fact that should have been submitted to the jury." Acknowledging that the issue of whether a termination from a volunteer position is equal to termination from a paid position has not been addressed by the Second Circuit, the Court chose not to exercise its discretion to find an error [**14**] in the District Court's failure to instruct the jury on this. *Lynch, 2008 U.S. App. LEXIS 24426.*

2013 N.Y. Misc. LEXIS 2072, *14; 2013 NY Slip Op 31063(U), **12

*N.Y.L.J. 83 (Sup. Ct. Kings Co. 2009)*; *see also Williams v. New York City Housing Authority, 61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dept. 2009)*

Here, McCormick alleges that due to her age, she was treated unfairly in her internship. However, the only allegations regarding age based discriminatory motive in the complaint consist of three (3) random comments attributed to Mindolovich. McCormick alleges that Mindolovich, her supervisor, stated that the therapists at ICD preferred not to work with older students, and suggested that she might rather spend time **[**13]** with her grandchildren or work part time. McCormick argues that these three stray remarks should give rise to an inference of age discrimination in her eventual discharge.

These three remarks, without more, are insufficient to give rise to such an inference. Only **[*16]** one of the alleged remarks actually mentions age, and none can be considered anything more than petty and trivial references. Moreover, "[s]tray remarks such as these, even if made by a decision maker, do not, without more, constitute evidence of discrimination." *Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 125, 946 N.Y.S.2d 27 (1st Dep't 2012)* (citations omitted). I note that the complaint is devoid of any statements or references to age made by Deluty, or any other ICD employees.

McCormick states in her complaint that the friction between herself and her supervisors began her second week of the internship, and continued until her dismissal. She complains of her treatment by Deluty and Mindolovich, but she makes no allegations connecting the stray remarks about her age to any of the work place actions taken against her. Moreover, the complaint is replete with allegations that McCormick was chastised for errors directly related to the quality of her work. She alleges she was not treated well, including being yelled at for making mistakes. McCormick may have been unhappy with her ICD supervisors' management style, but the complaint fails to connect this to her age. And despite the broader application **[*17]** of the NYCHRL, it is well recognized that the law does not "operate as a general civility code." *Williams, 61 A.D.3d at 79*.

McCormick also acknowledges, while putting forth self-serving excuses, that she was late in preparing her written reports, that she failed to use a computer to grade **[**14]** assessment tests, and that she made other mistakes in her written work, which while she categorized as "trivial," her supervisors were required to

spend time correcting. McCormick details an unpleasant working experience, where certain personality conflicts between herself and her supervisors were present from the start. "[M]ere personality conflicts must not be mistaken for unlawful discrimination, lest the anti[-]discrimination laws become a general civility code." *Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 126, 946 N.Y.S.2d 27 (1st Dep't 2012)* (internal quotation omitted).

As I find that McCormick's allegations fail to give rise to an inference of age discrimination under either the NYSHRL and NYCHRL, the complaint must be dismissed against all defendants.

In accordance with the foregoing, it is

ORDERED that the motion by defendants International Center for the Disabled and Marvin Deluty pursuant to *CPLR 3211(a)(7)* **[*18]** to dismiss plaintiff Deidre McCormick's complaint for failure to state a cause of action (motion seq. 001) is granted; and it is further

**[**15]** ORDERED that the motion by defendant Catherine Mindolovich to dismiss plaintiff Deidre McCormick's complaint for failure to state a cause of action (motion seq. 001) is granted; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment accordingly.

This constitutes the decision and order of the Court.

Dated: New York, New York

May 10, 2013

ENTER:

/s/ Saliann Scarpulla

Saliann Scarpulla, J.S.C.

---

**End of Document**

Positive
As of: June 23, 2025 10:00 PM Z

## *Pitter-Green v. NYU Langone Med. Ctr.*

Supreme Court of New York, New York County

December 16, 2022, Decided

Index No. 155386/2021

**Reporter**

2022 N.Y. Misc. LEXIS 7975 *; 2022 NY Slip Op 34276(U) **

 **[**1]** MEMORIS PITTER-GREEN Plaintiff, - V - NYU LANGONE MEDICAL CENTER, Defendant.

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Subsequent History:** Affirmed by *Pitter-Green v. NYU Langone Med. Ctr., 2024 N.Y. App. Div. LEXIS 259 (N.Y. App. Div. 1st Dep't, Jan. 23, 2024)*

**Prior History:** *Green v. NYU Langone Med. Ctr., 2021 U.S. Dist. LEXIS 90761, 2021 WL 1910549 (S.D.N.Y., May 12, 2021)*

## Core Terms

terminated, discriminatory, hostile work environment claim, employees, federal action, federal court, limitations, provisions, reinstated, reasons, animus, gender, toll, allegations, hostile

**Judges:** **[**1]** PRESENT: HON. DAVID B. COHEN, Justice.

**Opinion by:** DAVID B. COHEN

## Opinion

### DECISION + ORDER ON MOTION

The following e-filed documents, listed by NYSCEF document number (Motion 001) 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,22, 23, 24, 25, 26, 27, 28, 29, 30, 31,32, 33, 34, 35, 36, 37, 38, 39, 40, 41,42, 43, 44, 45, 46, 47, 48, 49, 50, 51,52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92 were read on this motion to/for DISMISS.

In this action, plaintiff sues defendant, her former employer, for its alleged discriminatory treatment of her. Before commencing the instant action, plaintiff sued defendant in federal court, asserting claims under both federal and state anti-discrimination law. In May 2021, plaintiff's federal claims were dismissed, and the federal court declined to exercise jurisdiction over plaintiff's state law claims (NYSCEF 14).

Now, by notice of motion, defendant moves pursuant to *CPLR 3212* for an order summarily dismissing the complaint. Plaintiff opposes.

### I. PERTINENT BACKGROUND

The following facts are derived from the federal court's dismissal decision (NYSCEF 14) and the parties' statements **[*2]** of material facts (NYSCEF 12, 68):

Plaintiff began working for defendant in 1987 as a phlebotomist. On August 6, 2010, she was fired. Shen then filed a grievance with her union, which resulted in her reinstatement and **[**2]** return to work on October 5, 2010. She claims that she was subjected to discrimination, retaliation, and a hostile work environment both before and after her reinstatement.

On April 17, 2012, plaintiff filed a discrimination claim with the Equal Employment Opportunity Commission (EEOC), and received a right to sue determination on February 2, 2015. She commenced the federal action on April 29, 2015.

On May 12, 2021, the federal court dismissed the action, finding that:

> Defendant argues, and Plaintiff does not dispute, that Plaintiffs federal claims are barred by the applicable statutes of limitations . . . Here, Plaintiffs employment was terminated on August 6, 2010,

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 244 of 321

Page 2 of 5

2022 N.Y. Misc. LEXIS 7975, *2; 2022 NY Slip Op 34276(U), **2

and the last act upon which Plaintiff bases her hostile work environment claim occurred on November 8, 2010. Accordingly, Plaintiff had until June 2, 2011, and September 4, 2011, to file a charge with the EEOC regarding her discrimination and retaliation claims and her hostile work environment claim, respectively. **[*3]** However, Plaintiff filed her charge with the EEOC on April 17, 2012, well beyond 300 days after both her termination and her return to [work]. Therefore, Plaintiffs claims under Title VII are barred by the statute of limitations and Defendant is entitled to dismissal of those claims as a matter of law.

(NYSCEF 14 [citations omitted]).

Following the federal court dismissal, plaintiff commenced the instant action in June 2021, asserting discrimination and hostile work environment claims, and filed a note of issue in November 2021.

As pertinent here, plaintiff alleges in her complaint that in 2009, two new non-black male supervisors were appointed to oversee her work assignment, and from then on, they harassed and verbally abused black employees, treated them differently than similarly-situated Hispanic and Filipino employees, treated males better than females, and treated younger employees better than older ones (NYSCEF 1).

**[**3]** II. ANALYSIS

A. Statute of limitations

*CPLR 205(a)* permits the commencement of an otherwise time-barred action in state court if the federal action was itself timely commenced and if the state action would have been timely if filed when the federal action was commenced. (*Jordan v Bates Advertising Holdings, Inc., 292 AD2d 205, 738 N.Y.S.2d 348 [1st Dept 2022]*).

There is **[*4]** federal authority to support the proposition that the timely filing of an EEOC complaint tolls the statute of limitations for NYSHRL and NYCHRL claims (*see Nixon v TWC Admin. LLC, 2017 U.S. Dist. LEXIS 160175, 2017 WL 4712420 [SD NY 2017]*), as does the untimely filing of an EEOC complaint (*Burns v County of Schenectady, 2008 U.S. Dist. LEXIS 109648, 2009 WL 2568546 [ND NY 2009]*). Recently, the Appellate Division, First Department, held that the filing of an

EEOC complaint tolls the statute of limitations for both State and City HRL claims (*Gabin v Greenwich House, Inc., 2022 N.Y. App. Div. LEXIS 6316, 2022 WL 16935706 [2022]*).

Here, the applicable toll period would be the 1031 days between April 7, 2012 (when plaintiff filed her EEOC complaint) to February 2, 2015 (when she received her EEOC letter), minus the 86 days between February 2, 2015 (the EEOC letter) and April 29, 2015 (when she filed her federal complaint), resulting in a net toll period of 945 days, or approximately two years and six months.

The dates for determining whether plaintiffs claims are timely, per the federal court decision, are: (1) April 6, 2010, the date of plaintiffs termination, which involves plaintiffs discrimination and retaliation claims; and (2) November 8, 2010, the last act at issue in plaintiffs hostile work environment claim.

**[**4]** Plaintiff had until April 8, 2013 to commence the federal action and timely interpose State and City HRL discrimination claims, **[*5]** which would have expired on April 8, 2013, and thus adding the two year-six month toll period to that deadline, her claims were timely interposed when she filed her federal action in April 29, 2015. Similarly, for the hostile work environment claim, plaintiff had until November 8, 2013, and thus her claims were timely filed in the federal action. Moreover, plaintiff timely filed her state action within six months of dismissal of the federal action (*See Jordan, 292 AD2d at 206* [plaintiff's state law claims were not time-barred as action commenced within six months of federal court dismissal, and state claims were timely interposed in federal action]; *see also Leavy v New York City Tr. Auth., 11 Misc 3d 1052[A], 814 N.Y.S.2d 891, 2006 NY Slip Op 50177[U] [Sup Ct, Kings County 2006]* [statute of limitations for HRL claims was tolled during pendency of EEOC investigation, notwithstanding that federal court determined that EEOC complaint was untimely filed]).

Defendant thus fails to establish that plaintiff's claims are time-barred.

B. Discriminatory discharge claim

1. State HRL

The *New York State Human Rights Law (NYSHRL) (Exec Law § 296 et seq)* prohibits unlawful

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 245 of 321

Page 3 of 5

2022 N.Y. Misc. LEXIS 7975, *5; 2022 NY Slip Op 34276(U), **4

discriminatory practices. In 2019, the NYSHRL was amended to provide that

> [t]he provisions of [*Executive Law 296*] shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including **[*6]** those laws with provisions worded comparably to the provisions of this article, have been so construed. Exceptions to and exemptions from the provisions of this article shall be construed narrowly in order to maximize deterrence of discriminatory conduct.

A plaintiff advancing a claim for discrimination under the NYSHRL must plead and prove that: (1) she is a member of a protected class; (2) she was qualified to hold her employment position; (3) she was terminated from employment or suffered another adverse **[**5]** employment action; and (4) the discharge or adverse action took place under circumstances giving rise to an inference of discrimination (*Forrest v Jewish Guild for the Blind, 3 NY3d 295, 819 N.E.2d 998, 786 N.Y.S.2d 382 [2004]*).

> The burden then shifts to the employer "to rebut the presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*id.* [citations omitted]). In order to nevertheless succeed on her claim, the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason (*see [*7] id.* at 629-630).

To prevail on their summary judgment motion, defendants must demonstrate either plaintiffs failure to establish every element of intentional discrimination, or, having offered legitimate, nondiscriminatory reasons for their challenged actions, the absence of a material issue of fact as to whether their explanations were pretextual. In that event, summary judgment would constitute "a highly useful device for expediting the just disposition of a legal dispute for all parties and conserving already overburdened judicial resources" (*Matter of Suffolk County Dept. of Social Sen's. [Michael V.] v James M., 83 NY2d 178, 182, 630 N.E.2d 636, 608 N.Y.S.2d 940 [1994]*), inasmuch as no valid purpose is served by submitting to a jury a cause of action that cannot survive as a matter of law.

(*Id. at 305-306*).

It is undisputed that plaintiff, a black woman over 40 years of age, is a member of a protected class, is qualified to hold her position, and was terminated from her employment. The sole issue is whether the termination took place giving rise to an inference of discrimination.

Addressing defendant's contentions, while the fact that the same people hired, promoted, and then fired plaintiff may negate an inference of discrimination in certain circumstances, plaintiff was hired in 1987 and fired in 2010, which **[*8]** is too long a time span to negate the inference (*See Tirschwell v TCW Group, Inc., 194 AD3d 665, 150 N.Y.S.3d 38 [1st Dept 2021]* ["same actor" inference unavailing as one and half years passed between hiring and firing]; *Dickerson v Health Mgt. Corp. of Am., 21 A.D.3d 326, 800 N.Y.S.2d 391 [1st Dept 2005]* ["in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span **[**6]** following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer"]).

In terms of differential treatment, plaintiff may raise an inference of discrimination by showing that similarly-situated individuals were treated differently than her. Defendant argues that plaintiff has not identified anyone as similarly-situated to her, and thus fails to establish differential treatment. However, by its own admission, defendant reinstated plaintiff when it "became known that other individuals (possessing unspecified characteristics) had not been discharged for similar conduct" (NYSCEF 65, p. 20), and it thereby undermine its argument.

Nevertheless, defendant establishes legitimate, independent, and nondiscriminatory reasons for its discipline of plaintiff, by the undisputed facts (as set forth in plaintiff's response to defendant's statement **[*9]** of material facts) which demonstrate that defendant was critical of certain aspects of plaintiffs work beginning in 2008, that she was given verbal and written warnings between 2008 and 2010, that she was suspended for a few days in 2010, that her union grieved her suspension but it was denied, that she was put on a performance improvement plan, and that she was eventually terminated but then reinstated. Moreover, once reinstated, plaintiffs supervisors, including a black woman over the age of 40, recommended that her

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 246 of 321
Page 4 of 5

2022 N.Y. Misc. LEXIS 7975, *9; 2022 NY Slip Op 34276(U), **6

performance improvement plan continue; in 2012 other supervisors advised plaintiff that she was continuing to make the same mistakes as before; by 2013 the two non-black male supervisors had retired but plaintiff received a written memo about her work in 2014 along with a "needs improvement" rating in certain areas of her 2014 performance review; in 2015 plaintiff received a verbal and written warning regarding her performance; and in 2016 plaintiff received a verbal warning and a "needs improvement" rating on some portions of her 2016 performance review (NYSCEF 68).

While plaintiff observes that she worked for defendant for many years until her voluntary **[\*\*7]** retirement in **[\*10]** 2018 and that she received compliments and positive comments about her work, she offers no evidence showing that the criticisms of her work were either unwarranted or resulting from animus based on her race, gender, and/or age. And, even if plaintiff's termination was unwarranted, as recognized by the fact that she was reinstated shortly thereafter, she also does not show that it occurred due to her supervisors' animus based on race, gender, or age (*see Weir v Montefiore Med. Ctr., 208 A.D.3d 1122, 175 N.Y.S.3d 498 [1st Dept 2022]* ["' [p]laintiffs disagreement with defendants'] assessment of [his] performance is insufficient to raise' an issue of fact as to whether poor performance was a pretext for unlawful conduct"] [citations omitted]).

Plaintiff points to one race-related remark made by her non-black male supervisor as evidence of discriminatory intent, but does not relate it to the issues defendant had with her work or its decision to terminate her (*see Kwong v City of New York, 204 AD3d 442, 167 N.Y.S.3d 9 [1st Dept 2022]* [eve if remarks were derogatory or indicative of animus, plaintiff failed to identify evidence connecting such animus to decision to demote him]). Plaintiff's allegations that certain employees of other races, ages, and genders were treated better by her supervisors are too general to sustain a discrimination **[\*11]** claim (*Lent v City of New York, 209 AD3d 494, 175 N.Y.S.3d 525 [1st Dept 2022]* [allegations that younger employees did not receive unfavorable assignments too general to support inference of age discrimination]). Plaintiff also admits that no one at her workplace ever made a negative comment to her about her age or gender, nor did she witness anyone make such comments about other employees.

Defendant thus establishes that it is entitled to summary judgment on plaintiff's NYSHRL discriminatory discharge claim.

## 2. City HRL

The NYCHRL provides, in pertinent part, that:

> **[\*\*8]** [i]t shall be an unlawful discriminatory practice ... [f]or an employer ... because of the actual or perceived gender [or] disability ... of any person, ... to discharge from employment such person or to discriminate against such person or in compensation or in terms, conditions or privileges of employment. (Admin Code § 8-107[a][1]).

The NYCHRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." (*Admin Code § 8-130*).

A cause of action for employment discrimination under the NYCHRL is set forth, *prima facie* **[\*12]** , on a showing that (1) the plaintiff is a member of a protected class, (2) the plaintiff was qualified to hold the position, (3) the plaintiff was terminated from employment or suffered another adverse employment action, and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination. (*Forrest, 3 NY3d at 295*; *Harrington v City of New York, 157 AD3d 582, 584, 70 N.Y.S.3d 177 [1st Dept 2018]*). The plaintiff's burden of proof in a discrimination case is to show, by a preponderance of the evidence, that he was treated worse than other employees because of his protected characteristic (*Suri v Grey Global Group, Inc., 164 AD3d 108, 83 N.Y.S.3d 9 [1st Dept 2018]*).

The required element of an adverse employment action must be shown to have occurred under circumstances giving rise to an inference of discrimination. To satisfy this element, a plaintiff must plead facts sufficient to support such an inference beyond conclusory allegations of bias (*Wolfe-Santos vNYS Gaming Commission, 188 AD3d 622, 132 N.Y.S.3d 757 [1st Dept 2020]*; *Askin v Dept. of Educ. of City of NY, 110 AD3d 621, 622, 973 N.Y.S.2d 629 [1st Dept 2013]*). Allegations of discriminatory comments by an employer may suffice (*O'Rourke vNatl. Foreign Trade Council, 176 AD3d 517, 110 N.Y.S.3d 104 [1st Dept 2019]*; *Whitfield-Ortiz v Dept. of Educ. of City of N.Y., 116 AD3d 580, 581, 984 N.Y.S.2d 327 [1st Dept **[\*\*9]** 2014]*) or of disparate treatment of similarly-situated

Case 1:25-cv-03496-JPC-SLC    Document 20-3    Filed 07/09/25    Page 247 of 321

Page 5 of 5

2022 N.Y. Misc. LEXIS 7975, *12; 2022 NY Slip Op 34276(U), **9

employees (*Brown v City of New York, 188 AD3d 518, 519, 135 N.Y.S.3d 103 [1st Dept 2020]*; *Whitfield-Ortiz, 116 AD3d at 581*).

For the same reasons discussed in analyzing plaintiff's NYSHRL claim, defendant demonstrates that plaintiff's NYCHRL claim must be dismissed.

### C. Hostile work environment claims

The NYSHRL defines a hostile work environment claim as arising **[*13]** from acts that subject an individual to inferior terms, conditions or privileges of employment because of the individual's membership in a protected category (*Executive Law 296[ 1 ][h]*). The plaintiff need not show that the conduct was severe or pervasive (*Id.*; *NY PJI 9:5* [2002]).

A hostile work environment violates the NYCHRL where an employee "has been treated less well than other employees because of [his/her] protected status." (*Chin v New York City Hous. Auth., 106 AD3d 443, 445, 965 N.Y.S.2d 42 [1st Dept 2013]*; *see also Golston-Green v City of New York, 184 AD3d 24, 40-41, 123 N.Y.S.3d 656 [2d Dept 2020]* ["Another way in which a plaintiff may establish discrimination in the terms, conditions, and privileges or employment is by showing that she or he was subject to a hostile work environment"] [internal quotation marks and citation omitted]). Under the NYCHRL, "the conduct's severity and pervasiveness are relevant only to the issue of damages." (*Mihalikv Credit Agricole Cheuvreux N. Am., Inc., 715 F3d at 110] [2d Cir 2013]* [internal citation omitted]).

Despite the broader application of the NYCHRL, conduct that consists of "petty slights or trivial inconveniences . . . do[es] not suffice to support a hostile work environment claim" (*Buchwald v Silverman Shin & Byrne PLLC, 149 AD3d 560, 560, 50 N.Y.S.3d 272 [1st Dept 2017]* [citation omitted]). However, the employer bears the burden of proving that the conduct was trivial (*Mihalik, 715 F3d at 111*). Nonetheless, "[c]ourts must be mindful that the NYCHRL **[**10]** is not a general civility code and that the plaintiff still bears **[*14]** the burden of showing that the conduct is caused by a discriminatory motive" (*Id. at 110* [internal quotation marks and citation omitted]). Plaintiff must also show that the workplace was both subjectively and objectively hostile (*Long v Aerotek, Inc., 202 AD3d 1216, 162 N.Y.S.3d 521 [3d Dept 2022]*).

Here, plaintiff does not submit proof that she was subject to behavior consisting of anything more than petty slights and trivial inconveniences, nor that her supervisors' conduct toward her was motivated by a discriminatory animus (*see Sedhom v SUNY Downstate Med. Ctr., 201 AD3d 536, 160 N.Y.S.3d 243 [1st Dept 2022]* [alleged remarks made to plaintiff were not sufficiently severe or pervasive to permeate workplace or alter conditions of employment, and no indication that alleged hostile conduct toward plaintiff was related to her age]).

Moreover, as plaintiff has not shown any animus toward her based on race, gender, or age, her hostile work environment claim may not be maintained (*Lent v City of New York, 209 A.D.3d 494, 175 N.Y.S.3d 525 [1st Dept 2022]*).

### III. CONCLUSION

Accordingly, it is hereby

ORDERED, that defendant's motion for summary judgment is granted, and the complaint is dismissed in its entirety, and the clerk is directed to enter judgment accordingly.

**12/16/2022**

**DATE**

/s/ David B. Cohen

**DAVID B. COHEN, J.S.C.**

—

 Neutral

As of: June 23, 2025 9:52 PM Z

## *Rosado v. Port Auth. of N.Y. & N.J.*

United States Court of Appeals for the Second Circuit

February 16, 2024, Decided

No. 22-587

**Reporter**

2024 U.S. App. LEXIS 3670 *; 2024 WL 658776

VICTOR ROSADO, Plaintiff-Appellant, v. PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant-Appellee.[*]

**Prior History: [*1]** Appeal from a judgment of the United States District Court for the Southern District of New York.(Analisa Torres, Judge).

*Espinoza v. Port Auth. of NY & NJ, 2022 U.S. Dist. LEXIS 37998, 2022 WL 623809 (S.D.N.Y., Mar. 2, 2022)*

## Core Terms

summary judgment, district court, disability, quotation, exhaust, marks

## Case Summary

### Overview

HOLDINGS: [1]-Where an employee alleged that his former empoyer discriminated against him on the basis of his national origin, ethnicity, and disability status and retaliated against him when he expressed his concerns about this disparate treatment, the district court did not err in dismissing the employee's ADA claim pursuant to 42 U.S.C.S. § 12117(a) because none of the acts of discrimination alleged in the employee's September 2018 EEOC charge overlapped with or involved the same acts raised in connection with his ADA claim. A claim of disability discrimination was conceptually distinct from a claim of racial discrimination, and the employee did not allege any facts in his EEOC charge that would have given the agency reason to investigate a disability claim.

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1* **Appeals, Appellate Briefs**

Though an appellate court liberally construes pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest, pro se appellants must still comply with Fed. R. App. P. 28(a), which requires appellants to provide the court with a clear statement of the issues on appeal. Although the appellate court accords filings from pro se litigants a high degree of solicitude, even a litigant representing himself is obliged to set out identifiable arguments in his principal brief. Furthermore, the appellate court will not decide issues that a pro se appellant raises in his brief only obliquely and in passing.

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > ADA Enforcement

Labor & Employment Law > Discrimination > Disability Discrimination > ADA Enforcement

2024 U.S. App. LEXIS 3670, *1

Labor & Employment
Law > Discrimination > Disparate
Treatment > Exhaustion of Remedies

Civil Procedure > ... > Justiciability > Exhaustion of
Remedies > Administrative Remedies

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > Filing of
Charges

*HN2* **Disability Discrimination, ADA Enforcement**

As with claims under Title VII, plaintiffs asserting claims under the ADA must first file a charge of discrimination with the EEOC. 42 U.S.C.S. § 12117(a) adopts, among other procedures, the exhaustion requirements of Title VII. Ordinarily, a plaintiff seeking to bring a claim pursuant to the ADA must exhaust administrative remedies through the EEOC.

Labor & Employment Law > ... > Civil
Actions > Exhaustion of Remedies > Filing of
Charges

*HN3* **Exhaustion of Remedies, Filing of Charges**

Claims not asserted before the EEOC may still be pursued in a subsequent federal action if they are reasonably related to those that were filed with the agency. A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. Appellate courts have described this exception as essentially an allowance of loose pleading in light of the fact that most employees do not have the benefit of counsel while filing a charge with the EEOC.

Civil Procedure > Appeals > Reviewability of Lower
Court Decisions > Preservation for Review

*HN4* **Reviewability of Lower Court Decisions, Preservation for Review**

In general appellate courts refrain from passing on issues not raised below.

**Counsel:** VICTOR ROSADO, Plaintiff-Appellant, Pro se, Chester, NY.

For Defendant-Appellee: MEGAN LEE, Port Authority Law Department, New York, NY.

**Judges:** PRESENT: PIERRE N. LEVAL, SUSAN L. CARNEY, RICHARD J. SULLIVAN, Circuit Judges.

# Opinion

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Victor Rosado, proceeding *pro se*, appeals from the district court's grant of summary judgment in favor of his former employer, the Port Authority of New York and New Jersey (the "Port Authority"), on Rosado's claims under *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.*, the *Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.*, and *42 U.S.C. § 1981*. We assume the parties' familiarity with the facts, procedural history, and issues on appeal, which we refer to only as necessary to resolve this appeal.

On January 11, 2019, Rosado - who was represented by counsel at the time - commenced the instant case, alleging that the Port Authority discriminated against him on the basis of his national origin, ethnicity, and disability status and retaliated against him when he expressed his concerns about this disparate treatment. The district court granted summary judgment **[*2]** in favor of the Port Authority, concluding that several of Rosado's proffered unsworn declarations were inadmissible; that certain of his claims were time-barred because he failed to timely file a charge with the Equal Employment Opportunity Commission (the "EEOC"); that he failed to administratively exhaust his ADA claim; and that he otherwise failed to establish a racial discrimination or retaliation claim.[1] On appeal, Rosado argues that the district court erred in dismissing his claims as time-barred, in granting summary judgment as to his ADA claim, and in failing to require the Port Authority to disclose exhibits that Rosado claims were never provided to him or his counsel. For the reasons set forth below, we disagree.

───────────────────────

[1] The district court additionally dismissed Rosado's claims pursuant to the *New York State Human Rights Law* and the *New York City Human Rights Law* on the basis that Rosado withdrew those claims in his counseled opposition to the Port Authority's motion for summary judgment. Rosado does not challenge the dismissal of those claims on appeal.

2024 U.S. App. LEXIS 3670, *2

## I. Title VII and *Section 1981* Claims

*HN1* Though we "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest," *McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 156 (2d Cir. 2017)* (internal quotation marks omitted), *pro se* appellants must still comply with *Federal Rule of Appellate Procedure 28(a)*, which requires appellants "to provide the court with a clear statement of the issues on appeal," *Moates v. Barkley, 147 F.3d 207, 209 (2d Cir. 1998)*. Accordingly, a *pro se* litigant will be deemed to have "abandon[ed] an issue by failing to address it in [his] **[*3]** appellate brief." *Green v. Dep't of Educ. of City of N.Y., 16 F.4th 1070, 1074 (2d Cir. 2021)*; *see also LoSacco v. City of Middletown, 71 F.3d 88, 93 (2d Cir. 1995)* ("[W]e need not manufacture claims of error for an appellant proceeding *pro se*."); *Terry v. Inc. Vill. of Patchogue, 826 F.3d 631, 632-33 (2d Cir. 2016)* ("Although we accord filings from *pro se* litigants a high degree of solicitude, even a litigant representing himself is obliged to set out identifiable arguments in his principal brief." (internal quotation marks omitted)). Furthermore, we will not decide issues that a *pro se* appellant raises in his brief only "obliquely and in passing." *Gerstenbluth v. Credit Suisse Sec. (USA) LLC, 728 F.3d 139, 142 n.4 (2d Cir. 2013)*.

Rosado's brief does not address the merits of the district court's grant of summary judgment as to his *Title VII* and *section 1981* claims. Instead, he argues only that the district court's conclusion regarding the timeliness of his EEOC charge was erroneous and that he was discriminated against in violation of the ADA. Although he once identifies a doctor who treated him as a "policy maker or decision maker" for the Port Authority and briefly mentions several specific summary judgment exhibits, Rosado Br. at 4-6, Rosado does not explain how those points are relevant to any of his claims or address the district court's determination that he failed to show how the alleged discrimination was the result of a policy or custom. Because Rosado fails to address **[*4]** the substance of the district court's decision granting summary judgment as to his *Title VII* and *section 1981* claims in his brief on appeal, we must conclude that he has abandoned any challenge to these aspects of the district court's judgment. *See Green, 16 F.4th at 1074*; *LoSacco, 71 F.3d at 92-93*; *Gerstenbluth, 728 F.3d at 142 n.4*.

## II. ADA Claim

Although Rosado does not explicitly challenge the district court's conclusion that he failed to administratively exhaust his ADA claim, he generally argues that the Port Authority "violated [his] disability rights" by "not following the [ADA's] rules and regulations . . . regarding disabilities and accommodations." Rosado Br. at 8, 10. We will therefore liberally construe his brief as challenging the district court's dismissal of his ADA claim for failure to exhaust.

*HN2* As with claims under *Title VII*, plaintiffs asserting claims under the ADA must first file a charge of discrimination with the EEOC. *See 42 U.S.C. § 12117(a)* (adopting, among other procedures, the exhaustion provisions of *Title VII*); *Soules v. Conn., Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 57 (2d Cir. 2018)* ("Ordinarily, a plaintiff seeking to bring a claim pursuant to the [ADA] . . . must exhaust administrative remedies through the EEOC."). Here, the record reflects that Rosado filed a charge with the EEOC in September 2018, complaining of racial and ethnic discrimination **[*5]** and retaliation. Although the charge referenced discrimination and retaliation claims related to Rosado's "[r]ace," "[e]thnicity," and "[c]olor," Supp. App'x at 562, it did not make any reference to Rosado's alleged disability.

In his memorandum in opposition to summary judgment, Rosado's then-counsel argued that certain of Rosado's claims were "[r]easonably related" to the conduct discussed in his EEOC charge, and that the EEOC permits "loose pleading." Dist. Ct. Doc. No. 88 at 5 (alterations omitted). We agree with the district court that Rosado failed to demonstrate that his ADA claim was reasonably related to the claims set forth in his EEOC charge, and that he therefore failed to exhaust his ADA claim.

*HN3* Claims not asserted before the EEOC may still be pursued in a subsequent federal action if they are "reasonably related to those that were filed with the agency." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001)* (internal quotation marks omitted). "A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik, 335 F.3d 195, 200-01 (2d Cir. 2003)* (internal quotation marks omitted). We have described this exception as "essentially **[*6]** an allowance of loose pleading" in light of the fact that most employees do not have the benefit of counsel while filing a charge with the

2024 U.S. App. LEXIS 3670, *6

EEOC. *Id. at 201* (internal quotation marks omitted).

In this case, none of the acts of discrimination alleged in Rosado's September 2018 EEOC charge overlapped with or involved the same acts raised in connection with his ADA claim. A claim of disability discrimination is conceptually distinct from a claim of racial discrimination, *see id.*, and Rosado did not allege any facts in his EEOC charge that would have given the agency reason to investigate a disability claim. We therefore cannot conclude that the district court erred in dismissing Rosado's ADA claim.[2]

### III. Remaining Arguments

Rosado argues that the Port Authority did not disclose certain exhibits to him or his attorney during discovery but relied on them for the purposes of summary judgment. But Rosado's attorney did not object to the use of these exhibits. We therefore decline to consider this issue. *See Virgilio v. City of New York, 407 F.3d 105, 116 (2d Cir. 2005)* ("**HN4** In general we refrain from passing on issues not raised below." (internal quotation marks omitted)).

Finally, Rosado filed a "motion to appeal" in this Court, asserting that the district court did **[*7]** not fully examine the summary judgment evidence and that the Port Authority failed to accommodate his disability. As discussed above, Rosado has failed to identify any way in which the district court erred in granting summary judgment in favor of the Port Authority. The motion is therefore denied.

We have considered Rosado's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court and **DENY** Rosado's pending motion.

---

**End of Document**

---

[2] Because Rosado's appellate brief addresses only his ADA claim and we agree with the district court that his ADA claim was unexhausted, we need not reach his argument that his claims were timely since he began seeing a Port Authority doctor in January 2018.

⚠️ Caution
As of: June 23, 2025 9:52 PM Z

# *Salahuddin v. Cuomo*

United States Court of Appeals for the Second Circuit

October 11, 1988, Argued ; November 4, 1988, Decided

No. 87-2131

### Reporter

861 F.2d 40 *; 1988 U.S. App. LEXIS 14981 **; 12 Fed. R. Serv. 3d (Callaghan) 915

RICHARD A. SALAHUDDIN, Plaintiff-Appellant, v. MARIO CUOMO, THOMAS A. COUGHLIN, ROBERT J. HENDERSON, ROBERT ABRAMS, PETER SULLIVAN, DOUGLAS CREAM, JOSEPH COSTELLO, WILLIAM KOMENECKI, WILLIAM MCCORMICK, JOHN/JERRY SECAUR, STANLEY FRITZ, C.O. CLARK, C.O. T.M. WILD, Correctional Counselor SULLIVAN, EUGENE LEFEVRE, DANIEL SENKOWSKI, R. FULLER, LT. GRATTO, LT. DEFAYETTE, SGT. KELLY, ROBERT COX and JAMES MOODY, Defendants-Appellees

**Prior History:** **[**1] Appeal from a judgment of the United States District Court for the Northern District of New York, James T. Foley, Judge, dismissing complaint for violation of *Fed. R. Civ. P. 8*.

**Disposition:** Affirmed as modified to allow plaintiff to file amended complaint.

## Core Terms

amended complaint, district court, in forma pauperis, prolix, rights, leave to amend, frivolous, pleadings

## Case Summary

### Procedural Posture

Plaintiff prisoner sought review of a judgment from the United States District Court for the Northern District of New York, which dismissed plaintiff's complaint against defendant state officials for monetary, declaratory, and injunctive relief pursuant to *42 U.S.C.S. § 1983*. The complaint was dismissed sua sponte on the ground that its length and detail violated *Fed. R. Civ. P. 8*.

### Overview

Plaintiff prisoner brought an action against defendant state officials for monetary, declaratory, and injunctive relief pursuant to *42 U.S.C.S. § 1983* on account of various alleged deprivations of his rights. The trial court dismissed plaintiff's complaint sua sponte on the ground that its length and detail violated *Fed. R. Civ. P. 8*. The court affirmed the order dismissing the complaint, but vacated the judgment and remanded the action to the trial court for entry of an order allowing plaintiff an appropriate period in which to file an amended complaint. The court concluded that the dismissal for noncompliance with *rule 8* without leave to amend was an abuse of discretion. The court found that plaintiff's complaint was not a short and plain statement as was required by *Rule 8*. The court determined, however, that the complaint was neither vague nor incomprehensible, and that it clearly contained at least some claims that could not be termed frivolous on their face. The allegations were sufficiently clear and specific to give defendants notice of ways in which they were claimed to have violated plaintiff's rights.

### Outcome

The judgment in favor of defendant state officials was modified to permit plaintiff prisoner to file an amended complaint. The complaint was neither vague nor incomprehensible and it clearly contained at least some claims that could not be termed frivolous on their face.

## LexisNexis® Headnotes

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN1* **Complaints, Requirements for Complaint**

861 F.2d 40, *40; 1988 U.S. App. LEXIS 14981, **1

A complaint shall contain a short and plain statement of the claim showing that the pleader is entitled to relief. _Fed. R. Civ. P. 8(a)(2)_. The statement should be plain because the principal function of pleadings under the Federal Rules of Civil Procedure is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Governments > Legislation > Initiative & Referendum

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Dismissal > Involuntary Dismissals > General Overview

_HN2_ **Amendment of Pleadings, Leave of Court**

When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised. When the court chooses to dismiss, it normally grants leave to file an amended pleading that conforms to the requirements of _Fed. R. Civ. P. 8_.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

_HN3_ **Standards of Review, Abuse of Discretion**

As a general matter, of course, the district court has discretion whether or not to grant leave to amend, and

its decision is not subject to review on appeal except for abuse of discretion. In exercising its discretion, however, the court must observe the direction in _Fed. R. Civ. P. 15(a)_ that leave to amend shall be freely given when justice so requires. _Fed. R. Civ. P. 15(a)_.

Civil Procedure > Attorneys > Appointment of Counsel

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > Attorneys > General Overview

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

_HN4_ **Attorneys, Appointment of Counsel**

The complaint of a pro se litigant should be liberally construed in his favor and his allegations must be taken as true in considering whether a claim is stated. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

**Counsel:** Richard Akbar Salahuddin, Plaintiff-Appellant Pro Se, Brooklyn, New York.

**Judges:** Kearse, Pratt, and Mahoney, Circuit Judges.

**Opinion by:** KEARSE

# Opinion

[*41] KEARSE, Circuit Judge:

861 F.2d 40, *41; 1988 U.S. App. LEXIS 14981, **1

Plaintiff *pro se* Richard A. Salahuddin appeals from a final judgment of the United States District Court for the Northern District of New York, James T. Foley, *Judge*, dismissing his complaint for monetary, declaratory, and injunctive relief pursuant to, *inter alia*, 42 U.S.C. § 1983 (1982), on account of various alleged deprivations of his rights while he was a New York State prisoner. The court dismissed the complaint *sua sponte* on the ground that its length and detail violated Rule 8 of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules"). For the reasons below, we conclude that Salahuddin should have been given an opportunity to file an amended complaint that complies with the Rules.

BACKGROUND

The present action was originally filed in the Western District of **[**2]** New York by Salahuddin, then a New York State prisoner, against 22 state officials or employees, complaining of various violations of his civil rights during his incarceration. Salahuddin sought to proceed in forma pauperis, and his complaint came before Chief Judge John T. Curtin. Chief Judge Curtin granted leave to proceed in forma pauperis, but noted in an order dated January 2, 1987, that Rule 8 "requires the plaintiff to set forth his claim by making a short and plain statement showing that he is entitled to relief. This claim, naming at least 22 defendants, setting forth 23 causes of action, numbering 15 pages and 88 paragraphs is clearly in violation of Rule 8 and may be dismissed for that reason alone."

Nonetheless, the court dismissed the complaint only as against two defendants, finding that it failed to state a claim upon which relief could be granted against them. Noting that the remaining defendants apparently resided in the Northern District of New York, that Salahuddin was incarcerated in that district, and that all of the events complained of occurred in that district, the court found that venue properly lay in the Northern District. *See* 28 U.S.C. § 1391(b) (1982). **[**3]** Rather than dismiss the remainder of the action, Chief Judge Curtain transferred the action to the Northern District pursuant to 28 U.S.C. § 1404(a) (1982) ("in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought").

In the Northern District, pursuant to that court's standard procedure for preliminary review of prisoner civil rights complaints, Salahuddin's complaint was referred to a United States Magistrate for a recommendation as to whether the defendants should be required to answer it. The magistrate's report, quoting Chief Judge Curtin's

order, recommended that the complaint be dismissed as violative of Rule 8. Judge Foley, after reviewing the entire file, accepted the magistrate's recommendation "for the reasons set forth by Chief Judge John T. Curtin in his Order dated January 2, 1987."

Final judgment was entered dismissing the complaint. Judge Foley denied Salahuddin's motion for leave to appeal in forma pauperis, finding that "there are in my judgment no questions of substance for appeal purposes and certification is hereby made that the appeal is not taken in good faith." *See* 28 U.S.C. § 1915(a) **[**4]** (1982) ("An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."). Salahuddin has pursued this appeal without the grant of in forma pauperis status. For the reasons below, we conclude that the appeal is not without merit and that a final judgment dismissing the complaint should not have been entered.

DISCUSSION

To the extent pertinent here, Rule 8 provides that **HN1** a complaint "shall contain . . . **[**42]** a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. *See, e.g.,* Geisler v. Petrocelli, 616 F.2d 636, 640 (2d Cir. 1980); 2A *Moore's Federal Practice* para. 8.13, at 8-61 (2d ed. 1987). The statement should be short because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." 5 C. Wright & A. Miller, *Federal* **[**5]** *Practice and Procedure* § 1281, at 365 (1969).

**HN2** When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, *see* Fed. R. Civ. P. 12(f), or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised. *See* Gillibeau v. City of Richmond, 417 F.2d 426, 431 (9th Cir. 1969). When the court chooses to dismiss, it normally grants leave to file an amended pleading that conforms to the requirements of Rule 8. *See generally* 5 C. Wright & A.

Miller, *Federal Practice and Procedure* § 1281, at 366-67; 2A *Moore's Federal Practice* para. 8.13, at 8-81 to 8-82 n.38.

*HN3* As a general matter, of course, "the district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion. . . ." 3 *Moore's Federal Practice* para. 15.08[4], at 15-64 (2d ed. 1987) (footnotes omitted). In **[**6]** exercising its discretion, however, the court must observe the direction in *Rule 15(a)* that leave to amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*; *see Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; 3 *Moore's Federal Practice* para. 15.08[4], at 15-65. Given our jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities, it will generally be an abuse of discretion to deny leave to amend when dismissing a nonfrivolous original complaint on the sole ground that it does not constitute the short and plain statement required by *Rule 8*. *See, e.g., Gordon v. Green, 602 F.2d 743, 745-47 (5th Cir. 1979)* (ruling that 4000-page pleading should have been dismissed for lack of compliance with *Rule 8* but that leave to file amended complaint should be granted); *Bertucelli v. Carreras, 467 F.2d 214, 215 (9th Cir. 1972)* (per curiam) (though prolix complaint violated *rule 8(a)*, "ample opportunity for amendment should be provided in all except the most unusual cases").

We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as **[**7]** where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible, *see, e.g., Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir. 1972)* (per curiam) (final dismissal appropriate where complaint was "a labyrinthian prolixity of unrelated and vituperative charges that defied comprehension" and amended complaint failed to cure prolixity and incomprehensibility), *cert. denied, 411 U.S. 935, 36 L. Ed. 2d 396, 93 S. Ct. 1911 (1973)*; *Michaelis v. Nebraska State Bar Association, 717 F.2d 437, 439 (8th Cir. 1983)*; or where the substance of the claim pleaded is frivolous on its face, *see, e.g., Moorish Science Temple v. Smith, 693 F.2d 987, 990 (2d Cir. 1982)*; *cf. 28 U.S.C. § 1915(d) (1982)* (when a plaintiff has moved to proceed in forma pauperis, the court may *sua sponte* dismiss the action if it is "satisfied that the action is frivolous"). The court must bear in mind, however, the well established rules that *HN4* the complaint of a *pro se* litigant should be liberally construed in his favor, *Haines*

*v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)* (per curiam), that his allegations must be taken as true in considering whether a **[**43]** claim is stated, *Cooper v. Pate, 378 U.S. 546, 12 L. Ed. 2d 1030, 84 S. Ct. 1733 (1964)* **[**8]** (per curiam), and that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944)*. In light of these principles, this Court has repeatedly cautioned against *sua sponte* dismissals of *pro se* civil rights complaints prior to requiring the defendants to answer. *See, e.g., Bayron v. Trudeau, 702 F.2d 43, 45 (2d Cir. 1983)*; *Fries v. Barnes, 618 F.2d 988, 989 (2d Cir. 1980)* (citing cases).

In the present case, there is no doubt that Salahuddin's complaint fails to comply with *Rule 8*'s "short and plain statement" requirement. It spans 15 single-spaced pages and contains explicit descriptions of 20-odd defendants, their official positions, and their roles in the alleged denials of Salahuddin's rights; it contains a surfeit of detail. In light of the length and detail, the district court was within the bounds of discretion to strike or dismiss the complaint for noncompliance with *Rule 8*.

Despite its length, however, Salahuddin's complaint is neither **[**9]** vague nor incomprehensible, and it clearly pleads at least some claims that cannot be termed frivolous on their face. For example, he asserts that certain of the defendants combined and conspired to deprive him of due process at certain prison disciplinary hearings by, *inter alia*, preventing him from calling witnesses and tampering with testimony of witnesses called. He also asserts that despite timely requests on at least two occasions, he was denied the right to attend religious services. These allegations are sufficiently clear and specific to give the defendants notice of ways in which they are claimed to have violated Salahuddin's rights, and one cannot say that in support of such a pleading Salahuddin can prove no set of facts that would entitle him to relief. Thus, the complaint could not properly have been dismissed as frivolous, and the dismissal for noncompliance with *Rule 8* without leave to amend was an abuse of discretion.

Accordingly, though we affirm the order dismissing the complaint, we vacate the judgment and remand to the district court for entry of an order allowing Salahuddin an appropriate period in which to file an amended complaint that omits unnecessary **[**10]** detail.

861 F.2d 40, *43; 1988 U.S. App. LEXIS 14981, **10

Finally, we note that, in reviewing any amended complaint filed by Salahuddin, the court should bear in mind that we have required pleadings under *§ 1983* to contain more than mere conclusory allegations, *see, e.g., Ostrer v. Aronwald, 567 F.2d 551 (2d Cir. 1977)*; *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck, 463 F.2d 620, 622-23 (2d Cir. 1972)*, *cert. denied, 410 U.S. 944, 35 L. Ed. 2d 611, 93 S. Ct. 1393 (1973)*, and that while a plaintiff should not plead mere evidence, he should make an effort to provide "some details of time and place and the alleged effect of the conspiracy," 2A *Moore's Federal Practice* para. 8.17[5], at 8-123 to 8-124. Given the fact that Salahuddin has erred on the side of detail rather than vagueness, thereby meeting the notice requirement of the Rules, and the fact that the present complaint contains at least some claims that are not frivolous on their face, we doubt that a dismissal of the present action with prejudice solely on the basis of even an amended pleading will be appropriate. If the amended complaint does not, in the view of the district court, satisfactorily condense the pleading, the court remains free, in accordance with *Rule 12(f)*, **[**11]** simply to strike so much of the amended complaint as it deems redundant or immaterial.

CONCLUSION

The judgment of the district court is modified to permit Salahuddin to file an amended complaint in accordance with the foregoing.

**End of Document**

Q Questioned
As of: June 23, 2025 9:53 PM Z

# *Sheppard v. Beerman*

United States Court of Appeals for the Second Circuit

November 2, 1993, Argued ; March 3, 1994, Decided

Docket No. 93-7658

**Reporter**

18 F.3d 147 *; 1994 U.S. App. LEXIS 3985 **

BRIAN SHEPPARD, Plaintiff-Appellant, v. LEON BEERMAN, as an individual and in his official capacity as Justice of the Supreme Court of the State of New York, Defendant-Appellee.

**Subsequent History: [**1]** Certiorari Denied October 3, 1994, Reported at: *1994 U.S. LEXIS 5534*.

**Prior History:** Appeal from a judgment of the United States District Court for the Eastern District of New York (Glasser, J.), dismissing plaintiff-appellant's complaint on the pleadings pursuant to Fed. Civ. P. 12(c).

**Disposition:** Affirmed, in part, and vacated and remanded, in part.

## Core Terms

district court, courtroom, pleadings, proceedings, chambers, seizure, free speech, belongings, alleges, matter of public concern, motion to dismiss, file cabinet, searched, reasons, rights, seized, files, fired

## Case Summary

**Procedural Posture**

Appellant employee sought review of the judgment from the United States District Court for the Eastern District of New York , which dismissed appellant's complaint on the pleadings pursuant to Fed. Civ. P. 12(c) in an action involving an alleged violation of free speech. Appellant contended that the district court made certain improper factual findings in ruling on appellee employer's Fed. Civ. P. 12(c) motion to dismiss on the pleadings.

**Overview**

Following the dismissal of appellant employee's complaint that alleged violation of free speech, appellant sought review. Appellant contended that the district

court made improper factual findings in dismissing appellant's claim pursuant to Fed. R. Civ. P 12(c). The court found that in order for appellant's claim to withstand a motion to dismiss on the pleadings, he had to establish that his speech concerned a matter of public concern, and that the speech was a motivating factor in his discharge. The court held that the motive for the termination was a question in fact. The court found that it was improper for the district court to answer it on a motion for dismissal on the pleadings. The court found fault with the district court's public concern analysis. The court also found that appellant had no reasonable expectation of privacy in his office furniture or file cabinets, and therefore any search was not violative of appellant's *Fourth Amendment* rights. The court also held that appellant failed to state a claim that his person was seized. The judgment was reversed in part and affirmed in part.

**Outcome**

The judgment that dismissed appellant employee's complaint on the pleadings in an action involving an alleged violation free speech was affirmed in part and vacated and remanded in part. The court held that the district court made improper factual findings in dismissing appellant's claim that his discharge amounted to a violation of his right to free speech because there was a question of fact.

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN1* Defenses, Demurrers & Objections, Motions to Dismiss

In deciding a *Fed. R. Civ. P. 12(c)* motion, the court of

18 F.3d 147, *147; 1994 U.S. App. LEXIS 3985, **1

appeals apply the same standard as that applicable to a motion under *Fed. R. Civ. P. 12(b)(6)*. Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The standard is applied with particular strictness when the plaintiff complains of a civil rights violation.

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Speech > Public
Employees

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Speech > Scope

### *HN2* Freedom of Speech, Public Employees

A state may not discharge an employee for reasons which infringe on that employee's constitutionally protected interest in freedom of speech. If an employee is discharged for making statements concerning a matter of public concern, the employee's freedom of speech may have been violated. In such a situation, the court must balance the employee's interest in making the statement against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Speech > Public
Employees

### *HN3* Freedom of Speech, Public Employees

Speech will be fairly characterized as a matter of public concern if the speech relates to any matter of political, social, or other concern to the community. Whether speech involves a public concern is a question of law to be determined on the basis of the content, form, and context of a given statement, as revealed by the whole record.

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search &

Seizure > Expectation of Privacy

### *HN4* Search & Seizure, Scope of Protection

A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

Governments > Courts > Clerks of Court

### *HN5* Search & Seizure, Scope of Protection

An employee's expectation of privacy must be assessed in the context of the employment relationship.

Civil Procedure > ... > Privileged
Communications > Work Product
Doctrine > General Overview

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > General Overview

### *HN6*  Privileged Communications, Work Product Doctrine

The unlawfulness of an interference with an individual's possessory interest in property depends on the reasonableness of the seizure.

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN7* Search & Seizure, Scope of Protection

In order to determine whether a particular encounter between police officers and an individual constitutes a "seizure" for the purposes of *U.S. Const. amend. IV*, a court must decide if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

**Counsel:** BRIAN SHEPPARD, New Hyde Park, N.Y., Pro Se.

JOHN J. SULLIVAN, Assistant Attorney General of the

18 F.3d 147, *147; 1994 U.S. App. LEXIS 3985, **1

State of New York, New York, N.Y. (Robert Abrams, Attorney General of the State of New York, Albany, N.Y., of counsel), for Defendant-Appellee.

**Judges:** Before: OAKES, KEARSE, and ALTIMARI, Circuit Judges.

**Opinion by:** ALTIMARI

# Opinion

[*149]  ALTIMARI, *Circuit Judge:*

Plaintiff-appellant Brian Sheppard, appearing *pro se,* appeals from a judgment of the United States District Court for the Eastern District of New York (Glasser, J.), dismissing his complaint on the pleadings pursuant to *Fed. R. Civ. P. 12(c)* ("*Rule 12(c)*"). Sheppard, a law clerk to defendant-appellee Leon Beerman, a justice of the Supreme Court of the State of New York, was discharged following a heated dispute with Beerman. Sheppard subsequently brought an action under *42 U.S.C. § 1983 (1988)* alleging that his discharge and Beerman's conduct following the discharge [**2] violated his *First* and *Fourth Amendment* rights. In his complaint, Sheppard claimed that he was fired in "retaliation for [his] protesting, and [sic] considering to expose, judicial misconduct." He further alleged that subsequent to the discharge, Beerman illegally searched his office and seized his belongings. The district court dismissed Sheppard's claims on the pleadings, finding that he failed to state any cognizable constitutional claims. On appeal, Sheppard challenges the dismissal of each of his claims, generally arguing that the district court made certain improper factual findings in ruling on Beerman's *Rule 12(c)* motion to dismiss on the pleadings. For the reasons discussed below, we agree with Sheppard only as to one of his *First Amendment* claims. Accordingly, we affirm, in part, and vacate and remand, in part.

BACKGROUND

Sheppard served as a law clerk to Beerman from 1986 until he was fired on December 11, 1990. Because this case comes to us on a motion to dismiss, we must view the facts in the light most favorable to Sheppard. Accordingly, his view of the facts alleges the following series of events preceding and following his discharge.

Sheppard alleges that on December [**3] 6, 1990, after engaging in *ex parte* communications with the

prosecution in a pending murder case, Beerman ordered him to draft a decision denying the defendant's pending speedy trial motion without a hearing, regardless of the motion's merits, so that the defendant would stand trial at a time advantageous to the prosecution. Sheppard refused to follow Beerman's direction, stating that he would not take part in the "railroading" of the defendant. Beerman responded that although Sheppard was not being discharged, he should seek other employment if he felt that way.

At this time, Sheppard informed Beerman that he had taken extensive notes of instances of other judicial misconduct by Beerman during the preceding four years of Sheppard's service in chambers. As an example, Sheppard noted a case that Beerman had assigned to himself in order to take personal revenge against the accused. Beerman expressed concern about Sheppard making his notes public. Harsh words were exchanged [*150] between the parties: Sheppard called Beerman "corrupt" and a "son of a bitch," and Beerman called Sheppard "disturbed" and "disloyal." Sheppard immediately apologized for his characterization. The argument ended [**4] with no resolution, and Sheppard worked the remainder of the day.

When Sheppard next returned to work on December 11, 1990, he was removed from chambers by court officers, who informed him that Beerman had fired him. Sheppard was forced to leave immediately and not allowed to take his belongings with him. Both before and after his discharge on that day, Sheppard's property was searched by Beerman or by others at his direction. Specifically, Sheppard's file cabinets and desk drawers were searched, and a box of his personal file cards was seized and removed to Beerman's private office and examined. On December 13, 1990, Sheppard was permitted to return to chambers accompanied by court officers to retrieve certain of his belongings. On December 21, 1990, he was permitted to retrieve the rest of his personal files.

Following his discharge, Sheppard returned to Beerman's courtroom on a number of occasions. On January 18, 1991, while attending Beerman's calendar call, Sheppard began ruffling through court files. Beerman subsequently directed him to leave the courtroom if he wished to examine documents. On January 28, 1991, Beerman told an attorney not to speak with Sheppard and warned Sheppard [**5] not to involve himself in the cases Sheppard had worked on when he was a clerk. On February 11, 1991, Sheppard was told not to keep coming in and out of the courtroom,

18 F.3d 147, *150; 1994 U.S. App. LEXIS 3985, **5

and was told to be quiet when he sought to reply to this direction.

*Sheppard's Lawsuit*

In April 1991, Sheppard commenced an action under *42 U.S.C. § 1983*, alleging that the above actions by Beerman violated Sheppard's *First Amendment* right to free speech, his *First Amendment* right of access to criminal proceedings and documents, his *First Amendment* right to petition the government for redress of grievances, and his *Fourth Amendment* right to be free from unlawful searches and seizures. Sheppard also asserted pendent state law tort claims for, among other things, false imprisonment, trespass, conversion, and defamation. Beerman filed an answer and then moved for judgment on the pleadings pursuant to *Rule 12(c)* on the grounds that Sheppard had not met threshold pleading requirements, that the complaint failed to state a cause of action, and that Beerman was entitled to qualified immunity.

On May 21, 1993, the United States District Court for the Eastern District of New York (Glasser, **[**6] *J.)* granted Beerman's motion for judgment on the pleadings on the grounds that Sheppard could not state any cognizable constitutional claim under any set of facts as a matter of law. Having held that plaintiff failed to state any cognizable constitutional claims, the court declined to exercise its pendent jurisdiction over plaintiff's state law claims.

Sheppard now appeals.

DISCUSSION

We review the district court's grant of Beerman's motion to dismiss Sheppard's claims *de novo. See Grimes v. Ohio Edison Co., 992 F.2d 455, 456* (2d Cir.), *cert. denied, 126 L. Ed. 2d 419, 114 S. Ct. 467 (1993).* **HN1** In deciding a *Rule 12(c)* motion, we apply the same standard as that applicable to a motion under *Rule 12(b)(6). See Ad-Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980, 982 (2d Cir. 1987).* Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "'unless it appears beyond doubt that the plaintiff can prove no set **[**7]** of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80,*

*78 S. Ct. 99 (1957)).* This standard is "applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)* (citations omitted).

On appeal, Sheppard generally contends that the district court erred in finding that he had not stated cognizable constitutional **[*151]** claims. Each of Sheppard's *First* and *Fourth Amendment* claims will be discussed in turn.

I. *First Amendment Claims*

a. *Free speech claims*

Sheppard first contends that the district court made improper factual findings in dismissing his claim that his discharge amounted to a violation of his *First Amendment* right to free speech. We agree, and for the reasons discussed below vacate the district court's dismissal of that claim and remand for proceedings not inconsistent with this opinion.

**HN2** A state may not discharge an employee for reasons which infringe on that employee's constitutionally protected interest in freedom of **[**8]** speech. *See Perry v. Sindermann, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972).* If an employee is discharged for making statements concerning a matter of public concern, the employee's freedom of speech may have been violated. *See Rankin v. McPherson, 483 U.S. 378, 384, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987); Connick v. Myers, 461 U.S. 138, 146, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983).* In such a situation, the Court must balance the employee's interest in making the statement against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin, 483 U.S. at 388* (quoting *Pickering v. Board of Educ., 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968)).*

Sheppard specifically alleges that he was dismissed in retaliation for his exercise of free speech in confronting Beerman about the judge's **[**9]** alleged misconduct. In order for Sheppard's claim to withstand a motion to dismiss on the pleadings, he must establish that his speech concerned a matter of public concern, and that the speech was a motivating factor in his discharge. *See Frank v. Relin, 1 F.3d 1317, 1330* (2d. Cir.), *cert. denied, 126 L. Ed. 2d 569, 114 S. Ct. 604 (1993).* **HN3** Speech will be fairly characterized as a matter of public concern if the speech "relat[es] to any matter of political, social, or other concern to the community." *Connick,*

18 F.3d 147, *151; 1994 U.S. App. LEXIS 3985, **9

*461 U.S. at 146*. Whether speech involves a public concern is a question of law to be determined on the basis of the "content, form, and context of a given statement, as revealed by the whole record." *Id. at 147-48* & n.7.

In analyzing the validity of Sheppard's claim, the district court made a determination that Sheppard was actually discharged for insubordination and not for his speech. We find this determination problematic for two reasons. First, the motive behind Sheppard's firing **[**10]** in his retaliation claim is clearly a question of fact. *See Frank v. Relin, 1 F.3d at 1328-29*. Because this question is in dispute, it was improper for the district court to answer it on a motion for dismissal on the pleadings. Second, the district court's determination that Sheppard was actually dismissed for insubordination seemed to impact its determination that Sheppard's speech was not a matter of public concern. Because the reason for Sheppard's dismissal is not relevant to the legal determination of whether his speech was a matter of public concern, we find fault with the district court's public concern analysis. Accordingly, we reverse the district court's dismissal of Sheppard's *First Amendment* free speech claim and remand for proceedings not inconsistent with this opinion.

b. *Remaining First Amendment claims*

Sheppard next contends that the district court erred in dismissing his claims concerning a violation of his *First Amendment* right of access to criminal cases, and his *First Amendment* right to petition the government for redress of grievances. As to these contentions we disagree. Even assuming that all the facts alleged by Sheppard in **[**11]** his complaint are true, we find, as did the district court, that the facts do not support either of those claims.

Sheppard claims that Beerman violated his right to access to criminal proceedings by (i) directing Sheppard to examine court files outside of the courtroom; (ii) telling certain attorneys that it would be improper for them **[*152]** to speak to Sheppard about anything that Sheppard had learned during his tenure as Beerman's law clerk; (iii) refusing to field courtroom questions by those who were not parties to cases on the calendar; and (iv) admonishing Beerman to stop using the courtroom as a "revolving door" when Sheppard went in and out of Beerman's courtroom during a calendar call. Even assuming that all of the above incidents occurred, they do not indicate that Sheppard was denied a right of access to criminal proceedings. Sheppard admits that

he was allowed to examine files outside of Beerman's courtroom, and that he was also permitted to listen to cases as long as he did not disrupt Beerman's courtroom proceedings or waste the court's time. Clearly, Beerman was entitled to exercise his discretion in keeping decorum in his courtroom.

Sheppard's claim that he was deprived of **[**12]** his right to petition for redress of grievances is equally without merit. The instant action provides such a vehicle. Accordingly, we affirm the district court's dismissal of these claims.

II. *Fourth Amendment* Claims

A. *Search/Seizure of Office, Desk, and File Cabinets*

Sheppard alleges that after the dismissal, Beerman searched his office, desk, and file cabinets in violation of his *Fourth Amendment* rights. "**HN4** A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen, 466 U.S. 109, 113, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984)*. *See also O'Connor v. Ortega, 480 U.S. 709, 715, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (1987)*. The district court ultimately concluded that Sheppard had no reasonable expectation of privacy in his office furniture or file cabinets, and therefore any search was not violative of Sheppard's *Fourth Amendment* rights. For the reasons discussed below, we agree.

**HN5** An "employee's expectation of privacy must be assessed in the context of the employment relationship." *Ortega, 480 U.S. at 717*. **[**13]** The working relationship between a judge and her law clerk, as noted by the district court, is unique. Unlike a typical employment relationship where an employer may limit the information she wants to share with her employees, in order for a judicial chambers to function efficiently, an absolute free flow of information between the clerk and the judge is usually necessary. Accordingly, the clerk has access to all the documents pertaining to a case. More importantly, clerks regularly have access to the judge's confidential thoughts on a case. The judge may discuss her feelings with her clerk, or may allow the clerk access to her personal notes. In turn, the judge necessarily has access to the files and papers kept by the clerk, which will often include the clerk's notes from discussions with the judge. Because of this distinctive open access to documents characteristic of judicial chambers, we agree with the district court's determination that Sheppard had "no reasonable expectation of privacy in chambers' appurtenances, embracing desks, file cabinets or other work areas."

18 F.3d 147, *152; 1994 U.S. App. LEXIS 3985, **13

Accordingly, the district court was correct in finding that there was no violation of Sheppard's *Fourth Amendment* [**14] rights.

Moreover, we also agree with the district court's finding that any alleged seizure done in connection with the search was similarly not violative of Sheppard's *Fourth Amendment* rights. Even assuming that Sheppard's belongings were seized for a short time during the judge's search of his things, a short delay by a judicial employer in returning a disgruntled employee's belongings after the employee has been fired does not rise to the level of a *Fourth Amendment* violation. **HN6** The unlawfulness of an interference with an individual's possessory interest in property depends on the reasonableness of the seizure. *See Soldal v. Cook County, 121 L. Ed. 2d 450, 113 S. Ct. 538, 549 (1992)*. Because a judicial employer has an overriding interest in securing the confidentiality of chambers' work product and in making sure that an angry clerk does not attempt to confiscate or destroy important court property, the brief alleged withholding of Sheppard's belongings while they were searched was not unreasonable.

[*153] B. *Seizure of Sheppard's Person*

Sheppard's final claim is that there was an unlawful seizure of his person when he was escorted out of [**15] the courthouse by court officers on December 11, 1990. The district court dismissed this claim finding that Sheppard's liberty was never restrained. We agree.

**HN7** In order to determine whether a particular encounter between police officers and an individual constitutes a "seizure" for the purposes of the *Fourth Amendment*, a court must decide "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980)*.

In the present case, as correctly noted by the district court, Sheppard was "free to go anywhere else that he desired," with the exception of Beerman's chambers and the court house. Had Beerman retained Sheppard's car keys or his wallet, then perhaps Sheppard arguably could have been seized, because it would have prevented him from being "free to leave." *See, e.g., United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990)* (noting factors that might suggest a seizure include "prolonged retention of a person's personal effects, such as airplane [**16] tickets or identification."). Because there are no such allegations in Sheppard's complaint,

Sheppard has failed to state a claim that his person was seized.

We have examined Sheppard's remaining contentions and find them to be without merit.

CONCLUSION

Based on the foregoing, we affirm the district court's dismissal of all of Sheppard's claims other than his *First Amendment* free speech claim. Regarding that claim, we find that in concluding that Sheppard failed to state a violation of his *First Amendment* right to free speech, the district court made certain factual determinations that were not appropriate on a motion for judgment on the pleadings. Accordingly, we vacate the district court's dismissal of Sheppard's *First Amendment* freedom of speech claim on the pleadings and remand for proceedings not inconsistent with this opinion. In doing so, however, we make no comment on the merits of the claim nor do we preclude the district court from re-examining the matter at some future, more appropriate time in the proceedings. Our ruling today is based only on the procedural posture in which the case came before the district court.

---

**End of Document**

⚠ Caution
As of: June 23, 2025 9:54 PM Z

# *Soules v. Connecticut*

United States Court of Appeals for the Second Circuit

December 1, 2017, Argued; February 8, 2018, Decided

No. 17-52-cv

**Reporter**

882 F.3d 52 *; 2018 U.S. App. LEXIS 2996 **; 102 Empl. Prac. Dec. (CCH) P45,975; 33 Am. Disabilities Cas. (BNA) 1561; 2018 WL 774000

GARY SOULES, Plaintiff-Appellant, v. STATE OF CONNECTICUT, DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION, STATE OF CONNECTICUT, AND TOWN OF OXFORD, Defendants-Appellees.

**Prior History: [**1]** Gary Soules appeals from the judgment of the United States District Court for the District of Connecticut (Bryant, J.) dismissing his complaint sua sponte on the ground of res judicata. Soules' first action alleged harassment, discrimination, and retaliation by defendants on the basis of his disabilities, military status, and certain protected activities. After dismissal, Soules brought this second action alleging a nearly identical set of facts and claims, adding a single further allegation: that defendants terminated his employment in retaliation for filing the first action.

We conclude that Soules effectively amended his complaint via the motion papers in the first action to add a retaliatory termination claim. Accordingly, Soules could have raised his termination claim in the first action and did, and thus res judicata precludes Soules from litigating the claim in this subsequent case. We also reject Soules' argument that the requirement to exhaust administrative remedies prevented him from raising the termination claim in the first action; the claim was "reasonably related" to the original administrative charge, and therefore Soules would not have been barred from bringing the claim **[**2]** in the first action. Furthermore, res judicata applies to claims pending review in administrative proceedings. The requirement to exhaust administrative remedies therefore does not alter our conclusion that res judicata precludes the second action.

*Soules v. Connecticut, 2016 U.S. Dist. LEXIS 169009 (D. Conn., Dec. 7, 2016)*

**Disposition:** Affirmed.

## Core Terms

termination, res judicata, retaliation, retaliatory, lawsuit, district court, exhaust, motion to dismiss, administrative remedy, reasonably related, argues, amend

## Case Summary

### Overview

HOLDINGS: [1]-The dismissal of the employee's discrimination complaint on the ground of res judicata was affirmed because both actions repeatedly link the employee's termination to the same course of unlawful conduct by appellees; [2]-The employee had two options after the termination of his employment: (1) request a stay of the first action after he filed the second Connecticut Human Rights Office charge, and then seek to join the termination claim, or (2) seek to amend the complaint of the first action.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN1* **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's

882 F.3d 52, *52; 2018 U.S. App. LEXIS 2996, **2

dismissal of a complaint on the ground of res judicata.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN2* Preclusion of Judgments, Res Judicata

Res judicata bars re-litigation if (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. As to the third element, the court considers whether the second lawsuit concerns the same claim—or nucleus of operative facts—as the first suit, applying three considerations: (1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties-expectations. Res judicata is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event.

Labor & Employment Law > ... > US Equal Employment Opportunity Commission > Civil Actions > Exhaustion of Remedies

*HN3* Civil Actions, Exhaustion of Remedies

Ordinarily, a plaintiff seeking to bring a claim pursuant to the Americans with Disabilities Act (ADA), Title VII, or the Connecticut Fair Employment Practices Act (CFEPA) must exhaust administrative remedies through the Equal Employment Opportunity Commission (EEOC) or Connecticut Human Rights Office. In the Second Circuit, however, claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency. Subsequent conduct is reasonably related to conduct in an EEOC charge if: (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

Civil Procedure > Judgments > Preclusion of

Judgments > Res Judicata

*HN4* Preclusion of Judgments, Res Judicata

Res judicata applies to claims pending review in administrative proceedings.

**Counsel:** WILLIAM S. PALMIERI, New Haven, Connecticut, for Plaintiff-Appellant.

Dennis M. Durao (James N. Tallberg, on the brief), Karsten & Tallberg, LLC, Rocky Hill, Connecticut, for Defendant-Appellee Town of Oxford.

COLLEEN B. VALENTINE, Assistant Attorney General (Ann E. Lynch, Assistant Attorney General, on the brief), Hartford, Connecticut, for George Jepsen, Attorney General of the State of Connecticut, for Defendants-Appellees State of Connecticut, Department of Emergency and Services and Public Protection, State of Connecticut.

**Judges:** Before: JACOBS, RAGGI, and DRONEY, Circuit Judges.

**Opinion by:** DENNIS JACOBS

# Opinion

[*53] DENNIS JACOBS, *Circuit Judge*:

Gary Soules appeals from the judgment of the United States District Court for the District of Connecticut (Bryant, J.) dismissing his complaint sua sponte on the ground of res judicata. Soules' first lawsuit was dismissed. See *Soules v. Connecticut, No. 3:14-CV-1045 (VLB), 2015 U.S. Dist. LEXIS 131985, 2015 WL 5797014 (D. Conn. Sept. 30, 2015)* ("Soules I"). The dismissal was affirmed in part and [**3] vacated in part (on grounds not relevant to this appeal) by summary order. See *Soules v. Town of Oxford, 669 F. App'x 54 (2d Cir. 2016)*. Soules brought the present case after the dismissal of the first case, alleging nearly identical claims with a single additional one: that defendants terminated his [*54] employment in retaliation for filing Soules I (the "termination claim").

On appeal, Soules argues that res judicata does not bar his termination claim because the termination happened after he filed the complaint in Soules I. However, Soules was fired while the motions to dismiss were pending and he repeatedly raised the termination issue as evidence that his claims were sufficiently pleaded. These filings

indicate that Soules implicitly sought to amend his pleadings, and that the district court in effect permitted him to do so. Accordingly, we conclude that the termination claim could have been raised in the prior action and was, and that res judicata precludes Soules from asserting the claim in this subsequent action.

Soules also argues that he could not have asserted claims based on his termination because he was required to exhaust administrative remedies. However, the termination claim was "reasonably related" to the original administrative **[**4]** charge; so the exhaustion requirement would not have foreclosed raising the claim added in Soules I. In any event, the res judicata doctrine applies in administrative proceedings. The requirement to exhaust administrative remedies thus does not disturb our holding that the termination claim is barred by res judicata.

## BACKGROUND

Soules, who is assumed to suffer from post-traumatic stress disorder, alleges that, while he was a police officer in the Town of Oxford, he was "subjected to an ongoing pattern of harassment, discrimination, retaliation and disparate treatment based upon his [mental and physical] disabilities or perceived disabilities, his military service and in retaliation for his protected complaints." Joint App'x 40, 42 (Am. Compl. ¶¶ 2, 17). Soules' supervisor, Sergeant Daniel Semosky, allegedly swore at Soules and said he was "unhappy" with Soules' return to work after a combat tour; and employees of the Town of Oxford and State Police allegedly physically intimidated him. Id. at 43-44 (Am. Compl. ¶¶ 23-25). Soules protested in writing to the Department of Emergency Services and Public Protection ("DESPP"), and made that grievance known to other officers.

The complaint alleges that First **[**5]** Selectman George Temple instructed Soules to cut back enforcement of drunk driving laws, that Soules refused, and that disciplinary action ensued. Defendants allegedly solicited false complaints about Soules, created false performance evaluations, and attempted to have him arrested without probable cause.

On or about April 28, 2013, Soules filed a discrimination charge with the Connecticut Human Rights Office ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). Soules' first lawsuit, filed on July 23, 2014, alleged that defendants violated his rights under state and federal anti-discrimination laws. *Soules I, 2015 U.S. Dist. LEXIS 131985, 2015 WL 5797014, at *1-4.* While the motions to dismiss in Soules I were pending, Soules was terminated on January 6, 2015, prompting him to file a separate charge with the CHRO. On September 30, 2015, the district court granted defendants' motion to dismiss.

On May 9, 2016, Soules filed a second action in the District of Connecticut against the same parties (minus two individual defendants) alleging a nearly identical set of facts and claims, but adding the allegation that defendants terminated Soules in retaliation for filing Soules I. *Soules v. Connecticut, No. 3:16-cv-00703 (VLB), 2016 U.S. Dist. LEXIS 169009, 2016 WL 7155731 (D. Conn. Dec. 7, 2016)* ("Soules II"). The **[**6]** district court's dismissal of Soules II on the ground of res judicata prompted this appeal.

## [*55]  DISCUSSION

### I

**HN1** We review de novo a district court's dismissal of a complaint on the ground of res judicata. *EDP Medical Computer Sys., Inc. v. United States, 480 F.3d 621, 624 (2d Cir. 2007).*

**HN2** Res judicata bars re-litigation if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000).* It is conceded that Soules I constituted an adjudication on the merits and that the first and second lawsuit involve the same parties. Accordingly, the only issue on appeal is whether Soules' termination claim in Soules II was raised, or could have been raised, in Soules I.

As to the third element, we consider whether the second lawsuit concerns "the same claim—the same or nucleus of operative facts—as the first suit," applying three considerations: "(1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties-expectations." *Channer v. Dep't of Homeland Sec., 527 F.3d 275, 280 (2d Cir. 2008)* (internal quotation marks omitted). Res judicata **[**7]** "is based on the requirement that the plaintiff must bring all claims

at once against the same defendant relating to the same transaction or event." _N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 88 (2d Cir. 2000)_ (citation omitted).

Soules contends that he merely mentioned his termination in Soules I; but the first lawsuit repeatedly pressed the termination issue. Examples abound. Thus: "[a]fter the filing [of the complaint], the defendants further retaliated against the plaintiff by subjecting him to leave without pay, and further baseless demands that he submit to invasive examinations, with the intent to punish him and *fabricate a grounds for his termination*." See Joint App'x 27 (Soules I Am. Compl. ¶ 61) (emphasis added). In a document that Soules entitled "Objection to Defendants' Motion to Dismiss," which was attached to his memorandum of law in opposition to the motion to dismiss, Soules stated: "[i]n addition to the unlawful conduct of the defendants directed at the plaintiff as set forth in his Amended Complaint, the plaintiff has been terminated by the defendants." Objection to Defs.' Mots. To Dismiss at 1, Soules v. Connecticut, No. 3:14-cv-1045, (D. Conn. Feb. 10, 2015), ECF 40. He added: "[t]his act of employment capital punishment [**8] occurred on or about January 6, 2015, after the filing of the Amended Complaint, and constitutes further unlawful conduct by the defendants." Id. Soules' opposition to defendants' motions to dismiss declared on the first page of the memorandum that he "has been terminated by the defendants," and that the termination "constitutes further unlawful conduct." Town of Oxford Supplemental App'x 21 (Opp. Br. at 1). His termination is mentioned throughout the opposition papers as the culmination of the course of retaliatory, discriminatory, and harassing conduct. Soules alleged that "due to his disability or being regarded as disabled, he has been targeted for harassment and termination . . ." Id. at 46 (Opp. Br. at 26). In a similar vein, Soules emphasized his termination to bolster the plausibility of his substantive due process claim, his claim under the _Uniformed Services Employment and Reemployment Rights Act ("USERRA")_, and his _First Amendment_ retaliation claim. See id. at 52, 60, 62, 69, 71 (Opp. Br. at 32, [*56] 40, 42, 49, 51). These filings reflect that Soules was seeking to update his claims to add a termination claim in the district court, and he repeatedly raised his termination in his brief to this Court in the Soules I appeal. [**9] See id. 140, 152, 159-61 (Br. for Appellant at 20, 32, 39-41). The complaint was thus effectively amended.

Soules relies on Computer Associates International, Inc. v. Altai, Inc., which explains that for the purposes of res judicata "the scope of litigation is framed by the complaint at the time it is filed," and that the doctrine "does not apply to new rights acquired during the action which might have been, but were not, litigated." _126 F.3d 365, 369-70 (2d Cir. 1997)_. In Legnani v. Alitalia Linee Aeree Italiane, S.P.A., we specifically applied this principle to a retaliatory discharge claim. See _400 F.3d 139, 141 (2d Cir. 2005)_ ("When Legnani filed her 1995 [Title VII] action, she had not yet been discharged from Alitalia. She could not have brought the retaliatory discharge action at that time and, accordingly, she was free to bring her retaliatory discharge claim in this subsequent action."). Moreover, in Proctor v. LeClaire, we applied that rule where, as here, the plaintiff raised a subsequently arising claim in motion papers during the pendency of the first action. See _715 F.3d 402, 406-12 (2d Cir. 2013)_. Soules thus argues that res judicata does not bar claims that arose from transactions that occurred after he filed Soules I.

We conclude, however, that Soules' argument fails because his post-complaint [**10] conduct in Soules I effectively amended his complaint to add a retaliatory termination claim. Ordinarily, parties may not amend the pleadings through motion papers. See _Shah v. Helen Hayes Hosp., 252 F. App'x 364, 365 (2d Cir. 2007)_ (summary order); _Mathie v. Goord, 267 F. App'x 13, 14 (2d Cir. 2008)_ (summary order). But our only holding is that "a party is not *entitled* to amend its complaint through statements made in motion papers," _Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)_ (emphasis added), and "entitlement" is not the claim or the issue in this case. One may seek what one is not entitled to demand, and may get what one cannot claim as of right. Here, it appears that the district court implicitly permitted Soules to amend the initial complaint to address his employment termination. Soules can hardly claim on behalf of defendants that the amendment caused them prejudice. See _Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)_ (holding that "undue prejudice to the opposing party," among other reasons, is a ground to deny leave to amend). Much less can he show good reason why he should be afforded the opportunity to pursue the claim again.

Soules I and Soules II repeatedly link Soules' termination to the same course of unlawful conduct by defendants. The termination in Soules II is thus "related in time, space, origin, or motivation" to the discriminatory and retaliatory conduct alleged [**11] in Soules I. _Channer, 527 F.3d at 280_. And because Soules I and Soules II allege the same conduct by defendants, there can be no question that addressing all

882 F.3d 52, *56; 2018 U.S. App. LEXIS 2996, **11

of the claims at once would form a "convenient trial unit" and would "conform[] to the parties' expectations." Id. Computer Associates is thus inapposite to the circumstances here: if res judicata did not apply, the duplication of proceedings that would ensue, with the attendant waste of resources and risk of inconsistent results, is precisely what the doctrine of claim preclusion prevents. We conclude that the district court correctly ruled that res judicata bars this subsequent action.

**II**

Soules further argues that the dismissal should be reversed because it was **[*57]** impossible for him to assert the termination claim in Soules I without exhausting administrative remedies. *HN3* Ordinarily, a plaintiff seeking to bring a claim pursuant to *Americans with Disabilities Act ("ADA")*, *Title VII*, or the *Connecticut Fair Employment Practices Act ("CFEPA")* must exhaust administrative remedies through the EEOC or CHRO. See *Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006)* (Title VII); *J.C. v. Reg'l Sch. Dist. 10, Bd. of Educ., 278 F.3d 119, 124 (2d Cir. 2002)* (ADA); *Sullivan v. Bd. of Police Comm'rs of City of Waterbury, 196 Conn. 208, 215-16, 491 A.2d 1096 (1985)* (CFEPA).

In this circuit, however, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if **[**12]** they are 'reasonably related' to those that were filed with the agency." *Shah v. N.Y. State Dep't of Civil Servs., 168 F.3d 610, 614 (2d Cir. 1999)* (citations omitted). "Subsequent conduct is reasonably related to conduct in an EEOC charge if: [1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2002)* (internal quotation marks omitted).

Soules' termination claim was "reasonably related" to the original administrative charge under both the second and third Alfano exceptions to the exhaustion requirement.

As to the second exception, Soules draws a distinction between a claim of retaliation for filing an EEOC or CHRO charge, which would be subsumed in the original administrative filing, and the filing of a federal lawsuit (Soules I), which he argues (for some reason) would not. But the reason underlying this exception applies with equal force to retaliation for filing a federal lawsuit as it does for filing an administrative charge: "the close connection of the retaliatory act to both the initial discriminatory **[**13]** conduct and the filing of the [lawsuit] itself." *Butts v. City of N.Y. Hous. Pres. and Dev., 990 F.2d 1397, 1402 (2d Cir. 1993)* (citing *Owens v. N.Y.C. Hous. Auth., 934 F.2d 405, 410-11 (2d Cir. 1991))*. Requiring plaintiffs to file a second lawsuit regarding an employer's retaliatory conduct would duplicate investigations and waste resources on a claim concerning conduct already at issue in the first lawsuit; furthermore, it could perversely incentivize employers to retaliate in order to "impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." Id. Because the termination claim was reasonably related to the original administrative charge, Soules would not have been barred from bringing the claim in Soules I.

As to the third exception, Soules contends that the termination claim does not include "discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano, 294 F.3d at 381* (internal quotation marks omitted). Considering the filings in both Soules I and Soules II allege that defendants retaliated against Soules for filing a complaint, that the retaliation took the form of disciplinary action, and that defendants were building a case for retaliatory termination, the termination claim bore (at least) a reasonable relationship to the claims in Soules **[**14]** I.

*HN4* Res judicata applies to claims pending review in administrative proceedings. See *Woods v. Dunlop Tire Corp., 972 F.2d 36, 37-41 (2d Cir. 1992)*. Soules therefore had two options after the termination of his employment: (1) request a stay of **[*58]** Soules I after he filed the second CHRO charge, and then seek to join the termination claim, or (2) seek to amend the Soules I complaint. See *id. at 41*. As explained above, Soules took the second option: his conduct amended the Soules I complaint to include a retaliatory termination claim. The requirement that plaintiffs must exhaust administrative remedies does not alter this conclusion. Accordingly, Soules' termination claim could have been fully litigated in Soules I and was, and res judicata therefore prohibits Soules from re-litigating it here.

**CONCLUSION**

For the foregoing reasons, we hereby **AFFIRM** the

882 F.3d 52, *58; 2018 U.S. App. LEXIS 2996, **14

judgment of the district court.

---

**End of Document**

 Cited
As of: June 23, 2025 10:00 PM Z

## *Sullivan v. Bdg Media*

Supreme Court of New York, New York County

March 26, 2021, Decided

156613/2019

**Reporter**
71 Misc. 3d 863 *; 146 N.Y.S.3d 395 **; 2021 N.Y. Misc. LEXIS 1305 ***; 2021 NY Slip Op 21070 ****

 **[****1]** Phillip Sullivan, Plaintiff, v BDG Media, Inc., Doing Business as Elite Daily, Defendant.

## Core Terms

video, captioning, website, regulations, programming, accommodation, modifications, online-only, disability, establishments, occupy, place of public accommodation, allegations, preemption, television, preempts, online

## Headnotes/Summary

### Headnotes

**Statutes—Federal Preemption—Field Preemption—Accessibility Requirements for Online Video Content**

1. Plaintiff's claim that defendant discriminated against deaf and hard-of-hearing individuals by posting videos on its website without closed captioning in violation of the New York State and New York City Human Rights Laws was not precluded by the doctrine of field preemption because the federal Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA) and its implementing regulations do not occupy the field of online-video accessibility requirements. Federal law will be considered to impliedly preempt state law under the *Supremacy Clause of the United States Constitution* only when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it. The CVAA, which amended the Telecommunications Act of 1996 but left intact its savings clause, does not contain express language providing that it impairs or supersedes state law regarding video captioning. Further, the captioning requirements of the CVAA and its implementing regulations are limited to full-length video programs (and clips excerpted from full-length programs) that previously appeared on television. These regulatory requirements simply do not address one way or another the large and ever-growing field of online-only video content.

**Statutes—Federal Preemption—Conflict Preemption—Accessibility Requirements for Online Video Content**

2. Plaintiff's claim that defendant discriminated against deaf and hard-of-hearing individuals by posting videos on its website without closed captioning in violation of the New York State and New York City Human Rights Laws was not precluded by the doctrine of conflict preemption because interpreting those laws to require captioning for online-only video content would not necessarily obstruct federal captioning policy as expressed in the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA) and its implementing regulations. By enacting the CVAA, Congress intended to update the communications laws to help ensure that individuals with disabilities are able to fully utilize communications services and equipment and better access video programming. Interpreting New York law to require captioning of online-only videos furthers, rather than obstructs, the congressional purpose of enhancing the ability of individuals with disabilities to access video programming. There is no indication that Congress deliberately refrained in 2010 from requiring captioning of online-only video content because it felt that such a requirement would impose an excessive burden on content providers—rather than, for example, deciding to proceed one step at a time in regulating a new (and rapidly growing and changing) form of communication.

**Civil Rights—Discrimination Based on Disability—Website as Place of Public Accommodation**

3. Defendant's website, which allows users to access

71 Misc. 3d 863, *863; 146 N.Y.S.3d 395, **395; 2021 N.Y. Misc. LEXIS 1305, ***1305; 2021 NY Slip Op 21070, ****1

the news, read articles about current events and trends, and browse videos relating to popular culture, qualified as a place of public accommodation under the New York State (NYSHRL) and New York City (NYCHRL) Human Rights Laws, notwithstanding the absence of any physical location. The legislature intended that the definition of place of accommodation in the NYSHRL should be interpreted broadly, and the NYCHRL is to be construed more broadly than the NYSHRL in favor of plaintiffs alleging discrimination. The NYSHRL's definition of "place of public accommodation" lists a host of examples, including "establishments dealing with goods or services of any kind" (*Executive Law § 292 [9]*). The place of the public accommodation need not be a fixed location; it is the place where regulated parties do what they do. Under the expansive, functional understanding of "place," defendant's website—like a mail-order catalog or the like—qualified as a place of public accommodation. Given the modern prevalence of e-commerce, excluding online-only commercial enterprises from the definition of "public accommodation" would severely frustrate the legislature's intent to enable individuals with disabilities to fully enjoy the goods, services, privileges, and advantages available to the general public.

### Civil Rights—Discrimination Based on Disability—Failure to Allege Denial of Request for Modification or Accommodation

4. Plaintiff, who alleged that defendant discriminated against deaf and hard-of-hearing individuals by posting videos on its website without closed captioning, failed to state a claim under the New York State (NYSHRL) and New York City (NYCHRL) Human Rights Laws because he did not allege that he sought and was denied a captioning-related modification or accommodation, or that he had a basis to believe that making such a request would be futile. Under the NYSHRL, an unlawful discriminatory practice includes "a refusal to make reasonable modifications in policies, practices, or procedures" that are needed to enable an individual with a disability to take advantage of a place of accommodation; or, similarly, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services" (*Executive Law § 296 [2] [c] [i]-[ii]*). Plaintiff did not allege that he ever requested that defendant modify its video content or take steps necessary for him to enjoy that content without auxiliary aids. Nor did he allege any facts supporting his contention that it would have been futile to make such requests—for example, that defendant

had affirmatively represented that it was unwilling to add captioning to videos or provide similar accommodations, or that plaintiff was aware that defendant had previously refused similar requests made by other deaf individuals. Although disability-discrimination claims under the NYCHRL may be subject to a less-demanding inquiry than NYSHRL claims, plaintiff did not identify any respect in which the court should treat his NYSHRL and NYCHRL claims differently.

**Counsel:** **[***1]** *Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, New York City (*Scott A. Rader* of counsel), and Washington, D.C. (*Tara M. Corvo, Alyssia J. Bryant* and *Elana R. Safner* of counsel), for defendant.

*Lee Litigation Group, PLLC*, New York City (*C. K. Lee* of counsel), for plaintiff.

**Judges:** Gerald Lebovits, J.

**Opinion by:** Gerald Lebovits

## Opinion

 **[**398]** **[*865]** Gerald Lebovits, J.

Plaintiff, Phillip Sullivan, Jr., commenced this action against defendant, BDG Media, Inc., doing business as Elite Daily (Elite Daily), alleging that defendant violated his civil rights by denying him equal access to services offered on defendant's website.

Elite Daily owns and operates the website www.elitedaily.com. This website allows users to access the news, read articles about current events and trends, and browse videos relating to popular culture. Sullivan is deaf. He alleges that in June 2019, he attempted to watch seven videos on the website, but was unable to do so properly due to their lack of closed captioning. Without closed captioning, Sullivan could not understand the audio portions of the videos he tried to access.

Sullivan then brought this action against Elite Daily. His complaint alleges that Elite Daily discriminates against deaf and hard-of-hearing individuals **[***2]** by posting videos on its website without closed captioning, in violation of the New York State (NYSHRL) and New York City (NYCHRL) Human Rights Laws. Sullivan seeks damages and declaratory and injunctive relief.

71 Misc. 3d 863, *865; 146 N.Y.S.3d 395, **398; 2021 N.Y. Misc. LEXIS 1305, ***2; 2021 NY Slip Op 21070, ****1

Elite Daily now moves to dismiss this complaint under *CPLR 3211 (a) (7)*. The motion is granted, because Sullivan has not alleged that he requested—and was denied—a reasonable modification of the videos on Elite Daily's website that Sullivan asserts are inaccessible to him.

**[*866]** Discussion

On a motion to dismiss under *CPLR 3211 (a) (7)*, courts must give the pleadings a liberal construction, accept the allegations in the complaint as true, and accord a plaintiff every possible favorable inference. (*See Chanko v American Broadcasting Cos. Inc., 27 NY3d 46, 52, 29 NYS3d 879, 49 NE3d 1171 [2016]*.) However, allegations consisting of bare legal conclusions, or factual claims contradicted by documentary evidence, are not entitled to such consideration. (*See CIBC Bank & Trust Co. v Credit Lyonnais, 270 AD2d 138, 138, 704 NYS2d 574 [1st Dept 2000]*.)

I. Elite Daily's Argument That Sullivan's Claims are Preempted

Elite Daily contends that Sullivan's claim must be dismissed as preempted by the federal *Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA)*. The CVAA directed the Federal Communications Commission (FCC) to "revise its regulations to require the provision of closed captioning on video programming **[***3]** delivered using Internet protocol that was published or exhibited on **[**399]** television with captions." (*47 USC § 613 [c] [2] [A]*.) The resulting 2012 FCC regulations require closed captioning on "all nonexempt full-length video programming delivered using Internet protocol . . . if the programming is published or exhibited on television in the United States with captions." (*47 CFR 79.4 [b] [1]*.)

In other words, federal law requires closed captioning on Internet-based video content *only* for video content that was previously shown on television with captions. Elite Daily argues that this regulatory framework preempts application of the NYSHRL and NYCHRL to require content providers to include captioning for online-only videos. This court concludes that the CVAA does not have the preemptive effect that Elite Daily ascribes to it.

A. Field Preemption

Elite Daily asserts that the CVAA and its implementing regulations occupy the field of accessibility requirements for online video content, precluding *any* state regulation

in this area. Federal law will be considered to impliedly preempt state law under the *Supremacy Clause of the United States Constitution* only when "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the **[***4]** States to supplement it.' " (*Balbuena v IDR Realty LLC, 6 NY3d 338, 356, 845 NE2d 1246, 812 NYS2d 416 [2006]*, quoting *Cipollone v Liggett Group, Inc., 505 US 504, 516, 112 S Ct 2608, 120 L Ed 2d 407 [1992]*.) Several reasons lead **[*867]** this court to conclude that the CVAA (and the accompanying FCC regulations) do not occupy the legislative field of online-video accessibility requirements for preemption purposes.

**[1]** The CVAA amended the Telecommunications Act of 1996. In so doing, the CVAA left intact the Telecommunications Act's savings clause, which provides that the act or any amendments thereto "shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or Amendments." (*Telecommunications Act of 1996, Pub L 104-104, 110 US Stat 56, § 601 [c] [1]*.) This savings clause undercuts any inference that Congress intended to occupy the entire legislative field of captioning requirements. (*See Greater Los Angeles Agency on Deafness, Inc. v Cable News Network, Inc., 742 F3d 414, 428 [9th Cir 2014]*.)

There also is little reason to think that Congress intended to occupy the field with respect to online-video accessibility requirements such as captioning. The CVAA does not contain express language providing that it impairs or supersedes state law regarding video captioning, as **[****2]** would be needed under the Telecommunications Act's savings clause.

Further, the captioning requirements of CVAA and its implementing regulations **[***5]** are limited to full-length video programs (and clips excerpted from full-length programs) that previously appeared on television. These regulatory requirements simply do not address one way or another the large and ever-growing field of *online-only* video content. Nor is this court persuaded by Elite Daily's argument that federal regulatory silence in this area should be understood as evincing an intent to wholly occupy the field and thereby displace preemptively *any* state or local regulation of accessibility of online-only video content. (*See Greater Los Angeles Agency on Deafness, 742 F3d at 428* [similarly rejecting a version of this argument].)

B. Conflict Preemption

71 Misc. 3d 863, *867; 146 N.Y.S.3d 395, **399; 2021 N.Y. Misc. LEXIS 1305, ***5; 2021 NY Slip Op 21070, ****2

Elite Daily also contends that federal law preempts the NYSHRL and NYCHRL as a matter of conflict preemption. **[**400]** [1] Such implied preemption will be found "where state law stands as an obstacle to the accomplishment and execution of the full **[*868]** purposes and objectives of Congress." (*English v General Elec. Co., 496 US 72, 79, 110 S Ct 2270, 110 L Ed 2d 65 [1990]* [internal quotation marks and citations omitted].) No such obstacle exists here.

**[2]** By enacting the CVAA, Congress intended to "update the communications laws to help ensure that individuals with disabilities are able to fully utilize communications services and equipment and better access video programming." (S Rep 111-386, **[***6]** 111th Cong, 2d Sess, republished at 2010 WL 5186403.) Interpreting New York law to require captioning of online-only videos furthers, rather than obstructs the congressional purpose of enhancing the ability of individuals with disabilities to access video programming.

Elite Daily asserts that Congress deliberately chose to balance that objective against the regulatory burden of the CVAA by requiring closed captioning only with respect to online video that had previously aired on television. But Elite Daily has not identified any indication that Congress deliberately refrained in 2010 from requiring captioning of online-only video content because it felt that such a requirement would impose an excessive burden on content providers—rather than for example, deciding to proceed one step at a time in regulating a new (and rapidly growing and changing) form of communication. To the contrary, Elite Daily itself quotes from a CVAA committee report suggesting that Congress was open to the possibility of requiring captioning for online-only content but wished to have the benefit of further study of the issue before proceeding.[2]

───────────────

[1] More precisely, Elite Daily's conflict-preemption argument draws on what is sometimes referred to as the "obstacle" branch of conflict preemption (in which state law is an obstacle to federal policy), as distinct from the "impossibility" branch of conflict preemption (in which it is literally impossible for a regulated party to comply with both state and federal law at the same time).

[2] Elite Daily quotes from FCC rulemaking documents that refer to balancing the interests of users of closed captioning of online video content against the interests of providers of such content. (*See* NY St Cts Elec Filing [NYSCEF] Doc No. 4 at 5-6.) In context, however, that interest-balancing analysis does not refer to the choice between requiring captioning only of television-first online video content as opposed to captioning

(*See* NYSCEF Doc No. 4 at 5, quoting HR Rep 111-563, 111th Cong, 2d **[****3]** Sess, at 30, republished at 2010 WL 2902494.) Similarly, the 2014 FCC **[***7]** order on closed captioning cited and quoted by Elite Daily (*see id.* at 6) *expanded* federal regulation of online video content by requiring captioning for excerpted clips of previously aired content, in addition to full-length programs.[3] (*See* **[*869]** **[**401]** second order on reconsideration, *Matter of Closed Captioning of Internet Protocol-Delivered Video Programming*, 29 FCC Record 8687 ¶¶ 1-2, 4-9 [July 14, 2014].) Elite Daily thus has not shown that interpreting the NYSHRL and NYCHRL to require captioning for online-only video content would necessarily obstruct federal captioning policy, such that Sullivan's complaint should be dismissed on that ground at the pleading stage.

II. Elite Daily's Argument That its Website is Not a Place of Public Accommodation

**[3]** Next, Elite Daily argues that its website is not a place of public accommodation—as required for it to be subject to the accessibility requirements of the NYSHRL and NYCHRL. (*See Executive Law § 296 [2] [a]*; Administrative Code of City of NY § 8-107 [4] [a] [1] [a].) This court is not aware of any prior decision by a New York court that addresses this question.[4] As a matter of

───────────────

of *all* online video content—nor could it, given the CVAA's imposition only of television-first captioning requirements. Rather, the references relied on by Elite Daily pertain to various subsidiary policy questions that arose in the course of implementing the statutory television-first requirements.

[3] To the extent Elite Daily suggests that a state-law captioning requirement for online-only content is preempted because it "removes the flexibility granted by federal law," this court disagrees. (NYSCEF Doc No. 4 at 11.) As Elite Daily contends, in some circumstances a state law may be preempted where that law, if enforced, would deprive a federal department or agency of policy discretion afforded by Congress. Here, however, the CVAA specifies clearly the parameters of the closed-captioning regulation that Congress is directing the FCC to promulgate. (*See 47 USC § 613 [c] [2]*.) Applying the NYSHRL and NYCHRL to captioning of online-only video content would not narrow those parameters, or otherwise interfere with the policy discretion that the FCC retains in implementing the CVAA. It would instead add a distinct regulatory requirement outside the scope of the CVAA altogether. As discussed above, that new, added requirement would not stand as an obstacle to Congress's policy objectives in the CVAA.

[4] A decision of the court recently noted that a federal district court applying New York law has held a website to qualify as a

71 Misc. 3d 863, *869; 146 N.Y.S.3d 395, **401; 2021 N.Y. Misc. LEXIS 1305, ***7; 2021 NY Slip Op 21070, ****3

first impression, considering the NYSHRL's text, purpose, and precedent, this court concludes that a website qualifies as a place of public accommodation under the statute.

 **[***8]**

The NYSHRL treats "place of public accommodation" as an extremely broad category. The statute's definition of this term is expressly framed in illustrative rather than exclusive or limiting terms. (*See Executive Law § 292 [9]*.) And it is clear that "the Legislature intended that the definition of place of accommodation should be interpreted broadly." ( **[*870]** *Matter of United States Power Squadrons v State Human Rights Appeal Bd., 59 NY2d 401, 410, 452 NE2d 1199, 465 NYS2d 871 [1983]*.)

The statutory definition lists a host of examples—most relevantly here, "establishments **[****4]** dealing with goods or services of any kind."[5] (*Executive Law § 292 [9]*; *accord Matter of Cahill v Rosa, 89 NY2d 14, 21-22, 674 NE2d 274, 651 NYS2d 344 [1996]* [construing this example broadly].) Although many of these examples are physical structures or establishments, rather than an intangible "place" like a website, the Court of Appeals emphasized in *United States Power Squadrons* that "place" in this statute is a "term of convenience, not limitation." ( *59 NY2d at 411*.) That is, public accommodations need not necessarily be "supplied at fixed places," and establishments "may discriminate by denying goods and services without denying individuals access to any particular place"—as in the case of "mail order services." (*Id.*) Thus, the "place of the public accommodation need not be a fixed location, it is the place where [regulated parties] do what they do." (*Id.*)

---

place of public accommodation. (*See Petty v Law Off. of Robert P. Santoriella, P.C., 2020 NY Slip Op. 33908[U], at *3 [Sup Ct, NY County Nov. 25, 2020]*, Rosado, J.], citing *Andrews v Blick Art Materials, LLC, 268 F Supp 3d 381, 398-401 [ED NY 2017]*.) But that decision did so merely to indicate the breadth of the NYSHRL's definition of public accommodation, in the course of resolving a different interpretive question. The court did not itself have occasion in *Petty* to consider whether websites are within the statutory definition.

[5] Conversely, the statutory definition's two principal categories of institutions or establishments that are *not* places of public accommodation are (i) various types of educational institutions; and (ii) "any institution, club or place of accommodation which proves that it is in its nature distinctly private." (**Executive Law § 292 [9]**.) Elite Daily's website is neither an educational institution nor distinctly private.

 **[**402]** Here, **[***9]** Elite Daily is a media establishment that provides services to the public in the form of articles and videos. And it provides those services through its website. This court concludes that under *United States Power Squadrons*' expansive, functional understanding of "place," Elite Daily's website—like a mail-order catalog or the like—qualifies as a place of public accommodation notwithstanding the absence of any physical location. Indeed, given the modern prevalence of e-commerce, excluding online-only commercial enterprises from the definition of "public accommodation" would severely frustrate the legislature's intent to enable individuals with disabilities to fully enjoy the goods, services, privileges, and advantages available to the general public.

Elite Daily contends that its website nonetheless does not qualify as a place of public accommodation under the NYSHRL because the website "does not sell or lease goods or services to the public," but instead "offers free content to its online readers" while deriving its revenue "from online ad placements." (NYSCEF Doc No. 4 at 15.) But Elite Daily fails to explain *why* this distinction should make a dispositive difference under **[***10]** New York law; and this court concludes that it does not.[6] That the business model of the "establishment" in this case is based on a more indirect means of earning revenue from the services it provides—i.e., through advertising rather than through subscriptions or per-item charges—does not alter the nature of the services (articles and videos) themselves. And in any event, the statutory definition encompasses "retail stores and establishments dealing with goods or services *of any kind*." (*Executive Law § 292 [9]* [emphasis added].)

This court is thus not persuaded by Elite Daily's argument that Sullivan's complaint fails to state a cause of action for failure to allege that Sullivan was denied access to the advantages and privileges of a place of accommodation within the meaning of the NYSHRL. And given that the NYCHRL is to be construed *more* broadly than the NYSHRL in favor of plaintiffs alleging discrimination, Elite Daily's argument fails perforce as to this element of Sullivan's NYCHRL **[****5]** claim.

### III. Elite Daily's Argument That it Did Not Refuse to Make Reasonable Modifications to its Website

---

[6] Elite Daily's argument on this point is based exclusively on federal decisions interpreting the Americans with Disabilities Act (ADA), rather than on New York precedent. (*See NYSCEF Doc No. 4 at 14-15 and n 7*.)

71 Misc. 3d 863, *871; 146 N.Y.S.3d 395, **402; 2021 N.Y. Misc. LEXIS 1305, ***10; 2021 NY Slip Op 21070, ****5

**[4]** Elite Daily also argues that Sullivan's claims should be dismissed because he has not alleged that he sought and was denied a captioning-related **[***11]** modification or accommodation. This court agrees.

Under the NYSHRL, an unlawful discriminatory practice in the context of disability discrimination includes "a refusal to make reasonable modifications in policies, practices, or procedures" that are needed to enable an individual with a disability to take advantage of a place of accommodation; or, similarly, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services." (*Executive Law § 296 [2] [c] [i]-[iii]*.)

As Elite Daily argues, though, Sullivan's complaint cannot establish that Elite Daily refused to make necessary modifications to its video content, or refused to take steps necessary for him to enjoy that content without auxiliary aids, because he has not alleged that he ever *requested* such steps or modifications in the first place. Indeed, **[**403]** Sullivan's opposition to the motion to dismiss effectively concedes as much.

 **[*872]** Sullivan contends that he can nonetheless state a cause of action because it would have been futile for him to make that request of Elite Daily. But his complaint does not allege any facts supporting this contention—for example, that Elite **[***12]** Daily had affirmatively represented that it was unwilling to add captioning to videos or provide similar accommodations, or that Sullivan was aware that Elite Daily had previously refused similar requests made by other deaf individuals.

Sullivan suggests that such allegations are unnecessary. He asserts that he had actual notice that Elite Daily "does not intend to comply" with its obligations under anti-discrimination law because Sullivan "has affirmatively attempted and failed to access Defendant's services." (NYSCEF Doc. No. 13 at 12, 13.) But for present purposes the question is not whether Elite Daily's failure to provide captioning for several videos allegedly prevented Sullivan from meaningfully accessing those videos. Rather, it is whether Sullivan has alleged a basis to conclude that Elite Daily would refuse to make reasonable modifications on request that would afford Sullivan such access. And he has not.

This case is thus similar to the decision of the U.S. District Court for the Southern District of New York in *Castillo v Hudson Theatre, LLC*, in which the court held

that the plaintiff had failed to state a disability-discrimination cause of action because she had not alleged facts **[***13]** indicating either that she had sought and been refused a modification or accommodation for her disability, or that she had a basis to believe that making such a request would be futile. *(412 F Supp 3d 447, 451-452 [SD NY 2019].)* If anything, Sullivan's position is weaker than that of the plaintiff in *Castillo*, because Elite Daily undisputedly provides a means of accessing captioned versions of most of the videos at issue via YouTube.[7] (*See* NYSCEF Doc No. **[****6]** 4 at 17 and n 9.)

Sullivan relies heavily on a decision of the U.S. District Court for the Western District of Texas, which held that the **[*873]** wheelchair-using plaintiffs in the case did not need to have actually downloaded Uber and Lyft's mobile apps and requested rides as a precondition to suing defendants under the ADA for failing to provide ride-sharing services to wheelchair-users. (*See* NYSCEF Doc No. 13 at 12-13, citing *Ramos v Uber Techs., Inc., 2015 U.S. Dist. LEXIS 20914, 2015 WL 758087, at *9 [WD Tex, Feb. 20, 2015, No. SA-14-CA-502-XR, Rodriguez, J.]*.) But in reaching this conclusion, the district court in *Ramos* took into account the detailed affidavits from plaintiffs explaining why they believed that Uber and Lyft would deny services to—and would not accommodate—wheelchair-using customers. (*See 2015 U.S. Dist. LEXIS 20914, 2015 WL 758087 at *8-*9; accord Lowell v Lyft, Inc., 352 F Supp 3d 248, 253, 256 [SD NY 2018]* [same].) This is precisely the kind of information that is *not* alleged in Sullivan's complaint (or for that **[***14]** matter his motion to dismiss). Sullivan thus cannot satisfy a necessary element of his disability-discrimination claims.[8]

---

[7] Sullivan disputes Elite Daily's contention that these alternative means are, in practice, reasonably equivalent to offering captioned videos directly on Elite Daily's website. (*See* NYSCEF Doc. No. 13 at 14-15.) The point here, though, is not whether offering links to Elite Daily content on YouTube is itself a reasonable accommodation—a question on which this court expresses no opinion here. It is that Elite Daily's apparent willingness to provide captioning for its videos when hosted on YouTube undercuts Sullivan's argument that it would have been futile for him even to request that Elite Daily provide captioning for videos on its website. And again, Sullivan has not alleged facts that might otherwise support (or salvage) his futility argument.

[8] Although, as noted above, disability-discrimination claims under the NYCHRL may be subject to a less-demanding inquiry than NYSHRL claims, Sullivan does not identify any respect in which this court should treat his NYSHRL and

71 Misc. 3d 863, *873; 146 N.Y.S.3d 395, **403; 2021 N.Y. Misc. LEXIS 1305, ***14; 2021 NY Slip Op 21070, ****6

 **[\*\*404]** Accordingly, for the foregoing reasons, it is hereby ordered that defendant's motion to dismiss under *CPLR 3211 (a) (7)* is granted, and the action is dismissed, with costs and disbursements to defendant as taxed by the County Clerk upon submission of a reasonable bill of costs; and it is further ordered that defendant serve a copy of this decision with notice of its entry on plaintiff; on the office of the General Clerk; and on the office of the County Clerk, which shall enter judgment accordingly.

---

**End of Document**

---

NYCHRL claims differently.

⚠ Caution
As of: June 23, 2025 9:54 PM Z

# *Traguth v. Zuck*

United States Court of Appeals for the Second Circuit

March 18, 1983, Argued ; June 17, 1983, Decided

Docket Nos. 82-7148, 82-7850, No. 15

**Reporter**
710 F.2d 90 *; 1983 U.S. App. LEXIS 26622 **; 36 Fed. R. Serv. 2d (Callaghan) 1189

FRED TRAGUTH and OTTO HANDTKE, individually and doing business as Dance Motion Press, Plaintiffs-Appellees, v. D'LELA ZUCK, Defendant-Appellant

**Prior History: [**1]** Appeal from a default judgment entered in the United States District Court for the Southern District of New York, Carter, J., in an action brought under the district court's diversity jurisdiction.

**Disposition:** Reversed and remanded.

## Core Terms

default, pro se, district court, plaintiffs', damages, extension of time

## Case Summary

**Procedural Posture**
Defendant agent challenged an order of the United States District Court for the Southern District of New York, which granted plaintiff clients' motion for default judgment in their conversion suit after defendant did not retain counsel or file an answer within the time that was allowed for doing so.

**Overview**

The trial court granted plaintiff clients' motion for a default judgment in their conversion suit against defendant agent due to her failure to file an answer or to obtain counsel within the permitted time. The court reversed that order on appeal and remanded the case. The court found that defendant's timely pro se answer was in compliance with the order on which the default was based, and that her pro se status was not properly regarded. The court also determined that, even if defendant's answer was untimely, the trial court abused its discretion by disregarding her motion to set aside the finding of default. The court held that granting additional time to secure counsel was an extension of time under *Fed. R. Civ. P. 6(b)(2)*, and that requiring defendant to answer through counsel was invalid because it denied her the statutory right to self-representation. The court also concluded that failing to set aside the finding of default was an abuse of discretion because there were no grounds for finding that defendant's default was willful, plaintiffs did not allege prejudice, and meritorious defenses seemed to be presented to most of the complaint's counts.

**Outcome**
The court reversed the default judgment granted in favor of plaintiff clients in their conversion suit against defendant agent. The court found that defendant's pro se answer complied with the default-based order, and that requiring an answer through counsel denied her the statutory self-representation right.

## LexisNexis® Headnotes

Civil Procedure > ... > Pleadings > Time Limitations > Extension of Time

Governments > Courts > Rule Application & Interpretation

Civil Procedure > ... > Pleadings > Time Limitations > General Overview

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Right to Self Representation

*HN1* **Time Limitations, Extension of Time**

710 F.2d 90, *90; 1983 U.S. App. LEXIS 26622, **1

*Fed. R. Civ. P. 6(b)(2)* provides that when an act is required or allowed to be done at or within a specified time, the court, for cause shown, may at any time in its discretion upon motion made after the expiration of the specified period permit the act to be done where the failure to act is the result of excusable neglect. *Rule 6(b)* does not, however, vest a court with discretion to impose a special condition on the responding party which violates a statutory right. Under *28 U.S.C. S. § 1654*, a party to a civil action in federal court has the right to appear pro se.

Civil Procedure > Parties > Pro Se Litigants > Right to Self Representation

Civil Procedure > Parties > Pro Se Litigants > General Overview

*HN2* **Pro Se Litigants, Right to Self Representation**

The right to self-representation is a right of high standing, not simply a practice to be honored or dishonored by a court depending on its assessment of the desiderata of a particular case.

Civil Procedure > Parties > Pro Se Litigants > General Overview

*HN3* **Parties, Pro Se Litigants**

See *28 U.S.C.S. § 1654*.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > General Overview

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Default Judgments

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Relief From Default

Governments > Courts > Rule Application & Interpretation

*HN4* **Standards of Review, Abuse of Discretion**

*Fed. R. Civ. P. Rule 55(c)* permits a party to be relieved of default for good cause shown. Whether good cause is deemed to be shown depends on three considerations: whether the default is willful, whether setting it aside prejudices the adversary, and whether a meritorious defense is presented. The decision is committed to the discretion of the district court, but an abuse of discretion need not be glaring to justify reversal. The narrow scope of the district court's discretion stems from strong policies favoring the resolution of genuine disputes on their merits, and for the same reasons, doubts are to be resolved in favor of a trial on the merits.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > Parties > Pro Se Litigants > Right to Self Representation

Governments > Courts > Authority to Adjudicate

*HN5* **Pleadings, Amendment of Pleadings**

Implicit in the right to self-representation is an obligation on the part of the trial court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training. While the right does not exempt a party from compliance with relevant rules of procedural and substantive law, it should not be impaired by harsh application of technical rules. Trial courts have been directed to read pro se papers liberally, and to allow amendment of pro se complaints "fairly freely."

**Counsel:** D'Lela Zuck, New York, New York, Appellant Pro Se.

Henry O. Leichter, New York, New York (Susan M. Erda, Erda & Leichter, New York, New York, of Counsel), for Plaintiffs-Appellees.

**Judges:** Mansfield, Meskill and Newman, Circuit Judges.

**Opinion by:** MESKILL

# Opinion

**[*91]**  MESKILL, Circuit Judge:

This is an appeal from a default judgment entered against a *pro se* defendant in the United States District Court for the Southern District of New York, Carter, *J.* Judgment was entered against D'Lela Zuck after she failed to file a timely answer or to obtain counsel within the time allotted her by the court for that purpose. For the reasons set forth below, we reverse and remand the case for further proceedings on the merits.

I

This case arises from a dispute between Fred Traguth and Otto Handtke, author and illustrator respectively, of the book *Modern Jazz Dance*, and D'Lela Zuck, erstwhile American distributor of the book. Traguth and **[**2]** Handtke are West German citizens who live in West Germany and occasionally travel to the United States on business. Under the name of Dance Motion Press, they published the book in a German language edition in 1976 and in an English language edition in 1978. In 1979 they hired Zuck to act as agent for Dance Motion Press in the United States and Canada, and **[*92]**  to promote and distribute the American edition of the book.

Disagreements apparently arose over the scope of Zuck's authority and the compensation to which she was entitled, and on September 11, 1981 Traguth and Handtke filed the instant diversity action in conversion. Their complaint alleged that Zuck had failed to account to them for her receipts from sales of the book, that she had paid them only $6,000 of the proceeds, that she had refused to return to them the book production materials and unsold copies and that she had asserted exclusive publication rights to the book, hampering their efforts to publish a second American edition. On September 17, 1981 plaintiffs moved for a preliminary injunction to restrain Zuck from disposing of the unsold copies and the production materials.

On October 9, 1981 Zuck wrote **[**3]**  to the district judge to request an extension of time to answer the complaint and assistance in securing counsel. She explained her view of the dispute, described her efforts to obtain an extension from Henry Leichter, plaintiffs' counsel, and expressed her willingness "to come to court and cooperate in order to resolve the matter." On October 22, 1981 a conference was held in chambers

with Zuck and Leichter present. In a conversation following the conference, Zuck rejected a settlement proposed by Leichter and offered a counterproposal. Leichter later telexed Zuck's offer to the plaintiffs in Germany. On October 26 Zuck wrote to the court to report that while no agreement had been reached, she remained hopeful that they would settle. She added that, on the court's recommendation, she was continuing to seek counsel. That same day, Leichter wrote to the court to say that plaintiffs had telexed their rejection of Zuck's offer the day before and that a settlement appeared unlikely.

On November 9, 1981, in response to the October 26 letters, the judge wrote Zuck and Leichter a letter which included the following:

> Since Ms. Zuck does need legal representation, I am willing **[**4]**  to give her until December 1, 1981, to secure counsel. If on or before December 1, counsel does not put in an appearance on Ms. Zuck's behalf, Mr. Leichter may renew his motion for default judgment.

Counsel never appeared for Zuck. On November 28, however, Zuck filed an answer in which she denied the bulk of plaintiffs' allegations and asserted, as an affirmative defense, lack of subject matter jurisdiction for failure to meet the jurisdictional amount in controversy. On December 2 Leichter wrote to the court, acknowledging receipt of Zuck's answer on December 1, but arguing that Zuck had failed to comply with the November 9 directive by answering *pro se* instead of retaining counsel. In a letter to the court dated December 9, Zuck responded to Leichter's letter and requested that the court entertain her motion to dismiss for lack of jurisdiction. That motion was received in the Southern District *pro se* office December 9, filed December 10, and received in Judge Carter's chambers December 11.

In an endorsement order dated December 10, 1981 and filed December 11, the court agreed with Leichter:

> The November 9 extension was quite specific. It gave defendant **[**5]**  additional time to secure counsel. It did not extend time to answer *pro se* after the initial failure to make a timely response to the complaint. The court was of the view that Ms. Zuck's interest could best be protected if she employed counsel. That was the only justification for not acting on plaintiffs' motion for default. Although the court desires defendant to proceed with professional help, it cannot be overlooked that

plaintiffs' rights have a claim on the court's attention. Accordingly, since defendant has failed or refused to use the time between November 9, 1981, and December 1, 1981, to secure counsel, plaintiffs may renew the motion for default judgment.

On December 14, 1981 Zuck responded to the order with dismay, offering the following explanation:

**[*93]** There was no intent at any time to over-look Your Honor's order, and I have put a great deal of time and effort in my continuous attempts to secure counsel. However nothing was available unless I could provide the financial backing which I lack. Unless the court decides that I should sacrifice my livelihood for that cause, there is no means available for me to secure counsel, and as I am **[**6]** already in debt I have no way of persuing [sic] this possibility.

For the reasons mentioned above, I have taken the only way left, believing that it was my right to defend myself. In my attempts to find legal knowledge I have frequented the Library of the Bar Association and came upon a quotation which I believed was supportive of my action.

Zuck proceeded to quote *28 U.S.C. § 1654 (1976)*, which provides the right to self-representation in the federal courts and requested that the court "consider my unknowledgeable position." On December 21 Zuck sent the court a notarized letter describing her attempts to obtain counsel and stating that she had been unable to do so.

Plaintiffs renewed their motion for default judgment on December 15, 1981. On January 14, 1982 Zuck requested an extension of the return date on the motion. On January 22, 1982 the court granted plaintiffs' motion, entered judgment in an amount later determined to be $75,407.05 and enjoined Zuck from moving or transferring the book production materials and the unsold copies of the book. The court also ordered Zuck to account to plaintiffs for all proceeds of sales of the book **[**7]** and referred the case to Magistrate Kent Sinclair "to conduct such accounting and to determine the amount of damages sustained by plaintiffs, if necessary."

On January 25, 1982 Zuck filed a motion for leave to file her answer out of time, which was denied on February 5. On February 10 Zuck wrote to the court to point out that it had never ruled on her motion to dismiss. That same day she filed a notice of appeal.

We denied plaintiffs' motion to dismiss the appeal for lack of a final judgment holding that the district court's order granting injunctive relief was appealable. We revested the district court with sufficient jurisdiction to complete the accounting and stayed the appeal until the accounting was completed and a supplemental judgment was filed.

On June 15, 1982 Magistrate Sinclair held a hearing on the issue of damages at which Zuck and Leichter were present and on September 1 he issued his findings and conclusions. On September 10 Zuck filed an objection to the magistrate's report. The court adopted the report on October 6 and a judgment for $75,407.05 in damages was filed on October 12. On November 4 Zuck filed a notice of appeal.

II

The district court's entry **[**8]** of default judgment was improper for two reasons. First, Zuck's answer was timely filed under the court's November 9 directive extending her time to respond until December 1. Second, even if the answer was untimely, the court abused its discretion in disregarding Zuck's motion to set aside the finding of default. These issues are addressed seriatim.

A. *Timeliness of the Answer*

In its letter directive of November 9, 1981 the court allowed Zuck an extension of time until December 1 to secure counsel for purposes of responding to the complaint. In effect, the November 9 directive was an extension of time to answer under *Rule 6(b)(2) of the Federal Rules of Civil Procedure* on the condition that Zuck answer through counsel rather than *pro se*. That condition, however, improperly denied Zuck's statutory right to self-representation and was thus unenforceable by a finding of default after an answer was filed within the extension period.

**HN1** *Rule 6(b)(2)* provides that when "an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion upon motion made after the expiration of the specified **[*94]** period **[**9]** permit the act to be done where the failure to act was the result of excusable neglect." Since the complaint was served on September 15, Zuck had until October 5 to file a timely answer. *See Fed. R. Civ. P. 12(a)*. By her letter of October 9, in which she stated her willingness to go to court to resolve the dispute and asked for an extension of time, Zuck moved for an extension of time to file her answer. *See Haines v.*

710 F.2d 90, *94; 1983 U.S. App. LEXIS 26622, **9

*Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*; *Moorish Science Temple of America, Inc. v. Smith, 693 F.2d 987, 989-90 (2d Cir. 1982)* (pro se papers should be read liberally). Thus, the court, within its discretion, granted Zuck leave to respond to the complaint (albeit through counsel) on or before December 1.

*Rule 6(b)* does not, however, vest a court with discretion to impose a special condition on the responding party which violates a statutory right. Under *28 U.S.C. § 1654 (1976)*, a party to a civil action in federal court has the right to appear *pro se*. [1] **HN2** The right to self-representation "is a right of high standing, not simply a practice to be honored or dishonored **[**10]** by a court depending on its assessment of the desiderata of a particular case." *O'Reilly v. New York Times Co., 692 F.2d 863, 867 (2d Cir. 1982)*. While the right may be limited under certain circumstances, *see id. at 867-69*, none of those circumstances are present in this case. The condition that Zuck appear through counsel was clearly impermissible. Since Zuck filed and served her answer within the period allowed by the district court, the court's December 10 finding of default was based solely on the fact that she answered *pro se*. The subsequent grant of plaintiffs' motion for default judgment must therefore be reversed.

B. *Motion to Set Aside the Finding of Default*

By **[**11]** her letter of December 14, Zuck sought to set aside the December 10 finding of default. *See Haines v. Kerner, 404 U.S. at 520*; *Moorish Science Temple of America, Inc. v. Smith, 693 F.2d at 989-90*. While a default was never entered on the district court docket sheet, *see Fed. R. Civ. P. 55(a)*, the court's December 10 order was functionally equivalent to an entry of default, *cf. Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981)*, and Zuck's request should therefore have been considered as a motion to set aside an entry of default under *Rule 55(c) of the Federal Rules of Civil Procedure, see id. at 276-77*. **HN4** *Rule 55(c)* permits a party to be relieved of default "for good cause shown." Whether good cause is deemed to have been shown depends on three considerations: "whether the default was willful, whether setting it aside would prejudice the

adversary, and whether a meritorious defense is presented." *Id. at 277*. The decision is committed to the discretion of the district court, *Keegel v. Key West & Caribbean Trading Co., 200 U.S. App. D.C. 319, 627 F.2d 372, 373 (D.C. Cir. 1980)*, **[**12]** but "an abuse of discretion need not be glaring to justify reversal," *id. at 373-74*. The narrow scope of the district court's discretion stems from "strong policies favoring the resolution of genuine disputes on their merits," *Jackson v. Beech, 205 U.S. App. D.C. 84, 636 F.2d 831, 835 (D.C. Cir. 1980)*, and for the same reasons, "doubts are to be resolved in favor of a trial on the merits," *Meehan v. Snow, 652 F.2d at 277*.

The district court did not make the required inquiries because it did not rule on Zuck's motion. It is clear from the record, however, that the motion could not properly have been denied. As in *Meehan*, there were no grounds for finding that Zuck's default was willful and plaintiffs neither alleged nor proved prejudice. It appears that Zuck presented meritorious defenses to most of the counts alleged in the complaint. [2] **[**13]** Since Zuck satisfied the requirements **[*95]** of *Rule 55(c)*, the court's failure to set aside the finding of default was an abuse of discretion. [3]

───────────────

[2] As to the alleged conversion of the production materials, testimony of a plaintiff's witness at a hearing held in March 1982 by Magistrate Sinclair established that the printer had shipped the materials to Germany and that Zuck never had possession of them. Hearing Tr. at 13-19; *see* Magistrate's Findings and Conclusions at 10 n.11 ("Liability for this material was determined by default, although the hearing evidence suggested a lack of liability."). In her letter of October 9, 1981 Zuck alleged that she had not been compensated for her services or reimbursed for her expenses as was previously agreed to by plaintiffs, so part of the allegedly converted proceeds from sales of the book may have been hers, depending on the agreed-upon payment procedure. She also asserted that she held the unsold books "in lieu of payment." Depending on her ultimate intentions, she may have had a good-faith defense to the claim of conversion of the books. *See* 23 N.Y. Jur.2d *Conversion* § 56 (1982).

[3] Compare *Martin v. Fesson*, 80 Civ. 42, slip op. (S.D.N.Y. Dec. 30, 1982), in which the court denied defendant's motion to set aside an entry of default upon finding, after a careful review of defendant's conduct over the course of the proceedings, that the default was willful and that defendant had no meritorious defenses. Two months had passed between service of the complaint and entry of default judgment, during which defendant's lawyer called plaintiffs' lawyer twice to inquire about the substance of the action without entering a notice of appearance, filing responsive

───────────────

[1] **HN3** *28 U.S.C. § 1654 (1976)* provides as follows:

In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

710 F.2d 90, *95; 1983 U.S. App. LEXIS 26622, **13

The district court also abused its discretion in failing to take into account Zuck's *pro se* status.  *HN5* Implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal **[**14]** training.  While the right "does not exempt a party from compliance with relevant rules of procedural and substantive law," *Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981)*, it should not be impaired by harsh application of technical rules.  Trial courts have been directed to read *pro se* papers liberally, *Haines v. Kerner, 404 U.S. at 520*, and to allow amendment of *pro se* complaints "fairly freely," *Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir. 1980)*.

The court's duty is even broader in the case of a *pro se* defendant who finds herself in court against her will with little time to learn the intricacies of civil procedure.  Zuck had no reason to know, upon service of the complaint, that she faced default if she did not answer within twenty days.  She searched in good faith for a lawyer to represent her and, failing in that, she responded within that period diligently, if unskillfully, to every pronouncement of the court.

The judgment of the district court is reversed and the cause remanded for further proceedings on the merits.  If Zuck is ultimately found liable and continues to represent herself through the inquiry **[**15]** into damages, the district court may proceed on the record developed in the hearings on damages held before Magistrate Sinclair, without prejudice to the parties' right to offer additional evidence pertaining to damages.

---

**End of Document**

---

papers, or appearing at a scheduled pretrial conference.  *Id.* at 3-4.  Defendant finally appeared after a final judgment was filed, about fourteen months after service of the complaint.

⚠️ Caution
As of: June 23, 2025 9:55 PM Z

# *Triestman v. Fed. Bureau of Prisons*

United States Court of Appeals for the Second Circuit

September 18, 2006, Argued ; December 5, 2006, Decided

Docket No. 05-3080-pr

**Reporter**
470 F.3d 471 *; 2006 U.S. App. LEXIS 29858 **

BEN GARY TRIESTMAN, Plaintiff-Appellant, v. FEDERAL BUREAU OF PRISONS, UNITED STATES OF AMERICA, Defendants-Appellees.

**Prior History: [**1]** Appeal from a dismissal pursuant to *Fed. R. Civ. Proc. 12(b)(1)* of plaintiff's complaint under the Federal Torts Claim Act ("FTCA"), *28 U.S.C. §§ 1346(b)(1)* and *2671 et seq.* Because the pro se plaintiff's submissions should be read to include a theory of liability that the district court did not consider, which might not be barred by the FTCA's discretionary function exception, dismissal was inappropriate.

**Disposition:** VACATED and REMANDED, with the recommendation that district court appoint counsel to aid plaintiff in further pursuing his claims on remand.

## Core Terms

guard, district court, pro se, staff, staffing, pro se litigant, coverage, injuries, inmate, emergency, discretionary function, signaling device, allegations, locked, cell, theory of liability, appellate brief, diligence, strongest, housing unit, unattended, pursuing, assault, hear, inattentiveness, regulations, patrolling, employees, assigned, laziness

## Case Summary

### Procedural Posture

Plaintiff prisoner, who was pro se, appealed the dismissal of counts four and five of his complaint, pursuant to *Fed. R. Civ. P. 12(b)(1)*, brought against defendant prison bureau under the Federal Tort Claims Act (FTCA), *28 U.S.C.S. §§ 1346(b)(1)* and *2671 et seq.*

### Overview

Counts four and five asserted that defendant did not provide either emergency signaling devices or continuous staffing of the areas where inmates were left unattended in locked areas. As a result, plaintiff urged that he was preventably injured by his cell mate. The district court granted defendant's motion to dismiss for lack of jurisdiction, concluding that plaintiff's complaint regarding the signaling devices and proper staffing were barred by the FTCA's discretionary function exceptions to the federal government's limited waiver of sovereign immunity under *28 U.S.C.S. § 2680(a)*. The court vacated the dismissal. Although plaintiff argued that the staffing policy where he was incarcerated was negligent, he did not expressly articulate the separate argument that the prison's employee's were negligent in their enforcement of this policy. Under the circumstances, the court construed plaintiff's complaint liberally and broadly since plaintiff was pro se so that it could be read to include a claim for the latter. As to this negligent guard theory, although it did not rule on the merits, the court held that the district court clearly had subject matter jurisdiction.

### Outcome

The court vacated the district court's dismissal of plaintiff's counts four and five, and remanded to the district court for further proceedings. The court recommended that the district court appoint counsel to aid plaintiff.

## LexisNexis® Headnotes

Governments > Federal Government > Claims By & Against

Torts > ... > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions

*HN1* **Federal Government, Claims By & Against**

470 F.3d 471, *471; 2006 U.S. App. LEXIS 29858, **1

28 U.S.C.S. § 2680(a) bars liability for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee whether or not the discretion involved be abused.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN2* **Standards of Review, De Novo Review**

Where a district court grants a defendant's *Fed. R. Civ. P. 12(b)(1)* motion to dismiss, a circuit court of appeals reviews the district court's legal conclusions de novo, and must accept as true all material factual allegations in the complaint.

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN3* **Pro Se Litigants, Pleading Standards**

It is well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest. This policy of liberally construing pro se submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.

Governments > Federal Government > Claims By & Against

Torts > ... > Federal Tort Claims Act > Exclusions From Liability > Discretionary Functions

Torts > ... > Liability > Federal Tort Claims Act > Employees

*HN4* **Federal Government, Claims By & Against**

The negligent guard theory is a theory of liability under the Federal Tort Claims Act over which the district court clearly has subject matter jurisdiction. A negligent guard

theory would not fall under the discretionary function exception because such negligent acts neither involve an element of judgment or choice nor are grounded in considerations of governmental policy.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN5* **Defenses, Demurrers & Objections, Motions to Dismiss**

At the *Fed. R. Civ. P. 12(b)(1)* stage of litigation, it is not necessary for the district court to determine which party shall ultimately prevail.

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN6* **Pro Se Litigants, Pleading Standards**

Courts cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest; the courts should not excuse frivolous or vexatious filings by pro se litigants; and pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.

**Counsel:** Ben Gary Triestman, Pro se, Shady, N.Y.

William H. Pease, Assistant United States Attorney (for Barbara D. Cottrell, Assistant United States Attorney) (Paula Ryan Conan, Assistant United States Attorney, of counsel), for Glenn T. Suddaby, United States Attorney for the Northern District of New York, Albany, N.Y., for Defendant-Appellee.

**Judges:** Before: CALABRESI and B.D. PARKER, Circuit Judges, and LYNCH, District Judge; [*] Judge Lynch dissents in a separate opinion. **[**2]**

# Opinion

[*472] PER CURIAM:

Appellant Ben Gary Triestman appeals from a March

_____

[*] The Honorable Gerard E. Lynch, United States District Judge for the Southern District of New York, sitting by designation.

10, 2004 order of the United States District Court for the Northern District of New York (Mordue, *J.*) partially dismissing -- pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* -- Triestman's complaint brought under the Federal Tort Claims Act ("FTCA"), *28 U.S.C. §§ 1346(b)(1)* and *2671 et seq.*, against the Federal Bureau of Prisons ("BOP") and the United States of America. [1] We conclude that Triestman's submissions, construed "liberally" and "interpret[ed] [so as] to raise the strongest arguments that they suggest," *Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)* (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)),* should be read to allege a theory of liability under the FTCA that the district court did not consider below. Because the district court has jurisdiction to consider this theory of liability, dismissal pursuant to *Rule 12(b)(1)* was inappropriate and, accordingly, we vacate and remand to the district court for further proceedings. In addition, [**3] we recommend that the district court appoint counsel to assist Triestman in further pursuing his claims.

## BACKGROUND

### I. Statement of facts

At all relevant times, the BOP had in place a program statement which provided that "[s]ignaling devices will be available for inmate use in all locked housing units that do not have *continuous staff coverage,*" and that "[i]nmates will not be left *unattended* in locked areas unless a signaling device is available to them for emergencies." BOP Program Statement No. 1600.06(3-4) (Feb. 25, 1992). The language of this program statement makes clear that prison officials must provide "continuous staff coverage" to, and may not leave "unattended," any inmate in a locked housing unit who does not have access to an emergency [**4] "signaling device." The precise terms "continuous staff coverage" and "unattended" are not defined in the program statement.

According to Triestman, while he was incarcerated at the Federal Correctional Institution at Ray Brook, New York ("FCI Ray Brook"), the BOP "neglect[ed] its duty of care" by failing to "adhere[] to its own regulations." Specifically, Triestman asserts that BOP employees -- namely, the correctional staff at FCI Ray Brook -- "did

not provide either emergency signaling devices or continuous staffing of the areas where inmates were left unattended in locked areas," and, consequently, failed to comply with the BOP's program statement. It is undisputed that emergency signaling devices were not made available at FCI Ray Brook. Triestman contends that "continuous staff coverage" was not provided either, and that, as a result, he was left "unattended in . . . a locked area."

[*473] In support of this contention, Triestman's submissions have focused on the staffing policy in place at FCI Ray Brook which, Triestman argues, was so inadequate that it "cannot be interpreted as continuous staff coverage." Under the staffing policy -- according to Triestman's undisputed description [**5] -- a single guard was assigned to an officer's station positioned in the center of numerous locked cells. Triestman explains that "[t]wice throughout the night, at regularly scheduled times, the guard is to make a cell check, and peeks into the window of each darkened cell for about 5 seconds. Between these cell checks, the inmates are entirely beyond earshot of the guard."

Triestman alleges that he was "preventably injured" as a result of FCI Ray Brook's failure to provide "continuous staff coverage." As a first-time, non-violent federal inmate, Triestman had originally been "designated a low security inmate and initially housed a [sic] low security facility at . . . Otisville, [New York]." On January 12, 1995, due to overcrowding at Otisville, Triestman was transferred to FCI Ray Brook, a "medium/high security prison." [2] Upon arrival at FCI Ray Brook, Triestman was assigned to share a cell with an inmate, Gerald Harris, whom Triestman argues "was known to the [BOP] to be a violent criminal and sexual predator."

[**6] Triestman's appellate brief recounts the circumstances leading to his alleged injuries:

> On the morning of January 26, 1995, at approximately 4:00 am [sic], after a night of escalating cajoling, advances and threats to convince Plaintiff to participate in homosexual intercourse and sodomy, Gerald Harris assaulted Plaintiff out of frustration and extortion, whereas

---

[1] In an order filed on March 11, 2005, the district court, summarily adopting the report and recommendation of the magistrate judge, dismissed the remaining count in Triestman's complaint. Triestman did not appeal this dismissal.

---

[2] Triestman argued to the district court that he had been wrongly classified at a higher security level, "which led to him being transferred to [sic] medium/high security prison and thus being placed into a circumstance of unwarranted higher risk of violence and risk." The district court dismissed this "negligent transfer" claim, and Triestman does not appeal the district court's decision on this point.

470 F.3d 471, *473; 2006 U.S. App. LEXIS 29858, **6

[sic] Plaintiff refused to submit to Harris' overtures. In the assault, Harris dislocated Plaintiff's shoulder and later burned his hand with lit cigarettes.

Despite Plaintiff's shouts for help, no officer responded, and over this time Plaintiff was at the mercy of Harris, and in excruciating pain and fear . . . .

When the officer finally did come by, Plaintiff banged on the door begging to be let out[;] the officer queried as to why through the closed door[;] and Plaintiff yelled that he had been attacked.

The officer unlocked the door . . . and later Plaintiff was escorted to the infirmary, where he was X-rayed, [and] his shoulder reduced without anesthetics.

Triestman says that, as a result of the attack, he "suffered acute excruciating pain, emotional distress, and continues to suffer chronic **[**7]** shoulder instability as well as continuing post traumatic stress." We must, at this stage of the proceedings, accept these factual assertions as true.

II. Procedural history

In July 1996, Triestman, proceeding *pro se*, filed this FTCA suit. [3] In counts four **[*474]** and five of his complaint, Triestman asserted that the BOP failed to provide him signaling devices and proper staffing at FCI Ray Brook. [4] The district court, adopting the report and recommendation of United States Magistrate Judge David R. Homer, concluded, in relevant part, that counts four and five of Triestman's complaint were barred by the FTCA's "discretionary function" exception to the federal government's limited waiver of sovereign immunity. *See* **HN1** *28 U.S.C. § 2680(a)* (barring liability

_____

[3] In August 1995, Triestman also brought a *Bivens* suit, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*, against various BOP employees, based on similar factual allegations. The district court denied Triestman's motion to consolidate his *Bivens* and FTCA suits, however, and then dismissed the *Bivens* suit on April 11, 1997. For reasons unknown, Triestman did not appeal the dismissal of his *Bivens* suit, and that case was closed.

[4] While these arguments were presented in counts four and five of Triestman's complaint, the magistrate judge relied, instead, on the numbering in the introductory section of Triestman's complaint, which listed these same arguments under numbers "2" and "3." We will, like the district court, refer to the counts addressing signaling devices and staffing as counts four and five.

for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or [] employee . . ., whether or not the discretion involved be abused"); *see also Fazi v. United States, 935 F.2d 535, 538 (2d Cir. 1991)* (describing the two-pronged *Berkovitz-Gaubert* test for determining whether **[**8]** a government employee's conduct is protected under the discretionary exception function) (citing *United States v. Gaubert, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)*; *Berkovitz v. United States, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988)*). Accordingly, the district court granted the government's *Rule 12(b)(1)* motion to dismiss for lack of subject matter jurisdiction, on the ground of sovereign immunity.

**[**9] DISCUSSION**

On appeal, Triestman challenges only the district court's dismissal for lack of jurisdiction of the allegations in counts four and five of his complaint -- namely, that the BOP "did not provide either emergency signaling devices or continuous staffing of the areas where inmates were left unattended in locked areas," and that this failure is causally related to the injuries he suffered. Accordingly, we address only those counts.

I. Standards of review and construction of *pro se* submissions

**HN2** Where, as here, a district court grants a defendant's *Rule 12(b)(1)* motion to dismiss, we review the district court's legal conclusions *de novo*, *Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005)*, and "must accept as true all material factual allegations in the complaint," *J.S. ex rel. N.S. v. Attica Cent. Schs, 386 F.3d 107, 110 (2d Cir. 2004)*. *See also Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*.

**HN3** It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they **[**10]** suggest." *Pabon, 459 F.3d at 248* (emphasis added) (quoting *Burgos, 14 F.3d at 790*); *see also Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)*; *Forsyth v. Fed'n Employment & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005)*; *Sharpe v. Conole, 386 F.3d 482, 484 (2d Cir. 2004)*; *Wright v. Comm'r., 381 F.3d 41, 44 (2d Cir. 2004)*; *Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)*; *Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)*; *Weixel v. New York City Bd of*

*Educ., 287 F.3d 138, 145-46 (2d Cir. 2002)*; *Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)*; *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)*; *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)*.

 **[\*475]** This policy of liberally construing *pro se* submissions is driven by the understanding that "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack **[\*\*11]** of legal training." *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)*; *see also Ruotolo v. I.R.S., 28 F.3d 6, 8 (2d Cir. 1994)* (recognizing that *pro se* litigants must be accorded "special solicitude"). *See generally* Jonathan D. Rosenbloom, *Exploring Methods to Improve Management and Fairness in* Pro Se *Cases: A Study of the* Pro Se *Docket in the Southern District of New York*, *30 FORDHAM URB. L.J. 305, 380 (2002)* ("In this time of ever increasing legal costs and complexity of litigation, the *pro se* litigant is at an insurmountable disadvantage.").

## III. Analysis

### A. Triestman's submissions, liberally construed

Throughout this case, Triestman has manifestly argued that FCI Ray Brook's staffing policy was itself negligent. He has not, however, expressly articulated the separate argument that FCI Ray Brook employees were negligent in their enforcement of this policy. Nevertheless, under the circumstances of this case, the majority of this panel believes -- in light of the "special solicitude" that is appropriately accorded to *pro se* litigants, *see Ruotolo, 28 F.3d at 8* -- that **[\*\*12]** Triestman's submissions can be read to assert the latter claim, i.e., that the officer on duty when the incident occurred failed to patrol or respond diligently to an emergency situation out of laziness or inattentiveness. Indeed, our court has, in a similar case, read such a "negligent guard" theory into a *pro se* complaint that was "susceptible to various readings." *See Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000)* (construing a *pro se* complaint as alleging negligence due to a BOP employee's failure to perform a diligent inspection out of laziness, hastiness, or inattentiveness, in addition to a claim that the BOP's inspection policy was itself negligent).

As in *Coulthurst*, the language in Triestman's submissions is "broad enough to cover" the negligent guard theory. *Coulthurst, 214 F.3d at 110*. Triestman's

appellate brief asserts that his "injuries would have been prevented had [the BOP] *adhered to its own regulations*," and, broadly, that the BOP "is liable for *neglecting its duty of care*." This language must be liberally construed. *See Dotson v. Griesa, 398 F.3d 156, 159 (2d Cir. 2005)* (applying **[\*\*13]** a "liberal reading" to plaintiff's "*pro se* appellate brief"); *Wright v. Comm'r., 381 F.3d at 44* ("[W]e construe *pro se* appellate briefs and submissions liberally and interpret them to raise the strongest arguments they suggest.") (citation omitted); *Ortiz v. McBride, 323 F.3d 191, 194 (2d Cir. 2003)* ("This court construes appellate briefs submitted by *pro se* litigants liberally and reads such submissions to raise the strongest arguments they suggest.") (citation omitted).

Similarly, Triestman's complaint uses broad language in its assertion that the BOP "[f]ailed to *institute and enforce* proper staffing and patrolling for each wing of the housing units during lockdown, and thus did not provide due diligence and emergency response [sic] when such emergency occurred . . . ." The words "institute and enforce" quite plainly "suggest" two separate but complimentary arguments: (1) that FCI Ray Brook's staffing policy fell so far outside the range of appropriate judgment that it can no longer be viewed as an exercise of "discretion" in attempting to comply with the BOP's policy statement; **[\*476]** and (2) that FCI Ray Brook also "enforce[d]" **[\*\*14]** that policy inadequately, due to the negligent actions of its employees. [5]

It is true that Triestman, during oral argument before this panel, did not articulate the "negligent guard" theory for himself. But that is of no moment, as it was the obligation of the district court below to interpret Triestman's complaint "to raise the strongest arguments that they suggest." *Pabon, 459 F.3d at 248* (citation omitted).

### B. Consideration of the negligent guard theory **[\*\*15]**

---

[5] Triestman's complaint also alleges that "[a] single staff member cannot be said to be staffing both wings when he cannot hear or be alerted to an emergency in the opposing wing." This language is, of course, consistent with the first argument, i.e., that FCI Ray Brook's staffing policy was hopelessly inadequate. However, Triestman's claim about the inadequacy of the staffing policy is in no way *inconsistent* with the second argument about the negligence of BOP employees, which his complaint also fairly suggests.

HN4 The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction. *See Coulthurst, 214 F.3d at 109* (holding that a negligent guard theory would not fall under the discretionary function exception because "[s]uch negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy"). Therefore, Triestman's complaint should not have been dismissed pursuant to *Rule 12(b)(1)*. *See Aurecchione, 426 F.3d at 638* (holding that a plaintiff's complaint survived *Rule 12(b)(1)* dismissal where the plaintiff "made a colorable pleading of subject matter jurisdiction upon which the district court could have relied to adjudicate the complaint").

While expressing no ultimate view of the merits of the negligent guard theory in this case, or even of its capacity to withstand summary judgment, we believe the claim is not so meritless that it can now be dismissed under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. *See Aurecchione, 426 F.3d at 638-39* [**16] (noting that, HN5 at the *Rule 12(b)(1)* stage of litigation, "it is not necessary for the district court to determine which party shall ultimately prevail" (citing *Scheuer, 416 U.S. at 236* ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim[]. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.")).

The complexity of the negligent guard theory in this case is such, moreover, that we believe a claim of this sort is best made with the assistance of counsel. Hence, we recommend that the district court, on remand, appoint counsel to aid Triestman in pursuing this claim. *Cf. Mosseri v. FDIC, 104 F.3d 356, at *3 (2d. Cir. 1996)* (unpublished) (noting that "full briefing before the district court is . . . desirable" and therefore "encourag[ing] the district court to . . . appoint counsel" for the *pro se* litigant).

Furthermore, we decline at this time to rule on the justiciability or merits of the theory of liability that Triestman has explicitly presented to us, i.e., that FCI Ray [**17] Brook's staffing policy was itself negligent. We do so decline because, if the negligent guard theory can be made on remand, the answer that the defendants might give to such a claim -- insofar as it touches on the clarity of the rules with which they were complying -- may affect the propriety of a dismissal, pursuant to the discretionary function exception, of Triestman's "negligent policy" claim. Thus, in view of the

[*477] possibly inextricable relationship between the negligent guard and negligent policy theories of liability, we believe it would be inappropriate to rule on these theories in piecemeal fashion.

* * *

Our learned dissenting colleague does not believe that the petitioner's complaint can be read to assert the negligent guard theory of liability. In the end, that has to be a matter of judgment on which reasonable people may differ. There are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," *Ruotolo, 28 F.3d at 8*; that a *pro se* litigant's submissions must be construed "liberally," *Brownell, 446 F.3d at 310*; and that such submissions must be read to raise the strongest arguments that they [**18] "suggest," *Pabon, 459 F.3d at 248*. At the same time, our cases have also indicated that HN6 we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, *Phillips v. Girdich, 408 F.3d 124, 127 (2d Cir. 2005)* (citation omitted), or arguments that the submissions themselves do not "suggest," *Pabon, 459 F.3d at 248*; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," *Iwachiw v. N.Y. State DMV, 396 F.3d 525, 529 n.1 (2d Cir. 2005)*; and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law," *Traguth, 710 F.2d at 95* (citation omitted). [6] In all candor, the rubric used in all these cases seems more likely to reflect the conclusion already reached by the court than to give much guidance in deciding which case falls on which side of the line. Under the circumstances, we must all do our best to gauge what is appropriate.

[**19] CONCLUSION

We VACATE the district court's dismissal of Appellant's counts four and five, and REMAND to the district court for further proceedings consistent with this decision. Additionally, we recommend that the district court appoint counsel to aid Appellant in further pursuing his

_____

[6] *Cf. Donald v. Cook County Sheriff's Dep't, 95 F.3d 548, 555 (7th Cir. 1996)* (cautioning that while the court "is not to become an advocate" for a *pro se* litigant, it must "take appropriate measures to permit the adjudication of *pro se* claims on the merits"). *See generally* Ellen E. Sward, *Values, Ideology, and the Evolution of the Adversary System*, *64 IND. L.J. 301, 321 n.96 (1989)* ("A judge can be impartial but very active in developing the case . . . . Impartiality is a requirement for fair adjudication, but judicial passivity is not.").

claims on remand. In identifying one line of argument that is clearly not barred by the discretionary function exception -- i.e., the negligent guard theory -- we express no opinion as to its ultimate merits. Nor, in doing so, do we prevent counsel from pursuing other arguments -- for example, whether FCI Ray Brook's staffing policy falls outside the range of appropriate judgment, such that it can no longer be viewed as an exercise of "discretion" under the discretionary function exception -- as counsel may deem appropriate. In leaving such matters to counsel's judgment we, of course, do not suggest that any such arguments will be meritorious.

**Dissent by:** Gerard E. Lynch

# Dissent

LYNCH, District Judge, dissenting:

In January 1995, Ben Gary Triestman was brutally assaulted by a cellmate in the Federal Correctional Institution at Ray Brook, New York. On August 16, 1995, he filed a lawsuit pursuant to **[\*\*20]** *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, [\*478] 29 L. Ed. 2d 619 (1971)*, against several prison officials, alleging that their actions and negligence had proximately caused the injuries inflicted on him in the assault. He filed the instant case on July 10, 1996, alleging that the Federal Bureau of Prisons and the United States were also responsible for his injuries. He advanced a number of theories in these lawsuits, including that the Bureau and individual prison officials improperly transferred him to Ray Brook in the first place based on an inaccurate assessment of his security level, that they acted negligently in double-celling him with a known violent sexual predator, and, most relevant to this appeal, that the Bureau failed to comply with a regulation requiring that prisoners not be left in locked housing units without either a signaling device that would permit calling for help in the event of emergency, or "continuous staff coverage." (See App. at 13-18.) The district court denied Triestman's motion to consolidate the two lawsuits and, at various stages of the litigation, rejected all of Triestman's theories of liability in **[\*\*21]** each case.[1]

---

[1] These cases represent only two of over a dozen cases filed by Triestman in the District Court for the Northern District of New York between 1992 and 1996.

After receiving final judgments from the district court, Triestman abandoned the *Bivens* action and most of the claims against the Bureau, choosing to appeal instead only the dismissal of his claim against the Bureau regarding the alleged lack of "continuous staff coverage." According to Triestman, the district court erred when it dismissed this claim under the "discretionary function" exception to the Federal Tort Claims Act (FTCA). See *28 U.S.C. § 2680(a)*. The argument is straightforward: Triestman contends that because the placement of a single guard on duty for an entire housing unit cannot be interpreted as providing "continuous staff coverage," the Bureau's assignment of only one guard to his unit violated mandatory regulations requiring either "continuous staff coverage" or an emergency signaling device. **[\*\*22]** (Appellant's Br. at 5-8.) The discretionary function exception, Triestman argues, does not permit the Bureau to redefine the plain meaning of "continuous staff coverage" to include "any de minimus level prison staff care." (Appellant's Reply Br. at 5.) To hold otherwise, he asserts, would render the FTCA ineffective, by allowing the government to cast any unreasonable interpretation of a mandatory regulation as an exercise of its "discretion" and therefore immune from judicial scrutiny. (See id. at 5-6.)

Rather than address the merits of this argument, the Court today determines sua sponte that a theory of negligence on the part of the specific guard on duty (which in turn could be attributed to the United States on a theory of respondeat superior) lurks unexpressed in Triestman's FTCA complaint, and remands the case to the district court to explore liability on this basis. The Court thus extends this ten-year old litigation by requiring the district court essentially to start at the beginning with an entirely new theory never asserted by Triestman, while at the same time declining to decide the one issue that the parties have clearly presented for decision.

One is loathe **[\*\*23]** to dissent from a ruling that appears simply to keep open an option for a pro se plaintiff who was unquestionably injured, by suggesting an avenue of relief that conceivably could be successfully pursued by a diligent attorney. After all, it is common ground that submissions of pro se litigants must be read liberally to include "the strongest arguments they suggest." *Wright v. C.I.R., 381 F.3d 41, 44 (2d Cir. 2004)*. As the Court indicates, reasonable people can disagree over **[\*479]** whether a given theory is encompassed within a complaint. It is tempting simply to go along with an apparently charitable impulse

470 F.3d 471, *479; 2006 U.S. App. LEXIS 29858, **23

to make sure every theory has been explored.

Here, however, even under a liberal interpretation, I do not believe Triestman's complaint can fairly be read to allege that his injuries resulted from a particular guard's negligence, laziness, or inattentiveness. On the contrary, Triestman clearly alleges that the Bureau's practice of placing a single guard on duty made it impossible for any guard even to hear Triestman's cries for help, and therefore made it impossible for any guard to prevent his injuries. The complaint alleges, for example, that the housing unit contained **[**24]** "two widely separated wings," and that the single officer assigned to patrol them "*could not hear* or be alerted to an emergency" in one wing while he was in the other. (App. at 7 (emphasis added).) "A single staff member," the complaint continues, "cannot be said to be staffing both wings when he *cannot hear* or be alerted to an emergency in the opposing wing." (Id. (emphasis added).) Though the complaint alleges injuries caused by "substandard and insufficient patrolling and monitoring of the inmate rooms," it clearly explains that these deficiencies existed "due to [the] lack of staffing," and cannot fairly be read to attribute the "insufficient patrolling" to the negligence of particular guards. (Id.)

Triestman's brief on appeal is also inconsistent with the "negligent guard" theory. Thus, even if the complaint could be read to include a claim that a particular guard was inattentive or lazy, this Court should deem the claim abandoned on appeal. See *Cruz v. Gomez, 202 F.3d 593, 596 n. 3 (2d Cir. 2003)* ("When a litigant -- including a pro se litigant -- raises an issue before the district court but does not raise it on appeal, the issue is abandoned. **[**25]** " (citing *LoSacco v. City of Middletown, 71 F.3d 88, 92-93 (2d Cir. 1995))).* Nowhere in the brief does Triestman claim that the guard on duty on the night of the assault acted negligently in any manner. The brief asserts instead that when an officer was stationed in his "assigned" position, "it was *impossible* for [him] to hear cries for help from any of the cells." (Appellant's Br. at 4 (emphasis added).) Though the assigned guard was required to make two "cell checks" at regularly scheduled times during the night, the brief explains, "the inmates [were] entirely beyond earshot of the guard" at all other times. (Id.; see also *id. at 7* ("[B]etween [cell checks,] . . . a guard cannot . . . hear an inmate's calls or cries for help.").) [2] These factual allegations, which the majority

largely ignores, are inconsistent with any claim that a guard's negligence caused plaintiff's injuries. Contrary to the majority's conclusion that "Triestman's claim about the inadequacy of the staffing policy is in no way inconsistent with the second argument about the negligence of [Bureau] employees," Majority Opinion at 9 n. 5 (emphasis omitted), Triestman's **[**26]** complaint and brief make clear that, because the Bureau placed only one guard on duty, even a diligent guard would have been physically unable to hear Triestman's cries for help. If a guard's diligence would not have prevented Triestman's injuries, the lack of diligence on the guard's part could not have caused them. [3]

 **[**27]** **[*480]** It is telling, moreover, that Triestman has not hesitated to allege negligence or recklessness on the part of particular prison officials when he believes they are responsible for his injuries. In the unappealed <u>Bivens</u> action -- which related to the same assault at issue in this case -- Triestman alleged that Roger Fink, the prison's Safety Manager, as well as some of Fink's employees, had acted with "deliberate indifference" in "keeping the facility without necessary safety devices" that could have prevented Triestman's injuries. Complaint at 1d, <u>Triestman v. Sizer</u> (N.D.N.Y. 1995) (95 Civ. 1140). Triestman also alleged that two of the prison wardens were "responsible for keeping Ray Brook FCI below federally mandated conditions, resulting in Plaintiff's injury." Id. The <u>Bivens</u> complaint, however, did not allege laziness, inattentiveness, or negligence on the part of any guard on duty the night Triestman was attacked. This further confirms what the complaint and appellate brief in the instant case already make clear --

_____

was impossible for any . . . guard" in his "assigned" position "to hear cries for help." (Appellant's Br. at 4.)

[3] The majority notes that this Court "has, in a similar case, read such a 'negligent guard' theory into a *pro se* complaint that was 'susceptible to various readings.'" Majority Opinion at 8 (quoting *Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000)).* In <u>Coulthurst</u>, however, unlike in this case, the plaintiff clearly presented a "negligent guard" theory on appeal. It is one thing to read a complaint liberally to avoid finding that a plaintiff has forfeited a claim he wishes to make before this Court. It is quite another to read a complaint to contain a claim the plaintiff does not assert even on appeal. While <u>Coulthurst</u> may provide further support for the undisputed proposition that pro se submissions should be construed liberally to raise the strongest arguments they suggest, the case provides no support for the majority's refusal to take into account the multiple, unambiguous factual allegations in Triestman's submissions that undermine the "negligent guard" theory.

_____

[2] According to Triestman, the assault occurred between cell checks (<u>see</u> App. at 20), and thus occurred at a time when "it

that Triestman has never intended to advance the theory invented by the Court today.

My most serious objection to the majority's disposition of the **[**28]** case, however, has less to do with the Court's willingness to read the pro se complaint to contain a theory not presented -- though I disagree with its reading -- than with its unwillingness to decide the issue that plainly *is* presented. The district court in this case considered and ruled on what the majority refers to as the "negligent policy" claim. Triestman then appealed, presenting this Court with a very clear argument as to why the district court's application of the discretionary function exception to bar the "negligent policy" claim was in error. The issue having been decided by the district court and fully briefed by the parties on appeal, I believe that we have a responsibility to rule on it. After all, if the "negligent policy" claim has merit, and the district court's decision should be reversed on that basis, then the plaintiff's case goes forward expeditiously. If it does not, then the district court need waste no further time on that theory. [4]

**[**29]** Under the majority's chosen course, however, the case is remanded to the district court to revisit, possibly with the assistance of counsel, a claim that the district court has already found without merit. If the district court was right, this will be a waste of everyone's time; if the district court was wrong, the error will have **[*481]** to be corrected by this Court at some future time, and correction of the error will have been long delayed, to the benefit of no one -- and certainly not of Triestman. Moreover, since no one until now has ever considered the "negligent guard" theory that the majority finds hidden in the complaint, the actual behavior of the guard in question has not been explored in discovery. The proceedings on remand, therefore, may well be extensive and time-consuming. One may hope that it will not take another ten years to bring the case again to a final judgment, but there is no small likelihood of a lengthy and inconclusive battle over an invented issue.

Rather than the "special solicitude" represented by the majority's disposition, see Majority Opinion at 7, 8 (quoting *Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir. 1994))*, a reasonable pro se litigant **[**30]** might well prefer to be accorded the ordinary respect of this Court's deciding the issue he has earnestly put before us. If he is correct, the case can proceed on the theory that he has chosen and pursued for ten years. If he is not, then that branch of the litigation will be terminated, and Triestman will be spared the time and expense of re-litigating a losing argument.

Because I believe the Court has improperly ducked the one issue properly presented to it, and has unnecessarily required the district court to extend a decade-old litigation by addressing issues not fairly suggested by the plaintiff's complaint or appellate brief, I respectfully dissent.

---

**End of Document**

---

[4] Though I believe Triestman presented his arguments effectively, I would have not the slightest objection to appointing counsel in this Court if the majority felt that doing so could elucidate the issues better for us and result in fairer treatment for Triestman. This is precisely what the Court did in Coulthurst, which as the majority notes similarly involved allegations of negligence by an injured prisoner. See *214 F.3d at 108*. The Coulthurst panel specifically instructed appointed counsel to explore the viability of the negligent guard theory. See *Coulthurst v. United States, 214 F.3d 106 (2d Cir. 1999)* (order appointing counsel).

⚠️ Caution
As of: June 23, 2025 9:56 PM Z

# *United States v. Space Hunters, Inc.*

United States Court of Appeals for the Second Circuit

September 16, 2005, Argued ; November 9, 2005, Decided

Docket Nos. 02-6313-cv(L), 04-6681-cv(XAP), 05-0481-cv(CON)

**Reporter**
429 F.3d 416 *; 2005 U.S. App. LEXIS 24139 **

UNITED STATES OF AMERICA, Plaintiff-Appellant-Cross-Appellee, v. SPACE HUNTERS, INC., JOHN McDERMOTT, Defendants-Appellees-Cross-Appellants.

**Subsequent History:** As Amended, December 9, 2005.

Related proceeding at *Space Hunters, Inc. v. United States, 2011 U.S. Dist. LEXIS 53009 (S.D.N.Y., May 17, 2011)*

**Prior History:  [**1]**  The Government appeals from the dismissal of Fair Housing Act claims and the striking of a claim for punitive damages by the United States District Court for the Southern District of New York (Casey, J.). Space Hunters, Inc. and John McDermott cross-appeal from the denial of their motion for judgment as a matter of law.

*United States v. Space Hunters, Inc., 2004 U.S. Dist. LEXIS 23699 (S.D.N.Y., Nov. 22, 2004)*
*United States v. Space Hunters, Inc., 2001 U.S. Dist. LEXIS 12804 (S.D.N.Y., Aug. 23, 2001)*

**Disposition:** AFFIRMED IN PART, VACATED AND REMANDED IN PART.

## Core Terms

district court, exemption, relay, punitive damages, testers, housing, disability, alleges, investigator, defendants', discriminatory, discriminated, violating, answered, rooms, advertisement, dwelling, motion for judgment as a matter of law, violation of section, affirmative defense, disabled people, telephone, courts, rental, cases, subject matter jurisdiction, rights, reckless indifference, matter of law, quotation

## Case Summary

**Procedural Posture**
Plaintiff Government appealed from the judgment of the United States District Court for the Southern District of New York, dismissing six of seven Fair Housing Act (FHA) claims, and striking its claim for punitive damages. Defendants cross-appealed from the denial of their motion for judgment as a matter of law.

**Overview**

The district court erred in limiting the application of § 804(c) of the FHA, *42 U.S.C.S. § 3604(c)*, to owners and their agents because the statute's plain language applied broadly to any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicated a discriminatory preference on prohibited grounds. Also, the district court erred in treating the exemption found in § 803(b)(2) of the FHA, *42 U.S.C.S. § 3603(b)(2)*, as a jurisdictional limitation. Because the "Mrs. Murphy" exemption was an affirmative defense having no bearing on subject matter jurisdiction, the district court should not have considered evidence outside the complaint. Additionally, the district court should have allowed the jury to consider punitive damages, as there was ample evidence that defendants acted with malice and reckless indifference to an individual's federally protected rights. Finally, the district court correctly denied defendants' motion for judgment as a matter of law, as the jury heard a virtual tsunami of evidence that defendants did treat disabled people differently from non-disabled people.

**Outcome**
The judgment of the district court was affirmed as to its denial of defendants' motion for judgment as a matter of law, and vacated and remanded in part.

## LexisNexis® Headnotes

429 F.3d 416, *416; 2005 U.S. App. LEXIS 24139, **1

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Exemptions

### HN1 Fair Housing Rights, Exemptions

The exemption in § 803(b)(2) of the Fair Housing Act (FHA), *42 U.S.C.S. § 3603(b)(2)*, states that most of the provisions of § 804 of the FHA, *42 U.S.C.S. § 3604*, do not apply to housing that is occupied by four or less families and in which the owner lives.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### HN2 Standards of Review, De Novo Review

Appellate courts review de novo the grant of a motion to dismiss for failure to state a claim. In so doing, appellate courts accept all of a plaintiff's factual allegations in the complaint as true and draws inferences from those allegations in the light most favorable to the plaintiff.

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Prohibited Conduct

### HN3 Fair Housing Rights, Prohibited Conduct

Section 804(c) of the Fair Housing Act makes it unlawful to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination. *42 U.S.C.S. § 3604(c)*.

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Prohibited Conduct

### HN4 Fair Housing Rights, Prohibited Conduct

The language of the Fair Housing Act applies broadly to any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates a discriminatory preference on prohibited grounds. *42 U.S.C.S. § 3604(c)*. Nothing in the language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, the language does not provide any specific exemptions or designate the persons covered, but rather applies on its face to anyone who makes prohibited statements.

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Prohibited Conduct

### HN5 Fair Housing Rights, Prohibited Conduct

The Fair Housing Act protects against the psychic injury caused by discriminatory statements made in connection with the housing market.

Constitutional Law > ... > Freedom of Speech > Commercial Speech > General Overview

### HN6 Freedom of Speech, Commercial Speech

Commercial speech, a subset of speech for which the *First Amendment* accords a lesser protection than to other constitutionally guaranteed expression.

Constitutional Law > ... > Freedom of Speech > Commercial Speech > General Overview

### HN7 Freedom of Speech, Commercial Speech

Courts have consistently found that commercial speech that violates § 804(c) of the Fair Housing Act, *42 U.S.C.S. § 3604(c)*, is not protected by the *First Amendment*.

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Exemptions

### HN8 Fair Housing Rights, Exemptions

See *42 U.S.C.S. § 3603(b)(2)*.

429 F.3d 416, *416; 2005 U.S. App. LEXIS 24139, **1

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > Preliminary Considerations > Jurisdiction

**_HN9_ Defenses, Demurrers & Objections, Affirmative Defenses**

While a district court may resolve disputed jurisdictional fact issues by resort to evidence outside the pleadings, a defendant's assertion of a position that is properly characterized as an affirmative defense is not a jurisdictional fact issue.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

**_HN10_ Defenses, Demurrers & Objections, Affirmative Defenses**

A court may dismiss a claim on the basis of an affirmative defense only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Exemptions

**_HN11_ Defenses, Demurrers & Objections, Affirmative Defenses**

Courts have consistently characterized exemptions to the Fair Housing Act (FHA) as affirmative defenses. While these exemptions are found in other sections of the FHA, there is no reason to treat the "Mrs. Murphy" exemption differently.

Civil Procedure > Preliminary Considerations > Jurisdiction

Governments > Legislation > Interpretation

**_HN12_ Preliminary Considerations, Jurisdiction**

When considering whether a fact that Congress has specified as a prerequisite for the application of a federal statute is an ingredient of subject matter jurisdiction or the merits, courts look to two considerations: (1) the consequences of a determination that some fact or circumstance is an ingredient of subject matter jurisdiction, and (2) the wording of the statute identifying the authority of a court to consider the case at hand.

Civil Procedure > Preliminary Considerations > Jurisdiction

**_HN13_ Preliminary Considerations, Jurisdiction**

With respect to the first Da Silva factor, federal courts must examine their jurisdiction when it is questionable even if no party has raised the issue.

Civil Procedure > Preliminary Considerations > Jurisdiction

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Exemptions

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > General Overview

**_HN14_ Preliminary Considerations, Jurisdiction**

Congress conferred jurisdiction on federal courts to hear Fair Housing Act claims in _42 U.S.C.S. § 3612(o)_, as well as _28 U.S.C.S. §§ 1331_ (federal question jurisdiction), 1343(a)(4) (jurisdiction over civil rights cases), and 1345 (jurisdiction over cases in which the United States is the plaintiff). None of these provisions make the non-applicability of the "Mrs. Murphy" exemption an explicit ingredient of subject matter jurisdiction.

Civil Procedure > Appeals > Standards of Review > De Novo Review

429 F.3d 416, *416; 2005 U.S. App. LEXIS 24139, **1

Civil Procedure > Remedies > Damages > Punitive Damages

**_HN15_ Standards of Review, De Novo Review**

Appellate courts review de novo a district court's refusal to submit the issue of punitive damages to a jury.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Remedies

**_HN16_ Damages, Punitive Damages**

The Fair Housing Act expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices. _42 U.S.C.S. § 3613(c)(1)._ Punitive damages are limited to cases in which the defendant has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual. Malice and reckless indifference refer to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Remedies

**_HN17_ Damages, Punitive Damages**

A Fair Housing Act plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Trials > Judgment as Matter of Law

**_HN18_ Standards of Review, De Novo Review**

Appellate courts review de novo a district court's denial of a motion for judgment as a matter of law.

Civil Procedure > Trials > Judgment as Matter of Law

**_HN19_ Trials, Judgment as Matter of Law**

Judgment as a matter of law is proper when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. _Fed. R. Civ. P. 50(a)(1)._

Civil Procedure > Trials > Judgment as Matter of Law > Judgment Notwithstanding Verdict

**_HN20_ Judgment as Matter of Law, Judgment Notwithstanding Verdict**

A court considering a request for judgment as a matter of law must consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.

Civil Procedure > Trials > Judgment as Matter of Law > Judgment Notwithstanding Verdict

**_HN21_ Judgment as Matter of Law, Judgment Notwithstanding Verdict**

A jury verdict should be set aside only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

**Counsel:** ANDREW W. SCHILLING, Assistant United States Attorney, for David N. Kelley, United States Attorney for the Southern District of New York, New York, NY (Sara L. Shudofsky, on the brief), for Plaintiff-Appellant-Cross-Appellee.

429 F.3d 416, *416; 2005 U.S. App. LEXIS 24139, **1

E. CHRISTOPHER MURRAY, Reisman, Peirez & Reisman, L.L.P., Garden City, NY (Megan F. Carroll, on the brief), for Defendants-Appellees-Cross-Appellants.

**Judges:** Before: McLAUGHLIN and CABRANES, Circuit Judges, and MUKASEY, District Judge. [*]

**Opinion by:** Laughlin

# Opinion

 [*418]  McLAUGHLIN, *Circuit Judge*:

This appeal arises from defendants Space Hunters, Inc. and John McDermott's (together, "defendants") alleged discrimination,  [*419]  [**2] based on both race and disability, in the New York City room rental market. The Government brought seven claims for relief against the defendants under the Fair Housing Act (the "FHA"), which prohibits discrimination in the housing market based on, *inter alia*, race, color, religion, sex, national origin, or disability. The United States District Court for the Southern District of New York (Casey, *J.*) dismissed all but one of those claims.

At trial on the remaining claim, the district court struck the Government's claim for punitive damages. The jury returned a verdict in favor of the Government, and the district court denied defendants' motion for judgment as a matter of law. The Government now appeals the district court's dismissal of six of their seven FHA claims and the district court's decision to strike its claim for punitive damages. Defendants cross-appeal the district court's denial of their motion for judgment as a matter of law.

We hold that the district court (1) erred in limiting the application of *section 804(c) of the FHA* to owners and their agents; (2) erred in treating the exemption found in *section 803(b)(2)* as a jurisdictional limitation; (3) should have allowed the jury to consider punitive [**3] damages; *and* (4) correctly denied defendants' motion for judgment as a matter of law. Thus, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

# BACKGROUND

John McDermott has been involved in the rental housing market in New York City and surrounding areas since 1976. In that time, he has operated or worked for several different corporations that supply housing information to prospective renters.

From the late 1980s until April 1996, McDermott operated a corporation entitled Places to Live, Inc., where he admittedly steered prospective tenants to rooms on the basis of race. Because of this practice, the State of New York and others sued Places to Live and McDermott in February 1994, alleging violations of the FHA and other federal and state statutes. In June 1996, that action was settled through a consent judgment, which permanently enjoined McDermott from, *inter alia*, violating the FHA.

In February 1996, the State of New York commenced a separate proceeding against McDermott seeking to revoke his real estate broker's license. A hearing examiner found, *inter alia*, that McDermott had continued his practice of racial [**4] steering despite the 1996 consent judgment and another consent order that had been entered in 1993, and revoked McDermott's broker's license in October 1997.

Three days before the revocation of his broker's license, McDermott started a corporation entitled Space Hunters. Space Hunters, in its capacity as a housing information vender, compiles information from classified advertisements about rooms for rent in New York City, advertises the availability of rooms for rent, communicates with owners or landlords of rooms for rent, and refers prospective tenants according to their preferred neighborhood and price range. Space Hunters charges prospective tenants a fee for its services, usually $ 100 for an individual and $ 125 for a couple. According to defendants (but disputed by the Government), Space Hunters does not advertise apartments or rooms at locations where the owner does not reside or where more than four families live.

In March 2000, the Government sued defendants in the Southern District of New York, alleging several violations of  [*420]  the FHA. The complaint alleges the following.

In January 1999, Keith Toto, who is deaf, telephoned Space Hunters through the services of a relay [**5] service operator after seeing a Space Hunters newspaper advertisement. [1] The person who answered

---

[*] The Honorable Michael B. Mukasey, Chief Judge, United States District Court for the Southern District of New York, sitting by designation.

[1] As the district court described, "deaf individuals use a relay

429 F.3d 416, *420; 2005 U.S. App. LEXIS 24139, **5

the call told Toto that Space Hunters does not service the disabled. When Toto persisted, the Space Hunters employee said, "eat shit," and hung up.

In February 1999, Toto filed a claim with the United States Department of Housing and [**6] Urban Development ("HUD") alleging that Space Hunters discriminated on the basis of disability. In March 1999, a HUD investigator requested the Fair Housing Council of Northern New Jersey (the "FHC"), a non-profit group used by HUD to assist with investigations into alleged FHA violations, to conduct a test to determine if Space Hunters discriminates against disabled individuals. That same month, an FHC tester called Space Hunters through a relay service operator. The person who answered the call at Space Hunters refused to speak with the tester through the operator, stating only, "give me shit about Jesus Christ Almighty," and ended the call.

A few days later, a second tester called Space Hunters through a relay service operator. The person who answered the phone at Space Hunters said, "not interested, take a hike," and hung up the telephone.

Thereafter, a HUD investigator telephoned Space Hunters and informed the person with whom she spoke that she was investigating a complaint alleging discrimination against persons with disabilities. The individual at Space Hunters became abrasive and loud, arguing that he was not required to deal with hearing-impaired people. When the HUD [**7] investigator, who is black, described the complaint's allegations, the individual at Space Hunters responded with an expletive and a racial epithet. [2]

In light of the use of a racial epithet by a Space Hunters

_____

service operator in conjunction with a telecommunication device for the deaf, or TDD. The deaf individual types a message on the TDD keyboard, which is transmitted over telephone lines to a relay service operator who reads the message to the person on the other end of the call. The relay service operator then types the person's response, which is transmitted back to the screen of [the] deaf individual's TDD." *See generally* [47 U.S.C. § 225](defining "TDD" and "telecommunications relay services" and requiring that such services be generally available to hearing- and speech-impaired people).

[2] At his deposition, McDermott admitted that he was the individual at Space Hunters who spoke with the HUD investigator. In fact, McDermott is the sole employee of Space Hunters and has never denied that he was the Space Hunters representative on all the telephone calls at issue in this case.

employee, HUD asked the FHC to conduct tests to determine whether Space Hunters also discriminates on the basis of race. In April 1999, the FHC sent several testers to Space Hunters.

The FHC testers heard McDermott repeatedly make derogatory remarks about blacks and use racial epithets. For example, a white tester observed McDermott treat a black couple in a rude and condescending manner. After they left his office, McDermott made crude remarks about the couple. McDermott called the white tester the "Donald Trump" [**8] of people who usually come to his office, saying that he "get[s] a lot of lowlife, scumbag [minorities] that come in." Additionally, Space Hunters treated black and white testers [*421] differently under similar circumstances and did not provide the same range of services to the black testers as it provided to the white testers.

After its tests were complete, the FHC filed a complaint with HUD alleging that defendants discriminated in the housing market in violation of the FHA. In January 2000, HUD issued a charge of discrimination, pursuant to [42 U.S.C. § 3610(g)(2)(A)](https://...), based on both Toto's and the FHC's complaints. Defendants elected, pursuant to [42 U.S.C. § 3612(a)](https://...), to have the charges heard in a civil action instead of a hearing before a HUD administrative law judge. Thereafter, pursuant to [42 U.S.C. § 3612(o)(1)](https://...), the Secretary of HUD authorized the Attorney General to commence this action in the district court on behalf of Toto and the FHC.

The complaint alleges seven claims for relief under the FHA. The first four claims are brought on behalf of Toto. Claim One alleges that defendants discriminated against [**9] Toto in the rental market because of Toto's disability, in violation of section 804(f)(1)(A) of the FHA, [42 U.S.C. § 3604(f)(1)(A)](https://...). Claim Two alleges that defendants refused to accommodate Toto's disability in violation of section 804(f)(3)(B) of the FHA, [42 U.S.C. § 3604(f)(3)(B)](https://...). Claim Three alleges that defendants made discriminatory statements to Toto in violation of section 804(c) of the FHA, [42 U.S.C. § 3604(c)](https://...). Claim Four alleges that defendants denied Toto access to rental services in violation of section 806 of the FHA, [42 U.S.C. § 3606](https://...).

The remaining three claims are brought on behalf of the FHC testers. Claim Five alleges that defendants made housing unavailable to the testers because or race or color in violation of section 804(a) of the FHA, [42 U.S.C. § 3604(a)](https://...). Claim Six alleges that defendants

discriminated against the testers in violation of section 804(b) of the FHA, _42 U.S.C. § 3604(b)_. Claim Seven alleges that defendants made discriminatory statements to the testers in violation of section 804(c) of the FHA, _42 U.S.C. § 3604_ **[**10]** _(c)_.

The complaint seeks declaratory and injunctive relief. It also asks for compensatory and punitive damages.

In December 2000, defendants moved to dismiss the complaint. In August 2001, the district court granted the motion as to all the claims except Claim Four. _United States v. Space Hunters, Inc., 2001 U.S. Dist. LEXIS 12804, No. 00 Civ. 1781(RCC), 2001 WL 968993 (S.D.N.Y. Aug. 24, 2001)_. The district court dismissed Claims One, Two, Five, and Six based on _HN1_ the exemption in section 803(b)(2) of the FHA, _42 U.S.C. § 3603(b)(2)_, which states that most of the provisions of section 804 of the FHA, _42 U.S.C. § 3604_, do not apply to housing that is occupied by four or less families and in which the owner lives. The district court found that Space Hunters "only lists rooms in owner-occupied buildings where less than four families live independently of each other." Based on that finding, the court assumed that it lacked jurisdiction over claims to which the exemption applied.

With respect to Claims Three and Seven, the district court held that section 804(c) of the FHA, _42 U.S.C. § 3604(c)_, applies only to dwelling owners **[**11]** and their agents. The court found that Space Hunters is neither an owner nor an agent, and, thus, the Government failed to state a _section 804(c)_ claim.

Finally, the district court denied defendants' motion with respect to Claim Four, rejecting defendants' argument that section 806 of the FHA, _42 U.S.C. § 3606_, applies only to "multiple listing services."

In October 2002, the district court conducted a jury trial on the surviving Claim Four. The Government called four witnesses: **[*422]** McDermott, Toto, one of the FHC testers, and the HUD investigator who investigated Toto's complaint.

McDermott testified as follows. [3] Space Hunters does not accept telephone calls from people using a relay service operator. In fact, McDermott said he "hang[s] up on every one of them." McDermott testified that "no

relay calls will ever be taken by my office" and he will "never have to change this practice." When hearing-impaired people call, McDermott tells them that Space Hunters does not "accept relay service operator calls under [any] circumstances." That policy was in effect in 1999 and remained in effect at the time of trial. When relay service operators call more than once, McDermott **[**12]** "let[s] them know that [he is] annoyed." In such circumstances, "it could escalate to a level where [McDermott] certainly want[s] to chase them away from continuing to call back."

McDermott testified that Space Hunters does not take relay service operator calls because "it takes too much time and that guy can't come in and sign up anyway because he is not able to come to my business and do business with me. And I am not going to deal with somebody and use sign language." McDermott explained that "it is not about losing business. It is about what is reasonable under the law." He said, "there has to be cases where you can say to a relay service operator go rub salt up your ass." McDermott described relay service operator calls as "very, very annoying" and "a very, very unpleasant experience."

McDermott testified that when a potential customer calls Space Hunters **[**13]** for the first time, he asks them to come to the Space Hunters office. He also asks them "where they want to live and things like that." When Toto called Space Hunters in 1999, McDermott admitted that he told him, through the relay service operator, to "eat shit, asshole."

McDermott further testified that he records telephone calls to Space Hunters to protect against someone making false allegations about Space Hunters. However, he erased the tapes of the calls at issue in this case.

Following McDermott's testimony, Toto testified as follows. In January 1999, after seeing an advertisement in a newspaper, he called Space Hunters through a relay service operator because he was looking for a room in the Bronx. The person who answered the call at Space Hunters told him to "eat shit" and stated that Space Hunters does not help disabled people. Toto made a second call to Space Hunters and the person who answered the call told Toto that if he called again, Space Hunters would file harassment charges against him. Toto tried a third call in February 1999, and Space Hunters again refused to take his call. As a result of this treatment, Toto filed a complaint with HUD. Toto never went to the **[**14]** Space Hunters office.

---

[3] This summary of McDermott's testimony includes his testimony at trial and excerpts from his deposition that the Government read to the jury.

429 F.3d 416, *422; 2005 U.S. App. LEXIS 24139, **14

William Donegan, an FHC tester, testified next. In March 1999, he twice called Space Hunters through a relay service operator. In the first call, the relay service operator informed Donegan that an initial automated answering message said that potential customers should go to the Space Hunters office in order to do business with it. Then, the person who answered the phone after the automated message said, "Give me shit, Jesus Christ Almighty," and ended the call. In the second call, the person who answered the call hung up after saying "I am not interested. Take a hike."

[*423] Vanessa Summers, the HUD investigator who investigated Toto's complaint, testified that after receiving the results of the FHC's tests, she called Space Hunters in March 1999. She asked to speak with a manager. A male, who refused to give his name, identified himself as the manager. When Summers explained that she was investigating a complaint, the Space Hunters manager "proceeded to tell [her] about their rights under the *Fourteenth Amendment*, that they do not have to deal with a disabled person who uses a relay service, and if a disabled person, a hearing impaired person would come to [**15] their office that they would not gain entry into the building and that they would not be able to communicate with an agent." The manager was "disrespectful," "loud," "indignant," and "abrasive."

The Government submitted into evidence three letters that McDermott wrote to HUD during its investigation. In these letters, McDermott explained that Space Hunters has "a policy of not accepting relay operator calls," and "there is never any discussion with any relay operator regarding anything." He also argued that HUD "has no subject matter jurisdiction" over Toto's complaint because Space Hunters deals in rooms that are not covered by the FHA. Therefore, Space Hunters does not "have to lift a finger to comply" with the FHA. McDermott also called Toto a "malicious prevaricator," a "clown," and a "falsifier," and requested that HUD have Toto arrested for "perpetuating a fraud and playing the department like a cheap violin." [4]

------

[4] In one of the letters, McDermott posed a "hypothetical" that speaks volumes about his feelings toward the FHA and disabled people. In his hypothetical, Toto has no arms, no legs, and cannot speak or hear. "Then let's say the Space Hunter official told him flat out we have no landlords that will rent to him because of his defects, therefore we will not waste our time with you on the phone and we are now hanging up. However, if you please Mr. Toto, we can use you as a second base bag when we play baseball this weekend. As politically

[**16]  Defendants did not call any witnesses at trial. At the charging conference, the district court granted defendants' motion to strike the Government's claim for punitive damages, stating: "I find the record to be devoid of any evil intent on behalf of the defendant or callous disregard for Mr. Toto's legal rights." The jury returned a verdict in favor of the Government and awarded Toto $ 1500 in compensatory damages.

Following the trial, defendants moved for judgment as a matter of law, and the Government moved for injunctive relief. In November 2004, the district court denied defendants' motion and granted the Government's motion, permanently enjoining defendants from violating the FHA and requiring various record-keeping and monitoring obligations for a period of three years. *United States v. Space Hunters, Inc., 2004 U.S. Dist. LEXIS 23699, No. 00 Civ. 1781(RCC), 2004 WL 2674608 (S.D.N.Y. Nov. 23, 2004)*.

This appeal and cross-appeal followed.

## DISCUSSION

In its appeal, the Government argues that the district court erred by (1) dismissing Claims Three and Seven brought under *section 804(c) of the FHA*; (2) dismissing Claims One, Two, Five, and Six based on the exemption found in [**17]  *section 803(b)(2) of the FHA;*  and (3) striking the Government's claim for punitive damages. In [*424]  their cross-appeal, defendants argue that the district court erred in denying their post-trial motion for judgment as a matter of law. We address each issue in turn.

### I. The *Section 804(c)* Claims

The first issue is whether the rule against discriminatory statements found in *FHA section 804(c)* applies only to dwelling owners and their agents. We reject so crabbed a reading.

*HN2* We review de novo the grant of a motion to dismiss for failure to state a claim. *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. In so doing, "we accept all of plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999)*.

------

incorrect and insensitive as that scenario may be, it still does not violate the Fair Housing Act in its current state as it pertains to the rental of rooms in private homes."

429 F.3d 416, *424; 2005 U.S. App. LEXIS 24139, **17

*HN3* *Section 804(c) of the FHA* makes it unlawful

to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on **[**18]** race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

*42 U.S.C. § 3604(c)*.

In this case, the district court held that *section 804(c)* - specifically, the phrase "with respect to the sale or rental of a dwelling" - applies only to dwelling owners or their agents. It reached this conclusion by relying on what it said to be the "purpose" of the statute: "to prevent expressions that result in the denial of housing, not to prevent all discriminatory expression." Because it found that defendants are neither owners nor agents and that applying *section 804(c)* to them "would not further the purpose of the statute," the district court dismissed Claims Three and Seven. We disagree with this interpretation.

The district court's assessment of the "purpose" of *section 804(c)* is inconsistent with the statute's plain language, which *HN4* applies broadly to "*any notice, statement, or advertisement,* with respect to the sale or rental of a dwelling that indicates" a discriminatory preference on prohibited grounds. *42 U.S.C. § 3604(c)* (emphasis added). **[**19]** Nothing in this language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this language "does not provide any specific exemptions or designate the persons covered, but rather . . . applies on its face to anyone" who makes prohibited statements. *United States v. Hunter, 459 F.2d 205, 210 (4th Cir. 1972)* (internal quotation marks omitted); *see also Ragin v. N.Y. Times Co., 923 F.2d 995, 999 (2d Cir. 1991)* ("Congress used broad language in *[section 804(c)]*, and there is no cogent reason to narrow the meaning of that language."). [5]

_____

[5] To the extent that *Michigan Protection & Advocacy Service, Inc. v. Babin, 799 F. Supp. 695 (E.D. Mich. 1992)*, *aff'd on other grounds*, *18 F.3d 337 (6th Cir. 1994)*; and *Heights Community Congress v. Hilltop Realty, Inc., 629 F. Supp. 1232 (N.D. Ohio 1983)*, *aff'd in part, rev'd in part*, *774 F.2d 135 (6th Cir. 1985)*, limit the application of *section 804(c)* to owners and their agents, we find their reasoning unpersuasive.

**[**20]** Moreover, the district court's view that *section 804(c)*'s purpose is to "prevent expressions that result in the denial of housing" is too narrow. *HN5* The statute also "protect[s] against [the] psychic injury" caused by discriminatory statements made in connection with the housing market. Robert G. Schwemm, *Discriminatory Housing* **[*425]** *Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, *29 Fordham Urb. L.J. 187, 250 (2001)*; *see also HUD ex rel. Stover v. Gruzdaitis*, No. 02-96-0377-8, 1998 WL 482759, at *3 (HUD ALJ Aug. 14, 1998) (stating that *section 804(c)* protects the right "to inquire about the availability of housing without being subjected to racially discriminatory statements"). If that were not so, Congress likely would not have made *section 804(c)* applicable to dwellings that are otherwise exempt from section 804's prohibition on discrimination. *See 42 U.S.C. § 3603(b)*. In fact, we have permitted plaintiffs to recover for discriminatory advertising even when the plaintiffs were not in the market for housing. *See Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 903-04 (2d Cir. 1993).* **[**21]**

Defendants attempt to evade the sweep of *section 804(c)* by invoking the *First Amendment*. Specifically, defendants claim that "under the Government's expansive reading of *[section 804(c)]*" anyone who 'make[s]' a statement indicating discrimination in race, religion, family status, *etc.* would be liable, including private individuals who may state they do not like children living on their block." Defs.' Br. at 42. Defendants are wrong.

While there may indeed be some cases in which the breadth of *section 804(c)* encroaches upon the *First Amendment*, this is not one of those cases. This case (unlike defendants' hypothetical) unmistakably involves *HN6* commercial speech, a subset of speech for which the *First Amendment* "'accords a lesser protection . . . than to other constitutionally guaranteed expression.'" *Ragin, 923 F.2d at 1002* (quoting *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n, 447 U.S. 557, 562-63, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)).* *HN7* Courts have consistently found that commercial speech that violates *section 804(c)* is not protected by the *First Amendment*. *See, e.g., id. at 1002-03; Hunter, 459 F.2d at 211-13.*

For these reasons, **[**22]** we hold that the district court erred in limiting the application of *section 804(c)* to owners and their agents and should not have dismissed Claims Three and Seven.

II. *The Section 803(b)(2) Exemption*

*Section 803(b)(2) of the FHA* (commonly referred to as the "Mrs. Murphy" exemption on the theory then that the statute did not reach the metaphorical "Mrs. Murphy's boardinghouse," *see* 114 Cong. Rec. 2495, 3345 (1968)) provides that

> **HN8** nothing in section [804] . . . (other than subsection (c)) shall apply to . . . rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

*42 U.S.C. § 3603(b)(2)*. Defendants, and the district court, regard this exemption as a limitation on subject matter jurisdiction. We conclude that it is an affirmative defense having no bearing on jurisdiction.

The district court dismissed Claims One, Two, Five, and Six, finding that the "Mrs. Murphy" exemption "deprives the Court of subject matter jurisdiction" because defendants' **[**23]** "publication only lists rooms in owner-occupied buildings where less than four families live independently of each other." In arriving at this conclusion, the district court appears to have considered evidence outside the complaint, and it prematurely resolved a disputed factual issue at the pleadings stage.

**HN9** While a district court may resolve disputed jurisdictional fact issues by resort to evidence outside the pleadings, *Filetech S.A. v. Fr. Telecom S.A., 157 F.3d 922, 932 [*426] (2d Cir. 1998)*, a "defendant's assertion of a position that is properly characterized as an affirmative defense" is not a jurisdictional fact issue. *Miller v. Am. Stock Exch., Inc. (In re Stock Exchs. Options Trading Antitrust Litig.), 317 F.3d 134, 150-51 (2d Cir. 2003)*. **HN10** A court may dismiss a claim on the basis of an affirmative defense only if "the facts supporting the defense appear on the face of the complaint," and "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004)* (internal quotation marks omitted).

**HN11** Courts have consistently characterized exemptions to the FHA as affirmative **[**24]** defenses. *See, e.g., Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc., 3 F.3d 1472, 1474, 1476 n.6 (11th Cir. 1993)* (characterizing the "housing for older persons" exemption as an affirmative defense); *Hooker v. Weathers, 990 F.2d 913, 916 (6th Cir. 1993)* (same);

*United States v. Columbus Country Club, 915 F.2d 877, 882-85 (3d Cir. 1990)* (treating the "religious organization" and "private club" exemptions as affirmative defenses). While these exemptions are found in other sections of the FHA, there is no reason to treat the "Mrs. Murphy" exemption differently.

Moreover, **HN12** when considering whether a fact "that Congress has specified as a prerequisite for the application of a federal statute" is "an ingredient of subject matter jurisdiction or the merits," we look to two considerations: (1) "the consequences of a determination that some fact or circumstance is an ingredient of subject matter jurisdiction," *and* (2) "the wording of the statute identifying the authority of a court to consider the case at hand." *Da Silva v. Kinsho Int'l Corp., 229 F.3d 358, 363, 365 (2d Cir. 2000)*.

**HN13** With respect to the first **[**25]** *Da Silva* factor, federal courts must examine their jurisdiction when it is questionable even if no party has raised the issue. *Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 328 (2d Cir. 2005)*. Thus, one consequence of characterizing the "Mrs. Murphy" exemption as a jurisdictional question would be that courts (including circuit courts) must search the record to eliminate the possibility that this fact-intensive exemption does not apply even when the issue is not addressed by either party. Requiring such an exercise makes little sense, especially since the record may be silent on the issue. *Cf. Sharpe v. Jefferson Distrib. Co., 148 F.3d 676, 678 (7th Cir. 1998)*.

As to the second *Da Silva* factor, the wording of the statutes conferring authority upon federal courts to hear FHA cases supports treating the exemption as irrelevant to the question of jurisdiction. **HN14** Congress conferred jurisdiction on federal courts to hear FHA claims in *42 U.S.C. § 3612(o)*, as well as *28 U.S.C. §§ 1331* (federal question jurisdiction), *1343(a)(4)* (jurisdiction over civil rights cases), and *1345* (jurisdiction over **[**26]** cases in which the United States is the plaintiff). None of these provisions make the non-applicability of the "Mrs. Murphy" exemption "an explicit ingredient of subject matter jurisdiction." *Da Silva, 229 F.3d at 365*.

Because the "Mrs. Murphy" exemption is an affirmative defense having no bearing on subject matter jurisdiction, the district court should not have considered evidence outside the complaint. [6] *See McKenna, 386*

_____

[6] The district court appears to have relied on an affidavit submitted by McDermott in which he baldly asserts that all the

 [*427] F.3d at 436. Thus, the district court erred in dismissing Claims One, Two, Five, and Six.

 [**27]  III. *Punitive Damages*

The Government argues that the district court erred in striking its claim for punitive damages. We agree.

HN15 We review de novo a district court's refusal to submit the issue of punitive damages to a jury. *Farias v. Instructional Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001)*.

HN16 The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices. *42 U.S.C. § 3613(c)(1)*. Punitive damages are limited "to cases in which the [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529-30, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)* (internal quotation marks omitted). "'Malice and reckless indifference refer to 'the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Farias, 259 F.3d at 101* (quoting *Kolstad, 527 U.S. at 535*). HN17 A plaintiff may establish the requisite state of mind for an [**28] award of punitive damages with evidence (1) that the defendant "discriminated in the face of a perceived risk that its actions . . . violated federal law," *Kolstad, 527 U.S. at 536*, or (2) of "egregious or outrageous acts" that "may serve as evidence supporting an inference of the requisite 'evil motive.'" *Farias, 259 F.3d at 101* (internal quotation marks and alteration omitted) (quoting *Kolstad, 527 U.S. at 538*).

Here, the district court struck the Government's claim for punitive damages because it found "the record to be devoid of any evil intent on behalf of the defendant or callous disregard for Toto's legal rights." This ruling overlooked ample evidence that defendants acted with malice and reckless indifference to Toto's federally protected rights.

*First*, there can be no dispute that McDermott was

generally - indeed acutely - aware of the FHA. A consent judgment had been previously entered against him in which he was "personally" enjoined from violating the FHA, expressly including discriminating in housing on the basis of a disability. And the State of New York revoked his real estate license in 1997, in part because [**29] of FHA violations. Moreover, McDermott's letters to HUD during the course of its investigation into Toto's complaint demonstrate a vast, if skewed, awareness of the FHA. Thus, McDermott cannot argue that he did not know about the FHA. *See Preferred Props., Inc. v. Indian River Estates, Inc., 276 F.3d 790, 800 (6th Cir. 2002)* (stating that punitive damages are available under the FHA where evidence shows "malice or reckless indifference that [a defendants'] actions might violate a federal statute of which they were aware" (internal quotation marks omitted)).

*Second*, the Government presented evidence that defendants "discriminated in the face of a perceived risk that [their] actions . . . violated" the FHA. *See Kolstad, 527 U.S. at 536*. For example, the jury could have inferred that McDermott knew he was acting improperly based on the fact that he erased his recordings of the telephone conversations at issue in this case - recordings that he [*428] purportedly made to protect himself from allegations of misconduct. *Cf. EEOC v. Wal-Mart Stores, Inc., 156 F.3d 989, 993 (9th Cir. 1998)* (stating that evidence of a defendant's [**30] actions to cover up discriminatory conduct can support an inference that the defendant acted with reckless indifference to a federally protected right).

*Third*, the record is awash with evidence of "egregious" and "outrageous" acts by defendants that could support an inference of the requisite "'evil motive.'" *See Kolstad, 527 U.S. at 538*. McDermott did not simply hang up on relay calls. He used profanity "to chase them away from continuing to call back." *Cf. Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000)* (stating that recklessness and malice can be inferred when a defendant repeatedly refuses to deal with blacks). He told Toto to "eat shit, asshole" - not the most judicious of remarks - and that Space Hunters does not do business with disabled people. *Cf. Fountila v. Carter, 571 F.2d 487, 492 (9th Cir. 1978)* (holding that a punitive damages award was supported by the fact that the defendant hung up on the plaintiff when she learned he was black). McDermott also threatened Toto with harassment charges if he called Space Hunters again. And McDermott told the HUD investigator that "if a disabled person, a hearing impaired [**31] person would come to [his] office . . .

---

rooms Space Hunters advertises fall within the "Mrs. Murphy" exemption. Whether the exemption applies, however, is a "highly fact-dependent inquiry." *Hogar Aqua y Vida en el Desierto, Inc. v. Suarez-Medina*, 36 F.3d 177, 182 n. 4 (1st Cir. 1994). It is hard to see how submitting an affidavit that does little more than track the language of the exemption discharges defendants' burden.

429 F.3d 416, *428; 2005 U.S. App. LEXIS 24139, **31

they would not gain entry into the building."

*Finally*, given McDermott's history, this case is particularly appropriate for consideration of punitive damages. "The purpose of punitive damage awards is to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)*. McDermott is an FHA recidivist. As the district court stated, "the trial record is replete with suggestions that McDermott is likely to violate the [FHA] in the future," and his conduct thus far has demonstrated "a contemptuous disregard for judicial and executive authority." He was enjoined from violating the FHA in 1996. [7] Yet, in 1997, a hearing examiner found that McDermott continued to violate the FHA *despite* the 1996 injunction. And now the jury in this case has found that McDermott has violated the FHA yet again. In light of the circumstances, the Government was entitled to have the jury consider this history and decide whether, this time, punitive damages were necessary to deter defendants from returning to their previous practices. *Cf. Miller v. Apartments & Homes of N.J., Inc., 646 F.2d 101, 111 (3d Cir. 1981)* [**32] (affirming award of punitive damages when defendant had been subject to a consent decree enjoining discrimination but did not comply with the injunction).

IV. *Judgment as a Matter of Law*

In their cross-appeal, defendants argue that the district court should have granted their motion for judgment as a matter of law after trial. We disagree.

**HN18** We review de novo a district court's denial of a motion for judgment as a matter of law. *Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 597 (2d Cir. 2001)*. **HN19** Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to [**33] find for that party on that issue." *Fed. R. Civ. P. 50(a)(1)*. **HN20** A court considering [*429] a request for judgment as a matter of law must "'consider the evidence in the light most favorable to the party against whom the motion was made and …give that party the benefit of all reasonable inferences that the jury might have drawn in his favor

from the evidence.'" *Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)* (quoting *Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988))*. "'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" *Id.* (quoting *Smith, 861 F.2d at 367*). **HN21** A jury verdict should be set aside only where there is "'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" *Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)* [**34] (omission in original) (quoting *Mattivi v. S. African Marine Corp., 618 F.2d 163, 168 (2d Cir. 1980))*.

Defendants argue that the Government presented no evidence at trial that defendants treated disabled people differently from non-disabled people, and they contend that such evidence is necessary for a finding of discrimination. Specifically, defendants claim that what the evidence shows is that McDermott refused to engage in lengthy telephone calls with anyone. The Government argues that evidence of disparate treatment is not necessary. We need not delve into this casuistry, however, because, as Judge Friendly once noted, "whatever the conceptual beauty of the argument, it neglects the facts." *Farrell v. Piedmont Aviation, Inc., 411 F.2d 812, 816 (2d Cir. 1969)*.

The jury heard a virtual tsunami of evidence that defendants did treat disabled people generally - and Toto specifically - differently from non-disabled people. McDermott testified that when non-hearing-impaired people called Space Hunters, he talked to them, including answering their questions, inviting them to the office, and asking them what neighborhood they wanted to live in. In stark [**35] contrast, when Toto and a tester called, McDermott swore at them and ended the call. He specifically told Toto that Space Hunters does not deal with disabled people, and he told the HUD investigator that disabled people would not even be able to enter the Space Hunters office. In one of his letters to HUD, McDermott wrote, "there is never any discussion with any relay operator regarding anything."

Defendants also claim that "the Government offered no evidence that Mr. Toto attempted to go to defendants' place of business to employ their services." In light of Toto's testimony that McDermott told him that Space Hunters does not service disabled people, this argument borders on the frivolous. The FHA does not require Toto

[7] At his deposition, McDermott testified that he did not know what the terms of the injunction entailed because his copy of the consent judgment was "in the garbage." The record does not reflect whether the State of New York has sought to have McDermott held in contempt for his apparent repeated violations of the 1996 injunction.

429 F.3d 416, *429; 2005 U.S. App. LEXIS 24139, **35

to go to Space Hunters to confirm what he was caustically told; he was entitled to take McDermott at his word.

The jury heard sufficient evidence to find that defendants violated the FHA by discriminating against Toto based on his disability. Thus, we affirm the district court's denial of defendants' motion for judgment as a matter of law.

**CONCLUSION**

For the foregoing reasons, we (1) vacate the district court's dismissal of Claims One, Two, Three, Five, **[**36]** Six, and Seven; (2) vacate the district court's refusal to charge the jury on punitive damages; (3) affirm the district court's denial of defendants' motion for judgment as a matter of law; **[*430]** *and* (4) remand this case for further proceedings consistent with this opinion.

---

**End of Document**

⚠️ Caution
As of: June 23, 2025 10:01 PM Z

# *Williams v. New York City Hous. Auth.*

Supreme Court of New York, Appellate Division, First Department

January 27, 2009, Decided; January 27, 2009, Entered

115453/01, 4490

### Reporter

61 A.D.3d 62 *; 872 N.Y.S.2d 27 **; 2009 N.Y. App. Div. LEXIS 433 ***; 2009 NY Slip Op 440 ****; 105 Fair Empl. Prac. Cas. (BNA) 1059

[****1] Gina Williams, Appellant, v New York City Housing Authority et al., Respondents.

**Subsequent History:** Leave to appeal denied by *Williams v N.Y. City Hous. Auth., 13 NY3d 702, 914 NE2d 365, 2009 NY LEXIS 3330, 885 NYS2d 716 (NY, Aug. 27, 2009)*

## Core Terms

retaliation, provisions, severe, pervasive, human rights law, purposes, sexual harassment, harassment, civil rights, courts, terms and conditions, cases, limitations period, federal law, hostile work environment, disparate treatment, retaliation claim, remedial purpose, discriminatory, sex, summary judgment, local law, title vii, gender-based, workplace, amended complaint, counterpart, colleagues, training, unwanted

## Case Summary

### Procedural Posture

Plaintiff employee appealed an order of the New York County Supreme Court (New York) that granted defendant employer's motion for summary judgment in the employee's action under New York City, N.Y., Loc. Laws No. 85 (2005).

### Overview

The employee sued the employer for a hostile work environment, disparate treatment on the basis of sex, and retaliation in violation of the applicable provisions of *Executive Law § 296(a)(1)*, *(6)*, *(7)*, and Administrative Code of the City of NY § 8-107(a)(1), (6), (7). The appellate court agreed with the trial court's analysis as it pertained to the employee's state claims. However, the decision failed to properly construe the employee's

claims under Loc. Laws No. 85. Nevertheless, it was clear that even under the broader construction required by Loc. Laws No. 85, that the employee's claims failed. The employee failed to prove by a preponderance of the evidence that she had been treated less well than other employees because of her gender. Accordingly, the trial court properly granted the employer's motion for summary judgment dismissing the claims.

### Outcome

The order was affirmed.

## LexisNexis® Headnotes

Labor & Employment
Law > Discrimination > Actionable Discrimination

### *HN1* Discrimination, Actionable Discrimination

The Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by New York City Human Rights Law (HRL), requiring an analysis more stringent than that called for under either Title VII or the state HRL, *Executive Law § 296*.

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Actionable Discrimination

### *HN2* Legislation, Interpretation

See *Administrative Code of the City of NY § 8-130*.

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***433; 2009 NY Slip Op 440, ****1

Labor & Employment
Law > Discrimination > Actionable Discrimination

### HN3  Discrimination, Actionable Discrimination

As a result of a revision in 2005, the New York City Human Rights Law (City HRL) explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws.

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Actionable Discrimination

### HN4  Legislation, Interpretation

The Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85, § 1 (2005), mandates that provisions of the New York City Human Rights Law (City HRL) be interpreted independently from similar or identical provisions of New York state or federal statutes. Taking §§ 1 and 7 of the Restoration Act together, it is clear that interpretations of state or federal provisions worded similarly to the City HRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed as a floor below which the City HRL cannot fall, rather than a ceiling above which the local law cannot rise (§ 1), and only to the extent that those state- or federal-law decisions may provide guidance as to the uniquely broad and remedial provisions of the local law.

Labor & Employment
Law > Discrimination > Actionable Discrimination

### HN5  Discrimination, Actionable Discrimination

The Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85, § 1 (2005), notifies courts that (a) they have to be aware that some provisions of the New York City Human Rights Law (City

HRL) are textually distinct from its state and federal counterparts, (b) all provisions of the City HRL require independent construction to accomplish the law's uniquely broad purposes and (c) cases that fail to respect these differences are being legislatively overruled.

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Actionable Discrimination

### HN6  Legislation, Interpretation

The key principles that should guide the analysis of claims brought under the New York City Human Rights Law are: discrimination should not play a role in decisions made by employers, landlords and providers of public accommodations; traditional methods and principles of law enforcement ought to be applied in the civil rights context; and victims of discrimination suffer serious injuries, for which they ought to receive full compensation.

Governments > Legislation > Effect & Operation > Amendments

Governments > Legislation > Interpretation

### HN7  Effect & Operation, Amendments

Legislative amendments are deemed to have intended a material change in the law. N.Y. Stat. § 193(a).

Governments > Legislation > Effect & Operation > Amendments

Governments > Legislation > Interpretation

### HN8  Effect & Operation, Amendments

Courts, in construing a statute, should consider the mischief sought to be remedied by new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy. N.Y. Stat. § 95. As such, they are not free to give force to one section of the law that has specifically been amended, and decline to give force to another. They must give force to all amendments, and not relegate any of them

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***433; 2009 NY Slip Op 440, ****1

to window dressing.

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN9* **Discrimination, Actionable Discrimination**

Administrative Code of the City of NY § 8-107(13)(b)(1) is the city law's explicit statutory basis for imposing vicarious liability on those exercising managerial or supervisory authority. The breadth and scope of the New York City Human Rights Law will often yield results different from Title VII.

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN10* **Discrimination, Actionable Discrimination**

The explicit statutory structure of Administrative Code of the City of NY § 8-107(13)(b) precludes the availability of the federal Faragher affirmative defense where the conduct of those exercising managerial or supervisory authority is at issue.

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN11* **Discrimination, Actionable Discrimination**

The New York City Human Rights Law is more protective than the state and federal counterparts.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

*HN12* **Discrimination, Retaliation**

Regardless of the degree or quality of harm to the particular complainant, retaliation harms the public interest by deterring others from filing a charge. An interpretation of Title VII that permits some forms of retaliation to go unpunished would undermine the effectiveness of the Equal Employment Opportunity statutes and conflict with the language and purpose of the anti-retaliation provisions.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

*HN13* **Discrimination, Retaliation**

To accomplish the purpose of giving force to the earlier proscription on retaliation in any manner, the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), amended Administrative Code of the City of NY § 8-107(7) to emphasize that the retaliation or discrimination complained of under the subdivision need not result in an ultimate action with respect to employment, housing, or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

*HN14* **Discrimination, Retaliation**

In assessing retaliation claims that involve neither ultimate actions nor materially adverse changes in terms and conditions of employment, it is important that the assessment be made with a keen sense of workplace realities, of the fact that the chilling effect of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

*HN15* **Discrimination, Retaliation**

The language of the New York City Human Rights Law does not permit any type of challenged conduct to be categorically rejected as non-actionable. On the contrary, no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***433; 2009 NY Slip Op 440, ****1

conduct was, in the words of the statute, "reasonably likely to deter a person from engaging in protected activity."

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment
Law > Discrimination > Harassment > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Continuing Violations

Labor & Employment Law > ... > Civil Actions > Time Limitations > Continuing Violations

*HN16* Discrimination, Actionable Discrimination

For federal law purposes, the continuing violation doctrine only applies to harassment claims as opposed to claims alleging discrete discriminatory acts.

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment
Law > Discrimination > Harassment > General Overview

*HN17* Discrimination, Actionable Discrimination

The Local Civil Rights Restoration Act of 2005's, New York City, N.Y., Loc. Laws No. 85 (2005), uniquely remedial provisions are consistent with a rule that neither penalizes workers who hesitate to bring an action at the first sign of what they suspect could be discriminatory trouble, nor rewards covered entities that discriminate by insulating them from challenges to their unlawful conduct that continues into the limitations period.

Labor & Employment
Law > ... > Harassment > Sexual Harassment > General Overview

*HN18* Harassment, Sexual Harassment

In a sexual harassment context, there is no evidence that "severe or pervasive" has ever been subjected to liberal construction analysis, let alone the enhanced analysis required by the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005).

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN19* Legislation, Interpretation

The New York City Human Rights Law's (HRL's) provisions are to be construed more broadly than federal civil rights laws and the State HRL, *Executive Law § 296*. New York City, N.Y., Loc. Laws No. 85 (2005)'s provisions are to be construed as more remedial than federal civil rights laws and the State HRL. *Administrative Code of the City of NY § 8-130*.

Labor & Employment
Law > Discrimination > Gender & Sex Discrimination > General Overview

Labor & Employment
Law > ... > Harassment > Sexual Harassment > General Overview

*HN20* Discrimination, Gender & Sex Discrimination

Despite the popular notion that "sex discrimination" and "sexual harassment" are two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination. There is no "sexual harassment provision" of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender. Administrative Code of the City of NY § 8-107(1)(a).

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Gender & Sex Discrimination > General Overview

*HN21* Legislation, Interpretation

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***433; 2009 NY Slip Op 440, ****1

Regardless of federal interpretations, the primary task of a judge hearing a New York City Human Rights Law claim is to find the interpretation for the City Law that most robustly furthers the purposes of the City statute.

Governments > Legislation > Interpretation

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > General Overview

*HN22* **Legislation, Interpretation**

The Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), makes clear, with specific statutory language, that the obligation to determine what interpretation best fulfills New York City Human Rights Law's purposes is in no way limited by the existence of cases that have interpreted analogous federal civil rights provisions. *Administrative Code of the City of NY § 8-130*.

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > General Overview

*HN23* Discrimination, Gender & Sex Discrimination

The New York City Human Rights Law is explicitly designed to be broader and more remedial than the Supreme Court's "middle ground," a test that had sanctioned a significant spectrum of conduct demeaning to women. With this broad remedial purpose in mind, questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability.

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > General Overview

*HN24* Discrimination, Gender & Sex Discrimination

In a sexual discrimination context, the "severe or pervasive" test reduces the incentive for employers to create workplaces that have zero tolerance for conduct demeaning to a worker because of protected class status. In contrast, a rule by which liability is normally determined simply by the existence of differential

treatment (i.e., unwanted gender-based conduct) maximizes the law's deterrent effect. It is the latter approach--maximizing deterrence--that incorporates traditional methods and principles of law enforcement, one of the principles by which judicial analysis must be guided.

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > General Overview

*HN25* Discrimination, Gender & Sex Discrimination

Both *Administrative Code of the City of NY § 8-101* and the Committee Report accompanying the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), say the analysis of the New York City Human Rights Law must be guided by the need to make sure that discrimination plays no role, a principle much more consistent with a rule by which liability is normally determined simply by the existence of unwanted gender-based conduct.

Labor & Employment
Law > Discrimination > Gender & Sex
Discrimination > General Overview

*HN26* Discrimination, Gender & Sex Discrimination

The "severe or pervasive" doctrine, by effectively treating as actionable only a small subset of workplace actions that demean women or members of other protected classes, is contradicted by the principle in the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), that discrimination violations are per se "serious injuries."

Labor & Employment
Law > Discrimination > Actionable Discrimination

*HN27* Discrimination, Actionable Discrimination

The fact that conduct is actionable does not control the amount of damages to be awarded.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***433; 2009 NY Slip Op 440, ****1

Overview

Labor & Employment
Law > Discrimination > Actionable Discrimination

_HN28_ **Summary Judgment, Entitlement as Matter of Law**

In the "mixed motive" context, the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for a defendant's conduct. Under _Administrative Code of the City of NY § 8-101_, discrimination shall play no role in decisions relating to employment, housing, or public accommodations.

Labor & Employment
Law > Discrimination > Actionable Discrimination

_HN29_ **Discrimination, Actionable Discrimination**

In a discrimination context, the task under the New York City Human Rights Law (City HRL), as amended by the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), is not to ask, "Would a proposed interpretation differ from federal law?," but rather, "How differently, if at all, should harassment and non-harassment sex discrimination cases be evaluated to achieve the City HRL's uniquely broad and remedial purposes?"

# Headnotes/Summary

**Headnotes**

**Civil Rights -- New York City Human Rights Law -- Unlawful Retaliation -- Effect of Local Civil Rights Restoration Act of 2005**

1. Plaintiff, an employee of defendant New York City Housing Authority, failed to state a claim for unlawful retaliation under the State's Human Rights Law (_Executive Law § 296 [7]_) based upon her one-time "out-of title" assignment to strip and wax the boiler room office floor after she made complaints about discriminatory treatment, and also failed to state a retaliation claim under the City's Human Rights Law (HRL) (Administrative Code of City of NY § 8-107 [7]), even though the HRL, as amended by the Local Civil Rights Restoration Act of 2005 (_see Administrative Code § 8-130_) is required to be liberally construed

independently from its state and federal counterparts in order to accomplish the statute's "uniquely broad and remedial" purposes. Even under a broader construction of the HRL's antiretaliation provision, which proscribes workplace retaliation "in any manner," plaintiff's retaliation claim failed. Plaintiff failed to link her complained-of assignment to a retaliatory motivation, and otherwise failed to demonstrate that her assignment to do field work and respond to tenant complaints and defendant's failure to grant her "excused time" to deal with a parking ticket were attributable to retaliation.

**Civil Rights -- New York City Human Rights Law -- Sexual Harassment -- Effect of Local Civil Rights Restoration Act of 2005**

2. Plaintiff, an employee of defendant New York City Housing Authority, failed to state a sexual harassment claim under the State's Human Rights Law (_Executive Law § 296 [1] [a]_) based upon the finding that the alleged sexual harassment was not "severe or pervasive" and thus not actionable, and also failed to state a claim under the City's Human Rights Law (HRL) (Administrative Code of City of NY § 8-107 [1] [a]), even though the HRL, as amended by the Local Civil Rights Restoration Act of 2005 (_see Administrative Code § 8-130_) is required to be liberally construed independently from its state and federal counterparts in order to accomplish the statute's "uniquely broad and remedial" purposes. In view of the statute's construction provision, the more restrictive "severe and pervasive" test otherwise applicable to state and federal sexual harassment claims is no longer applicable to gender-based discrimination claims under the HRL. Rather, liability should be determined by the existence of unequal treatment based on gender, with questions of "severity" and "pervasiveness" being reserved for consideration of damages. Here, however, defendant successfully asserted an affirmative defense to avoid liability by demonstrating that the conduct complained of in plaintiff's presence on one occasion during the applicable limitations period could not be interpreted by a trier of fact as anything other than "petty slights" or "trivial inconveniences." Furthermore, in the absence of any connection to actionable conduct during the limitations period, the continuing violation doctrine did not render the complaint about a pre-limitations period comment timely.

**Counsel: [***1]** _Gina Williams_, appellant pro se.

_Ricardo Elias Morales_, New York City (_Steven J._

61 A.D.3d 62, *62; 872 N.Y.S.2d 27, **27; 2009 N.Y. App. Div. LEXIS 433, ***1; 2009 NY Slip Op 440, ****1

*Rappaport* and *Donna M. Murphy* of counsel), for respondents.

**Judges:** Richard T. Andrias, J.P., David B. Saxe, Luis A. Gonzalez, James M. Catterson, Rolando T. Acosta, JJ. Opinion by Acosta, J. All concur except Andrias, J.P. who concurs in the result only in a separate Opinion.

**Opinion by:** Rolando T. Acosta

# Opinion

Appeal from an order of the Supreme Court, New York County (Michael D. Stallman, J.), entered August 14, 2007. The order granted defendants summary judgment dismissing the amended complaint.

*Williams v New York City Hous. Auth.*, 2007 NY Slip Op 34401(U), affirmed.

 **[*63] [**29]**  Acosta, J.

Introduction

This appeal presents us with the opportunity to construe for the first time the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 of City of New York [2005]).

Defendants' summary judgment motion--addressed to an amended complaint alleging a hostile work environment, disparate treatment on the basis of sex, and retaliation in violation of **[****2]** applicable provisions of the Executive Law and the New York City Administrative Code--was granted in its entirety. While we agree with the motion court that the claims arising under both **[*64]** the State and City Human Rights Laws must be dismissed, we take a different approach and **[***2]** consider the city claims under the commands of the Restoration Act, as a distinct analysis is required to fully appreciate and understand the distinctive and unique contours of the local law in this area.

Background

Plaintiff was, at all times relevant to the action, an employee of defendant Housing Authority. From November 1995 to June 2004, she worked as a heating plant technician assigned to the Authority's South Jamaica Houses development. As such, she was responsible for maintaining the development's heating system.

The pro se plaintiff commenced this action in August 2001. After converting defendants' dismissal motion to one for summary judgment, Justice Louise Gruner Gans dismissed the claims asserted under title VII of the federal Civil Rights Act of 1964 (as amended), and otherwise granted plaintiff's motion for leave to amend the complaint. In the 2003 amended complaint, plaintiff alleged that defendants engaged in, or permitted, a hostile work environment, disparate treatment on the basis of sex, and retaliation, all in violation of *Executive Law § 296 (1) (a)*; *(6)* and *(7)* and Administrative Code § 8-107 (1) (a); (6) and (7).

 **[**30]** Plaintiff alleged she was sexually harassed in January **[***3]** 1997, when her supervisor allegedly told her, after she had requested facilities to take a shower, "You can take a shower at my house." Plaintiff alleged a second incident on October 21, 1998, where sex-based remarks were made in her presence, although not directed at her. Plaintiff interpreted some of those remarks as being complimentary to a coworker, and a disparaging reference to the supervisor's own wife.

For her disparate treatment claim, plaintiff alleged that her supervisor denied her tools that she needed for her work, preferred (higher paying) shifts, and some training, all during her probationary year (i.e., no later than 1996). Plaintiff acknowledges that she was ultimately permitted to work the preferred shifts when they were vacated by employees of longer standing. She also alleged that she was denied two training opportunities in 2001. The record reflects that plaintiff did participate in other substantial training throughout her tenure.

Plaintiff asserted that she was retaliated against after making complaints about discriminatory treatment. She alleges that in **[*65]** August 1999 she had to do work outside of her regular duties; specifically, she was required to strip and wax **[***4]** the boiler room office floor, a task that she completed in two regular workdays. Plaintiff also asserted that in August 2001, she was required to perform work in the field and to respond to tenant complaints, work she claimed was customarily given to utility staff. She alleged that a 2002 incident of retaliation consisted of her supervisor's refusal to permit her to take "excused time" to resolve a parking ticket she had received.

Plaintiff was promoted in June 2004 to become an assistant superintendent.

61 A.D.3d 62, *65; 872 N.Y.S.2d 27, **30; 2009 N.Y. App. Div. LEXIS 433, ***4; 2009 NY Slip Op 440, ****2

In August 2007, the court (Michael D. Stallman, J.) granted defendants' motion for summary judgment dismissing the amended complaint in its entirety (2007 NY Slip Op 34401[U]). The sexual harassment claim was dismissed on the basis that the conduct complained of was not "severe or pervasive." (*Id.* at *4.)

 **[****3]** On the disparate treatment claim, the court found the allegations from plaintiff's probationary year were time-barred because they were not part of a continuing pattern of discriminatory conduct. It also found that plaintiff had attended at least nine one- or two-day training courses, and did not allege that she suffered any injury as a result of not attending more. Finally, it found that plaintiff accepted a promotion offered **[***5]** in May 2004, and had not claimed that she would have been promoted earlier had she taken more classes. The court characterized the disparate treatment claim as missing the necessary element of an "adverse employment action." (*Id.* at *5.)

Evaluating the retaliation claim, the court found that a one-time assignment to perform a task arguably within plaintiff's duties did not constitute retaliation, and that the other claims did not involve being treated differently from workers who had not complained.

We agree with the court's analysis as it pertains to plaintiff's state claims under the Executive Law. The decision dismissing the action failed, however, to properly construe plaintiff's claims under **HN1** the Restoration Act, 1 which mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by the City Human Rights Law (City HRL), requiring an analysis more stringent than that called for under either title VII or the State Human Rights Law (State **[**31]** HRL). In **[*66]** light of this explicit legislative policy choice by the City Council, we separately analyze plaintiff's City HRL claims.

I. Requirements and Purposes of the Restoration Act

While the Restoration Act amended the City HRL **[***6]** in a variety of respects, 2 the core of the

measure was its revision of *Administrative Code § 8-130*, the construction provision of the City HRL:

> **HN2** "The provisions of this [chapter] *title* shall be construed liberally for the accomplishment of the *uniquely broad and remedial* purposes thereof, *regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.*" (Local Law 85 §7 [deleted language in brackets, new language emphasized].)

**HN3** As a result of this revision, the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding **[***7]** and fulfilling **[****4]** what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart state or federal civil rights laws.

Section 1 of the Restoration Act amplifies this message. It states that the measure was needed because the provisions of the City HRL had been "construed too narrowly to ensure protection of the civil rights of all persons covered by the law." It goes on to **HN4** mandate that provisions of the City HRL be interpreted "independently from similar or identical provisions of New York state or federal statutes." (*Id.*) Taking sections 1 and 7 of the Restoration Act together, it is clear that interpretations of state or federal provisions worded similarly to City HRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed "as a floor below which the City's Human Rights Law cannot fall, rather **[*67]** than a ceiling above which the local law cannot rise" (§1), and only to the extent that those state or federal law decisions may provide guidance as to the "uniquely broad and remedial" provisions of the local law (§7).

The Committee Report accompanying the legislation likewise states that **[***8]** the intent of the Restoration Act was to "ensure construction of the City's human rights law in line with the purposes of fundamental amendments to the law enacted in 1991," and to reverse the pattern of judicial decisions that had improvidently "narrowed the scope of the law's protections" (Rep of Comm on Gen Welfare, 2005 NY City Legis Ann, at 536).

---

1 *See* 2005 NY City Legis Ann, at 528-535.

2 These include reemphasizing the breadth of the anti-retaliation requirement, discussed *infra,* in part II. Other provisions include creating protection for domestic partners, increasing civil penalties for claims brought administratively, restoring attorney's fees for "catalyst" cases, and requiring

---

thoroughness in administrative investigations conducted by the New York City Human Rights Commission.

61 A.D.3d 62, *67; 872 N.Y.S.2d 27, **31; 2009 N.Y. App. Div. LEXIS 433, ***8; 2009 NY Slip Op 440, ****4

The City Council's debate on the legislation made plain the Restoration Act's intent and consequences:

"Insisting that our local law be interpreted broadly and independently will safeguard New Yorkers at a time when federal and state civil rights protections are in jeopardy. There are many illustrations of cases, like *Levin* on marital status, *Priore*[,] *McGrath* and *Forrest* that have either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore [*sic*] [**32] the text of specific provisions of the law, or both. With [the Restoration Act], these cases and others like them, will no longer hinder the vindication of our civil rights." [3]

In other words, HN5 the Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes, [4]  [*68] and (c) cases that had failed to respect these differences were being legislatively overruled.

There is significant guidance in understanding the meaning of the term "uniquely broad and remedial." For example, in telling us that the City HRL is to be interpreted "in line with the purposes of the fundamental amendments to the law enacted in 1991," the Council's

committee was referring to amendments [5]  that were

"consistent in tone and approach: every change either expanded coverage, limited an exemption, increased responsibility, or broadened remedies. In case after case, the balance struck by the Amendments favored victims and the interests of enforcement over the claimed needs of covered entities in ways materially different from those incorporated into state and federal law." [6]

The Council directs courts to the key principles that should guide the analysis of claims brought under the City HRL:

HN6 "discrimination should not play a role in decisions made by employers, landlords and providers of public accommodations; traditional methods and principles of law enforcement ought to be applied in the civil rights context; and victims of discrimination suffer serious injuries, for which they ought to receive full compensation" (Committee Report, 2005 NY City Legis Ann, at 537).

 [****5]  In short, the text and legislative history represent a desire that the City HRL "meld the broadest vision of social justice with the strongest law enforcement deterrent." [7]  Whether or not [*69] that

---

[3] Statement of Annabel Palma at the meeting of the NY City Council (Sept. 15, 2005, transcript at 41). Council Member Palma was a member of the Committee on General Welfare  [***9] that had brought the bill to the floor of the Council. Committee Chairman Bill deBlasio emphasized that "localities have to stand up for their own visions" of "how we protect the rights of the individual," regardless of federal and state restrictiveness (transcript at 47). Council Member Gale Brewer, the chief sponsor of the Restoration Act, reiterated the comments of Palma and deBlasio, and the importance of making sure that civil rights protections "are stronger here than [under] the State or federal law" (transcript at 48-49). (Transcript on file with NY City Clerk's Office and NY Legislative Service.)

[4] The City Council in amending Administrative Code § 8-130 could have mandated that "some" provisions of the law be "construed liberally for the accomplishment of the uniquely broad and  [***10] remedial purposes thereof" or that "new" provisions of the law be so construed. The Council instead made the "shall construe" language applicable to "[t]he provisions of this title" without limitation.

---

[5] Local Law No. 39 (1991) of City of NY.

[6] (Professor Craig Gurian, *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law*, 33 Fordham Urb LJ 255, 288 [2006].) The article--described elsewhere as "an extensive analysis of the purposes of the Local Civil Rights Restoration Act,  [***11] written by one of the Act's principal authors" (Ochei v Coler/Goldwater Mem. Hosp., 450 F Supp 2d 275, 283 n 1 [SD NY 2006])--summarizes some of the dramatic changes of the 1991 Amendments (see Gurian, at 283-88).

[7] (Gurian, *A Return to Eyes on the Prize*, 33 Fordham Urb LJ at 262.) This is consistent with statements and testimony of the Association of the Bar of the City of NY (letter dated Aug.  [**12] 1, 2005), the Brennan Center for Justice at New York University School of Law (July 8, 2005), and the Anti-Discrimination Center of Metro New York, Inc. (Apr. 14, 2005), all on file with the Committee on General Welfare and the NY Legislative Service, each confirming that the Council sought to have courts maximize civil rights protections. For example, the Bar Association, at page 4 of its letter, referred to "the Council's clear intent to provide the greatest possible protection for civil rights." At the Council's debate prior to passage, Council Member Palma described the Bar Association and Brennan Center statements as important to

61 A.D.3d 62, *69; 872 N.Y.S.2d 27, **32; 2009 N.Y. App. Div. LEXIS 433, ***12; 2009 NY Slip Op 440, ****5

desire is wise **[**33]** as a matter of legislative policy, our judicial function is to give force to legislative decisions. [8]

As New York's federal and state trial courts begin to recognize the need to take account of the Restoration Act, the application of the City HRL as amended by the Restoration Act must become the rule and not the exception. [9]

---

the Committee, and characterized the Anti-Discrimination Center's testimony as "an excellent guide to the intent and consequences of [the] legislation we pass today." (Transcript at 41.)

[8] We note in this context two cardinal rules of statutory construction: that *HN7* legislative amendments are "deemed to have intended a material change in the law" (McKinney's Cons Laws of NY, Book 1, Statutes §193 [a]), and that *HN8* "courts in construing a statute should consider the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy" (*id.* §95). As such, we are not free to give force **[***13]** to one section of the law that has specifically been amended (*e.g.* Administrative Code § 8-107 [7]) and decline to give force to another (*e.g.* § 8-130). We must give force to all amendments, and not relegate any of them to window dressing.

[9] *See e.g. Selmanovic v NYSE Group, 2007 US Dist LEXIS 94963, *9-20, 2007 WL 4563431 *4-6 (SD NY)* (recognizing the Restoration Act's enhanced liberal construction requirement, and its impact on sexual harassment and retaliation claims under the local law); *Pugliese v Long Is. R.R. Co., 2006 US Dist LEXIS 66936, *38-40, 2006 WL 2689600, *12-13 (ED NY)* (identifying *HN9* Administrative Code § 8-107 (13) (b) (1) as the city law's explicit statutory basis for imposing vicarious liability on those exercising managerial or supervisory authority, and noting that "the breadth and scope of CHRL will often yield results different from Title VII" [*2006 WL 2689600 at *13, 2006 US Dist LEXIS 66936 at *40]*); Okayama v Kintetsu World Express (U.S.A.) (2008 WL 2556257 [Sup Ct, NY County] (holding that *HN10* the explicit **[***14]** statutory structure of Administrative Code § 8-107 [13] [b] precludes the availability of the federal *Faragher* affirmative defense where the conduct of those exercising managerial or supervisory authority is at issue); *Farrugia v North Shore Univ. Hosp., 13 Misc 3d 740, 820 NYS2d 718, (2006)* (noting that *HN11* "The New York City Human Rights Law was intended to be more protective than the state and federal counterparts"); *Bumpus v New York City Tr. Auth, 18 Misc. 3d 1131[A], 859 NYS2d 893, 2008 NY Slip Op 50254[U], 2008 NY Misc LEXIS 4628, *7, 2008 WL 399147, *3* (noting that "The legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation").

**[****6]** II. Retaliation

In 1991, the anti-retaliation provision of the City HRL (Administrative Code § 8-107 [7])--which had been identical to **[*70]** the State HRL provision--was amended in pertinent part to proscribe retaliation "*in any manner*" (Local Law 39 [1991], § 1). If courts were to construe this language to make actionable only conduct that has caused a materially adverse impact on terms and conditions of employment, it would constitute a significant narrowing of the Council's proscription on retaliation "in any manner." However, courts have consistently engaged in **[***15]** this construction. Therefore, the City Council was determined, via the Restoration Act of 2005, to

> "make clear that the standard to be applied to retaliation claims under the City's human rights law differs from the standard currently applied by the Second Circuit in [title VII] retaliation claims … [and] is in line with the standard set out in the guidelines of the Equal Employment Opportunity Commission" (Committee Report, 2005 NY City Legis Ann, at 536).

In **[**34]** section 8 (D) (3) of its Compliance Manual (1998), dealing with the subject of retaliation, the Equal Employment Opportunity Commission (EEOC) indicates that the

> "broad view of coverage accords with the primary purpose of the anti-retaliation provisions, which is to '[m]aintain[] unfettered access to statutory remedial mechanisms.' *HN12* Regardless of the degree or quality of harm to the particular complainant, retaliation harms the public interest by deterring others from filing a charge. An interpretation of Title VII that permits some forms of retaliation to go unpunished would undermine the effectiveness of the EEO statutes and conflict with the language and purpose of the anti-retaliation provisions" (citations omitted). [10]

*HN13* To accomplish the purpose of giving force to the earlier proscription on retaliation "in any manner," the Restoration Act amended § 8-107 (7) to emphasize that

---

[10] The Committee Report cited, inter alia, *Ray v Henderson (217 F3d 1234, 1241-1243 [9th Cir 2000])* **[***16]** to help illustrate the broad sweep of the reemphasized city anti-retaliation provision.

61 A.D.3d 62, *70; 872 N.Y.S.2d 27, **34; 2009 N.Y. App. Div. LEXIS 433, ***16; 2009 NY Slip Op 440, ****6

"[t]he retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse [*71] change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

HN14 In assessing retaliation claims that involve neither ultimate actions nor materially adverse changes in terms and conditions of employment, it is important that the assessment be made with a keen sense of workplace realities, of the fact that the "chilling effect" of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities. [11] Accordingly, HN15 the language of the City HRL does not permit any type [***17] of challenged conduct to be categorically rejected as nonactionable. On the contrary, no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, "reasonably likely to deter a person from engaging in protected activity." [12]

[1] Turning to the retaliation claims, it is clear that even under this broader construction, plaintiff's claim that her assignment to strip and wax the boiler room office floor did not constitute retaliation. It is certainly possible for a jury to conclude that someone would be deterred from making a complaint if knowing that doing so might result

_____

[11] See discussion in *A Return to Eyes on the Prize* 33 Fordham Urb LJ at 321-322.

[12] Subsequent to passage of the Restoration Act, the U.S. Supreme Court modified the title VII anti-retaliation standard (*Burlington N. & Santa Fe Ry. Co. v White, 548 US 53, 126 S Ct 2405, 165 L Ed 2d 345 [2006]*). In doing so, however, *Burlington* still spoke in terms of "material adversity," i.e., conduct that might have dissuaded a reasonable worker from making or supporting a charge of discrimination (*id. at 68*). While this was a standard similar to that set forth in section 8-107 (7), it cannot be assumed that cases citing *Burlington* adequately convey the full import of the City HRL standard, especially because the confusing use of the term "materially adverse" might lead some courts to screen out some types of conduct *prior* to conducting "reasonably likely to deter" analysis. In fact, to reiterate, section [***18] 8-107 (7) specifically rejects a materiality requirement.

in being assigned to duties outside or beneath one's normal work [**35] tasks. However, an examination of this record shows conclusively [****7] that plaintiff cannot link her complained-of assignment to a retaliatory motivation. The same allegedly "out of title" work was given to noncomplaining employees for whom the work was not normally part of the job.

[*72] Although not raised expressly on appeal by the pro se plaintiff, her other retaliation claims are similarly unavailing. Her assignment to do field work and respond to tenant complaints did not represent a difference in treatment attributable to retaliation, since the record shows that other workers (who did not complain of discrimination) were given similar assignments. The failure to grant plaintiff "excused time" to deal with a parking ticket also did [***19] not represent a difference in treatment from workers who did not complain of discrimination. [13] Accordingly, plaintiff's retaliation claim must fail.

III. Continuing Violations

In *National R.R. Passenger Corp. v Morgan (536 US 101, 122 S Ct 2061, 153 L Ed 2d 106 [2002])*, the Supreme Court established that HN16 for federal law purposes, the "continuing violation" doctrine only applied to harassment claims as opposed to claims alleging "discrete" discriminatory acts. At the time the comprehensive 1991 Amendments to the City HRL were enacted, however, federal law in the Second Circuit did not so limit continuing violation claims (*see e.g. Acha v Beame, 570 F2d 57, 65 [2d Cir 1978]* [holding that a continuing violation would exist if there had been a continuing policy that "limited opportunities for female participation" in the work force, including policies related to "hiring, assignment, transfer, promotion and discharge"]; *see also Cornwell v Robinson, 23 F3d 694, 704 [2d Cir 1994]* [reaffirming the vitality of the [***20] continuing violation doctrine where there had been a consistent pattern of discriminatory hiring practices]). There is no reason to believe that the Supreme Court's more restrictive rule of 2002 was anticipated when the City HRL was amended in 1991, or even three years after that ruling, when the Restoration

_____

[13] There is no evidence in the record to suggest that in the circumstances presented, the failure to grant such time off was an act reasonably likely to deter a person from engaging in protected activity.

61 A.D.3d 62, *72; 872 N.Y.S.2d 27, **35; 2009 N.Y. App. Div. LEXIS 433, ***20; 2009 NY Slip Op 440, ****7

Act was passed in 2005. [14] **[****8]** On the contrary, **HN17** the Restoration Act's uniquely remedial provisions **[*73]** are consistent with a rule that neither penalizes workers who hesitate to bring an action at the first sign of what they suspect could be discriminatory trouble nor rewards covered entities that discriminate by insulating them from challenges to their unlawful conduct that continues into the limitations period. **[**36]** The continuing violation doctrine is discussed in the specific context of plaintiff's sexual harassment and disparate treatment claims, infra, at parts IV and V, respectively.

### IV. Sexual Harassment

**[2]** In 1986 the Supreme Court ruled, for federal law purposes, that sexual harassment must be "severe or pervasive" before it could be actionable (*Meritor Sav. Bank, FSB v Vinson, 477 US 57, 67, 106 S Ct 2399, 91 L Ed 2d 49 [1986]*)[15] The "severe or pervasive" rule has

---

[14] See, for example, the statement of then-Mayor Dinkins in connection with the signing of the 1991 Amendments, quoted in the 2005 Committee Report, that "there is no time in the modern civil rights era when vigorous local enforcement of anti-discrimination laws has been more important. Since 1980, the federal government **[***21]** has been marching backward on civil rights issues" (Committee Report, 2005 NY City Legis Ann, at 536). This desire for enhanced liberal construction was directly resisted in *McGrath v Toys "R" Us, Inc. (3 NY3d 421, 821 NE2d 519, 788 NYS2d 281 [2004])*, a case in which a narrow, post-1991 interpretation of federal law was transplanted into the Administrative Code without Council action (Committee Report at 537). Indeed, one motivation expressed by the Committee for passing the Restoration Act was that construction of numerous provisions of the City HRL "narrowed the scope of the law's protections" (*id.* at 536). *McGrath* was specifically identified on the floor of the Council as a case inconsistent with the requirements of the Restoration Act (*see* Council Member Palma's statement preceding footnote 3, *supra*).

[15] Although the assumption has been that such a rule applies to the City HRL (see, for example, the recent case of *Gallo v Alitalia-Linee Aeree Italiane-Societa Per Azioni, [585 F. Supp. 2d 520, 2008 US Dist LEXIS 94195, *26-30, 2008 WL 865036, *10-11 (SD NY 2008)]*), the fact is that "severe or pervasive" was not the accepted City HRL rule at the time of the 1991 Amendments (see discussion in *A Return to Eyes on the Prize [33 Fordham Urb LJ at 300-301]*). Moreover, **HN18** there is no evidence that "severe or pervasive" has ever been subjected to liberal construction analysis, let alone the enhanced analysis required by the Restoration Act.

resulted in courts "assigning a significantly lower importance to the right to work in an atmosphere free from discrimination" than other terms and conditions of work. [16] The rule (and its misapplication) has **[***22]** routinely barred the courthouse door to women who have, in fact, been treated less well than men because of gender. [17] **[****9]**

Before the Restoration Act, independent development of the City HRL was limited by the assumption that decisions interpreting **[***23]** federal law could safely be imported into local human rights law because, it was said, any broad anti-discrimination policies embodied in state or local law are "*identical* to those underlying the federal statutes" (*McGrath, 3 NY3d at 433* [emphasis added]). If the City Council had wanted to depart from a federal doctrine, *McGrath* stated, it should have **[*74]** amended the law to rebut that doctrine specifically (*id. at 433-434*). The City Council responded to the premise set forth in *McGrath*, legislatively overruling *McGrath* by amending the construction provision of *Administrative Code § 8-130*, and putting to an end this view of the City HRL as simply mimicking its federal and state counterparts. [18] By making a specific textual amendment to the construction provision (something not done in 1991), the Council formally and unequivocally rejected the assumption that the City HRL's purposes were identical to those of counterpart civil rights statutes. In its place, the Council instructed the courts--

---

[16] Judith J. Johnson, *License to Harass Women: Requiring Hostile Environment Sexual Harassment to be "Severe or Pervasive" Discriminates among "Terms and Conditions" of Employment*, *62 Md L Rev 85, 87 [2003]*).

[17] *Id. at 111-134* (describing a variety of techniques by which claims have been turned away using "severe or pervasive" as a shield for discriminators).

[18] (*See* Committee Report, 2005 NY City Legis Ann, at 537.) Importantly, the way that the Council responded to *McGrath* was not to be dealing with the specific topic of the case (the availability of attorney's fees in circumstances where only nominal damages were awarded), but by changing the method of analysis applicable to *all* provisions of the law. *McGrath*, of course, was also explicitly mentioned on the floor of the City Council as one of the cases that, with the passage of the Restoration Act, would--in Council Member Palma's words-- "no longer hinder the vindication of our civil rights" (see text preceding footnote 3, *supra*). In light of the foregoing, it is puzzling that *Gallo* would make the identical Council "could have done so" argument already specifically rejected by the Restoration Act (*see 585 F Supp 2d at 537*).

61 A.D.3d 62, *74; 872 N.Y.S.2d 27, **36; 2009 N.Y. App. Div. LEXIS 433, ***23; 2009 NY Slip Op 440, ****9

reflected in text and legislative history--that it wanted *HN19* the City HRL's provisions to be construed *more broadly than federal civil rights laws and the State HRL*, and wanted the local **[**37]** law's provisions to be construed **[***24]** as *more remedial than federal civil rights laws and the State HRL* (*Administrative Code § 8-130* [as amended by Local Law No. 85 [2005] §7]).

The Council saw the change to section *8-130* as the means for obviating the need for wholesale textual revision of the myriad specific substantive provisions of the law. While the specific *topical* provisions changed by the **[***25]** Restoration Act give unmistakable *illustrations* of the Council's focus on broadening coverage, section *8-130*'s specific *construction* provision required a "process of reflection and reconsideration" that was intended to allow independent development of the local law "in all its dimensions" (*A Return to Eyes on the Prize*, *33 Fordham Urb LJ at 280*).[19] **[****10]**

Accordingly, we first identify the provision of the City HRL we are interpreting and then ask, as required by the City **[*75]** Council: What interpretation "would fulfill the uniquely broad and remedial purposes of the City's human rights law"?[20]  *HN20* Despite the popular notion that "sex discrimination" and "sexual harassment" are

two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination. There is no "sexual harassment provision" of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender (Administrative Code § 8-107 [1] [a]).[21]  **[****11]**

As applied in the context of sexual harassment, therefore, the relevant question is what constitutes inferior terms and conditions based on gender. One approach would be to import the "severe or pervasive" test, a rule that the Supreme Court has characterized as "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to  **[***28]** cause a tangible psychological injury" (*Harris v Forklift Sys., 510 US 17, 21, 114 S Ct 367, 126 L Ed 2d 295  [**38]  [1993]*). This "middle path," however, says bluntly that a worker whose terms and conditions of employment include being on the receiving end of all unwanted gender-based conduct (except what is severe or pervasive) is experiencing essentially the same terms and conditions **[*76]** of employment as the worker whose employer has created a workplace free of unwanted gender-based conduct.

Twenty-two years after *Meritor (477 US 57, 106 S Ct 2399, 91 L Ed 2d 49 [1986])*, it is apparent that the two workers described above do not have the same terms and conditions of employment. Experience has shown that there is a wide spectrum of harassment cases falling between "severe or pervasive" on the one hand and a "merely" offensive utterance on the other.[22] *HN23* The City HRL is now explicitly designed to be broader and more remedial than the Supreme Court's

---

[19] See also page 4 of the Bar Association letter (*supra* at footnote 7), reciting the expectation that the undoing of narrow construction of the law by legislative amendment "should no longer be necessary" if there is judicial appreciation for the Restoration Act's intention that the law provide "the greatest possible protection for civil rights," and page 5 of the Brennan Center statement (same footnote), noting the suggestion that

"a better approach would be for the Council to limit itself to specifically overruling individual interpretations that it views as unduly restrictive. However, this approach has proven ineffective in the past, as the courts have tended to construe narrowly specific Council amendments. Without an explicit instruction that the City Human Rights Law should be construed independently, courts will continue to weaken New York **[***26]** City's Law with restrictive federal and state doctrines."

[20] See Committee Report (2005 NY City Legis Ann, at 538 n 8). See also page 4 of the Bar Association letter (*supra* at footnote 7) that construction must flow from "the Council's clear intent to provide the greatest possible protection for civil rights," and page 6 of the Anti-Discrimination Center testimony (same footnote) that "[i]n the end, *HN21* regardless of federal interpretations, the primary task of [a] judge hearing a City Human Rights Law claim is to find the interpretation  **[***27]** for the City law that most robustly further[s] the purposes of the City statute."

---

[21] The fact that title VII has language similar to that of the City HRL does not even begin our inquiry, let alone end it. *HN22* The Restoration Act made clear, with specific statutory language, that the obligation to determine what interpretation best fulfills the city law's purposes is in no way limited by the existence of cases that have interpreted analogous federal civil rights provisions (*Administrative Code § 8-130*; *cf. Gallo* [where the court apparently believed there was something called "the hostile work environment law" (*585 F Supp 2d at 538*), but never asked what interpretation of section 8-107 (1) (a)'s "terms (and) conditions" language would best fulfill the uniquely broad and remedial purposes of the City HRL]).

[22] It would be difficult to find a worker who viewed a job where she knew she would have to cope with unwanted gender-based conduct (except what is severe or pervasive) as equivalent to one free of unwanted gender-based conduct.

61 A.D.3d 62, *76; 872 N.Y.S.2d 27, **38; 2009 N.Y. App. Div. LEXIS 433, ***28; 2009 NY Slip Op 440, ****11

"middle ground," a test that had sanctioned a significant spectrum of conduct demeaning to women. With this broad remedial purpose in mind, we conclude that questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability **[\*\*\*29]** (*Farrugia, 13 Misc 3d at 748-749*).

In doing so, we note that **HN24** the "severe or pervasive" test reduces the incentive for employers to create workplaces that have zero tolerance for conduct demeaning to a worker because of protected class status. In contrast, a rule by which liability is normally determined simply by the existence of differential treatment (i.e., unwanted gender-based conduct) maximizes the law's deterrent effect. It is the latter approach--maximizing deterrence--that incorporates "traditional methods and principles of law enforcement," one of the principles by which our analysis must be guided (Committee Report, 2005 NY City Legis Ann, at 537). Permitting a wide range of conduct to be found beneath the "severe or pervasive" bar would mean that discrimination is allowed to play *some significant role* in the workplace. **HN25** Both *Administrative Code § 8-101* and the Committee Report accompanying the Restoration Act say the analysis of the City HRL must **[\*\*\*30]** be guided by the need to make sure that discrimination plays *no* role (2005 NY City Legis Ann, at 537), a principle again much more consistent with a rule by which liability is normally determined simply by the existence of unwanted gender-based conduct. Finally, **HN26** the "severe or pervasive" doctrine, by effectively treating as actionable only a small subset of workplace actions that demean women or members of other protected classes, is contradicted by the Restoration **[\*77]** Act principle that the discrimination violations are per se **[\*\*\*\*12]** "serious injuries" (*id.*). [23] Here again, a focus on differential treatment better serves the purposes of the statute.

Further evidence in the legislative history precludes making the standard for sexual harassment violations a carbon copy of the federal and state standard. The City HRL's enhanced liberal construction requirement was passed partly in recognition of multiple complaints that a change to section *8-130* was necessary to prevent women from being hurt by the unduly restrictive "severe or pervasive" standard. The Council had been told that the "severe or **[\*\*\*31] [\*\*39]** pervasive" standard

"continuously hurts women" and "means that many victims of sexual harassment may never step forward." [24] Likewise, the Council was told that "without any consideration of what **[\*\*\*\*13]** standard would best further **[\*78]** the purposes of the City Law, women who have been sexually harassed are routinely thrown out of court without getting a chance to have a jury hear their claims because a judge uses the federal standard that they have not been harassed enough" [25] and that "[w]e

_____

[24] (Kathryn Lake Mazierski, President, New York State Chapter of the National Organization for Women, testimony at hearing of the City Council's Committee on General Welfare, at 49-50 [Sept. 22, 2004] [NOW testimony, transcript on file with NY City Clerk's Office]). Note that *Gallo* asserts that organizations sought to have the "severe and pervasive" test "removed" from the City HRL, that the Council "ignored" that suggestion and "amended only those specific portions of the CHRL that the City thought needed to be addressed," **[\*\*\*32]** and that Professor Gurian's article supports that account (*585 F Supp 2d at 537*). In so stating, *Gallo* ignores the legislative history and mischaracterizes the article. In fact, as discussed *supra*, the most important specific textual changes made by the Council were the changes to section *8-130*--changes designed to control the construction of every other provision of the HRL, and so important that they were doubly emphasized in section 1 of the Restoration Act. Contrary to *Gallo*, neither the New York Chapter of NOW nor any of the other organizations that spoke to this issue had argued that the City Council should revise the text of section 8-107 (1) (a)'s terms and conditions provision to proscribe the "no severe or pervasive" limitation, and the Council made no decision to "adopt" the "severe or pervasive" rule. Instead, the organizations all raised the issue as part of their (successful) advocacy to have the language of section *8-130* changed. For example, Ms. Mazierski, after describing the "problem of hitching the local law to a federal standard" (NOW testimony at 47), argued for an enhanced liberal construction provision: "If judges are forced to look at a proper standard **[\*\*\*33]** for sexual harassment claims under the City's Human Rights Law, independent [of] the federal standard, *we will be able to have an argument on the merits and not be stuck on the standard that continuously hurts women*" (*id.* at 50 [emphasis added]). As for Professor Gurian's article, it set forth the decision that the City Council actually made, describing the enhanced liberal construction provision as the Restoration Act's "declaration of independence," and noting that areas of law that have been settled by virtue of interpretations of federal or state law "will now be reopened for argument and analysis… . As such, advocates will be able to argue afresh (or for the first time) a wide range of issues under the City's Human Rights Law, including the parameters of actionable sexual harassment" (*A Return to Eyes on the Prize*, *33 Fordham Urb LJ at 258*).

_____

[23] As already noted, **HN27** the fact that conduct is actionable does not control the amount of damages to be awarded.

[25] Brennan Center statement (*supra* at footnote 7) at page 5.

61 A.D.3d 62, *78; 872 N.Y.S.2d 27, **39; 2009 N.Y. App. Div. LEXIS 433, ***33; 2009 NY Slip Op 440, ****13

have long had the problem of judges insisting that harassment [has] to be 'severe or pervasive' before it is actionable, even though such a requirement unduly narrows the reach of the law." [26]

For HRL liability, therefore, the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated [***34] less well than other employees because of her gender. At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred (Administrative Code § 8-107 (1) (a); see _Farrugia, 13 Misc 3d at 748-749_ ["Under the City's law, liability should be determined by the existence of unequal treatment, and questions of severity and frequency reserved for consideration of damages" (quoted in _Selmanovic, 2007 US Dist LEXIS 94963, *11, 2007 WL 4563431, [**40] *4_]). [27] [****14]

_Farrugia_ was recently criticized in _Gallo_ for its focus on "'unequal' treatment," the latter decision insisting that the "severe or pervasive" restriction be applied to City HRL claims just as the restriction is applied to title VII and State HRL claims (_585 F Supp 2d at 537_). We conclude that the criticism simply [***35] does not recognize the City HRL's broader remedial purpose. The _Gallo_ decision states:

> "A single instance of 'unequal' treatment (between, say, a man and woman or a homosexual and heterosexual) can constitute 'discrimination,' but may not qualify as 'harassment' of the sort needed to create [*79] a hostile work environment. If inequality of treatment were all that the hostile work environment law required, hostile work environment and discrimination claims would merge." (_Id. at 537-538_.)

In other words, the _Gallo_ court begins with the premise that it is necessary to maintain the distinction that current federal law makes between non-harassment sex

discrimination claims on the one hand (where a permissive standard is applied) and sex discrimination claims based on harassment (where "hostile work environment" is the term of art describing the application of a restrictive standard). Contrary to the assumption embedded in _Gallo_, [28] _HN29_ the task under the City HRL, as amended by the Restoration Act, is not to ask "Would a proposed interpretation differ from federal law?" but rather "How differently, if at all, should harassment and non-harassment sex discrimination [***36] cases be evaluated to achieve the City HRL's uniquely broad and remedial purposes?" [29]

As discussed above, we conclude that a focus [***37] on unequal treatment based on gender-- regardless of whether the conduct is "tangible" (like hiring or firing) or not--is in fact the [****15] approach that is most faithful to the uniquely broad and remedial purposes of the local statute. To do otherwise is to permit far too much unwanted gender-based conduct to continue befouling the workplace.

Our task, however, is not yet completed because, while the City HRL has been structured to emphasize the vindication of civil rights over shortcuts that reduce litigation volume, we recognize that the broader purposes of the City HRL do not connote an intention that the law operate as a "general civility code" (_Oncale v Sundowner Offshore Servs., 523 US 75, 81, [**41] 118 S Ct 998, 140 L Ed 2d 201 [1998]_ [discussing title VII]). The way to avoid this result is [*80] not by adopting _Oncale_'s overly restrictive "severe or pervasive" bar, but by recognizing an affirmative

---

[26] Anti-Discrimination Center testimony (_supra_ at footnote 7) at page 2.

[27] _HN28_ In the "mixed motive" context, of course, the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct. Under _Administrative Code § 8-101_, discrimination shall play no role in decisions relating to employment, housing or public accommodations.

---

[28] Throughout this decision, we have referenced _Gallo_ to illustrate types of analyses that have now been rejected by the Restoration Act, but it is important to note that the Restoration Act will require many courts to approach the City HRL with new eyes. It is not that frequent that, as here, legislation is enacted "to remind, empower, and require judges to fulfill their essential role as active and zealous agents for the vindication of the purposes of the law" (_A Return to Eyes on the Prize, 33 Fordham Urb LJ at 290_). Nor are judges often urged by the legislative body to exercise judicial restraint against substituting their own more conservative social policy judgments for the policy judgments made by the Council or treating a local law as merely in parallel with its federal or state counterpart (_id._).

[29] _Cf._ Committee Report, 2005 NY City Legis Ann, at 538 n 8 (the Restoration Act "underscores the need for thoughtful, independent consideration of whether the proposed interpretation would fulfill the uniquely broad and remedial purposes of the City's human rights law").

61 A.D.3d 62, *80; 872 N.Y.S.2d 27, **41; 2009 N.Y. App. Div. LEXIS 433, ***37; 2009 NY Slip Op 440, ****15

defense whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider "petty slights and trivial inconveniences."

In doing so, we narrowly target concerns about truly insubstantial cases, while at the same time avoiding **[***38]** improperly giving license to the broad range of conduct that falls between "severe or pervasive" on the one hand and a "petty slight or trivial inconvenience" on the other. By using the device of an affirmative defense, we recognize that, in general, "a jury made up of a cross-section of our heterogeneous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation" (*Gallagher v Delaney, 139 F3d 338, 342 [2d Cir 1998]*). At the same time, we assure employers that summary judgment will still be available where they can prove that the alleged discriminatory conduct in question does not represent a "borderline" situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences.

In the instant case, the complaint was filed in August 2001. As such, actions that occurred prior to August 1998 would normally be barred except if the continuing violation doctrine applies. During the limitations period, the only harassment allegation supported by evidence that could be credited by a jury consists of comments made in plaintiff's **[***39]** presence on one occasion in October 1998 that were not directed at her, and were perceived by her as being in part complimentary to a coworker. These comments were, in view of plaintiff's own experience and interpretation, nothing more than petty slights or trivial inconveniences, and thus are not actionable. [30]

Prior to the limitations period, the record does reflect the inappropriate comment about taking a shower, made in January 1997 (i.e., 19 months before the start of the limitations period). Since this pre-limitations period comment was not joined to actionable **[*81]** conduct within the **[****16]** limitations period, [31] the continuing

violation doctrine does not render the complaint about the January 1997 comment timely. Accordingly, plaintiff's sexual harassment claims must fail.

## V. **[***40]** Other Disparate Treatment Claims

Plaintiff's allegations regarding not initially being provided with necessary tools and not being assigned to more desirable work-shift assignments refer to conduct in 1995 and 1996. The absence of any problem for at least 20 months prior to the start of the limitations period does not evidence a "consistent pattern," and in any event, there is no connection to actionable conduct during the limitations period. Plaintiff does not show differences in treatment with male workers in the limitations period; like other workers, she received **[**42]** substantial training. [32] It is thus unnecessary to reach the issue of the "materiality" of these non-harassment claims. [33]

Accordingly, the order of Supreme Court, New York County (Michael D. Stallman, J.), entered August 14, 2007, which granted defendants summary judgment dismissing the amended complaint, should be affirmed, without costs.

**Concur by:** Richard T. Andrias

# Concur

ANDRIAS, J.P. (concurring in the result only). **[****17]** Because my learned colleagues insist on addressing

---

[30] One can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable. No such circumstances were present here.

[31] The lack of actionable gender-based discrimination in this case (to which a pre-limitations period harassing comment

could otherwise be linked) is discussed infra, in part V.

[32] The record shows that plaintiff was, in fact, absent on two occasions, but complained about being denied training.

[33] In view of the Restoration Act's rejection of *Forrest v Jewish Guild for the Blind (3 NY3d 295, 819 NE2d 998, 786 NYS2d 382 [2004])* and *Galabya v New York City Bd. of Educ. (202 F3d 636 [2d Cir 2000])*, two of the cases cited by the court below, that issue would need to be decided afresh with due regard for the commands of the enactment (*see e.g.* Council Member Palma's statement preceding footnote 3, *supra* [that cases like **[***41]** these "will no longer hinder the vindication of our civil rights"]; *see also* Committee Report, 2005 NY City Legis Ann, at 537 [demanding that "discrimination … not play a role"], at 538 n 4 [contrasting *Galabya* with the Council's preferred approach to materiality]). However, given the factual circumstances of the instant case, such a determination is not necessary.

61 A.D.3d 62, *81; 872 N.Y.S.2d 27, **42; 2009 N.Y. App. Div. LEXIS 433, ***41; 2009 NY Slip Op 440, ****17

and deciding an issue that was raised neither below nor on appeal, I would affirm for the reasons stated by the motion court which, in pertinent part, properly dismissed plaintiff's claim for retaliation upon a finding that a one-time assignment to strip and wax the boiler room floor - a task that was, at least arguably, a part of her duties - did not constitute retaliation.

[*82] Relying upon the Supreme Court's [***42] decision in *Burlington N. & Santa Fe Ry. Co. v White (548 US 53, 67-68, 126 S Ct 2405, 165 L Ed 2d 345 [2006])* for its holding that "actionable retaliation" is that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotations and citations omitted), plaintiff succinctly argues on appeal that a reassignment of duties can constitute retaliatory discrimination even where both the former and present duties fall within the same job description, that a jury could reasonably conclude the reassignment would have been "materially adverse to a reasonable employee," and that the motion court inappropriately assessed the credibility of the witnesses' statements regarding that assignment.

My colleagues find no merit to plaintiff's arguments and agree with the motion court's analysis as pertinent to plaintiff's State Human Rights Law claim, but take issue with its decision because it failed to construe her claim according to the standard set forth in the Local Civil Rights Restoration Act of 2005. However, neither at nisi prius nor on appeal has plaintiff enunciated a specific claim under the New York City Human Rights Law. Moreover, even if it could be argued [***43] that, by amending her verified complaint to add in its introduction that "This is an action pursuant to the *New York Executive Law §§ 296 (a) (1) [sic],(6), (7)* and New York City Administrative Code §§ 8-107 (a) (1) [sic], (6), (7), of a hostile work environment and retaliation to vindicate the civil rights of plaintiff," she had actually raised the issue, she clearly has not pursued it on appeal.

[**43] The question of whether we should be deciding appeals on the basis of arguments not raised by the parties on appeal has recently become a recurring issue in this Court. It is, however, a fundamental principle of appellate jurisprudence that arguments raised below but not pursued on appeal are generally deemed abandoned, and such arguments, which are therefore not properly before us, should not be considered (*see McHale v Anthony, 41 AD3d 265, 266-267, 839 NYS2d 33 [2007]*). The rationale for such principle, as

expressed by this Court, is that deciding issues not even raised or addressed in the parties' briefs would be so unfair to the parties as to implicate due process concerns (*id. at 267*).

"By any standard it would be unusual behavior for an appellate court to reach and determine an issue never presented in a litigation, [***44] and to do so without providing an opportunity for the adversely affected parties to be heard on a question which they had no [*83] reason to believe was part of the litigation" (*Grant v Cuomo, 130 AD2d 154, 176, 518 NYS2d 105 [1987]*, affd *73 NY2d 820, 534 NE2d 32, 537 NYS2d 115 [1988]*).

"These principles are not mere technicalities, nor are they only concerned with fairness to litigants, important as that goal is. They are at the core of the distinction between the Legislature, which may spontaneously change the law whenever it perceives a public need, and the courts which can only announce the [****18] law when necessary to resolve a particular dispute between identified parties. It is always tempting for a court to ignore this restriction and to reach out and settle or change the law to the court's satisfaction, particularly when the issue reached is important and might excite public interest. However, it is precisely in those cases that the need for judicial patience and adherence to the common-law adversarial process may be--or is often greatest" (*Lichtman v Grossbard, 73 NY2d 792, 794-795, 533 NE2d 1048, 537 NYS2d 19 [1988]*).

For my colleagues to adopt a new and supposedly more liberal standard for determining liability under the City's Human Rights Law and to abandon [***45] the present, supposedly unduly restrictive, "severe or pervasive" standard in favor of one that "is most faithful to the uniquely broad and remedial purposes of the local statute," without any input from the parties concerned, flies in the face of these well settled principles.

In *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law* (*33 Fordham Urb LJ 255 [2006]*), which my colleagues repeatedly cite with approval, the author, who is described as "the principal drafter of the Local Civil Rights Restoration Act" of 2005, complains that the failure of such reforms to achieve their potential is due in significant part to the supposed "unwillingness of judges to engage in an independent analysis of what interpretation of the City Human Rights Law would best

61 A.D.3d 62, *83; 872 N.Y.S.2d 27, **43; 2009 N.Y. App. Div. LEXIS 433, ***45; 2009 NY Slip Op 440, ****18

effectuate the purposes of that law" (*id. at 255 n a1*, *id. at 255-256*). However, in the next breath, he states: "In fairness, advocates for victims of discrimination must also take responsibility for the stunted state of City Human Rights Law. On far too many occasions, courts have not been asked to engage in this independent analysis" (*id. at [****19] 256 n 5*). That is exactly the case here, and my colleagues' departure **[***46]** from the normal rules governing appellate courts is singularly unwarranted (*see Grant, 130 AD2d at 176*).

Saxe, Gonzalez and Catterson, JJ., concur with Acosta, J.; Andrias, J.P., concurs in the result only in a separate opinion.

Order, Supreme Court, New York County (Michael D. Stallman, J.), entered August 14, 2007, affirmed, without costs.

---

**End of Document**